## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MEAGHAN BAUER,** | ) | |
| 80 Foster Street, Apt. 308 | ) | |
| Peabody, MA 01960, | ) | |
| | ) | |
| **STEPHANO DEL ROSE,** | ) | |
| 7 Pleasant Garden Road | ) | Civil Action No. 17-1330 |
| Canton, MA 02021, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **ELISABETH DEVOS,** | ) | **COMPLAINT FOR DECLARATORY** |
| **in her official capacity as Secretary of the** | ) | **AND INJUNCTIVE RELIEF** |
| **U.S. Department of Education,** | ) | |
| Office of the Secretary | ) | |
| 400 Maryland Avenue, SW | ) | |
| Washington, DC 20202, | ) | |
| | ) | |
| **U.S. DEPARTMENT OF EDUCATION,** | ) | |
| 400 Maryland Avenue, SW | ) | |
| Washington, DC 20202, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

1.      Plaintiffs, two federal student loan borrowers, bring this action seeking declaratory and injunctive relief with respect to a final rule issued on June 16, 2017, by the U.S. Department of Education (ED). ED, Final Rule, Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27,621 (June 16, 2017). This "Delay Rule" postpones in part the July 1, 2017, effective date of the agency's "Borrower Defense Regulations," which were intended to protect federal student loan borrowers "from misleading, deceitful, and predatory practices of" institutions that participate in federal Title IV aid programs. ED, Final Regulations, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal

Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75,926, 75,926 (Nov. 1, 2016).

2.     Title IV aid programs, named after Title IV of the Higher Education Act, 20 U.S.C. § 1070 *et seq*., provide the largest stream of federal postsecondary student aid, accounting for more than $125 billion distributed last year. The bulk of funds available under Title IV are distributed through the Federal Direct Loan Program. Students use Direct Loans to attend colleges, career training programs, and graduate schools authorized to participate in the program.

3.     Some predatory schools, generally concentrated in the for-profit college industry, rely on the federal student aid program. These schools often have more students that drop out than graduate and leave students with significantly more debt than other schools. The exponential growth of the for-profit sector has left millions of former students with unmanageable student loan debt borrowed in service of a credential they were not able to obtain or that provides little or no value. The widespread fraud perpetrated by some institutions in the for-profit higher education industry created the need for the Borrower Defense Regulations.

4.     The Borrower Defense Regulations delayed by ED consist of numerous provisions to protect students and the federal investment in postsecondary education.

5.     Once effective, the Borrower Defense Regulations will require schools that participate in the Direct Loan Program not to rely on existing agreements or enter into new agreements with their students that include forced arbitration provisions or provisions waiving students' right to participate in a class action for the resolution of claims related to the education financed by a Direct Loan. *See* 81 Fed. Reg. at 76,021-31.

6.     The Regulations will also provide needed procedural protections to a longstanding right (often referred to as a "borrower defense"), *see* 20 U.S.C. § 1087e(h); 34 C.F.R.

§ 685.206(c), for student loan borrowers to seek cancellation of federal loans when the loans were used to attend a school that engaged in fraud or certain other unlawful conduct. 81 Fed. Reg. at 75,961-64.

7.    ED's Delay Rule postponing the effective date of the Borrower Defense Regulations will harm countless Americans, including plaintiffs, by relieving schools that participate in federal student aid programs of their obligations under the Borrower Defense Regulations and by precluding federal student loan borrowers from benefiting from the rights conferred on them by those same regulations.

8.    ED's Delay Rule violates the Administrative Procedure Act (APA) because it exceeds ED's authority under the APA, 5 U.S.C. § 705, to postpone the effective date of a regulation pending litigation; was adopted without public consultation, a negotiated rulemaking, and notice and an opportunity for public comment, as required by the Higher Education Act 1098, and APA, 5 U.S.C. § 553; and is arbitrary, capricious, and otherwise contrary to law, 5 U.S.C. § 706.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction under 28 U.S.C. § 1331.

10.    Venue is proper in this district because the U.S. Department of Education resides in this judicial district, and because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(c)(2), (e)(1).

