# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEAGHAN BAUER and STEPHANO DEL ROSE, <br><br> *Plaintiffs*, <br><br> v. <br><br> ELISABETH DEVOS, <br> in her official capacity as Secretary of the <br> U.S. Department of Education, and <br> U.S. DEPARTMENT OF EDUCATION, <br><br> *Defendants*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   Civil Action No. 17-1330 (RDM) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs Meaghan Bauer and Stephano Del Rose hereby move for summary judgment on the ground that there is no genuine issue of disputed material fact and that they are entitled to judgment as a matter of law.

In support of this motion, plaintiffs submit the accompanying (1) memorandum; (2) declarations of attorney Toby R. Merrill and plaintiffs Meaghan Bauer and Stephano Del Rose; and (3) a proposed order.

Dated: September 26, 2017                              Respectfully submitted,

                                                       /s/ Adam R. Pulver
Toby R. Merrill                                       Adam R. Pulver
Mass. BBO No. 601071                                 D.C. Bar No. 1020475
Amanda M. Savage                                     Scott L. Nelson
Mass. BBO No. 690938                                 D.C. Bar No. 413548
Alec P. Harris                                       Julie A. Murray
Colo. Bar No. 47547                                  D.C. Bar No. 1003807
PROJECT ON PREDATORY STUDENT LENDING,                PUBLIC CITIZEN LITIGATION GROUP
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL          1600 20th Street NW
122 Boylston Street                                  Washington, DC 20009
Jamaica Plain, MA 02130                              (202) 588-1000
(617) 522-3003                                       apulver@citizen.org
tomerrill@law.harvard.edu

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MEAGHAN BAUER and STEPHANO DEL ROSE, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No. 17-1330 (RDM) |
| ELISABETH DEVOS, in her official capacity as Secretary of the U.S. Department of Education, and U.S. DEPARTMENT OF EDUCATION, | ) ) ) ) ) | |
| *Defendants*. | ) ) | |

# MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Toby R. Merrill
Mass. BBO No. 601071
Amanda M. Savage
Mass. BBO No. 690938
Alec P. Harris
Colo. Bar No. 47547
PROJECT ON PREDATORY STUDENT LENDING,
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
tomerrill@law.harvard.edu

Adam R. Pulver
D.C. Bar No. 1020475
Scott L. Nelson
D.C. Bar No. 413548
Julie A. Murray
D.C. Bar No. 1003807
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

*Counsel for Plaintiffs*

September 26, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

STATEMENT OF FACTS ...................................................................................................... 4

I.      Statutory and Regulatory Background ..................................................................... 4

        A.  The Title IV Aid Program and Predatory Schools ........................................... 4

        B.  The Department's Consideration of the Borrower Defense Rule ...................... 10

        C.  The Contours of the Borrower Defense Rule ................................................... 12

            1.  The borrower defense process ................................................................ 12

            2.  Arbitration and other contractual barriers to justice. .............................. 13

            3.  Financial responsibility triggers ............................................................ 15

            4.  Disclosures of loan repayment rates. ...................................................... 17

II.     The *CAPPS* Litigation and the Department's Delay Rule. ........................................ 18

III.    The Plaintiffs ......................................................................................................... 21

STANDARD OF REVIEW .................................................................................................... 24

ARGUMENT ...................................................................................................................... 25

I.      The Department's purported reliance on section 705 was arbitrary, capricious, and con-
        trary to law.. ........................................................................................................ 25

        A.  The Agency's failure to apply the appropriate four-part standard was arbitrary and ca-
            pricious. .............................................................................................................. 26

        B.  The Department's explanation is unreasonable and insufficient under any standard ....... 29

            1.  The Agency's unexplained reference to "serious questions" fails to justify the de-
                lay. ........................................................................................................... 29

            2.  The Agency did not establish any imminent, serious harm to regulated entities. ....... 31

            3.  The Agency's balancing of harm was unreasonable ................................... 34

a.   The Agency ignored the obvious harm to borrowers caused by delay of the borrower defense provisions. ...................................................................................35

b.   ED ignored other harms caused by an indefinite delay of other provisions of the Rule. ......................................................................................................................39

4.   The Agency insufficiently analyzed the public interest.............................................41

C.  Section 705 does not authorize an agency to delay a rule for the purpose of undertaking a new rulemaking. ....................................................................................................................42

II.     The Delay Rule is otherwise invalid without negotiated rulemaking, notice, and an opportunity for public comment. ..............................................................................................44

CONCLUSION.......................................................................................................................................45

# TABLE OF AUTHORITIES

*Authorities on which we chiefly rely are marked with asterisks.*

**CASES**                                                                   **PAGE(S)**

*AFL-CIO v. Chao*,
    496 F. Supp. 2d 76 (D.D.C. 2007) ...................................................................45

*Affinity Healthcare Services, Inc. v. Sebelius*,
    720 F. Supp. 2d 12 (D.D.C. 2010) ...................................................................27

*Alpharma, Inc. v. Leavitt*,
    460 F.3d 1 (D.C. Cir. 2006) ............................................................................43

*American Trucking Ass'ns, Inc. v. Reich*,
    955 F. Supp. 4 (D.D.C. 1997) .........................................................................43

*American Wild Horse Preservation Campaign v. Perdue*,
    865 F.3d 691 (D.C. Cir. 2017) ........................................................................40

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................................26

*Clean Air Council v. Pruitt*,
    862 F.3d 1 (D.C. Cir. 2017) ............................................................................25

*ConverDyn v. Moniz*,
    68 F. Supp. 3d 34 (D.D.C. 2014) ....................................................................32

*Council of Southern Mountains, Inc. v. Donovan*,
    653 F.2d 573 (D.C. Cir. 1981) ........................................................................44

*Cuomo v. U.S. Nuclear Regulatory Commission*,
    772 F.2d 972 (D.C. Cir. 1985) ........................................................................27

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ....................................................................................31

*Environmental Defense Fund, Inc. v. EPA*,
    716 F.2d 915 (D.C. Cir. 1983) ........................................................................44

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .............................................................................29, 31, 42

*Ferguson v. Corinthian Colleges,*
    733 F.3d 928 (9th Cir. 2013) ........................................................................9

*Fox v. Clinton,*
    684 F.3d 2012 (D.C. Cir. 2012) ....................................................................4

*Freeman v. Cavazos,*
    No. CIV. A. 90-2175-LFO, 1990 WL 141483 (D.D.C. Sept. 20, 1990) ..........................31

*IBM Corp. v. U.S. Dep't of Energy,*
    No. CIV.A. 88-0874, 1988 WL 40291 (D.D.C. Apr. 21, 1988) ......................................31

*ITT Educational Services, Inc. v. Arce,*
    533 F.3d 342 (5th Cir. 2008) ........................................................................9

*International Union, United Mine Workers of America v. U.S. Department of Labor,*
    358 F.3d 40 (D.C. Cir. 2004) ......................................................................31

*Judulang v. Holder,*
    565 U.S. 42 (2011)....................................................................................26

*McCafferty v. Centerior Energy,*
    No. 96-ERA-6, 1996 WL 897658 (Dep't of Labor Admin. Rev. Bd. Oct. 16, 1996) ............................................................................................28

*Mexichem Specialty Resins, Inc. v. EPA,*
    787 F.3d 544 (D.C. Cir. 2015) ....................................................................28

*Miller v. Corinthian Colleges, Inc.,*
    769 F. Supp. 2d 1336 (D. Utah 2011) ..........................................................9

*Mizerak v. Adams,*
    682 F.2d 374 (2d Cir. 1982)........................................................................38

*Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mutual Automobile Insurance Co.,*
    463 U.S. 29 (1983)............................................................................ *passim*

*N.Y. State Bar Ass'n v. FTC,*
    276 F. Supp. 2d 110 (D.D.C. 2003) ............................................................30

*Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Administration,*
    494 F.3d 188 (D.C. Cir. 2007) ....................................................................30

*Public Citizen, Inc. v. Lew*,
    127 F. Supp. 2d 1 (D.D.C. 2000) ........................................................................43

*Public Citizen v. Federal Motor Carrier Safety Administration*,
    374 F.3d 1209 (D.C. Cir. 2004) ........................................................................28

*Public Citizen v. Steed*,
    733 F.2d 93 (D.C. Cir. 1984) ....................................................................25, 44

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Administration*,
    823 F. Supp. 2d 36 (D.D.C. 2011) ....................................................................27

*Ranchers Cattlemen Action Legal Fund v. U.S. Department of Agriculture*,
    566 F. Supp. 2d 995 (D.S.D. 2008) ..................................................................45

*Resolute Forest Products, Inc. v. U.S. Department of Agriculture*,
    187 F. Supp. 3d 100 (D.D.C. 2016) ..................................................................38

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ..........................................................................................32

*Safari Club International v. Salazar*,
    852 F. Supp. 2d 102 (D.D.C. 2012) ..................................................................34

*\*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012) ........................................................... *passim*

*St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*,
    85 F. Supp. 3d 197 (D.D.C. 2015) ....................................................................42

*Sunday School Board v. U.S. Postal Service*,
    No. 99-5018, 1999 WL 322746 (D.D.C. Apr. 30, 1999) ....................................31

*United Mine Workers v. Dole*,
    870 F.2d 662 (D.C. Cir. 1989) ........................................................................28

*\*Virginia Petroleum Jobbers Ass'n v. Federal Power Committee*,
    259 F.2d 921 (D.C. Cir. 1958) ............................................................27, 34, 41

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................27, 29

## STATUTES

5 U.S.C. § 553 ..............................................................................................21, 25, 44

5 U.S.C. § 705 .................................................................................................... *passim*

5 U.S.C. § 706 ..............................................................................................24, 45

20 U.S.C. § 1070 ....................................................................................................4

20 U.S.C. § 1087c(a) ..............................................................................................5

20 U.S.C. § 1087e(h) ..............................................................................................8

20 U.S.C. § 1088(a)(1) ..........................................................................................11

20 U.S.C. § 1094 ....................................................................................................5

20 U.S.C. § 1098a ............................................................................................ *passim*

## REGULATIONS

34 C.F.R. § 600.2 ................................................................................................11

34 C.F.R. § 668.14 ..........................................................................................5, 24

34 C.F.R. § 668.41 ..............................................................................................17

34 C.F.R. § 668.82 ................................................................................................5

34 C.F.R. § 668.171 ..............................................................................15, 16, 33

34 C.F.R. § 668.175 ............................................................................................15

34 C.F.R. § 685.205 ............................................................................................13

34 C.F.R. § 685.206 ..................................................................................8, 22, 23

34 C.F.R. § 685.214 ..............................................................................................8

34 C.F.R. § 685.222 ................................................................12, 13, 23, 37

34 C.F.R. § 685.300 ..................................................................................5, 13, 24

**FEDERAL REGISTER NOTICES AND PUBLICATIONS**

ED, Negotiated Rulemaking Committee; Public Hearings, 80 Fed. Reg. 50588 (Aug. 20, 2015) ........................................................................................................10

ED, Final Regulations, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75926 (Nov. 1, 2016) ............................... *passim*

ED, Final Rule; Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27621 (Jun. 16, 2017) ..................................................................................... *passim*

ED, Proposed Rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 39330 (Jun. 16, 2016)......................................... *passim*

EPA, National Emission Standards for Hazardous Air Pollutants From the Portland Cement Manufacturing Industry and Standards of Performance for Portland Cement Plants, 76 Fed. Reg. 28318 (May 17, 2011) ......................................................28

FERC, Market-Based Rates for Wholesale Sales of Electric Energy, Capacity and Ancillary Services by Public Utilities, 74 Fed. Reg. 30924 (Jun. 29, 2009)..............................28

