**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| MEAHAN BAUER and STEPHANO DEL ROSE, <br><br> *Plaintiffs*, <br><br> v. <br><br> ELIZABETH DEVOS, *in her official capacity as Secretary of the U.S. Department of Education*, and U.S. DEPARTMENT OF EDUCATION, <br><br> *Defendants*. |

Civil Action No. 17-1330 RDM
ECF Case

**BRIEF OF PROFESSORS SANT'AMBROGIO AND ZIMMERMAN**
**AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTEREST OF AMICUS ................................................................................................. 1

INTRODUCTION ........................................................................................................... 2

I.   The Department Correctly Concluded in 2016 That It Possessed Broad
     Authority to Adopt Procedures to Hear Group Claims ................................................ 4

II.  The Department Correctly Concluded that the Group Process Would Allow It
     to Resolve its Large Caseload More Efficiently, Consistently, and Fairly ................. 8

     A.   Aggregate Procedures Help Agencies Resolve Large Groups
          of Similar Claims More Efficiently and Consistently,
          While Expanding Legal Access ....................................................................... 8

     B.   The Department Similarly Justified its New "Group Process"
          To Promote Efficiency, Consistency and Legal Access
          in Mass Adjudication ..................................................................................... 10

III. The Department Adopted The Group Borrower Defense Procedures
     Consistent With Recommended Best Practices ......................................................... 14

IV.  The Department's Suspension of the Group Borrower Defense Procedures
     Ignores Its Earlier Findings And Lacks Any Reasoned Justification ....................... 16

     A.   The Department Provided No Justification for Suspending
          the Group Process for Borrower Defense Claims ......................................... 17

     B.   The Agency's Delay Will Be More, Not Less Burdensome than
          Implementing the Group Process for Borrower Defense ............................. 19

CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES                                                              PAGE(S)

*Barrett v. U.S. Civil Service Comm'n*,
   69 F.R.D. 544 (D.D.C. 1974) ............................................................................ 6, 10

*Cedillo v. Sec'y of Health & Human Servs.*,
   No. 98- 916V, 2009 WL 331968 (Fed. Cl. Feb. 12, 2009) ........................................ 9

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................................ 16

*F.C.C. v. Pottsville Broad. Co.*,
   309 U.S. 134 (1940) .......................................................................................... 5

*Hackley v. Roudebush*,
   520 F.2d 108 (D.C. Cir. 1975).............................................................................. 10

*Monk v. Shulkin*,
   855 F.3d 1312 (Fed. Cir. 2017) ......................................................................... 5, 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................................... 17

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ......................................................................................... 10

*Pub. Citizen v. Steed*,
   733 F.2d 93 (D.C. Cir. 1984)............................................................................... 17

*Quinault Allottee Ass'n & Individual Allottees v. United States*,
   453 F.2d 1272 (Ct. Cl. 1972)................................................................................. 6

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ............................................................................................ 6

## STATUTES

12 U.S.C. § 12a ...................................................................................................... 6

20 U.S.C. § 1087e ................................................................................................... 6

29 U.S.C. § 156....................................................................................................... 7

42 U.S.C. § 2000e ................................................................................................... 7

Higher Education Act of 1965 ................................................................................ 3, 6

## RULES & REGULATIONS

29 C.F.R. § 1614.204 ............................................................................................ 7, 9

34 C.F.R. § 668 ................................................................................................... 7, 16

34 C.F.R. § 685.206 ................................................................................................ 18

34 C.F.R. § 685.222 .......................................................................................... *passim*

57 Fed. Reg. 12,634 .................................................................................................. 9

64 Fed. Reg. 37,644 ................................................................................................ 10

81 Fed. Reg. 39,330 .................................................................................... 13, 15, 18

81 Fed. Reg. 40,260 ............................................................................................ 5, 14

81 Fed. Reg. 75,926 ......................................................................................... *passim*

82 Fed. Reg. 27,621 ............................................................................................ 2, 17

82 Fed. Reg. 49,114 ............................................................................................ 3, 18

82 Fed. Reg. 6,253 ............................................................................................ 13, 18

Fed. R. Civ. P. 23 ................................................................................................ 5, 7

Fed. R. Civ. P. 42 .................................................................................................... 8

## OTHER AUTHORITIES

Administrative Conference Recommendation 2016-2:
    *Aggregation of Similar Claims in Agency Adjudication* (June 10, 2016) .......... *passim*

American Law Institute, Principles of the Law of Aggregate Litig. § 1.04 (2010) .......... 10

Jeff Appel, Deputy Under Secretary, Opening Remarks,
    U.S. Dep't of Educ., Jan. 12, 2016 .......................................................................... 12

Yan Cao & Tarik Habash, *College Complaints Unmasked:*
    *99 Percent of Student Fraud Claims Concern For-Profit Colleges*,
    The Century Foundation, Nov. 8, 2017 ........................................................ 2, 19, 20

Comments of Kaplan, Inc. to Proposed Amendments to Rule Regarding
    Student Loan Repayment, U.S. Dep't of Educ. 8-9 (July 30, 2016) ........................ 15

Comments from the Legal Aid Community to the Department of Education,
    U.S. Dep't of Educ. 41-43 (Aug. 1, 2016) ............................................................. 15

Comments of Southern New Hampshire University to NPRM on
    Borrower Defense to Repayment Regulations to
    Secretary John B. King, U.S. Dep't of Educ. (Aug. 1, 2016) .................................. 15

