## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEAGHAN BAUER and STEPHANO DEL ROSE, | |
| Plaintiffs, | |
| v. | |
| BETSY DEVOS, *in her official capacity as Secretary of Education*, | Civil Action No. 17-01330 (RDM) |
| and | |
| UNITED STATES DEPARTMENT OF EDUCATION | |
| Defendants. | |

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al. | |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION, | Civil Action No. 17-CV-01331 (RDM) |
| and | |
| BETSY DEVOS, *in her official capacity as Secretary of Education,* | |
| Defendants. | |

### *AMICUS CURIAE* BRIEF OF
### CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS
### IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY
### JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' SECOND RENEWED MOTION
### FOR SUMMARY JUDGMENT

BORIS BERSHTEYN
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036

GREGORY BAILEY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive
Chicago, IL 60606

ROBERT L. SHAPIRO, DC Bar No. 415854
DUANE MORRIS LLP
505 Ninth Street, NW
Washington, DC 20004

CLIFFORD M. SLOAN, DC Bar No. 417339
CAROLINE S. VAN ZILE, DC Bar No. 1017942
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
T: 202/371-7000
F: 202/661-8340
Email: cliff.sloan@skadden.com
Email: caroline.vanzile@skadden.com

*Attorneys for CAPPS*

## CORPORATE DISCLOSURE STATEMENT
## AND CERTIFICATE OF DISCLOSURE

Pursuant to Local Rule 7(o) of the Local Rules of the United States District Court for the

District of Columbia (the "Local Rules"), and Federal Rule of Appellate Procedure 29:

I, undersigned counsel of record for *amicus curiae*, certify that to the best of my

knowledge and belief, the California Association of Private Postsecondary Schools ("CAPPS")

does not have a parent corporation, no publicly held company holds 10% or more of stock of

CAPPS, and no parents, subsidiaries, or affiliates thereof have any outstanding securities in the

hands of the public.

## STATEMENT OF COUNSEL

Pursuant to Local Rule 7(o) and Federal Rule of Appellate Procedure 29, counsel for

*amicus curiae* states that none of the parties to the above-captioned dispute, and none of their

counsel, authored this brief in whole or in part.  No persons other than *amicus*, its members, or

its counsel made a monetary contribution to preparation or submission of this brief.

Dated: April 20, 2018                                 Respectfully submitted,

BORIS BERSHTEYN                                       /s/ Clifford M. Sloan
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP              CLIFFORD M. SLOAN, DC Bar No. 417339
4 Times Square                                        CAROLINE S. VAN ZILE, DC Bar No. 1017942
New York, NY 10036                                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                                      1440 New York Avenue, NW
GREGORY BAILEY                                         Washington, DC 20005
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP              T: 202/371-7000
155 N. Wacker Drive                                   F: 202/661-8340
Chicago, IL 60606                                     Email: cliff.sloan@skadden.com
                                                      Email: caroline.vanzile@skadden.com
ROBERT L. SHAPIRO, DC Bar No. 415854
DUANE MORRIS LLP
505 Ninth Street, NW
Washington, DC 20004

*Attorneys for CAPPS*

# **TABLE OF CONTENTS**

Page

INTEREST OF AMICUS CURIAE ................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................2

ARGUMENT ...................................................................................................................5

I.     THE DEPARTMENT SATISFIED THE REQUIREMENTS OF § 705. ........................5

       A.     The Department Reasonably Concluded That Justice Required Issuing the
              § 705 Stay. ..............................................................................................6

              1.     Whether "Justice So Requires" Is a Broad Standard that Gives the
                     Department Considerable Discretion. ........................................6

              2.     The Conclusion that the Regulation Would Cause Substantial
                     Harm to Schools and Students Is Amply Justified by the Record. ...........6

                     (a)     The Borrower Defense Provisions Would Cause Substantial
                             Harm. ..................................................................8

                     (b)     The Financial Responsibility Provisions Would Cause
                             Substantial Harm.....................................................9

                     (c)     The Repayment Rate Provisions Would Cause Substantial
                             Harm. ..................................................................10

                     (d)     The Arbitration and Class Action Provisions Would Cause
                             Substantial Harm.....................................................11

              3.     The Department Permissibly Balanced the Equities.................................12

       B.     The Department Issued the § 705 Stay "Pending Judicial Review" of the
              Borrower Defense Regulations. ..............................................................13

       C.     The Department Was Not Required to Engage in Notice and Comment
              Rulemaking Before Issuing the § 705 Stay...............................................14

II.    THE DEPARTMENT LAWFULLY PROMULGATED THE IFR................................15

III.   THE DEPARTMENT LAWFULLY PROMULGATED THE 2018 RULE. ...................17

       A.     The 2018 Rule Satisfies Applicable Requirements Under the APA.....................18

       B.     The 2018 Rule Comports with the HEA's Goal of Providing Notice to
              Institutions...........................................................................................21

IV.     IF THE COURT CONCLUDES OTHERWISE, THE COURT SHOULD
        REMAND WITHOUT VACATUR. ................................................................................22

CONCLUSION...........................................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
   988 F.2d 146 (D.C. Cir. 1993) ........................................................................................ 22

*Am. Lung Ass'n v. EPA*,
   134 F.3d 388 (D.C. Cir. 1998) ........................................................................................ 22

*Black Oak Energy, LLC v. FERC*,
   725 F.3d 230 (D.C. Cir. 2013) ........................................................................................ 23

*California v. Bureau of Land Management*,
   277 F. Supp. 3d 1106 (N.D. Cal. 2017) .......................................................................... 18

*California v. Bureau of Land Management*,
   286 F. Supp. 3d 1054 (N.D. Cal. 2018) ..................................................................... 18, 20

*Cytori Therapeutics, Inc. v. FDA*,
   715 F.3d 922 (D.C. Cir. 2013) ............................................................................... 6, 14, 20

*Dean v. United States*,
   556 U.S. 568 (2009) ........................................................................................................ 14

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..................................................................................................... 5, 13

*Hibbs v. Winn*,
   542 U.S. 88 (2004) .......................................................................................................... 15

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
   460 U.S. 1 (1983) ............................................................................................................ 11

*National Venture Capital Ass'n v. Duke*,
   No. CV 17-1912 (JEB), 2017 WL 5990122 (D.D.C. Dec. 1 2017) .................................. 19

*POM Wonderful LLC v. Coca-Cola Co.*,
   134 S. Ct. 2228 (2014) .................................................................................................... 14

*U.S. Telecom Ass'n v. FBI*,
   276 F.3d 620 (D.C. Cir. 2002) ........................................................................................ 23

