**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:17-cv-1331 (RDM) c/w No. 1:17-cv-1330 (RDM) |
| BETSY DEVOS, in her official capacity as Secretary of Education, and THE DEPARTMENT OF EDUCATION, | |
| Defendants. | |

## REPLY IN SUPPORT OF DEFENDANTS'
## RENEWED MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

I.   PLAINTIFFS LACK STANDING .........................................................................3

    A.   Plaintiffs Suffer No Injury That Is Actual, Imminent, And Traceable
        To The Temporary Delay Of The 2016 Rule's Effective Date ..............................4

    B.   The Plaintiffs Lack Standing To Bring This Action Against
        The Federal Government As *Parens Patriae*.........................................................7

II.  THE SECTION 705 NOTICE, IF REVIEWABLE, IS VALID ......................................8

    A.   The Decision To Postpone The Effective Date Of Agency Action Pending
        Judicial Review Is Committed To Agency Discretion By Law ...........................8

    B.   The Department Adequately Justified The Section 705 Notice ..........................11

        i.   The 705 Notice Explicitly Delays The Relevant Provisions
            Of The Final Rule Pending Judicial Review In CAPPS….........................12

        ii.  Plaintiffs Do Not Demonstrate That The Department Was
            Obligated To Use The Four-Factor Test Employed By
            Courts .......................................................................................................13

        iii. The Department Adequately Determined That Justice Required
            The Delay………………………………………………………………...15

III. PLAINTIFFS DO NOT DEMONSTRATE THAT THE IFR IS INVALID .......................17

    A.   The Department's Interpretation Is Entitled To *Chevron* Deference....................17

    B.   The Department's Interpretation Is Reasonable ...................................................19

    C.   The IFR Was Adequately Justified ......................................................................21

IV.  PLAINTIFFS DO NOT DEMONSTRATE THAT THE 2018 RULE IS INVALID ............22

    A.   The Department Adequately Explained The Basis For The 2018
        Rule ......................................................................................................................22

    B.   There Is No Basis To Second-Guess The Department's Consideration
        Of The Effects Of The 2018 FR ..........................................................................25

V.   PLAINTIFFS DO NOT DEMONSTRATE ADDITIONAL PROCEDURES WERE
    REQUIRED ....................................................................................................28

VI.     ANY RELEVANT REMEDY ISSUES SHOULD BE ADDRESSED IN SUPPLEMENTAL
        BRIEFING… .................................................................................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Air Transp. Ass'n of Am. v. FAA*,
    169 F.3d 1 (D.C. Cir. 1999) ........................................................................ 25

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982) ................................................................................... 7

*Am. Great Lakes Ports Ass'n v. Zukunft*,
    No. CV 16-1019 (RC), 2017 WL 5128999 (D.D.C. Nov. 3, 2017) ........................ 30

*Am. Lung Ass'n v. EPA*,
    134 F.3d 388 (D.C. Cir. 1998) .................................................................... 30

*Arizona v. Thompson*,
    281 F.3d 248 ............................................................................................. 18

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ........................................................................ 6

*Association of Private Sector Colleges & Universities v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) .................................................................... 27

*Becerra v. U.S. Dep't of Interior*,
    276 F. Supp. 3d 953 (N.D. Cal. 2017) ........................................................ 28

*California v. Bureau of Land Management*,
    286 F. Supp. 3d 1054 (N.D. Cal. 2018) ...................................................... 24

*Career College Association v. Riley*,
    No. 94-1372, 1994 WL 454713 (D.D.C. Aug. 9, 1994) .................................. 19

*Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*,
    78 F. Supp. 3d 208 (D.D.C. 2015) ............................................................... 6

*Chevron, USA, Inc. v. NRDC*,
    467 U.S. 837 (1984) ................................................................................. 19

*CityFed Fin. Corp. v. OTC*,
    58 F.3d 738 (D.C. Cir. 1995) ..................................................................... 10

*Crossroads Grassroots Policy Strategies v. FEC*,
    788 F.3d 312 (D.C. Cir. 2015) ...................................................................... 4

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) ..................................................................... 7

*Dickson v. Secretary of Defense,*
  68 F.3d 1396 (D.C. Cir. 1995) ............................................................. 8, 9

*Doran v. Salem Inn, Inc.,*
  422 U.S. 922 (1975) .................................................................................. 9

*Drake v. FAA,*
  291 F.3d 59 (D.C. Cir. 2002) .................................................................. 9

*Equal Rights Ctr. v. Post Properties, Inc.,*
  657 F. Supp. 2d 197 (D.D.C. 2009) ..................................................... 5, 6

*Ethyl Corp. v. EPA,*
  541 F.2d 1 (D.C. Cir. 1976) .................................................................. 15

*Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp.,*
  28 F.3d 1268 (D.C. Cir. 1994) ............................................................... 6

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ............................................................................... 24

*Fla. Pub. Telecomms. Ass'n v. FCC,*
  54 F.3d 857 (D.C. Cir. 1995) ............................................................... 10

*Fund for Animals v. Norton,*
  512 F. Supp. 2d 49 (D.D.C. 2007) ....................................................... 16

*Fund for Animals, Inc. v. Norton,*
  322 F.3d 728 (D.C. Cir. 2003) ............................................................... 4

*Gov't of Province of Manitoba v. Zinke,*
  273 F. Supp. 3d 145 (D.D.C. 2017) .................................................... 7, 8

*Great Lakes Comnet, Inc. v. FCC,*
  823 F.3d 998 (D.C. Cir. 2016) ............................................................. 13

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n,*
  720 F.3d 370 (D.C. Cir. 2013) ....................................................... 26, 28

*Mail Order Ass'n of Am. v. U.S. Postal Serv.,*
  986 F.2d 509 (D.C. Cir. 1993) ............................................................. 16

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ................................................................................. 7

*McKinney v. McDonald,*
  796 F.3d 1377 (Fed. Cir. 2015) ........................................................... 23

*Md. People's Counsel v. FERC*,
   760 F.2d 318 (D.C. Cir. 1985) ........................................................................ 7, 8

*Mid-Tex Elec. Co-op, Inc. v. FERC*,
   822 F.2d 1123 (D.C. Cir. 1987) ........................................................................ 29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................................... 17

*Nicopure Labs, LLC v. FDA*,
   266 F. Supp. 3d 360 (D.D.C. 2017) ................................................................. 26

*NRDC v. SEC*,
   606 F.2d 1031 (D.C. Cir. 1979) ........................................................................ 16

*Oceana v. Bureau of Ocean Energy Mgmt.*,
   37 F. Supp. 3d 147 (D.D.C. 2014) ................................................................... 16

*Petro-Chem Processing, Inc. v. EPA*,
   866 F.2d 433 (D.C. Cir 1989) ............................................................................. 6

*Public Citizen v. Steed*,
   733 F.2d 93 (D.C. Cir. 1984) ...................................................................... 24, 25

*Sierra Club v. Gorsuch*,
   715 F.2d 653 (D.C. Cir. 1983) .................................................................... 16, 23

*Sierra Club v. Jackson*,
   833 F. Supp. 2d 11 (D.D.C. 2011) ................................................................... 14

*Sierra Club v. Salazar*,
   177 F. Supp. 3d 512 (D.D.C. 2016) ................................................................. 23

*Sierra Club v. U.S. Dep't of Agric., Rural Utils. Serv.*,
   841 F. Supp. 2d 349 (D.D.C. 2012) ................................................................. 30

*St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*,
   85 F. Supp. 3d 197 (D.D.C. 2015) ................................................................... 29

*State v. U.S. Bureau of Land Management*,
   277 F. Supp. 3d 1106 (N.D. Cal. 2017) ................................................. 13, 16, 28

*UC Health v. NLRB*,
   803 F.3d 669 (D.C. Cir. 2015) .......................................................................... 18

*Vill. of Barrington v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) .......................................................................... 15

*Watervale Marine Co. v. DHS*,
   55 F. Supp. 3d 124 (D.D.C. 2014) ........................................................................................ 8, 9

## **Statutes**

5 U.S.C. §§ 701-706 ........................................................................................................... 9, 11

34 C.F.R. § 685.206(c) ............................................................................................................... 5

## **INTRODUCTION**

In 2016, the Department of Education (the "Department") promulgated regulations addressing a borrower's ability to assert a defense to repayment of federal Direct Loan obligations (*i.e.*, a borrower defense) based on misconduct by an educational institution (the "2016 Rule"). Acting pursuant to express grants of statutory authority, the Department has postponed the effective date of, but not repealed or replaced, certain provisions of the 2016 Rule.  Plaintiffs bring this lawsuit because they would like to see the 2016 Rule implemented sooner.  But in conflating the Department's limited actions delaying the Rule's effective date with substantive rescission of the Rule, they fail to demonstrate that any of the actions they challenge were unlawful.