## PARTIES

11.    Plaintiff Meaghan Bauer is a natural person who resides in Peabody, Massachusetts.

12.    Plaintiff Stephano Del Rose is a natural person who resides in Canton, Massachusetts.

13.     Once effective, the Borrower Defense Regulations will confer on Ms. Bauer and Mr. Del Rose procedural and substantive rights with respect to the provisions on arbitration, class action waivers, and the borrower defense process. ED's Delay Rule impairs their interests in these rights.

14.     Defendant Elisabeth DeVos is the Secretary of Education and charged with the supervision and management of all decisions and actions within the U.S. Department of Education. Plaintiffs sue Secretary DeVos in her official capacity.

15.     Defendant U.S. Department of Education is an agency of the United States within the meaning of the APA. It is responsible for overseeing and adopting implementing regulations for Title IV of the Higher Education Act, 20 U.S.C. § 1070 *et seq.*, including the Federal Direct Loan Program.

## BACKGROUND

**The Borrower Defense Regulations**

16.     The Higher Education Act requires ED to "obtain public involvement in the development of proposed regulations" under Title IV, including by obtaining the "advice of and recommendations from" individuals and groups "involved in student financial assistance programs" under Title IV. 20 U.S.C. § 1098a(a)(1). The Act then requires ED to prepare draft regulations and submit any new regulations to a negotiated rulemaking process, "unless the Secretary determines that applying such a requirement with respect to given regulations is impracticable, unnecessary, or contrary to the public interest" within the meaning of the APA, 5 U.S.C. § 553(b)(3)(B), "and publishes the basis for such determination in the Federal Register at the same time as the proposed regulations in question are first published." 20 U.S.C. § 1098(b). After a negotiated rulemaking, ED must publish any proposed rule on which negotiators reach

consensus, or a proposed rule of ED's choosing if negotiators do not reach consensus, in the Federal Register for public comment.

17.     In August 2015, ED published a notice in the Federal Register indicating that it intended to amend its Title IV regulations to update provisions concerning a school's acts or omissions that could provide grounds for a borrower to seek cancellation of federal loans and to address the consequences of these "borrower defenses" for borrowers, schools, and the agency. ED, Negotiated Rulemaking Committee; Public Hearings, 80 Fed. Reg. 50,588, 50,588 (Aug. 20, 2015).

18.     As required by the Higher Education Act, ED initiated the public consultation process by holding hearings in Washington, DC, and San Francisco to request public feedback about its plans and to solicit specific topics for consideration in a rulemaking. *See* ED, Proposed Rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 39,330, 39,333 (June 16, 2016). ED then attempted to develop its new rule by consensus through a negotiated rulemaking with representatives selected from groups of stakeholders with an interest in the rule. *See id.* The negotiated rulemaking committee met in early 2016 but ultimately failed to reach a consensus agreement on a rule. *Id.* at 39,334.

19.     On June 16, 2016, ED published in the Federal Register a notice of proposed rulemaking (NPRM) and set a deadline for public comments of August 1, 2016. *Id.* at 39,330.

20.     The NPRM made clear that ED intended to finalize its rule to take effect on July 1, 2017, *see, e.g., id.* at 39,331, 39,337, the beginning of the next "award year" for Title IV funding, *see* 20 U.S.C. § 1088(a)(1); 34 C.F.R. § 600.2.

21.    The projected July 1 effective date was incorporated into specific provisions of the NPRM that would have significant implications for regulated entities' obligations and borrowers' rights. For example, the NPRM "propose[d] to create" new and amended regulations "to establish, effective July 1, 2017, a new Federal standard for borrower defenses, new limitation periods for asserting borrower defenses, and processes for the assertion and resolution of borrower defense claims" by students seeking to have their federal loans cancelled based on misrepresentation or other unlawful conduct by their schools. 81 Fed. Reg. at 39,336.