**MISCELLANEOUS**

79th Congress, Administrative Procedure Act, Legislative History, Pub. L. 1944–46, S. Doc. 248 (1946)............................................................................................27

Colorado Attorney General's Office, Press Release, Attorney General Suthers Announces Consumer Protection Settlement with Argosy University (Dec. 5, 2013).............7

ED, Fact Sheet: School Closure, Charlotte School of Law Located in Charlotte, North Carolina (2017) ..............................................................................................40

ED, Federal Student Aid Office, 2016 Annual Report ..................................................4

ED, Press Release, Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions, June 14, 2017 .....................................20, 43

ED, Press Release, U.S. Department of Education Announces Path for Debt Relief for Students at 91 Additional Corinthian Campuses, Mar. 25, 2016........................1

ED, Remarks from Secretary DeVos to the American Legislative Exchange Council,
July 20, 2017 .................................................................................................................21

Adam Looney and Constantine Yannelis, A Crisis in Student Loans? How Changes in
the Characteristics of Borrowers and in the Institutions They Attended Contrib-
uted to Rising Loan Defaults, Brookings Institution (2015)................................................8

James F. Manning, Acting Under Secretary of Education, Declaration, *Dieffenbacher v.
DeVos*, Case No. 17-cv-342, Dkt. No. 32-2 (C.D. Cal. filed Sept. 7, 2017), ....................21

James F. Manning, Acting Under Secretary of Education, Letter to Sen. Richard J.
Durbin, July 7, 2017...............................................................................................21, 37, 38

Elizabeth Olson, *For-Profit Charlotte School of Law Closes*, N.Y. Times, Aug. 15, 2017...........3

Kristen Taketa, *Hickey College in St. Louis Stops Accepting New Student Applications*,
St. Louis Post-Dispatch, Jun. 21, 2017 .................................................................................3

Tamar Lewin, *Government to Forgive Student Loans at Corinthian Colleges*,
N.Y. Times, June 8, 2015 .......................................................................................................1

Tariq Habash and Robert Shireman, How College Enrollment Contracts Limit Students'
Rights (The Century Foundation), Apr. 27, 2016................................................................8

U.S. Senate Health, Education, Labor & Pensions Committee, For Profit Higher Educa-
tion: The Failure to Safeguard the Federal Investment and Ensure Student Suc-
cess  (2012) .....................................................................................................................6, 7

## INTRODUCTION AND SUMMARY OF ARGUMENT

The need to protect student borrowers from predatory for-profit educational institutions has become ever more apparent over the past several years, as investigations have revealed fraud and misrepresentation that have lured students into amassing significant student loan debt—under federal government programs—in exchange for low-quality and often useless educations. These predatory institutions stand on precarious financial grounds and close at alarming rates, stranding students and leaving federal taxpayers with the bill.[1] Plaintiffs Meaghan Bauer and Stephano Del Rose are two of the tens of thousands of student borrowers nationwide who have been harmed by the practices of these predatory institutions and continue to be harmed today.

In 2015, the Department of Education (the Department or ED) began a negotiated rulemaking process, as required by the Higher Education Act (HEA), 20 U.S.C. § 1098a, to examine proposals to address these problems, such as by making sure students have more complete information about schools before they enroll, minimizing the risk that federal financial aid dollars go to financially unstable institutions, and helping students who are victims of predatory institutions obtain relief. When the negotiated rulemaking did not yield consensus, ED went through a full notice-and-comment rulemaking process—considering over 10,000 comments before publishing a 150-page final rule, known as the Borrower Defense Rule (the Rule) on November 1, 2016, with an effective date of July 1, 2017. ED, Final Regulations, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal

---

[1] *See, e.g.*, Press Release, U.S. Department of Education Announces Path for Debt Relief for Students at 91 Additional Corinthian Campuses, Mar. 25, 2016, https://www.ed.gov/news/press-releases/us-department-education-announces-path-debt-relief-students-91-additional-corinthian-campuses; Tamar Lewin, *Government to Forgive Student Loans at Corinthian Colleges*, N.Y. Times, June 8, 2015, https://www.nytimes.com/2015/06/09/education/us-to-forgive-federal-loans-of-corinthian-college-students.html.

Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75926 (Nov. 1, 2016). The Rule clarified and strengthened procedures by which borrowers raise claims of misrepresentation and fraud as defenses against loan repayment and obtain loan discharges when their schools close; disallowed participation in certain federal student loan programs by schools that rely on forced arbitration clauses or class action waivers when students sue them on claims relating to education funded by student loans; required schools to provide a letter of credit or other demonstration of financial soundness when circumstances call their soundness into doubt; and required for-profit schools to make public disclosures when their median borrower has been unable to reduce her loan balance by even one dollar after three years.

More than six months later, a trade association representing private post-secondary schools sued in this Court, challenging specific provisions of the Rule and moving for a preliminary injunction as to one part of the rule. *CAPPS v. DeVos*, No. 17-999 (D.D.C. filed May 24, 2017). A few weeks later, ED issued a "Final Rule" indefinitely postponing the effective date of a selection of provisions of the Rule two weeks before they would have gone into effect. ED, Final rule; Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27621 (Jun. 16, 2017) (the Delay Rule). The Department invoked section 705 of the Administrative Procedure Act (APA), 5 U.S.C. § 705, as its sole authority for delaying the Borrower Defense Rule, while also indicating it intended to initiate rulemaking to "review and revise" that rule. *Id.* at 27621-22.

The Department has vastly exceeded its authority under section 705. Section 705 authorizes agencies and courts to delay a rule's effective date because judicial proceedings are pending, when "justice" so requires—and for no other reason. Invocation of section 705 must be based on the same four-factor test that guides courts in granting preliminary injunctive relief. *See Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30-31 (D.D.C. 2012). In delaying the Borrower Defense Rule,

ED did not even acknowledge this standard. Instead, it engaged in a cursory one-page discussion that failed to acknowledge any negative impacts of a delay on students, the public, and the government itself—including the harms that the agency itself had determined only months earlier that the Borrower Defense Rule would help prevent. Moreover, the purported harm to regulated institutions that the Department identified does not rise to the level of the non-speculative, irreparable serious injury that is required for a stay. Nowhere in the Delay Rule did the Department provide any explanation for, or even acknowledgement of, its reversal of its view of the costs and benefits of the Borrower Defense Rule or its legal basis—a failure that condemns its decision as arbitrary and capricious decision-making under the four-factor test or any other conceivable standard.

This case is not one in which delay only freezes the status quo; borrowers continue to be hurt every day. The delay harms not only borrowers like Plaintiffs who have already left predatory institutions and are saddled with insurmountable debt and worthless educations, but also current and future students. Since the Delay Rule was issued on June 16, 2017, predatory institutions that would have been subject to the Borrower Defense Rule continue to shutter, and their students are left without the protections that the Rule would have provided them.[2] Meanwhile, the Department halted processing borrower defense applications, and even if it resumes processing, it will do so without the protections that the Rule provided borrowers. Borrowers also continue to suffer the irreversible economic and psychological harms of debt. In addition, statutes of limitations on any claims they may bring against the institutions that defrauded them continue to run. If the Rule were

---

[2] *See, e.g.*, Elizabeth Olson, *For-Profit Charlotte School of Law Closes*, N.Y. Times, Aug. 15, 2017, https://www.nytimes.com/2017/08/15/business/dealbook/for-profit-charlotte-school-of-law-closes.html; Kristen Taketa, *Hickey College in St. Louis Stops Accepting New Student Applications*, St. Louis Post-Dispatch, Jun. 21, 2017, http://www.stltoday.com/news/local/education/hickey-college-in-st-louis-stops-accepting-new-student-applications/article_de82cce1-9c15-5ee5-9776-f9d18d215f2a.html.

in effect, they could seek judicial relief in a class action. With the Rule indefinitely stayed, they face the dilemma of being forced into individual arbitration if they assert their claims or facing a time bar if they do not. The Department ignored these obvious consequences.

The Department's invocation of section 705 must be set aside because it does not reflect reasoned decision-making. *See, e.g., Fox v. Clinton*, 684 F.3d 2012 (D.C. Cir. 2012). And absent a valid invocation of section 705, the agency acted unlawfully in issuing what amounted to a substantive rule without the required negotiated rulemaking and notice-and-comment proceedings.

## STATEMENT OF FACTS

### I.    Statutory and Regulatory Background[3]

#### A.    The Title IV Aid Program and Predatory Schools

The federal government spends more than $125 billion annually on student aid distributed under Title IV of the HEA, 20 U.S.C. § 1070 *et seq. See* ED,Federal Student Aid Office, 2016 Annual Report, https://studentaid.ed.gov/sa/sites/default/files/FY_2016_Annual_Report_508.pdf. Title IV is the largest stream of federal postsecondary education funding and covers, among other programs, federal Direct Loans, Perkins Loans, and Pell Grants. Students use Title IV aid to attend colleges, career training programs, and graduate schools authorized by the Department to participate in Title IV programs.

---

[3] Plaintiffs believe that the administrative record in this action is properly limited to the documents published by the agency in the Federal Register and its other official statements concerning the Delay Rule, and the docket in the pending litigation in *CAPPS v. DeVos*. The one analogous case in this Court that Plaintiffs have identified proceeded on a similar administrative record. *See Sierra Club v. Jackson*, No. 11-cv-1278-PLF, Dkt. No. 18 (administrative record consisting of agency publications and subsequent petitions for reconsideration and/or judicial review). In accordance with the Court's Standing Order, we will work with the Government to prepare a joint appendix.  References to comments submitted in the underlying rulemaking at issue in the *CAPPS* case are provided as background.

In exchange for Title IV funds, participating schools must enter into contracts called Program Participation Agreements (PPA) with the Department and agree to comply with the Higher Education Act and all applicable regulations. *See* 20 U.S.C. §§ 1094 & 1087c(a); 34 C.F.R. §§ 668.14 & 685.300(b). Schools act as fiduciaries to the Department in coordinating federal aid programs, and by participating, they become subject to federal oversight. *See, e.g.*, 20 U.S.C. § 1094; 34 C.F.R. § 668.82.

Recent years have seen many revelations of Title IV schools engaging in fraud and misrepresentation regarding educational offerings and student outcomes. *See* ED, Proposed Rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 39330, 39335 (Jun. 16, 2016) (NPRM) (discussing fraudulent practices of Corinthian College); *see also* Comments of Legal Services NYC, ED-2015-OPE-0103-10057 at 3-6 (Aug. 1, 2016); Comments of Coalition of Legal Aid Organizations, ED-2015-OPE-0103-10705 at 7-9, 12, 14-16, 19-25 (Aug. 1, 2016); Comments of Attorneys General of Massachusetts, et al., ED-2015-OPE-0103 at 1 (Aug. 1, 2016); Comments of Veteran Negotiators, ED-2015-OPE-0103-9726 at 1-2 (Aug. 1, 2016).[4] These predatory schools, generally concentrated in the for-profit college industry, target vulnerable populations of students, including students of color, first-generation immigrants, single parents, and students with disabilities. *See, e.g.*, Comments of Americans for Financial Reform, ED-2015-OPE-0103-10698 at 1 (Aug. 1, 2016). Because Title IV schools cannot obtain more than 90 percent of their funding

---

[4] All comments are available at https://www.regulations.gov/docket?D=ED-2015-OPE-0103 (searchable by provided docket number).

from the Department's aid programs, 20 U.S.C. § 1094(a)(24), these schools also relentlessly target service members and veterans who have access to GI Bill benefits not subject to the 90 percent cap. *See* Comments of Veteran Negotiators, ED-2015-OPE-0103-9726 at 1 (Aug. 1, 2016).