Daniel Douglass-Gabriel, *Embattled For-Profit Corinthian*
    *Colleges Closes its Doors*, Wash. Post, Apr. 26, 2015 ............................................ 11

Daniel Douglass Gabrielle, *Trump Administration is Sitting on Tens of Thousands of Student Debt Forgiveness Claims*, Wash. Po., July 27, 2017 ............................... 18

Letter from 18 States Attorneys General to Jean-Didier Gaina, U.S. Dep't of Educ. (Aug. 1, 2016) ........................................................................... 15

Letter from The Institute for College Access and Success to Jean-Didier Gaina, U.S. Dep't of Educ. 9-10 (Aug. 1, 2016) .................................................................. 15

Letter of Americans for Financial Reform to Secretary John B. King, U.S. Dep't of Educ. 6-7 (Aug. 1, 2016) ..................................................................... 15

Letter from the Association of Proprietary Colleges to Jean-Didier Gaina, U.S. Dep't of Educ. 21-23 (Aug. 1, 2016) .............................................................. 15

Letter of Acting Under Secretary James Manning to Senator Richard J. Durbin, July 7, 2017 ....................................................................................................... 18

Letter to Secretary Arne Duncan from Attorney Generals, Apr. 9, 2015, submitted by M. Firestone to Negotiation Committee on Feb. 17, 2016 .................. 11

Letter to Secretary Arne Duncan from Maura Healy, Attorney General of Massachusetts, Feb. 4, 2015 ...................................................... 11

Letter to Secretary Arne Duncan from Senators Warren, Baldwin, Blumenthal, Durbin, Franken, Hirono, Markey, Merkly, Murphy, Reed, Schatz, and Whitehouse, Dec. 4, 2014 .......................................................................................... 11

Michael D. Sant'Ambrogio & Adam S. Zimmerman, *The Agency Class Action*, 112 Colum. L. Rev. 1992 (2012) ................................... 1, 8

Michael Sant'Ambrogio & Adam S. Zimmerman, *Inside the Agency Class Action*, 126 Yale L.J. 1634 (2017) .................................... 1, 5

Michael Sant'Ambrogio & Adam Zimmerman, *Aggregate Agency Adjudication, Report to the Administrative Conference of the United States* (Jun. 9, 2016) .............................................................................. 9

William B. Rubenstein, Newberg on Class Actions (5th ed. 2015) .............................. 8, 9

U.S. Dep't of Educ., *Fact Sheet: Protecting Students from Abusive Career Colleges*, June 8, 2015 ...................................................................... 12

U.S. Dep't of Educ., Office of Insp. Gen. Report, *Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process* Dec. 8, 2017 .................................. 19

U.S. Dep't of Educ., Press Release, *U.S. Department of Education
Announces Path for Debt Relief for Students at 91 Additional
Corinthian Campuses*, March 25, 2016 .................................................................... 12

U.S. Dep't of Educ., Title IV Loans, Borrower Defenses,
Meeting Summary, Feb. 17-19 (2016) ..................................................................... 14

U.S. Dep't of Educ., Title IV Loans, Borrower Defenses,
Meeting Summary, Jan. 12-14 (2016) ..................................................................... 14

U.S. Dep't Of Health & Human Servs., Settlement Conference Facilitation .................... 9

U.S. Dep't of Health & Human Servs., Statistical Sampling Initiative ............................ 9

## INTEREST OF AMICUS[1]

Amici are professors at Michigan State University College of Law and Loyola Law School, Los Angeles, who write extensively about the ways that federal agencies aggregate cases and claims.[2] We recently completed a study for the Administrative Conference of the United States—a government body that issues guidance for all federal agencies—surveying a wide range of class action and other aggregate procedures used by agencies in adjudication. Based on our report, the Administrative Conference adopted recommendations for agencies considering aggregate procedures in their own administrative proceedings.[3] Accordingly, we have a strong interest in identifying ways that agencies can respond to many claims efficiently, consistently and fairly.

The Department of Education adopted just such a rule when it finalized new student borrower regulations in November 2016. After extensive public deliberation, it created a "group process" to "provide simple, accessible, and fair" debt relief for student borrowers. *See* 34 C.F.R. 685.222(f)-(h) (2016). Unfortunately, the Department has now suspended these rules, without explanation, even as its backlog approaches 100,000 claims. We submit this brief to describe the value of group procedures and the Department's reasons for adopting them, in order to help explain why the Department's decision to suspend the 2016 Regulations was arbitrary, capricious, and contrary to law.

------------------------------

[1] No counsel for a party authored this brief in whole or in part. No person other than amicus curiae or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

[2] *See, e.g.,* Michael Sant'Ambrogio & Adam S. Zimmerman, *Inside the Agency Class Action*, 126 Yale L.J. 1634 (2017); Michael Sant'Ambrogio & Adam S. Zimmerman, *The Agency Class Action*, 112 Colum. L. Rev. 1992 (2012).

[3] *See* Administrative Conference Recommendation 2016-2: *Aggregation of Similar Claims in Agency Adjudication* (June 10, 2016).

## INTRODUCTION

Following an extensive process that generated over 50,000 public comments, on November 1, 2016 the Department of Education released new rules for students seeking debt relief (the "2016 Regulations").[4] The 2016 Regulations included a "group process" designed to "provide simple, accessible, and fair avenues to relief for borrowers."[5] Under the new process, Department officials could commence a single action before a neutral decision maker to adjudicate a common set of facts and claims raised by a large group of student borrowers against the same school. The process was adopted in response to the collapse of the Corinthian Colleges, which prompted thousands of students to petition the Department for debt relief in 2016.[6] The Department believed that a centralized hearing process offered many benefits: (1) students and schools gained access to a "consistent, clear, fair, and transparent" process; (2) administrators conserved resources by avoiding repetitive claims; and (3) taxpayers saved money when discharged federal loans were offset by money recovered from schools found to have engaged in misconduct.