## STATUTES

20 U.S.C. § 1089 ................................................................................................ 15, 16, 21

20 U.S.C. § 1098a ...................................................................................................... 17

20 U.S.C. §§ 1070-1099 ................................................................................................ 2

5 U.S.C. § 553 ..................................................................................................... 15, 17

5 U.S.C. § 705 ............................................................................................... *passim*

5 U.S.C. § 706 .......................................................................................................... 5

9 U.S.C. §§ 1 *et seq,* ............................................................................................... 11

**REGULATIONS**

34 C.F.R. § 685.222 .................................................................................................. 9

34 C.F.R. § 685.300 ............................................................................................ 3, 12

Exchange Act Rule 13p-1 and Form SD, Exchange Act Release No. 72,079,
    79 Fed. Reg. 26,297 (May 2, 2014) .................................................................. 13

Notice of Proposed Rulemaking, Student Assistance General Provisions, Federal Loan
    and Grant Programs,
    82 Fed. Reg. 49,155 (Oct. 24, 2017) .................................................................. 4

Senate Report No. 79-752 ........................................................................................ 14

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and
    Teacher Education Assistance for College and Higher Education Grant Program
    82 Fed. Reg. 49,114 (Oct. 24, 2017) .............................................................. 1, 3

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and
    Teacher Education Assistance for College and Higher Education Grant Program,
    83 Fed. Reg. 6458 (Feb. 14, 2018) ...................................................... 1, 18, 20

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and
    Teacher Education Assistance for College and Higher Education Grant Program,
    81 Fed. Reg. 75,926 (Nov. 1, 2016) ........................................................ *passim*

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
    Education Loan Program, William D. Ford Federal Direct Loan Program, and
    Teacher Education Assistance for College and Higher Education Grant Program,
    82 Fed. Reg. 27,621 (June 16, 2017) .................................................. 1, 3, 6, 12

# OTHER AUTHORITIES

Andrew Kreibaum, *After Borrower Defense Negotiation Fails, Department to Craft New Rule*, Inside Higher Ed (Feb. 16, 2018), https://www.insidehighered.com/quicktakes/ ................................................................... 19

Anthony T. Caso, *No Good Reason For New Student Loan Forgiveness Rules*, Law360 (July 22, 2016), https://www.law360.com/articles/817923/no-good-reason-for-new-student-loan-forgiveness-rules ................................................................... 7

CAPPS, Comment Letter on Proposed Delay of Borrower Defense Regulations, No. ED-2017-OPE-0112 (Nov. 24, 2017) ....................................................... 20

CAPPS, Comment on Borrower Defense Regulations, No. ED-2015-OPE-0103 (Aug. 1, 2016) .................................................. 8, 10

CAPPS, Comment on Borrower Defense Regulations, Declaration of Jonathan Guryan, Ph.D., No. ED-2015-OPE-0103 (Aug. 1, 2016)……………………………………………………8

Career Education Colleges and Universities, Comment Letter on Borrower Defense Regulations, No. ED-2015-OPE-0103 (Aug. 1, 2016) ......................................................... 10

Judah Bellin, *A Gateway to the Working World*, City Journal (Spring 2015), https://www.city-journal.org/html/gateway-working-world-13724.html; Henry Bienen, *In Defense of For-Profit Colleges*, Wall Street Journal (July 24, 2010), https://www.wsj.com/articles/SB10001424052748703724104575378933954267308.......................................................................................................................... 8

National Association of College and University Business Officers, Comment Letter on Borrower Defense Regulations, No. ED-2015-OPE-0103 (Aug. 1, 2016) ......................................................... 11

Spelman College, Comment Letter on Borrower Defense Regulations, No. ED-2015-OPE-0103 (July, 28, 2016) ......................................................... 7

United Negro College Fund, Thurgood Marshall College Fund, and National Association for Equal Opportunity in Higher Education, Comment Letter on Borrower Defense Regulations, No. ED-2015-OPE-0103 (July 29, 2016) .................................................. 7, 9

## INTEREST OF AMICUS CURIAE

*Amicus* California Association of Private Postsecondary Schools ("CAPPS"), is a non-profit association of California private postsecondary educational institutions.  CAPPS has a membership of approximately 150 institutions, including proprietary, or for-profit, and non-profit schools.  Many CAPPS schools are small institutions, with an average of fewer than 400 students and one or two locations.  In a related case, *CAPPS v. DeVos*, No. 1:17-cv-00999-RDM (D.D.C. 2017) ("Borrower Defense litigation"), CAPPS is challenging the Final Borrower Defense to Repayment Rule adopted by the Department of Education ("Department").  *See* Student Assistance General Provisions, Federal Loan and Grant Programs, 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("Borrower Defense Regulations" or the "Final Rule").

CAPPS has a pressing interest in this case.  Plaintiffs seek to invalidate the Department's decisions (i) to postpone the effective date of the Borrower Defense Regulations pending the resolution of the Borrower Defense litigation (the "§ 705 Stay"); (ii) to issue an interim final rule delaying the effective date of the Regulations until July 1, 2018 (the "IFR"); and (iii) to promulgate a rule delaying the effective date of the Final Rule until July 1, 2019 (the "2018 Rule").  *See* Student Assistance General Provisions, Federal Loan and Grant Programs, 82 Fed. Reg. 27,621 (June 16, 2017) ("§ 705 Stay"); 82 Fed. Reg. 49,114 (Oct. 24, 2017) ("IFR"); 83 Fed. Reg. 6458 (Feb. 14, 2018) ("2018 Rule"), (collectively the "Delay Rules").  If the Court invalidates and vacates these temporary delays, the Regulations could, in Plaintiffs' view, take effect immediately.  Vacatur of the Delay Rules would cause chaos and disruption for CAPPS schools and other postsecondary institutions.  Schools and students alike would be injured by the implementation of the Regulations' onerous and unlawful requirements.

## INTRODUCTION AND SUMMARY OF ARGUMENT

CAPPS supports the Department's considered and lawful actions in delaying the effective date of the Regulations. CAPPS schools and students would sustain significant harm if the Borrower Defense Regulations were implemented. The Department's temporary Delay Rules are necessary, legally sound, and entirely reasonable. They prevent the irreparable injuries that schools would suffer if they were subjected to this unlawful and unjustified regulatory regime, with inadequate notice to institutions and while legal challenges regarding the Regulations remain unresolved.