In response to a lawsuit challenging the 2016 Rule (the "CAPPS litigation"), the Department, pursuant to specific statutory authority in 5 U.S.C. § 705, postponed the effective date of certain provisions of the Rule pending judicial review because it found that "justice so require[d]."  When this temporary delay resulted in the 2016 Rule not taking effect on July 1, 2017, as originally scheduled, the Department provided notice that pursuant to its long-standing interpretation of the Higher Education Act ("HEA") – reflected in a decades-long practice of implementing financial aid regulations only at the beginning of an "award year" – the postponed regulatory provisions would become effective, at the earliest, at the beginning of the next award year on July 1, 2018 (the Interim Final Rule, or "IFR").  At the same time, the Department has engaged in an ongoing process of reviewing and reconsidering the substance of its borrower defense regulations.  In order to promote efficiency and avoid disruption given the impending specter of regulatory change, the Department announced, through notice and comment rulemaking, a final rule further delaying the relevant provisions of the 2016 Rule until July 1, 2019 (the "2018 FR" or "2018 Rule").

1

In challenging these regulatory actions, the only injury Plaintiffs allege they will suffer results from Plaintiffs' own strategic choices in response to hypothesized future violations by institutions of higher education, rather than directly from the Department's actions. Neither this alleged injury, nor Plaintiffs' asserted "*parens patriae*" interest in the "economic health and well-being of their residents," is sufficient to support standing in a suit, like this one, against the federal government.

Even if Plaintiffs had standing, their claims fail. Section 705's plain text, as well as the Administrative Procedure Act's ("APA") statutory scheme, demonstrate Congress' intent to commit to agency discretion the decision whether to stay the effective date of an action pending judicial review. And even if this action were reviewable, Plaintiffs' attempt to impose on the Department obligations beyond finding that "justice so requires" a delay would essentially treat action pursuant to Section 705 the same as action taken pursuant to the APA's substantive rulemaking provisions, overriding Section 705's inherently flexible and discretionary standard and rendering the provision a nullity. Because such interpretations are disfavored, and the Department made the only finding that the statute requires, the Court should grant summary judgment for Defendants on the Section 705 claims.

Plaintiffs' challenges to the IFR and the 2018 FR fare no better. In arguing that *Chevron* deference should not apply to the statutory interpretation reflected in the IFR, Plaintiffs conveniently confuse discretion in interpreting a statute (which the Department clearly exercised here), with discretion to act in light of the interpretation. Only lack of the former precludes *Chevron* deference, but the Department (pursuant to the exercise of its delegated authority to interpret the HEA), only lacks the latter here. The text and objectives of the master calendar provision, as well as the Department's historical practice, demonstrate that the Department's

interpretation is reasonable.  Moreover, despite Plaintiffs' repeated (and unsupported) assertions to the contrary, the 2018 FR does not repeal the 2016 Rule; thus there is no basis for Plaintiffs' claim that the Department acted arbitrarily and capriciously by seeking to avoid potentially unnecessary costs and certain confusion by delaying the 2016 Rule pending the conclusion of ongoing rulemaking procedures addressing the same substantive topic.  Nor can Plaintiffs show that further procedures was required for either of these limited actions postponing the 2016 Rule.  Thus, summary judgment for Defendants is warranted on these claims as well.

## I.   PLAINTIFFS LACK STANDING

As stated in the preamble to the 2016 Rule, the "purpose of the borrower defense regulations is to protect student loan borrowers from misleading, deceitful, and predatory practices" by "institutions participating in the Department's student aid programs."  AR-A at 10.  Even so, Plaintiffs try to argue that this Rule was designed to provide the *states* with concrete benefits, and that a temporary delay of the Rule (as opposed to actions of educational institutions) would deprive the states of these hypothesized benefits.  Primarily, they contend that the Rule "formalized the role of state enforcement actions in the borrower defense framework."  Plaintiffs' Opposition and Reply Brief at 4, ECF No. 64 ("Pls.' Opp.").  But the mere fact that the Rule incorporates certain types of judgments in cases brought by state enforcement agencies (as a basis for a student borrower to assert a defense to repayment), and provides that a notice of state enforcement action tolls the limitation period for the Department to commence a collection action against a school, confers no tangible benefit on the states themselves.  Indeed, the harms the states will allegedly suffer as the result of delayed implementation are primarily in the form of resources voluntarily diverted towards enforcing their own consumer protection schemes, which remain in effect and with which the Department's challenged actions do not interfere.  Because such harms

are not cognizable under Article III, and because, in any case, they are not fairly traceable to the Department's actions, Plaintiffs cannot demonstrate their own standing.  Moreover, they are barred by well-established law from asserting standing as *parens patriae* on behalf of their citizens.

### A.      Plaintiffs Suffer No Injury That Is Actual, Imminent, And Traceable To The Temporary Delay Of The 2016 Rule's Effective Date

Plaintiffs claim standing on the basis of an alleged deprivation of the "benefits from agency action."  Pls.' Opp. at 7-8.  The cases they cite for this proposition, however, demonstrate the necessity of a much closer connection between agency action and claimed benefit than exists here.

In *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312 (D.C. Cir. 2015), the Federal Election Commission (FEC) had dismissed an administrative complaint against Crossroads GPS, which alleged that Crossroads was a political committee required to register under the Federal Election Campaign Act (FECA).  The complainant, Public Citizen, then exercised its right under the FECA to challenge the dismissal in district court, and Crossroads sought to intervene to defend the dismissal.  The court found that the agency action at issue involved potential "direct regulation of Crossroads – *i.e.*, a determination of whether Crossroads was a political committee required to register with the FEC" and that "Crossroads thus has a significant and direct interest in the favorable action shielding it from further litigation and liability; and the threatened loss of that favorable action constitutes a concrete and imminent injury."  *Id*. at 318; *see also Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (finding that the government of Mongolia had standing to intervene in an action seeking to classify the Mongolian argali sheep as an endangered species, and to cancel hunting permits for argali sheep, because such permits "are the primary source of funding" for the Mongolian government's argali conservation program and granting the relief requested in the action would directly result in a loss of funding for that program).

4

In both *Crossroads* and *Fund for Animals*, the party seeking to demonstrate standing was able to clearly connect the agency action at issue with a direct, concrete, imminent injury – in *Crossroads*, exposure to further litigation before the FEC and civil liability; in *Fund for Animals*, a tangible reduction in funding of a specific program.[1]  Here, on the other hand, Plaintiffs claim only a potential incidental benefit from the 2016 Rule (that, in seeking to protect student borrowers by regulating educational institutions, the Rule may incidentally compel greater compliance with state laws prohibiting misconduct by the same institutions).  Plaintiffs' consumer protection laws remain in effect even without the 2016 Rule, and state enforcement actions can still support borrower defense claims under the currently effective regulations, *see* 34 C.F.R. § 685.206(c).  Plaintiffs' claimed benefits, then, are in the form of alleged "increase[d] compliance" by third parties with state law, Pls.' Opp. at 4, and other alleged enhancements to existing enforcement mechanisms.  Such "benefits" amount to little more than an ability to save enforcement resources by diverting them away from consumer protection violations by educational institutions.  But as made clear in Defendants' opening brief, such a "self-inflicted diversion of resources" is insufficient to confer Article III standing.  *Equal Rights Ctr. v. Post Properties, Inc.*, 657 F. Supp. 2d 197, 201 (D.D.C. 2009).