22.    The NPRM also proposed to require contracts between schools and students "entered into after [the] effective date of this regulation" to include specific language regarding the availability of class actions to resolve disputes and limitations on the ability to compel arbitration of claims. *Id.* at 39,421; *see also id.* at 39,386. Institutions "that, prior to the effective date of the proposed regulations, incorporated pre-dispute arbitration or any other pre-dispute agreement addressing class actions in any agreements with Direct Loan Program borrowers" would be required "to provide to borrowers agreements or notices with specific language regarding a borrower's right to file or be a member of a class action suit." *Id.* at 39,404; *see also id.* at 39,421-22 (describing a school's obligation when a "mandatory pre-dispute arbitration agreement has been entered into before the effective date of this regulation").

23.    ED received more than 10,000 comments on the proposed rule. Some comments addressed the proposed effective date of the regulations and either argued that the effective date be postponed or that portions of the rule be permitted to take effect earlier than July 1. *See* Comments from the California Ass'n of Private Postsecondary Schools 8, Aug. 1, 2016, ED-2015-OPE-0103-10693 (urging ED to "allow more time for study, deliberation, and input, rather than rushing to promulgate these rules by November 1, 2016[,] for an effective date of July 1, 2017");

Comments of Trade Associations Representing Student Loan Providers, Aug. 1, 2016, ED-2015-OPE-0103-10045 (urging ED to permit early implementation of a portion of the rule before the effective date as necessary).

24.    On November 1, 2016, ED published in the Federal Register its final Borrower Defense Regulations, 81 Fed. Reg. 75,926. The Borrower Defense Regulations state that they are "effective July 1, 2017." *Id.* at 75,926.

25.    The Borrower Defense Regulations amend 34 C.F.R. § 685.300 to address the extent to which a school wishing to participate in the Direct Loan Program may rely on predispute arbitration agreements or class action waiver provisions with students to resolve claims related to the making of a Direct Loan or the education financed by that loan.

26.    Specifically, the Borrower Defense Regulations provide that a school may not "enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim." 81 Fed. Reg. at 76,088 (new § 685.300(f)(i)).

27.    The Borrower Defense Regulations similarly amend § 685.300 to require a participating school to forgo reliance on any predispute agreement with a student that waives the student's right to participate in a class action against the school related to a borrower defense claim. *Id.* (new § 685.300(e)).

28.    Once the Borrower Defense Regulations take effect, schools participating in the Direct Loan Program must include language incorporating the policy into any new contracts with students. *Id.* at 76,087, 76,088 (new § 685.300(e)(3)(i), (f)(3)(i)). For those contracts entered into before the effective date of the rule, schools have the option of attempting to amend the previous contracts or simply notifying affected students or former students that the schools will no longer

elect to rely on predispute arbitration or class action waiver provisions included in a student's earlier contract. *Id.* at 76,087, 76,088 (new § 685.300(e)(3)(ii)-(iii), (f)(3)(ii)-(iii)).

29.     The Borrower Defense Regulations also update rules that implement a statutory provision giving students the right to seek loan cancellation based on the illegal conduct of their schools. The Regulations obligate ED to provide new protections to borrowers who seek cancellation, including borrowers with requests pending at the time the Regulations become effective.

**The Impact of the Borrower Defense Regulations on Plaintiffs**

30.     Plaintiffs Meaghan Bauer and Stephano Del Rose attended the for-profit college New England Institute of Art (NEIA) in Brookline, Massachusetts, in the Digital Filmmaking and Video Production program. Ms. Bauer attended from 2011 to 2014. Mr. Del Rose attended from 2009 to 2014.

31.     Ms. Bauer borrowed approximately $35,900 in Federal Direct Loans to attend NEIA. With interest, she owes more than $41,000 to the Department of Education on these loans.

32.     Mr. Del Rose borrowed approximately $31,000 in federal student loans to attend NEIA. Nine of his ten federal student loans are Federal Direct Loans. With interest, he currently owes more than $40,000 to the Department of Education on his federal student loans.

33.     Ms. Bauer and Mr. Del Rose relied on numerous representations made by NEIA with respect to the quality of instruction and equipment, the school's industry connections, the job prospects for NEIA graduates, the school's job placement assistance, and the school's high costs, especially in comparison to its graduates' low-paying employment. They later learned that many of these representations were untrue.