Investigations have documented boiler room-like enrollment processes at predatory, for-profit schools. Enrollment representatives are trained to encourage prospective students to enroll quickly before classes purportedly fill up. *See* U.S. Senate Health, Education, Labor & Pensions Committee, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success 64 (2012) (HELP Report) (cited in multiple comments, including Coalition of Legal Aid Organizations, *supra*, and Consumers Union, ED-2015-OPE-0103-10390 (Aug. 1, 2016)); *see also* Comments of Public Citizen, ED-2015-OPE-0103-10723 (Aug. 1, 2016) (including student declarations describing the enrollment process at predatory schools). Some are also trained to intentionally divert questions during the enrollment process, including those about projected costs. HELP Report at 54-55.

Once enrolled, students often find that the educational experience at these predatory schools is not what they had been promised. As the Senate HELP committee found, these schools frequently spend more per student on marketing than they do on instruction—whereas public and non-profit institutions spend significantly more on instruction in both absolute and relative terms. *See, e.g.*, HELP Report at 86-87. For example, the HELP Committee noted that in 2009, Northern Virginia Community College spent $4,068 per student per year on instruction, and about $22 per student per year on marketing. *Id.* at 87. For-profit ITT, on the other hand, spent only $2,839 per student on instruction, and a whopping $3,156 on marketing. *Id.* It is thus little surprise, then, "that many for-profit schools have curricula that do not challenge students, academic integrity policies that are sparsely enforced, and teaching practices that in some cases do not lead to successful

student learning and outcomes." *Id.* at 89 (discussing results of GAO undercover investigation). Many also have substandard, outdated, or insufficient equipment and materials. *See, e.g.*, Bauer Decl. ¶ 10; Del Rose Decl. ¶ 10; Comments of Coalition of Legal Aid Organizations, *supra*, at 15.

Many students drop out of such predatory schools, citing a variety of reasons, including the low quality of educational programs and schools' failures to live up to promises regarding facilities and services. Many students come to realize they were admitted to programs from which the school should have known they could not benefit. *See* NPRM, 81 Fed. Reg. at 39366; HELP Report at 69 (discussing enrollment of a veteran with traumatic brain injury who "can't remember what course he's taking").

Students who drop out, and even those who graduate, often are surprised to find they are unable to use the educational credits they earned in any meaningful way, as they were misled about a particular program's accreditation, its preparation of students to seek professional certification or licensure, or the transferability of its credits to other schools. In 2013, for example, the Attorney General of Colorado entered into a $3.3 million settlement with Argosy University, Denver, involving allegations that the school misled students about the accreditation of its doctorate of education program in counseling psychology. Press Release, Attorney General Suthers Announces Consumer Protection Settlement with Argosy University (Dec. 5, 2013), https://coag.gov/press-room/press-releases/12-05-13, cited in Comments of Consumers Union, *supra*, at 5. The Attorney General concluded that Argosy had engaged in "a long and elaborate pattern of deceptive behavior," including telling students that the program was seeking accreditation by the American Psychological Association when it was not. *See id.* The state observed that no student in the program "ha[d] become licensed as a psychologist in Colorado or any other state." *Id.*

When Title IV-participating schools engage in fraud, misrepresentation, and other wrong-doing, they threaten the federal investment in student aid. By statute and Department regulation, students who attend a Title IV school and are harmed by the school's violation of certain laws, including prohibitions on fraud, may be entitled to cancellation of their federal Direct Loans through a process known as a "borrower defense" to repayment. *See* 20 U.S.C. § 1087e(h); preexisting 34 C.F.R. § 685.206(c). Moreover, students who attend a Title IV school that closes—including for reasons of mismanagement or based on findings or investigations of wrongdoing—are entitled to a "closed-school" discharge of their federal loans if they do not subsequently reenroll in another program. 34 C.F.R. § 685.214 (new and preexisting rule). And students who drop out or obtain worthless degrees from institutions ill-prepared to educate them—a common outcome at predatory schools—are more likely to default on their student loans. *See* NPRM, 81 Fed. Reg. at 39373 (citing Adam Looney & Constantine Yannelis, A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributed to Rising Loan Defaults, Brookings Institution (2015), 49, https://www.brookings.edu/bpea-articles/a-crisis-in-student-loans-how-changes-in-the-characteristics-of-borrowers-and-in-the-institutions-they-attended-contributed-to-rising-loan-defaults/) (finding 47% default rate for for-profit school borrowers versus 28% for borrowers at all schools).

Unfortunately, students who have been injured by their school's wrongdoing often have little recourse to be made whole by the school itself. Predatory schools have been remarkably successful at insulating themselves from liability through forced arbitration and class action waiver provisions buried in their enrollment contracts. One recent investigation found, based on a sample of enrollment contracts at for-profit colleges, that roughly 98 percent of students who attended such colleges were subject to forced arbitration provisions. *See* Tariq Habash & Robert Shireman,

8

How College Enrollment Contracts Limit Students' Rights (The Century Foundation) Apr. 27, 2016, at 7 (submitted as part of Comments of the Century Foundation, ED-2015-OPE-0103-9861 (Aug. 1, 2016)). Another analysis of such provisions in the for-profit industry documented the role they had played in forcing student-brought cases out of court and shutting down class actions that alleged systematic wrongdoing. *See* Comments of Public Citizen, *supra*, App'x C at 8-18. The recent closures of Corinthian Colleges and ITT Technical Institutes provide two cases in point. Both schools eventually closed after multiple investigations by state and federal authorities, leaving the federal government and/or students on the hook for loans used to finance education at these predatory institutions. *See, e.g.*, Rule, 81 Fed. Reg. at 75985; ED, Important Information Regarding ITT Educational Services, Inc., https://studentaid.ed.gov/sa/about/announcements/itt.  For years before its closing, however, Corinthian had used arbitration agreements with class action waivers to stave off lawsuits alleging a variety of misrepresentations in the recruitment process at multiple campuses. *See, e.g.*, *Ferguson v. Corinthian Colleges*, 733 F.3d 928 (9th Cir. 2013); *Miller v. Corinthian Colleges, Inc.*, 769 F. Supp. 2d 1336 (D. Utah 2011). During the peak years of Corinthian's wrongdoing, only one student obtained a favorable arbitrator's award, among the thousands of students enrolled in the school at that time.[5] Likewise, ITT enforced arbitration agreements including "gag clauses" that forbade students who *did* arbitrate against the school from publicly disclosing any information about the outcome of the proceedings or the evidence obtained in the course of those proceedings. Comments of Public Citizen, *supra*, App'x C at 12-13. In one case, ITT obtained a permanent injunction against multiple former students who had prevailed

---

[5] In connection with its August 1, 2016 comments in response to the NPRM, Public Citizen conducted an analysis of publicly available data produced by the American Arbitration Association (AAA). That analysis found 71 students pursued arbitration against Corinthian with AAA between 2011 and 2015. Ten students' claims were resolved by an arbitrator's final decision; one received monetary relief, and none received non-monetary relief. Comments of Public Citizen, *supra*, at 25.

against it in arbitration from sharing the arbitral findings with another student seeking to bring a similar suit. *ITT Educational Servs., Inc. v. Arce*, 533 F.3d 342 (5th Cir. 2008).

### B.    The Department's Consideration of the Borrower Defense Rule

In 2015, after the Corinthian collapse and amid widespread confusion about the borrower-defense process, the Department announced that it intended to amend its Title IV regulations to address the process, including its consequences for borrowers, schools, and the agency. *See* ED, Negotiated Rulemaking Committee; Public Hearings, 80 Fed. Reg. 50588, 50588 (Aug. 20, 2015). The HEA generally requires the agency to attempt to adopt rules through consensus-based negotiated rulemaking. 20 U.S.C. § 1098a(b). If the committee fails to reach agreement on a rule, the Department may propose a rule of its own choosing on the subjects covered by the negotiated rulemaking and follow the normal notice-and-comment procedures provided by the APA.

Consistent with the HEA's mandate, the Department established a negotiated rulemaking committee with representatives selected from groups of stakeholders with an interest in the rule, including borrowers, veterans' groups, consumer groups, legal aid providers, state attorneys general, and a broad array of schools, including for-profit institutions. *See* NPRM, 81 Fed. Reg. at 39333. The negotiated rulemaking committee met in early 2016 and discussed a rule that would, among other things, (1) amend substantive and procedural standards for the borrower defense process, (2) restrict Title IV-participating institutions' use of forced arbitration and class action waiver provisions in enrollment contracts, (3) require schools at risk of financial instability to provide greater assurances to the Department of their ability to repay Title IV funds, where necessary, and (4) mandate new disclosures from schools whose students are largely unable to pay down their federal loans. *See id.* at 39334-35; ED, Negotiated Rulemaking for Higher Education 2015–2016,

https://www2.ed.gov/policy/highered/reg/hearulemaking/2016/index.html (collecting materials provided to negotiating committee and hearing transcripts).

The negotiated rulemaking ultimately failed to reach a consensus agreement on a rule. NPRM, 81 Fed. Reg. at 39334. Accordingly, in June 2016, the Department published the NPRM setting forth its own proposal and set a deadline for public comments of August 1, 2016. *Id.* at 39,330. The NPRM stated that the Department intended to issue a final rule to take effect on July 1, 2017, *see*, *e.g.*, *id.* at 39331, 39337, the beginning of the next "award year" for Title IV funding, *see* 20 U.S.C. § 1088(a)(1); 34 C.F.R. § 600.2.

The projected July 1 effective date was incorporated into provisions of the NPRM with significant implications for schools' obligations and borrowers' rights. Specifically, the NPRM "propose[d] to create" new and amended regulations "to establish, effective July 1, 2017, a new Federal standard for borrower defenses, new limitation periods for asserting borrower defenses, and processes for the assertion and resolution of borrower defense claims" by students seeking to have federal loans cancelled based on misrepresentations or other unlawful conduct by schools. 81 Fed. Reg. at 39336. The NPRM also proposed to require contracts between schools and students "entered into after [the] effective date of this regulation" to include specific language regarding the availability of class actions to resolve disputes and limitations on the ability to compel arbitration of claims. *Id.* at 39421; *see also id.* at 39386. Institutions "that, prior to the effective date of the proposed regulations, incorporated pre-dispute arbitration or any other pre-dispute agreement addressing class actions in any agreements with Direct Loan Program borrowers" would be required "to provide to borrowers agreements or notices with specific language regarding a borrower's right to file or be a member of a class action suit." *Id.* at 39404; *see also id.* at 39421-22.

The Department received more than 10,000 comments on the proposed rule. Some addressed the proposed effective date of the regulations and either urged that the effective date be postponed or that portions of any rule be permitted to take effect earlier than July 1. *See* Comments from the California Ass'n of Private Postsecondary Schools, ED-2015-OPE-0103-10693 at 8 (Aug. 1, 2016) (urging ED to "allow more time for study, deliberation, and input, rather than rushing to promulgate these rules … for an effective date of July 1, 2017"); Comments of Trade Ass'ns Representing Student Loan Providers, ED-2015-OPE-0103-10045 at 4 (Aug. 1, 2016) (urging ED to permit early implementation of a portion of a rule before the effective date).