Two weeks before the rules were to take effect, however, the Department suspended this procedure, without explanation, just as its backlog of claims surged to historic levels (the "Delay Rule").[7] Four months later, the Department further delayed the effective date of the 2016 Regulations in an Interim Final Rule.[8]

---

[4] *See* Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75,926 (Nov. 1, 2016).

[5] 81 Fed. Reg. at 75,968.

[6] 81 Fed. Reg. at 75,926.

[7] Final rule; notification of partial delay of effective dates, 82 Fed. Reg. 27,621 (June 16, 2017); Yan Cao & Tarik Habash, *College Complaints Unmasked: 99 Percent of*

Amici submit this brief in support of Plaintiffs' Motion for Summary Judgment. In their brief, Plaintiffs argue that the Department's decision to delay the 2016 Regulations does not meet the requirements for an administrative stay and that no "good cause" exists to extend that stay in the Interim Final Rule. They also argue that the Department's actions were "arbitrary and capricious" and "contrary to law" because the Department did not give a "reasoned" justification for suspending the 2016 Regulations.

We offer the Court a unique perspective, based on extensive research, about the impact of the Department's delay on the "group process," which was a critical part of the 2016 Regulations. The Department's failure to provide *any explanation* for suspending that part of the 2016 Regulations was itself "arbitrary and capricious" and "contrary to law." As we show, the Department carefully crafted this group process, repeatedly emphasizing that it was necessary to fairly resolve large numbers of student claims for debt relief. But just when the Department faced mounting backlogs of those same claims, the Department suspended that part of the rule without any justification.

We make four main points in this brief:

First, in issuing the 2016 Regulations, the Department correctly concluded that Section 455(h) of the Higher Education Act of 1965 gave the Department of Education broad power to craft hearing procedures, including rules to aggregate cases and claims. Agencies generally have substantial authority to craft group hearing procedures, as the

---

*Student Fraud Claims Concern For-Profit Colleges*, The Century Foundation, Nov. 8, 2017 ("the backlog of fraud complaints—currently numbering 87,000 not yet reviewed—is increasing, with the number of new claims submitted per month averaging approximately 8,000 since mid-August"), https://tcf.org/content/report/college-complaints-unmasked/.

[8] Interim final rule; delay of effective date; request for comments, 82 Fed. Reg. 49,114 (Oct. 24, 2017).

Department of Education itself recognized when it created this group process. Over 70 federal agencies and legislative courts have used their statutory authority to adopt procedures to aggregate claims.

Second, the Department was on solid ground when it repeatedly emphasized that its group process would "provide simple, accessible, and fair avenues to relief" for students. Other agencies successfully use aggregate procedures to promote efficiency, consistency, and fairness.

Third, the Department followed best practices recommended by the Administrative Conference as it crafted the group process. The Department gathered information about the use of aggregate procedures—including its own pilot program— and solicited input from diverse stakeholders. The Department also sought to balance the parties' due process rights against the need for administrative efficiency.

Fourth, despite the hard work the Department put into designing the group process, the Department has never explained its abrupt decision to suspend it, much less offered a "reasoned justification" for doing so, as required by law. This is striking in light of the thousands of claims students continue to file with the Department every month, as well as its contemporaneous promise that it would continue to adjudicate them. With a backlog of student applications approaching 100,000 claims, the Department has needlessly shelved a process carefully designed to provide students with swift relief.

I.   THE DEPARTMENT CORRECTLY CONCLUDED IN 2016 THAT IT POSSESSED BROAD AUTHORITY TO ADOPT PROCEDURES TO HEAR GROUP CLAIMS

When Congress creates administrative agencies, Congress often gives them broad authority under their enabling statutes to craft hearing procedures that allow them to carry

out their statutory missions. *See* Aggregation of Similar Claims in Agency Adjudication, 81 Fed. Reg. 40,260 (June 21, 2016). The Supreme Court has explained that such tribunals "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *F.C.C. v. Pottsville Broad. Co.*, 309 U.S. 134, 143 (1940).

For that reason, agencies may consolidate cases and decide "subordinate questions of procedure," such as "the scope of the inquiry, whether [cases] should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions." *Id.* at 138. The procedural flexibility Congress generally gives administrative agencies reflects a basic feature of administrative law: agencies need authority to shape their own rules and, when appropriate, to adapt those rules to the types of cases and claims that they hear.

As part of that authority, agencies have long adopted class actions and other aggregate procedures. Indeed, over 70 administrative tribunals and legislative courts have adopted procedures to aggregate claims. *See* Michael Sant'Ambrogio & Adam S. Zimmerman, *Inside the Agency Class Action,* 126 Yale L.J. 1634 (2017). Nine have adopted class action rules of some kind. *Id.* at 1659. Some rules loosely track Rule 23 of the Federal Rules of Civil Procedure, while others are tailored to the specific types of cases and claims that the court or agency hears.