On November 1, 2016, the Department promulgated the Borrower Defense Regulations with an effective date of July 1, 2017, pursuant to Title IV of the Higher Education Act, 20 U.S.C. §§ 1001 *et seq.* ("HEA"). *See id.* §§1070-1099; Final Rule, *supra*, at 75,926-27. As CAPPS explained in its Complaint in the Borrower Defense litigation, Complaint, *CAPPS*, No. 1:17-cv-00999-RDM (D.D.C. May 24, 2017), ECF No. 1 ("CAPPS Compl."), those Regulations create upheaval in the regulation of postsecondary schools without a legal basis or rational justification. Four core provisions of the Borrower Defense Regulations are unlawful and may threaten the very existence of many schools.

*First*, the Borrower Defense Regulations radically alter the grounds and processes for student borrowers to raise "borrower defenses" to Title IV loan repayment (the "Borrower Defense Provisions"). *Second*, the Regulations impose sweeping new requirements regarding a school's financial responsibility based on "triggering events" that bear no relation to an institution's actual financial health (the "Financial Responsibility Provisions"). Final Rule, *supra*, at 76,073-75. *Third*, the Regulations require a new loan repayment rate warning that impermissibly discriminates against proprietary schools (the "Repayment Rate Provisions"). *Id.*

at 76,070-71.  *Finally*, the Regulations unlawfully bar schools from enforcing arbitration

provisions and class action waivers in existing agreements with students, and impermissibly

prohibit those schools from executing new agreements with arbitration provisions and class

action waivers (the "Arbitration and Class Action Provisions").  *Id.* at 76,065-67; 34 C.F.R.

§ 685.300(e)-(f) (2017).

On May 24, 2017, CAPPS filed a lawsuit in this Court against the Department,

challenging the Borrower Defense Regulations as exceeding the Department's statutory

authority, violating the Administrative Procedure Act ("APA"), and contravening the

Constitution.  *See generally* CAPPS Compl.  CAPPS requested a preliminary injunction to bar

the enforcement of the Arbitration and Class Action Provisions.  *See* Mot. for Prelim. Inj.,

*CAPPS*, No. 1:17-cv-00999-RDM (D.D.C. June 2, 2017), ECF No. 6.

Shortly thereafter, the Department issued the § 705 Stay in a final rule postponing the

effective date of certain portions of the Regulations, including all four of its major operative

provisions, pending the resolution of the Borrower Defense litigation.  *See* § 705 Stay, *supra*, at

27,621.  As a result of the § 705 Stay, CAPPS withdrew its motion for a preliminary injunction.

*See* Notice of Withdrawal of Mot., *CAPPS*, No. 1:17-cv-00999-RDM (D.D.C. June 14, 2017),

ECF No. 21.  The Court has stayed the Borrower Defense litigation pending resolution of the

present cross-motions for summary judgment.  Minute Order, *CAPPS*, No. 1:17-cv-00999-RDM

(D.D.C. Mar. 1, 2018).

In October 2017, the Department issued the IFR, which confirmed that the provisions of

the Regulations subject to the § 705 Stay would not take effect until July 1, 2018, at the earliest.

*See generally* IFR, *supra*.  Also in October 2017, the Department published a notice of proposed

rulemaking seeking comments on an additional postponement of the Regulations until July 1,

2019.  Notice of Proposed Rulemaking, Student Assistance General Provisions, Federal Loan and Grant Programs, 82 Fed. Reg. 49,155 (Oct. 24, 2017) ("NPRM").  After considering the comments submitted, on February 14, 2018, the Department issued the 2018 Rule, which postponed the effective date until July 1, 2019, the beginning of a new financial award year.

As the Department appropriately recognized, the Borrower Defense Regulations are of questionable validity and threaten to cause significant, unjustified injury to schools, especially if the Regulations are implemented with inadequate warning and while challenges to their legality remain unresolved.  The Department's actions were lawful and justified under the APA.

*First*, the Department satisfied the statutory requirements of § 705 when it found that justice required that the Department delay the effective date of the Regulations pending the resolution of the Borrower Defense litigation.  The Department's invocation of § 705 was reasonable, explained appropriately, and satisfied applicable procedural requirements.

*Second,* in promulgating the IFR, the Department followed the proper procedures and reasonably interpreted the master calendar requirement to prevent the drastic harm that regulated entities would sustain if the Regulations went into effect before July 1, 2018.

*Third*, in promulgating the 2018 Rule, the Department followed the proper procedures and reasonably concluded, after considering comments submitted in response to the NPRM, that the Regulations should be delayed until July 1, 2019.  The delay is particularly justified because the Department is expected to complete its renewed borrower-defense rulemaking and attendant revisions to the Regulations this November, which may obviate the need for the challenged Regulations to ever go into effect.  The 2018 Rule thus prevents schools from being subject to shifting regulatory regimes within a single award year.

*Finally,* while CAPPS respectfully maintains it is clear that the Department promulgated

the Delay Rules permissibly and lawfully, if the Court concludes otherwise, it should remand to the Department without vacatur so that the Department can remedy any issues.

## ARGUMENT

### I.    THE DEPARTMENT SATISFIED THE REQUIREMENTS OF § 705.

The § 705 Stay constitutes a lawful exercise of the Department's authority.  The APA directs courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).  The arbitrary and capricious standard of review is narrow, and requires a court to determine whether an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted).  A court may not "substitute its judgment for that of the agency," and  must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* at 513-14 (citations omitted).

The § 705 Stay is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  Under 5 U.S.C. § 705, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review."  Even assuming arguendo that an agency's decision pursuant to § 705 is reviewable – and the Department forcefully argues it is not, *see* Mem. in Supp. of Defs.' Renewed Mot. for Summ. J. & in Opp'n to Pls.' Second Renewed Mot. for Summ. J. 20-23, ECF No. 59-1 ("Defs.' Opp'n to States' Mot."); Mem. in Supp. of  Defs.' Renewed Mot. for Summ. J. & in Opp'n to Pls.' Second Renewed Mot. for Summ. J. 16-20, ECF No. 58-1 ("Defs.' Opp'n to Borrowers' Mot.") – this language grants agencies considerable discretion to postpone a rule's effective date, so long as the agency "finds that justice so requires" and delays the effective date "pending judicial review."  5 U.S.C. § 705.  The Department satisfied both of these requirements.  In addition, the

Department followed the appropriate procedures for issuing the § 705 Stay.