Contrary to Plaintiffs' assertion, this doctrine is not so limited that it only disqualifies expenses incurred in connection with the very litigation in which a plaintiff seeks to assert standing.  *See* Pls.' Opp. at 9.  "'[Q]uintessentially . . . strategic choice[s],' of course, are not

---

[1] *Accrediting Council for Independent Colleges and Schools v. DeVos*, Civil Action No. 16-2448 (RBW) (D.D.C. Aug. 31, 2017) ("*ACICS*"), cited in Pls.' Opp. at 8, 11, is inapposite.  In that case, the court emphasized that the state plaintiffs were *currently* benefitting from a decision by the Department of Education to revoke ACICS' recognition as an accrediting agency.  *ACICS* at 5. Here, because the 2016 Rule has not taken effect, Plaintiffs cannot claim, in the temporary delay of benefits that they can only hypothesize the Rule would confer, the same kind of concrete, present injury as was recognized in *ACICS*.

limited to litigation expenses," and a plaintiff must establish "that the injuries it suffered were *not* due to a self-inflicted diversion of resources." *Equal Rights Ctr.*, 657 F. Supp. 2d at 201 (citation omitted).  Because the injuries Plaintiffs identify are the result of their own strategic choices in response to hypothesized future violations by third-party educational institutions, they are insufficient to confer Article III standing. *See Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (organization does not show standing based on its "diversion of resources from one program to another"); *see also Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir 1989) (a "self-inflicted" injury is "so completely due to the [complainant's] own fault as to break the causal chain" (citation omitted)).

Ultimately, because the 2016 Rule does not directly regulate the Plaintiffs nor provide them any benefits, the only injuries they can claim are inflicted by third parties not before this Court. Plaintiffs do not dispute that where this is the case, standing is "substantially more difficult to establish," *Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*, 78 F. Supp. 3d 208, 216 (D.D.C. 2015) (citation omitted), and that D.C. Circuit case law requires "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress," *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015).  Plaintiffs have failed to establish such a causal connection here.  That the Rule incorporates certain state enforcement actions, to some degree, into its mechanism for deterring misconduct is just a recognition of the role state law has always played in the Department's borrower defense scheme; that incorporation does not provide "substantial evidence" that states (as opposed to individual borrowers therein) would receive any direct benefit from the 2016 Rule, or that the Rule would alter the behavior of higher education institutions vis-à-vis *the states* in a concrete way.

6

**B.      The Plaintiffs Lack Standing To Bring This Action Against The Federal Government As *Parens Patriae***

Plaintiffs assert that they have standing as *parens patriae* to protect certain "quasi-sovereign" interests.  Pls.' Opp. at 12.  No doubt a state can sometimes sue in that capacity to protect its citizens; but "it is no part of its duty or power to enforce [its citizens'] rights in respect of their relations with the federal government.  In that field it is the United States, and not the state, which represents them as parens patriae."  *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n. 16 (1982).

Notwithstanding this general rule that "the *parens patriae* interest is inadequate to support standing in suits against the federal government," *Md. People's Counsel v. FERC*, 760 F.2d 318, 321 (D.C. Cir. 1985), Plaintiffs rely on the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007), to justify their standing here.  But that case, involving a state's asserted interest in protecting the physical contours of its sovereign territory, does not "reject[]" the rule that states cannot assert standing as *parens patriae* against the federal government.  Pls.' Opp. at 14.[2]  As this Court recently recognized, the Supreme Court's decision "never once mentioned a role for Massachusetts as *parens patriae*," *Gov't of Province of Manitoba v. Zinke*, 273 F. Supp. 3d 145, 165 (D.D.C. 2017), and "did not change [the above-referenced] longstanding limitations on a state's standing to sue the federal government as *parens patriae*," *id.* at 167.  Because the

---

[2] Nor does it entitle the states to "special solicitude" in the standing analysis here.  The D.C. Circuit has recognized that the holding in *Massachusetts* "turned on the unique circumstances of that case," and accordingly limited the holding to its facts.  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476-77 (D.C. Cir. 2009).  In particular, the D.C. Circuit noted that it was "critical" that Massachusetts sought to assert "its own rights as a state," rather than the rights of its citizens, and clarified that the "special solicitude" afforded to Massachusetts in the Court's standing analysis was "due to Massachusetts's interests in ensuring the protection of the land and air within its domain, and its 'well-founded desire to preserve its sovereign territory.'"  *Id.* at 476 (quoting *Massachusetts*, 549 U.S. at 519)).  Here, of course, the Plaintiff states assert no such analogous interest, unique to them as states, that would warrant similar "special solicitude."

*Massachusetts* decision "carefully avoided" that doctrine, it remains the case that "a state cannot sue the United States in the state's role as *parens patriae*," *id.*, at least where, as here, the state asserts no cognizable injury of its own.[3]

## II.   THE SECTION 705 NOTICE, IF REVIEWABLE, IS VALID

### A.   The Decision To Postpone The Effective Date Of Agency Action Pending Judicial Review Is Committed To Agency Discretion By Law

Because Section 705 provides no guidance for an agency's exercise of the broad discretion that it confers, or for a court to review such an exercise of discretion, the statute vests an agency, so long as it bases its action on a finding that "justice so requires," with unreviewable discretion to effect a temporary postponement of its action during the limited period of judicial review of that action.

Plaintiffs' primary argument in favor of reviewability is that the D.C. Circuit's decision in *Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995), is "controlling" in this case.  Pls.' Opp. at 17.  But while *Dickson* addressed language ("in the interest of justice") similar to that contained in Section 705, it involved a different statutory provision within a different statutory scheme.  The relevant case law makes clear that courts considering whether a statute commits a particular determination to an agency's discretion do not simply read the statutory text in isolation, but consider "a variety of factors," including "the language and structure of the statute that supplies the applicable legal standards," and Congress' overall intent to "commit the matter fully to agency discretion as evidenced by, among other things, the statutory scheme."  *Watervale Marine Co. v.*

---

[3] Plaintiffs' reliance on *Maryland People's Counsel* is misplaced.  *See* Pls.' Opp. at 14.  There, the plaintiff asserted standing under a statutory provision that the court determined was itself "designed to recognize precisely . . . the states' *parens patriae* interest."  760 F.2d at 321.  The court's "narrow" ruling, that in certain circumstances Congress can legislatively override the rule from *Massachusetts v. Mellon*, *id.* at 322, did not create an exception so broad as to allow a state plaintiff to overcome that rule anytime it brings an action under the APA, which does not evince any express intent to vindicate a state's *parens patriae* interest.

*DHS*, 55 F. Supp. 3d 124, 137-38 (D.D.C. 2014).   Because the key inquiry is into the statutory scheme as a whole and, ultimately, into congressional intent in enacting that scheme, *see Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002), *Dickson's* holding is not directly controlling in this case.