34.     Ms. Bauer and Mr. Del Rose seek to bring state-law causes of action in court on

behalf of a class of students against NEIA for its misrepresentations and other unlawful conduct. On behalf of themselves and other former NEIA students, Ms. Bauer and Mr. Del Rose are preparing to file a lawsuit under the Massachusetts Consumer Protection Act against NEIA and its corporate parent, Education Management Corporation (EDMC). As a legal prerequisite to suit under that statute, they have sent a demand letter to NEIA and EDMC, *see* Mass. Gen. Laws ch. 93A, § 9(3), describing the defendants' illegal and unfair practices, including defendants' targeting through misrepresentations of vulnerable and low-income students and families to take advantage of their desire for educational attainment. The letter also details the injuries to the students and their families, including unaffordable and unmanageable debt, which in turn has hindered students' later attempts to obtain meaningful education and training.

35.     Ms. Bauer and Mr. Del Rose signed enrollment contracts with NEIA that include a forced arbitration clause purporting to cover future claims between students and the school and to bar students from participating in a class action against the school. In their demand letter, Ms. Bauer and Mr. Del Rose called upon NEIA and EDMC not to enforce forced arbitration clauses to prevent students from bringing suit together.

36.     NEIA and EDMC responded to the demand letter by explicitly refusing Ms. Bauer and Mr. Del Rose's request that the school and its parent company agree not to enforce the arbitration provision in their enrollment contracts.

37.     NEIA participates in the Title IV student assistance program, including the Federal Direct Loan Program, and maintains a Program Participation Agreement (PPA) with defendant Department of Education. Under its PPA, NEIA has an ongoing obligation to comply with the Higher Education Act and its implementing regulations in order to continue participating in the Direct Loan Program. *See* 34 C.F.R. §§ 668.14, 685.300.

38.     To comply with its PPA, NEIA will be required—once the Borrower Defense Regulations take effect—not to rely on forced arbitration agreements or class action waiver agreements it has entered into with students participating in the Direct Loan Program. This requirement will apply to claims related to its misrepresentations to Ms. Bauer and Mr. Del Rose.

39.     Ms. Bauer and Mr. Del Rose wish to file their lawsuit against NEIA and EDMC in 2017. They seek to do so after the Borrower Defense Regulations take effect because they anticipate that, at that time, NEIA and EDMC will not attempt to enforce the arbitration provision and class action waiver in contravention of NEIA's PPA obligations. If Ms. Bauer and Mr. Del Rose file their claims before the Borrower Defense Regulations go into effect, NEIA and EDMC are more likely to seek to enforce the forced arbitration clause and class action waiver in their enrollment agreements. To access the court on behalf of themselves and a class of similarly situated borrowers, Ms. Bauer and Mr. Del Rose would have to succeed in opposing NEIA and EDMC's efforts to compel them to resolve their claims in individual arbitrations.

40.     Ms. Bauer and Mr. Del Rose have also submitted "borrower defense" applications to ED seeking cancellation of their federal loans based on NEIA's fraud and other misconduct related to their education at NEIA. Those applications have been pending since September 30, 2015, and August 30, 2015, respectively.

41.     Although current regulations provide Ms. Bauer and Mr. Del Rose a path to seek cancellation of their federal loans, they lack clarity with respect to the process that ED will use to adjudicate these borrower defense applications and ED's obligations with respect to denials of requests for cancellation. *See* 34 C.F.R. § 685.206(c). The regulations state only that if a "borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees

that the borrower would otherwise be obligated to pay" and may "afford[] the borrower such further relief as the Secretary determines is appropriate under the circumstances." *Id.*

42.     Once the Borrower Defense Regulations take effect, ED will be required to provide Ms. Bauer and Mr. Del Rose with significant new protections in the adjudication of their borrower defense applications. *See* 81 Fed. Reg. 76,080 (new C.F.R. § 685.206(c)(2)) (cross-referencing procedures prescribed in new § 685.222(e)).