### C.    The Contours of the Borrower Defense Rule

On November 1, 2016, the Department published its final Borrower Defense Rule, "effective July 1, 2017." 81 Fed. Reg. at 75926. The Rule has four key parts:

**1.    The borrower defense process.** The Borrower Defense Rule provides revised procedures to better enable student loan borrowers to vindicate their longstanding right to seek cancellation of federal loans through the "borrower defense" process when the loans were used to attend a school that engaged in fraud or other unlawful conduct. 81 Fed. Reg. at 75961-64. For example, the Rule requires the Department to process borrower defense applications "through a fact-finding process" that includes consideration of "Department records" and "[a]ny additional information or argument that may be obtained by" the Department—i.e., not just the evidence available to and provided by borrowers. 81 Fed. Reg. at 76084 (new § 685.222(e)(3)(i)). The Rule also obligates the Department, "[u]pon the borrower's request," to identify "the records the Department official considers relevant to the borrower defense" and, upon reasonable request, provide those documents to the borrower. *Id.* (new § 685.222(e)(3)(ii)). If the Department denies a

12

request for cancellation in full or in part, it must issue "a written decision" that notifies the applicant "of the reasons for the denial, the evidence that was relied upon, any portion of the loan that is due and payable to the Secretary, and whether the Secretary will reimburse any amounts previously collected." *Id.* (new § 685.222(e)(4)). Moreover, while a borrower defense application is pending, the Borrower Defense Rule requires the Department to provide automatic forbearance on payments toward any non-defaulted loans for which cancellation is sought through the borrower defense process. *See* 81 Fed. Reg. at 76083 (new § 685.222(e)(2)(i)); *see also id.* at 76080 (new § 685.205(b)(6)(i), (vi)).

In promulgating these new provisions, ED explained how they benefit student borrowers. The new regulations "give students access to consistent, clear, fair, and transparent processes to seek debt relief," and reduce obstacles to pursuing borrower defense claims. 81 Fed. Reg. at 76047. The streamlined borrower defense process also aids institutions: "[T]hrough clarification of circumstances that could lead to a valid claim, institutions may better avoid behavior that could result in a valid claim and future borrowers may be less likely to face such behavior," which would also benefit both borrowers and the federal government. *Id.* at 76049. ED also noted the extensive benefits to "borrowers who ultimately have their loans discharged," explaining that discharge would ameliorate the well-documented hardships that are associated with high levels of student debt, while also providing "spillover economic benefits." *Id.* at 76051. Discharge would produce benefits for students and the public as a whole by allowing more students to return to school. *Id.*

   2.   **Arbitration and other contractual barriers to justice.** The Rule amends 34 C.F.R. § 685.300 to address the extent to which a school wishing to participate in the Direct Loan Program may rely on predispute arbitration agreements or class action waiver provisions with students to resolve claims related to the making of a Direct Loan or the education financed by that

loan. *See* 81 Fed. Reg. at 76021-31. Specifically, the Rule provides that a participating school may not "enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim." 81 Fed. Reg. at 76088 (new § 685.300(f)(i)). It similarly amends § 685.300 to require a participating school to forgo reliance on any predispute agreement with a student that waives the student's right to participate in a class action against the school related to a borrower defense claim. *Id.* (new § 685.300(e)). The Rule requires that, as of its effective date, schools participating in the Direct Loan Program include language incorporating the policy into any new contracts with students. *Id.* at 76087, 76088 (new § 685.300(e)(3)(i), (f)(3)(i)). For contracts entered into before the Rule's effective date, schools may either amend those contracts or notify affected students or former students that the schools will no longer rely on the contracts' predispute arbitration or class action waiver provisions. *Id.* at 76087, 76088 (new § 685.300(e)(3)(ii)-(iii), (f)(3)(ii)-(iii)).

ED explained that "prohibiting predispute arbitration clauses will enable more borrowers to seek redress in court," on either individual or class bases. 81 Fed. Reg. at 75939. The Department found that forced arbitration clauses "jeopardize the taxpayer investment in Direct Loans," by allowing institutions to "insulat[e] themselves from direct and effective accountability for their misconduct, [] deter[] publicity that would prompt government oversight agencies to react, and [] shift[] the risk of loss for that misconduct to the taxpayer." *Id.* at 76022. As to class action waivers, the Department concluded that they "effectively removed any deterrent effect that the risk of such lawsuits would have provided," and shifted the risk to taxpayers, by foreclosing meaningful options for redress other than the borrower defense process. *Id.* Based on its experience, ED concluded that "class action waivers for these claims substantially harm the financial interest of the United States and thwart achievement of the purpose of the Direct Loan Program." *Id.* Limiting

the use of arbitration and class action waivers by Title IV-eligible institutions would thus benefit both borrowers and federal taxpayers, given the Department's findings of "widespread and aggressive use of class action waivers and predispute arbitration agreements [that] coincided with widespread abuse by schools over recent years, and effects of that abuse on the Direct Loan Program." *Id*. at 76025.

**3.   Financial responsibility triggers.** The Rule amends section 668.171, which sets forth standards by which the Department determines whether an institution is "financially responsible." Institutions that must meet these standards to be eligible for Title IV programs unless they obtain a letter of credit or demonstrate another form of financial protection. *See* 81 Fed. Reg. at 76075-76 (new § 668.175).

Whereas the prior version of the regulations focused solely on the institution's current equity, reserve, and net income ratios and calculated a "composite score" on that basis, the new regulations take into consideration certain "triggering" events that indicate an institution is at significant risk of financial instability. For all institutions, these triggers are: (1) a debt or other liability arising from a final judgment or settlement, 81 Fed. Reg. at 76073 (new § 668.171(c)(i)(A)); (2) the pendency of an action by a federal or state government agency against the institution for claims relating to the making of a Direct Loan or the provision of educational services for more than 120 days, *id.* (new § 668.171(c)(i)(B)); (3) other litigation against the institution that has reached one of three procedural stages *id.* (new § 668.171(c)(ii)); (4) a requirement for a "teach-out plan" by an institution's accrediting agency for any location of that institution, *id.* (new § 668.171(c)(iii)); (5) a determination by the Secretary that the institution has programs that may be ineligible for aid under the Department's "gainful employment" rules, *id.* (new § 668.171(c)(iv)); and (6) withdrawal of owner equity in certain scenarios, *id.* (new

§ 668.171(c)(v)). If any of these six triggers is met, the Rule requires recalculation of the institu-

tion's "composite score," accounting for potential losses to the institution that could result from

these events. *Id.* (new § 668.171(c)(2)).

The new Rule also includes additional events that automatically trigger a finding that an

institution is financially irresponsible. These include violating the statute's 90/10 rule, which caps

the amount of a for-profit school's revenue that can come from Title IV funds at 90 percent, 81

Fed. Reg. at 76074 (new § 668.171(d)) and (2) two official cohort default rates of 30 percent or

more, *id.* (new § 668.171(f)). For publicly traded institutions, certain actions by the SEC or the

exchange on which the institution is traded also serve as triggers. *Id.* (new § 668.171(e)).

In addition to these "automatic" triggers, the new Rule provides that an institution may be

deemed not financially responsible if the Secretary determines than an event or condition is "rea-

sonably likely to have a material adverse effect on the financial condition, business, or results of

operations of the institution." 81 Fed. Reg. at 76074 (new § 668.171(g)). The Rule includes a

nonexhaustive list of eight events or conditions that may serve as "discretionary triggers." *Id.* (new

§ 668.171(g)(1)–(8)).

ED determined that these financial responsibility provisions "introduce far stronger incen-

tives for schools to avoid committing acts or making omissions that could lead to a valid borrower

defense claim than currently exist." 81 Fed. Reg. at 76049. Associated disclosure provisions allow

"borrowers to receive early warning signs about an institution's risk for students, and therefore

borrowers may be able to select a different college, or withdraw or transfer to an institution in

better standing in lieu of continuing to work towards earning credentials that may have limited

value." *Id.* at 76051. ED also found that, together, these provisions "provide some protection for

taxpayers as well as potential direction for the Department and other Federal and State investigatory agencies to focus their enforcement efforts." *Id.* at 76055.

4.      **Disclosures of loan repayment rates.** The fourth major provision of the Rule, set forth at revised section 668.41, creates an additional disclosure requirement for proprietary institutions. 81 Fed. Reg. at 76070-72. Under this provision, the Secretary will calculate the final loan repayment rate for each institution based on a two-year cohort period. *Id.* at 76070-71 (new § 668.41(h)(1)). If that rate shows that the median borrower has neither fully repaid his or her Title IV loans, nor made payments sufficient to reduce the balance on each such loan by at least one dollar, the institution must include a prescribed disclosure in its promotional materials. *Id.* at 76,071 (new § 668.41(h)(3)). The institution must also use this language to notify enrolled and prospective students, and must post the language on its website. *Id.* at 76,071-72 (new § 668.41(i)).

ED explained that these provisions "give borrowers more information with which they can make informed decisions about the institutions they choose to attend." 81 Fed. Reg. at 76051; *see also id.* at 76015. "How alumni are repaying their loans … [is] of direct interest to consumers." *Id.* at 76,014. The loan repayment disclosure provisions reflect ED's determination that "all students deserve to have information about their prospective outcomes after leaving the institution." *Id.* at 76015. Based on cited research, the Department concluded that such information would have meaningful benefits, as "students and families react to information about the costs and especially the value of higher education, including by making different decisions." *Id.* ED concluded that "this information is critical to ensure students and families have the information they need to make well-informed decisions about where to go to college." *Id.* at 76018.

## II.     The *CAPPS* Litigation and the Department's Delay Rule

In May 2017, just weeks before the Rule was slated to take effect, the California Association of Private Postsecondary Schools (CAPPS), an industry group representing private schools, including many for-profit institutions, filed suit to challenge parts of each of the Rule's four major provisions. *See CAPPS*, Dkt. No. 1 (Complaint). CAPPS sought invalidation and vacatur of the Borrower Defense Rule in its entirety. *Id.* ¶ 242(iv). It also moved for a preliminary injunction solely against those portions of the Rule that would prohibit participating schools from entering into or relying on predispute arbitration clauses and class action waivers. *CAPPS*, Dkt. No. 6, 6-1 (Mot. for Preliminary Injunction).

The following month, the Department published a two-page "Final Rule" delaying the effective date for many of the Borrower Defense Rule's provisions, "pending judicial review" in the *CAPPS* litigation. *See* ED, Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27621, 27621 (June 16, 2017). To justify this Delay Rule, the Department invoked its authority under section 705 of the APA. Section 705 provides that "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." The Department stated that it had "concluded that justice require[d] it to postpone the effectiveness of certain provisions of the final regulations until the judicial challenges to the final regulations are resolved." 82 Fed. Reg. at 27621.

The scope of the Delay Rule is *not*, however, limited to those regulatory provisions specifically challenged in CAPPS's lawsuit or preliminary injunction motion. For example, the Department stayed changes providing for the automatic discharge of federal loans where a student's school closes, new § 685.214(c)(2) & (f)(4)–(7), and requiring schools to produce to the Department judicial and arbitral records from proceedings involving students and borrower defense

claims, new § 685.300—provisions that CAPPS did not specifically challenge. *See* Delay Rule, 82 Fed. Reg. at 27622. Yet the Department did not delay certain other portions of the Borrower Defense Rule—including provisions on death discharge, nursing loans, severability, and technical amendments—that took effect on July 1, even though those portions would be vacated if CAPPS were successful in obtaining the relief of complete vacatur it sought. *See* Delay Rule, 82 Fed. Reg. at 27622. The Department did not explain how it selected which portions of the Rule would be delayed.