As the Federal Circuit recently recognized, many agencies enjoy power to formally adopt rules for "class actions or other methods of aggregation" under their broadly worded statutory authority. *See Monk v. Shulkin*, 855 F.3d 1312, 1320 (Fed. Cir. 2017). This is because aggregation rules like "class action[s], no less than traditional

joiner (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010). And just as class actions fall "within the Supreme Court's mandate to adopt rules of 'practice and procedure'" for district courts, there is no reason why agencies and legislative courts cannot do the same.[9]

Section 455(h) of the Higher Education Act of 1965 gave the Department of Education the same broad authority to design its own procedural rules. The Act states, without limitation, that "the Secretary *shall specify in regulations which acts or omissions of an institution of higher education* a borrower may assert as a defense to repayment of a loan. . . ." 20 U.S.C. § 1087e(h) (emphasis added). As the Department of Education correctly observed, that language similarly authorizes the Department to develop rules to hear claims on behalf of large numbers of students. *See* 81 Fed. Reg. at 75,965 ("[I]n giving the Secretary the discretion to "specify which acts or omissions" may be asserted as a defense to repayment of loan, Congress also gave the Department the authority to determine … whether such claims should be heard contemporaneously as a group or successively").[10]

---

[9] *Quinault Allottee Ass'n & Individual Allottees v. United States*, 453 F.2d 1272, 1274 (Ct. Cl. 1972) (holding that the Court of Claims may certify class actions in appropriate cases); *Monk*, 855 F.3d at 1320 (observing statute giving EEOC authority to adopt "necessary and appropriate" rules was sufficient for it to "adopt class actions and other aggregate procedures"); *Barrett v. U.S. Civil Service Comm'n*, 69 F.R.D. 544, 550 (D.D.C. 1974) (ordering United States Civil Service Commission to adopt class action rules for federal employees).

[10] The Department's power may be even broader than other agencies with aggregate procedures. Other organic statutes require "reasonable," "appropriate," or "necessary" rules. *See* 7 U.S.C. § 12a (authorizing Commodity Futures Trading Commission (CFTC) "to make and promulgate such rules and regulations as, in the judgment of the Commission, *are reasonably necessary* to effectuate any of the provisions or to

Indeed, the Department's new rules resemble other aggregate procedures adopted by agencies and courts. The Department's rules provide that when it finds "common facts and claims" raised by students seeking debt relief, a designated department official may commence a "group process" before a neutral decision maker to expeditiously determine their claims. 34 C.F.R. § 685.222(f). Like class actions in federal court and in EEOC adjudication, the rules then require the Department to (1) notify the school and students of the proceedings, 34 C.F.R. § 685.222(f)(iii) & (iv), and (2) give students a chance to "opt-out" and pursue claims individually. *Compare* 34 C.F.R. § 685.222 (f)(iii) *with* Fed. R. Civ. P. 23(c) & 29 C.F.R. § 1614.204 (2012). The rules ultimately require that the Department provide the parties with the full process available under the Administrative Procedure Act, including neutral fact-finding, motion practice and rights to appeal. 34 C.F.R. § 685.222(h) (specifications for hearing officers); 81 Fed. Reg. 75,970 (noting that rules were "structured to provide the substantive and procedural due process protections both borrowers and schools are entitled to under applicable law, including those provided under the APA").[11]

---

accomplish any of the purposes of" the Commodity Exchange Act) (emphasis added); 29 U.S.C. § 156 (granting National Labor Relations Board "authority … to make, amend, and rescind … such rules and regulations *as may be necessary* to carry out" its statutory mandate) (emphasis added); 42 U.S.C. § 2000e-16(b) (empowering EEOC to "issue such rules, regulations, orders and instructions as it deems *necessary and appropriate* to carry out its responsibilities" with respect to federal employees) (emphasis added). By contrast, Congress only said that the Department "shall specify in regulations."

[11] Much like Rule 42 of the Federal Rules of Civil Procedure, the rules provide that the Department may also "bifurcate" proceedings to expedite claims—resolving common questions in one hearing (like whether a school attended by many students violated federal law), thereby narrowing the range of individual issues that students would have to address in a later hearing. 34 C.F.R. § 668.87(1)(a)(iiii)(B). *See also* 29 C.F.R. § 1614.204(l) (permitting EEOC to make individualized findings after a general "finding of discrimination against a class has been made"). In cases involving severe wrongdoing,

## II. The Department Correctly Concluded that the Group Process Would Allow It to Resolve its Large Caseload More Efficiently, Consistently, and Fairly

Agencies frequently rely on aggregate procedures to promote efficiency, consistency, and fairness. The Department of Education correctly identified these benefits when it concluded that its own "group process" would "provide simple, accessible, and fair avenues to relief for borrowers." 81 Fed. Reg. at 75,968.

### A. Aggregate Procedures Help Agencies Resolve Large Groups of Similar Claims More Efficiently and Consistently, While Expanding Legal Access

Aggregate procedures help agencies respond to large numbers of claims and address allegations of group-wide harm more efficiently than piecemeal individual adjudication.[12] Aggregation is especially helpful for agencies that administer large benefit programs, like the Department of Education, which has been inundated with a large number of related claims for debt relief following the collapse of a college or university.[13] For example, the Office of Medicare Hearings and Appeals, which hears appeals from Medicare coverage determinations, has successfully aggregated claims to address a 600,000 case backlog that arose when the Medicare program stepped up efforts

---

the Department also could automatically discharge certain groups of students to expedite and simplify the claim process.

[12] *See* William B. Rubenstein, Newberg on Class Actions § 1:9, at 27 (5th ed. 2015) ("Class actions are particularly efficient when many similarly situated individuals have claims sufficiently large that they would each pursue their own individual cases.").