**A.      The Department Reasonably Concluded That Justice Required Issuing the § 705 Stay.**

1.      Whether "Justice So Requires" Is a Broad Standard that Gives the Department Considerable Discretion.

As ably explained by the Department, whether "justice so requires" is a broad standard that grants ample discretion to the Department to postpone the effective date of a regulation. *See* Defs.' Opp'n to States' Mot. 24-28; Defs.' Opp'n to Borrowers' Mot. 21-25.  As the Department recognized when it issued the § 705 Stay, CAPPS "raised serious questions [in the Borrower Defense litigation] concerning the validity of certain provisions of the [Regulations] and ha[s] identified substantial injuries that could result if the final regulations go into effect before those questions are resolved." § 705 Stay, *supra*, at 27,621.  The Department also acknowledged that, absent the § 705 Stay, regulated entities, such as CAPPS schools, would incur significant costs, including those associated with "modify[ing] their contracts in accordance with the arbitration and class action waiver regulations." *Id.*  Surely findings that (i) a substantial question exists as to a rule's legality and (ii) the questionable rule, if implemented, would cause substantial harm support a stay in the interest of justice.  At the very least, the Department was not arbitrary in so holding. *See, e.g.*, *Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 924, 926-27 (D.C. Cir. 2013) (requiring only that an agency decision be "reasonable and reasonably explained").

2.      The Conclusion that the Regulation Would Cause Substantial Harm to Schools and Students Is Amply Justified by the Record.

The Department's determination that the Regulations would cause "substantial injuries" to schools – and, therefore, ultimately to students – is amply supported by the record.  Indeed, the impact that the Borrower Defense Regulations will have on many schools is dramatic.

As the Department observed in its Final Rule, many  provisions in the Borrower Defense

Regulations would cause massive financial disruption for CAPPS schools, among others.  The Regulations impose burdensome requirements, estimated to cost schools across the country almost $10 million a year in paperwork alone.  *See* Final Rule, *supra*, at 76,046.  Implementing those requirements abruptly and while CAPPS's legal challenges to the Regulations remain unresolved will undermine postsecondary institutions' ability to make rational budgetary decisions.  *See, e.g.,* Anthony T. Caso, *No Good Reason For New Student Loan Forgiveness Rules*, Law360 (July 22, 2016), https://www.law360.com/articles/817923/no-good-reason-for-new-student-loan-forgiveness-rules (detailing the potential litigation costs to universities).

As many schools observed during the Borrower Defense Regulations proceedings, the increased costs and threat of meritless claims and litigation generated by the Regulations will be crippling for many schools.  Historically black colleges and universities ("HBCUs") and other traditional postsecondary institutions have voiced concerns about the profound, negative, and unjustified impact the Regulations would have on their institutions, including the effects on students who are underrepresented in higher education.  *See* United Negro College Fund, Thurgood Marshall College Fund, and National Association for Equal Opportunity in Higher Education, Comment Letter on Borrower Defense Regulations 2, No. ED-2015-OPE-0103 (July 29, 2016) ("UNCF Comment") (noting that certain aspects of the Borrower Defense Regulations may be "unduly injurious and burdensome to HBCUs and [predominantly black institutions], potentially causing financial calamity for some schools"); Spelman College, Comment Letter on Borrower Defense Regulations 1, No. ED-2015-OPE-0103 (July, 28, 2016) (urging the Department to consider the proposed Regulations' "sweeping scope and potentially damaging financial impact on [HBCUs]").

The Regulations also are specifically and unfairly targeted at proprietary schools.  *See*

CAPPS, Comment on Borrower Defense Regulations 8-11, No. ED-2015-OPE-0103 (Aug. 1, 2016) ("CAPPS Comment").  As a result, a sudden implementation of the Regulations would have a disproportionate negative, and unwarranted, impact on proprietary schools, which serve large percentages of minority, low-income, and non-traditional students.  *See id.*; CAPPS Comment, Declaration of Jonathan Guryan, Ph.D. at 4-7.  If the Regulations abruptly are implemented, they will upend the stability of many proprietary schools, and non-traditional students in particular are likely to find themselves faced with fewer educational options because many traditional institutions deem such students at-risk.  *See, e.g.*, Judah Bellin, *A Gateway to the Working World*, City J. (Spring 2015), https://www.city-journal.org/html/gateway-working-world-13724.html; Henry Bienen, *In Defense of For-Profit Colleges*, Wall St. J. (July 24, 2010), https://www.wsj.com/articles/SB10001424052748703724104575378933954267308.  The upheaval caused by the Regulations, particularly if they are implemented with inadequate notice and with the possibility that they will be revised or invalidated, cannot be overstated.

Plaintiffs imply that, because CAPPS sought a preliminary injunction only with respect to the Arbitration and Class Action Provisions, CAPPS did not take issue with the harm caused by other provisions.  *See* Mem. in Supp. of Pls.' Second Renewed Mot. for Summ. J. 30-31, ECF No. 56 ("Borrowers' Mot."); Mem. in Supp. of State Pls.' Second Renewed Mot. for Summ. J. 21, ECF No. 55-1 ("States' Mot.").  But this is not accurate.  CAPPS and other educational organizations have outlined, time and again, the far-reaching harm that would be caused by *each* of the Regulations' four major provisions.  *See generally* CAPPS Compl.  The Department acted reasonably in determining that these substantial harms warranted a temporary stay of the Regulations, pending determination of their legality.

> (a)     *The Borrower Defense Provisions Would Cause Substantial Harm.*

The Borrower Defense Provisions represent a sea change in Department policy.  These

provisions expand liability for schools in an unprecedented manner by allowing borrowers to initiate an action for affirmative debt relief through a request to a Department official – and allow that Department official to then pursue schools for the cost of the forgiven loans.  *See* Final Rule, *supra*, at 75,956.  Additionally, the Borrower Defense Provisions implement an amorphous and unspecified new federal standard for claims of misrepresentation.  *See id.* at 75,926; 34 C.F.R. § 685.222.  These provisions also create a new "group borrower defense" process, allowing the Department to both prosecute and adjudicate claims concerning groups of students, akin to a class or collective action.  *See, e.g.*, Final Rule, *supra*, at 75,960, 75,964-65.

If the Borrower Defense Provisions were implemented mid-award year, schools would have to pivot to react to a potential flood of specious claims of misrepresentation.  As several commenters noted during the comment period for the Regulations, many institutions "could be subject to inaccurate and frivolous claims of misrepresentation, resulting in significant costs that would severely undermine [those] institutions and divert precious resources that should be spent on serving students."  UNCF Comment, at 3.  The Department's decision to delay implementation of the Regulations is appropriate, especially in light of the possibility that the Regulations could be invalidated entirely due to the ongoing Borrower Defense litigation.