With respect to the statutory scheme, Plaintiffs rely on the APA's general presumption of reviewability.   Pls.' Opp. at 17.   However, the court must consider "the function and purpose of the statute as a whole" to determine, among other things, whether the statute provides "guidance or standards from other portions of the statute," or whether "a deferential attitude on the part of Congress … permeates the overall structure of the statute."   *Watervale Marine Co.*, 55 F. Supp. 3d at 139 (citations omitted).   An analysis of Section 705 within its proper context reveals congressional intent, absent in *Dickson*, to commit the relevant decision to agency discretion.[4]

As discussed in Defendants' opening brief, Section 705 sets forth different standards for agencies on the one hand, and courts on the other, to exercise their authority to provide "relief pending review" of a particular agency action.   While an agency's limited authority is conditioned upon it making a finding that "justice so requires," courts are granted authority, as necessary to prevent "irreparable injury," to "issue all necessary and appropriate process" not only to postpone an effective date pending review, but also to "preserve status or rights."   5 U.S.C. § 705.   Congress' use of the term "irreparable injury" is a clear indication that it intended *courts* to employ traditional standards for awarding temporary injunctive relief.   *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S.

---

[4] Unlike in *Dickson*, which involved the narrow decision of whether to excuse an untimely request for correction of military records, an agency's determination of whether "justice so requires" a temporary postponement pending judicial review involves "a complicated balancing of factors which are *peculiarly within [the agency's] expertise.*"   *Dickson*, 68 F.3d at 1403 (alteration in original) (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).   As described below, such factors may include not only the relative merits of the legal challenge, but also whether the agency is likely to reconsider or revise the challenged action from a policy perspective, and whether, in light of such a policy change, the costs of bringing the regulated industry into compliance with existing policy is justified.

922, 931 (1975) (noting that the "traditional standard for granting a preliminary injunction" requires a showing of "irreparable injury"); *CityFed Fin. Corp. v. OTC*, 58 F.3d 738, 747 (D.C. Cir. 1995) ("[t]he basis of injunctive relief in the federal courts has always been irreparable harm" (alteration in original) (citation omitted)).  Section 705's second sentence (which addresses *court* stays of agency action) thus sets forth a well-established *judicial* standard for courts to grant temporary relief, *i.e.*, the four-factor test for awarding preliminary injunctive relief which is premised upon preventing irreparable injury, during the pendency of judicial review.

By contrast, Section 705's first sentence (which addresses *agency* stays of agency action) does not contain any reference to either "irreparable injury" or any other factor a court would use in awarding preliminary injunctive relief.  Congress' decision to set forth a discrete, manageable standard incorporating a well-established body of law for a court to apply, while choosing not to do the same with respect to an agency's action under the same statute, suggests that the lack of a standard in the first sentence was intentional and that Congress did not intend for courts to have any role in reviewing agency action taken pursuant to that sentence (as opposed to the underlying agency action, review over which Section 705's first sentence enables).  *See Fla. Pub. Telecomms. Ass'n v. FCC*, 54 F.3d 857, 860 (D.C. Cir. 1995) ("when Congress uses different language in different sections of a statute, it does so intentionally") (citations omitted)).

Moreover, the broader statutory scheme reveals Congress' intent to carve out and insulate from the APA's judicial review provisions an agency's decision to delay the effective date of its action pending judicial review of that action.  The APA sets forth a carefully delineated mechanism for review of agency action.  Congress' placement of Section 705's specific and limited agency authority within the very provisions of the APA that govern judicial review reveals that an agency's action under Section 705 is designed to facilitate judicial review of the underlying action,

and that it does not constitute the type of final agency action reviewable by a court under the APA. Specifically, 5 U.S.C. §§ 701-706 comprise Chapter 7 of the APA, titled "judicial review."  These provisions generally establish a right of judicial review for individuals suffering legal wrong as the result of agency action – except to the extent judicial review does not apply because it is precluded by statute or because the agency action in question is committed to agency discretion by law.  Section 704 defines the types of actions that are reviewable and Section 706 describes the scope of judicial review of such actions. The intervening section, Section 705, states that both agencies and courts can act to provide "relief pending review" of an underlying agency action subject to judicial review.  Section 705 does not limit a court's ability to review the underlying agency action (indeed, its purpose is to facilitate such review by freezing the status quo and allowing a court to consider a legal challenge) under generally applicable APA standards.  That the APA's judicial review provisions define the actions that are themselves subject to judicial review, as well as delineate the scope of such judicial review, while separately providing for an agency to afford a limited form of relief pending such review, provides clear evidence that Congress did not intend for the agency's action granting "relief pending review" to itself be reviewable under the APA or any other source of law.

### B.      The Department Adequately Justified The Section 705 Notice

In order to invoke its authority to postpone an effective date under Section 705, all an agency need do is "find[] that justice so requires."  As explained in Defendants' opening brief, the Department made this finding, referencing a host of relevant factors including the presence of the CAPPS litigation and the serious questions it raised about the validity of the 2016 Rule, the harm that implementation during the pendency of judicial review would impose on the regulated community, the cost savings to the United States, the extent to which any harm a temporary delay

might cause to student borrowers would be mitigated by the Department's ongoing processing of borrower defense claims under existing law, and the practical reality that the Department was (and is still) actively considering whether to revise its borrower defense regulations through appropriate procedures.   Plaintiffs' arguments that these findings were somehow insufficient conflate the Department's limited action pursuant to Section 705 with a substantive rulemaking repealing the 2016 Rule; their attempts to impose requirements on the Department's Section 705 authority that do not appear in the text should be rejected.

i.       The 705 Notice Explicitly Delays The Relevant Provisions Of The Final Rule Pending Judicial Review In CAPPS

The Department made clear in the 705 Notice that it was effecting a temporary postponement of certain provisions of the 2016 Rule based on, among other things, the "serious questions" that the CAPPS litigation had raised about the validity of those provisions, and tied its postponement to the pendency of the Court's review in CAPPS.   Plaintiffs take issue with the fact that the Department also noted in its 705 Notice that it was separately planning to review and revise the regulations through the negotiated rulemaking process, and they argue that Section 705 does not "permit an agency to delay implementation of a final rule for reasons unrelated to pending litigation."  Pls.' Opp. at 18.  To the contrary, the governing standard allows an agency to postpone the effective date of its action upon finding that "justice so requires."  The reason it must give is not simply that litigation is pending (although that is a necessary condition), but that justice requires a delay during the pendency of judicial review.  Plaintiffs read the words "justice so requires" out of Section 705 and turn a statutory directive to act based on a holistic consideration of what justice requires in an individual case into a simple command to postpone agency action only because litigation is pending.  Not only is such a reading inconsistent with Plaintiffs' overall theory of the case (which would have the Department assess, among other things, "the *costs* of its

§ 705 delay" and the "multitude of rights and protections established by the Borrower Defense Rule," Pls.' Opp. at 24), but it violates the well-established principle that, "when construing a statute courts 'give effect, if possible, to every clause and word.'" *Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016) (citation omitted).[5]

Applying the appropriate standard, there is nothing in the text of Section 705 that requires an agency's consideration of justice to focus solely on the underlying action under judicial review or that forbids consideration of the practical reality that the action in question is subject to reconsideration pursuant to the APA's procedures for doing so. The 705 Notice does not itself repeal or reconsider the 2016 Rule, and Plaintiffs' concern that the Department is using the Section 705 postponement to "achieve other ends," Pls.' Opp. at 18, is a fallacy. A 705 Notice can achieve no ends other than to postpone temporarily the effective date of agency action during the pendency of judicial review. That Plaintiffs continue to ignore this does not change the limited effect that the 705 Notice actually has or prevent an agency from exercising its lawful authority to review and reconsider the Rule through valid APA procedures and take note of that fact in its 705 Notice.[6]

ii.   Plaintiffs Do Not Demonstrate That The Department Was Obligated To Use The Four-Factor Test Employed By Courts

---

[5] Furthermore, even if Section 705 provided that only litigation-related reasons are appropriate justifications for staying agency action pending judicial review, Defendants are entitled to summary judgment. Even standing alone, the litigation-related reasons set forth in the 705 Notice sufficiently justify the Department's finding that justice requires staying implementation.