43.     For example, the Borrower Defense Regulations, once effective, will require ED to resolve Ms. Bauer and Mr. Del Rose's borrower defense applications "through a fact-finding process" that includes consideration of "Department records" and "[a]ny additional information or argument that may be obtained by" ED, not solely the evidence available to and provided by Ms. Bauer and Mr. Del Rose in their applications. 81 Fed. Reg. at 76,084 (new § 685.222(e)(3)(i)).

44.     The new regulations also obligate ED, "[u]pon the borrower's request," to identify "to the borrower the records the Department official considers relevant to the borrower defense" and, upon reasonable request, provide those documents to the borrower. *Id.* (new § 685.222(e)(3)(ii)). If the Borrower Defense Regulations were in effect, Ms. Bauer and Mr. Del Rose would request these records.

45.     Under the new regulations, if ED denies the requests for cancellation in full or in part, it must issue "a written decision" that notifies Ms. Bauer and Mr. Del Rose "of the reasons for the denial, the evidence that was relied upon, any portion of the loan that is due and payable to the Secretary, and whether the Secretary will reimburse any amounts previously collected." *Id.* (new § 685.222(e)(4)).

46.     Moreover, while a borrower defense application is pending, the Borrower Defense Regulations require ED to provide automatic forbearance on payments toward any non-defaulted loans for which cancellation is sought through the borrower defense process. *See* 81 Fed. Reg. at 76,083 (new § 685.222(e)(2)(i)); *see also id.* at 76,080 (new § 685.205(b)(6)(i), (vi)). Although Ms. Bauer has requested that ED place loans at issue in her borrower defense application in forbearance, to date she has not been able to secure that status. Mr. Del Rose has placed loans at issue in his borrower defense application in forbearance, but this administrative status is currently set to expire in January 2018 and its renewal is uncertain.

47.     The Borrower Defense Regulations' protections will provide Ms. Bauer and Mr. Del Rose with enforceable rights.

**The CAPPS Litigation and ED's Issuance of the Delay Rule**

48.     On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed suit to challenge four aspects of the Regulations: (1) the provisions of the rule that prohibit schools receiving Direct Loan funds from entering into and relying on forced arbitration provisions and class action waivers in contracts with students, (2) provisions that changed the grounds and process for students to assert "borrower defenses" to repayment of Title IV loans, (3) provisions that imposed new financial responsibility requirements on schools and required disclosures to students when schools failed to meet those requirements, and (4) provisions that required schools to make public disclosures when fewer than half of recent borrowers had been able to reduce their loan balance by a single dollar three years after leaving school. *See CAPPS v. DeVos*, No. 17-999, Compl. ¶¶ 202-241, ECF No. 1 (D.D.C. filed May 24, 2017). It sought invalidation and vacatur of the Borrower Defense Regulations in their entirety. *Id.* ¶ 242(iv).

49.     On June 2, 2017, more than seven months after the Borrower Defense Regulations

were adopted, CAPPS moved for a preliminary injunction against those portions of the regulations that would prohibit participating schools from entering into or relying on predispute arbitration clauses and class action waivers to deny students the right to seek relief in court. *Id.*, Motion for a Preliminary Injunction, ECF No. 6, 6-1. It did not seek to enjoin any other portion of the rule pending the litigation.

50.     On June 16, 2017, ED published in the Federal Register a rule delaying the effective date for many of the Borrower Defense Regulations' provisions "pending judicial review" in the litigation brought by CAPPS. ED, Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27,621, 27,621. ED's Delay Rule swept more broadly than the focus of the CAPPS litigation, postponing the effective date of provisions that were not the subject of CAPPS' specific challenges.

51.     To justify the delay, ED invoked its authority under the APA, 5 U.S.C. § 705, to delay the effective date of a rule subject to litigation. Section 705 provides that "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." ED stated that it had "concluded that justice require[d] it to postpone the effectiveness of certain provisions of the final regulations until the judicial challenges to the final regulations are resolved." 82 Fed. Reg. at 27,621.