Rather, the Department stated that postponing the selected portions of the Borrower Defense Rule would "preserve the regulatory status quo while the litigation is pending and the Court decides whether to uphold the final regulations." *Id.* at 27621. It contended without elaboration that CAPPS had "raised serious questions concerning the validity of certain provisions of the final regulations." *Id.* Which provisions, or what serious questions CAPPS had raised about them, the Department did not say.[6] It also stated that CAPPS had "identified substantial injuries that could result if the final regulations go into effect before those questions are resolved." *Id.* However, the only injuries that the Department described involved (1) modification of schools' "contracts in accordance with the arbitration and class action waiver regulations," which would impose costs on schools "in making these changes," and (2) the imposition of "financial responsibility trigger provisions" that identify adverse events involving a school's finances and require the school to provide a letter of credit or other financial protection insuring against later liabilities to the Department. *Id.* The Department did not determine that these purported injuries to schools, if they occurred, would be irreparable. *Id.*

---

[6] The Department's answer to CAPPS's complaint likewise identifies no "serious questions": It avers that CAPPS failed to state a claim upon which relief may be granted and that the Department's actions were "fully consistent with applicable law." *CAPPS*, Dkt. No. 52 at 41.

In addition, the Department stated that the United States would "suffer no significant harm from postponing the effectiveness of the final regulations while the litigation is pending." *Id.* It stated that the borrower defense provisions and separate provisions regarding cancellation of loans to students whose schools close (the latter of which were not expressly challenged by CAPPS) were the most costly portions of the Rule, and that postponing the Rule would "help to avoid these significant costs." *Id.* at 27622. The costs ascribed to these portions of the Rule are solely attributable to the increased numbers of students the Department estimated would have their repayment liabilities cancelled under the Rule. Yet the Department inexplicably stated that delaying the final rule would "not prevent student borrowers from obtaining relief because the Department will continue to process borrower defense claims under existing regulations that will remain in effect during the postponement." *Id.* at 27621. It made no attempt to reconcile these two sentences or to address the impact of the delay on borrowers in any other way.

The Department also stated that the Rule's delay "w[ould] allow" it to "review and revise the final regulations," which the Department intended to do through a new negotiated rulemaking. *Id.* at 27622 (citing 20 U.S.C. § 1098a). The Department closed by stating that, "[b]ased upon the foregoing" analysis, it had "determined that it [was] necessary to postpone the effectiveness of the revisions to or additions of" a subset of the provisions of the Borrower Defense Rule. *Id.*

Alongside the Delay Rule, and in the months since, the Department made a series of statements indicating that the Trump Administration intends to roll back the Borrower Defense Rule in substantial part. Secretary DeVos issued a statement describing the delay as part of a "regulatory reset" of the Rule. ED, Press Release, Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions, June 14, 2017 ("June 14 Press Release"), https://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-reset-

protect-students-taxpayers-higher-ed-institutions. In a separate Federal Register notice, the Department provided additional information about its intent to initiate a new negotiated rulemaking to revise the Borrower Defense Rule, *see* 82 Fed. Reg. 27640 (June 16, 2017). Secretary DeVos heaped additional criticism on the Borrower Defense Rule in July. *See* Remarks from Secretary DeVos to the American Legislative Exchange Council, July 20, 2017, https://www.ed.gov/news/ speeches/remarks-secretary-devos-american-legislative-exchange-council. And that same month, the Department confirmed to Congress that, contrary to the assertion in the Delay Rule that it would continue to process borrower defense applications under preexisting law and regulations, it had not processed any borrower defense applications since the change in administrations. *See* July 7, 2017 Letter from Acting Under Secretary James F. Manning to Sen. Richard J. Durbin, https://www.durbin.senate.gov/imo/media/doc/17-010570%20Durbin%20Outgoing.pdf ("July 7 Letter"); *see also* Decl. of James F. Manning, Acting Under Secretary of Education, *Dieffenbacher v. DeVos*, Case No. 17-cv-342, Dkt. No. 32-2 ("Manning Decl.") (C.D. Cal. filed Sept. 7, 2017), available at http://www.legalservicescenter.org/wp-content/uploads/2012/10/32-ED-Status-Rpt.pdf (noting only that ED is "currently evaluating *criteria* for Borrower Defense relief").

After the Department announced the Delay Rule, CAPPS withdrew its motion for a preliminary injunction. The CAPPS litigation remains pending.

## III.    The Plaintiffs

Plaintiffs Meaghan Bauer and Stephano Del Rose brought this action to challenge the legality of the Department's Delay Rule. They contend that the Delay Rule violates the APA because it exceeds the Department's authority under 5 U.S.C. § 705 to postpone the effective date of a regulation pending litigation, and because it was adopted without public consultation, a negotiated rulemaking, and notice and an opportunity for public comment, as required by the HEA, 20 U.S.C.

§ 1098a, and APA, 5 U.S.C. § 553. Compl., Dkt. No. 1. The Plaintiffs, who attended the for-profit New England Institute of Art (NEIA) in Brookline, Massachusetts, have been injured by the Delay Rule in at least two distinct ways.

First, the Delay Rule harms Ms. Bauer and Mr. Del Rose because each has submitted and has pending a "borrower defense" application to the Department seeking cancellation of their federal loans. Ms. Bauer and Mr. Del Rose relied on numerous representations made by NEIA with respect to the quality of instruction and equipment, the school's industry connections, the job prospects for NEIA graduates, the school's job placement assistance, and the school's affordability, especially in relation to its graduates' purported success at landing well-paying jobs. Bauer Decl. ¶ 6; Del Rose Decl. ¶ 7. They later learned that many of these representations were untrue. Bauer Decl. ¶ 10; Del Rose Decl. ¶ 10. They also claim that their loans were structurally unfair because the education provided by NEIA would not allow them to earn income sufficient to repay them. Bauer Decl. ¶ 19; Del Rose Decl. ¶ 21. Each currently owes tens of thousands of dollars to the Department for federal Direct Loans used to attend NEIA. Bauer Decl. ¶ 13; Del Rose Decl. ¶ 13.

Although the preexisting regulations specify substantive standards that Ms. Bauer and Mr. Del Rose must meet to obtain cancellation of their loans based on school misconduct, they lack clarity with respect to the process that ED will use to adjudicate these borrower defense applications and their rights should ED deny their applications. *See* preexisting 34 C.F.R. § 685.206(c). The preexisting regulations specify the relief the Department may provide upon a successful application, but they are silent as to the process for appealing a denial. *Id.*

By contrast, if the Borrower Defense Rule took effect, the Department would be required to provide Ms. Bauer and Mr. Del Rose with significant protections in the adjudication of their borrower defense applications, including an automatic forbearance, the right to any information

ED considers relevant to the defense, and the right to an explanation of any denial. *See* 81 Fed. Reg. at 76080 (new § 685.206(c)(2)), 76,083-84 (new § 685.222(e)); *see also supra*, pp. 12-13.

Second, Ms. Bauer and Mr. Del Rose have been harmed by the delay in effective date of the arbitration and class action waiver provisions of the Borrower Defense Rule. On behalf of themselves and other former NEIA students, Ms. Bauer and Mr. Del Rose are preparing to file a class action lawsuit under the Massachusetts Consumer Protection Act against NEIA and its corporate parent, Education Management Corporation (EDMC), both of which participate in Title IV programs, including the Direct Loan Program. Bauer Decl. ¶¶ 17-18; Del Rose Decl. ¶¶ 19-20; Merrill Decl. ¶ 3. As a legal prerequisite to suit under that statute, they have sent a demand letter to NEIA and EDMC, *see* Mass. Gen. Laws ch. 93A, § 9(3), describing the defendants' illegal and unfair practices, including defendants' misrepresentations to and targeting of vulnerable and low-income students and families to take advantage of their desire for educational attainment. Bauer Decl. ¶¶ 17-18, Exh. 1; Del Rose Decl. ¶¶ 18-19, Exh. 2. The letter also details the injuries to the students and their families, including unaffordable and unmanageable debt, which in turn has hindered students' later attempts to obtain meaningful education and training. *Id.*

Both Ms. Bauer and Mr. Del Rose signed enrollment contracts with NEIA that include a forced arbitration clause purporting to cover future claims between students and the school and to bar students from participating in a class action against the school. Bauer Decl. ¶ 8; Del Rose Decl. ¶ 8, Exh. 1. In their demand letter, Ms. Bauer and Mr. Del Rose called upon NEIA and EDMC not to enforce these provisions, so that they and other former NEIA students could proceed in court collectively. Bauer Decl. ¶ 21, Exh. 1; Del Rose Decl.¶ 23, Exh. 2. NEIA and EDMC responded

to the demand letter by explicitly refusing the students' request that the school and its parent company agree not to enforce the arbitration and class action waiver provisions in their enrollment contracts. Bauer Decl. ¶ 23; Del Rose Decl. ¶ 25.

Once the Borrower Defense Rule takes effect, NEIA's participation in the Direct Loan Program will, under the Rule and NEIA's PPA, be conditioned on NEIA's forgoing any reliance on forced arbitration or class action waiver agreements it has entered into with students participating in the Direct Loan Program. *See* new 34 C.F.R. §§ 668.14, 685.300; Merrill Decl. ¶ 3 (noting NEIA's current participation). This condition will apply to claims related to its misrepresentations to Ms. Bauer and Mr. Del Rose. Absent the Borrower Defense Rule, however, NEIA and EDMC's confirmation that they will seek to enforce the arbitration and class action waiver provisions means that to access the court on behalf of themselves and a class of similarly situated borrowers, Ms. Bauer and Mr. Del Rose would have to succeed in opposing NEIA and EDMC's efforts to compel them to resolve their claims in individual arbitrations. *See* Bauer Decl.¶ 23; Del Rose Decl. ¶ 25. The delay of the Rule thus forces them to choose between initiating litigation and facing the prospect of a contest over being compelled into arbitration, or delaying the initiation of their action as applicable statutes of limitations continue to run on their claims. Bauer Decl. ¶¶ 26-27; Del Rose Decl. ¶¶ 28-29.

## STANDARD OF REVIEW

Under the APA, this Court "shall hold unlawful and set aside agency action" that is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. §706(2)(A), (C)-(D).

**ARGUMENT**

In issuing the Delay Rule, ED took a final agency action that affected the rights and obligations of both student borrowers and Title IV-eligible institutions. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (per curiam) (delay of a rule's effective date is final agency action). An agency has no "inherent authority" to delay a duly-promulgated rule, *id.* at 9; it can do so only by utilizing procedures authorized by Congress. Here, ED invoked APA section 705, which authorizes delays pending judicial review in certain circumstances. Section 705 is designed to allow agencies to stay rules so that courts may review them without irreparable harm to affected parties. The agency's failure even to address the appropriate considerations governing a section 705 delay, as well as the irrationality of its cursory attempt to justify the Delay Rule, require that the Delay Rule be set aside as arbitrary and capricious and contrary to law.

Moreover, the Delay Rule's transparent failure to pass muster under section 705, together with ED's statements tying its issuance to the agency's plans to revise key aspects of the Borrower Defense Rule, reveals it to be an unlawful effort to revoke a rule without the required process. *Cf. Public Citizen v. Steed*, 733 F.2d 93, 98 (D.C. Cir. 1984) ("'indefinite suspension' does not differ from a revocation simply because the agency chooses to label it a suspension"). Because the agency's use of section 705 was unlawful, and the agency did not comply with the HEA's negotiated rulemaking requirements, 20 U.S.C. § 1098a, and the APA's notice-and-comment requirements, 5 U.S.C. § 553, the Delay Rule is unlawful and must be vacated.

**I.      The Department's purported reliance on section 705 was arbitrary, capricious, and contrary to law.**

ED relied solely on section 705 of the APA as authority for the Delay Rule. Section 705 provides:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

The provision's meaning is plain on its face: Both courts and agencies may postpone the effective date of agency action pending judicial review, if and only if specified circumstances are met. Those circumstances do not exist here, and the agency's brief explanation for its invocation of section 705 shows it was the product of arbitrary and capricious decision-making.