[13] *See* Michael D. Sant'Ambrogio & Adam S. Zimmerman, *The Agency Class Action*, 112 Colum. L. Rev. 1992, 2010-12 (2012) (without aggregation procedures, large public benefits programs waste resources in "duplicative litigation, requiring frequent remands to address common factual errors, and hampering the efficient development and enforcement of law").

to recover excess billings.[14]  These efforts have been so successful that medical providers are urging OMHA to expand opportunities to aggregate and settle large numbers of claims.[15]

Aggregate procedures also help agencies resolve cases more consistently, particularly when many different people challenge the same organizational misconduct.[16] The EEOC, for example, has long used a class action procedure for resolving "pattern and practice" claims of discrimination lodged against the same federal employer, which include hearings before specialized administrative law judges. *See* 29 C.F.R. § 1614.204. The EEOC deems the process important in light of the volume of claims it processes each year, the potential for inefficient and inconsistent judgments, and the otherwise limited access to counsel.[17]

---

[14] *See* U.S. Dep't Of Health & Human Servs., Settlement Conference Facilitation, HHS.GOV, (last visited Oct. 20, 2015), http://goo.gl/YSaUOU; U.S. Dep't of Health & Human Servs., Statistical Sampling Initiative, HHS.GOV (last visited Oct. 20, 2015), http://goo.gl/y24gPF; Michael Sant'Ambrogio & Adam Zimmerman, *Aggregate Agency Adjudication*, Report to the Administrative Conference of the United States (Jun. 9, 2016) [hereinafter, "Report to Administrative Conference"], at 50-59.

[15] Sant'Ambrogio & Zimmerman, *supra* note 14*, at 61 & n.185 (describing requests for expansion). Another example comes from the National Vaccine Injury Compensation Program. When over 5,000 parents alleged that a vaccine additive called thimerosal caused autism in children, the Vaccine Court used a national Autism "Omnibus Proceeding" to pool all the individual claims that raised the same highly contested scientific questions. *Cedillo v. Sec'y of Health & Human Servs.*, No. 98- 916V, 2009 WL 331968, at *11 (Fed. Cl. Feb. 12, 2009), *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd,* 617 F.3d 1328 (Fed. Cir. 2010). Omnibus proceedings "turned out to be a highly successful procedural device," facilitating settlement of individual cases and allowing those cases that proceed to a hearing to be resolved "far more efficiently than if we had needed a full blown trial, with multiple expert witnesses, in each case." *Id.*

[16] Rubenstein, Newberg on Class Actions § 1:10, at 30 (aggregate procedures "reduce[] the risk of inconsistent adjudications").

[17] *See, e.g.,* 57 Fed. Reg. 12,634, 12,639 (Apr. 10, 1992) (describing inconsistent judgments that result in the absence of class actions). *See also Barrett*, 69 F.R.D. at 550 (D.D.C. 1974) (ordering United States Civil Service Commission to adopt class action

Finally, aggregate rules can expand access to legal representation,[18] particularly for wide and diffuse harms that are too costly to be prosecuted through individual claims and appeals, *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (aggregation "may permit the plaintiffs to pool claims which would be uneconomical to litigate individually"). They also help agencies gather information about matters within their regulatory jurisdiction. The EEOC's class action device, for example, allows the agency to pool information about employers' policies and highlights patterns that may escape detection in individual proceedings. According to the EEOC, "class actions … are an essential mechanism for attacking broad patterns of workplace discrimination and providing relief to victims of discriminatory policies or systemic practices." 64 Fed. Reg. 37,644, 37,651 (July 12, 1999).

### B. The Department Similarly Justified its New "Group Process" To Promote Efficiency, Consistency and Legal Access in Mass Adjudication

The Department of Education repeatedly emphasized these benefits as it designed its own "group process" to improve the speed at which it processed borrower defense claims, while promoting transparency and legal access.

Following state and federal investigations into the now-defunct Corinthian Colleges, on December 9, 2014, several United States Senators called on the Department to "immediately discharge" federal student loans held by students who had sued the

---

rules for federal employees because "any action" for workplace discrimination necessarily "*involves considerations beyond those raised by the individual claimant*."), *citing Hackley v. Roudebush*, 520 F.2d 108 (D.C. Cir. 1975) (emphasis in original).

[18] *See* American Law Institute, Principles of the Law of Aggregate Litig. § 1.04 (2010) (describing the central "object of aggregate proceedings" as "enabling claimants to voice their concerns and facilitating the rendition of further relief that protects the rights of affected persons").

Corinthian Colleges for fraud and violating state consumer protection laws.[19] States attorneys general, who had already found the Corinthian Colleges "engaged in numerous acts of deception," soon followed suit—encouraging the Department to adopt an aggregate process that would afford students more legal access and conserve resources.[20] Absent a "unified process," the states attorneys general observed, students attempting to secure relief on their own "will find it extremely difficult to obtain the information needed to support their cases," particularly given that individual students lacked "resources to investigate their schools."[21] In cases involving "systematic misconduct involving hundreds of students, it would be inefficient to require adjudication of numerous separate actions involving common defenses."[22]

Calls for a quick aggregate resolution grew after the Corinthian Colleges formally closed its doors in April 2015, giving rise to thousands of claims for debt relief.[23] In June

---

[19] Letter to Secretary Arne Duncan from Senators Warren, Baldwin, Blumenthal, Durbin, Franken, Hirono, Markey, Merkley, Murphy, Reed, Schatz, and Whitehouse, Dec. 4, 2014, https://www.warren.senate.gov/files/documents/2014%2012%209%20Corinthian%20Letter.pdf.