*(b)*     *The Financial Responsibility Provisions Would Cause Substantial Harm.*

Additionally, many schools, even those that are financially responsible by any reasonable definition, will be subjected to significant costs if the Financial Responsibility Provisions are implemented.  As CAPPS explained in its complaint, the Department already has an established formula based on accounting principles to determine whether schools are financially responsible. *See* CAPPS Compl. ¶¶ 73-74.  But the Department's new Financial Responsibility Provisions would layer a host of non-fiscal considerations on top of the existing test by deeming schools

9

financially irresponsible whenever certain "triggers" are tripped, or when the existence of those

triggers could have a negative impact on the schools' existing financial responsibility "score."

Final Rule, *supra*, at 76,074.  Those triggers include the mere existence of a pending lawsuit;

certain perfectly lawful actions taken by publicly traded companies; or the late filing of a report

with the Securities and Exchange Commission ("SEC") even when the SEC has granted a filing

extension.  *See id.* at 76,073-74.  Tripping a trigger may result in the requirement that a school

obtain a very costly letter of credit for 10% of the prior year's Title IV funds.  *Id.* at 76,076.

As CAPPS and others explained during the comment period for the Borrower Defense

Regulations, each letter of credit generally is required to be backed by cash collateral.  *See, e.g.*,

CAPPS Comment at 4.  As a result, when a triggering event occurs, such as the pendency of

even a meritless lawsuit against an institution, that institution may incur costs that amount to

millions of dollars under the new Regulations.  *See id.*  This may jeopardize an institution's very

existence.  *See* Career Education Colleges and Universities, Comment Letter on Borrower

Defense Regulations 4-5, No. ED-2015-OPE-0103 (Aug. 1, 2016) (noting the "tremendous

financial burden" that obtaining letters of credit will place on both non-profit and proprietary

institutions).

Causing such an extraordinary and unnecessary fiscal impact on schools will put many

institutions at risk.  This, in turn, will harm students who are attending schools that are burdened

by the mid-award year regulatory shift.  The Department was amply justified in finding that the

possibility of these and similar harms counseled in favor of a stay.

<em>(c)      The Repayment Rate Provisions Would Cause Substantial Harm.</em>

The Borrower Defense Regulations also include provisions requiring that, in certain

situations, a proprietary institution – and only a proprietary institution – include in all

promotional materials a warning regarding its former students' repayment rates  ("Repayment

10

Rate Provisions"). Final Rule, *supra*, at 76,071. Under the Regulations, schools would suffer unjustified reputational injury because the warnings are, as CAPPS has alleged, discriminatory, unlawful, and unwarranted. In addition to the cost of being forced to re-create all of their promotional materials, schools may be viewed unjustifiably and unfairly as being unstable. The damage is especially severe if they are required to issue these warnings mid-year, thereby harming schools' recruitment and fundraising efforts. *See* National Association of College and University Business Officers, Comment Letter on Borrower Defense Regulations 5, 11, No. ED-2015-OPE-0103 (Aug. 1, 2016). Avoiding these injuries surely justifies a temporary stay.

> **(d)** *The Arbitration and Class Action Provisions Would Cause Substantial Harm.*

Finally, many CAPPS schools and other postsecondary schools have arbitration clauses and class action waivers in existing enrollment agreements that would be prohibited and rendered unenforceable by the Arbitration and Class Action Provisions. If those Provisions are implemented, CAPPS schools instantly will be deprived of the contracted-for benefits of arbitration, which have been acknowledged and protected by Congress through the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and recognized repeatedly by the Supreme Court, *see, e.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Schools also will need to quickly amend their agreements and will be compelled, in conflict with their previous agreements, to litigate cases, including class actions, in federal and state court. *See, e.g.*, Johnson Decl. ¶ 12, *CAPPS*, No. 1:17-cv-00999-RDM (June 2, 2017), ECF No. 6-2 ("Johnson Decl."); Declaration of West Coast University ¶¶ 13-14, *CAPPS*, No. 1:17-cv-00999-RDM (D.D.C. June 2, 2017), ECF No. 6-7 ("West Coast Decl."); Declaration of American Career College ¶¶ 13-14, *CAPPS*, No. 1:17-cv-00999-RDM (D.D.C. June 2, 2017), ECF No. 6-3 ("ACC Decl."). This will require schools to divert resources on short notice from students' education

toward a possible flood of litigation, potentially disrupting students' progress in their courses and career paths.  West Coast Decl. ¶¶ 13-14; ACC Decl. ¶¶ 13-14.

CAPPS schools also may be required to send notices to borrowers stating that they will not enforce existing agreements.  Final Rule, at 76,067; 34 C.F.R. § 685.300(e)(3)(ii), (f)(3)(ii). If these provisions go into effect with little warning, and are revised or invalidated later in the Borrower Defense litigation, institutions will be forced to shift back and forth in amending policies, training (and re-training) staff, and developing litigation strategies in response to the sudden implementation and possible future repeal of these sweeping changes.  *See* Johnson Decl. ¶ 11.  Accordingly, implementing the Borrower Defense Regulations while significant legal challenges to the Regulations are unresolved would severely and unreasonably harm institutions and their students, as the record reflects and as the Department rightly recognized.

3.      The Department Permissibly Balanced the Equities.

After balancing the equities involved in postponing the effective date, the Department reasonably found that justice required issuing the § 705 Stay.  *See* § 705 Stay, *supra*, at 27,621; Defs.' Opp'n to Borrowers' Mot. 29 n.9; Defs.' Opp'n to States' Mot. 32 n.9.[1]  That balancing was eminently reasonable in light of the substantial harms and serious legal questions raised by CAPPS's challenge to the Regulations.  Though Plaintiffs may disagree with the Department's weighing of these considerations, the fact that they might have weighed the considerations differently is not reflective of a failure to reasonably determine that justice required issuing the

---

[1] As the Department and the Trade Association Coalition have explained, there is no sound basis for the Plaintiffs' argument that the Department was required to consider the four factors that courts apply when deciding whether to grant a preliminary injunction as opposed to merely considering the dictates of justice.  *See* Defs.' Opp'n to States' Mot. 29-33; Defs.' Opp'n to Borrowers' Mot. 25-29; Brief of the Trade Association Coalition as *Amicus Curiae* 3-15, *Massachusetts v. DeVos*, No. 17-1331 (RDM) (D.D.C. Dec. 8, 2017), ECF No. 59-1.