[6] Plaintiffs' citation to *State v. U.S. Bureau of Land Management*, 277 F. Supp. 3d 1106, 1121-22 (N.D. Cal. 2017) ("*BLM I*"), for the proposition that an agency's reference to "serious questions" concerning the validity of its action is insufficient to satisfy the "justice so requires" standard, Pls.' Opp. at 19, is of limited persuasive value. Applying Section 705 requires a contextual analysis of what justice requires in a given case, which does not lend itself to categorical rules about the sufficiency of an agency's justification under the statute. Moreover, that case is inapposite because it involved a postponement that was issued after the relevant agency action had become effective.

As described both above and in Defendants' opening brief, although the plain text of Section 705 authorizes a *court* to take action as necessary to prevent irreparable injury, it does not require an *agency*, in postponing its action pursuant to Section 705, to consider irreparable injury or any other factor a court would consider in determining whether to grant preliminary injunctive relief.   Nonetheless, Plaintiffs continue to rely on *Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2011), and legislative history for the argument that "§ 705 affords *the same* authority to agencies and courts."  Pls.' Opp. at 21.  As described in Defendants' opening brief, *Sierra Club*'s holding on this point is poorly reasoned and provides no basis for ignoring the clear text of Section 705.   Nor does the legislative history, which stops well short of demonstrating any affirmative requirement that agencies and courts employ the same standard or engage in the same analysis. *See* Defs.' Renewed Mot. for Summ. J. at 31-32, ECF No. 59-1 ("Defs.' MSJ").

Plaintiffs' reference to the fact that some other agencies have at times voluntarily chosen to employ the four-factor test when applying Section 705 does not demonstrate that agencies are *required* to consider the same four factors every time they exercise their statutory authority. Defendants do not dispute that consideration of such factors might sometimes be relevant to an agency's finding that justice requires a temporary postponement in a given situation.   Plaintiffs argue, however, that Section 705 imposes a mandatory obligation on an agency to consider the preliminary injunction factors as a necessary precondition before exercising its authority.  Such a statutory obligation is not created by the mere fact that some other agencies "have a history of employing the preliminary injunction test" when invoking Section 705.  Pls.' Opp. at 22.[7]

---

[7] In any case, as pointed out in the Trade Association Coalition's amicus brief, agencies' use of the preliminary injunction factors is far from a uniform practice, and agencies often issue Section 705 stays without referring to those factors.  *See* ECF No. 62 at 10-11.

iii.    The Department Adequately Determined That Justice Required The Delay

Plaintiffs further argue that, regardless of whether the Department was required to consider the preliminary injunction factors, its "explanation for the [705 Notice] failed to meet the APA's minimum requirements."   Pls.' Opp. at 22.   Plaintiffs' interpretation of these "minimum requirements," however, ignores the text of Section 705, which only requires an agency to make a simple finding that "justice so requires" a temporary postponement, and instead imposes a *requirement* that the agency "consider *both* the costs and benefits of delay." *Id*. at 23.   In this case, the Plaintiffs' interpretation would require "reasoned explanations" for any changes in assessments of such costs and benefits from those reflected in the 2016 Rule, *id*. at 25.   But again, the 705 Notice merely postponed the effective date of the 2016 Rule pending judicial review in the CAPPS litigation; it did not alter or rescind the Rule and the Department was not obligated to supplement its "justice so requires" finding with any further justification that might be required if it were announcing a new or different policy.

Assuming *arguendo* that the arbitrary and capricious standard of review imposes any obligation on an agency above and beyond what the text of Section 705 requires, the standard is in any event "highly deferential," "presumes agency action to be valid," and "forbids the court's substituting its judgment for that of the agency." *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976).   It cannot be applied to swallow the text of Section 705 and replace the Department's assessment of what justice required in this situation with Plaintiffs' preferred weighing of the relevant considerations.   Section 705 imposes no requirement that an agency consider any specific factors or make any particular findings, and it is well-established that "the APA's arbitrary and capricious standard alone [does not] require[] an agency to engage in cost-benefit analysis." *Vill.*

*of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 670-71 (D.C. Cir. 2011).[8]   Moreover, when an agency does not actually change policy, as when it acts pursuant to Section 705, the cited line of cases requiring a reasoned explanation for the change, *see* Pls.' Opp. at 33, is "inapposite." *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 165 n.18 (D.D.C. 2014).

The APA's default standard "encompasses a range of levels of deference to the agency," *Fund for Animals v. Norton*, 512 F. Supp. 2d 49, 54 (D.D.C. 2007) (citation omitted), and "requires reviewing courts to adjust their inquiry according to the particular agency action under review," *Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983).  *See also NRDC v. SEC*, 606 F.2d 1031, 1050 (D.C. Cir. 1979) (review "depends upon analysis of a number of factors, including the intent of Congress," "the needs, expertise, and impartiality of the agency as regards the issue presented; and the ability of the courts effectively to evaluate the questions posed").   Indeed, Plaintiffs' proffered application of the arbitrary and capricious standard would render Section 705 a nullity.   Through the rulemaking provisions of the APA, the Department has the authority to either amend or fully repeal the 2016 Rule.   Section 705, on the other hand, allows an agency to take the limited step of delaying the effective date of an action pending judicial review upon making the simple finding that "justice so requires."   Were an agency, every time it invoked its authority under Section 705, required to justify its action to the same extent it would have to justify substantive repeal of the delayed action, Section 705 would serve no independent purpose and be rendered superfluous.  *See Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 515 (D.C. Cir. 1993).

---

[8] Because it finds no basis in Section 705's text, and relies on an oversimplified definition of "justice," no weight should be accorded to the statement in *BLM I*, cited by Plaintiffs, that "justice so requires" imposes a requirement to weigh, like "the iconic statute of the blindfolded goddess," Pls.' Opp. at 23 (quoting *BLM I*, 277 F. Supp. 3d at 122), the costs and benefits of a delay.

The particular agency action at issue here is a temporary delay under Section 705, and thus review must focus simply on whether the Department made the finding that justice requires a temporary postponement.  To note, as part of a larger consideration of the requirements of justice, that it would be wasteful and inefficient to have regulated entities incur the cost of complying with a Rule that might soon be revised is not "inconsistent with fundamental tenets of administrative law," as Plaintiffs contend, Pls.' Opp. at 24.  Instead, it is a recognition that "[e]lections have consequences," *id.* at 25 (quoting *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 5 (D.D.C. 2017)).  The Department is entitled to reevaluate its regulatory priorities in light of a change in administration, so long as it follows the procedures set forth by Congress.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part).  Here, the Department's analysis was fully consistent with Section 705's text and overall purpose, and its temporary postponement was thus justified by that lawful source of authority.

## III.   PLAINTIFFS DO NOT DEMONSTRATE THAT THE IFR IS INVALID

### A.   The Department's Interpretation Is Entitled To *Chevron* Deference

The IFR providing notice of the new effective date of the 2016 Rule is based on the Department's long-standing interpretation and application of the HEA's master calendar provision, which is entitled to *Chevron* deference.  Plaintiffs' arguments against such deference mischaracterize the facts and rely on erroneous statements of law, and therefore should be rejected.

First, the Court should reject Plaintiffs' claim that deference is inappropriate because "the Department pointed to no ambiguity in the Master Calendar Provision requiring interpretation." Pls.' Opp. at 29.  As discussed in the Department's opening brief, the statute is ambiguous with respect to the precise question of whether a regulation that was scheduled to become effective on

July 1, but that does not take effect on that date, may go into effect at any time before the next July 1. Defs.' MSJ at 38.[9]  Moreover, the IFR made clear that the Department has "consistently interpreted" the master calendar to provide that any regulatory change relating to student financial aid programs may take effect only at the beginning of an award year.  *See* AR-B at 3.  Thus, the IFR itself made clear that the Department was interpreting an ambiguous statute, and Defendants' argument that the interpretation is entitled to *Chevron* deference is not an impermissible "*post hoc rationalization[]*," as Plaintiffs assert.  *See* Pls.' Opp. at 29.