52.     ED stated that postponing the rule would "preserve the regulatory status quo while the litigation is pending and the Court decides whether to uphold the final regulations." *Id.* It contended without elaboration that CAPPS had "raised serious questions concerning the validity of certain provisions of the final regulations." *Id.* It also stated that CAPPS had "identified substantial injuries that could result if the final regulations go into effect before those questions are resolved." *Id.* However, the only injuries to schools that ED described involved (1)

modification of schools' "contracts in accordance with the arbitration and class action waiver regulations," which would impose costs on schools "in making these changes," and (2) the imposition of "financial responsibility trigger provisions" that identify adverse events involving a school's finances and require the school to provide a letter of credit or other financial protection insuring against later liabilities to the Department. *Id.* ED did not determine that these purported injuries to schools, if they occurred, would be irreparable. *Id.*

53.     In addition, ED stated that the United States would "suffer no significant harm from postponing the effectiveness of the final regulations while the litigation is pending." *Id.* It contended that the borrower defense provisions and separate provisions regarding cancellation of loans to students whose schools close were the most costly portions of the rule, and that postponing the rule would "help to avoid these significant costs." *Id.* at 27,622. ED did not explain how the projected cost-savings from delaying the borrower-defense provisions could be reconciled with the sole sentence in the notice addressing borrowers' interests, in which ED asserted that delaying the final rule would "not prevent student borrowers from obtaining relief because the Department will continue to process borrower defense claims under existing regulations that will remain in effect during the postponement." *Id.* at 27,621. Nor did ED explain why it delayed the cancellation of loans to students whose schools close, given that CAPPS had not specifically challenged that portion of the Borrower Defense Regulations.

54.     ED also stated that the rule's delay "w[ould] allow" it to "review and revise the final regulations," which, as "required" by the Higher Education Act, ED intends to do through a new negotiated rulemaking. *Id.* at 27,622 (citing 20 U.S.C. § 1098a).

55.     ED closed by stating that, "[b]ased upon the foregoing" analysis, it had "determined that it [was] necessary to postpone the effectiveness of the revisions to or additions of" a subset of

those provisions adopted by the Borrower Defense Regulations. *Id.* The delayed provisions of the rule include the arbitration and class action provisions, *id.* (citing new 34 C.F.R. § 685.300(b)(11), (b)(12), and (d) through (i)), and those provisions applying to the borrower defense process for pending claims, *id.* (citing new §§ 685.206(c), 685.222).

56.     CAPPS subsequently withdrew its motion for a preliminary injunction. The CAPPS litigation remains pending.

57.     In a separate Federal Register notice, ED provided additional information about its intent to initiate a new negotiated rulemaking to revise the Borrower Defense Rule. *See* 82 Fed. Reg. 27,640 (June 16, 2017). That notice indicates that ED anticipates negotiators "will begin negotiations in November or December of 2017." *Id.* at 27,641.

58.     Under the Higher Education Act, "any regulatory changes . . . affecting the programs" under Title IV "that have not been published in final form by November 1 prior to the start of the award year" beginning on July 1 "shall not become effective until the beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c); *see also id.* § 1088(a)(1). Because ED cannot publish a rule amending or replacing the Borrower Defense Rule by November 1, 2017, any new rule could not take effect before July 1, 2019.

**Administrative Procedure Act**

59.     Under the APA, final agency action is judicially reviewable. 5 U.S.C. § 704. The Delay Rule constitutes final agency action because it marks the consummation of the agency's decisionmaking process with respect to whether delay of the effective date of the Borrower Defense Regulations is appropriate and for how long and because it has immediate legal consequences for regulated schools, student borrowers, and members of the public who will rely on information required to be disclosed under the Regulations.

60.     The APA defines "rule making" as the "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5). The APA defines "rule" to include "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). Under the APA, an agency must publish a notice of proposed rulemaking in the Federal Register and solicit public comment before adopting, modifying, or repealing a rule. 5 U.S.C. § 553. The Delay Rule constitutes a rule for purposes of the APA because it effects a substantive rescission of the effective date of the Borrower Defense Regulations. The Delay Rule was subject to the APA's notice-and-comment rulemaking requirements.