### A.     The Agency's failure to apply the appropriate four-part standard was arbitrary and capricious.

Critical to any assessment of whether an agency has acted arbitrarily and capriciously is whether it has considered the factors that, by law, must guide its decision, and articulated a rational connection between those factors and the decision. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action must be set aside if it was not "based on a consideration of the relevant factors." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *see also Judulang v. Holder*, 565 U.S. 42, 53 (2011) (under APA, reviewing court is to assess, *inter alia*, "whether the decision was based on a consideration of the relevant factors"). Here, ED's decision on its face failed to set forth, analyze, or otherwise satisfy the standard that, as a matter of law, must guide an agency's decision whether to

postpone a rule's effective date under section 705—namely, the familiar four-part equitable test used to determine whether to grant a request for interim relief pending litigation.

There is wide agreement that, in determining whether a judicial stay is appropriate under section 705, courts utilize "the same standards used to evaluate requests for interim injunctive relief." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n. 4 (D.D.C. 2010) (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)); *see also Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm.*, 259 F.2d 921, 925 (D.C. Cir. 1958); *R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 823 F. Supp. 2d 36, 43 n. 14 (D.D.C. 2011). These factors are (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm absent relief; (3) the balance of equities; and (4) the public interest. *See, e.g.*, *Affinity Healthcare*, 720 F. Supp. 2d at 15 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In a leading decision construing section 705, this Court held in *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012), that "the standard for a stay at the agency level [under section 705] is the same as the standard for a stay at the judicial level: each is governed by the four-part preliminary injunction test applied in this Circuit."

*Sierra Club*'s holding that the four-part standard applies to an agency's own determination of whether a section 705 stay is appropriate rested on the court's conclusion that neither the text nor policies of the APA support the view that courts and agencies should apply different standards. 833 F. Supp. 3d at 31. To the contrary, legislative history "makes clear the intent" that "the standard for the issuance of a stay pending judicial review is the same whether a request is made to an agency or a court." *Id.* (citing APA, Legislative History, Pub. L. 1944–46, S. Doc. 248 at 277 (1946) ("This section permits *either agencies or courts*, if the proper showing be made, to maintain the status quo. … The authority granted is equitable and should be used by *both agencies and*

*courts to prevent irreparable injury or afford parties an adequate judicial remedy*.") (emphasis in original)). Allowing an agency to stay its own rule with less justification than a court would need to do the same would run the risk of encouraging agencies to "circumvent the rulemaking process through litigation concessions," and would undermine the notice-and-comment process. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015). "If an agency could engage in rescission by concession, the doctrine requiring agencies to give reasons before they rescind rules would be a dead letter." *Id.* (citing *State Farm*, 463 U.S. at 52). The four-factor test avoids this outcome by ensuring that an agency provides reasons for a court to review.[7]

In *Sierra Club*, the Court held that an agency's failure to "employ[] [or] mention[] the four-part test" in its explanation for the delay "is arbitrary and capricious" and thus alone warrants setting aside the Delay Rule. 833 F. Supp. 2d at 31. Here, in the brief text accompanying the Borrower Defense Rule, the Department similarly did not acknowledge this standard, analyze the determinative factors, or otherwise explain how a stay was justified under the four-part test. *See* 82 Fed. Reg. at 27621-22. The "'complete absen[c]e of any discussion' of … statutorily mandated factor[s] 'leaves … no alternative but to conclude that [the agency] failed to take account of th[ese] statutory limit[s] on its authority,' making the agency's reasoning arbitrary and capricious." *Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (quoting *United Mine Workers v. Dole*, 870 F.2d 662, 673 (D.C. Cir. 1989)).

---

[7] Agencies have also recognized that the four-part test governs agency actions under section 705. *See McCafferty v. Centerior Energy*, No. 96-ERA-6, 1996 WL 897658 (Dep't of Labor Admin. Rev. Bd. Oct. 16, 1996) (collecting cases); *see also* EPA, National Emission Standards for Hazardous Air Pollutants From the Portland Cement Manufacturing Industry and Standards of Performance for Portland Cement Plants, 76 Fed. Reg. 28318, 28326 (May 17, 2011); FERC, Market-Based Rates for Wholesale Sales of Electric Energy, Capacity and Ancillary Services by Public Utilities, 74 Fed. Reg, 30924, 30931 (Jun. 29, 2009); *In re Pub. Serv. Co. of New Hampshire, et al.*, 1 E.A.D. 389 (EPA Aug. 12, 1977).

**B.      The Department's explanation is unreasonable and insufficient under any standard.**

Even if ED's failure to acknowledge or apply the four-factor test were not in itself a basis for vacatur, the agency's action must be set aside as arbitrary and capricious. Whether examined against the four factors or the more nebulous standard of "justice" referred to by the agency, ED's reasoning "failed to consider … important aspect[s] of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, [and] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The brief explanation did little more than "merely recite the terms" of section 705, *see State Farm*, 463 U.S. at 52, and conclude "that justice require[d]" a delay. 82 Fed. Reg. at 27621. That assertion, in turn, rested only on a conclusory and unexplained reference to "serious issues" raised by CAPPS's legal challenge to the regulations, a factually flawed and arbitrary discussion of the potential irreparable harm, virtually no serious consideration of the impact of the delay on borrowers like Ms. Bauer and Mr. Del Rose, and an incomplete and illogical analysis of the implications for the public interest. Each part of the agency's explanation, moreover, directly contradicted its previous findings concerning the benefits of the Borrower Defense Rule, its impacts on participating schools, and the harms to borrowers, the federal government and the general public that its provisions were designed to prevent. The agency neither acknowledged its change of mind nor provided the "reasoned explanation … needed for disregarding facts and circumstances that underlay … the prior policy"—hallmarks of arbitrary and capricious action. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

**1.      The Agency's unexplained reference to "serious questions" fails to justify the delay.**

The first of the four factors governing issuance of preliminary relief pending litigation is the likelihood of success on the merits of the claims. *Winter*, 555 U.S. at 20. Here, ED did not

evaluate the likelihood of success of CAPPS's claims; it stated only that "the plaintiffs [sic] have raised serious questions concerning the validity of certain provisions of the final regulations." 82 Fed. Reg. at 27,621. It did not say what those questions were. Even assuming that "serious questions" may under some circumstances satisfy the test for preliminary relief, or that some more open-ended test applies under section 705, ED's conclusory reference to serious questions fails to provide a rational explanation for its action.

ED's failure even to identify the serious questions, let alone explain what makes them serious, fails the most basic test for reasoned explanation: It explains exactly nothing. *Cf. Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 206 (D.C. Cir. 2007) (finding an "agency's failure of explanation renders [regulatory action] arbitrary and capricious"); *N.Y. State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110 (D.D.C. 2003) (failure to articulate any explanation is arbitrary and capricious).

Moreover, to the extent ED now asserts that there are "serious questions" about the validity of any portion of the Borrower Defense Rule, that view reflects a change in agency position from November 2016. In its final rulemaking notice for the Borrower Defense Rule, the agency extensively discussed and refuted challenges to its legal authority to promulgate the provisions of the proposed rule, specifically including the challenges asserted in CAPPS's complaint. *See, e.g.*, 81 Fed. Reg. at 75945-46, 75964-65, 75973-78 (addressing challenges to authority for borrower defense provisions); *id.* at 75978-80, 76005, 76010 (addressing challenges to authority for financial responsibility provisions); *id.* at 76014-21 (addressing challenges related to repayment warnings); *id.* at 76021-31 (addressing challenges to authority for forced arbitration and class action waiver provisions). Nowhere in its cursory statement that CAPPS has raised serious questions does ED

acknowledge that it dismissed these questions as insubstantial only months ago. Of course, agencies are not precluded from changing their positions. When doing so, however, an agency must "display awareness that it is changing position" and provide "reasoned explication." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016); *see also Fox Television*, 556 U.S. at 516. The agency's statements here fall far short of that standard.

The Department's failure to provide an explanation here is analogous to the action considered by the D.C. Circuit in *International Union, United Mine Workers of America v. U.S. Department of Labor*, 358 F.3d 40 (D.C. Cir. 2004). There, MSHA had withdrawn a proposed rule because of the "possible adverse effect" of an Eleventh Circuit decision about another rule. *Id.* at 44. But as the D.C. Circuit noted, the agency had earlier suggested it could promulgate a rule that was consistent with that same decision. *Id.* The agency provided no elucidation of how its thinking had changed, failing to "explain why it came to deem the Eleventh Circuit decision fatal to that effort." *Id.* The lack of explanation that the court found arbitrary and capricious in *United Mine Workers* is not meaningfully different from ED's choice here to refer cryptically to "serious questions" without further explanation.

### 2.  The Agency did not establish any imminent, serious harm to regulated entities.

ED cited "substantial injuries" identified by CAPPS as a justification for the Delay Rule, claiming they made "maintaining the status quo [] critical." 82 Fed. Reg. at 27621.[8] Injury, however, must meet a high bar to justify a section 705 stay. Here, the only relevant injuries would be

---

[8] The Department also referenced "uncertainty," 82 Fed. Reg. at 27621, but "uncertainty" alone is not a non-speculative irreparable harm. *See, e.g.*, *Sunday Sch. Bd. v. U.S. Postal Serv.*, No. 99-5018, 1999 WL 322746, at *1 (D.D.C. Apr. 30, 1999); *Freeman v. Cavazos*, No. CIV. A. 90-2175-LFO, 1990 WL 141483, at *3 (D.D.C. Sept. 20, 1990); *IBM Corp. v. U.S. Dep't of Energy*, No. CIV.A. 88-0874, 1988 WL 40291, at *1 (D.D.C. Apr. 21, 1988).

imminent or certain harms that would be irreparably suffered during the pendency of the *CAPPS* litigation. *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 47 (D.D.C. 2014). Where, as here, the injuries are solely financial, they must "threaten the very existence of [the plaintiff's] business, the only circumstance in which this Circuit has endorsed a finding of irreparable harm based on monetary loss." *Id.* (brackets, citation, and internal quotation marks omitted). The purported harms to CAPPS on which ED relied do not reach this level.

The first purported harm ED referenced in the Delay Rule was that institutions "would be required, as of July 1, to modify their contracts in accordance with the arbitration and class action waiver regulations, which may be contrary to their interests." 82 Fed. Reg. at 27621. That contracts will be modified, however, is no more than a description of the consequences of the Borrower Defense Rule; it is not, in itself, a harm. The vague assertion that such modifications "*may*" be "contrary to the[] interests" of schools does not elevate it to the level of imminent, irreparable harm. Notably, ED did not assert, let alone substantiate, that institutions will be prejudiced in their defense or otherwise irreparably harmed if they litigate claims in court rather than arbitrate them. And to the extent ED is concerned about the cost associated with the actual modification of contracts and providing required notices as specified in the Rule, that cost hardly rises to the level of harm that would justify a stay: ED estimated modifying contracts would take 10 minutes per student—a drop in the bucket compared to the amount of time spent cajoling and recruiting students. 81 Fed. Reg. at 76067.[9]

---

[9] CAPPS made additional arguments in its since-withdrawn preliminary junction papers, but ED did not address these in its own notice and thus may not rely on them here. *See, e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (court "must judge the propriety of [agency] action solely by the grounds invoked by the agency"). Regardless, CAPPS's arguments that schools would "need to amend their agreements" and to "retrain their admissions staffs[] and actually litigate cases, including class actions, in federal and state court," CAPPS Dkt. No. 6 at 21, do not establish irreparable, imminent harm. The record on the Borrower Defense Rule is replete with

Second, ED asserted that "institutions would be subject to financial responsibility trigger provisions that could impose substantial costs." The Delay Rule itself, however, did not attempt to substantiate the existence or quantum of these potential "substantial costs" beyond stating that the plaintiff in the CAPPS case had "identified substantial injuries that could result if the final regulations go into effect." 82 Fed. Reg. at 27621. But CAPPS's preliminary injunction motion did not seek to enjoin the financial responsibility provisions or assert that CAPPS's members would be irreparably injured if those provisions went into effect pending litigation. *See CAPPS*, Dkt. No. 6 at 19-23. ED's explanation thus fails to demonstrate that the Delay Rule was the product of reasoned decision-making. Rather, ED has asserted that sections of its own rule would cause imminent, irreparable harm pending judicial review where CAPPS, the plaintiff in the underlying case, did not—while also incongruously saying that it was relying only on the "substantial injuries" that CAPPS identified to establish the harms purportedly justifying delay.