[20] Letter to Secretary Arne Duncan from Attorney Generals at 4, Apr. 9, 2015, submitted by M. Firestone to Negotiation Committee on Feb. 17, 2016, https://www2.ed.gov/policy/highered/reg/hearulemaking/2016/bd2-lettertoduncan-020415.pdf.

[21] *Id.*

[22] The state attorneys general noted that, in many cases, the cost of individually defending a collection action often could exceed the value of a typical $8,000 to $10,000 loan. Letter to Secretary Arne Duncan from Maura Healy, Attorney General of Massachusetts at 2-3, Feb. 4, 2015, submitted by M. Firestone to Negotiation Committee on Feb. 17, 2016, https://www2.ed.gov/policy/highered/reg/hearulemaking/2016/bd2-lettertoduncan-020415.pdf.

[23] Daniel Douglass-Gabriel, *Embattled For-Profit Corinthian Colleges Closes its Doors*, Wash. Post, Apr. 26, 2015, https://www.washingtonpost.com/news/business/

2015, the Department of Education appointed an experienced special master, Joseph A. Smith, to develop a rational claim resolution procedure. Given the daunting task of individually adjudicating thousands of claims efficiently, fairly, and transparently,[24] the Department proposed an aggregate procedure so that the Special Master could effectively discharge his duties:

> Wherever possible, the Department will rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers. [25]

As the Special Master began his work, the Department moved to formalize a "group process" to handle large volumes of claims, by commencing a negotiated rulemaking proceeding. As it did so, it again highlighted the importance of establishing "permanent processes" to address such claims. [26]  A formal group process, the Department later went on to say, would give "students access to consistent, clear, fair and

---

wp/2015/04/26/embattled-for-profit-corinthian-colleges-closes-its-doors/?utm_term=.38ca508a3f1e.

[24] *See* U.S. Dep't of Educ., Press Release, *U.S. Department of Education Announces Path for Debt Relief for Students at 91 Additional Corinthian Campuses*, March 25, 2016, https://www.ed.gov/news/press-releases/us-department-education-announces-path-debt-relief-students-91-additional-corinthian-campuses.

[25] U.S. Dep't of Educ., *Fact Sheet: Protecting Students from Abusive Career Colleges*, June 8, 2015, https://www.ed.gov/news/press-releases/fact-sheet-protecting-students-abusive-career-colleges.

[26] *See* Opening Remarks of Jeff Appel, Deputy Under Secretary, U.S. Dep't of Educ., Jan. 12, 2016 ("Although the special master's process is separate from this rulemaking effort, the large number of claims received to date make clear the need for permanent processes to address such claims in the future.").

transparent processes to seek debt relief." [27] The rules would also protect taxpayers, ensuring that "financially risky institutions … take responsibility for losses to the government" for federal loan discharges, while providing "due process for students and institutions." [28] The negotiated rulemaking committee convened several meetings on the group process in January, February and March, sharing and revising draft language, before seeking public comment on the proposed rule. [29]

The Department then released its final rule in November 2016, again noting that a group borrower defense would more fairly and efficiently resolve student claims. The Department explained: "We believe that the group process we adopt here will facilitate the efficient and timely adjudication of not only borrower defense claims for large numbers of borrowers with common facts and claims, but will also conserve the Department's administrative resources…" 81 Fed. Reg. at 75,965.

Finally, the Department struck the same note, one last time, when it issued rules clarifying the group process in January 2017. *See* 82 Fed. Reg. 6,253 (Jan 19, 2017). The new rules spelled out procedures for pre-hearing conferences, motion practice, hearings, and appeals. *Id.* at 6,254. In so doing, the Department reiterated that its aggregate procedures "balanced important interests" in due process while assuring that "borrower

---

[27] Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 39,330 (June 16, 2016).

[28] *Id.*

[29] *Id.* at 39,334. In the interest of full disclosure, one of the authors of this amicus brief, Professor Adam Zimmerman, also discussed how agencies generally use aggregate procedures with the committee.

defense claims asserted against institutions are resolved fairly, efficiently, and expeditiously for all parties." *Id.*

### III. THE DEPARTMENT ADOPTED THE GROUP BORROWER DEFENSE PROCEDURES CONSISTENT WITH RECOMMENDED BEST PRACTICES

The Department of Education observed many best practices recommended by the Administrative Conference as it crafted its group process. Among other things, the Department (1) collected information about the use of aggregate procedures, including its own pilot program for resolving claims; (2) sought input from many relevant stakeholders; and (3) adopted aggregate rules designed to balance the parties' due process rights against the need for administrative efficiency and consistency.[30]

First, the Department of Education sought to design formal rules based on its experience. Special Master Smith's experience handling and processing cases provided the Department with valuable insights.[31] In the course of the negotiated rulemaking process, the Department was able to identify recurring issues and design formal rules based on the Special Master's experience.[32]

---

[30] Aggregation of Similar Claims in Agency Adjudication, 81 Fed. Reg. 40,260 (June 21, 2016) (recommending principles for agency aggregation of claims, including Recommendation No. 3(c) (agencies should "pilot[] programs to test the reliability of an approach to aggregation before implementing the program broadly") and Recommendation Nos. 5 and 6 (agencies should "ensure that the parties' and other stakeholders' interests are adequately protected" consistent with Due Process).

[31] U.S. Dep't of Educ., Title IV Loans, Borrower Defenses, Meeting Summary, Jan. 12-14 (2016) (noting that Special Master Joseph A. Smith briefed the Committee on status of his "work to develop a process for discharging loans, the loans that had been discharged, and expectations for the discharge in the future."), https://www2.ed.gov/policy/highered/reg/hearulemaking/2016/bd2-mtg1summary.doc.