§ 705 Stay.  *See Fox Television*, 556 U.S. at 513-14 ("[A] court is not to substitute its judgment

for that of the agency . . . , and should uphold a decision . . . if the agency's path may reasonably

be discerned.") (internal quotation marks and citations omitted).  As a result, the Department

acted reasonably in finding that justice required the issuance of the Stay.

> **B.**     **The Department Issued the § 705 Stay "Pending Judicial Review" of the Borrower Defense Regulations.**

The Department issued the § 705 Stay pending the resolution of the Borrower Defense

litigation.  As the Department explains, Defs.' Opp'n to States' Mot. 26; Defs.' Opp'n to

Borrowers' Mot. 23, it articulated a rational connection between the Borrower Defense litigation

and the § 705 Stay.  Additionally, contrary to Plaintiffs' contentions, the Department was not

prohibited from acknowledging its plans to reconsider the Borrower Defense Regulations – plans

which are now nearing completion.  *See* 5 U.S.C. § 705.  Nor would such a prohibition make

sense.  An agency's willingness to reevaluate an action based, in part, on a judicial challenge to

that action, is a natural and desirable side-effect of such a legal challenge.  Interpreting § 705 as

prohibiting agencies from delaying the effective date of a rule pending litigation if the agency

also is planning to review and revise the challenged rule has no basis in the text of the statute,

and yields the detrimental result of restricting an agency's reconsideration of a rule with potential

legal flaws.  *See, e.g.*, Exchange Act Rule 13p-1 and Form SD, Exchange Act Release No.

72,079, 79 Fed. Reg. 26,297 (May 2, 2014) (SEC) (issuing stay and adapting rule "pending the

completion of judicial review").

The Department did not act arbitrarily or capriciously when predicating the § 705 Stay on

the ongoing Borrower Defense litigation.  Rather, it explained that there were "serious

questions" regarding the Regulations' validity and then weighed various equitable factors

counseling in favor of a stay.  *See Fox Television*, 556 U.S. at 513-14.  This decision was both

reasonable and reasonably explained. *Cytori Therapeutics, Inc.*, 715 F.3d at 926.

**C.   The Department Was Not Required to Engage in Notice and Comment Rulemaking Before Issuing the § 705 Stay.**

Plaintiffs contend that the Department was required to engage in notice-and-comment rulemaking before postponing the effective date of the Regulations pursuant to § 705.  That assertion is incorrect as a matter of law, statutory interpretation, and Congressional intent.[2]

The language and structure of the APA indicate that § 705 does not include a notice and comment requirement.  Section 705 provides agencies and courts with a mechanism to maintain the status quo while a court evaluates the lawfulness of a challenged agency action.  Nowhere does the APA or its history suggest that this "stay" function  is intertwined with the notice and comment provisions of the APA.

The language and structure of the APA indicate that § 705 is separate and distinct from other sections requiring notice and comment.  The text of § 705 contains no notice and comment requirement, and courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (citation omitted). Additionally, Congress included § 705 separate and apart from the sections that impose procedural requirements, such as notice-and-comment proceedings, on agency decisionmaking. *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238 (2014) (finding statutory structure to be instructive because it "reinforce[d] the conclusion drawn from the text"); *see also* S. Rep. No. 79-752, at 8-9 (1945) (noting that the section of the original bill in which § 705 was located was "law apart" from the sections addressing procedural rulemaking requirements, in a

---

[2]  Additionally, as the Department explains, it was not required to undertake negotiated rulemaking under the HEA to issue the § 705 Stay.  *See* Defs.' Opp'n to States' Mot. 37 n.13; Defs.' Opp'n to Borrowers' Mot. 35 n.13.

separate section addressing review provisions).  Furthermore, as noted by the Department, § 705 contains no cross-reference to the notice-and-comment rulemaking provisions despite Congress's clear cross-referencing of those provisions elsewhere in the APA.  *See* Defs.' Opp'n to States' Mot. 47; Defs.' Opp'n to Borrowers' Mot. 31-32.

Additionally, § 705 would be rendered superfluous if the Court were to accept Plaintiffs' contention that agencies must either engage in notice-and-comment rulemaking or invoke the good cause exception of 5 U.S.C. § 553 before employing § 705.  After all, an entire rule can be *repealed* through notice-and-comment rulemaking—and certainly a rule could be postponed via notice-and-comment rulemaking without necessitating resort to § 705.  If Plaintiffs are correct, then § 705 would have no practical purpose or effect.  Because "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant," this Court should not read § 705 simply to duplicate the procedure for issuing a new rule under § 553.  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted).

In sum, Plaintiffs are attempting to graft notice-and-comment requirements from § 553 onto § 705 when the legislative history of the APA, language and structure of the APA, and Congressional intent all indicate that Plaintiffs' view is incorrect.  This Court should reject Plaintiffs' arguments and uphold the § 705 Stay.

## II.     THE DEPARTMENT LAWFULLY PROMULGATED THE IFR.

Plaintiffs' challenges to the IFR also are unavailing.  Under 20 U.S.C. § 1089(c)(1) (the "effective date provision"), "any regulatory changes initiated by the Secretary affecting the programs under this subchapter that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date."  The HEA defines an "award year" as "the period beginning July 1 and ending June 30 of the following year."  *Id.* § 1088(a)(1).

The master calendar requirement also sets forth deadlines that are meant "[t]o assure adequate notification and timely delivery of student aid funds." *Id.* § 1089(a).  The master calendar requirement states that, before the beginning of an award year, the Secretary must "provide to institutions of higher education a list of reports and disclosures required," and the dates by which each report or disclosure must be completed.  *Id.* § 1089(e).  Taken together, these provisions reflect Congress's commitment to furnishing regulated entities and students with predictability and sufficient notice of their obligations before an award year begins.

The effective date provision demonstrates that Congress intended institutions to plan for regulatory changes with sufficient notice before the beginning of a given award year.  That provision reflects a legislative judgment that the effective date of regulations should correspond with the beginning of the award year.  Congress's determination that educational institutions be accorded sufficient notice of their regulatory obligations also is reflected in the HEA's legislative history.  *See, e.g.,* Defs.' Opp'n to Borrowers' Mot. 57-58; Defs.' Opp'n to States' Mot. 40-41.

Here, the Borrower Defense Regulations did not take effect on July 1, 2017.  Pursuant to the § 705 Stay issued several weeks in advance of the effective date, institutions received affirmative notice that the Regulations would not go into effect by the beginning of the 2017-18 award year.  As a result, institutions continued to operate under the existing rules.  Consistent with the purpose of the master calendar requirement, the Regulations should not be permitted to take effect before the beginning of the next award year.  As a matter of common sense, if a given regulation did not take effect by the July 1 start date due to the Department's actions, then to avoid disruption well into an award year, the regulation may not take effect until, at the earliest, the next window of opportunity, namely July 1 of the following year.  Congress did not intend that regulations with such onerous requirements would take effect in the middle of an award

16

year, and the statutory language and purpose of the master calendar requirement guard against that outcome.