Plaintiffs' further argument that *Chevron* deference should not apply because the Department referenced its lack of discretion to set an effective date earlier than July 1, 2018, *id.*, should be rejected because it confuses discretion to interpret a statute with discretion to act in light of the agency's interpretation.  Only lack of the former precludes *Chevron* deference, but the Department only lacks the latter here.  The Department does not contend that it did not have discretion in interpreting the HEA; it merely maintains that *once* it interpreted the statute as providing that regulations should become effective only on July 1, it did not, going forward, have discretion to implement the final regulations on a date other than July 1.  *See* AR-B at 3-4 ("the Department has consistently interpreted and applied the master calendar requirement to provide that any regulatory change relating to student financial aid programs may take effect only at the beginning of an award year . . . Given the Department's limited discretion to set an effective date under [this interpretation of] the master calendar requirement, …").[10]

[9] To the extent Plaintiffs' argument is that the Department was required to, but did not, state in the IFR what was ambiguous about the statute, the D.C. Circuit has made clear that it "does not require such statements."  *UC Health v. NLRB*, 803 F.3d 669, 673 n.1 (D.C. Cir. 2015).

[10] Plaintiffs' citation to *Arizona v. Thompson*, 281 F.3d 248, 254, *see* Pls.' Opp. at 29, does not save their argument. Here, unlike in *Arizona*, the Department does not contend that there is only one *possible* interpretation of the HEA that is compelled by the statute; rather, the Department's

Finally, Plaintiffs' continued reliance on *Career College Association v. Riley*, No. 94-1372, 1994 WL 454713 (D.D.C. Aug. 9, 1994) is unavailing. As noted in Defendants' opening brief, even if this case was binding, which it is not, it is irrelevant because it presented a different question than is before the Court here. Namely, *Riley* involved the procedural determination of whether a regulation is in "final form," which the court found did not relate to subject matter entrusted to the Department's particular expertise. 1994 WL 454713, at *6. In contrast, the question at issue here – whether the master calendar requirement prevents regulations from becoming effective in the middle of an award year, based on the resulting disruptive effect and lack of notice to regulated entities and students – *does* implicate the Department's substantive expertise, and the Department's interpretation of this part of the statute should therefore be entitled to deference.

## B.      The Department's Interpretation Is Reasonable

Having failed to establish that *Chevron* deference is inappropriate, Plaintiffs' remaining arguments are irrelevant because they ignore the appropriate deference due to the agency's interpretation, and that the only proper inquiry is whether the agency's interpretation was permissible. Plaintiffs instead argue that the Court should reject the IFR because Plaintiffs believe it "has no basis in either the text of the provision or in its legislative history" and because Plaintiffs are unpersuaded that having all relevant regulations be implemented only at the beginning of an award year advances the statutory notice-giving objective. Pls.' Opp. at 29-30. But these arguments misapprehend the law. The Department is only required to offer a *permissible* or *reasonable* interpretation. *See Chevron, USA, Inc. v. NRDC*, 467 U.S. 837, 845 (1984). Plaintiffs' opposition ignores Defendants' explanation of why their interpretation is reasonable. Namely, the

_____

position is that its interpretation is the most reasonable. This does not preclude the Court from deferring to the Department's interpretation.

Department contends that the statute is ambiguous as to whether regulations can *only* be implemented at the beginning of an award year, and that, based on other statutory language and objectives, the master calendar provision should be read to answer that question affirmatively.  As described in Defendants' opening brief, the fact that the relevant sub-section is titled "[d]elay of effective date of late publications" reflects that there is only one "effective date" each year (*i.e.*, the first day of the award year); if that date passes and a regulation is not implemented, it cannot become effective until the beginning of the next award year.  Defs.' MSJ at 39-40.  Plaintiffs offer no excuse for ignoring this argument or for arguing, wrongly, that the Department did not tie its interpretation to "the text of the Master Calendar Provision."  Pls.' Opp. at 30.

Plaintiffs' treatment of the legislative history is no more successful.  They continue to argue that, to the extent the purpose of the master calendar requirement is to provide notice, the regulated community has already been afforded the requisite level of notice and predictability because the 2016 Rule was published in final form by November 1, and, they allege, Defendants do not explain how *additional* notice would harm this legislative goal.  Pls.' Opp. at 30.  But, as the Department noted in its opening brief, this argument ignores the effect of the CAPPS litigation and the 705 Notice, which identified significant legal concerns concerning the 2016 Rule and created significant uncertainty about its future implementation.  In light of these circumstances, there is no basis to conclude that publication of the Rule in November 2016 provided the regulated industry the kind of advance notice the master calendar requirement deems necessary.  Without the added certainty of clarifying *when* a given regulation will become effective and in what form, mere notice of the existence of a regulatory change does not allow the regulated industry to adjust in advance its behavior to comply with the regulatory requirements.  Plaintiffs address these points only by erroneously claiming Defendants' argument means "the mere filing of a lawsuit [would] excuse[]

regulated parties from preparing for and complying with … regulation[s]," Pls.' Opp. at 30-31. But Defendants say nothing of the sort; it is not the filing of the lawsuit that delayed the implementation date, but the agency determining – as Congress authorized it to – that, in light of the litigation, "justice so requires" staying the regulation's effective date pending judicial review.

Accordingly, Plaintiffs' insistence that, if the Court were to invalidate the 705 Notice, the 2016 Rule could go into effect immediately because adequate notice has already been provided should be rejected.  An interpretation yielding the indeterminacy described above is inconsistent with the HEA's objective of providing notice.[11]

### C.    The IFR Was Adequately Justified

The Department demonstrated in its opening brief that where, as here, an agency action is limited to setting forth a statutory interpretation to provide notice to the regulated industry, the Court's inquiry is less demanding than if it were reviewing an agency's substantive policy decision within a complex regulatory scheme.  Plaintiffs disagree, but their attempt to characterize the IFR as "a substantive action," Pls.' Opp. at 31-32, does not make it so.[12]  The IFR did not itself effect a delay; it merely provided notice of the revised effective date of certain 2016 Rule provisions, pursuant to the Department's long-standing interpretation of the HEA.  Because it is not a substantive rule, discussion of the costs and benefits related to delayed implementation, as well as

---

[11] Plaintiffs attempt to mitigate the import of the Department's long-standing policy and practice of implementing financial aid regulations only at the start of an award year by noting that none of these regulations explicitly articulate the policy.  Pls.' Opp. at 30 n.14.  But Plaintiffs offer no support for this purported requirement.  And, in any event, all that matters is that the Department has a long-standing interpretation that is consistent with its interpretation here.

[12] Plaintiffs' argument that an agency "changing its course" is required to "supply a reasoned analysis for the change," Pls.' Opp. at 32 (citations omitted), is irrelevant because the IFR does not "change course" from any previous policy or determination; it merely gives notice of an agency interpretation.

consideration of the impact of the "delay," is irrelevant to implementation of the master calendar and unnecessary to justify the delay reflected in the IFR.

## IV.    PLAINTIFFS DO NOT DEMONSTRATE THAT THE 2018 RULE IS INVALID

Defendants have explained that the 2018 Rule, which temporarily delays the effective date of the 2016 Rule by one year, accords with the requirements of the APA.  *See* Defs.' MSJ at 51-70.  Plaintiffs' continued attempts to challenge the Department's stated justification for the rule, and its cost-benefit analysis, are unpersuasive because they are based on a failure to recognize the limited nature of the 2018 Rule.  Accordingly, and for the reasons discussed below, the Court should uphold the 2018 FR and grant summary judgment in favor of Defendants.