## FIRST CAUSE OF ACTION

**(Violation of the APA – Agency action in excess of statutory authority and arbitrary, capricious, and otherwise contrary to law)**

61.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

62.     The APA's provision for a stay of the effective date of a rule under 5 U.S.C. § 705 requires agencies to articulate a justification for the stay that is based on the underlying litigation. Section 705 also requires agencies to set forth and consider four factors generally applicable to court-imposed stays, including whether parties benefiting from the stay of a rule will be irreparably harmed without it, whether other members of the public will be harmed by the stay, and the public interest in granting the stay.

63.     ED's Delay Rule rested in part on the agency's plans to undertake a new rulemaking to replace or amend portions of the Borrower Defense Regulations, an impermissible consideration under Section 705.

64.     ED's Delay Rule failed to acknowledge the four-part test applicable to Section 705

16

stays by agencies and to apply it with respect to the specific provisions covered by the Delay Rule.

65.      ED set forth an arbitrary and illogical justification for the Delay Rule. For example, with respect to the arbitration and class action provisions, ED ignored the interests of students and the public entirely. It did not acknowledge that the delay would preclude borrowers from bringing claims in court while the rule is delayed and from representing classes of borrowers in litigation that would enable more broad-scale relief than individual arbitration proceedings. And ED ignored that borrowers whose borrower defense applications are currently pending have an interest in the fair adjudication of those applications under the new standards set by the Borrower Defense Regulations.

66.      ED also engaged, for example, in arbitrary analysis of costs relating to the delay and expanded the portions of the rule affected by the delay beyond any conceivable cost-related basis. ED ignored that many costs to schools related to amending their enrollment agreements with respect to arbitration and class actions would already have been borne by the time ED issued its Delay Rule. It also ignored the anticipated cost savings to ED of portions of the rule regarding arbitration and class action waivers, which would permit students to seek compensation more readily from the schools that harmed them instead of seeking loan cancellation from ED. Moreover, invoking costs, ED stayed portions of the rule for which CAPPS had not sought a preliminary injunction, and indeed, portions of the rule that CAPPS had not even specifically challenged.

67.      The rationale underlying ED's Delay Rule is arbitrary, capricious, contrary to law, and in excess of the agency's statutory authority under Section 705, in contravention of the APA, 5 U.S.C. § 706(2).

## SECOND CAUSE OF ACTION

### (Violation of the APA – Failure to observe procedure required by law)

68.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

69.     The Delay Rule is a substantive and legislative rule that was subject to the notice-and-comment requirements of the APA, 5 U.S.C. § 553.

70.     The Delay Rule is a regulation pertaining to Title IV and was subject to the requirement for public consultation and a negotiated rulemaking under the Higher Education Act, 10 U.S.C. § 1098a.

71.     By failing to engage in public consultation, a negotiated rulemaking, and notice-and-comment rulemaking before adopting the Delay Rule, ED failed to observe procedures required by law, in contravention of the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A) Declare that defendants have violated the APA by issuing the Delay Rule based on impermissible considerations under 5 U.S.C. § 705, by justifying the Delay Rule using a rationale that is arbitrary, capricious, and otherwise contrary to law, by failing to engage in public consultation and conduct a negotiated rulemaking before adopting the Delay Rule, and by failing to notify the public and afford it an opportunity to comment before adopting the Delay Rule;

(B) Declare unlawful and set aside the Delay Rule;

(C) Enjoin the defendants from implementing the Delay Rule;

(D) Award plaintiffs their costs and expenses, including reasonable attorney's fees and expert witness fees; and

(E) Grant such other relief as this Court deems just and proper.

Dated: July 6, 2017

Respectfully submitted,

/s/ *Julie A. Murray*

Toby R. Merrill
Mass. BBO No. 601071
Amanda M. Savage
Mass. BBO No. 690938
Alec P. Harris
Colo. Bar No. 47547
PROJECT ON PREDATORY STUDENT LENDING,
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
tomerrill@law.harvard.edu

Julie A. Murray
D.C. Bar No. 1003807
Scott L. Nelson
D.C. Bar No. 413548
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

*Counsel for Plaintiffs*