In any event, it is apparent from the face of the Borrower Defense Rule that any harm attributable to the financial responsibility provisions is both too speculative and too minimal to justify a stay. Under the Rule, an institution would be required to strengthen its financial stability

---

evidence that schools provided their staff with little if any training about forced arbitration and class action waivers in the past. *See, e.g.*, Comments of Public Citizen, *supra*, at 4. The costs of familiarizing staff with applicable regulations do not rise to the level of irreparable injury to merit a stay; nearly every regulation has such costs, and they are not particularly onerous here. Moreover, both these costs and the costs of preparing to modify new contracts would likely have already been incurred before the Delay Rule was issued, which occurred just two weeks before the Borrower Defense Rule was supposed to go into effect and more than seven months after the Rule was published. Regulatory familiarization and the preparation of new contract language for July 1 would necessarily have begun before that date. As to having to litigate in judicial fora as opposed to arbitration, or on a classwide basis, the possibility of facing an adjudication in a court of law does not threaten irreparable injury to a school's ability to defend itself.

by obtaining a letter of credit only upon the occurrence of a specified event, such as a court judgment, the imposition of a teach-out plan, or the de-listing of its stock on an exchange. 81 Fed. Reg. at 76073-74 (new § 668.171). Whether any of these events will occur is inherently speculative.[10] And the agency has not attempted to explain or demonstrate how obtaining a letter of credit—which brings benefits to institutions—would be so costly as to inflict the kind of irreparable financial injury the D.C. Circuit has concluded is necessary for a stay. Additionally, the agency considered the argument that the financial responsibility provisions would impose unjustified substantial costs on certain institutions in its November Final Rule—and rejected it. 81 Fed. Reg. at 76007-08. The agency's failure to acknowledge, let alone give reasons for, this reversal of position is arbitrary and capricious.

The Department did not identify any harms resulting from the other provisions of the Rule that it stayed.

### 3.   ED's balancing of harm was unreasonable.

If ED had been able to identify any irreparable harm to regulated institutions, it would then have had to balance that harm against the interests of both the government and other interested parties, including student borrowers, in the implementation of the Rule. *See, e.g., Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 124-25 (D.D.C. 2012); *Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925. ED's purported balancing of those interests does not meet minimal standards of rational explanation, for two fundamental reasons: First, the agency's assertion that delay will not

---

[10] If an institution were to argue that one of the triggers of the financial responsibility provisions was "imminent" and that requiring it to get a letter of credit would be so burdensome as to force it to close, it would be conceding how precarious its financial situation is. In such a case, the public interest would not support allowing the institution to continue to be eligible for Title IV funds. Likely for this reason, CAPPS did not seek a preliminary injunction as to these provisions.

harm borrowers is contradicted by its simultaneous claim that the delay will benefit the government by reducing transfers of funds from the government to students resulting from loan cancellations. Second, ED completely ignores other harms that both student borrowers and the federal government will suffer as a result of delaying the Borrower Defense Rule and disregards its own prior findings that substantiate the existence of those harms and demonstrate that the benefit of eliminating them justifies issuance of the Borrower Defense Rule.

### a. The Agency ignored the obvious harm to borrowers caused by delay of the borrower defense provisions.

In justifying the Delay Rule, ED asserted that the government would benefit financially by not allowing the Borrower Defense Rule to go into effect. 82 Fed. Reg. at 27621-22. Specifically, ED stated that it would save billions of dollars of costs over ten years that would be attributable to the "discharge of borrowers' loans" if the Borrower Defense Rule went into effect. *Id.* at 27621. But the agency completely ignored the inherent harm that goes hand in hand with this cost savings: Borrowers whose loans would have been, but now will not be, discharged are significantly harmed by the Delay Rule. The Borrower Defense Rule's regulatory impact analysis is the source of the $16.6 billion "cost" figure cited to support the assertion that the government's interests will not be harmed by delay. That analysis explains at length that any such costs are the result of increased "transfers" to student borrowers—more of whom will receive discharges under the Borrower Defense Rule, particularly since that Rule would automatically grant discharges to students who attended schools that closed, rather than requiring eligible borrowers from closed schools to apply for discharges. Thus, any cost savings to the government necessarily comes at expense to the borrowers who were to be protected by the Rule.

ED's "balancing" of harm ignored this obvious consequence and rested entirely on the illogical and inconsistent statement that students would not be harmed at all by the indefinite stay

of the Borrower Defense Rule. ED also ignored that every dollar saved by the government—the claimed benefit of the Delay Rule—represents more than a dollar of harm to a student borrower. Whereas the Government would recover some of the costs associated with discharge from the institutions students attended, *see* 81 Fed. Reg. at 75930-32,[11] student borrowers—who can withstand the budgetary impact far less than the federal government—have limited avenues for relief, particularly in light of the class action waivers and forced arbitration clauses that institutions are free to invoke during the indefinite stay. It is arbitrary and capricious for an agency to claim the benefit of cost savings, while entirely ignoring the interests of the borrowers at whose expense those savings would come.

The government not only committed a blatant logical error in failing to recognize the adverse consequences to student borrowers from delay, it also ignored its own prior conclusion that the benefits to students of the new provisions amply justify the costs of the Borrower Defense Rule. In promulgating the Borrower Defense Rule, ED noted that existing regulations had "led to much confusion among borrowers regarding what protections and actions for recourse are available to them when dealing with cases of wrongdoing by their institutions." 82 Fed. Reg. at 76047. The Rule, therefore, gave "students access to consistent, clear, fair, and transparent processes to seek debt relief," not just with respect to the borrower defense provision of the statute, but also the closed school discharge and other provisions. *Id.* ED provides no explanation whatsoever as to why it is ignoring these findings, made only eight months earlier, as well as its own 15-page,

---

[11] ED's discussion of costs was also incomplete and disingenuous in referencing language from the Rule stating that "the largest quantified impact of the regulations is the transfer of funds from the Federal government to borrowers who succeed in a borrower defense claim," 81 Fed. Reg. 76050 (referenced at 82 Fed. Reg. 27621), while ignoring the second half of that sentence: "a significant share of which will be offset by the recovery of funds from institutions whose conduct gave rise to the claims." *Id.*

detailed regulatory impact analysis, which concluded that costs to the public fisc are outweighed by the benefits of the Rule. *See id.* at 76046-61.

A letter from ED to Senator Durbin shows the magnitude of the harms caused by the Delay Rule. ED received 14,949 borrower defense applications in the less than six months between January 20, 2017, and July 7, 2017. July 7 Letter. All of these borrowers, and many more, including plaintiffs Mr. Del Rose and Ms. Bauer, are being deprived of the procedural protections that would have been provided had the Rule not wrongfully been delayed.

The harm to student borrowers caused by the delay is real and irreparable. For example, Mr. Del Rose and Ms. Bauer have had borrower defense applications pending with ED since August 2015 and September 2015, respectively. Del Rose Decl. ¶¶ 30-31; Bauer Decl. ¶¶ 28-29. Had the Rule gone into place, ED would have been required to provide automatic forbearance on payments toward any non-defaulted loans for which cancellation is sought through the borrower defense process. *See* 81 Fed. Reg. at 76083 (new § 685.222(e)(2)(i)); *see also id.* at 76080 (new § 685.205(b)(6)(i), (vi)). Ms. Bauer has requested that ED place loans at issue in her borrower defense application in forbearance, but to date she has not been able to secure that status. Bauer Decl. ¶¶ 31-32. The loans at issue in Mr. Del Rose's borrower defense application have been placed in forbearance, but this administrative status is currently set to expire in January 2018, and its renewal is uncertain. Del Rose Decl. ¶¶ 32-33.

Notably, in the Borrower Defense Rule, ED recognized that the economic and psychological harms of continuing debt are well-established. *See* 81 Fed. Reg. at 76051. Each month that passes causes borrowers like Ms. Bauer and Mr. Del Rose additional anguish as they wait for ED to rule on their borrower defense applications—currently in an opaque and confusing process— while interest continues to accrue. Had the Rule gone into effect, each of them would have been

able to take advantage of a clarified and expanded process—one that would have provided them access to records ED considered in the process, new § 685.222(e)(3)(ii)), and a reasoned, written decision if their requests were denied, new § 685.222(e)(4)).

ED failed to consider *any* of these harms to student borrowers. The *only* statement it made about harm to student borrowers was that they would not be harmed "because the Department will continue to process borrower defense claims under existing regulations that will remain in effect during the postponement." 82 Fed. Reg. at 27621. Not only does this statement fail to recognize that the purported financial benefits to the government from delay are entirely attributable to estimates that fewer students will receive loan forbearance or cancellations, it also rests on a false factual assertion that the Department has continued to process borrower defense claims. But as the Department confirmed in its July letter to Senator Durbin, the agency has not processed a *single* borrower defense claim since January 20, 2017. *See* July 7 Letter, *supra*. And in a recent court filing, the Department stated only that it is "currently evaluating *criteria* for Borrower Defense relief." Manning Decl., *supra* (emphasis added). "[A]n agency decision is arbitrary and must be set aside when it rests on a crucial factual premise shown by the agency's records to be indisputably incorrect." *Mizerak v. Adams*, 682 F.2d 374, 376 (2d Cir. 1982); *see also Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 123 (D.D.C. 2016) ("[W]here an agency has relied on incorrect or inaccurate data or has not made a reasonable effort to ensure that appropriate data was relied upon, its decision is arbitrary and capricious and should be overturned."). ED's recent official statements indicate that the agency's purported balancing rested both on an arbitrary and capricious failure to acknowledge that any savings to the government come directly from the pockets of students, and also on the indisputably incorrect factual premise that the agency was continuing to process discharge applications as diligently as it would under the Rule.

### b. ED ignored other harms caused by an indefinite delay of other provisions of the Rule.

ED also "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, when it failed to give any consideration at all to the harm to borrowers of delaying provisions of the Rule other than the ones clarifying the procedural and substantive standards for asserting borrower defenses. The most obvious such provision is the one concerning forced arbitration and class action waivers. It was arbitrary and capricious for ED to consider the harms that institutions would face if the ban on forced arbitration and class action waivers went into effect, but not the harms that borrowers would suffer if it did not. These real harms are irreparable.

As noted above, Ms. Bauer and Mr. Del Rose intend to sue the school they attended, NEIA, and its corporate parent, EDMC. If the Rule were in effect, they could bring a class action in Massachusetts state court under the Massachusetts Consumer Protection Act, and NEIA and EDMC would be forced to defend that suit on the merits. With the Rule delayed, NEIA and EDMC's explicit statements demonstrate that they would respond to such a suit by moving to compel arbitration and ban Ms. Bauer and Mr. Del Rose from pursuing relief on a classwide basis. If they prevailed, Ms. Bauer and Mr. Del Rose would be forced to either abandon their claims, as so many borrowers do, or confront the difficulties associated with individual arbitration. The Department has explained at length the harms these options impose on borrowers and the public:

> [C]lass action lawsuits not only provide a vehicle for addressing a multitude of relatively small claims that would otherwise not be raised—or raised only as borrower defense claims—but create a strong financial incentive for both a defendant school and other similarly situated schools to comply with the law in their business operations. Pre-dispute arbitration agreements coupled with class action waivers eliminate this incentive by preventing the aggregation of small claims that may reflect widespread wrongdoing. We believe that banning class action waivers as they pertain to potential borrower defense claims would promote direct relief to borrowers from the party responsible for injury, encourage schools' self-corrective actions, and, by both these actions, lessen the amount of financial risk to the taxpayer in discharging loans through the defense to repayment process.