[32] U.S. Dep't of Educ., Title IV Loans, Borrower Defenses, Meeting Summary, Feb. 17-19 (2016) (noting Special Master Smith "answered questions about the process he and

Second, the decision to adopt aggregate procedures was the product of careful study, discussion, and deliberation. Student organizations, department officials, schools and other stakeholders explored many possible approaches and rules for aggregating claims, including: who would initiate the claim process, whether and how to adopt evidentiary presumptions, provisions for notice, effective claim administration procedures, and due process protections for schools and students.[33] After the negotiated rulemaking process, the Department received detailed comments on the group process from a wide variety of sources—including state attorneys general,[34] student, consumer and civil rights organizations,[35] as well as a wide variety of colleges and other educational institutions.[36]

---

his team are using to assess loan discharge claims…in response to Committee's request for an opportunity to learn more about his work"), https://www2.ed.gov/policy/highered/reg/hearulemaking/2016/bd3-session2-summary.doc.

[33] 81 Fed. Reg. 39,347-48.

[34] Letter from 18 States Attorneys General to Jean-Didier Gaina, U.S. Dep't of Educ. 3 (Aug. 1, 2016) (on file with the Department of Education, docket number ED-2015-OPE-0103-9542) ("One of the most significant components of the borrower defense rule is the group debt-relief process contained in § 685.222(f)-(h).").

[35] *See, e.g.,* Comments from the Legal Aid Community to the Department of Education, U.S. Dep't of Educ. 41-43 (Aug. 1, 2016) (on file with the Department of Education, docket number ED-2015-OPE-0103-10705); Letter from The Institute for College Access and Success to Jean-Didier Gaina, U.S. Dep't of Educ. 9-10 (Aug. 1, 2016) (on file with the Department of Education, docket number ED-2015-OPE-0103-10697); Letter of Americans for Financial Reform to Secretary John B. King, U.S. Dep't of Educ. 6-7 (Aug. 1, 2016) (on file with the Department of Education, docket number ED-2015-OPE-0103-10698).

[36] *See, e.g.,* Letter from the Association of Proprietary Colleges to Jean-Didier Gaina, U.S. Dep't of Educ. 21-23 (Aug. 1, 2016) (on file with the Department of Education, docket number ED-2015-OPE-0103- 9989); Comments of Southern New Hampshire University to NPRM on Borrower Defense to Repayment Regulations to Secretary John B. King, U.S. Dep't of Educ. (Aug. 1, 2016) (on file with the Department of Education, docket number ED-2015-OPE-0103- 9989); Comments of Kaplan, Inc. to Proposed Amendments to Rule Regarding Student Loan Repayment, U.S. Dep't of Educ. 8-9 (July

Finally, the Department took several steps to ensure its aggregate process balanced the due process interests of students, institutions and the government. First, the rule allows the Department to make record evidentiary findings consistently for students at the same institution, while streamlining the claim process for students.[37] Second, to avoid frivolous claims or spurious lawsuits by private parties, the Department alone decides whether to commence a group action.[38] Third, the Department adopted all the protections of the Administrative Procedure Act for hearing cases involving open schools, which includes neutral decision-making, vigorous fact finding, and full-blown hearings for schools impacted by the process.[39]

## IV. THE DEPARTMENT'S SUSPENSION OF THE GROUP BORROWER DEFENSE PROCEDURES IGNORES ITS EARLIER FINDINGS AND LACKS ANY REASONED JUSTIFICATION

Unlike the Department's detailed study and discussion behind the design of the "group process" included in the 2016 Regulations, the Department offered no explanation in either the Delay Rule or the Interim Final Rule for its decision to suddenly suspend the group process, much less a "reasoned explanation." *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (when amending, suspending, or repealing a rule, an agency must provide "a reasoned explanation . . . for disregarding facts and

---

30, 2016) (on file with the Department of Education, docket number ED-2015-OPE-0103- 6907).

[37] 34 C.F.R. § 685.222(f)(1)(ii) & (f)(3).

[38] 34 C.F.R. § 685.222(f)(1) ("Upon consideration of factors including, but not limited to, common facts and claims, fiscal impact, and the promotion of compliance by the school … the Secretary may initiate" a "group process.").

[39] *See* 34 C.F.R. §§ 668.88-91 (setting forth rules for pre-hearing conferences, hearing procedures, and appeals).

circumstances that underlay or were engendered by the prior policy"); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Pub. Citizen v. Steed*, 733 F.2d 93 (D.C. Cir. 1984) (agencies must "cogently explain" suspension of rules). The Department's delay is particularly puzzling given the historic backlog of student petitions still awaiting resolution.

### A. The Department Provided No Justification for Suspending the Group Process for Borrower Defense Claims

Two weeks before the 2016 Regulations were to take effect, on June 16, 2017, the Department announced that it would suspend certain parts of the 2016 Regulations, including the group process for borrower defense claims. Final rule; notification of partial delay of effective dates, 82 Fed. Reg. 27,621 (June 16, 2017). Yet the Department provided no justification for suspending the group process for borrower defense claims and even acknowledged that it needed to continue to adjudicate these claims regardless of its suspension of the 2016 Regulations. *Id.*

The Department justified its suspension by citing to a lawsuit filed on May 24, 2017 by the California Association of Private Postsecondary Schools (CAPPS) challenging the Department's 2016 Regulations. Specifically, the Department cited the costs that colleges and universities might incur if they had to "modify their contracts in accordance with the arbitration and class action waiver regulations." 82 Fed. Reg. 27,621. In addition, the Department suggested that "postponement will allow the Department to consider and conduct a rulemaking process to review and revise the final regulations and ensures regulated parties will not incur costs that could be eliminated under any future regulations the Department promulgates on these matters." *Id*. The Department later said it was postponing the effective date of the regulations until July 1, 2018 without any

reference to the group process. Interim final rule; delay of effective date; request for comments, 82 Fed. Reg. 49,114 (Oct. 24, 2017).