Furthermore, the Department's decision to delay the effective date of the Borrower Defense Regulations until at least July 1, 2018, was reasonable in light of the harm that schools and students alike would sustain from an abrupt implementation of the Regulations.  As explained above, many provisions in the Borrower Defense Regulations would cause massive disruption for CAPPS schools, HBCUs, other traditional postsecondary institutions, and students. The Department's decision to delay the effective date of the Regulations is fully consistent with the purpose of the master calendar requirement, especially in light of the possibility that the Regulations could be invalidated due to the Borrower Defense litigation.  The master calendar requirement exists to avoid the very harms that would result if these sweeping regulations were implemented *mid-year* – harms that would undoubtedly be even greater than if schools had some opportunity for advanced planning.  Accordingly, the Department's reliance on the master calendar requirement was lawful and reasonable.

In addition, as explained in the Department's brief, the IFR complied with applicable procedural requirements.  *See* Defs.' Opp'n to States' Mot. 49-50; Defs.' Opp'n to Borrowers' Mot. 64-66.  The Department moved expeditiously to provide clarity to schools while striving in good faith to allow public participation during a 30-day comment period.  *See* 5 U.S.C. § 553(b)(3)(B), (d)(3) (allowing agency to forgo notice and comment rulemaking for good cause when notice and comment are "impracticable, unnecessary, or contrary to the public interest"); 20 U.S.C. § 1098a(b)(2) (allowing agency to forgo negotiated rulemaking under the same circumstances).  As a result, this Court should uphold the IFR.

## III.     THE DEPARTMENT LAWFULLY PROMULGATED THE 2018 RULE.

The Department also lawfully promulgated the 2018 Rule.  First, the Department satisfied

applicable requirements under the APA when it promulgated the 2018 Rule.  Second, the

decision to postpone the effective date of the Regulations until July 1, 2019 comports with the

HEA's structure and design, which afford institutions sufficient notice of regulatory changes.

### A.    The 2018 Rule Satisfies Applicable Requirements Under the APA.

Contrary to Plaintiffs' assertions, the 2018 Rule is not arbitrary, capricious, or contrary to

law, and the Department followed proper procedures.  After providing notice and a 30-day

comment period, the Department considered and responded to the comments submitted for and

against the 2018 Rule, measured the costs and benefits, and ultimately concluded that postponing

the effective date of the Regulations was appropriate.  *See generally* 2018 Rule.  Plaintiffs'

disagreement with the Department is an insufficient ground for invalidating the 2018 Rule.

First, the Department's plan to revise the Regulations is a valid reason for the 2018 Rule,

particularly because those Regulations never went into effect and because, as described above,

institutions would be harmed severely by regulatory whipsawing should the Regulations take

effect only to be repealed or invalidated shortly thereafter.  Plaintiffs' reliance on *California v.

Bureau of Land Management*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018) ("*BLM II*"), is inapposite.

In *BLM II*, the regulations at issue already had gone into effect, *see id.* at 1057-59, and BLM did

not invoke § 705 before the effective dates, *see California v. Bureau of Land Mgmt.*, 277 F.

Supp. 3d 1106, 1125 (N.D. Cal. 2017) ("*BLM I*").  *BLM II* does not address the present case in

which the Regulations have not yet gone into effect, and in which the concerns about

implementing them are sound and well-founded.

Second, the Borrower Plaintiffs argue that the need for clarity and consistency is an

improper basis for delaying the effective date of a rule, primarily because "[t]he potential of a

future change of a rule *always* exists."  Borrowers' Mot. 45.  While that potential may always

exist, here, there is far more than a theoretical potential that the Regulations will change.  Rather,

the Department already has undertaken negotiated rulemaking in an effort to amend the

Regulations and the Department reportedly will issue a new rule by November 2018.  *See*

Andrew Kreibaum*, After Borrower Defense Negotiation Fails, Department to Craft New Rule*,

Inside Higher Ed (Feb. 16, 2018), https://www.insidehighered.com/quicktakes/

2018/02/16/after-borrower-defense-negotiation-fails-department-craft-new-rule.  Additionally,

the Borrower Plaintiffs ignore the fact that the Regulations *never went into effect* in 2017.  The

Borrower Plaintiffs contend, essentially, that institutions have no right to rely on a delayed

implementation date issued by the Department after notice-and-comment rulemaking.  Such an

assertion blinks reality.

Plaintiffs' reliance on *National Venture Capital Ass'n v.  Duke*, No. CV 17-1912 (JEB),

2017 WL 5990122 (D.D.C. Dec. 1, 2017) likewise is misguided for two reasons.  First, the court

in *Duke* rejected an agency's "confusion" argument under the heightened scrutiny a court uses

when an agency attempts to circumvent the APA's notice and comment requirements; here,

however, the Department has complied with the notice and comment requirements.  *See id.* at *7.

Second, the court in *Duke* found that the agency's attempts to avoid confusion "r[a]ng hollow" as

the agency had not issued any notice proposing delay or rescission of the regulation at issue.  *See

id*. at *10.  Here, the Department has issued notice of the proposed delay, begun the negotiated

rulemaking process, and apparently intends to have a new rule ready by November 2018.

Third, the 2018 Rule was issued after the Department conducted an appropriate cost-

benefit analysis.[3]  *See* Defs.' Opp'n to States' Mot. 62-66; Defs.' Opp'n to Borrowers' Mot. 40-

---

[3]  The Department argues that the cost-benefit analysis is not even reviewable in this instance,
however, even if it was, the Department conducted an appropriate analysis.  *See* Defs.' Opp'n to
States' Mot. 62-66; Defs.' Opp'n to Borrowers' Mot. 40-48.