### A.    The Department Adequately Explained The Basis For The 2018 Rule

Plaintiffs seek to challenge the validity of the 2018 Rule by claiming that it is improperly based on the Department's desire to effectuate a policy change.  *See* Pls.' Opp. at 34-35.  They also claim that the Department failed to adequately explain in the 2018 FR why the agency "abandoned the Borrower Defense Rule and its previous determination that the Borrower Defense Rule is necessary."  *Id.* at 37.  Both arguments, however, misconstrue the 2018 FR and fail to establish that the Department acted arbitrarily and capriciously.

First, the Department has consistently explained that the purpose of the 2018 FR is not to replace the 2016 Rule; rather, because of the status of the pending rulemaking and statutory requirements to which the agency must adhere, the Department decided that an additional, limited delay of the 2016 Rule was preferable to the confusion and costs that would otherwise ensue if those regulations were to take effect.  *See* Administrative Record for 2018 Rule ("AR") at 7 (identifying as grounds for the 2018 FR the "timing of the negotiated rulemaking," "the effect of the master calendar requirement," and the desire to mitigate regulatory confusion).    As the

Department emphasized in the 2018 FR, the one-year delay "would prevent a scenario in which the 2016 final regulations might become effective for a short period of time before new regulations resulting from the current borrower defense rulemaking process take effect, a result which likely would lead to a great deal of confusion and difficulty for borrowers and schools alike." *Id.* Plaintiffs do not claim that the Department cannot take these factors into account when justifying the 2018 FR, nor could they. *See, e.g.*, *McKinney v. McDonald*, 796 F.3d 1377, 1385 (Fed. Cir. 2015) (action making regulation prospective not arbitrary or capricious where alternative "would create potential confusion among both claimants and adjudicators, increasing the complexity of adjudications and the potential for errors and inconsistent results" (citation omitted)).

Second, Plaintiffs' claim that the Department has not adequately explained the 2018 FR is based on the erroneous premise that the Department has "change[d] position," "contradict[ed] the Department's own reasoning," or otherwise "abandoned" the 2016 Rule. *See* Pls.' Opp. at 35, 36, 37. But the Department made clear that the 2018 FR "does not amend the substance of the 2016 final regulations; it merely changes the effective date of the 2016 final regulations." AR at 7. This assertion is borne out by the rule itself, which does not impose new obligations on borrowers or institutions, nor make assumptions about what provisions of the borrower defense regulations will ultimately be revised. Thus, much as Plaintiffs may wish to litigate the merits of the 2016 Rule, they cannot use the 2018 FR as a basis to do so. *See Sierra Club v. Gorsuch*, 715 F.2d at 658 ("[A]pplication of the 'arbitrary and capricious' standard requires reviewing courts to adjust their inquiry according to the particular agency action under review."); *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 532 (D.D.C. 2016) ("[A]rbitrary and capricious review defies generalized application and must be contextually tailored." (citation omitted)). All the APA requires is an adequate explanation for the one-year delay, which the Department has provided. *See* AR at 3-4;

*see also* AR at 7 ("We are separately conducting a negotiated rulemaking process to address the substance of the borrower defense regulations, and any resulting NPRM will provide a rationale for proposed changes.").

The two cases on which Plaintiffs rely – *California v. Bureau of Land Management*, 286 F. Supp. 3d 1054, 1064-65 (N.D. Cal. 2018) ("*California v. BLM II*") and *Public Citizen v. Steed*, 733 F.2d 93, 98 (D.C. Cir. 1984) – should not compel a different conclusion.  As discussed in Defendants' opening brief, Defs.' MSJ at 54, *California v. BLM II* is factually distinct from this case; there the findings underlying the agency's suspension rule contradicted those in the rule being suspended, 286 F. Supp. 3d at 1065-68, whereas here the 2018 FR and the 2016 Rule are not inconsistent.  *See* AR at 4, 7.[13]  While Plaintiffs attempt to characterize the 2018 FR as contrary to the 2016 Rule's arbitration and class-action waiver provisions, *see* Pls.' Opp. at 36 (claiming the Department has "newly adopted [a] view that central provisions of the Borrower Defense Rule would not survive judicial review"), their argument is without merit: in the 2018 FR, the Department did not abandon its prior determinations but rather concluded that given the litigation risk presented in the CAPPS case, borrowers' ability to apply for discharges directly from the Department, and the administrative costs associated with implementing these provisions of the 2016 Rule, "the harm from having these provisions take effect . . . is too great and outweigh[s] any benefits these provisions would have."  AR at 5.

*Steed* is also inapposite, as demonstrated in Defendants' opening brief.  Defs.' MSJ at 54-55.  There, the D.C. Circuit held that the "indefinite suspension" of regulations amounted to a revocation and, consequently, the agency should have more fully articulated its explanation to

---

[13] *California v. BLM II*'s reliance on *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), is also flawed. *See* Defs.' MSJ at 54 n.20.

account for the revocation.  733 F.2d at 98.  In their opposition, Plaintiffs rely on the court's language that "[a]lthough the agency's characterization may provide some guidance in determining the nature of the challenged action, 'it is the substance of what the [agency] has purported to do and has done which is decisive.'"  *Id.* (citation omitted).  *See* Pls.' Opp. at 37.  But here, both the Department's characterization and the substance of its action establish that the 2018 FR does not constitute a revocation of the 2016 Rule.  By its terms, the delay implemented by the 2018 FR is not indefinite, and as the Department has explained, any revision to the borrower defense regulations will be effected through a separate rulemaking, which would include public comment.  AR at 7.  Thus both the temporal nature and the "reasoning asserted" in the 2018 FR demonstrate that the rule is not a "complete reversal of [the agency's] prior position," *Steed*, 733 F.2d at 98, distinguishing this case from *Steed*.

### B.      There Is No Basis To Second-Guess The Department's Consideration Of The Effects Of The 2018 FR

Plaintiffs also challenge the Department's finding that the 2018 FR's costs are outweighed by its benefits.  *See* Pls.' Opp. at 38-42.  However, to the extent the agency's analysis is reviewable under the APA, Plaintiffs fail to demonstrate that it is arbitrary and capricious.

As an initial matter, Plaintiffs appear to concede that they have no cause of action to challenge the Department's compliance with the Executive Orders that give rise to the requirement for a cost-benefit analysis.  *See id.* at 38-39; *see also Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) ("Although petitioner indicated that it does not seek to assert rights under the order but is merely referencing it to provide evidence of the arbitrary and capricious nature of the FAA's decision, such an argument is nothing more than an indirect—and impermissible—attempt to enforce private rights under the order.").  They likewise do not contest the Department's position that the HEA does not require the Department to conduct any cost-benefit analysis whatsoever.

*See* Pls.' Opp. at 40; *see also Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 378 (D.C. Cir. 2013); *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 400 (D.D.C. 2017) (rejecting plaintiff's argument that agency's cost-benefit analysis was insufficient in part because "the agency was not required to undertake a cost-benefit analysis when it implemented the statutory deeming provision").  Thus, there is no dispute that APA review under Executive Orders 12866 and 13563, or APA review under the HEA, is precluded.  Instead, Plaintiffs clarify that their challenge is limited only to whether the Department's cost-benefit analysis contained two inconsistencies such that the entire 2018 FR should be deemed irrational.  *See* Pls.' Opp. at 40-42. Both arguments, however, are without merit.