NPRM, 81 Fed. Reg. at 39383; *see also id.* at 39384-85; 81 Fed. Reg. at 76022-23. The agency's failure even to acknowledge its prior findings about the harmful impact of arbitration and class action waiver provisions on students, let alone explain its change in view, is arbitrary and capricious. *See, e.g., Am. Wild Horse Pres. Campaign v. Perdue*, 865 F.3d 691, 705 (D.C. Cir. 2017).

Moreover, Ms. Bauer, Mr. Del Rose, and other borrowers in comparable situations cannot avoid the harms imposed by arbitration agreements and class action waivers by simply waiting until the unspecified end of the stay to take legal action. Their claims are subject to statutes of limitations. Those statutes of limitations continue to run. If they expire before the stay is lifted, the harm will be irreparable.

Other stayed provisions also cause harms to borrowers not addressed by ED. One such provision is the closed-school discharge provision, which is not even discussed in CAPPS's Complaint. In light of the recent closure of for-profit Charlotte School of Law, the Department has issued guidance that makes clear that it will not be providing students of that institution the benefits they would have received under the Rule (including, for example, automatic closed-school discharges). *See* ED, Fact Sheet: School Closure, Charlotte School of Law Located in Charlotte, North Carolina at 2, https://studentaid.ed.gov/sa/sites/default/files/charlotte-law.pdf. Staying the Rule's repayment-rate disclosure requirement will also irreparably harm students. Students who enroll in institutions, taking out loans without knowing about the abysmal repayment rate of those institutions' borrowers, cannot go back in time and reverse their enrollment once the repayment disclosures go into effect.

ED also ignored the harms to the government caused by other provisions delayed by the Delay Rule. Parts of the Borrower Defense Rule like the financial responsibility provisions and repayment disclosure warnings *protect* the public fisc by preventing a new generation of students

from being saddled with debt they will be unable to repay because their degrees are worthless. As the agency noted when issuing the Borrower Defense Rule, the financial responsibility provisions "introduce far stronger incentives for schools to avoid committing acts or making omissions that could lead to a valid borrower defense claim than currently exist." 81 Fed. Reg. at 76050. ED also concluded that the Borrower Defense Rule, as a whole, would lead to a reduction in school closures over time. *Id.* at 76051. Delaying the applicability of these provisions is bad for the American taxpayer—as recognized in the agency's previous conclusions that it now ignores. The Delay Rule's utterly incomplete consideration of the harms of delay defies the norms and requirements of reasoned decisionmaking.

### 4.   The Agency insufficiently analyzed the public interest.

Although the agency asserted that "the public interest" required the indefinite delay of the Rule, 82 Fed. Reg. at 27621, the accompanying discussion was woefully inadequate, as it failed to consider the impact on borrowers—who are members of the public—and disregarded all "public interests" other than the savings to the government that would result from granting fewer discharges to distressed student borrowers. 82 Fed. Reg. at 27621-22. As discussed above, delaying implementation of the Borrower Defense Rule imposes real harms on both borrowers and the public fisc itself. "The public interest may, of course, have many faces." *Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925. ED's simplistic conclusion that "the United States will suffer no significant harm from postponing the effectiveness of the final regulations," 82 Fed. Reg. at 27621, ignores the fact that American students and borrowers will suffer, and provides no coherent account of how it is genuinely in the public interest for the government to save money by denying student borrowers discharges to which they are entitled under the governing legal standard. Completely ignoring the impact that an indefinite stay of the *Borrower* Defense Rule would have on *borrowers*

in analyzing the "public interest" is perhaps the epitome of arbitrary and capricious—particularly because it represents a *sub silentio*, unreasoned reversal of position from the November 2016 Final Rule. *Cf. Fox*, 556 U.S. at 516; *see also St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 207 (D.D.C. 2015).

Equally important, ED had already explicitly considered the costs and benefits of a delay of the Rule when it promulgated the Borrower Defense Rule, and found that the public interest did *not* justify a delay:

> The Department has weighed the benefits of delay against these costs in making the decision to proceed with the regulation. With respect to borrower defense, if the Department did not proceed with the final regulations, the existing borrower defense provisions would remain in effect and some of the costs associated with potential claims would be incurred whether or not the final regulations go into effect. The final regulations build in more clarity and add accountability and transparency provisions that are designed to shift risk from the taxpayers to institutions. … Delaying the regulations would delay the improved clarity and accountability from the regulations without developing additional data within a definite timeframe, and we do not believe the benefits of such a delay outweigh the costs.

81 Fed. Reg. at 76049. ED's sudden reversal of its view of the public interest neither acknowledged nor explained why it had abandoned its previous findings on exactly the same point.

### C. Section 705 does not authorize an agency to delay a rule for the purpose of undertaking a new rulemaking.

In publishing the Delay Rule, ED stated:

> The postponement will allow the Department to consider and conduct a rulemaking process to review and revise the final regulations and ensures regulated parties will not incur costs that could be eliminated under any future regulations the Department promulgates on these matters.

82 Fed. Reg. at 27622.

The agency's reliance on its interest in revising the rule is impermissible under section 705.

Section 705 is specifically tied to judicial review. Although ED may find it inconvenient that the HEA and APA create a lengthy process for promulgating (or revising) rules, section 705 is not a

42

means of evading those requirements. *Cf. Am. Trucking Associations, Inc. v. Reich*, 955 F. Supp. 4, 7 (D.D.C. 1997) ("salutary as its motive may be," an agency cannot "avoid the rulemaking process, thereby silencing any … opposition and saving it the cost, delay, and uncertainty associated with such proceedings"). If the Delay Rule notice left any doubt that this impermissible consideration played a role in ED's invocation of section 705, the contemporaneous public statement of the Secretary confirms that the agency issued the Delay Rule as part of a "regulatory reset," not based on the equitable balancing the agency must use in determining whether to grant a stay pending litigation. *See* June 14 Press Release, *supra*. The agency's intention to engage in new rulemaking was an impermissible consideration under section 705, and requires vacatur of the Delay Rule. *See Public Citizen, Inc. v. Lew*, 127 F. Supp. 2d 1, 7 (D.D.C. 2000) (where agency "has relied on impermissible factors … the court must undo its action").

As its plain text demonstrates, section 705 exists for one purpose—to provide for a stay of a regulation where justice warrants during a period of judicial review. A Section 705 stay is not warranted "simply because litigation … *happens to be pending*." *Sierra Club*, 833 F. Supp. 2d at 34 (emphasis in original). The agency "must [articulate], at a minimum, a rational connection between its stay and the underlying litigation." *Sierra Club*, 833 F. Supp. 2d at 34; *see also Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citing *State Farm*, 463 U.S. at 43) (agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"). Here, ED's failure to explain why the *CAPPS* litigation necessitates any stay at all, much less the specific stay it imposed, shows that the agency improperly sought to use section 705 as a substitute for revising the Borrower Defense Rule.

In *Sierra Club*, the Court concluded that EPA's invocation of section 705 violated the APA because the agency only "paid lip service to the pending litigation" and was actually focused on

plans to reconsider the rules. *Id.* at 34. ED's actions here are no different: Not only did the Department explicitly acknowledge that its desire to change the rule motivated its action, but the scope of its stay confirms that the action had little relation to the *CAPPS* litigation. The Delay Rule postpones the effective date of over twenty provisions (but not every provision) of the Borrower Defense Rule. *See* 82 Fed. Reg. at 27622. At a minimum, ED was required to explain how the litigation justified a stay of each of the major provisions of the Rule it subjected to delay. It did not. Instead, it referenced generic "serious questions" and relied solely on the injuries asserted by CAPPS in connection with its preliminary injunction motion—although CAPPS only sought a preliminary injunction of one of the Rule's four major provisions (the arbitration and class action waiver ban). *See CAPPS*, Dkt. No. 6 at 25. In staying parts of the rule that CAPPS did not seek to preliminarily enjoin, ED showed its hand. If imminent injury revealed in the *CAPPS* litigation were genuinely the reason for the delay, the Delay Rule would have been more narrowly tailored. The disproportionate scope reveals that the litigation is merely a pretext for anticipated deregulation. The APA requires more than a pretextual justification. *See State Farm*, 463 U.S. at 52.

## II. The Delay Rule is otherwise invalid without negotiated rulemaking, notice, and an opportunity for public comment.

"The suspension or delayed implementation of a final regulation normally constitutes substantive rulemaking under APA § 553." *Envtl. Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920 (D.C. Cir. 1983); *see also Steed*, 733 F.2d at 98. Because ED's action cannot be justified as a rational application of section 705, its delay of the Rule's effective date could be sustained only if it had followed the notice-and-comment procedures set forth in the APA, *as well* as the negotiated rulemaking precursors required by the HEA, 20 U.S.C. § 1098a. It indisputably failed to do so.

The effective date of a regulation is a substantive element that triggers the HEA and APA procedural requirements for rulemaking. *See, e.g.*, *Envtl. Def. Fund, Inc.*, 716 F.2d at 920; *Council*

*of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 n. 28 (D.C. Cir. 1981); *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 566 F. Supp. 2d 995, 1004 (D.S.D. 2008). Reflecting this point, the July 1 effective date was an integral part of the proposed rule considered by ED and addressed by interested parties during the comment period on the Borrower Defense Rule. *See, e.g.*, NPRM, 81 Fed. Reg. at 39331, 39337. This date was incorporated into specific provisions of the NPRM that would have significant implications for regulated entities' obligations and borrowers' rights. Moreover, as discussed above, some commenters, including CAPPS, addressed the effective date in their comments on the proposed rule. *See supra* at 12. The agency's issuance of the final rule reflected its determination that the July 1, 2017, effective date was an important element of the Borrower Defense Rule.

Because, as demonstrated above, section 705 cannot justify the agency's action here, and because the Department has invoked no exception to notice-and-comment requirements that could otherwise justify altering a substantive term of the Borrower Defense Rule without compliance with the rulemaking procedures normally required by law, the Delay Rule must be vacated because it was issued without observance of procedure required by law. 5 U.S.C § 706(2); *see, e.g.*, *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 90-91 (D.D.C. 2007).

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for summary judgment should be granted and the Delay Rule vacated.

Respectfully submitted,

/s/ *Adam R. Pulver*

Toby R. Merrill                                      Adam R. Pulver
Mass. BBO No. 601071                         D.C. Bar No. 1020475
Amanda M. Savage                              Scott L. Nelson
Mass. BBO No. 690938                         D.C. Bar No. 413548
Alec P. Harris                                        Julie A. Murray
Colo. Bar No. 47547                             D.C. Bar No. 1003807
PROJECT ON PREDATORY STUDENT LENDING,    PUBLIC CITIZEN LITIGATION GROUP
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL    1600 20th Street NW
122 Boylston Street                              Washington, DC 20009
Jamaica Plain, MA 02130                     (202) 588-1000
(617) 522-3003                                      apulver@citizen.org
tomerrill@law.harvard.edu

*Counsel for Plaintiffs*

Dated: September 26, 2017