Notably, the Department *never* claimed that the group process for borrower defense would create a burden for either the Department or the schools. Moreover, the Department *did not* dispute it prior findings that the group process would "promote greater efficiency and expediency in the resolution of borrower defense claims" *nor* that the group process would "conserve the Department's administrative resources." 81 Fed. Reg. at 75,965. Indeed, the Department did not address the group process for borrower defense claims at all, in either the Delay Rule or the Interim Final Rule.

The Department's silence is notable given its contemporaneous promise to continue processing student claims. It makes no sense for the Department to promise to adjudicate student borrower defense claims and yet reject the very process designed to resolve such claims. The regulations would have allowed the Department to use a group process for claims arising out of any time period.[40] Indeed, notwithstanding the Department's pledge, the Department has not approved a single borrower defense claim since January 20, 2017,[41] even though most of its growing backlog originates from the Corinthian Colleges[42]—the very school that inspired the Department's group process.

_____

[40] 81 Fed. Reg. 39,347 (observing the Secretary may use group process "for loans first disbursed before July 1, 2017" for "violation[s] of State law" that impact a "group of borrowers."); 82 Fed. Reg. at 6,254 ("Such a proceeding may be used when pursuing an action under either the Department's new borrower defense regulation at 34 CFR 685.222 or its precursor at 34 CFR 685.206.").

[41] *See* Letter of Acting Under Secretary James Manning to Senator Richard J. Durbin, July 7, 2017, https://www.durbin.senate.gov/imo/media/doc/17-010570%20Durbin%20Outgoing.pdf. *See also* Daniel Douglass Gabrielle, *Trump Administration is Sitting on Tens of Thousands of Student Debt Forgiveness Claims*, WASH. POST, July 27, 2017. According to a recently released Inspector General report, of

## B. The Agency's Delay Will Be More, Not Less Burdensome than Implementing the Group Process for Borrower Defense

The group process for borrower defense will help not only students. Aggregating borrower defenses involving common facts or claims will help the Department conserve resources in repetitive adjudication. As discussed in Part II, federal agencies handling large numbers of similar claims have used aggregation to great effect. Moreover, a formal group process will help the Department to avoid inconsistencies that arise when resourced-constrained personnel resolve thousands of student borrower claims without clear guidelines.[43] Aggregation will help schools conserve resources, by allowing them to present their arguments in a single proceeding, rather than in thousands of individual administrative actions. Finally, aggregation helps protect taxpayers, ensuring that "financially risky institutions … take responsibility for losses to the government" for federal loan discharges" in a single group process.[44]

---

the 98,868 claims it has received, the Department of Education has not approved a single claim since January 21, 2017. (It has apparently denied two.) In roughly half that time, the previous administration's Department of Education's Borrower's Defense Unit (BDU) approved 27,986 claims between July 1, 2016 and January 17, 2017, by applying common evidentiary findings for certain categories of student claims. *See* U.S. Dep't of Educ., Office of Insp. Gen. Report, *Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process* 11, Dec. 8, 2017 [hereinafter, "Insp. Gen. Report"]. Special Master Smith approved an additional 3,787 claims.

[42] Cao & Habash, *supra* note 7 ("Approximately three-fourths of all claims (76.2 percent) were against schools owned by one for-profit entity, the now-closed Corinthian Colleges.").

[43] A recently released Inspector General report of the Department's program, for example, found the Department resolved common claims inconsistently and without concrete timeframes for approving or denying claims. *See, e.g.,* Insp. Gen. Report, *supra* note 41, at 16 and 18; *see also id.* at 7 (showing that unit charged with processing claims today has "only six contracted staff" compared to nineteen in November 2016).

[44] *Id.*

As important, the longer the Department waits to implement aggregate procedures, the larger its backlog of claims will grow. Each month, student borrowers file approximately 8,000 new claims for relief.[45] No amount of changes to the 2016 Regulations will change the fact that the Department will have to adjudicate thousands of similar clams for relief it receives from student borrowers. The Department has not offered a reason why it should not rely on the group process it carefully designed after years of study and public deliberation.

## CONCLUSION

The Department's suspension of the group process for borrower defense claims included in the 2016 Regulations was arbitrary, capricious, and contrary to law. The Department created a "group process" in 2016 to "provide simple, accessible, and fair" debt relief for student borrowers. But even as its backlog of claims continued to grow, the Department suspended its group process, disregarding its prior findings and without providing any reasoned justification.

---

[45] Cao & Habash, *supra* note 7.

Dated:  December 15, 2017          Respectfully Submitted,


By:   */s/* Brian Gilmore

Brian Gilmore
D.C. Bar No. 439757
Michigan State University Law Clinic
648 North Shaw Lane
East Lansing, MI 48824
Tel: (517) 432-6998
bgilmore@law.msu.edu

Counsel for *Amicus Curia*e, Professors
Sant'Ambrogio and Zimmerman

21