48. Plaintiffs' arguments that the Department's cost-benefit analysis is inconsistent miss the mark. Plaintiffs rely on *BLM II* to suggest that the Department's cost-benefit analysis is somehow deficient. However, in *BLM II*, the court concluded that the agency's cost-benefit analysis was inconsistent because the agency calculated the harm to the environment from delaying the regulation for only one year, while the agency considered a permanent benefit in reduced compliance costs from rescinding the rule. *BLM II*, at 1068-69. Here, unlike in *BLM II*, the Department is not considering the benefit from permanent reduction in compliance costs in perpetuity, but rather properly limited its analysis to the year-long delay. The Department focused primarily on the benefits of avoiding the regulatory whiplash which would arise if the Borrower Defense Regulations were implemented in 2018 and then rescinded or amended soon thereafter. *See, e.g.*, 2018 Rule at 6461. CAPPS has pointed out the immense harm that this regulatory whiplash could potentially cause both in this brief and administrative comments, and the Department appropriately took those injuries into account. *See, e.g.*, CAPPS, Comment Letter on Proposed Delay of Borrower Defense Regulations, No. ED-2017-OPE-0112 (Nov. 24, 2017). Indeed, in the circumstances of this case, in which a new rule is forthcoming and an older rule has not yet been implemented, the Department would be irresponsible *not* to attempt to avoid the unnecessary waste involved in implementing a rule that will almost immediately be repealed or replaced. Furthermore, the Department did not ignore or dismiss the potential harms caused by the delay. Instead, the Department discussed and weighed both the costs and benefits associated with the delay, and made a considered judgment that the benefits of the year-long delay outweighed the costs. *See* 2018 Rule, at 6466-68. The Department's decision to delay the Regulations' effective date until July 1, 2019 therefore is both reasonable and reasonably explained. *Cytori Therapeutics, Inc.*, 715 F.3d at 926.

**B.      The 2018 Rule Comports with the HEA's Goal of Providing Notice to Institutions.**

The 2018 Rule furthers the HEA's goal of providing sufficient notice to institutions before implementing new regulations.  As explained above, the master calendar provisions reflect Congress's commitment to furnishing regulated entities and students with predictability and sufficient notice of their obligations before an award year begins.

The effective date provision demonstrates that Congress intended institutions to have sufficient notice to plan for regulatory changes before the beginning of a given award year.  By requiring that "any regulatory changes" be published in final form by November 1 and  take effect by July 1 of the following award year, 20 U.S.C. §§  1089(c)(1), 1088(a)(1), Congress provided regulated institutions an eight-month period in which they can prepare for and comply with any obligations arising from regulatory changes, all before the next award year commences. The effective date provision reflects a legislative judgment that regulated entities should have several months to implement new regulatory changes before an award year begins, and the effective date of regulations should correspond with the beginning of the award year.

Here, the Regulations did not take effect in 2017.  Instead, institutions received affirmative notice from the Department that implementation would be delayed pursuant to the § 705 Stay and the IFR.  When the Department issued the 2018 Rule, the start of the 2018-19 award year was only a few months away.  Yet at that time (and to this day), the Borrower Defense Rules remained in flux – CAPPS's legal challenge remains pending, and the Regulations may very well be revised in November.  As such, giving schools until the start of the next award year to allow the final content of the Regulations to be settled is  sound and reasonable.  Because the HEA contemplates that institutions would have a several-month period to prepare  to comply with regulatory changes, particularly ones as onerous as those imposed by

21

the Borrower Defense Regulations, the Department justifiably deferred the effective date of the

Regulations until July 1, 2019 – the beginning of the next award year.[4]

## IV.     IF THE COURT CONCLUDES OTHERWISE, THE COURT SHOULD REMAND WITHOUT VACATUR.

CAPPS respectfully submits that the Department's actions are not arbitrary, capricious,

or otherwise contrary to law, nor were they taken without observing the required procedures.

However, if the Court concludes otherwise, it should remand without vacating the Delay Rules to

allow the Department to address any defects identified by the Court.  Even "[a]n inadequately

supported rule . . . need not necessarily be vacated." *Allied-Signal, Inc. v. U.S. Nuclear*

*Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993).  Remand without vacatur typically is

appropriate when "there is at least a serious possibility that the [agency] will be able to

substantiate its decision on remand." *Id.* at 151.  In deciding whether vacatur is justified, courts

consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the

agency chose correctly) and the disruptive consequences of an interim change that may itself be

changed." *Id.* at 150-51 (citation omitted).

Even assuming arguendo that the Court finds deficiencies in the § 705 Stay, the IFR, or

the 2018 Rule, which it should not, any purported deficiency likely can be readily remedied on

remand.  *See*, *e.g.*, *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 393 (D.C. Cir. 1998) (remanding

without vacatur to allow agency "to explain . . . conclusions more fully").  Despite the Borrower

Plaintiffs' unsupported contention that "[v]acatur . . . would not be particularly disruptive,"

Borrowers' Mot. 61, any possible error plainly is outweighed by the serious disruptive

---

[4] The 2018 Rule is well-justified even absent the IFR.  The context and timing of the relevant Delay Rules, however, further support the contention that the Department acted reasonably.

consequences of short-term implementation of the Regulations.

Because the Regulations have not yet gone into effect, and because vacating the Delay Rules will cause considerable harm to CAPPS schools and their students, as well as significant disorder in the postsecondary education market, the most prudent course, if the Court finds any shortcoming, is for the Court to leave the present regulatory regime in place while the Department addresses any deficiencies.  *See, e.g.*, *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (remanding without vacatur in part because vacating agency action would "impos[e] significant transaction costs" on petitioner and its members, and cause disruptions to "uninvolved market participants"); *U.S. Telecom Ass'n v. FBI*, 276 F.3d 620, 627 (D.C. Cir. 2002) (remand without vacatur is appropriate unless it is clear there are "no defensible grounds" for the agency's conclusions).  Accordingly, if the Court concludes that the Department's actions have any deficiencies, it should remand without vacatur.

## <u>CONCLUSION</u>

CAPPS respectfully requests that this Court grant summary judgment in the

Department's favor and deny Plaintiffs' Motions for Summary Judgment.  Were the Court to

remand to the Department, CAPPS respectfully asks that the Court remand without vacatur.


Dated: April 20, 2018                                  Respectfully submitted,

BORIS BERSHTEYN                            /s/ Clifford M. Sloan
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP       CLIFFORD M. SLOAN, DC Bar No. 417339
4 Times Square                             CAROLINE S. VAN ZILE, DC Bar No. 1017942
New York, NY 10036                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                                           1440 New York Avenue, NW
GREGORY BAILEY                             Washington, DC 20005
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP       T: 202/371-7000
155 N. Wacker Drive                        F: 202/661-8340
Chicago, IL 60606                          Email: cliff.sloan@skadden.com
                                           Email: caroline.vanzile@skadden.com
ROBERT L. SHAPIRO, DC Bar No. 415854
DUANE MORRIS LLP
505 Ninth Street, NW
Washington, DC 20004

*Attorneys for CAPPS*