First, Plaintiffs claim that in the 2018 FR "the Department broke from its previous positions and found that borrowers would not be significantly harmed by further delay of the Borrower Defense Rule because pre-2016 regulations provide adequate protection for borrowers."  Pls.' Opp. at 40.  Not so.  In the 2018 FR, the Department acknowledged the concerns of some of the commenters regarding the potential harm to borrowers that a one-year delay may cause.  AR at 3 (describing comments stating, *inter alia*, that borrowers "would continue to be subject to the predatory practices of certain institutions," "interest, collection costs and financial distress [would] continue[] to mount," "they would be denied access to the many provisions in the 2016 final regulations that are beneficial to borrowers," delay "would perpetuate existing harms experienced by borrowers, such as poor credit ratings," and "the delay creates uncertainty in how the Department will treat future borrower defense claims").  Responding to these concerns, the Department determined that, based on its analysis, it "does not agree that borrowers will be significantly harmed by changing the effective date of the 2016 final regulations to July 1, 2019." *Id.* at 3-4.

The agency supported this conclusion by emphasizing the limited nature of the 2018 FR and explaining that numerous protections for borrowers remain in effect, such as the ability to apply for relief directly from the Department under the existing borrower defense regulation, periodic reviews and site visits by Department employees, and oversight and enforcement by other Federal and State entities that protect borrowers.  *Id.* at 4; *see also* AR at 4 ("While the Department acknowledges that certain benefits of the 2016 final regulations will be delayed, it has determined that those benefits are outweighed by the administrative and transaction costs for regulated entities and borrowers of having those regulations go into effect only to be changed a short while later."). Thus, the Department's discussion of borrower protection does not constitute a "br[eak] from its previous positions," Pls.' Opp. at 40, but instead is a reasoned analysis in support of a short delay.[14]

Second, Plaintiffs assert that "[b]y considering the likelihood that the [2016] Rule will be replaced in assessing the *benefits* of delay but not the *costs*, the Department overstated the benefits of delay to regulated entities while undervaluing the potential harms to borrowers who may never gain access to the protections of the Borrower Defense Rule."  Pls.' Opp. at 42.  Again Plaintiffs misstate the Department's analysis, which focused on the benefit to regulated entities of delaying implementation costs and not permanent benefits to the industry from the 2016 Rule never going into effect.  *See* AR at 9 ("[T]he analysis of the net budget impact in this final rule is limited to the effect of delaying the effective date of the 2016 final regulations from July 1, 2018, to July 1, 2019, and does not account for any potential changes in the 2016 final regulations . . . .").  Nor can the

---

[14] Given this detailed discussion, Plaintiffs cannot credibly allege that the Department "dismiss[ed]" the commenters' concerns.  *See* Pls.' Opp. at 41 n.17.  The Department's response to comments is therefore unlike that at issue in *Association of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012), where the court found that the Department "failed to address the commenters' concerns" or "address[ed] them in a conclusory manner."

Department be faulted for finding that costs beyond the short-term delay are not currently quantifiable. *See* Pls.' Opp. at 42; *Inv. Co. Inst.*, 720 F.3d at 378 ("[T]he law does not require agencies to measure the immeasurable."). Thus, the Department appropriately, and consistently, considered the costs and benefits associated with that delay, rather than the costs and benefits that would result if the 2016 Rule were ultimately replaced with a new, different rule. *See Inv. Co. Inst.*, 720 F.3d at 379 (rejecting challenge to cost-benefit analysis in part because "it would be quite literally impossible to calculate the costs of an unknown regulation"). There is therefore no basis to conclude that the Department's consideration of the effects of the 2018 FR is arbitrary and capricious.

## V.     PLAINTIFFS DO NOT DEMONSTRATE ADDITIONAL PROCEDURES WERE REQUIRED

Plaintiffs argue that additional procedures were required for the 705 Notice because it was "a quintessentially substantive action that necessitates adherence to the APA's notice-and-comment requirements." *See* Pls.' Opp. at 26. Because, as described above, the structure of the APA makes clear that Section 705 is intended to be treated differently than other substantive actions, and courts have recognized that notice and comment would not be required in connection with a properly invoked 705 Notice, *see Becerra v. U.S. Dep't of Interior*, 276 F. Supp. 3d 953, 966 (N.D. Cal. 2017); *BLM I*, 277 F. Supp. 3d at 1121, Plaintiffs have not shown that additional procedures were required for the 705 Notice.

With respect to the IFR, Defendants have explained that the "good cause" exceptions to notice and comment and negotiated rulemaking procedures excused their applicability here because the Department's lack of discretion to pick a different implementation date rendered the procedures "unnecessary." Defs.' MSJ at 49-50. Therefore, Plaintiffs' claim that Defendants only rely on the interim nature of the IFR to excuse their failure to follow mandatory procedures, Pls.'

Opp. at 33, is simply erroneous.  In any event, Plaintiffs do not offer any argument for why the robust explanation of "good cause" actually offered by the Department is insufficient, and thus fail to show why any additional procedures are required in connection with the IFR.

And finally, Plaintiffs offer nothing in reply to rebut Defendants' arguments demonstrating why good cause existed to excuse negotiated rulemaking under the HEA.  *See* Defs.' MSJ at 67-70.  While Plaintiffs highlight that the HEA's exceptions to negotiated rulemaking are designed to follow the APA's exceptions to notice and comment, they ignore that such inquiry under the APA is "inevitably fact- or context- dependent," *Mid-Tex Elec. Co-op, Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987). Here, the relevant context is that negotiated rulemaking is especially cumbersome (as compared to notice and comment procedures) and was impracticable where, as described above, the pendency of these same negotiated rulemaking procedures addressing the Department's borrower defense regulations created the need for a limited delay rule to provide clarity and prevent confusion.  Plaintiffs also rely on the unsupported assertion that the Department's "desire to replace" the 2016 Rule is an impermissible basis on which to excuse negotiated rulemaking.  *See* Pls.' Opp. at 43.  As has been discussed, however, the 2018 Rule does not express any position with respect to the outcome of the rulemaking proceedings, much less a "desire" to replace the 2016 Rule.  Rather, it recognizes the need to provide clarity to the regulated community and avoid disruption given the possibility that the Department's ultimate policy position might change.  In the end, Plaintiffs fail to show that negotiated rulemaking was required in this instance.

## VI.   ANY RELEVANT REMEDY ISSUES SHOULD BE ADDRESSED IN SUPPLEMENTAL BRIEFING

If the Court determines that any of the Department's actions challenged in this litigation are unlawful, it should order separate briefing on any appropriate remedy.  *See St. Lawrence*

*Seaway Pilots Ass'n v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 208 (D.D.C. 2015) (ordering, despite Defendant's silence as to remedy, supplemental briefing on remedy because court found it appropriate to have "benefit of argument from all parties").  Briefing the issue of remedy after the court decides the merits is more efficient.  To brief these issues now, the parties would have to describe the appropriate remedy under multiple potential outcomes and different theories of liability.  *See, e.g.*, *Am. Lung Ass'n v. EPA*, 134 F.3d 388 (D.C. Cir. 1998) (finding remand to agency was appropriate remedy where agency needed to explain its conclusions more fully).  If the Court instead solicits supplemental briefs about remedy *after* it has ruled on the merits, the parties can tailor their arguments to the Court's specific ruling.  *See, e.g.*, *Am. Great Lakes Ports Ass'n v. Zukunft*, --- F. Supp. 3d ----, 2017 WL 5128999, at *18 (D.D.C. Nov. 3, 2017) (court "not inclined to decide the issue of remedy without additional briefing from the parties now that the issues in the cross-motions have been resolved"); *Sierra Club v. U.S. Dep't of Agric., Rural Utils. Serv.*, 841 F. Supp. 2d 349, 362 (D.D.C. 2012) (determining remand, not vacatur, was the appropriate remedy after court-ordered supplemental briefing about this issue).

Dated:  May 11, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
KAREN S. BLOOM
Senior Counsel
R. CHARLIE MERRITT (VA # 89400)
STUART J. ROBINSON
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530

(202) 616-8098
robert.c.merritt@usdoj.gov

*Counsel for Defendants*