# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEAGHAN BAUER and STEPHANO DEL ROSE, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 17-1330 (RDM) |
| ELISABETH DEVOS, Secretary, U.S. Department of Education, *et al.*, | |
| *Defendants*. | |
| COMMONWEALTH OF MASSACHUSETTS, PEOPLE OF THE STATE OF CALIFORNIA *ex rel.* XAVIER BECERRA, Attorney General, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAII, PEOPLE OF THE STATE OF ILLINOIS, STATE OF IOWA, STATE OF MAINE, STATE OF MARYLAND, STATE OF MINNESOTA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA *ex rel.* JOSH STEIN, Attorney General, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, *ex rel.* MARK R. HERRING, Attorney General, and STATE OF WASHINGTON, | Civil Action No. 17-1331 (RDM) |
| *Plaintiffs*, | |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION, and BETSY DEVOS, *in her official capacity as Secretary of Education,* | |
| *Defendants*. | |

## ADMINISTRATIVE RECORD APPENDIX

# TABLE OF CONTENTS

Delay of Effective Date: Final Rule, June 16, 2017 .................................................... AR-A-000001

Intent to Establish Negotiated Rulemaking Committees, June 16, 2017................... AR-A-000008

Borrower Defense: Final Rule, November 1, 2016 .................................................... AR-A-000010

*California Association of Private Postsecondary Schools v. DeVos*, Case No. 1:17-cv-00999-RDM (D.D.C. May 24, 2017), complaint ............................................................... AR-A-000174

Interim Final Rule, October 24, 2017 .......................................................................AR-B-000001

Senate Report No. 99-296 (1986) (selections) ..........................................................AR-B-000009

Senate Report No. 99-68 (1985) (selection) ..............................................................AR-B-000366

H.R. Rep. No. 102-446 (1992) (selection) .................................................................AR-B-000866

Notice of Proposed Rulemaking, October 24, 2017 ..................................................AR-B-001431

Final Rule, Feb. 14, 2018 October 24, 2017 ..............................................................AR-000001

Coalition Comments from 32 Organizations ..............................................................AR-000032

Comments of State Attorneys General .......................................................................AR-000067



safety zone need not be enforced for the full duration stated in this notice he or she may use a Broadcast Notice to Mariners to grant general permission to enter the respective safety zone.

Dated: June 12, 2017.

**J.S. Dufresne,**
*Captain, U.S. Coast Guard, Captain of the Port Buffalo.*

[FR Doc. 2017–12547 Filed 6–15–17; 8:45 am]

**BILLING CODE 9110–04–P**

---

## DEPARTMENT OF EDUCATION

**34 CFR Parts 668, 674, 682, and 685**

**RIN 1840–AD19**

**[Docket ID ED–2015–OPE–0103]**

**Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final rule; notification of partial delay of effective dates.

**SUMMARY:** On November 1, 2016, the Department of Education published final regulations entitled Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan (FFEL) Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program (the final regulations) in the **Federal Register**. On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed a Complaint and Prayer for Declaratory and Injunctive Relief in the United States District Court for the District of Columbia (Court). In light of the existence and potential consequences of the pending litigation, the Department has concluded that justice requires it to postpone certain provisions of the final regulations pursuant to the Administrative Procedure Act (APA), pending judicial review. The provisions to be postponed are listed in detail in the **SUPPLEMENTARY INFORMATION** section of this document.

**DATES:** As of June 16, 2017, the effective date for the amendments to or additions of: §§ 668.14; 668.41; 668.71; 668.90; 668.93; 668.171; 668.175 (c) and (d) and (f) and (h); Appendix C to Subpart L of Part 668; 674.33; 682.202; 682.211; 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*),

(d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii); 682.405(b)(4)(ii); 682.410; 685.200; 685.205; 685.206; 685,212(k); 685.214; 685.215; 685.222; Appendix A to Subpart B of Part 685; and 685.308, published November 1, 2016, at 81 FR 75926, is delayed until further notice.

**FOR FURTHER INFORMATION CONTACT:**
Barbara Hoblitzell, U.S. Department of Education, 400 Maryland Ave. SW., Room 6W252, Washington, DC 20202. Telephone: (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** On November 1, 2016, the Department published the final regulations in the **Federal Register** (81 FR 75296), and the final regulations are scheduled to take effect on July 1, 2017. The final regulations made several changes to the Department's student financial assistance regulations. Those changes include a new Federal standard and process for determining whether a borrower has a defense to repayment on a loan based on an act or omission of a school. The final regulations also prohibit schools from using certain contractual provisions regarding dispute resolution processes in their agreements with students, including predispute arbitration provisions and class action waivers. The final regulations further impose new financial responsibility standards and require proprietary schools to make certain disclosures regarding the student loan repayment rates of their graduates.

On May 24, 2017, CAPPS filed its complaint with the Court challenging the final regulations (*California Association of Private Postsecondary Schools* v. *DeVos,* No. 1:17–cv–00999 (D.D.C. May 24, 2017)), in particular those provisions of the regulations pertaining to the standard and process for the Department to adjudicate borrower defense claims, requirements pertaining to financial responsibility standards, provisions requiring proprietary institutions to provide warnings about their students' loan repayment rates, and prohibitions against institutions including arbitration or class action waivers in their agreements with students. CAPPS has also filed a motion for preliminary injunction asking the Court to restrain the Department from implementing or enforcing the arbitration and class action waiver prohibitions.

Under section 705 of the APA, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. 705. In light of the pending litigation, and for the following reasons, the Department has concluded that justice requires it to postpone the effectiveness of certain provisions of the final regulations until the judicial challenges to the final regulations are resolved.

First, the postponement will preserve the regulatory status quo while the litigation is pending and the Court decides whether to uphold the final regulations. The plaintiffs have raised serious questions concerning the validity of certain provisions of the final regulations and have identified substantial injuries that could result if the final regulations go into effect before those questions are resolved. Given the legal uncertainty, maintaining the status quo is critical. For instance, if the final regulations are not postponed, institutions participating in the programs under title IV of the Higher Education Act of 1965, as amended (HEA), would be required, as of July 1, 2017, to modify their contracts in accordance with the arbitration and class action waiver regulations, which may be contrary to their interests. Postponing the final regulations will avoid the cost that institutions would incur in making these changes while the regulation is subject to judicial review. Additionally, if the final regulations are not postponed, institutions would be subject to financial responsibility trigger provisions that could impose substantial costs. Meanwhile, the postponement of the final regulations will not prevent student borrowers from obtaining relief because the Department will continue to process borrower defense claims under existing regulations that will remain in effect during the postponement.

Second, the United States will suffer no significant harm from postponing the effectiveness of the final regulations while the litigation is pending. As the Department stated in the Net Budget Impacts section of the Regulatory Impact Analysis of the final regulations, the provisions with the greatest impact on the net budget impact of the final regulations are those related to the discharge of borrowers' loans, especially the changes to borrower defense and closed school discharges. The final regulations were estimated to have a net budget impact in costs over the 2016–2026 loan cohorts of $16.6 billion in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the regulations providing for a three-year automatic

**27622**      **Federal Register** / Vol. 82, No. 115 / Friday, June 16, 2017 / Rules and Regulations

closed school discharge. Postponing the effectiveness of the final regulations will help to avoid these significant costs to the Federal government and ultimately the Federal taxpayer.

Separately, the Department is announcing its plan to review and revise the regulations through the negotiated rulemaking process required under section 492 of the HEA. The postponement will allow the Department to consider and conduct a rulemaking process to review and revise the final regulations and ensures regulated parties will not incur costs that could be eliminated under any future regulations the Department promulgates on these matters.

Based upon the foregoing, the Department has determined that it is necessary to postpone the effectiveness of the revisions to or additions of the following provisions of the final regulations:

• § 668.14(b)(30), (31), and (32) Program participation agreement.
• § 668.41(h) and (i) Reporting and disclosure of information.
• § 668.71(c) Scope and special definitions.
• § 668.90(a)(3) Initial and final decisions.
• § 668.93(h), (i), and (j) Limitation.
• § 668.171   General.
• § 668.175(c), (d), (f), and (h) Alternative standards and requirements.
• Part 668 subpart L, Appendix C.
• § 674.33(g)(3) and (g)(8) Repayment.
• § 682.202(b)(1) Permissible charges by lenders to borrowers.
• § 682.211(i)(7) Forbearance.
• § 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.
• § 682.405(b)(4)(ii) Loan rehabilitation agreement.
• § 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.
• § 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.
• § 685.205(b)(6) Forbearance.
• § 685.206(c) Borrower responsibilities and defenses.
• § 685.212(k) Discharge of a loan obligation.
• § 685.214(c)(2), (f)(4) through (7) Closed school discharge.
• § 685.215(a)(1), (c)(1) through (c)(8), and (d) Discharge for false certification of student eligibility or unauthorized payment.
• § 685.222   Borrower defenses.
• Part 685 subpart B, Appendix A Examples of borrower relief.

• § 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.
• § 685.308(a) Remedial actions.

We do not intend to postpone the effectiveness of the regulatory provisions published in 81 FR 75926 which: (1) Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower; (2) amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; (3) address severability; and (4) make technical corrections. As established in 81 FR 75926, §§ 682.211(i)(7) and 682.410(b)(6)(viii) remain designated for early implementation, at the discretion of each lender or guaranty agency.

In sum, in light of the existence and potential consequences of the pending litigation, and given the potentially significant harm that could result if the status quo is altered by the implementation of the final regulations on July 1, 2017, the Department has determined that the public interest and justice require postponing the effectiveness of the sections of the final regulations specified herein until the matters raised in the litigation are resolved.

In order to accomplish a postponement of certain sections of the final regulations under section 705 of the APA, the Department is delaying the effective date of the sections specified in the **DATES** and **SUPPLEMENTARY INFORMATION** sections of this document pursuant to the **Federal Register** Act and its implementing regulations.

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* Braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register**. Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys*. At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal**

**Register** by using the article search feature at: *www.Federal Register.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 668*

Administrative practice and procedure; Colleges and universities; Consumer protection; Grant programs—education; Loan programs—education; Reporting and recordkeeping requirements; Selective Service System; Student aid; Vocational education.

*34 CFR Part 674*

Loan programs—education; Reporting and recordkeeping; Student aid.

*34 CFR Parts 682 and 685*

Administrative practice and procedure; Colleges and universities; Loan programs—education; Reporting and recordkeeping requirements; Student aid; Vocational education.

Dated: June 13, 2017.

**Betsy DeVos,**
*Secretary of Education.*
[FR Doc. 2017–12562 Filed 6–14–17; 11:15 am]
**BILLING CODE 4000–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R09–OAR–2016–0653; FRL–9963–43–Region 9]**

**Approval of Nevada Air Plan Revisions, Clark County Department of Air Quality and Washoe County Health District**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is taking final action to approve revisions to the Clark County Department of Air Quality (CCDAQ) and Washoe County Health District (WCHD) portions of the Nevada State Implementation Plan (SIP). These revisions concern emissions of particulate matter (PM) from fugitive dust and wood burning. We are approving local rules that regulate these emission sources under the Clean Air Act (CAA or the Act).

**DATES:** These rules are effective on July 17, 2017.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R09–OAR–2016–0683. All

**27640**          **Federal Register** / Vol. 82, No. 115 / Friday, June 16, 2017 / Proposed Rules

## DEPARTMENT OF EDUCATION

### 34 CFR Chapter VI

[Docket ID ED–2017–OPE–0076]

### Negotiated Rulemaking Committee; Public Hearings

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Intent to establish negotiated rulemaking committees.

**SUMMARY:** We announce our intention to establish two negotiated rulemaking committees to prepare proposed regulations for the Federal Student Aid programs authorized under title IV of the Higher Education Act of 1965, as amended (HEA). The committees will include representatives of organizations or groups with interests that are significantly affected by the subject matter of the proposed regulations. We also announce two public hearings at which interested parties may comment on the topics suggested by the Department and may suggest additional topics that should be considered for action by the negotiating committees. In addition, we announce that the Department will accept written comments on the topics suggested by the Department and suggestions for additional topics that should be considered for action by the negotiating committees.

**DATES:** The dates, times, and locations of the public hearings are listed under the **SUPPLEMENTARY INFORMATION** section of this document. We must receive written comments on the topics suggested by the Department and additional topics that should be considered for action by the negotiating committees on or before July 12, 2017.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments by fax or by email. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using *Regulations.gov*, including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under ''How to use Regulations.gov'' in the Help section.

• *Postal Mail, Commercial Delivery, or Hand Delivery.* If you mail or deliver your comments, address them to Wendy Macias, U.S. Department of Education,

400 Maryland Ave. SW., Room 6C111, Washington, DC 20202.

*Privacy Note:* The Department's policy is to make all comments received from members of the public (including those comments submitted by postal mail, commercial delivery, or hand delivery) available for public viewing in their entirety on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** For information about the public hearings, go to *www2.ed.gov/policy/highered/reg/hearulemaking/2017/index.html* or contact: Wendy Macias, U.S. Department of Education, 400 Maryland Ave. SW., Room 6C111, Washington, DC 20202. Telephone: (202) 203–9155 or by email: *Wendy.Macias@ed.gov.*

For information about negotiated rulemaking in general, see *The Negotiated Rulemaking Process for Title IV Regulations, Frequently Asked Questions* at *www2.ed.gov/policy/highered/reg/hearulemaking/hea08/neg-reg-faq.html* or contact: Wendy Macias, U.S. Department of Education, 400 Maryland Ave. SW., Room 6C111, Washington, DC 20202. Telephone: (202) 203–9155 or by email: *Wendy.Macias@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** Section 492 of the HEA requires that, before publishing any proposed regulations to implement programs authorized under title IV of the HEA, the Secretary obtain public involvement in the development of the proposed regulations. After obtaining advice and recommendations from the public, the Secretary conducts negotiated rulemaking to develop the proposed regulations. We announce our intent to develop proposed title IV regulations by following the negotiated rulemaking procedures in section 492 of the HEA.

We intend to select participants for the negotiated rulemaking committees from nominees of the organizations and groups that represent the interests significantly affected by the proposed regulations. To the extent possible, we will select from the nominees individual negotiators who reflect the diversity among program participants, in accordance with section 492(b)(1) of the HEA.

### Regulatory Issues

We intend to convene a committee to develop proposed regulations to revise the gainful employment regulations published by the Department on October 31, 2014 (79 FR 64889). We intend to convene a second committee to develop proposed regulations to revise the regulations on borrower defenses to repayment of Federal student loans and other matters, published November 1, 2016 (81 FR 75926), and the authority of guaranty agencies in the Federal Family Education Loan Program to charge collection costs under 34 CFR 682.410(b)(6) to a defaulted borrower who enters into a repayment agreement with the guaranty agency.

After a complete review of the public comments presented at the public hearings and in the written submissions, we will publish a document (or documents) in the **Federal Register** announcing the specific topics for which we intend to establish the negotiated rulemaking committees and a request for nominations for individual negotiators for the committees who represent the communities of interest that would be significantly affected by the proposed regulations. This document will also be posted on the Department's Web site at: *www2.ed.gov/policy/highered/reg/hearulemaking/2017/index.html.*

### Public Hearings

We will hold two public hearings for interested parties to discuss the rulemaking agenda. The public hearings will be held:

• July 10, 2017, at the U.S. Department of Education, 400 Maryland Ave. SW., Barnard Auditorium, Washington, DC 20202.

• July 12, 2017, at Southern Methodist University, Underwood Law Library-Walsh Classroom, 6550 Hillcrest Ave., Dallas, TX 75275.

The public hearings will be held from 9 a.m. to 4 p.m., local time. Further information on the public hearing sites is available at *www2.ed.gov/policy/highered/reg/hearulemaking/2017/index.html.*

Individuals who would like to present comments at the public hearings must register by sending an email to *negreghearing@ed.gov.* The email should include the name of the presenter along with the public hearing at which the individual would like to speak, the general topic(s) the individual would like to address, and a general timeframe during which the individual would like to speak (for example, a presenter could indicate

morning or afternoon, or before 11 a.m. or after 3 p.m.). We will attempt to accommodate each speaker's preference, but, if we are unable to do so, we will make the determination on a first-come first-served basis, based on the time and date the email was received. It is likely that each participant will be limited to five minutes. The Department will notify registrants of the location and time slot reserved for them. An individual may make only one presentation at the public hearings. If we receive more registrations than we are able to accommodate, the Department reserves the right to reject the registration of an entity or individual that is affiliated with an entity or individual that is already scheduled to present comments, and to select among registrants to ensure that a broad range of entities and individuals is allowed to present. We will accept walk-in registrations for any remaining time slots on a first-come first-served basis, beginning at 8:30 a.m. on the day of the public hearing at the Department's on-site registration table. Registration is not required to observe the public hearings; however, space may be limited.

The Department will post transcripts of the hearings to *www2.ed.gov/policy/ highered/reg/hearulemaking/2017/ index.html.* Although the Department will not be videoing the hearings, as this is a public meeting, speakers should be aware that they may be filmed or recorded by members of the public.

Speakers may submit written comments at the public hearings. In addition, the Department will accept written comments via the Federal eRulemaking portal, and by postal mail, commercial delivery, or hand delivery, through July 12, 2017. (See the **ADDRESSES** section of this document for submission information.)

**Schedule for Negotiations**

We anticipate that any committees established after the public hearings will begin negotiations in November or December of 2017, with the committees meeting for up to three sessions of three to four days each at roughly five- to eight-week intervals. The committees will meet in the Washington, DC area. The dates and locations of these meetings will be published in a subsequent notice in the **Federal Register**, and will be posted on the Department's Web site at: *www2.ed.gov/ policy/highered/reg/hearulemaking/ 2017/index.html.*

*Accessible Format:* Individuals with disabilities can obtain this document in an accessible format (*e.g.,* Braille, large print, audiotape, or compact disc) by contacting Wendy Macias, U.S. Department of Education, 400 Maryland Ave. SW., Room 6C111, Washington, DC 20202. Telephone: (202) 203–9155 or by email: *Wendy.Macias@ed.gov.*

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site. You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

*Program Authority:* 20 U.S.C. 1098a.

Dated: June 13, 2017.

**Kathleen A. Smith,**

*Acting Assistant Secretary for Postsecondary Education.*

[FR Doc. 2017–12555 Filed 6–14–17; 11:15 am]

**BILLING CODE 4000–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 60**

**[EPA–HQ–OAR–2017–0346; FRL–9963–82– OAR]**

**RIN 2060–AT65**

**Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources: Three Month Stay of Certain Requirements**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

---

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to stay for three months certain requirements that are contained within the Final Rule titled ''Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources,'' published in the **Federal Register** on June 3, 2016 (2016 Rule). On June 5, 2017, the EPA published a notice that, in accordance with the Clean Air Act (CAA), the EPA stayed for three initial months the fugitive emissions requirements, well site pneumatic pump standards, and requirements for certification of closed vent systems by a professional engineer. The EPA granted reconsideration after considering specific objections to these requirements. In a separate notice published today, the EPA is proposing a stay for two years, providing the EPA sufficient time to propose, take public comment, and issue a final action on the issues concerning the specific requirements on which EPA has granted reconsideration. The two-year proposed stay published today, if finalized as proposed, would likely be determined to be a major rule under the Congressional Review Act and therefore will not take effect until sixty days after publication or after Congress receives the rule report, whichever is later. Therefore, while the EPA intends to complete that rulemaking and take final action before the initial three-month stay expires, there may potentially be a gap between the two stays due to the sixty-day delay in effectiveness of that action. To avoid such a potential gap, and the resulting confusion, in this action the EPA is proposing a three-month stay which would not qualify as a major rule and could become effective upon publication. The EPA prepared an Economic Impact Analysis for this proposal, which is available in Docket ID EPA–HQ–OAR–2017–0346. The EPA is seeking comment pertaining to this stay and its duration. The EPA is also seeking comment on if a four-month stay may be more appropriate to ensure continuity of the stay. The EPA is not taking comment at this time on substantive issues concerning these requirements, or on any of the other provisions subject to the reconsideration.

**DATES:** Comments must be received on or before July 17, 2017. If a hearing is requested on this proposed rule, written comments must be received on or before August 9, 2017.

*Public Hearing.* A public hearing will be held, if requested by June 21, 2017, to accept oral comments on this proposed action. If a hearing is requested, it will be held at the EPA's Washington, DC campus located at 1201 Constitution Avenue NW., Washington, DC. The hearing, if requested, will begin at 9 a.m. (local time) and will conclude at 4 p.m. (local time) on July 10, 2017. To request a hearing, to register to speak at a hearing, or to inquire if a hearing will be held, please contact Aimee St. Clair at (919) 541–1063 or by email at *stclair.aimee@epa.gov.*

Any updates made to any aspect of the hearing, including whether or not a hearing will be held, will be posted

**75926**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

## DEPARTMENT OF EDUCATION

**34 CFR Parts 30, 668, 674, 682, 685, and 686**

**RIN 1840–AD19**

**[Docket ID ED–2015–OPE–0103]**

**Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary establishes new regulations governing the William D. Ford Federal Direct Loan (Direct Loan) Program to establish a new Federal standard and a process for determining whether a borrower has a defense to repayment on a loan based on an act or omission of a school. We also amend the Direct Loan Program regulations to prohibit participating schools from using certain contractual provisions regarding dispute resolution processes, such as predispute arbitration agreements or class action waivers, and to require certain notifications and disclosures by schools regarding their use of arbitration. We amend the Direct Loan Program regulations to codify our current policy regarding the impact that discharges have on the 150 percent Direct Subsidized Loan Limit. We amend the Student Assistance General Provisions regulations to revise the financial responsibility standards and add disclosure requirements for schools. Finally, we amend the discharge provisions in the Federal Perkins Loan (Perkins Loan), Direct Loan, Federal Family Education Loan (FFEL), and Teacher Education Assistance for College and Higher Education (TEACH) Grant programs. The changes will provide transparency, clarity, and ease of administration to current and new regulations and protect students, the Federal government, and taxpayers against potential school liabilities resulting from borrower defenses.

**DATES:** These regulations are effective July 1, 2017. Implementation date: For the implementation dates of the included regulatory provisions, see the *Implementation Date of These Regulations* section of this document.

**FOR FURTHER INFORMATION CONTACT:** For further information related to borrower defenses, Barbara Hoblitzell at (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov.* For further

information related to false certification and closed school loan discharges, Brian Smith at (202) 453–7440 or by email at: *Brian.Smith@ed.gov.* For further information regarding institutional accountability, John Kolotos or Greg Martin at (202) 453–7646 or (202) 453–7535 or by email at: *John.Kolotos@ed.gov* or *Gregory.Martin@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

*Purpose of This Regulatory Action:* The purpose of the borrower defense regulations is to protect student loan borrowers from misleading, deceitful, and predatory practices of, and failures to fulfill contractual promises by, institutions participating in the Department's student aid programs. Most postsecondary institutions provide a high-quality education that equips students with new knowledge and skills and prepares them for their careers. However, when postsecondary institutions make false and misleading statements to students or prospective students about school or career outcomes or financing needed to pay for those programs, or fail to fulfill specific contractual promises regarding program offerings or educational services, student loan borrowers may be eligible for discharge of their Federal loans.

The final regulations give students access to consistent, clear, fair, and transparent processes to seek debt relief; protect taxpayers by requiring that financially risky institutions are prepared to take responsibility for losses to the government for discharges of and repayments for Federal student loans; provide due process for students and institutions; and warn students in advertising and promotional materials, using plain language issued by the Department, about proprietary schools at which the typical student experiences poor loan repayment outcomes— defined in these final regulations as a proprietary school at which the median borrower has not repaid in full, or made loan payments sufficient to reduce by at least one dollar the outstanding balance of, the borrower's loans received at the institution—so that students can make more informed enrollment and financing decisions.

Section 455(h) of the Higher Education Act of 1965, as amended (HEA), 20 U.S.C. 1087e(h), authorizes the Secretary to specify in regulation which acts or omissions of an

institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Section 685.206(c), governing defenses to repayment, has been in place since 1995 but, until recently, has rarely been used. Those final regulations specify that a borrower may assert as a defense to repayment any "act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."

In response to the collapse of Corinthian Colleges (Corinthian) and the flood of borrower defense claims submitted by Corinthian students stemming from the school's misconduct, the Secretary announced in June 2015 that the Department would develop new regulations to establish a more accessible and consistent borrower defense standard and clarify and streamline the borrower defense process to protect borrowers and improve the Department's ability to hold schools accountable for actions and omissions that result in loan discharges.

These final regulations specify the conditions and processes under which a borrower may assert a defense to repayment of a Direct Loan, also referred to as a "borrower defense." The current standard allows borrowers to assert a borrower defense if a cause of action would have arisen under applicable State law. In contrast, these final regulations establish a new Federal standard that will allow a borrower to assert a borrower defense on the basis of a substantial misrepresentation, a breach of contract, or a favorable, nondefault contested judgment against the school, for its act or omission relating to the making of the borrower's Direct Loan or the provision of educational services for which the loan was provided. The new standard will apply to loans made after the effective date of the proposed regulations. The final regulations establish a process for borrowers to assert a borrower defense that will be implemented both for claims that fall under the existing standard and for later claims that fall under the new, proposed standard. In addition, the final regulations establish the conditions or events upon which an institution is or may be required to provide to the Department financial protection, such as a letter of credit, to help protect students, the Federal government, and taxpayers against potential institutional liabilities.

These final regulations also prohibit a school participating in the Direct Loan Program from obtaining, through the use of contractual provisions or other agreements, a predispute agreement for

arbitration to resolve claims brought by a borrower against the school that could also form the basis of a borrower defense under the Department's regulations. The final regulations also prohibit a school participating in the Direct Loan Program from obtaining an agreement, either in an arbitration agreement or in another form, that a borrower waive his or her right to initiate or participate in a class action lawsuit regarding such claims and from requiring students to engage in internal dispute processes before contacting accrediting or government agencies with authority over the school regarding such claims. In addition, the final regulations impose certain notification and disclosure requirements on a school regarding claims that are the subject of a lawsuit filed in court or that are voluntarily submitted to arbitration after a dispute has arisen.

Summary of the Major Provisions of This Regulatory Action: For the Direct Loan Program, the final regulations—

• Clarify that borrowers with loans first disbursed prior to July 1, 2017, may assert a defense to repayment under the current borrower defense State law standard;

• Establish a new Federal standard for borrower defenses, and limitation periods applicable to the claims asserted under that standard, for borrowers with loans first disbursed on or after July 1, 2017;

• Establish a process for the assertion and resolution of borrower defense claims made by individuals;

• Establish a process for group borrower defense claims with respect to both open and closed schools, including the conditions under which the Secretary may allow a claim to proceed without receiving an application;

• Provide for remedial actions the Secretary may take to collect losses arising out of successful borrower defense claims for which an institution is liable; and

• Add provisions to schools' Direct Loan Program participation agreements (PPAs) that, for claims that may form the basis for borrower defenses—

▪ Prevent schools from requiring that students first engage in a school's internal complaint process before contacting accrediting and government agencies about the complaint;

▪ Prohibit the use of predispute arbitration agreements by schools;

▪ Prohibit the use of class action lawsuit waivers;

▪ To the extent schools and borrowers engage in arbitration in a manner consistent with applicable law and regulation, require schools to disclose to

and notify the Secretary of arbitration filings and awards; and

▪ Require schools to disclose to and notify the Secretary of certain judicial filings and dispositions.

The final regulations also revise the Student Assistance General Provisions regulations to—

• Amend the definition of a misrepresentation to include omissions of information and statements with a likelihood or tendency to mislead under the circumstances. The definition would be amended for misrepresentations for which the Secretary may impose a fine, or limit, suspend, or terminate an institution's participation in title IV, HEA programs. This definition is also adopted as a basis for alleging borrower defense claims for Direct Loans first disbursed after July 1, 2017;

• Clarify that a limitation may include a change in an institution's participation status in title IV, HEA programs from fully certified to provisionally certified;

• Amend the financial responsibility standards to include actions and events that would trigger a requirement that a school provide financial protection, such as a letter of credit, to insure against future borrower defense claims and other liabilities to the Department;

• Require proprietary schools at which the median borrower has not repaid in full, or paid down by at least one dollar the outstanding balance of, the borrower's loans to provide a Department-issued plain language warning in promotional materials and advertisements; and

• Require a school to disclose on its Web site and to prospective and enrolled students if it is required to provide financial protection, such as a letter of credit, to the Department.

The final regulations also—

• Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower ("death discharge") in the Perkins, FFEL, Direct Loan, and TEACH Grant programs;

• Revise the Perkins, FFEL, and Direct Loan closed school discharge regulations to ensure borrowers are aware of and able to benefit from their ability to receive the discharge;

• Expand the conditions under which a FFEL or Direct Loan borrower may qualify for a false certification discharge;

• Codify the Department's current policy regarding the impact that a discharge of a Direct Subsidized Loan has on the 150 percent Direct Subsidized Loan limit; and

• Make technical corrections to other provisions in the FFEL and Direct Loan

program regulations and to the regulations governing the Secretary's debt compromise authority.

Costs and Benefits: As noted in the NPRM, the primary potential benefits of these regulations are: (1) An updated and clarified process and a Federal standard to improve the borrower defense process and usage of the borrower defense process to increase protections for students; (2) increased financial protections for taxpayers and the Federal government; (3) additional information to help students, prospective students, and their families make informed decisions based on information about an institution's financial soundness and its borrowers' loan repayment outcomes; (4) improved conduct of schools by holding individual institutions accountable and thereby deterring misconduct by other schools; (5) improved awareness and usage, where appropriate, of closed school and false certification discharges; and (6) technical changes to improve the administration of the title IV, HEA programs. Costs associated with the regulations will fall on a number of affected entities including institutions, guaranty agencies, the Federal government, and taxpayers. These costs include changes to business practices, review of marketing materials, additional employee training, and unreimbursed claims covered by taxpayers. The largest quantified impact of the regulations is the transfer of funds from the Federal government to borrowers who succeed in a borrower defense claim, a significant share of which will be offset by the recovery of funds from institutions whose conduct gave rise to the claims.

On June 16, 2016, the Secretary published a notice of proposed rulemaking (NPRM) for these parts in the **Federal Register** (81 FR 39329). The final regulations contain changes from the NPRM, which are fully explained in the *Analysis of Comments and Changes* section of this document.

*Implementation Date of These Regulations:* Section 482(c) of the HEA requires that regulations affecting programs under title IV of the HEA be published in final form by November 1, prior to the start of the award year (July 1) to which they apply. However, that section also permits the Secretary to designate any regulation as one that an entity subject to the regulations may choose to implement earlier and the conditions for early implementation.

The Secretary is exercising his authority under section 482(c) to designate the following new regulations included in this document for early implementation beginning on November

1, 2016, at the discretion of each lender or guaranty agency:

(1) Section 682.211(i)(7).

(2) Section 682.410(b)(6)(viii).

Additionally, the Secretary intends to exercise his authority under section 482(c) of the HEA to permit the Secretary and guaranty agencies to implement the new and amended regulations specific to automatic closed school discharges in §§ 674.33(g)(3)(ii), 682.402(d)(8)(ii) and 685.214(c)(2)(ii) as soon as operationally possible after the publication date of these final regulations. We will publish a separate **Federal Register** notice to announce this implementation date.

The Secretary has not designated any of the remaining provisions in these final regulations for early implementation. Therefore, the remaining final regulations included in this document are effective July 1, 2017.

*Public Comment:* In response to our invitation in the June 16, 2016, NPRM, more than 50,000 parties submitted comments on the proposed regulations.

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address technical or other minor changes or recommendations that are out of the scope of this regulatory action or that would require statutory changes in this preamble.

*Analysis of Comments and Changes*

An analysis of the comments and of any changes in the regulations since publication of the NPRM follows.

**General**

*Comments:* Many commenters supported the Department's proposals to improve the borrower defense regulations by establishing a Federal standard for permissible defenses to borrower repayment, standardizing the defense to repayment claim processes for both borrowers and institutions, and strengthening the financial responsibility standards for institutions. The commenters also supported granting automatic closed school discharges in certain instances and ending the use of mandatory, predispute arbitration agreements at schools that receive Federal financial aid.

Other commenters expressed support for the proposed regulations, but felt that the Department should further strengthen them. For example, these commenters believed that the final regulations should provide full loan relief to all defrauded students, eliminate the six-year time limit to recover amounts that borrowers have already paid on loans for which they have a borrower defense based on a

breach of contract or substantial misrepresentation, and allow automatic group discharges without an application in cases where there is sufficient evidence of a school's wrongdoing.

Many commenters agreed with the Department's proposed objectives, but believed that the proposed regulations would have the unintended consequences of creating a "cottage industry" of opportunistic attorneys and agents attempting to capitalize on students who have been, or believe they have been, victims of wrongdoing by schools and unleashing a torrent of frivolous and costly lawsuits, which would tarnish the reputation of many institutions. The commenters also believed that the proposed Federal standard is so broad that borrowers will have nothing to lose by claiming a borrower defense even if they are employed and happy with their college experience.

Many commenters did not support the proposed regulations and stated that the Department should completely revise them and issue another NPRM and 30-day comment period, or that the proposed regulations should be withdrawn completely. The commenters were concerned that the projected net budget impact provided in the NPRM would undermine the integrity of the Direct Loan Program and that neither American taxpayers, nor schools that have successfully educated students, could cover these costs if thousands of students or graduates start requesting discharges of their loans. Other commenters stated that the proposed regulations would create unneeded administrative and financial burdens for institutions that work hard to comply with the Department's regulations and establish new substantive standards of liability, new procedural issues, new burdens of proof, widespread and unwarranted "triggering" of the financial responsibility requirements, and the abolition of a "Congressionally favored" arbitration remedy, that are unnecessary or counterproductive.

*Discussion:* We appreciate the commenters' support. In response to the commenters requesting that the proposed regulations be strengthened, completely revised, or withdrawn, we believe these final regulations strike the right balance between our goals of providing transparency, clarity, and ease of administration to the current and new regulations while at the same time protecting students, the Federal government, and taxpayers against potential liabilities resulting from borrower defenses. In response to commenters' concerns that the proposed regulations will create a "cottage

industry" of opportunistic attorneys attempting to capitalize on victimized students and unleash a torrent of frivolous lawsuits, the individual borrower defense process described in § 685.222(e) is intended to be a simple process that a borrower may access without the aid of counsel. Similarly, by providing that only a designated Department official may present group borrower claims in the group processes described in § 685.222(f) to (h), the Department believes that the potential for frivolous suits in the borrower defense process will be limited. To date, Department staff have generally not received borrower defense claims submitted by attorneys, opportunistic or otherwise, and we have not observed the filing of frivolous lawsuits against schools. We will monitor both situations going forward. We note that we address commenters' arguments with respect to specific provisions of the regulations in the sections of this preamble specific to those provisions.

*Changes:* None.

*Comments:* One commenter contended that the proposed regulations run contrary to Article III (separation of powers) and the Seventh Amendment (right to jury trial) of the Constitution, in that it would vest the Department with exclusive judicial powers to determine private causes of action in the absence of a jury.

The commenter contended that the proposed regulations do not ensure Constitutional due process because they do not ensure that schools would have the right to receive notice of all the evidence presented by a borrower in the new borrower defense proceedings. The commenter stated that the lack of due process also affects the process for deciding claims, under which the Department is effectively the prosecutor, the judge, the only source of appeal, and the entity tasked with executing judgment.

The commenter also contended that a breach of contract or a misrepresentation determination are determinations that normally arise in common law claims and defenses and are subject to the expertise of the courts, rather than a particular government agency. The commenter believes that these determinations are not matters of public right, but are instead matters of "private right, that is, of the liability of one individual to another under the law as defined," which cannot be delegated outside the judiciary. *Stern* v. *Marshall,* 564 U.S. 462, 489 (2011) (quoting *Crowell* v. *Benson,* 285 U.S. 22, 50 (1932).

*Discussion:* The rights adjudicated in borrower defense proceedings are rights

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations **75929**

of the Direct Loan borrower against the government regarding the borrower's obligation to repay a loan made by the government, and rights of the government to recover from the school for losses incurred as a result of the act or omission of the school in participating in the Federal loan program. The terms of these rights are governed (for loans disbursed prior to July 1, 2017) by common law or State law, but in each instance the rights are asserted against or by a Federal agency, with respect to obligations incurred by the borrower and the school in the course of their voluntary participation in the Federal loan program. Those facts give the rights adjudicated in these proceedings, both the individual borrower adjudications and the adjudications of group claims against the school, the character of public rights, even if the resolution of those rights turns on application of common law and State law (for current loans), and thus giving them some of the characteristics of private rights as well.

Even if these common law rights of the borrower and the school were to be considered simply private rights, Congress could properly consign their adjudication to the Department, as it did in committing purely private rights of the investor and broker asserted in its reparations program to the Commodity Futures Trading Commission for adjudication. *Commodity Futures Trading Comm'n* v. *Schor,* 478 U.S. 833 (1986). In *Schor,* the competing claims asserted were not creations of Federal law, nor were the rights asserted by or against a Federal agency. Nevertheless, the Court ruled that Congress properly assigned adjudication of those private rights to the agency. Like the claimants in *Schor,* both parties—the Direct Loan borrower, by filing the claim for relief, and the Direct Loan-participant school, by entering into the Direct Loan Participation Agreement—have consented to adjudications of their respective rights by the Federal agency—the Department. Moreover, these rights are adjudicated in this context precisely because Congress directed the Department to establish by regulation which acts or omissions of a school would be recognized by the Department as defenses to repayment of the Direct Loan; by so doing, and by further requiring the Department to conduct a predeprivation hearing before credit bureau reporting, Federal offset, wage garnishment, of Federal salary offset, Congress necessarily committed adjudication of these claims to the Department. 20 U.S.C. 1080a(c)(4), 31 U.S.C. 3711(e) (credit bureau reporting);

5 U.S.C. 5514 (Federal salary offset); 20 U.S.C. 1095, 31 U.S.C. 3720D (wage garnishment); 31 U.S.C. 3716, 3720B (Federal payment offset). Similarly, by recognizing that acts or omissions of the school in participating in the title IV, HEA programs would give rise to a claim by the Department against the school that arises not by virtue of any statutory requirement, but under common law as discussed elsewhere and by requiring the Department to provide a hearing for a school that disputes that common law claim for damages, Congress necessarily committed adjudication of that common law claim to the Department. 20 U.S.C. 1094(b) (administrative hearing on appeal of audit or program review liability claim). In each of these instances, judicial review of these agency adjudications by an Article III court is available under the APA. 5 U.S.C. 706. The fact that the borrower, the school, and the Department might have pursued their claims solely in a judicial forum instead of an administrative forum does not preclude assignment of their adjudication to the Department: ''(T)he Congress, in exercising the powers confided to it may establish 'legislative' courts . . . to serve as special tribunals 'to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it.''' *Atlas Roofing Co.* v. *Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 452 (1977) (*quoting Crowell* v. *Benson,* 285 U.S. 22, 50 (1932)).

As to the assertion that committing adjudication of these claims to the Department deprives a party of the right to trial by jury, the Court has long rejected that argument, as it stated in *Atlas Roofing,* on which the commenter relies:

. . . the Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication. . . . This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned instead to a federal court of law instead of an administrative agency.

*Atlas Roofing Co,* 430 U.S. at 454–55 (*quoting Pernell* v. *Southall Realty,* 416 U.S. 363, 383 (1974)).

We address the comment with respect to ensuring due process in the sections of this preamble specific to the framework for the borrower defense claims process.

*Changes:* None.
*Comments:* Some commenters asserted that the Department lacks

authority to recover from the institution losses incurred by reason of borrower defenses to repayment. A commenter asserted that nothing in section 455(h) of the HEA (20 U.S.C. 1087e(h)) permits the Department to seek recoupment from any institution related to defenses to repayment. In contrast, the commenter asserted, section 437(c)(1) of the HEA (20 U.S.C. 1087) explicitly provides that, in the case of closed school discharges, the Secretary shall pursue any claim ''available to the borrower'' against the institution to recover the amounts discharged. The commenter contended that this clear grant of authority to pursue claims to recoup funds associated with closed school discharges and false certification discharges indicates that Congress intended no grant of authority to recover for borrower defense losses. The commenter noted that the Department conditions discharge on the borrower transferring any claim she has against the institution to the Department. The commenter asserted that this assignment does not empower the Department to enforce the borrower's claim, because the Secretary does not have the ability to acquire a claim from the borrower on which it may seek recoupment from a school. The commenter based this position on section 437(c) of the HEA, which provides that a borrower who obtains a closed school or false certification discharge is ''deemed to have assigned to the United States the right to a loan refund,'' and the absence of any comparable provision in section 455 of the HEA, which authorizes the Secretary to determine which acts or omissions of the institution may constitute defenses to repayment of a Direct Loan. Given that Congress indicated clear intent that the Secretary pursue claims related to closed school and false certification discharges, and explicitly provided for an assignment of claims, the commenter considered the failure of Congress to give any indication it wanted the Department to pursue claims of recoupment against institutions for section 455(h) loan discharges, or to acquire any claims from borrowers related to section 455(h) discharges, to show congressional intent to preclude a recoupment remedy against institutions.

Another commenter questioned whether the Department would have a valid right to enforce a collection against an institution in the absence of what the commenter called a ''third-party adjudication'' of the loan discharge.

A commenter stated that the Department could not recover from the institution losses incurred from

borrower defense claims because the commenter considered those losses to be incurred voluntarily by the Department. The commenter based this view on common law, under which a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution. The commenter asserted that the Department is further barred from recovery from the institution under a theory of indemnity or equitable subrogation because, under either theory, a party that voluntarily makes a payment or discharges a debt may not seek reimbursement.

*Discussion:* We address under "Group Process for Borrower Defenses—Statutory Authority" comments regarding whether the Department has authority to assert against the school claims that borrowers may have, and discuss here only the comments that dispute whether the Department has a legal right to recover from a school the amount of loss incurred by the Department upon the recognition of a borrower defense and corresponding discharge of some or all of a Direct Loan obtained to attend the school.

Applicable law gives the Department the right to recover from the school losses incurred on Direct Loans for several reasons. First, section 437(c) of the HEA gives the Department explicit authority to recover certain losses on Direct and FFEL loans. Section 437(c) provides that, upon discharge of a FFEL Loan for a closed school discharge, false certification discharge, or unpaid refund, the Secretary is authorized to pursue any claim of the borrower against the school, its principals, or other source, and the borrower is deemed to have assigned his or her claim against the school to the Secretary. 20 U.S.C. 1087(c). Section 487(c)(3)(ii) authorizes the Secretary to deduct the amount of any civil penalty, or fine, imposed under that section from any amounts owed to the institution, but any claim for recovery is not based on authority to fine under that section. Section 432(a)(6) authorizes the Secretary to enforce any claim, however acquired, but does not describe what those claims may be. 20 U.S.C. 1082(a)(6) (applicable to Direct Loan claims by virtue of section 455(a)(1), 20 U.S.C. 1078(a)(1)). In addition, section 498(c)(1)(C) of the HEA, 20 U.S.C. 1099c(c)(1)(C), implies that the Secretary has claims that the Secretary is expected to enforce and recover against the institution for "liabilities and debts"—the "liabilities of such institution to the Secretary for funds under this title, *including* loan obligations discharged pursuant to section 437." 20 U.S.C. 1099c(c)(3)(A)

(emphasis added).[1] These provisions are meaningless if the Secretary can enforce claims against institutions only if the HEA or another statute explicitly authorizes such recoveries.

There are two distinct, and overlapping, lines of authority that empower the Secretary to recover from the school the amount of losses incurred due to borrower defense claims. The first relies on the Secretary's longstanding interpretation of the HEA as authorizing such recovery. The second relies on the government's rights under common law.

In both the Direct Loan and FFEL programs, the institution plays a central role in determining which individuals receive loans, the amount of loan an individual receives, and the Federal interest subsidy, if any, that an individual qualifies to receive on the loan, a determination based on assessment of financial need. In the Direct Loan Program, the institution determines whether and to whom the Department makes a loan; in the FFEL Program, the institution determines whether and to whom a private lender may make a loan that will be federally reinsured.

In *Chauffeur's Training School* v. *Spellings,* 478 F.3d 117 (2d Cir. 2007), the court addressed a challenge by an institution to the Department's asserted right to hold the school liable through an administrative procedure for losses incurred and to be incurred on FFEL Loans that were made by private lenders and federally reinsured and subsidized, after the school had wrongly determined that the borrowers had proven eligibility for these loans. The court noted that no provision of the HEA expressly authorized the Department to determine and recover these losses on student loans (as opposed to recovery of losses of grant funds, expressly authorized by 20 U.S.C. 1234a)). However, the court looked to whether the Department's interpretation of the HEA as authorizing the Department to assess a liability for loan program violations was reasonable. 478 F.3d at 129. The court concluded that the Department had reasonably interpreted the HEA's grant of authority to administer the FFEL program to empower the Department to "assess liability to recover its guarantee payments" on loans made as a result of

the school's "improper documentation." *Id.*

Similarly, the Department is authorized under the HEA to administer the Direct Loan Program. The HEA directs that, generally, Direct Loans are made under the same "terms, conditions, and benefits" as FFEL Loans. 20 U.S.C. 1087a(b)(2), 1087e(a)(1). In 1994 and 1995, the Department interpreted that Direct Loan authority as giving the Department authority to hold schools liable for borrower defenses under both the FFEL and Direct Loan programs, and stated that, for this reason, it was not pursuing more explicit regulatory authority to govern the borrower defense process.

Thus, in Dear Colleague Letter Gen 95–8 (Jan. 1995), the Department stated (emphasis in original):

> Finally, some parties warn that Direct Loan schools will face potential liability from claims raised by borrowers that FFEL schools will not face. . . . The liability of any school—whether a Direct Loan or FFEL participant—for conduct that breaches a duty owed to its students is already established under law other than the HEA—usually state law. In fact, borrowers will have no legal claims against Direct Loan schools that FFEL borrowers do not already have against FFEL schools. The potential legal liability of schools under both programs for those claims is the same, and the Department proposes to develop procedures and standards to ensure that in the future schools in both programs will face identical actual responsibility for borrower claims based on grievances against schools.

> The Direct Loan statute creates NO NEW LIABILITIES for schools; the statute permits the Department to recognize particular claims students have against schools as defenses to the repayment of Direct Loans held by the Department. Current Direct Loan regulations allow a borrower to assert as a defense any claim that would stand as a valid claim against the school under State law.

> . . . Congress intended that schools participating in either FFEL or Direct Loan programs should receive parallel treatment on important issues, and the Department has already committed during negotiated rulemaking to apply the same borrower defense provisions to BOTH the Direct Loan and FFEL programs. Therefore, schools that cause injury to student borrowers that give rise to legitimate claims should and, under these proposals, will bear the risk of loss, regardless of whether the loans are from the Direct Loan or FFEL Program.

The Department reiterated this position in a notice published in the **Federal Register** on July 21, 1995 (60 FR 37768, 37769–37770):

> Some members of the FFEL industry have asserted that there will be greater liabilities for institutions participating in the Direct Loan Program than for institutions participating in the FFEL Program as a consequence of differences in borrower

---

[1] The Secretary can require the institution to submit "third-party financial guarantees" which third-party financial guarantees shall equal not less than one-half of the annual potential liabilities of such institution to the Secretary for funds under this title, including loan obligations discharged pursuant to section 437 [20 U.S.C. 1087], and to students for refunds of institutional charges, including funds under this title." 20 U.S.C. 1099c(c)(3)(A).

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations **75931**

defenses between the Direct Loan and FFEL Programs. These assertions are inaccurate.

The Department has consistently stated that the potential legal liability resulting from borrower defenses for institutions participating in the Direct Loan Program will not be significantly different from the potential liability for institutions participating in the FFEL Program. (59 FR 61671, December 1, 1994, and Dear Colleague Letter GEN 95–8 January 1995) That potential liability usually results from causes of action allowed to borrowers under various State laws, not from the HEA or any of its implementing regulations. Institutions have expressed some concern that there is a potential for greater liability for institutions in the Direct Loan Program than in the FFEL Program under 34 CFR 685.206. The Secretary believes that this concern is based on a misunderstanding of current law and the intention of the Direct Loan regulations. The Direct Loan regulations are intended to ensure that institutions participating in the FFEL and Direct Loan programs have a similar potential liability. Since 1992, the FFEL Program regulations have provided that an institution may be liable if a FFEL Program loan is legally unenforceable. (34 CFR 682.609) The Secretary intended to establish a similar standard in the Direct Loan Program by issuing 34 CFR 685.206(c). Consistent with that intent, the Secretary does not plan to initiate any proceedings against schools in the Direct Loan Program unless an institution participating in the FFEL Program would also face potential liability. . . .

Thus, the Secretary will initiate proceedings to establish school liability for borrower defenses in the same manner and based on the same reasons for a school that participates in the Direct Loan Program or the FFEL Program. . . .

Thus, applying the *Chauffeur's Training* analysis, this history and formal interpretation shows that the Department has, from the inception of the Direct Loan Program, considered its administrative authority under the HEA for the Direct Loan Program to authorize the Department to hold schools liable for losses incurred through borrower defenses, and to adopt administrative procedures to determine and liquidate those claims.

Alternatively, common law provides the Department a legal right to recover from the school the losses it incurs due to recognition of borrower defenses on Direct Loans. Courts have long recognized that the government has the same rights under common law as any other party. *U.S.* v. *Kearns,* 595 F.2d 729 (D.C. Cir. 1978). Even when Congress expressly provides a remedy by statute, the government has the remedies that "normally arise out of the relationships authorized by the statutory scheme." *U.S.* v. *Bellard,* 674 F.2d 330 (5th Cir. 1982) (finding the Department had a common law right to recover as would any other guarantor regardless of an

HEA provision describing the Department as assignee/subrogor to rights of the private lender whom it insured).[2] In fact, as noted by the *Bellard* court, statutes must be read to preserve common law rights unless the intent to limit those rights is "clearly and plainly expressed by the legislature." *Id.* The *Bellard* court found no such limiting language in the HEA, nor does any exist that is relevant to the Direct Loan issue presented here.

The school enters into a PPA with the Department in order to participate in the Direct Loan Program. 20 U.S.C. 1087(a). The PPA is a contract. *San Juan City College Inc.* v. *U.S.,* 74 Fed. Cl. 448 (2006); *Chauffeurs Training School* v. *Riley,* 967 F.Supp. 719, 727 (N.D. N.Y. 1997). In executing the contract, the school "assume[s] a fiduciary relationship with the title IV, HEA Programs." *Chauffeurs Training School* v. *Paige,* C.A. No. 01–CV–02–08 (N.D. N.Y. Sept. 30, 2003), at 7; 34 CFR 682.82(a). An institution must "act with the competency and integrity necessary to qualify as a fiduciary" on behalf of taxpayers, "in accordance with the highest standard of care and diligence in administering the program *and* in accounting to the Secretary for the funds received under [title IV HEA] programs." *Id.;* see 34 CFR 668.82.

Specifically, under the Direct Loan Program, the HEA describes the institution pursuant to its agreement with the Department as "originating" Direct Loans, 20 U.S.C. 1087c(a), 1087d(b), and accepting "responsibility and financial liability stemming from its failure to perform its functions pursuant to the agreement." 20 U.S.C. 1087d(a)(3), 34 CFR 685.300(b)(8). The regulations describe the role of the institution as "originating" Direct Loans. 34 CFR 685.300(c), 685.301.

As a loan "originator" for the Department, the school is the authorized agent of the Department: The school acts pursuant to Department direction, the school manifests its intent to act as agent by entering into the PPA, and most importantly, the school has power to alter the legal relationships between the principal (the Department) and third parties (the students). But for the school's act in originating the loan, there would be no lender-borrower relationship.

The interests of the Department as lender and principal in this Direct Loan Program relationship with the institution are simple: To enable

students and parents to obtain Federal loans to pay for postsecondary education. 20 U.S.C. 1087a. Congress selected the vehicle—a loan, not a grant—under which the borrower repays the loan, made with public funds, which in turn enables the making of new loans to future borrowers. Acts or omissions by an agent of the Department that frustrate repayment by the borrower of the amount the Department lends and interest. Acts or omissions by the institution, as the Department's loan-making agent, that harm the Department's interests in achieving the objectives of the loan program violate the duty of loyalty owed by the institution as the Department's loan originator, or agent. The Department made clear at the inception of the Direct Loan relationship with the institution that the institution would be liable for losses caused by its acts and omissions, in 1994 and 1995, when the Department publicly and unequivocally adopted the "borrower defense to repayment" regulation, 34 CFR 685.206, and in the **Federal Register** and other statements described earlier, stated the consequences for the institution that caused such losses.

The government has the same protections against breach of fiduciary duty that extend under common law to any principal against its agent. *U.S.* v. *Kearns,* at 348; see also *U.S.* v. *York,* 890 F.Supp. 1117 (D.D.C. 1995) (breach of fiduciary duty to government by contractor, loan servicing dealings constituting conflict of interest). The remedies available for breach of fiduciary duty are damages resulting from the breach of that duty. "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." *Restatement Second, Torts § 874.*

Applying this common law analysis to the relationship between the Department and the Direct Loan participating institution as it bears on the Department's right to recover, we note, first, that the Department has the rights available under common law to any other party, without regard to whether any statute explicitly confers such rights. Second, the institution enters into a contract with the Department pursuant to which the institution acts as the Department's agent in the making of Direct Loans. The school is the loan "originator" for the Department. Third, under common law, an agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency. Fourth, under common law, an agent's

---

[2] See: *U.S.* v. *Texas,* 507 U.S. 529, 534 (1993) (courts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except 'when a statutory purpose to the contrary is evident.' ").

**75932** **Federal Register**/Vol. 81, No. 211/Tuesday, November 1, 2016/Rules and Regulations

breach of its fiduciary duty makes the agent liable to the principal for the loss that the breach of duty causes the principal. And last, a school that commits an act or omission that gives a Direct Loan borrower a defense to repayment that causes the Department loss thereby violates its common law fiduciary duty to act loyally for the interests of the Department, and is liable to the Department for losses caused by that breach of duty.

The commenter who argued that the Secretary incurs the loss by honoring the borrower defense ''voluntarily,'' and is barred by that fact from recovery against the institution, misconceives the nature of the claim. As early as *Bellard*, the courts have consistently recognized that in its capacity as a loan guarantor under the FFEL Program, the Department pays the lender under its contractual obligation as loan guarantor, and not as a volunteer. The Department guarantees FFELP loans at the request of the borrower who applied for the guaranteed loan, as well as the lender. By virtue of payment of the guarantee, the Department acquired an implied-in-law right against the borrower for reimbursement of the losses it incurred in honoring the guarantee—a claim distinct from its claim as assignee from the lender of the defaulted loan. Similarly, where the Department incurs a loss under a statutory obligation to discharge by reason of closure of the school or false certification, the Department does not incur that loss voluntarily, but rather under legal obligation imposed by the statute, as well as the terms of the federally prescribed promissory note. Regardless of whether the HEA explicitly authorized the Secretary to recover for that loss, or deemed the borrower's claim against the school to be assigned to the Secretary, common law gives the Secretary the right to recover from the school for the loss incurred as a result of the act or omission of the school. Section 455(h) of the HEA, by directing that the Secretary determine by regulation that acts or omissions of the school constitute defenses to repayment, requires the Department to discharge the borrower's obligation to repay when the borrower establishes such a defense. 20 U.S.C. 1087e(h). To the extent that the borrower proves that the act or omission of the school gave the borrower a defense, the amount not recoverable from the borrower was a loss incurred because of the Department's legal obligation to honor that defense. That loss, like the loss on payment of a loan guarantee on a FFEL Loan, is not one incurred voluntarily,

but rather is incurred, like the loss on the loan guarantee, by legal obligation. By honoring the proven defense of the Direct Loan borrower, like honoring the claim of the lender on the government guarantee, the Secretary acquires by subrogation the claim of the Direct Loan borrower or FFEL lender, as well as a claim for reimbursement from the party that caused the loss—the borrower, on the defaulted FFEL Loan, or the school, on the Direct Loan defense.

*Changes:* None.
*Comments:* Several commenters stated that the HEA does not authorize, or even contemplate, the sweeping regulatory framework set forth in the Department's borrower defense proposals. The commenters questioned the three HEA provisions cited by the Department as the source of its statutory authority: Section 455(h), which allows the Secretary to identify ''acts or omissions . . . a borrower may assert as a defense to repayment of a loan;'' Section 487, which outlines certain consequences for an institution's ''substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates;'' and Section 454(a)(6), which permits the Department to ''include such . . . provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of'' the Direct Loan Program in each institution's PPA. The commenters believed that section 455(h) of the HEA only empowers the Department to define those ''acts or omissions'' that an individual borrower may assert as a defense in a loan collection proceeding and noted that none of the provisions allows the Department to create a novel cause of action for a borrower to levy against her school, which the Department would both prosecute and adjudicate in its own ''court.'' Accordingly, the commenters believed that the Department should substantially revise the rule to be consistent with the regulatory authority granted to the Department by Congress. Other commenters stated that the Department should withdraw the proposed regulations and instead work jointly with Congress to address the issues in the proposed regulations as part of the reauthorization of the HEA. The commenters believed that borrower defense policy proposals are so substantive and commit such an enormous amount of taxpayer dollars that careful consideration by Congress is required so that all of the available options are weighed in the overall context of comprehensive program changes.

*Discussion:* We disagree with the commenters who contended that the HEA does not authorize the regulatory framework proposed in the Department's borrower defense proposals. As explained above, common law and the HEA as interpreted by the Department in adopting the Direct Loan regulations, give the Department the right to recover losses incurred due to borrower defense claims. The commenters rightly identify sections 455(h), 487, and 454(a)(6) of the HEA as some of the sources of the Department's statutory authority for these regulations as they relate to identification of causes of action that are recognized as defenses to repayment, as well as procedures for receipt and adjudication of these claims. In addition, the HEA authorizes the Secretary to include in Direct Loan PPAs with institutions any provisions that are necessary to protect the interests of the United States and to promote the purposes of the Direct Loan Program. In becoming a party to a Direct Loan PPA, the institution accepts responsibility and financial liability stemming from its failure to perform its functions pursuant to the agreement. And, as a result, students and parents are able to obtain Federal loans to pay for postsecondary education. Far from exceeding its statutory authority in developing procedures for adjudicating these claims, section 455(h) presumes that the Department must recognize in its existing administrative collection and enforcement proceedings the very defenses that section directs the Department to establish, or create new procedures to better address these claims, as we do here.

In addition, section 410 of the General Education Provisions Act (GEPA) provides the Secretary with authority to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operations of, and governing the applicable programs administered by, the Department. 20 U.S.C. 1221e–3. Further, under section 414 of the Department of Education Organization Act, the Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department. 20 U.S.C. 3474. These general provisions, together with the provisions in the HEA and common law explained earlier, noted above, authorize the Department to promulgate regulations that govern defense to repayment standards, process, and institutional liability.

With regard to the commenters who believe that the Department's proposals are so substantive and commit such an

enormous amount of taxpayer dollars that the Department should work with Congress, or defer to Congress, in terms of the development of such comprehensive program changes, we do not agree that the Department should not take, or should defer, regulatory action on this basis until Congress acts. Since the collapse of Corinthian, the Department has received a flood of borrower defense claims stemming from the school's misconduct. In order to streamline and strengthen this process, we believe it is critical that the Department proceed now in accordance with its statutory authority, as delegated by Congress, to finalize regulations that protect student loan borrowers while also protecting the Federal and taxpayer interests.

*Changes:* None.

*Comments:* Several commenters stated that the proposed regulations were arbitrary and capricious and therefore violate the APA. Commenters raised this concern both generally and with respect to specific elements of the proposed regulations. For example, several commenters argued that the Department withheld substantive detail regarding its expansion of the loan repayment defenses into offensive causes of action and on the process by which borrower defense claims and Department proceedings to collect claim liabilities from institutions will be adjudicated, thereby depriving institutions and affected parties the opportunity to offer meaningful comment on critical parts of the rule.

*Discussion:* We address commenters' arguments with respect to specific provisions of the regulations in the sections of this preamble specific to those provisions. However, as a general matter, in taking this regulatory action, we have considered relevant data and factors, considered and responded to comments and articulated a reasoned basis for our actions. *Marsh* v. *Oregon Natural Res. Council,* 490 U.S. 360, 378 (1989); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *see also Pub. Citizen, Inc.* v. *Fed. Aviation Admin.,* 988 F.2d 186, 197 (D.C. Cir. 1993); *PPL Wallingford Energy LLC* v. *FERC,* 419 F.3d 1194, 1198 (D.C. Cir. 2005).

*Changes:* None.

*Comments:* Several commenters stated that the negotiated rulemaking process, by which the proposed rules were developed, was flawed.

One commenter stated that input from representatives of publicly held proprietary institutions was not included in the public comment process prior to the establishment of a negotiated rulemaking committee. This commenter also stated that only representatives from private, proprietary institutions were represented on the negotiated rulemaking committee and that those representatives had no expertise in the active management of an institution. The commenter also stated that the NPRM 45-day public comment process was too short.

Several commenters contended that the Department failed to provide adequate notice to the public of the scope of issues to be discussed at the negotiated rulemaking. The commenters stated that the issues of financial responsibility and arbitration clauses were not included in the **Federal Register** notices announcing the establishment of a negotiated rulemaking committee or the solicitation of negotiators and that, had the higher education community known these issues were within the scope of the rulemaking, negotiators more familiar with these issues would have been nominated. The commenters believed that the Department failed to carry out its statutory mandate under 20 U.S.C. 1098 to engage the public and receive input on the issues to be negotiated. One commenter also expressed dismay at the Department's accelerated timetable and intent to publish final regulations one week before the general election. The commenter felt that the "rush to regulate" resulted in a public comment period that did not give the public enough time to fully consider the proposals and a timeline that did not afford the Department enough time to develop an effective, cost-effective rule.

*Discussion:* The negotiated rulemaking process ensures that a broad range of interests is considered in the development of regulations. Specifically, negotiated rulemaking seeks to enhance the rulemaking process through the involvement of all parties who will be significantly affected by the topics for which the regulations will be developed. Accordingly, section 492(b)(1) of the HEA, 20 U.S.C. 1098a(b)(1), requires the Department to choose negotiators from groups representing many different constituencies. The Department selects individuals with demonstrated expertise or experience in the relevant subjects under negotiation, reflecting the diversity of higher education interests and stakeholder groups, large and small, national, State, and local. In addition, the Department selects negotiators with the goal of providing adequate representation for the affected parties while keeping the size of the committee manageable. The statute does not require the Department to select specific entities or individuals to be on the committee. As there was both a primary and an alternate committee member representing proprietary institutions, we believe that this group was adequately represented on the committee.

We note that the Department received several nominations to seat representatives from proprietary schools on the committee after publication of our October 20, 2015, **Federal Register** notice. The Department considered each applicant to determine their qualifications to serve on the committee.

This process did not result in proprietary sector nominees with the requisite qualifications, so we published a second **Federal Register** notice on December 21, 2015, seeking further nominations for the negotiated rulemaking committee, including representation from the proprietary sector. Dennis Cariello, Shareholder, Hogan Marren Babbo & Rose, Ltd., and Chris DeLuca, Founder, DeLuca Law, were selected following this second notice. Given the topics under discussion, we believe Mr. Cariello and Mr. DeLuca adequately represented the proprietary sector.

We disagree with the commenters who contended that the Department failed to provide adequate public notice and failed to engage and receive input from the public on the scope of issues to be discussed at the negotiated rulemaking, in particular the issues of financial responsibility and arbitration clauses. On August 20, 2015, the Department published a notice in the **Federal Register** announcing our intention to establish a negotiated rulemaking committee. We also announced our intention to accept written comments from and hold two public hearings (September 10, 2015 and September 16, 2015, in Washington, DC and San Francisco, respectively) at which interested parties could comment on the topics suggested by the Department and suggest additional topics that should be considered for action by the committee. Lastly, we announced our intent to develop proposed regulations for determining which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under the Direct Loan Program and the consequences of such borrower defenses for borrowers, institutions, and the Secretary. We specifically stated that we would address the issues of defense to repayment procedures; the criteria that constitute a defense to repayment; the standards and procedures that the Department would use to determine institutional liability for amounts based

**75934**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

on borrower defenses; and, the effect of borrower defenses on institutional capability assessments. No representatives of the proprietary sector testified at the hearings. One proprietary association representing 1,100 cosmetology schools submitted written testimony stating that the association was interested in working with the Department to determine the institutional liability and capability assessments associated with borrower defense claims. In addition, we presented issue papers prior to the first day of the first of the three negotiating sessions in which we outlined the particular questions to be addressed.[3] These included Issue Paper No. 5, which explicitly addresses financial responsibility and letters of credit.[4] Negotiators who had any question about the scope of issues we intended to cover were thus given very explicit notice before the first day of negotiations, and were free to obtain then, or at any other time during the nine days of hearings over three months, any expert advisors they wished to engage to inform their deliberations.

We received written testimony from other parties that supported both holding institutions financially accountable for the costs associated with borrower defenses and limiting a school's use of certain dispute resolution procedures.

We disagree with the commenter who contended that the Department's timetable for developing borrower defense regulations was rushed and that the comment period did not give the public enough time to fully consider the proposals. We believe that the 45-day public comment period provided sufficient time for interested parties to submit comments, particularly given that prior to issuing the proposed regulations, the Department conducted two public hearings and three

---

[3] http://www2.ed.gov/policy/highered/reg/hearulemaking/2016/index.html.

[4] The paper states—

Questions to be considered by the negotiating committee include:

1. Should the Department take additional steps to protect students and taxpayers from (a) potential borrower defense to repayment (DTR) claims, (b) liabilities stemming from closed school discharges, and (c) other conditions that may be detrimental to students?

■ If so, what conditions, triggering events, metric-based standards, or other risk factors should the Department consider indicative of failing financial responsibility, administrative capability, or other standards?

■ What should the consequences be for a violation? Letter of credit or other financial guarantee? Disclosure requirements and student warnings? Other consequences?

● If a letter of credit or other financial guarantee is required, how should the amount be determined?

negotiated rulemaking sessions, where stakeholders and members of the public had an opportunity to weigh in on the development of much of the language reflected in the proposed regulations. In addition, the Department also posted the NPRM on its Web site several days before publication in the **Federal Register**, providing stakeholders additional time to view the proposed regulations and consider their viewpoints on the NPRM.

*Changes:* None.

*Comments:* Although the regulations will affect all schools, many commenters expressed frustration at their perception that the regulations target proprietary schools in particular. The commenters noted several provisions of the regulations—for example, financial protection triggers related to publicly traded institutions, distributions of equity, the 90/10 regulations, and the Gainful Employment regulations, and disclosure provisions regarding loan repayment rates—as unfairly targeting only proprietary schools with no justification or rationale. The commenters noted that that there are many private sector career schools and colleges that play a vital role in the country's higher education system by providing distinctive, career-focused programs and that the Department should develop rules that are applied uniformly across all educational institutions that offer title IV, HEA funding. Another commenter appreciated the distinction made in the NPRM between nonprofit/public institutions and proprietary schools as the basis for restricting the loan repayment rate disclosure to proprietary schools. The commenter suggested that the fundamental differences in the governance structures and missions of the public and non-profit sectors versus the for-profit sector provide a substantive basis for differentiating this regulation among the sectors.

Several commenters urged the Department to reconsider the changes to the financial responsibility standards to include actions and events that would trigger a requirement that a school provide financial protection, such as a letter of credit, to insure against future borrower defense claims and other liabilities, given their sweeping scope and potentially damaging financial impact on historically black colleges and universities (HBCUs). The commenters contended that these provisions could lead to the closure of HBCUs that are not financially robust but provide quality educational opportunities to students and noted that HBCUs have not been the focus of Federal and State investigations nor

have they defrauded students or had false claims lawsuits filed against them. These commenters expressed concern about a number of the specific financial protection triggers, including, but not limited to, the triggers relating to lawsuits, actions by accrediting agencies, and cohort default rate.

*Discussion:* We agree that there are many proprietary career schools and colleges that play a vital role in the country's higher education system. We do not agree, however, that either the financial protection triggers or the loan repayment rate disclosure unfairly target proprietary institutions. We apply the financial protection triggers related to publicly traded institutions, the distribution of equity, and the 90/10 regulations only to proprietary institutions because, as another commenter noted, of the fundamental differences in the governance structures and missions of the public and non-profit sectors and the unique nature of the business model under which these institutions operate. These triggers identify events or conditions that signal impending financial problems at proprietary institutions that warrant action by the Department. We apply the loan repayment rate disclosure only to the for-profit sector primarily because the frequency of poor repayment outcomes is greatest in this sector. We appreciate the support of the commenter who agreed with this approach.

We note that we address commenters' arguments with respect to specific provisions of the regulations in the sections of this preamble specific to those provisions.

We also note that HBCUs play a vital role in the Nation's higher education system. We recognize the concerns commenters raised regarding the financial protection provisions of the proposed regulations, which they argue would have a damaging financial impact on HBCUs. We note that the triggers are designed to identify signs, and to augment the Department's tools for detection, of impending financial difficulties. If an institution is subject to material actions or events that are likely to have an adverse impact on the financial condition or operations of an institution, we believe that the Federal government and taxpayers should be protected from any resulting losses incurred by requiring a letter of credit, regardless of the institution's sector. As commenters mentioned, our recent experience suggests that HBCUs have not been the subject of government agency suits or other litigation by students or others, or of administrative enforcement actions. Institutions that do not experience these kinds of claims,

including HBCUs, will not experience adverse impacts under these triggers. In addition, institutions, including HBCUs, will retain their existing rights of due process and continue to have the ability to present to the Secretary if there is any factual objection to the grounds for the required financial protection. Accordingly, the Secretary can consider additional information provided by an institution before requiring a letter of credit. Even in instances where the Department still requires a letter of credit over a school's objection, the school could raise such issues to the Department's Office of Hearing and Appeals.

Finally, we have made a number of changes to the proposed triggers that address the commenters' specific objections to particular triggers, to more sharply focus the automatic triggers on actions and events that are likely to affect a school's financial stability. For instance, as we stated in other sections of this preamble, in light of the significant comments received regarding the potential for serious unintended consequences if the accreditation action triggers were automatic, we are revising the accreditation trigger so that accreditation actions such as show cause and probation or equivalent actions are discretionary. We note that we address commenters' arguments with respect to additional specific financial protection triggers, and any changes we have made in the final regulations, in the sections of this preamble specific to those provisions.

*Changes:* None.

*Comments:* One commenter suggested that the Department ensure that its contractors are aware of the basis for borrower defense discharge claims and the accompanying process. The commenter noted that inconsistent servicing and debt collection standards impede borrowers' access to the benefit and other forms of relief. The commenters also suggested that the Department update its borrower-facing materials to reflect the availability and scope of the borrower defense discharge.

*Discussion:* We are committed to ensuring that our contractors and any borrower-facing material published by the Department provide accurate and timely information on the discharge standards and processes associated with a borrower defense to repayment. We have begun the process of updating applicable materials to reflect these final regulations and will continue working closely with our contractors to help ensure that they have the information they need to assist borrowers expeditiously and accurately.

*Changes:* None.

*Comments:* Several commenters requested that the Department make information available to the public on the number of borrowers who submitted borrower defense applications, the number of borrowers who received a discharge, the amount of loans discharged, the basis or standard applied by the Department in a successful discharge claim, discharged amounts collected from schools, a list of institutions against which successful borrower defense claims are made, and any reports relevant to the process. The commenters believed that this information would provide transparency and facilitate a better understanding of how the process is working as well.

*Discussion:* We are committed to transparency, clarity and ease of administration and will give careful consideration to this request as we refine our borrower defense process.

*Changes:* None.

*Comments:* Several commenters noted that they, as student loan borrowers, are taxpayers like every American citizen and that paying student loans that were fraudulently made on top of paying taxes is a double penalty. The commenters also requested that the Department permit a borrower to include all types of student loans—private student loans, FFEL, Perkins, Parent Plus—they received to finance the cost of higher education in a borrower defense claim.

*Discussion:* The Department is committed to protecting student loan borrowers from misleading, deceitful, and predatory practices of, and failure to fulfill contractual promises by, institutions participating in the Federal student aid programs. These final regulations permit a borrower to consolidate loans listed in § 685.220(b), including nursing loans made under part E of title VIII of the Public Health Service Act, to pursue borrower defense relief by consolidating those loans, as provided in proposed § 685.212(k). The Department does not have the authority to include private student loans in a Direct Loan consolidation.

*Changes:* None.

*Comments:* Several commenters stated that, in order to avoid another failure as serious as that of Corinthian, the Department should implement strong compliance and enforcement policies to proactively prevent institutions that engage in fraudulent activity from continuing to receive title IV, HEA funding. The commenters believe that institutions that do not meet statutory, regulatory or accreditor standards and that burden students with debt without providing a quality

education should be identified early and subjected to greater scrutiny and sanctions so that a borrower defense is a last resort.

*Discussion:* The Department is committed to strong compliance and enforcement policies to proactively prevent institutions that engage in fraudulent activity from continuing to receive title IV, HEA funding. These final regulations establish the definitive conditions or events upon which an institution is or may be required to provide to the Department with financial protection, such as a letter of credit, to help protect students, the Federal government, and taxpayers against potential institutional liabilities.

*Changes:* None.

*Comments:* One commenter requested that the Department and the Internal Revenue Service develop a determination on the tax treatment of discharges of indebtedness for students with successful defense to repayment claims. While acknowledging that the Department does not administer tax law, the commenter stated that the Department should question, or at least weigh in on the matter, of the Internal Revenue Service's "decline to assert" policy on successful defense to repayment claims that currently applies to loans for students who attend schools owned by Corinthian, but not to loans for students who attend other schools.

*Discussion:* As noted by the commenter, the tax treatment of discharges that result from a successful borrower defense is outside of the Department's jurisdiction. However, the Department recognizes the commenter's concern and will pursue the issue in the near future.

*Changes:* None.

## Borrower Defenses (Sections 668.71, 685.205, 685.206, and 685.222)

### Federal Standard

Support for Standard

*Comments:* A group of commenters fully supported the Department's intent to produce clear and fair regulations that protect student borrowers and taxpayers and hold schools accountable for acts and omissions that deceive or defraud students. However, these commenters suggested that the Department has not fully availed ourselves of existing consumer protection remedies and have, instead, engaged in overreach to expand our enforcement options.

Another group of commenters noted that the proposed Federal standard is a positive complement to consumer protections already provided by State law. Another group of commenters

**75936**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

offered support for the Federal standard specifically because it addresses complexities and inequities between borrowers in different States.

One commenter explicitly endorsed our position that general HEA eligibility or compliance violations by schools could not be used a basis for a borrower defense.

Another group of commenters noted that the proposed Federal standard provides an efficient, transparent, and fair process for borrowers to pursue relief. According to these commenters, the Federal standard eliminates the potential for disparate application of this borrower rule's State-based standard, and enables those who are providing training and support to multiple institutions to develop standardized guidance.

A different group of commenters expressed support for the Federal standard, noting that it would be challenging for us to adjudicate claims based on 50 States' laws. Yet another group of commenters requested that the new Federal standard be applied retroactively when a borrower makes a successful borrower defense claim and has loans that were disbursed both before and after July 1, 2017.

*Discussion:* We appreciate the support of these commenters.

However, we do not agree with the commenters' contention that we are engaging in overreach to expand our enforcement options, nor have we disregarded existing consumer protection remedies. The HEA provides specific authority to the Secretary to conduct institutional oversight and enforcement of the title IV regulations. The borrower defense regulations do not supplant consumer protections available to borrowers. Rather, the borrower defense regulations describe the circumstances under which the Secretary exercises his or her long-standing authority to relieve a borrower of the obligation to repay a loan on the basis of an act or omission of the borrower's school. The Department's borrower defense process is distinct from borrowers' rights under State law. State consumer protection laws establish causes of action an individual may bring in a State's courts; nothing in the Department's regulation prevents borrowers from seeking relief through State law in State courts. As noted in the NPRM, 81 FR 39338, the limitations of the borrower defense process should not be taken to represent any view regarding other issues and causes of action under other laws and regulations that are not within the Department's authority.

As to the request to make the new Federal standard available to all Direct Loan borrowers, we cannot apply the new Federal standard retroactively when a borrower makes a successful borrower defense claim and has loans that were disbursed both before and after July 1, 2017. Loans made before July 1, 2017 are governed by the contractual rights expressed in the existing Direct Loan promissory notes. These promissory notes incorporate the current borrower defense standard, which is based on an act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law. Promissory notes for loans made after July 1, 2017 will include a discussion of the new Federal standard for borrower defense claims.

*Changes:* None.

*Evidentiary Standard*

*Comments:* A number of commenters and an individual commenter remarked that the proposed Federal standard increases the risk to institutions by granting loan discharges when the borrower's case is substantiated by a preponderance of the evidence.

Another commenter expanded on this position, asserting that the evidentiary standard in most States for fraudulent misrepresentation is clear and convincing evidence. A few commenters echoed these viewpoints and suggested that the perceived minimal burden of proof may encourage bad actors to entice borrowers into filing false claims.

A couple of other commenters wrote that the standard is not clear enough to preclude students from asserting claims of misrepresentation without supporting evidence. These commenters suggested that the proposed regulations presume that all proprietary schools engage in deliberate misrepresentation.

*Discussion:* We do not agree that the "preponderance of the evidence" standard will result in greater risk to institutions. We believe this evidentiary standard is appropriate as it is the typical standard in most civil proceedings. Additionally, the Department uses a preponderance of the evidence standard in other proceedings regarding borrower debt issues. See 34 CFR 34.14(b), (c) (administrative wage garnishment); 34 CFR 31.7(e) (Federal salary offset). We believe that this evidentiary standard strikes a balance between ensuring that borrowers who have been harmed are not subject to an overly burdensome evidentiary standard and protecting the Federal government, taxpayers, and institutions from unsubstantiated claims. Under the standard, the designated Department

official may determine whether the elements of the borrower's cause of action under the Federal standard for borrower defenses have been sufficiently alleged and shown. If the official determines that the elements have not been alleged or have not met the preponderance of evidence standard, the claim will be denied.

The Department is aware of unscrupulous businesses that prey upon distressed borrowers, charging exorbitant fees to enroll them in Federal loan repayment plans that are freely available. On January 28, 2016, the Department sent cease and desist letters to two third-party "debt relief" companies that were using the Department's official seal without authorization. The misuse of the Department's Seal is part of a worrying trend. Some of these companies are charging large up-front or monthly fees for Federal student aid services offered by the Department of Education and its student loan servicers for free. In April of 2016, the Department launched several informational efforts to direct borrowers to the Department's free support resources, as well as to share information regarding State and Federal entities that have the authority to act against companies that engage in deceptive or unfair practices. Although these or similar opportunists may seek to profit from filing false claims, the Department will be aggressive in curtailing this activity, and will remain vigilant to help ensure that bad actors do not profit from this process.

We do not agree that the Federal standard will incent borrowers to assert claims of misrepresentation without sufficient evidence to substantiate their claims. As explained in more detail under "Process for Individual Borrowers," under § 685.222(a)(2), a borrower in the individual process in § 685.222(e) bears the burden of proof in establishing that the elements of his or her claim have been met. In a group process under § 685.222(f) to (h), this burden falls on the designated Department official. Borrower defense claims that do not meet the evidentiary standard will be denied. We also disagree with the commenters' interpretation of the borrower defense regulations as based on a presumption that all proprietary institutions engage in deliberate misrepresentation. These borrower defense regulations are applicable to and designed to address all institutions of postsecondary education participating in the Direct Loan Program; further, they contain no presumption regarding the activities of any institution, but instead provide a fair process for determining whether

acts or omissions by any particular institution give rise to a borrower defense. We also discuss this issue in more detail under "Substantial Misrepresentation."

*Changes:* None.

*Educational Malpractice*

*Comments:* A group of commenters asked that we clarify the difference between educational malpractice and a school's failure to provide the necessary aspects of an education (such as qualified instructors, appropriately equipped laboratories, etc.).

*Discussion:* We do not believe that the regulations should differentiate between educational malpractice and a school's failure to provide the necessary aspects of an education, such as might be asserted in a claim of substantial misrepresentation or breach of contract. State law does not recognize claims characterized as educational malpractice, and we do not intend to create a different legal standard for such claims in these regulations. Claims relating to the quality of a student's education or matters regarding academic and disciplinary disputes within the judgment and discretion of a school are outside the scope of the borrower defense regulations. We recognize that there may be instances where a school has made specific misrepresentations about its facilities, financial charges, programs, or the employability of its graduates, and these misrepresentations may function as the basis of a borrower defense, as opposed to a claim regarding educational quality. Similarly, a borrower defense claim based on a breach of contract may be raised where a school has failed to deliver specific obligations, such as programs and services, it has committed to by contract.

*Changes:* None.

*Intent*

*Comments:* A number of commenters expressed concern that the proposed Federal standard does not require intent on the part of the institution. These commenters were concerned that inadvertent errors by an institution or its employees could serve as the basis for a borrower defense claim. Some commenters cited an example of an employee misstating or omitting information that is available to the borrower in a complete and correct form in publications or electronic media. One of these commenters noted that the six-year statute of limitations may exacerbate this issue, by permitting borrowers to present claims relying on distant memories of oral conversations that may have been misunderstood.

*Discussion:* Gathering evidence of intent would likely be nearly impossible for borrowers. Information asymmetry between borrowers and institutions, which are likely in control of the best evidence of intentionality of misrepresentations, would render borrower defense claims implausible for most borrowers.

As explained in more detail under "Substantial Misrepresentation," we do not believe it is necessary to incorporate an element of intent or knowledge into the substantial misrepresentation standard. This reflects the Department's longstanding position that a misrepresentation does not require knowledge or intent on the part of the institution. The Department will continue to operate within a rule of reasonableness and will evaluate available evidence of extenuating, mitigating, and aggravating factors prior to issuing any sanctions pursuant to 34 CFR part 668, subpart F. We will also consider the totality of the circumstances surrounding any misrepresentation for borrower defense determinations. However, an institution will generally be responsible for harm to borrowers caused by its misrepresentations, even if they are not intentional. We continue to believe that this is more reasonable and fair than having the borrower (or taxpayers) bear the cost of such injuries. It also reflects the consumer protection laws of many States.

Similarly, we do not believe it is necessary or appropriate to adopt an intent element for the breach of contract standard. Generally, intent is not a required element for breach of contract, and we do not see a need to depart from that general legal principle here.

Regardless of the point in time within the statute of limitations at which a borrower defense claim is made, the borrower will be required to present a case that meets or exceeds the preponderance of the evidence standard.

*Changes:* None.

*State Law Bases for the Federal Standard*

*Comments:* A number of commenters advocated the continuation of State-based standards for future borrower defense claims. These commenters put forward several arguments in support of their position.

Several commenters suggested that the proposed Federal standard effectively reduces, preempts, or repeals borrowers' current rights under the current, State law-based standard.

According to another commenter, the proposed acceptance of favorable,

nondefault, contested judgments based on State law suggests that allegations of State law violations should provide sufficient basis for a borrower defense claim. Another group of commenters contended that, when a Federal law or regulation intends to provide broad consumer protections, it generally does not supplant all State laws, but rather, replaces only those that provide less protection to consumers.

A group of commenters noted that the HEA's State authorization regulations require States to regulate institutions and protect students from abusive conduct. According to these commenters, the laws States enact under this authority would not be covered by the Federal standard unless the borrower obtained a favorable, nondefault, contested judgment.

Additionally, one commenter believed that providing a path to borrower defense based on act or omission of the school attended by the student that would give rise to a cause of action under applicable State law would preserve the relationship between borrower defense, defense to repayment, and the "Holder in Due Course" rule of the Federal Trade Commission (FTC).[5]

These commenters stated that the Department has not provided sufficient evidence to support its assertions that borrower defense determinations based on a cause of action under applicable State law results or would result in inequitable treatment for borrowers, or that the complexity of adjudicating State-based claims has increased due to the expansion of distance education. Further, these commenters also stated that the Department has not provided any examples of cases that would meet the standard required to base a borrower defense claim on a nondefault, contested judgement based on State law.

A group of commenters contended that State law provides the most comprehensive consumer protections to borrowers. Other commenters contended that State law provides clarity to borrowers and schools, as precedents have been established that elucidate what these laws mean with respect to the rights and responsibilities of the parties.

---

[5] The FTC's "Holder Rule" or "Holder in Due Course Rule" is also formally known as the "Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses," 16 CFR part 433. The Holder Rule requires certain credit contracts to include a contractual provision that establishes that the holder of such a contract is subject to all claims and defenses which the debtor could assert against the seller of the goods or services obtained with the proceeds of the contract, with recovery by the debtor being limited to the amounts paid by the debtor under the contract.

**75938**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

Another commenter suggested that providing borrowers comprehensive options to claim a borrower defense, including claims based on violation of State law, should be an essential precept of borrower relief.

One commenter contended that the elimination of the State standard is at odds with the proposed ban on mandatory arbitration, as this ban will clear the way for borrowers to pursue claims against their schools in State court.

Several commenters noted that the Department will continue to apply State law standards to borrower defense claims for loans disbursed prior to July 2017, necessitating the continued understanding and application of State laws regardless of whether or not they remain a basis for borrower defense claims for loans disbursed after July 2017.

A group of commenters expressed concern that borrowers with loans disbursed before July 2017 can access the Federal standard by consolidating their loans; however, borrowers with loans disbursed after July 2017 can only avail themselves of the State standard by obtaining a nondefault, contested judgment. They contended that Department should not introduce this inequity into the Federal student loan programs.

Another group of commenters asserted that defining bases for future borrower defense claims based on past institutional misconduct may limit the prosecution of future forms of misconduct that are unforeseeable.

Several commenters noted that many borrowers lack the resources necessary to obtain a nondefault, contested judgment based on State law. Moreover, these borrowers would not have access to the breadth of data and evidence available to the Department.

Several commenters contended that borrowers whose schools have violated State law should not have to rely upon their State's Attorney General (AG) to access Federal loan relief.

One commenter wrote that creating multiple paths a borrower may use to pursue a borrower defense claim is unnecessarily complex.

A group of commenters remarked that the proposed Federal standard is both too complex and the evidentiary standard too low, suggesting that the prior State standard was more appropriate for borrower defense claims.

*Discussion:* We disagree that the Federal standard effectively reduces, preempts, or repeals borrowers' current rights under the State standard. Borrowers may still submit a claim based on violation of any State or

Federal law, whether obtained in a court or an administrative tribunal of competent jurisdiction. As also explained in the "Claims Based on Non-Default, Contested Judgments" section of this document, the Department's borrower defense process is distinct from borrowers' rights to pursue judicial remedies in other State or Federal contexts and nothing in the Department's regulation prevents borrowers from seeking relief through State law in State courts.

We agree, as proposed in the NPRM and reflected in these final regulations, that the acceptance of favorable, nondefault, contested judgments based on State or Federal law violations may serve as a sufficient basis for a borrower defense claim. We believe it is important to enable borrowers to bring borrower defense claims based on those judgments, but we do not think this means that we should maintain the State-based standard.

We acknowledge that the HEA's State authorization regulations require States to regulate institutions and protect students from abusive conduct and that the laws States have enacted in this role would only be covered by the Federal standard where the borrower obtained a favorable, nondefault, contested judgment. However, we do not view this as a compelling reason to maintain an exclusively State-based standard, or a standard that also incorporates State law in addition to the Federal standard, for borrower defense.

We disagree that the Federal standard for borrower defense should incorporate the FTC's Holder Rule. We acknowledge that the current borrower defense regulation's basis in applicable State law has its roots in the Department's history with borrower defense.[6] However, we have decided that it is appropriate that the Department exercise its authority under section 455(h) of the HEA to specify "which acts or omissions" may serve as the basis of a borrower defense and establish a Federal standard that is not

based in State law, for loans made after the effective date of these final regulations.

We have acknowledged that potential disparities may exist as students in one State may receive different relief than students in another State, despite having common facts and claims. This concern is substantiated, in part, by comments made by non-Federal negotiators and members of the public in response to the NPRM, asserting that consumer protection laws vary greatly from State to State.

We have also described how the complexity of adjudicating State-based claims for borrower defense has increased due to the expansion of distance education. As noted in the NPRM (81 FR 39335 to 39336), while a determination might be made as to which State's laws would provide protection from school misconduct for borrowers who reside in one State but are enrolled via distance education in a program based in another State, some States have extended their rules to protect these students, while others have not.

Additionally, we have discussed the administrative burden to the Department and difficulties Department has experienced in determining which States' laws apply to any borrower defense claim and the inherent uncertainties in interpreting another authorities' laws. 81 FR 39339.

We agree that borrower relief should include comprehensive options, including claims based on violations of State law. While we believe that the proposed standards will capture much of the behavior that can and should be recognized as the basis for borrower defenses, it is possible that some State laws may offer borrowers important protections that do not fall within the scope of the Department's Federal standard. To account for these situations, the final regulations provide that nondefault, contested judgments obtained against a school based on any State or Federal law, may be a basis for a borrower defense claim, whether obtained in a court or an administrative tribunal of competent jurisdiction. Under these regulations, a borrower may use such a judgment as the basis for a borrower defense if the borrower was personally affected by the judgment, that is, the borrower was a party to the case in which the judgment was entered, either individually or as a member of a class. To support a borrower defense claim, the judgment would be required to pertain to the making of a Direct Loan or the provision of educational services to the borrower.

---

[6] As explained in the "Expansion of Borrower Rights" section, before the Department enacted the borrower defense regulations in 1994 as part of its Direct Loan Program regulations, 59 FR 61664, the Department had preserved borrowers' rights under the FFEL Program to bring any claims a borrower may have against a school as defenses against the holder of the loan if the school had a referral or affiliation relationship with the lender. This was done by adopting a version of the FTC's Holder Rule language in the FFEL Master Promissory Note in 1994, and was later formalized in regulation at 34 CFR 682.209(g) in 2008. As further explained under "*General,*" in 1995, the Department clarified that the borrower defense Direct Loan Program regulation was meant to create rights for borrowers, and as to liabilities for schools corresponding to those that would arise under the FFEL Program.

While State law may provide clarity to borrowers and schools regarding the rights and responsibilities of the parties under established precedents, we believe that the Federal standard for borrower defenses more clearly and efficiently captures the full scope of acts and omissions that may result in a borrower defense claim.

We disagree that the elimination of the State standard is at odds with the ban on predispute arbitration clauses. Rather, we assert that prohibiting predispute arbitration clauses will enable more borrowers to seek redress in court and, as appropriate, to submit a nondefault, contested judgment in support of their borrower defense claim, including a claim based on State law.

We concur that the Department's continued application of State law standards to borrower defense claims for loans disbursed prior to July 2017, will require the continued interpretation of State law. However, the number of loans subject to the State standard will diminish over time, enabling the Department to transition to a more effective and efficient borrower defense standard and process.

We understand the commenters' concern that borrowers may be treated inequitably based on when their loans were disbursed. However, while it is true that borrowers with loans disbursed prior to July 2017 may consolidate those loans, as discussed in the NPRM (81 FR 39357), the standard that would apply would depend upon the date on which the first Direct Loan to which a claim is asserted was made. Therefore, the standard applied to these loans does not change by virtue of their consolidation.

We do not agree that the Federal standard supplants all State consumer protection laws, as borrowers may still pursue relief based on these laws by obtaining a nondefault, contested judgment by a court or administrative tribunal of competent jurisdiction.

We do not agree that the three bases for borrower defenses under the Federal standard limit the prosecution of future unforeseeable forms of misconduct. We expect that many of the borrower defense claims that the Department anticipates receiving will be addressed through the categories of substantial misrepresentation, breach of contract, or violations of State or Federal law that are confirmed through a nondefault, contested judgment by a court or administrative tribunal of competent jurisdiction. Additionally, the Department's borrower defense process is distinct from borrowers' rights or other Federal, State, or oversight agencies' authorities to prosecute or initiate claims against schools for

wrongful conduct in State or other Federal tribunals. We recognize that, while the attainment of a favorable judgment can be an effective and efficient means of adjudicating a borrower's claim of wrongdoing by an institution, it can also be prohibitively time-consuming or expensive for some borrowers. The regulation includes a provision that enables a borrower to show that a judgment obtained by a governmental agency, such as a State AG or a Federal agency, that relates to the making of the borrower's Direct Loan or the provision of educational services to the borrower, may also serve as a basis for a borrower defense under the standard, whether the judgment is obtained in court or in an administrative tribunal. We do not agree that borrowers whose schools have violated State law will have to rely upon their State's AG to access Federal loan relief. These borrowers are still able to file borrower defense claims under the substantial misrepresentation or breach of contract standards, even if a nondefault, contested judgment is not obtained by the government entity. Moreover, the prohibition against predispute arbitration clauses and class action waivers will enable more borrowers to pursue a determination of wrongdoing on the part of an institution individually or as part of a class.

We do not agree that the State standard is less complex than the new Federal standard. As discussed, the current State law-based standard necessarily involves complicated questions relating to which State's laws apply to a specific case and to the proper and accurate interpretation of those laws. We believe the elements of the Federal standard and the bases for borrower defense claims provide sufficient clarity as to what may or may not constitute an actionable act or omission on the part of an institution. As discussed earlier, we also disagree that the State standard provides a higher evidentiary standard. Preponderance of the evidence is the typical standard in most civil proceedings. Additionally, the Department uses a preponderance of the evidence standard in other processes regarding borrower debt issues.

*Changes:* None.

### Federal Standard as a Minimum Requirement

*Comments:* Several groups of commenters recommended that we establish a Federal standard that serves as a floor, or minimum requirement, to provide additional consumer safeguards to borrowers in States that have less robust consumer protection laws. One group of commenters suggested that this

could assure consistency with the FTC Holder Rule. These commenters opined that expansion of the Federal standard to include Unfair, Deceptive or Abusive Acts and Practices (UDAP)[7] violations and breaches of contract would benefit borrowers and simplify borrower defense claim adjudication, as very few States would provide more robust consumer protections.

Another commenter opined that a strong Federal standard as a more robust minimum requirement, *i.e.,* one that requires only reasonable reliance to prove substantial misrepresentation and includes UDAP violations, would eliminate the need to maintain a State law standard.

*Discussion:* We disagree that the Federal standard requires expansion to include UDAP violations in order to ensure borrowers are protected or that the Federal standard should be established as a minimum requirement for borrower defense. As noted in the NPRM, reliance upon State law not only presents a significant burden for Department officials who must apply and interpret various State laws, but also for borrowers who must make the threshold determination as to whether they may have a claim. We believe that many of the claims the Department will receive will be covered by the standards proposed by the Department and that those standards will streamline the administration of the borrower defense regulations. The Department's substantial misrepresentation regulations (34 CFR part 668 subpart F) were informed by the FTC's Policy Guidelines on Deception, and we believe they are more tailored to, and suitable for, use in the borrower defense context. Under the borrower defense regulations, certain factors addressing specific problematic conduct may be considered to determine whether a misrepresentation has been relied upon to a borrower's detriment, thus making the misrepresentation "substantial." With regard to unfair and abusive conduct, we considered the available precedent and determined that it is unclear how such principles would apply in the borrower defense context as stand-alone standards. Such practices are often alleged in combination with misrepresentations and are not often addressed on their own by the courts. With this lack of guidance, it is unclear

---

[7] Each State has consumer protection laws that prohibit certain unfair and deceptive conduct, which are commonly known as "unfair and deceptive trade acts and practices" or "UDAP" laws. The FTC also enforces prohibitions against unfair and deceptive conduct in certain contexts under section 5 of the FTC Act, 15 U.S.C. 45, which may also be described as Federal "UDAP" law.

how such principles would apply in the borrower defense context.

Moreover, many of the borrower defense claims the Department has addressed or is considering have involved misrepresentations by schools. We believe that the standard established in these regulations will address much of the behavior arising in the borrower defense context, and that this standard appropriately addresses the Department's goals of accurately identifying and providing relief to borrowers for misconduct by schools; providing clear standards for borrowers, schools, and the Department to use in resolving claims; and avoiding for all parties the burden of interpreting other Federal agencies' and States' authorities in the borrower defense context. As a result, we decline to adopt standards for relief based on UDAP.

As discussed earlier, we also disagree that the Federal standard for borrower defense should incorporate the FTC's Holder Rule, 16 CFR part 433, and believe that it is appropriate for the reasons discussed that the Department exercise its authority to establish a Federal standard that is not based in State law.

Notwithstanding the foregoing discussion, we appreciate that State law provides important protections for students and borrowers. Nothing in the borrower defense regulations prevents a borrower from seeking relief under State law in State court. Moreover, § 685.222(b) provides that if a borrower has obtained a nondefault, favorable contested judgment against the school under State or other Federal law, the judgment may serve as a basis for borrower defense. As explained further under "Claims Based on Non-Default, Contested Judgments," we believe this strikes the appropriate balance between providing relief to borrowers and the Department's administrative burden in accurately evaluating the merits of such claims.

*Changes:* None.

*Additional Grounds*

State AGs

*Comments:* A number of commenters requested that the final regulations include a process for State AGs to petition the Secretary to grant relief based on State law violations. One group of commenters expanded on this request, suggesting that other law enforcement agencies and entities also be permitted to bring forward evidence in support of group claims, and to receive from the Department a formal response regarding its determination of the claim. Another group of commenters

contended that State AGs uncover institutional wrongdoing before others do, and, accordingly, their direct participation in the borrower defense process would provide affected borrowers more timely access to relief.

*Discussion:* The group process for borrower defenses in § 685.222(f) provides for a process by which evidence for determinations of substantial misrepresentation, breach of contract, or judgments, might come from submissions to the Department by claimants, State AGs or other officials, or advocates for claimants, as well as from the Department's investigations. We recognize that these entities may uncover institutional wrongdoing early and may have relevant evidence in support of group claims.

The Department always welcomes cooperation and input from other Federal and State enforcement entities, as well as legal assistance organizations and advocacy groups. In our experience, such cooperation is more effective when it is conducted through informal communication and contact. Accordingly, we have not incorporated a provision requiring formal written responses from the Secretary, but plan to create a point of contact for State AGs to allow for active communication channels. We also reiterate that we welcome a continuation of cooperation and communication with other interested groups and parties. As indicated above, the Department is fully prepared to receive and make use of evidence and input from other stakeholders, including advocates and State and Federal agencies. We also discuss this issue in more detail under "Group Process for Borrower Defense."

*Changes:* None.

*Unfair or Deceptive Acts or Practices (UDAP)*

*Comments:* Several groups of commenters advocated the inclusion of State UDAP laws as a stand-alone basis for borrower defense claims.

One group of commenters opined that UDAP laws, which include prohibitions against misrepresentation, along with unfair, fraudulent, and unlawful business acts, have been refined by decades of judicial decisions, while the proposed substantial misrepresentation basis for borrower defense claims remains untested.

Another group of commenters argued that State UDAP laws incorporate the prohibitions and deterrents that the Department seeks to achieve and offer the flexibility needed to deter and rectify institutional acts or omissions that would be presented as borrower defenses under the Department's

substantial misrepresentation and breach of contract standards. Another group of commenters noted that some acts that may violate State laws intended to protect borrowers may not constitute a breach of contract or misrepresentation.

Another commenter noted that multiple State AGs have investigated schools and provided the Department with their findings of wrongdoing based on their States' UDAP laws.

One group of commenters suggested that, if the Department did not opt to restore the State standard, the inclusion of a similar UDAP law provision would become even more important. These commenters assert that the additional factors that would favor a finding of a substantial misrepresentation would not close the gap between the Federal standard and States' UDAP laws. They recommend using State UDAP laws as the additional factors that would elevate a misrepresentation to substantial misrepresentation.

*Discussion:* As discussed above, we disagree that the inclusion of UDAP violations as a basis for a borrower defense claims is required to assure borrowers are protected by the Federal standard.

We believe that the Federal standard appropriately addresses the Department's interests in accurately identifying and providing relief to borrowers for misconduct by schools; providing clear standards for borrowers, schools, and the Department to use in resolving claims; and avoiding for all parties the burden of interpreting other Federal agencies' and States' authorities in the borrower defense context. While UDAP laws may play an important role in State consumer protection and in State AGs' enforcement actions, we believe the Federal standard addresses much of the same conduct, while being more appropriately tailored and readily administrable in the borrower defense context. As a result, we decline to include UDAP violations as a basis for borrower defense claims.

*Changes:* None.

*Comments:* One commenter stated that by foreclosing HEA violations from serving as a basis for borrower defense claims, the proposed regulations would effectively preempt State UDAP laws, which the commenter argued often use violations of other laws as a basis for determining that a practice is unfair or deceptive.

*Discussion:* The Department's borrower defense process is distinct from borrowers' rights under State law. State UDAP laws establish causes of action an individual may bring in a State's courts; nothing in the

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations   **75941**

Department's regulations prevents borrowers from seeking relief through State law in State courts. As noted in the NPRM, the specifics of the borrower defense process should not be taken to represent any view regarding other issues and causes of action under other laws and regulations that are not within the Department's authority.

*Changes:* None.

*HEA Violations*

*Comments:* One commenter requested that the regulations make clear that borrower defense claims do not include claims based on noncompliance with the HEA or sexual or racial harassment allegations, as described in the preamble to the NPRM. One commenter suggested that the explicit exclusion of sexual or racial harassment as the basis of a borrower defense claim is intended to protect public and non-profit schools.

Another commenter believed the current regulations would allow borrowers to base a claim for a borrower defense on an institution's violations of the HEA where those violations also constitute violations under State UDAP law. The commenter viewed the Department's position in the NPRM that a violation of the HEA is not, in itself, a basis for a borrower defense as a retroactive change to the standard applicable to loans made before July 2017. The commenter rejected the Department's assertion that this limitation is in fact based on a longstanding interpretation of the bases for borrower defense claims.

*Discussion:* It is indeed the Department's longstanding position that an act or omission by the school that violates an eligibility or compliance requirement in the HEA or its implementing regulations does not necessarily affect the enforceability of a Federal student loan obtained to attend the school, and is not, therefore, automatically a basis for a borrower defense. With limited exceptions not relevant here, the case law is unanimous that the HEA contains no implied private right of action for an individual to assert a claim for relief.[8] The HEA

---

[8] As stated by the Department in 1993:

[The Department] considers the loss of institutional eligibility to affect directly only the liability of the institution for Federal subsidies and reinsurance paid on those loans. . . . [T]he borrower retains all the rights with respect to loan repayment that are contained in the terms of the loan agreements, and [the Department] does not suggest that these loans, whether held by the institution or the lender, are legally unenforceable merely because they were made after the effective date of the loss of institutional eligibility.

58 FR 13,337. See, *e.g. Armstrong v. Accrediting Council for Continuing Educ. & Training,* 168 F.3d 1362 (D.C. Cir. 1999), *opinion amended on denial*

vests the Department with the sole authority to determine and apply the appropriate sanction for HEA violations.

A school's act or omission that violates the HEA may, of course, give rise to a cause of action under other law, and that cause of action may also independently constitute a borrower defense claim under § 685.206(c) or § 685.222. For example, advertising that makes untruthful statements about placement rates violates section 487(a)(8) of the HEA, but may also give rise to a cause of action under common law based on misrepresentation or constitute a substantial misrepresentation under the Federal standard and, therefore, constitute a basis for a borrower defense claim. However, this has always been the case, and is not a retroactive change to the current borrower defense standard under § 685.206(c).

As explained in more detail under "Federal Standard," it has been the Department's longstanding position that sexual and racial harassment claims do not directly relate to the making of a loan or provision of educational services and are not within the scope of borrower defense. 60 FR 37769. We also note, moreover, that sexual and racial harassment are explicitly excluded as bases for borrower defense claims in recognition of other entities, both within and outside of the Department, with the authority to investigate and resolve these complaints, and not in an effort to protect public and non-profit schools.

*Changes:* None.

*Claims Based on Non-Default, Contested Judgments*

*Comments:* A group of commenters requested that the Department explain how, if continuing to operate under the State standard results in potentially inequitable treatment for borrowers, it is still reasonable to rely upon State law when judgments have been obtained, thereby providing borrower protections that vary by State.

Several commenters suggested that a borrower should be required to obtain a favorable judgment under State law in order to obtain a loan discharge. One commenter suggested that borrowers pursuing State law judgments receive forbearance on their Direct Loans while their cases are proceeding.

*Discussion:* When the Department relies upon a nondefault, contested judgment to affirm a borrower defense, it is not required to interpret State law.

---

*of reh'g,* 177 F.3d 1036 (D.C. Cir. 1999) (rejecting claim of mistake of fact regarding institutional accreditation as grounds for rescinding loan agreements); *McCullough v. PNC Bank,* 298 F.3d 1362, 1369 (11th Cir. 2002)(collecting cases).

Rather, it relies upon the findings of a court or administrative tribunal of competent jurisdiction.

Although we expect that the prohibition against certain mandatory arbitration clauses will enable more borrowers to pursue a determination of wrongdoing on the part of an institution, we do not agree that it is appropriate to require borrowers to obtain a favorable judgment in order to obtain a loan discharge.

While the attainment of a favorable judgment can be an effective and efficient means of adjudicating a borrower's claim of wrongdoing by an institution, it can also be prohibitively time-consuming or expensive for some borrowers. We have included a provision under which a judgment obtained by a governmental agency, such as a State AG or a Federal agency, that relates to the making of the borrower's Direct Loan or the provision of educational services to the borrower, may also serve as a basis for a borrower defense under the standard, whether the judgment is obtained in court or in an administrative tribunal.

We agree that borrowers should receive forbearance on their Direct Loans while their cases are proceeding. Borrowers may use the General Forbearance Request form to apply for forbearance in these circumstances; we would grant the borrower's request, and the final regulations also will require FFEL Program loan holders to do the same upon notification by the Secretary. In addition, a borrower defense loan discharge based on a nondefault, contested judgment may provide relief for remaining payments due on the loan and recovery of payments already made.

*Changes:* None.

*Comments:* Several commenters stated that the Department's proposal to allow borrower defenses on the basis of "nondefault, favorable contested judgments" was unrealistic, and argued that such judgments are unlikely to occur. These commenters argued that both plaintiffs (either government agencies or students themselves) as well as institutions are under substantial pressure to settle lawsuits, and pointed to the lack of any current judgments against institutions that would meet this standard. One commenter argued that the lack of such nondefault favorable contested judgments effectively barred State causes of action and would force borrowers to rely on the Department's Federal standard as the only basis for relief.

*Discussion:* The Department recognizes that nondefault, favorable contested judgments may not be common, relative to the number of

lawsuits that are filed. The Department includes this basis for relief as a way for borrowers to avoid having to re-litigate claims actually decided on the merits. If no such determination against the institution has yet occurred, borrowers may bring claims to the Department for evaluation that satisfy the standards described for a substantial misrepresentation under § 685.222(d) or breach of contract under § 685.222(c). The Department will thus continue to recognize State law causes of action under § 685.222(b), but will require a tribunal of competent jurisdiction to decide the legal and factual basis for the claim.

*Changes:* None.

*Comments:* Several commenters stated that the proposed standard for nondefault, favorable contested judgments effectively narrows State law causes of action by putting what the commenters argued was a significant and unrealistic burden on borrowers to litigate claims to judgment. These commenters argued that the Department should not effectively remove these bases for relief. One of the commenters asked that the Department recognize settlements with the institution as a basis for relief, while another proposed that the Department recognize class action settlements in which the settlement has been approved by a judge or in which the plaintiff(s) have survived a motion for summary judgment. Another asked that claim preclusive court judgments and findings of fact and admissions in settlements should likewise serve as a basis for relief.

*Discussion:* As stated in the NPRM, 81 FR 39340, we decline to adopt a standard based on applicable State law due, in part, to the burden to borrowers and the Department in interpreting and applying States' laws. However, we recognize that State law may provide important protections for borrowers and students. We believe that a standard recognizing nondefault, favorable, contested judgments strikes a balance between recognizing causes of action under State or other Federal law and minimizing the Department's administrative burden in accurately evaluating the merits of such claims. For the reasons discussed here and in the NPRM, we decline to recognize settlements as a way to satisfy the standard in § 685.222(b). However, we welcome the submission of, and will consider, any orders, court filings, admissions, or other evidence from a borrower for consideration in the borrower defense process.

*Changes:* None.

*Comments:* One commenter stated that the Department's proposed language leaves it unclear whether the judgment against the institution must include a specific determination regarding the act or omission forming the basis of the borrower defense, and urged the Department to explicitly require such a determination. Another commenter argued that the carve-outs of certain claims that the Department would not consider to be borrower defenses are not explicitly included for judgments obtained against an institution, and urged that the Department include such carve-outs.

*Discussion:* For a judgment to form the basis of a borrower defense, it must include a determination that an act or omission that would constitute a defense to repayment under State or Federal law occurred and that the borrower would be entitled to relief under such applicable law. That said, the overarching principles established in § 685.222(a) apply to claims under all the standards established in § 685.222, including to judgments under § 685.222(b). Thus, under § 685.222(a)(3), the Department will not recognize a violation by the school of an eligibility or compliance requirement in the HEA or its implementing regulations as a basis for borrower defense under § 685.222 or § 685.206(c) unless the violation would otherwise constitute a basis for borrower defense. Similarly, borrower defense claims must be based upon an act or omission of the school attended by the student that relates to the making of a Direct Loan or the provision of educational services for which the loan was provided, under § 685.222(a)(5).

If a borrower, a class of consumers, or a government agency made a claim against a school regarding the provision of educational services and receives a favorable judgment that entitles the borrower to restitution or damages, but the borrower only obtained a partial recovery from the school on this judgment, under § 685.222(i)(8), we would recognize any unpaid amount of the judgment in calculating the total amount of relief that could be provided on the Direct Loan. If the borrower, a class of consumers, or a government agency obtained a judgment holding that the school engaged in wrongful acts or omissions regarding the provision of private loans, the borrower could demonstrate to the Department whether the findings of fact on which the judgment rested also established acts or omissions relating to the educational services provided to the borrower or the making of the borrower's Direct Loan that could be the basis of a borrower

defense claim under these regulations. This borrower defense claim would be a basis for relief independent of the judgment that related exclusively to the private loans, and such relief would be calculated without reference to any relief obtained through that private loan judgment.

*Changes:* None.

*Comments:* Several commenters raised concerns about a student's ability to bring a borrower defense claim based on judgments obtained by government agencies. One of the commenters stated that it is not always clear when an agency is acting on behalf of the students.

*Discussion:* The final regulation recognizes that judgments obtained by governmental agencies may not be brought on the behalf of specific students, as opposed to having been brought, for example, on the behalf of a State or on the behalf of the United States. As described in the final regulation, a judgment under the standard brought by a governmental agency must be a favorable contested judgment obtained against the school. As discussed previously, such judgments must also meet the requirements of § 685.222(a).

*Changes:* None.

*Comments:* One commenter argued that the Department's judgment standard should only apply with respect to loans disbursed, or judgments obtained, after July 1, 2017.

*Discussion:* We believe that the standard does not represent any change from current practice. If a borrower submitted a nondefault, contested judgment from a court or administrative tribunal of competent jurisdiction deciding a cause of action under applicable State law for a loan first disbursed before July 1, 2017, the Department would apply principles of collateral estoppel to determine if the judgment would bar a school from disputing the cause of action forming the basis of the borrower's claim under 34 CFR 685.206(c).

*Changes:* None.

*Comments:* One commenter urged the Department to specify that the judgments referenced in § 685.222(b) must be obtained in court cases and not merely through administrative proceedings.

*Discussion:* As set forth in in § 685.222(b), the judgment must be obtained ''in a court or administrative tribunal of competent jurisdiction.'' The Department continues to believe that administrative adjudications serve an important role in determining the factual and legal basis for claims that could serve as borrower defenses. We do

not believe further clarification is necessary on this point.

*Changes:* None.

*Comments:* One commenter stated that the Department should add language to the final regulations stating that it will also respect judgments in favor of the school as precluding a borrower defense claim.

*Discussion:* We will not incorporate an absolute bar on borrower defense claims where the borrower has already lost in a State proceeding because different underlying legal or factual bases may have been involved in the prior litigation. For example, a student might lose a breach of contract suit in State court premised on an institution's failure to provide job placement services, but have a valid claim that the institution misrepresented whether credits would be transferrable. The Department will, however, follow established principles of collateral estoppel in its determination of borrower defense claims.

*Changes:* None.

*Comments:* One commenter stated that the Department's proposed regulatory language would disrupt the adversarial process because institutions would be more likely to settle cases than risk a judgment that could lead to borrower defense liabilities, and also that institutions may be forced not to settle if the opposing party insists on admission of liability in the settlement that could form the basis of borrower defense liabilities. The commenter also argued that it would be unfair for the Department to consider past settlements retroactively. Another commenter argued that the Department should recognize default judgments against institutions obtained by a law enforcement agency such as the FTC, the Consumer Financial Protection Bureau (CFPB), or a State AG.

*Discussion:* We appreciate the concern that the new standard may cause disruptions to the strategy and risk calculus in other litigation by private parties as well as government agencies. The Department's purpose in this rulemaking is to create a Federal standard that will more efficiently and fairly determine whether a borrower is entitled to relief, and we consider this purpose to outweigh the concern raised about altering litigation strategies. We do not intend either to dissuade or encourage settlements between borrowers and institutions, and will give settlements and admissions in previous litigation the weight to which they are entitled. That said, a default judgment does not involve any determination of the merits, and therefore will require the Department to

make an independent assessment of the underlying factual and legal basis for the claim. Settlements prior to July 1, 2017 will not be considered under this standard.

*Changes:* None.

### Claims Based on Breach of Contract

*Comments:* Several commenters questioned why the Department would permit a breach of contract claim, but not any other State law claims. One commenter noted that evaluation of a breach of contract claim would require substantial Department resources, including choice-of-law decisions that may be especially complicated in cases of distance education. One commenter said that other contract-related causes of action should be open to borrowers, such as lack of consideration, lack of formation due to lack of capacity, and contract contrary to public policy, among others. Another commenter said that borrowers should be able to assert contract-related claims under State UDAP laws for signing forms saying they received materials that they never received.

*Discussion:* The comments suggest some confusion about the Department's standard for evaluating breach of contract claims. For loans first disbursed prior to July 1, 2017, the Department will continue to recognize any applicable State-law causes of action, in accordance with the State of the law prior to these regulations. That standard requires the Department to evaluate State law questions, including choice-of-law questions. For loans first disbursed after July 1, 2017, however, the Department will move to a Federal standard for misrepresentation and breach of contract claims, and will cease to recognize State-law bases that may exist for those causes of action. Some commenters appeared to question why the Department drew the line at accepting breach of contract claims but rejecting other traditional State law contract-related causes of action. As we explained in the NPRM, 81 FR 39341, breach of contract is a common allegation against schools, and the underlying facts for a breach of contract claim may very well not fit into the Department's substantial misrepresentation standard. Furthermore, breach of contract is a cause of action established in common law recognized across all States, and its basic elements are likewise uniform across the States. Developing a Federal standard in the particularized area of student-institution contracts will ultimately lead to better consistency and greater predictability in this area. That said, the Department will continue to

recognize a borrower defense based on any applicable State law cause of action, provided that such a claim is litigated to a non-default, favorable contested judgment under § 685.222(b). Thus, we believe the final regulations strike an appropriate balance between the efficiency and predictability of a Federal standard, while still providing sufficient bases upon which a borrower entitled to debt relief may seek it.

*Changes:* None.

*Comments:* Several commenters asked the Department to incorporate the covenant of good faith and fair dealing when evaluating breach of contract claims. One commenter argued that these doctrines could be used to prevent institutions from relying on fine print disclaimers, "job placement assistance" that does not provide any targeted advice for students but instead refers them to Internet job-posting sites, and other tactics the commenter believes are unfair to students. Another commenter attached examples of current institutional agreements that seek to disclaim any promises beyond what are made in the enrollment agreement, and urged the Department not to honor such disclaimers.

*Discussion:* The Department's position on this issue is that it will rely on general, widely accepted principles of contract law in developing a Federal standard in this area. We decline to elaborate further on what specific types of contract claims might or might not be successful at this time. We believe that a Federal standard for breach of contract cases within the education context will ultimately be more helpful if developed on a case-by-case basis.

*Changes:* None.

*Comments:* Several commenters weighed in on the Department's position that documents beyond the enrollment agreement might serve as part of the contract. Some of these commenters noted that this position may lead to inconsistent results, since different State laws and circumstances may or may not allow a student to rely on other documents beyond the enrollment agreement. Some of the commenters argued for more clarity from the Department on which materials we would consider to constitute the contract, and one of these commenters pointed to cases varying on the treatment of such materials. One commenter invited us to specify that a contract would include any promise the borrower reasonably believed would be the institution's commitment to them. Other commenters argued that, by raising the possibility that a student might be able to point to course catalogues and similar documents as

part of the "contract," the Department's rule would have the effect of limiting the information schools provide to students. These commenters said that the uncertainty could pose practical obstacles for large institutions in particular, and asked the Department to explicitly exclude such material from the definition of contract. One commenter said that the ultimate effect of the current uncertainty might be to reduce recruitment from under-served student populations.

*Discussion:* We understand the concerns from both the student advocates and the institutional advocates regarding the lack of certainty in the NPRM language. However, the Department is unable to draw a bright line on what materials would be included as part of a contract because that determination is necessarily a fact-intensive determination best made on a case-by-case basis. The Department intends to make these determinations consistent with generally recognized principles applied by courts in adjudicating breach of contract claims.[9] To the extent that Federal and State case law has resolved these issues, we will be guided by that precedent. Application of the standard will thus be guided but not controlled by State law. Moreover, the Department will continue to evaluate claims as they are received and may issue further guidance on this topic as necessary.

*Changes:* None.

*Comments:* A commenter argued that allowing breach of contract as a basis for borrower defense claims will not be effective. The commenter said that most contracts in the for-profit education sector are written to bind the student and not the institution. The commenter also argued that the NPRM preamble failed to cite any successful breach of contract suits students have made against schools, arguing that the Department's citation to *Vurimindi* v. *Fuqua Sch. Of Business,* 435 F. App'x 129 (3d Cir. 2011) is inapposite.

*Discussion:* The Department appreciates this concern, and intends to follow general fairness and contract principles in its analysis of whether other promises made to a student beyond the enrollment agreement should be considered.

*Changes:* None.

---

[9] Section 455(h)of the HEA clearly gives the Secretary the power to create legal defenses, which until now has been done by adopting State law; this rulemaking adopts a Federal standard, the interpretation and application of which will require consideration of principles developed by Federal and State courts in deciding cases brought on claims for breach of contract or misrepresentation, as distilled, for example, in the restatements of the law.

*Comments:* A commenter argued that the Department should not refer to "specific obligations" in its preamble discussion of how a borrower could make out a breach of contract theory, saying it was unnecessarily confusing in light of well-developed State law on what kind of promises are sufficient to make out a breach of contract claim.

*Discussion:* We believe the phrase "specific obligations" is consistent with general contract principles that a breach of contract cannot be based on promises that are so abstract as to be unenforceable, and believe that determinations regarding an institution's obligations under a contract with a student will be highly fact-specific. Given that many borrowers may not be legally sophisticated regarding what constitutes an enforceable promise, we do not believe that any modification to the language is necessary.

*Changes:* None.

*Comments:* Several commenters were concerned that the proposed rule did not include a "materiality" element that a borrower would need to show in order to make out a breach of contract claim, which they worried might lead to numerous, frivolous claims as well as wide uncertainty as to potential future liabilities. One commenter further invited the Department to explain in the final rule what would constitute a "de minimis" claim that would lead a judge to dismiss a case. Other commenters asked that the Department focus on systemic problems and material breaches, and identify the standards it will use to make determinations. A group of commenters suggested the Department adopt the standards used for such cases in New York.

*Discussion:* We appreciate the concerns, first raised during the negotiated rulemaking, about the lack of a materiality element in the standard for a breach of contract borrower defense. As explained in the NPRM, 81 FR 39341, we believe it is appropriate that the regulations allow borrowers to assert a borrower defense based on any breach of contract that would entitle them to any relief—including relatively minor breaches—and thus do not include a materiality requirement. The Department will consider whether any alleged breach of contract by an institution is material in its assessment of whether the borrower would be entitled to relief, as well as whether such relief would be full or partial.

*Changes:* None.

*Comments:* Several commenters expressed concern that the proposed regulation contains an exception to the bar on using HEA violations for

borrower defense claims if "the violation would otherwise constitute a basis for a borrower defense." These commenters stated that this exception could swallow the rule to the extent a compliance violation could be restated as a borrower defense, and further noted that the HEA does not contain a private right of action. These commenters urged the Department to bar compliance violations asserted as breach of contract.

*Discussion:* We agree that the HEA does not itself contain a private right of action, but note that the underlying conduct constituting a violation of the HEA may also be a cognizable borrower defense. For example, the Department has the authority to prohibit and penalize substantial misrepresentations under the HEA, but such misrepresentations may also serve as the basis for a borrower defense which a borrower is undoubtedly entitled to pursue with the Department if the borrower can demonstrate proof of substantial misrepresentation under § 685.222(d), which also requires that a borrower demonstrate actual, reasonable reliance to their detriment for relief. For that reason, the final regulations strike a balance between allowing borrowers to pursue defenses based on misconduct that might also constitute HEA violations, but only so long as the underlying misconduct also satisfies a standard under which borrower defense claims may be brought as noted at § 685.222(a)(3).

*Changes:* None.

*Comments:* A commenter argued that the lack of a reliance element on a contractual promise could lead to borrower relief that is unwarranted. Other commenters argued the same for lack of an injury element.

*Discussion:* The Department will analyze breach of contract defenses under general and well established contract principles shared by State law. At this time, the Department has not set forth more fulsome details for what elements a borrower must show in the Federal standard to allow the standard to develop on a case-by-case basis. We believe that the Federal standard will ultimately be more useful if developed in light of actual student claims.

*Changes:* None.

*Comments:* Several commenters urged the Department to exclude any claims related to academic considerations, such as the quality of instructional materials, because such matters should be left to the institution or the institution's accreditor or State licensing agency.

*Discussion:* We do not see any present need for categorical exemptions. The Department will evaluate claims in accordance with well-established

principles of contract law. Claims related to academic consideration may well be beyond the scope of a cognizable borrower defense or even the Department's jurisdiction, but that is something the Department will consider on a case-by-case basis in evaluating the borrower defense applications.

*Changes:* None.

*Comments:* One commenter argued that the Department should recognize defenses an institution could raise, such as compliance with contract terms, economic hardship, or that the borrower not be entitled to refund of monies already paid.

*Discussion:* The final regulations, like the proposed regulations, do not put limits on the defenses an institution can make in a proceeding before the Department.

*Changes:* None.

*Comments:* One commenter noted that the Department's proposed language was ambiguous as to whether the act or omission must give rise to the breach of contract or itself constitute a breach of contract.

*Discussion:* Consistent with the Department's interpretation of its authorizing statute, the act or omission by the school must be the breach of contract itself. We believe, however, that this reading is clear from the language in the final rule.

*Changes:* None.

*Comments:* One commenter asked the Department to clarify what kinds of actions it would consider to be within the scope of a borrower defense based on a breach of contract.

*Discussion:* We do not believe further detail or elaboration is necessary of helpful at this time, given the wide variety of allegations the Department expects to receive. Under the regulations, the Department will recognize as a borrower defense any breach of contract claim that reasonably relates to the student loan.

*Changes:* None.

*Claims Based on Substantial Misrepresentation*

*Comments:* A group of commenters expressed concern that the Department's substantial misrepresentation standard is too narrow. These commenters believed that the standard would allow schools to engage in problematic behavior, so long as they did not make untrue statements.

*Discussion:* We appreciate the concerns that the substantial misrepresentation standard does not capture all actions that may form causes of action under standards in State or other Federal law. However, as noted in the NPRM, 81 FR 39340, we believe that

the standard appropriately addresses the Department's interests in accurately identifying and providing relief for borrowers and in providing clear standards for borrowers, schools, and the Department in resolving claims. We believe that § 668.71(c), which is referenced in § 685.222(d), will address much of the behavior the Department anticipates arising in the borrower defense context.

We disagree that the substantial misrepresentation standard would not necessarily capture institutional misconduct that did not involve untrue statements. As revised in these final regulations, § 668.71(c) defines a "misrepresentation" as including not only false or erroneous statements, but also misleading statements that have the likelihood or tendency to mislead under the circumstances. The definition also notes that omissions of information are also considered misrepresentations. Thus, a statement may still be misleading, even if it is true on its face. As explained in the NPRM, 81 FR 39342, we revised the definition of "misrepresentation" to add the words "under the circumstances" to clarify that the Department will consider the totality of the circumstances in which a statement occurred, to determine whether it constitutes a substantial misrepresentation. We believe the Department has the ability to properly evaluate whether a statement is misleading, but otherwise truthful, to a degree that it becomes an actionable borrower defense claim.

*Changes:* None.

*Comments:* Several commenters expressed concern that the substantial misrepresentation standard would apply only to proprietary institutions. One commenter stated that the standard should apply to all institutions of higher education, stating that many public colleges and universities also misrepresent the benefits and outcomes of the education provided. Another commenter stated that the proposed addition of misrepresentation through omissions would target only borrower defense claims that would be made by students attending proprietary institutions, and not students at traditional schools.

Other commenters stated that by limiting the subject matter covered by the substantial misrepresentation standard to just those related to loans, in their view, the standard would target only proprietary schools and exclude issues facing students at traditional colleges, such as campus safety or sexual discrimination in violation of title IX of the HEA.

*Discussion:* There appears to be some confusion about the institutions covered under the scope of both 34 CFR part 668, subpart F and proposed § 685.222(d). Even prior to the proposed changes in the NPRM, § 668.71 was applicable to all institutions, whether proprietary, public, or private non-profit. Similarly, the current borrower defense regulation at § 685.206(c) does not distinguish between types of schools. The proposed and final regulations do not represent a change in these positions.

As discussed under the "Making of a Loan and Provision of Educational Services" section of this document, the Department's long-standing interpretation has been that a borrower defense must be related to the making of a loan or to the educational services for which the loan was provided. As a result, the Department has stated consistently since 1995 that it does not does not recognize as a defense against repayment of the loan a cause of action that is not directly related to the loan or to the provision of educational services, such as personal injury tort claims or actions based on allegations of sexual or racial harassment. 60 FR 37768, 37769. Such issues are outside of the scope of these regulations, and we note that other avenues and processes exist to process such claims. We also disagree with commenters that such issues are the only types of issues that may be faced by students at public and private non-profit institutions. While the Department acknowledges that the majority of claims presently before it are in relation to misconduct by Corinthian, we believe that scope of claims that may be brought as substantial misrepresentations that relate to either the making of a borrower's loan, or to the provision of educational services, is objectively broad in a way that will capture borrower defense claims from any type of institution.

*Changes:* None.

*Comments:* A few commenters opposed the proposed changes and argued that the proposed substantial misrepresentation standard either exceeds the Secretary's authority under the law or is contrary to Congressional intent. One commenter argued that the Department's proposal to use § 668.71 as the basis for borrower defense exceeds the Department's statutory authority under section 487 of the HEA, 20 U.S.C. 1094(c)(3)(A), which authorizes the Department to bring an enforcement action for a substantial misrepresentation for a suspension, limitation, termination, or fine action. The commenter also argued that the HEA does not authorize the Department

to seek recoupment from schools for relief granted for a borrower defense claim based on substantial misrepresentation. Another commenter suggested that the borrower defense standard should be based only on contract law.

Other commenters stated that the substantial misrepresentation standard was in violation of the Congressional intent in the HEA, as proposed. One commenter said that, in its view, Congress' intent in Section 455(h) was that borrower defenses should be allowed only for acts or omissions that are fundamental to the student's ability to benefit from the educational program and at a level of materiality that would justify the rescission of the borrower's loan obligation. In discussing the use of § 668.71 for borrower defense purposes, another commenter acknowledged that, while misrepresentation is not defined in the HEA, the penalties assigned to misrepresentation by statute are severe. From its perspective, the commenter stated that this indicates that Congress did not intend for the misrepresentation standard to be as low as negligence and suggested keeping the original language of § 668.71.

A few commenters argued that the Department lacks justification for the proposed changes to § 668.71, given that the Department last changed the definition in a previous rulemaking.

*Discussion:* We disagree that the Department lacks the statutory authority to designate what acts or omissions may form the basis of a borrower defense. Section 455(h) of the HEA clearly authorizes the Secretary to ''specify in regulations which act or omissions of an institution of higher education a borrower may assert as a defense to repayment under this part,'' without any limitation as to what acts or omissions may be so specified. As explained previously, we believe that the substantial misrepresentation standard, with the added requirements listed in § 685.222(d), will address not only much of the behavior that we anticipate arising in the borrower defense context, but also our concerns in accurately identifying and providing relief for borrowers. We believe it is within the Department's discretion to adopt the substantial misrepresentation standard for loans first disbursed after July 1, 2017 in § 685.222(d), with the added requirements of that section, to address borrower defense claims. No modification was proposed to § 668.71(a), which establishes that the Department may bring an enforcement action for a substantial misrepresentation for a suspension, limitation, termination, or fine action.

We discuss the Department's authority to recover from schools on the basis of borrower defense under ''General.''

We do not agree that the Department lacks authority to similarly specify the scope of the acts or omissions that may form the basis of a borrower defense. The Department understands that, generally, the rescission of a contract refers to the reversal of a transaction whereby the parties restore all of the property received from the other,[10] usually as a remedy for a material or significant breach of contract.[11] However, in stating that ''in no event may a borrower recover . . . an amount in excess of the amount such borrower has repaid on the loan,'' section 455(h) clearly contemplates that an amount may be recovered for a borrower defense that is less than the amount of a borrower's loan, as opposed to a complete rescission of a borrower's total loan obligation. This position also echoes the Department's consistent approach to borrower defenses to repayment. The Direct Loan borrower defense regulation that was promulgated in 1994 clearly established that a borrower may assert a borrower defense claim based upon ''any act or omission of the school. . .that would give rise to a cause of action against the school under applicable State law,'' without qualification as to whether the act or omission warrants a rescission of the borrower's loans. 34 CFR 685.206(c)(1). The regulation also stated that relief may be awarded as either ''all or part of the loan.'' *Id.* at § 685.206(c)(2). As explained by the Department in 1995, the Direct Loan borrower defense regulations were intended to continue the same treatment for borrowers and the same potential liability for institutions that existed in the FFEL Program. 60 FR 37769–37770. Under the FFEL Program at the time, a borrower was allowed to assert a defense to repayment on the ground that all or part of his or her FFEL Loan was unenforceable. *Id.* at 37770.

We also disagree that the HEA does not give the Department the discretion to define ''substantial misrepresentation,'' whether for the

Department's enforcement purposes in § 668.71 or for use for the borrower defense process. As noted, the HEA does not define ''substantial misrepresentation,'' thus giving the Secretary discretion to define the term. With regard to the commenter who expressed concern that the proposed revisions to the definition of ''misrepresentation'' constitute a lessening of the standard to negligence,[12] we note that even absent the proposed revisions, a misrepresentation under § 668.71 does not look to the actor's intent or the materiality of the statement, but considers whether the statement is false, erroneous, or misleading.

We disagree that there is no justification for the changes to 34 CFR part 668, subpart F. Since the Department's last negotiated rulemaking in 2010 on 34 CFR part 668, subpart F, the Department utilized its authority in 2015 under the substantial misrepresentation enforcement regulations to issue a finding that Corinthian had misrepresented its job placement rates. The subsequent closure of Corinthian led to thousands of claims relating to the misrepresentations at issue by Corinthian borrowers under borrower defense. These claims prompted, in part, this effort by the Department to establish rules and procedures for borrower defense, which in turn led to a review of and the proposed changes to the Department's regulations at 34 CFR part 668, subpart F. These changes were discussed extensively as part of the negotiated rulemaking process for borrower defense where reasons for each specific change to § 668.71 were explained and discussed.

*Changes:* None.

*Comments:* Many commenters generally stated that the proposed standard for substantial misrepresentation is vague and suggested that the regulation include an element of intent or distinguish between intentional and unintentional acts. These commenters expressed concern that inadvertent and innocent, but erroneous, statements or mistakes would lead to a large number of frivolous claims by borrowers and result in significant financial liabilities for schools. Another commenter stated that the standard, absent intent, is unconstitutionally vague and does not give fair notice of the conduct that is being required or prohibited.

---

[10] *See* Restatement (Third) of Restitution and Unjust Enrichment § 54 (2011).

[11] *See* Restatement (Third) of Restitution and Unjust Enrichment § 37, comment c (2011) (''Any breach of contract that results in quantifiable injury gives the plaintiff a remedy in damages, but the remedy of rescission is available only in cases of significant default. Short of a repudiation, the defendant's breach must be 'material,' 'substantial,' 'essential,' or 'vital'; it must 'go to the root' of the defendant's obligation, or be 'tantamount to a repudiation.' To replace this familiar catalogue of adjectives, both Restatements of Contracts employ the expression 'total breach.' '').

[12] Generally, ''negligence'' refers to a failure to exercise a reasonable duty of care and does not consider whether the failure was intentional. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 3 (2010).

Other commenters stated that students' own misunderstandings may lead to claims, even for schools that provide training and inspections to ensure compliance with pertinent guidelines, regulations, and standards. One commenter expressed concern that unavoidable changes to instructional policies and practices could lead to borrower defense claims for substantial misrepresentation. Another commenter expressed concern that the proposed standard would lead to allegations of substantial misrepresentation by students, even where a variety of reasons unrelated to the alleged misrepresentation may have contributed to a student outcome, which may not yet be apparent.

Several commenters supported using § 668.71 as a basis for borrower defense, but objected to the proposed changes to the definition in § 668.71(c), that would change the word "deceive" in the sentence, "A misleading statement includes any statement that has the likelihood or tendency to deceive," to "mislead under the circumstances." These commenters stated that the proposed change would give the same weight to inadvertent or unintentional misrepresentations as to a willful deception by a school. Some such commenters appeared to believe that, without the revisions reflected in proposed subpart F of part 668, the standard for substantial misrepresentation is a standard for fraud and requires proof of intentional deception.

One commenter stated that the borrower defense process does not provide for a contextualized analysis of whether a statement is misleading in the same manner as the FTC, and argued that this would lead to significant consequences for schools and would undercut FTC precedent.

Several commenters agreed with the Department that the standard should not require an element of institutional intent generally, stating that the Department's approach is consistent with existing State and other Federal law, citing the FTC's definition of deception as an example. One commenter stated that institutions should be responsible for the harm to borrowers caused by misrepresentations, even absent intent, and that proving intent would be very difficult for borrowers.

Other commenters supported the specific amendment of the definition to include "mislead under the circumstances." One commenter stated that the amendment was appropriate to provide more context as to whether a statement is misleading. Another

commenter stated that the Department's amendments are consistent with State consumer protection law and cited examples of States where courts consider an individual's or the target audience's circumstances in assessing whether an act is deceptive or unfair. The commenter also noted that the amendments are in keeping with the approaches used by other Federal agencies, such as the FTC, the CFPB, and the Office of the Comptroller of the Currency. The commenter noted that in its experience working with student loan borrowers, consideration of the circumstances of a misrepresentation is important, because many schools target borrowers in specific circumstances who may be more likely to trust a school's representations and rely upon promises tailored to such students. Another commenter noted that the Department's proposed rule is in keeping with well-established consumer protection legal precedent under State law, which is that schools are liable for deceptive and unfair trade practices, including a failure to deliver educational services of the nature and quality claimed. This commenter supported the Department's preamble statement, 81 FR 39337 to 39338, that educational malpractice is not a tort recognized by State law, but also stated that educational malpractice is to be narrowly construed.

One commenter supported the Department's reasoning for including omissions among misrepresentations for borrower defense purposes, but stated that intent should be a factor for the Department's enforcement actions based upon § 668.71. The commenter agreed that a school should be responsible for even an unintentional error that harms borrowers, but believed that that intent or knowledge of the school should be a required factor for the purposes of institutional eligibility and penalties.

One commenter stated that substantial misrepresentation should be limited to false and erroneous statements, and not include true but misleading statements. The commenter raised concerns about the adequacy of the Department's process for gathering evidence and the Department's experience and expertise in making such determinations.

*Discussion:* We disagree with the commenters who opined that the proposed regulations are broad, vague or subjective. As explained previously, section 455(h) of the HEA provides that the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part. The regulations in § 685.222(d),

which adopt the regulations in subpart F of part 668 and establish certain other requirements, set forth the types of activities that constitute misrepresentation by an institution and describe the process and procedure by which borrowers may receive relief based upon a substantial misrepresentation by a school. The regulations in § 685.222 also set forth the process by which the Secretary will evaluate borrower defenses and recover such losses from the institutions at issue. The proposed changes to the regulations strengthen the Department's regulatory authority to evaluate and determine borrower defense claims. Further, they not only establish what constitutes a misrepresentation for borrower defense claims, but they also clarify the definition for the Department's enforcement purposes under part 668, subpart F. We believe that aligning the definition and types of substantial misrepresentations for borrower defense with the Department's long-held authority to bring enforcement actions under part 668, subpart F, will provide more clarity for schools and reduce their burden in having to interpret and adjust for the new borrower defense standards.

There appears to be some confusion as to whether the definition for misrepresentation in part 668, subpart F, requires a demonstration of intent, as would be required in common law fraud. In proposing to replace the word "deceive" with "mislead under the circumstances" in § 668.71(c), the Department is not seeking to remove any intent element, but rather to clarify the definition to more accurately reflect the position it expressed in 2010 as to part 668, subpart F. As noted in the NPRM, 81 FR 39342, the word "deceive" may be viewed as implying knowledge or intent. However, in the Department's 2010 rulemaking on part 668, subpart F, we explicitly declined to require that a substantial misrepresentation under the regulation require knowledge or intent by the school. 75 FR 66915. We believe that an institution is responsible for the harm to borrowers caused by its misrepresentations, even if such misrepresentations cannot be attributed to institutional intent or knowledge and are the result of inadvertent or innocent mistakes. Similarly, we believe this is the case even for statements that are true, but misleading. We believe this is more reasonable and fair than having the borrower, or the Federal government and taxpayers, bear the cost of such injuries. As noted by some commenters, this approach is in accord with other

Federal and State consumer protection law regarding misrepresentation, and we believe it is appropriate for not only the Department's enforcement purposes, but also for borrower defense. As explained later in this preamble, we believe that we have the capability to evaluate borrower defense claims based upon substantial misrepresentations and anticipate establishing procedural rules that will provide schools with the opportunity to present evidence and arguments in accordance with due process, similar to what is available in the Department's proceeding in part 668, subparts G and H.

In 2010, the Department stated that, in deciding to bring an enforcement action under part 668, subpart F, it would operate within a rule of reasonableness and consider the circumstances surrounding any misrepresentation before determining an appropriate response. 75 FR 66914. In response to the comment that the proposed standard does not view the misrepresentation in context, the Department's addition of the words "under the circumstances" is intended to clarify and make explicit the Department's long-standing position that misrepresentations should be viewed in light of all of the available underlying facts. As explained in the NPRM, 81 FR 39342 to 39343, this also echoes the approach taken by the FTC with regard to deceptive acts and practices.[13] In determining whether a statement is a misrepresentation, the Department will consider the totality of the circumstances in which the statement occurred, including the specific group at which the statement or omission was targeted. The Department will also consider whether the situation was such that the borrower would have had reason to believe he or she could rely on the information being given to the borrower's detriment, such as because the statement was made by an individual by whom the borrower believed could be trusted to give accurate information, such as a school admissions officer.

*Changes:* None.

*Comments:* Some commenters supported the proposed inclusion of omissions in the definition under § 668.71. One commenter stated that the inclusion of omissions, as well as the additional factors listed in § 685.222(d)(2), would improve the information provided to students. One commenter stated that, in their experience, the inclusion of omissions

was needed, to prevent schools from taking advantage of the asymmetry of information and bargaining power between themselves and students. This commenter emphasized that omissions should be considered in the context of the specific audience targeted and cited schools that may target immigrants with little experience with the United States' higher education system and limited English ability as an example. Another commenter emphasized that the amendment would benefit first generation and low income students, who may not know what information is important or what questions to ask prior to enrolling at an institution. One commenter specifically supported the proposed language providing that a misrepresentation include omissions of "information" in such a way as to make a statement false, erroneous, or misleading.

Other commenters disagreed with the inclusion of omissions of information as part of the definition of substantial misrepresentation. One commenter stated that such language provides assistance to students attending career colleges, but not students attending traditional schools. One commenter stated that amending the standard to include omissions would create a strict liability standard that would not account for a school's actions or intent, and that the standard should distinguish minor and unintentional claims from material and purposeful misrepresentations.

Other commenters stated that the inclusion of omissions would not benefit students. One commenter stated that amending the definition of misrepresentation to include omissions could cause schools to provide students with numerous and confusing qualifications or to provide students with minimal information to avoid making misrepresentations. Another commenter stated that the inclusion of omissions would hinder the flow of advice to students and cause schools to expend time and money reviewing materials for misrepresentations.

One commenter stated that the Department's proposal to amend the definition to include omissions runs counter to the position the Department expressed in its 2010 rulemaking on 34 CFR part 668, subpart F, when it rejected commenters' suggestions that omissions be included in the definition.

One commenter stated that the Department's proposed amendment to include omissions, absent an intent element, runs counter to the limit established by the D.C. Circuit in the case *Ass'n of Private Sector Colls. & Univs.* v. *Duncan,* 681 F.3d 427, 452

(D.C. Cir. 2012) that a substantial misrepresentation under part 668, subpart F cannot include true and nondeceitful statements that have only the tendency or likelihood to confuse.

One commenter requested clarification regarding the effect of disclosures posted on the school's Web site or in printed materials. The commenter inquired about whether the school needed to disclose information about investigations, pending civil rights or legal matters; information about the qualifications and availability of faculty to teach certain courses or levels of students; and how a school's compliance with a State's required disclosures would be evaluated. This commenter also asked whether the Department would consider limiting the application of the new standard to only schools governed by States without a reasonable oversight mechanism. This commenter also asked for clarification as to what constitutes "information," and asked whether information would include aspirational goals or speculative plans; subjective beliefs or internal questions about the school's educational programs, financial charges, or the employability of its graduates; concerns about, the possibility, or existence of an upcoming audit; items listed in a title IV Audit Corrective Action Plan; items identified by the institution or an accreditor for improvement; or an institution's efforts to seek voluntary accreditation.

One commenter expressed concern that the inclusion of omissions in the standard would place schools with high default rates at risk. The commenter cited news articles calling for schools with default rates higher than graduation rates, which would include some HBCUs and community colleges, to lose their title IV eligibility. The commenter stated that students could argue that a failure to disclose such a measure constitutes a substantial misrepresentation under the proposed standard.

*Discussion:* We appreciate the support received from some commenters and agree with these commenters who stated that the inclusion of omissions will improve the information provided by schools.

As discussed earlier in this section, the commenters who stated that the revision to § 668.71 would apply only to proprietary institutions are incorrect. The final regulation applies to all schools. We also discuss our reasons for not including an intent element earlier in this section and our reasons for not including a materiality element later in this section.

---

[13] *See* FTC Policy Statement on Deception, 103 F.T.C. 110, 174 (1984) (appended to Cliffdale Assocs., Inc., 103 F.T.C. 110 (1984)), available at *www.ftc.gov/bcp/policystmt/ad-decept.htm.*

We disagree that the revision is contrary to the Department's purpose in revising part 668, subpart F, in its 2010 rulemaking. We believe that amending the definition to include "any statement that omits information in such a way as to make the statement false, erroneous, or misleading" merely clarifies the Department's original intent, aligns the definition of misrepresentation used for the Department's enforcement actions with the standard to be used in evaluating borrower defense claims, and is appropriate given the Department's experiences since 2010.

In 2010, the Department declined to include omissions in the definition of misrepresentation during its rulemaking on part 668, subpart F, on the basis that the Department's regulations require schools to provide accurate disclosures of certain information. 75 FR 66917 to 66918. The Department emphasized that the purpose of the regulations was to ensure that all statements made by an institution were truthful, *id.,* and that whether such a statement was a misrepresentation would be viewed in context of the circumstances. *Id.* at 66914. As noted earlier, however, the Department has had more experience with omissions in the context of its substantial misrepresentation regulations at part 668, subpart F, since that 2010 rulemaking. In 2014, the Department issued a fine of $29,665,000 to Heald College, of the Corinthian Colleges, in part, as a result of a finding that Heald College had omitted essential and material information concerning the methodology used to calculate job placement rates.[14] This same finding, concerning omissions, has resulted in thousands of borrower defense claims filed with the Department. As noted by some commenters, given the close connection between borrower defense and the Department's purpose of ensuring truthful statements by schools when viewed in the entirety of a situation, we believe it is appropriate to adopt the regulations at part 668, subpart F, with some added requirements, for the borrower defense regulations and to revise the definition at § 668.71 to better meet that purpose and enact the Department's long-standing purpose for part 668, subpart F, enforcement actions.

We disagree with the commenter that the inclusion of omissions in the definition, absent an intent element, runs counter to the limit established by the D.C. Circuit in *Ass'n of Private*

Sector Colls. & Univs., 681 F.3d 427. In that case, the court held that a substantial misrepresentation under part 668, subpart F, cannot include true and non-deceitful statements that have only the tendency or likelihood to confuse. However, the court also stated that it agreed with the Department that a misrepresentation can be a true statement that is deceitful, and specifically disagreed with the appellant that an intent element should be a required part of the definition. *Id.* We believe that the inclusion of omissions of information that may make a statement false, erroneous, or misleading clarifies the context under which a misrepresentation may be a true statement that is deceitful and does not infringe upon the court's ruling regarding statements with a likelihood to confuse. We also note that it is our understanding that many States' laws and other Federal consumer protection law also include omissions of information within prohibitions on deceptive acts and practices, and the proposed revision is in keeping with such precedent.

With respect to the commenters who expressed concern about how these regulations may affect schools' behaviors in their provision of certain types of information to students and prospective students, including information regarding investigations, pending civil rights or legal matters, faculty qualifications or availability, the school's compliance with State law, or a school's default rates, among others, the final regulation explicitly states that the Department will consider whether the statement omitting any such information is misleading "under the circumstances." As noted earlier, the Department will consider the totality of the circumstances to determine whether a statement is misleading—including whether the school is or is not under an affirmative legal obligation to disclose such information, or whether concerns such as privacy requirements prevent the disclosure or disclosure in full of such information. For borrower defense, § 685.222(d) also requires that the Department consider the reasonableness of the borrower's detrimental reliance on the misrepresentation.

We note, however, that it should not matter where or how a misrepresentation, whether as an omission or an affirmative statement, takes place, particularly as it pertains to the nature of a school's educational program, its financial charges, or the employability of its graduates. As we stated in 2010, 75 FR 66918, what is important is to curb the practice of misleading students regarding an

eligible institution. We continue to strongly believe that institutions should be able to find a way to operate in compliance with these regulations. As discussed later in this section, disclosures made by a school in publications or on the Internet may be probative evidence as to the reasonableness of a borrower's reliance on an alleged misrepresentation, depending on the totality of the circumstances.

*Changes:* None.

*Comments:* One commenter argued that it would be inappropriate to apply the FTC Policy Statement on Deception to cases of misrepresentation in higher education. The commenter stated that the FTC policy focuses specifically on deception perpetrated through advertising and is not aimed at establishing individual claims. The commenter noted that borrowers have more extensive interactions with their schools that may constitute fraud, and that absent the elements of materiality, reliance, and harm, the proposed Federal standard would fail to provide adequate protection.

*Discussion:* We disagree that the substantial misrepresentation standard in either part 668, subpart F, or in § 685.222(d) is the same as the FTC's prohibition on deceptive acts and practices. We considered a wide variety of both State and Federal legal precedents in developing the "substantial misrepresentation" definition in § 668.71 and have added specific elements, such as a reasonable reliance requirement, to address specific borrower defense claims in § 685.222(d).

*Changes:* None.

*Comments:* Some commenters stated that, for borrower defense purposes, the standard should specify that misrepresentations must be material, in order to avoid frivolous claims or claims based upon inadvertent errors or omissions. One commenter stated that such a materiality standard should not capture small deviations from the truth. Another commenter stated that the standard should allow only claims at a level of materiality that would justify the rescission of the loan at issue. One commenter expressed concern that under the standard without an accompanying materiality requirement, inadvertent or partial omissions of information would give rise to borrower claims.

One commenter stated that the Department should incorporate an express materiality requirement, emphasizing that the lack of such a standard is of particular concern because the standard does not incorporate an element of intent. The

[14] *See* Dept. of Educ., Notice of Intent to Fine Heald College, OPE–ID: 00723400 (Apr. 14, 2015), *available at www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf.*

commenter also stated that the need for a materiality standard is enhanced, because the Department's proposed standard does not seem to require proof of detriment to a student as a result of his or her actual, reasonable reliance. The commenter stated that the definition in § 668.71 only requires that an individual show that he or she could have relied on a misrepresentation and expressed concern about the Department's proposal to include a presumption of reliance for group claims, in the absence of a materiality requirement.

Several commenters stated that the inclusion of omissions, related to the provision of any educational service, is too broad without an accompanying materiality requirement in the regulation. These commenters expressed concern that students would be able to present claims for substantial misrepresentation by claiming that schools had failed to provide contextual information, such as how faculty-student ratio information works.

*Discussion:* As discussed in the NPRM, 81 FR 39344, we do not believe that a materiality element is required in either the proposed amendments to the definition for the Department's enforcement authority under § 668.71 or as the definition is adopted for the substantial misrepresentation borrower defense standard under § 685.222(d). We believe that the regulatory definition of "substantial misrepresentation" is clear and can be easily used to evaluate alleged violations of the regulations. *See* 75 FR 66916; 81 FR 39344. Generally, under both Federal deceptive conduct prohibitions and common law, information is considered material if it would be important to the recipient, or likely to affect the recipient's choice or conduct.[15] By noting specifically in section 487(c)(3) of the HEA, 20 U.S.C. 1094(c)(3), that the Department may bring an enforcement action against a school for a substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates, Congress indicated its intent that information regarding the nature of a school's educational program, its financial charges, or the employability of its graduates should be viewed as

material information of certain importance to students. *See Suarez* v. *Eastern Int'l Coll.,* 50 A.3d 75, 89–90 (N.J. Super. 2012).

As also noted in the NPRM, 81 FR 39344, we believe that by requiring that students demonstrate actual, reasonable reliance to the borrower's detriment under § 685.222(d), the borrower defense regulations incorporate similar concepts to materiality. As discussed, materiality refers to whether the information in question was information to which a reasonable person would attach importance in making the decision at issue. By requiring reasonable reliance to the borrower's detriment, the Department would consider whether the misrepresentation related to information to which the borrower would reasonably attach importance in making the decision to enroll or continue enrollment at the school and whether this reliance was to the borrower's detriment. This would be the case both for individual claims, and for the presumption of reliance applied in the process for group claims under § 685.222(f)(3). We discuss the rebuttable presumption of reasonable reliance in greater detail in the "Group Process" section of this document. As a result, we disagree it should include a materiality element in the standard.

*Changes:* None.

*Comments:* Many commenters expressed concerns about the requirement for borrowers to assert reliance under the substantial misrepresentation standard. One commenter expressed concern that a borrower could establish that a substantial misrepresentation had occurred by providing evidence of the misrepresentation and showing that he or she could have reasonably relied upon it to his or her detriment, notwithstanding the requirement in § 685.222(d) that the borrower demonstrate actual reasonable reliance upon the misrepresentation.

One commenter supported the use of a reasonable reliance standard, given that the standard may allow claims for statements, particularly unintentional statements, that are not accurate or complete.

A couple of commenters suggested that the Department should not require that borrowers actually and reasonably rely upon misrepresentations to obtain relief for borrower defense purposes, but rather that borrowers should be entitled to relief so long as actual reliance is demonstrated without regard for the reasonableness of that reliance. Alternatively, one commenter suggested that if a reasonable reliance standard were maintained, then the

reasonableness of the reliance should be judged according to the circumstances of the misrepresentation and the characteristics of the audience targeted by the misrepresentation, which the commenter stated would be in keeping with State consumer protection law.

One group of commenters suggested that the Department use the same standard for reliance for the Department's enforcement activities under § 668.71, as for borrower defenses under § 685.222(d), so that a borrower may assert a claim for borrower defense without having to show that he or she actually relied on the misrepresentation at issue. These commenters stated that neither State nor Federal consumer protection law typically requires actual reliance and that requiring actual reliance would increase the burden on both the borrower and the trier of fact without serving the purpose of deterring misrepresentations. The commenters also stated that actual reliance is not needed to protect schools from frivolous claims given the fact-finding process and separate proceedings that would be initiated by the Department to recover from schools under the proposed rule.

Another commenter also supported using a standard that did not require actual reliance, as opposed to showing that a borrower could have reasonably relied upon the misrepresentation. However, the commenter stated that in the alternative, borrowers should only be required to certify that they relied upon the misrepresentation, without any further proof, to satisfy the reliance requirement of the standard.

*Discussion:* There appears to be some confusion as to whether the substantial misrepresentation standard for borrower defense would require actual, reasonable reliance to a borrower's detriment. Although the definition of substantial misrepresentation in § 668.71 requires that, for a misrepresentation to be substantial, it must be one upon which a person "could reasonably be expected to rely, or has reasonably relied, to that person's detriment," the standard for substantial misrepresentation under § 685.222(d) requires that the borrower show that he or she "reasonably relied on" the misrepresentation at issue—in other words, that the borrower actually and reasonably relied upon the misrepresentation. As discussed later in this section, the Department acknowledges that the language of § 685.222(d) is confusing as to whether the borrower must also prove that he or she actually relied upon the misrepresentation to his or her detriment. As a result, we will to modify the language of proposed § 685.222(d) to

---

[15] *See, e.g.,* F.T.C. Policy Statement on Deception, 103 F.T.C. at 182; *see also* Restatement (Second) of Torts § 538 (1977) ("The matter is material if (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.").

clarify that actual, reasonable reliance to the borrower's detriment must be demonstrated under the borrower defense substantial misrepresentation standard.

We disagree that the purpose of the borrower defense regulations would be served if an actual reliance standard (without a reasonableness component) or a standard that did not require actual reliance was adopted. As explained in the NPRM, 81 FR 39343, a standard that does not require actual reliance serves the Department's interest in the public enforcement of its regulations: The Department requires title IV-participating institutions not to make false statements on which borrowers could reasonably rely to their detriment, and the Department appropriately will impose consequences where an institution fails to meet that standard. However, the Department will grant borrower defenses to provide relief to borrowers who have been harmed by an institution's misrepresentation, not borrowers who could have been harmed but were not; and an actual, reasonable reliance requirement is the mechanism by which borrowers demonstrate that they were indeed actually reasonably relied upon the misrepresentation to their detriment. The requirement also allows the Department to consider the context and facts surrounding the misrepresentation to determine whether other similar students and prospective students would have acted similarly.[16] We believe that the actual, reasonable reliance requirement for a borrower defense based upon a substantial misrepresentation enables the Department to provide relief for borrowers while properly avoiding

discharges and payments by the Federal government, taxpayers, and institutions. What may be deemed sufficient evidence to prove whether a borrower has reasonably relied upon a misrepresentation to his or her detriment will differ from case to case. As a result, we reject the suggestion that a certification of reliance should necessarily and in all cases by itself be found to be adequate proof of reliance for all borrower defense claims the Department may receive in the future.

*Changes:* We have revised § 685.222(d) to clarify that a borrower must have relied upon a substantial misrepresentation to his or her detriment.

*Comments:* One commenter expressed concern that the Department's proposed standard does not require that the borrower allege injury or damages as a requirement to assert substantial misrepresentation. Another commenter stated that students should be required to establish the extent of their injuries or damages, so that discharges are not granted where students received what they bargained for and so that claims are not filed for harmless errors by schools. Another commenter stated that the standard should require the borrower to show proof of detriment sufficient to deprive the student of the intended benefits of the tuition funded by the loan at issue.

*Discussion:* To assert a borrower defense under proposed § 685.222(d), the borrower must demonstrate that they reasonably relied upon a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, in deciding to attend, or continue attending, the school. A "substantial misrepresentation" is defined in § 668.71 as a misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment. The Department understands that, generally, "detriment" refers to any loss, harm, or injury suffered by a person or property.[17] When §§ 668.71 and 685.222(d) are read together, a borrower may assert a borrower defense for a misrepresentation, if also in accordance with the other requirements of 34 CFR part 668, subpart F, if he or she can demonstrate that the misrepresentation was one on which the borrower actually reasonably relied, to the borrower's detriment, in deciding to attend, or continue attending, the school at issue. However, we acknowledge that the language of § 685.222(d) may be confusing. For this reason, we are

clarifying in § 685.222(d) that the borrower must show reasonable detrimental reliance.

In contrast to detriment, "damages" refers to money claimed by, or ordered to be paid to, a person as compensation for loss or injury.[18] We do not believe that the term "damages" is appropriate in the context of borrower defense, because the Department is limited by statute to providing relief to the borrower on his or her Direct Loan and may not provide a borrower with the complete amount or types of compensation that might traditionally be considered to be damages at law.

There is no quantum or minimum amount of detriment required to have a borrower defense claim, and the denial of any identifiable element or quality of a program that is promised but not delivered due to a misrepresentation can constitute such a detriment. In contrast, proposed § 685.222(i) provides that the trier-of-fact, who may be a designated Department official for borrower defenses determined through the process in § 685.222(i) or a hearing official for borrower defenses decided through the processes in § 685.222(f) to (h), will determine the appropriate amount of relief that should be afforded the borrower under any of the standards described in § 685.222 and 685.206(c), including substantial misrepresentation. We explain the considerations for triers-of-fact for relief determinations under the "Borrower Relief" section of this document.

*Changes:* We have revised § 685.222(d) to clarify that a borrower must have relied upon a substantial misrepresentation to his or her detriment.

*Comments:* Several commenters expressed concern about the factors listed in proposed § 685.222(d)(2). A couple of commenters suggested that all of the additional factors listed in § 685.222(d)(2) should be removed. One commenter argued that the factors do not establish the falsity or misleading nature of a substantial misrepresentation claim. Another commenter stated that the factors are subjective and would be difficult to prove or disprove and thus should be removed in their entirety.

A couple of commenters disagreed with specific factors listed in proposed § 685.222(d)(2). One commenter stated that the factor pertaining to failure to respond to information was unnecessary, because passive and requested disclosures are already enforceable through existing consumer compliance requirements. Another

---

[16] It is our understanding that several other Federal agencies charged with consumer protection, such as the FTC and the CFPB, when bringing enforcement actions for violations of prohibitions of deceptive acts and practices, are not required to prove actual reliance by consumers upon alleged misrepresentations. However, we note that such agencies have prosecutorial discretion in bringing such cases, and are not charged with evaluating and deciding individual claims for relief by consumers as the Department is seeking to do with these regulations. Furthermore, such agencies obtain relief for consumers from the culpable actor, while the Department will be providing relief through public resources, with a possibility of recovery from the actor in some cases. In contrast to the laws these other Federal agencies enforce, many, if not all, States allow consumers to bring private actions under their consumer protection laws. However, it is the Department's understanding that the requirements as to whether reliance is required at all, or if the courts will consider the reasonableness of such reliance, varies. *See, e.g.,* National Consumer Law Center, Consumer Protection in the States: A 50-State Report on Unfair and Deceptive Acts and Practices Statutes, at 20, 22 (2009); Schwartz & Silverman, Commonsense Construction of Consumer Protection Acts, 54 U. Kan. L. Rev. 1, 18–19 (Oct. 2005).

[17] *See* Black's Law Dictionary (10th ed. 2014).

[18] *See* Black's Law Dictionary (10th ed. 2014).

commenter stated that the factors should not include failures to respond to information, or that this factor should be revised to include only purposeful failures to provide requested information. The commenter argued that a failure to respond promptly may be due to routine events or extraneous factors, such as an enrollment officer's vacation or workload issues, or a student's own delay of enrollment. A commenter also requested clarification as to the "unreasonable emphasis on unfavorable consequences of delay" language. This commenter argued that under this factor, routine, truthful provisions of information regarding timelines and possible late fees or other consequences as a result of actions such as late enrollment or making late housing arrangements may be viewed as improper conduct.

One commenter expressed support for the factors listed in § 685.222(d)(2), stating that it agreed with the Department that misrepresentations should be viewed in the context of circumstances, including the possible use of high pressure enrollment tactics.

One commenter expressed concern that decision makers would expect to see one or more of the newly added factors before finding that a substantial misrepresentation exists. This commenter suggested that the Department clarify that a borrower need not show the factors to have a claim for substantial misrepresentation under borrower defense.

Several commenters stated that the factors listed in proposed § 685.222(d)(2) were insufficient as part of the standard for substantial misrepresentation, as many problematic practices relating to high pressure and abusive sales practices do not necessarily involve misrepresentations as opposed to puffery or abusive or unfair practices.

*Discussion:* We disagree with the commenters' suggestion to remove the non-exhaustive list of factors in § 685.222(d)(2). We appreciate the concerns that the factors do not necessarily prove whether a statement was erroneous, false, or misleading. However, as explained in the NPRM, 81 FR 39343, we believe it is appropriate to consider factors that may have influenced whether a borrower's or student's reliance upon a misrepresentation to his or her detriment is reasonable, thus elevating the misrepresentation to a substantial misrepresentation under § 668.71 and § 685.222(d) for the purposes of evaluating a borrower defense claim. We recognize that such factors consider the viewpoint of the borrower as to his or

her reliance on a misrepresentation and may be subjective. However, in evaluating whether a statement is a misrepresentation, the Department will consider whether the statement is a misrepresentation "under the circumstances" and consider the totality of the situation, in addition to the reasonable reliance factors listed in § 685.222(d)(2). We also disagree with commenters that the factors are insufficient as part of the substantial misrepresentation standard. As discussed earlier in this section, we decline to include standards such as unfair or abusive acts or practices, which some commenters have stated would address issues such as puffery and abusive sales practices that may occur absent a misrepresentation, because of a lack of clear precedent and guidance. We believe that consideration of the factors, if the trier-of-fact determines that they are warranted under § 685.222(d)(2), strikes a balance between the Department's interests in establishing consistent standards by which the Department may evaluate borrower defenses; providing borrowers and schools with clear guidance as to conduct that may form the basis of a borrower defense claim, and providing appropriate relief to borrowers who have been harmed.

We understand the concern raised by commenters that a failure to respond to a borrower's requests for more information, including regarding the cost of the program and the nature of any financial aid, 34 CFR 685.222(d)(iv), may be due to unintentional and routine events such as an employee's oversight and vacation schedule. However, as discussed earlier in this section, we disagree that the substantial misrepresentation standard should include an element of intent. We also disagree that the factor is unnecessary, as different States and oversight entities may have differing disclosure standards and institutions' compliance with such standards may vary.

Section 685.222(d)(2)(ii) notes that in considering whether a borrower's reliance is reasonable, that an "unreasonable" emphasis on the unfavorable consequence of a delay may be considered. Generally, we do not believe that routine and truthful provisions of information such as timelines and fees to a borrower are unreasonable. However, as discussed, the standard requires that a consideration of any of the factors listed in § 685.222(d)(2) also include consideration of whether a statement is a misrepresentation under the circumstances or, in other words, in the context of the situation.

We also disagree that further modification of the regulations is needed to clarify that the factors do not need to exist for a borrower to have a borrower defense under § 685.222(d). We believe that in stating that the Secretary "may consider, if warranted" whether any of the factors listed in § 685.222(d)(2) were present, that the Department's intent is clear that the factors do not need to be alleged for a substantial misrepresentation to be established.

*Changes:* None.

*Comments:* One commenter stated that the preponderance of evidence standard established in the regulation, combined with the lower proof standard of preponderance of the evidence for misrepresentation, would open the door to frivolous claims. One commenter expanded on this position, asserting that the evidentiary standard in most States for fraudulent misrepresentation is clear and convincing evidence.

One commenter requested clarification regarding the reasonable reliance and the preponderance of evidence standard for the purposes of the substantial misrepresentation, raising as an example, that an error or oversight in one publication should not satisfy the preponderance of the evidence standard for substantial misrepresentation, if the statement was otherwise correct and complete in all of the school's other publications.

*Discussion:* We disagree that a "preponderance of the evidence" is a lesser standard of proof than what is used currently. As explained in the NPRM, 81 FR 39337, we believe that this evidentiary standard is appropriate as it is both the typical standard in most civil proceedings, as well as the standard used by the Department in other processes regarding borrower debt issues. See 34 CFR 34.14(b), (c) (administrative wage garnishment); 34 CFR 31.7(e) (Federal salary offset).

We understand that some commenters have concerns about baseless charges and frivolous claims that may be brought by borrowers as borrower defenses and lead to liabilities for schools. However, as established in § 685.222(e)(7) and (h), in determining whether a school may face liability for a borrower defense claim or a group of borrower defense claims, the school will have the opportunity to present evidence and arguments in a fact-finding process in accordance with due process. If, for example, during the course of such a fact-finding process, the school provides proof that a misstatement or oversight in one publication was otherwise correct and complete in the school's other

publications, such evidence may be determinative as to whether a borrower's reliance on the original misrepresentation was reasonable under the circumstances, as required under § 668.71 and § 685.222(d). However, the probative value of such evidence will vary depending on the facts and circumstances of each case. We also discuss comments relating to the evidentiary standard under "General."

*Changes:* None.

*Comments:* Several commenters suggested that we provide schools with specific safe harbors or defenses to substantial misrepresentation borrower defense claims. One commenter suggested such safe harbors could include a demonstration that an alleged misstatement is found to be true and not misleading when made; proof that a student participated in Student Loan Entrance counseling despite a claim that the student did not understand repayment requirements; proof that a borrower failed to obtain a professional license due to his or her own behavior despite having been provided with information on professional licensing requirements; a showing that the student has been made whole by the school; proof that the student has signed acknowledgements as to the information about which the student is claiming to have been misled; or underlying circumstances that are based on standard operational or institutional changes.

Another commenter stated that schools should be provided with defenses in the form of proof that the misrepresentation had been subsequently corrected by the school or that the institution had policies, procedures, or training in place to prevent the misrepresentation at issue.

*Discussion:* We disagree with commenters that specific defenses or safe harbors should be included in the regulations. Many of the factors listed by commenters, such as whether a student participated in entrance or exit counseling, proof of the availability of or receipts of accurate information by a student, or proof of underlying circumstances that are based on standard operational or institutional changes that should have been apparent to the borrower or student may be important evidence in the Department's consideration of whether a borrower's reliance upon an alleged misrepresentation is reasonable, as required by § 685.222(d). However, determinations as to the impact of such factors may vary significantly depending on the type of allegations made and the facts and circumstances at issue. As a result, we do not believe that

the inclusion of such factors is appropriate.

Similarly, other factors noted by commenters, such as a showing that a student has already been made whole by the school may, depending on the specific circumstances, be important considerations for the Department in its determination of whether a borrower may be entitled to relief or to the determination of the amount of relief under § 685.222(i), which in turn may affect the amount of liability a school may face in either the separate proceeding for recovery under § 685.222(e)(7) or in the group process described in § 685.222(h). Given that the importance of such factors will vary depending on the circumstances of each case, we also do not believe that the inclusion of such factors is appropriate for the regulations.

Section 668.71 defines a "misrepresentation" as any false, erroneous, or misleading statement. If an alleged misstatement can be proven to be true statement of fact when made, not false or erroneous, and it is not misleading when made, then such statements would not be actionable misrepresentations under the standard. However, as explained previously in this section, to determine whether a statement that was true at the time of its making was misleading, the Department will consider the totality of the situation to determine whether the statement had "the likelihood or tendency to mislead under the circumstances" or whether it "omit[ted] information in a way as to make the statement false, erroneous, or misleading." The Department will also look to whether the reliance by the borrower was reasonable. This would include a consideration of whether a misrepresentation has been corrected by the school in such a way or in a timeframe so that the borrower's reliance was not reasonable. This would also mean that, generally, claims based only on the speaker's opinion would not form the basis of a borrower defense claim under the standard, if it can be determined that under the circumstances borrowers would understand the source and limitations of the opinion.[19] For the same reason, it is our understanding that claims based on exaggerated opinion claims, also known as "puffery," would also generally not

be able to form the basis of a misrepresentation under State or Federal consumer protection law.[20] However, the determination of whether a statement is an actionable misrepresentation will necessarily involve consideration of the circumstances under which the representation was made and the reasonableness of the borrower's reliance on the statement.

We do not believe that the existence of policies, procedures, or training to be a defense to the existence of a substantial misrepresentation. As discussed earlier in this section, the Department does not consider intent in determining whether a substantial misrepresentation was made and believes that a borrower should receive relief if the borrower reasonably relied upon a misrepresentation to his or her detriment.

*Changes:* None.

*Comments:* Several commenters expressed concerns regarding the subject matter or topics upon which a substantial misrepresentation may be based. A few commenters expressed concerns that the substantial misrepresentation standard narrows the scope of borrower defenses by not including claims relating to campus safety and security, as well as those for sexual or racial harassment. One commenter expressed the view that not including such non-loan related issues is inconsistent with the purpose of the HEA and the borrower defense regulations. Another commenter said that by excluding such topics, the substantial misrepresentation standard targets just proprietary institutions and excludes traditional colleges.

Another commenter asked whether statements about topics such as cafeteria menu items, speakers hosted by a school, or opponents on a team's athletic schedule would be considered substantial misrepresentations.

One commenter supported using 34 CFR part 668, subpart F, as the basis for borrower defense claims, including limiting substantial misrepresentation claims to the categories listed in subpart F.

*Discussion:* We explain earlier our reasons for why subjects that do not relate the making of a borrower's loan or the provision of educational services for which the loan was provided, such as sexual or racial harassment and campus safety or security, are included within the scope of the borrower defense regulations.

---

[19] It should be noted, however, that a claim phrased as an opinion may still form the basis of a substantial misrepresentation, if the borrower reasonably interpreted the statement as an implied statement of fact, *see, e.g.,* FTC Policy Statement on Deception, 103 F.T.C. at 184, or if any of the factors listed in § 685.222(d)(2) existed so as to affect the reasonableness of the borrower's reliance on the misrepresentation.

[20] *See, e.g., Rasmussen* v. *Apple Inc.,* 27 F. Supp. 3d 1027 (N.D. Cal. 2014); FTC Policy Statement on Deception, 103 F.T.C. 110.

**75954** **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

As also discussed earlier in this section, we disagree that the substantial misrepresentation standard targets proprietary institutions and excludes issues facing public and private non-profit schools.

In response to questions about whether misrepresentations on specific topics may form the basis of a borrower defense, we note such determinations will necessarily be fact and situation specific-dependent inquiries. As proposed, the substantial misrepresentation standard considers a number of factors in determining whether a borrower defense claim may be sustained. Proposed § 685.222(d) specifies that the borrower defense asserted by the borrower must be a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, that the borrower reasonably relied on when the borrower decided to attend, or to continue attending, the school. 34 CFR part 668, subpart F, specifically limits the scope of substantial misrepresentation to misrepresentations concerning the nature of an eligible institution's educational program, 34 CFR 668.72; the nature of an eligible institution's financial charges, *id.* at § 668.73; and the employability of an eligible institution's graduates, *id.* at § 668.74. If a misrepresentation falls within one of these categories, then it may be a misrepresentation upon which a borrower may assert a borrower defense claim. However, as required by the revised language of § 668.71, the Department would consider the totality of the situation to determine whether the statement was false, erroneous, or misleading "under the circumstances." Additionally, the borrower would have to show that he or she reasonably relied upon the misrepresentation to his or her detriment in deciding to attend the school or in continuing his or her attendance at the institution under proposed § 685.222(d). If such requirements are met, then it is possible that a substantial misrepresentation may form the basis of a borrower defense claim.

*Changes:* None.

*Comments:* Several commenters expressed concern that the standard would result in schools being held liable for misrepresentations of contractors and others acting on their behalf. According to one commenter, this standard is acceptable for enforcement activities conducted by and guided by the Department in its discretion, but is not suitable for borrower defense. Another commenter stated that, as proposed, § 685.222 is unclear, because under § 685.222(a), a borrower defense is limited to the act or omission of the school, whereas under § 685.222(d), it does not appear to be clear that the act or omission may be by the school's representatives.

*Discussion:* In response to concerns in 2010 that institutions may be held accountable for false or misleading statements made by persons with no official connection to a school, the Department narrowed the scope of substantial misrepresentation to statements made by the school, the school's representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs or those that provide marketing, advertising, recruiting, or admissions services. 75 FR 66916. As explained in 2010, such persons actually either represent the school or have an agreement with the school for the specific purposes of providing educational programs, marketing, advertising, recruiting, or admissions services. Section § 685.222(d) similarly names the persons and entities making a substantial misrepresentation upon which a borrower may assert a claim and echoes the official relationships in § 668.71. We believe the definition provided in proposed § 685.222(d) does not need further clarification. We also believe that the specific persons and entities identified in § 685.222(d) upon whose substantial misrepresentation a borrower may assert a borrower defense claim is appropriate for the same reasons stated in 2010 as to their appropriateness for § 668.71 and decline to make any changes in this regard.

*Changes:* None.

*Comments:* One commenter requested that borrower defense claims extend to guaranty agencies and, specifically, suggested that § 685.222(d)(2) be revised to enable the Secretary to consider certain factors, listed in § 685.222(d)(2), to determine whether a guaranty agency's reliance on a substantial misrepresentation is reasonable.

*Discussion:* The Department's authority to regulate borrower defenses arises from Section 455(h) of the HEA, which describes borrower defenses that may be asserted by a borrower to the Department for loans made under the Direct Loan Program. We do not believe that it is appropriate to include guaranty agencies, which are not participants in the Direct Loan Program, in the borrower defense regulations and decline the commenter's suggestion.

*Changes:* None.

*Comments:* One commenter concurred with the Department's goal of deterring misrepresentations, but requested that the Department exempt foreign institutions with relatively small numbers of American students from the regulation. The commenter stated that eligible foreign institutions are governed by different countries' laws and oversight regimes, and that there are no indicators that the issues giving rise to borrower defense claims have affected Americans enrolled in foreign institutions.

*Discussion:* We do not agree that it would be appropriate to ignore any potential harm to students that may constitute the basis of a borrower defense from schools participating in the Direct Loan Program, whether such institutions are foreign or domestic. The standards proposed in § 685.222 for borrower defense were drafted for the purpose of ensuring that students receive consistent and uniform treatment for borrower defense claims, regardless of the type of institution. Exempting some institutions from the borrower defense process, whether partially or fully, would undermine the effectiveness of the regulation in providing relief for borrowers and providing the Department with information on misconduct forming the basis of borrower defenses among institutions participating the Direct Loan Program.

*Changes:* None.

*Limitations on Department Actions To Recover*

*Comments:* Commenters objected to the proposal to remove the limitations period in current § 685.206(c) to Department action to recover from the school for losses arising from borrower defense claims on both loans made before July 1, 2017, and those made thereafter. Section 685.206(c) refers to § 685.309(c), which in turn refers to the three-year record retention requirement in § 668.24. The current regulations also provide that the three-year limitation would not apply if the school received actual notice of the claim within the three-year period. Commenters objected for a variety of reasons.

Several commenters argued that it would be unduly burdensome and expensive for institutions to retain records beyond the mandatory three-year record retention period. These commenters also argued that it would be unfair for an institution to have to defend itself if it no longer has records from the time period in question. One commenter also noted that it would be difficult for the Department to assess claims in the absence of records. One commenter disagreed with the Department's statements in the NPRM that institutions have not previously

relied on the three-year limitations period and student-specific files are likely unnecessary to a borrower defense claim. A commenter asserted that the records to which the current record retention rule applies—including the Student Aid Report (SAR), documentation of each borrower's loan eligibility, documentation of each borrower's receipt of funds, documentation of exit counseling, documentation of the school's completion rates, among numerous other categories of documents—would be relevant and that the Department had failed to demonstrate that resolution of borrower defense claims would rarely, if ever, turn on the records to which the three-year record retention rule now applies. The commenter contended that these records will likely go to the heart of borrower claims concerning misrepresentation regarding student loans.

Some commenters stated that schools have tied their general record retention policies to the three-year student aid record retention regulation. Other commenters contended that the proposal would place an unfair, and unnecessary burden on schools by requiring them to retain records indefinitely, even though a borrower would reasonably be expected to know within a few years after attendance whether the student had a claim regarding the training he or she had received. Some commenters argued that due process requires a defined limitations period so that borrowers and schools would know how long to retain relevant records. These commenters also suggested that a defined limitation period would promote early awareness of claims, and proposed a six-year period for recovery actions on both misrepresentation and contract claims.

A commenter asserted that periods of limitation are enacted not merely to reduce the risk of failing memories and stale evidence, but to promote finality of transactions and an understanding of the possible risks that may arise from transactions. This proposed change, the commenter asserts, frustrates these objectives served by periods of limitation. One commenter contended that an unlimited record retention period would increase the risk that data security lapses could occur.

One commenter suggested that the limitation period for recovery actions should be tied to the rule adopted by the school's accreditor, or to the statute of limitations in the State, as even non-student specific records, such as catalogs (which the Department noted are likely be the basis of borrower defense claims), are likely to be destroyed at the end of these retention periods. Another commenter viewed the proposal as an impermissible retroactive regulation, by converting what was enacted as defense to repayment into an affirmative recovery claim, available to the Department for recovery for losses from actions of the school that occurred before the new regulation took effect.

*Discussion:* We fully address in the NPRM at 81 FR 39358 the contention that removing or extending a limitation period is unconstitutional and beyond the power of the Department.[21] As to the objections that the change would be unfair because schools in fact relied on the record retention rules, we note first that these record retention rules require the school to retain specific, particular student-aid related records. We include the specific records that must be maintained in order to provide the context in which to address the commenters' assertion that these records would go to the heart of borrower defense claims. 34 CFR 668.24. The commenters identify no lawsuits in which resolution of the dispute actually turned on any of the records listed here and, with minor exceptions, we are aware of no lawsuits against schools by borrowers or government entities, or borrower defense claims presented to the Department, in which the records described here are dispositive. In a handful of instances, recognition of borrower defenses under § 685.206 turned on records showing whether refunds owed to students had in fact been made, a requirement ordinarily examined in the routine compliance audit and in Department program reviews. In a few other cases, Department reviews have identified instances in which the school falsified determinations of satisfactory academic progress, another matter commonly examined in routine audits and program reviews, and we are amending the false certification discharge provisions to ensure that the Department can implement relief when this particular failure is identified. In contrast, even a cursory review of claims raised by students and student borrowers over the years that would constitute potential borrower defense claims have turned not on the individualized aid-specific records itemized in the Department's record retention regulations, but on broadly disseminated claims regarding such matters as placement rates,[22] accreditation status,[23] and employment prospects.[24]

Whether a school actually retains records relevant to the borrower's claim does not determine the outcome of any claim, because the borrower—and in group claims, the Department—bears the burden of proving that the claim is valid. The borrower, or the Department, must therefore have evidence to establish the merit of the claim, a prospect that becomes more unlikely as time passes. If the borrower or the Department were to assert a claim against the school, the school has the opportunity to challenge the evidence proffered to support the claim, whether or not the school itself retains contradictory records.

We acknowledge, however, that institutions might well have considered their potential exposure to direct suits by students in devising their record retention policies for records that may in fact be relevant to borrower defense type claims. Although we consider applicable law to support collection of claims by offset without regard to any previously applicable limitation period, we recognize that the burden of doing so may be unwarranted after the limitation period otherwise applicable had expired and the institution had no reason to expect that claims would arise later. Under current regulations, there is no limit on the time in which the Department could take recovery action if the institution received notice of a claim within the three-year period. Under the current regulation, an institution must have ''actual notice of a claim'' to toll the three-year period. An institution would in fact have ample warning that the claims may arise from other events besides receipt of a claim from an individual, such as lawsuits

---

[21] We add only that statutes of limitation applicable to government actions to collect these claims affect only the ability to recover by a particular action, and do not extinguish claims. Thus, a suit by the government to collect a liability arising in title IV, HEA program remains governed by the limitation periods in 28 U.S.C. 2415(a), while actions to collect by Federal offset have not, since subsection (i) was added to § 2415 by the 1982 Debt Collection Act to exempt actions to collect by administrative offset under 31 U.S.C. 3716, which originally imposed a 10-year statute of limitations, until amended in 2008 to remove any limitation period from collection by Federal offset.

[22] See *Armstrong* v. *Accrediting Council for Continuing Educ. & Training, Inc.,* 168 F.3d 1362, 1369 (D.C. Cir. 1999), *opinion amended on denial of reh'g,* 177 F.3d 1036 (D.C. Cir. 1999)

[23] *California* v. *Heald Coll.,* No. CGC–13–534793, Sup. Ct. Cty of San Francisco (March 23, 2016); *Consumer Fin. Prot. Bureau* v. *Corinthian Colls., Inc.,* No. 1:14–CV–07194, 2015 WL 10854380 (N.D. Ill. Oct. 27, 2015); *Ferguson* v. *Corinthian Colls., Inc.,* 733 F.3d 928 (9th Cir. 2013); *Moy* v. *Adelphi Inst., Inc.,* 866 F. Supp. 696, 706 (E.D.N.Y. 1994) (upholding claim of common law misrepresentation based on false statements regarding placement rates.); *Lilley* v. *Career Educ. Corp.,* 2012 IL App (5th) 100614–U (Oct. 25, 2012); *Fed. Trade Comm'n* v. *DeVry Educ.Group, Inc.,* C.A. No. 15–CF–00758 (S.D. Ind. Filed Jan. 17, 2016).

[24] *Suarez* v. *E. Int'l Coll.,* 428 N.J. Super. 10, 50 A.3d 75 (App. Div. 2012).

involving the same kind of claim, law enforcement agency investigations, or Department actions. State law, moreover, already commonly recognizes that the running of limitation periods may be suspended for periods during which the claimant had not yet discovered the facts that would support a claim, and may impose no limit on the length of the suspension, effectively allowing a claim to be asserted long after the otherwise applicable limitation period had run. The limitation period applicable to a particular recovery claim will thus depend—for current loans—on the limitation period State law would impose on an action by the student against the institution for the cause of action on which the borrower seeks relief, as that period may be affected by a discovery rule, as well as whether an event has occurred within that period to give the institution notice. The current three-year limit will be retained, subject to the notice provisions, if that limit exceeded the applicable State law limitation. For new loans, the applicable periods would be those in § 685.222(e)(7) and § 685.222(h)(5); for actions based on judgments, no limitation would apply.

We recognize that the retention of records containing personally identifiable information poses data security risks. However, the school already faces the need to secure such information, and we expect the school to have already adopted steps needed to do so. The regulation does not impose any new record retention requirement.

*Changes:* We have amended § 685.206(c) to remove the provision that the Secretary does not initiate a recovery action later than three years after the last year of attendance, and we have modified § 685.222(c)(3) to provide that the Department may bring a recovery action against the school within the limitation period that would apply to the cause of action on which the borrower defense is based, unless within that period the school received notice of the borrower's claim. We have further modified the regulations to state that notice of the borrower's claim includes actual notice from the borrower, a representative of the borrower, or the Department, of a claim, including notice of an application filed pursuant to § 685.222 or § 685.206(c); receipt of a class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of the borrower defense claim; and notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that it is initiating an

investigation into conduct of the school relating to specific programs, periods, or practices that may affect the student for underlying facts that may form the basis of the borrower defense claim.

We have also revised § 685.222(h)(5) and (e)(7) to provide that the Department may bring a recovery action against the school for recovery of claims brought under § 685.222(b) at any time, and may bring a recovery action for recovery of claims brought under § 685.222(c) or (d) within the limitation period that would apply to the cause of action on which the borrower defense is brought, unless within that period the school received notice of the borrower's claim. The Department further modifies § 685.222(h)(5) to include the same description of events that constitute notice as described above.

*Comments:* One commenter requested that the Department continue the three-year statute of limitations period for loans disbursed prior to July 1, 2017. Another commenter suggested it would be unfair for the Department to hold an institution accountable for claims going back more than ten years.

*Discussion:* As noted in the NPRM, the Department will continue to apply the applicable State statute of limitations to claims relating to loans disbursed prior to July 1, 2017. We also note that we will apply all aspects of relevant State law related to the statute of limitations as appropriate, including discovery rules and equitable tolling. However, these comments may reflect a drafting error in the NPRM that suggested loans disbursed prior to July 1, 2017, would be subject to the new limitations period established by the final regulations.

*Changes:* We have revised § 685.222(a)(5) to make clear that the six-year statute of limitations period established under that section does not apply to claims under § 685.206(c).

*Expansion of Borrower Rights*

*Comments:* A number of commenters noted that the regulations in proposed § 685.206(c) expand the rights of borrowers by allowing borrowers to assert defenses regardless of when the loan was disbursed. Under the current regulations, a defense to repayment is available only when collection on a Direct Loan has been initiated against a borrower, such as wage garnishment or tax offset proceedings. The commenters asserted that the revisions to the borrower defense regulations have reconstituted current defenses to collection, so they now serve as the bases for expanded borrower rights to initiate an action for affirmative debt relief at any time.

*Discussion:* We disagree that proposed § 685.206(c) would be an expansion of borrowers' rights as to the context in which a borrower defense may be raised. As explained by the Department in 1995, 60 FR 37769–37770, the Direct Loan borrower defense regulations were intended to continue the same treatment for borrowers and the same potential liability for institutions that existed in the FFEL Program—which allowed borrowers to assert both claims *and* defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings. Specifically, FFEL borrowers' ability to raise such a claim was pursuant the Department's 1994 inclusion in the FFEL master promissory note for all FFEL Loans a loan term [25]—that remains in FFEL master promissory notes to this day—stating that for loans provided to pay the tuition and charges for a for-profit school, "any lender holding [the] loan is subject to *all the claims and defenses* that [the borrower] could assert against the school with respect to [the] loan" (emphasis added).[26] *See also* Dept. of Educ., Dear Colleague Letter Gen 95–8 (Jan. 1995) (stating the Department's position that borrower defense claims would receive the same treatment as they were given in the FFEL program, which allowed borrowers to not only assert defenses but also claims under applicable law).

We also disagree that the revisions to § 685.206(c) expand any timeframe for a borrower to assert a borrower defense. As explained above, the Department's borrower defense regulation at § 685.206(c) was based upon the right of FFEL borrowers to bring claims and defenses, which in turn was adopted from the FTC's Holder Rule provision. The FTC has stated that applicable State law principles, such as statutes of limitations as well as any principles that would permit otherwise time-barred claims or defenses against the loan holder, apply to claims and defenses brought pursuant to a Holder Rule provision.[27] The Department's position on the application of any applicable statutes of limitation or principles that

---

[25] This loan term was adapted from a similar contract provision, also known as the Holder Rule, required by the Federal Trade Commission (FTC) in certain credit contracts. *See* 40 FR 533506.

[26] The substance of this loan term was also adopted as part of the FFEL Program regulations at 34 CFR 682.209(g) in 2009.

[27] Letter from Stephanie Rosenthal, Chief of Staff, Division of Financial Practices, Bureau of Consumer Protection, FTC to Jeff Appel, Deputy Under Secretary, U.S. Dep't. of Educ. (April 7, 2016), *available at www.ftc.gov/policy/advisory-opinions/ letter-stephanie-rosenthal-chief-staff-division-financial-practices-bureau.*

may permit otherwise time-barred claims is the same as the FTC's. We do not seek to change this position in revising § 685.206(c), which would apply to loans first disbursed before July 1, 2017.

*Changes:* None.

*Administrative Burden*

*Comments:* A group of commenters questioned the validity of the Department's argument that maintaining a State-based standard would be administratively burdensome. The commenters suggested that the Department could establish a system for determining which State's laws would pertain to students enrolled in distance education programs.

Several commenters criticized the Federal standard as being too broad and vague to provide sufficient predictability to institutions. One of these commenters asserted that the proposed regulations could encourage borrowers to file unsubstantiated claims. Many commenters noted that borrowers have existing avenues to resolve issues with their schools, using the complaint systems provided by institutions, accrediting agencies, and States, as well as judicial remedies.

One commenter suggested that the implementation of the proposed regulations would hamper interactions between school employees and students by creating an environment where any interaction could be misconstrued and used as a basis for borrower defense. The commenter concluded that this dynamic would increase the burden on schools as they seek to implement means of communicating to and interacting with borrowers that mitigate risk.

Several commenters recommend that the Federal standard describe the specific acts and omissions that would and would not substantiate a borrower defense claim. Another commenter suggested that the final rule include examples of serious and egregious misconduct that would violate the Federal standard.

*Discussion:* Reliance upon State law not only presents a significant burden for Department officials who must apply and interpret various State laws, but also for borrowers who must make the threshold determination as to whether they may have a claim. Contrary to the commenter's assertion, this challenge cannot be resolved through the Department's determination as to which State's laws would provide protection from school misconduct for borrowers who reside in one State but are enrolled via distance education in a program based in another State. Some States

have extended their rules to protect these students, while others have not.

We agree with commenters that the Federal standard does not provide significant predictability to institutions regarding the number or type of borrower defense claims that may be filed or the number of those claims that will be granted. However, the purpose of the Federal standard is not to provide predictability, but rather, to streamline the administration of the borrower defense regulations and to increase protections for students as well as taxpayers and the Federal government. That being said, the bases for borrower defense claims under the new Federal standard—substantial misrepresentation, breach of contracts, and nondefault, contested judgments by a court or administrative tribunal of competent jurisdiction for relief—do provide specific and sufficient information to guide institutions regarding acts or omissions pertaining to the provision of Direct Loan or educational services that could result in a borrower defense claim against the institution.

We do not agree that implementation of the Federal standard will hamper interactions between school personnel and students. Institutions that are providing clear, complete, and accurate information to prospective and enrolled students are exceedingly unlikely to generate successful borrower defense claims. While individuals may continue to misunderstand or misconstrue the information they are provided, a successful borrower defense claim requires the borrower to demonstrate by a preponderance of the evidence that a substantial misrepresentation or breach of contract has occurred.

We decline to describe the specific acts and omissions that would and would not substantiate a borrower defense claim, as each claim will be evaluated according to the specific circumstances of the case, making any such description illustrative, at best. We believe the elements of the Federal standard and the bases for borrower defense claims provide sufficient clarity as to what may or may not constitute an actionable act or omission on the part of an institution.

*Changes:* None.

*Authority*

*Comments:* A group of commenters expressed concern that the proposed Federal standard exceeds the Department's statutory authority. This same group of commenters opined that the proposed Federal standard violates the U.S. Constitution.

Two commenters suggested that the proposed regulations have exceeded the Department's authority to promulgate regulations for borrowers' defenses to repayment on their Federal student loans when advanced collection activity has been initiated. One of these commenters suggested that loan discharges based on institutional misconduct should be pursued only when the Department has court judgments against a school, final Department program review and audit determinations, or final actions taken by other State or Federal regulatory agencies, after the school has been afforded its due process opportunities.

*Discussion:* The Department's authority for this regulatory action is derived primarily from Sections 454, 455, 487, and 498 of the Higher Education Act, as discussed in more detail in the NPRM. Section 454 of the HEA authorizes the Department to establish the terms of the Direct Loan Program Participation Agreement, and section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Sections 487 and 498 authorize the adoption of regulations to assess whether an institution has the administrative capability and financial resources needed to participate in the title IV, HEA programs.[28]

Support for regulating in particular areas is also found in Section 432(a) of the HEA, which authorizes the Secretary to issue regulations for the FFEL program, enforce or compromise a claim under the FFEL Program; section 451(b) provides that Direct Loans are made under the same terms and conditions as FFEL Loans; and section 468(2) authorizes the Secretary to enforce or compromise a claim on a Perkins Loan.

Section 452(j) of the GEPA authorizes certain compromises under Department programs, and the Administrative Dispute Resolution Act, 31 U.S.C. 3711, authorizes a Federal agency to compromise or terminate collection of a debt, subject to certain conditions.

The increased debt resolution authority is provided in Public Law 101–552 and authorizes the Department to resolve debts up to $100,000 without approval from the Department of Justice (DOJ).

The HEA vests the Department with the sole authority to determine and

---

[28] This discussion addresses the Department's authority to issue regulations in the areas described below. As discussed earlier, the Department's authority to recoup losses rests on common law as well as HEA provisions included among those cited here.

**75958** **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

apply the appropriate sanction for HEA violations. The Department's authority for the regulations is also informed by the legislative history of the provisions of the HEA, as discussed in the NPRM.

*Changes:* None.

*Making of a Loan and Provision of Educational Services*

*Comments:* Several commenters expressed support for the Department's efforts to limit the scope of borrower defense claims by focusing the proposed regulations on acts or omissions that pertain to the provision of educational services. However, these commenters also suggested that the phrase, ''provision of educational services'' was open to interpretation and, as such, may not effectively constrain potential claims. One commenter suggested revising the phrase to read, ''provision of educational services related to the program of study.''

A number of commenters requested that the clarification included in the preamble to the NPRM, explaining that claims pertaining to personal injury, allegations of harassment, educational malpractice, and academic or disciplinary actions are not related to the making of a borrower's Direct loan or the provision of educational services be included in the regulatory text, as they viewed these specific examples as particularly helpful clarifications.

Two commenters listed a number of specific circumstances that may or may not fall within the scope of providing educational services, and requested that the Department provide an analysis of these acts and omissions.

Another commenter remarked that the Department's efforts to limit the scope of borrower defense claims by focusing the proposed regulations on acts or omissions that pertain to the provision of educational services fell short of its objective. Similar to other commenters, this commenter requested that the Department provide explicit descriptions of the claims that would and would not meet the proposed standard.

Another commenter who shared this view suggested the Department include in the final regulations a discussion of the factors that would be considered in determining whether a borrower defense claim pertained to the provision of educational services.

*Discussion:* We appreciate the support for our efforts to appropriately limit the scope of borrower defense claims to those that are related specifically to the provision of educational services or the making of a Direct Loan. We understand the commenters' interest in further clarification. However, we do not

believe it is appropriate to provide detailed institutional-borrower scenarios, or a hypothetical discussion of the analytic process the Department would undertake to ascertain whether a specific borrower's claim related to the provision of educational services or the making of a Direct Loan at this time. As is often the case in matters that address an individual's experience as part of the Federal Student Aid process, the Department's determination of whether a claim pertains to the provision of educational services or the making of a Direct Loan will depend greatly upon the specific elements of that claim.

For example, while it may appear to be a relatively straightforward clarifying change to amend the regulatory language to read, ''provision of educational services related to the program of study,'' such a change could be interpreted to mean that claims related to more general concerns associated with the institution's provision of educational services would not be considered. That is not our intent, and we believe the regulatory language as proposed best captures the intended scope of borrower defense claims.

Similarly, we do not believe that including in the regulatory language specific examples of acts or omissions that would not be considered in a borrower defense is appropriate at this time. These circumstances may evolve over time, necessitating a re-evaluation of their relevance. The Department can provide additional clarification, as needed, through other documents, such as a Dear Colleague Letter, Electronic Announcement, or the FSA Handbook.

*Changes:* None.

*Comments:* One commenter recommended that the phrase ''making of a Direct Loan'' be revised to include the phrase ''for enrollment at the school,'' to ensure consistency with the proposed regulatory language in § 685.222(a)(5). The commenter suggested that this modification would be required to ensure that all Direct Loans a borrower has obtained attend a school are covered by the regulation.

*Discussion:* We agree with the commenter that such a change would ensure consistency throughout the regulation.

*Changes:* We have revised § 685.206(c) to include the qualifying phrase, ''for enrollment at the school'' when referring to the ''making of the loan.''

*Comments:* Several commenters expressed concern that the proposed borrower defense regulations would limit borrower defense claims to acts or omissions that occurred during the same

academic year in which the borrower obtained a Direct Loan for which he or she is now seeking a loan discharge. One commenter suggested this concern could be ameliorated by amending the regulatory language in § 685.222(a)(5) to include acts and omissions that occur prior to enrollment (*e.g.,* marketing, recruitment) and after the borrower has left the school (*e.g.,* career placement).

Another commenter expressed concern that the limitation of scope would create of discrepancy between loan proceeds that were used to pay for tuition and loan proceeds used to pay for other elements of the institution's cost of attendance.

*Discussion:* The preamble to the NPRM explicitly acknowledged that the proposed standard described in § 685.206(c) and § 685.222(b), (c), and (d), would include periods of time prior to the borrower's enrollment, such as when the borrower was being recruited by the school, and periods of time after the borrower's enrollment, such as when the borrower was seeking career advising or placement services. 81 FR 39337.

The regulatory language in § 685.222(a)(5) refers to the making of a Direct Loan that was obtained in conjunction with enrollment at the school. This would include all eligible elements of the school's cost of attendance for which a Direct Loan can be obtained. The language in § 685.222 does not restrict potential borrower relief to the portion of a Direct Loan used to pay for tuition.

*Changes:* None.

*Comments:* None.

*Discussion:* In further reviewing proposed § 685.222(a)(6), the Department has determined that including an affirmative duty upon the Department to notify the borrower of the order in which his or her objections, if he or she asserts other objections in addition to borrower defense, to his or her loan will be determined is too burdensome because it would require the expenditure of administrative resources and time, even if not desired by the borrower. The borrower may contact the Department to find out the status of his or her objections, including borrower defense, if desired.

*Changes:* We have revised § 685.222(a)(6) to remove the requirement that the Department notify the borrower of the order in which his or her objections to a loan will be determined.

*Limitation Periods (Statute of Limitations)*

*Comments:* Several commenters requested that the Department allow

students to recoup loan funds already paid beyond the proposed six-year statute of limitations. These commenters argued that students often do not know that they are entitled to relief for many years. Some commenters stated that the beginning of the time limit would be difficult for borrowers to determine, since it could vary depending on the specifics of the alleged misconduct. Another commenter stated that some institutions have been defrauding borrowers for decades. One commenter stated that since there is no time limit for false certification discharges, there should not be a time limit for borrower defenses. A group of commenters argued that since there is no limit on the Department's ability to collect student debt, there should not be a limit on the ability of borrowers to recover. Other commenters pointed to the relatively smaller number of borrower applications, as opposed to numbers of borrower estimated to be eligible for relief, from Corinthian as evidence that many borrowers do not know they have claims.

*Discussion:* As noted in the NPRM, the six-year statute [29] of limitations is only applicable to students' claims for amounts already paid on student loans. A borrower may assert a defense to repayment at any time. This rule comports with the FTC Holder Rule [30] and general State law principles, as well as general principles relating to the defense of recoupment. *See, e.g., Bull* v. *United States,* 295 U.S. 247, 262 (1935) ("Recoupment is in the nature of a defense arising out of some feature of a transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely.") We understand that students may not always be in a position to bring borrower defense claims immediately, but believe the final regulations strike a balance between allowing borrowers sufficient time to bring their claims and ensuring that the claims are brought while there is still evidence available to assess the claims.

*Changes:* None.

General Process

*Comments:* Many commenters and groups of commenters expressed

concerns about potential due process issues with the process proposed in § 685.222(e) for individual borrowers to pursue borrower defense claims. These commenters asserted that the Department should allow institutions to actively participate in all aspects of the process, starting with a right to be notified of the claim and an opportunity to review the claimant's assertions and supporting documentation. These commenters further proposed that the Department's hearing official should advise the institution about the specific arguments and documents used in the fact-finding process. Some commenters offered proposed timeframes for each step in the review process, while emphasizing that most determinations should be made based solely on document review.

Some of these commenters acknowledged the value of not establishing a purely adversarial process, but emphasized the need to balance the interests of providing relief to students who were treated unfairly with the rights of schools to defend themselves, especially in light of the possible financial and legal exposure to institutions and potentially taxpayers.

Several commenters also contended that the exclusion of school participation in the individual process is especially problematic because of the fact-specific nature of such claims. These commenters expressed their belief that most individual cases cannot be thoroughly investigated without school input. Some commenters suggested that the proposed regulations flip the presumption of innocence that applies in many processes on its head and unfairly burdens institutions without an adequate process to vindicate their claims.

While many commenters emphasized that the proposed process tilts too favorably toward claimants, a few commenters asserted that it may not always fully protect the rights of adversely affected borrowers. Additionally, they noted that the Department's proposal removed not only the option of arbitration, but also the borrower's choice in the makeup of and the representation for the group. These commenters asserted that the rights of an individual claimant could be adversely affected because of some defect in a group claim that the Department interprets will cover the affected individual. They further stated that borrowers have no recourse to challenge the Department official's determination, who they allege will be acting under a set of obtuse and poorly defined rules, resulting in determinations benefitting borrowers

who were not wronged and possibly denying relief to deserving claimants.

*Discussion:* Schools will not be held liable for borrower defense claims until after an administrative proceeding that provides them due process. The Department already runs such proceedings in its Office of Hearings and Appeals on matters such as assessing a school's liability to the Department or limiting, suspending, or terminating a school's title IV participation.

We disagree that moving a claimant from the individual process into the group process negatively impacts the borrower. In fact, we believe the borrower may receive a faster decision using the group process. Additionally, the borrower maintains the ability to request reconsideration if there is new evidence that was not previously considered. Finally, the borrower retains the right to "opt-out" of the group process.

The Department will outline specific procedures, including other details requested by the commenters, in a separate procedural rule. We believe this is the most appropriate place for such detail.

*Changes:* None.

*Comments:* Many commenters expressed concerns relating to proposed § 685.222(e)(3), which provides for a Department official to administer the individual borrower process. Many of these commenters were concerned that these officials would have too much authority in deciding what evidence to review and use in decision making. Some of these commenters also argued that giving the Department's official the sole discretion over disposition of the claims actually denies borrowers certain rights.

Several commenters claimed that the Department official would be subject to political influence and not necessarily the unbiased, independent, and impartial party needed in this role.

*Discussion:* Department officials make independent decisions daily regarding the merit of objections to loan enforcement raised by borrowers who default on their loans, and borrower defense would be no different. Department officials also make decisions regarding institutional liabilities to the Department and enforcement actions against institutions. These officials do so in accordance with established standards in the APA for such decisions made by administrative agencies, such as ensuring that decision makers do not report to individuals responsible for managing or protecting the funds of an agency.

---

[29] In the NPRM, we explain our reasoning for establishing a six-year statute of limitations for the breach of contract and substantial misrepresentation standards under § 685.222(c) and (d). Further, we note that six-year period echoes the period applicable to non-tort claims against the United States under 28 U.S.C. 2401(a). *See also* 31 U.S.C. 3702.

[30] The FTC Holder Rule is explained in more detail elsewhere in the "State Standard" and "Expansion of Borrower Rights" sections.

**75960**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

As discussed during negotiated rulemaking, the Department also plans to outline more specific details about the process for schools and borrowers in forthcoming procedural rules.

*Changes:* None.

*Comments:* Commenters argued that the Department's proposed structure in § 685.222(e) places too much authority with the Department and its officials, creating a conflict of interest. These commenters had misgivings about designating an official who would have the ability to perform multiple functions, including adjudicating cases, creating groups from individual claims, as well as advocating on behalf of the group. Several commenters called for separation between the investigative and adjudicative functions.

Many of these commenters expressed concern that the entire process created conditions that would inevitably lead to unfair treatment of schools. This argument is based on the hypothesis that the inherent conflicts in the proposed investigative and adjudication processes will result in a high number of vindicated claims and the cost associated with high levels of loan forgiveness will force the Department to seek indemnification from schools regardless of the legitimacy of the claims.

Numerous commenters also expressed concerns that some of the Department officials hearing cases may not have the requisite experience to properly and dispassionately evaluate and decide these cases. Several commenters specifically offered alternatives to the Department's officials, including using independent hearing officials, administrative law judges, or a third party such as a member of the American Arbitration Association to decide cases. Some commenters specifically suggested this separation to ensure the decision maker would be more insolated form political pressures.

One commenter also noted that the proposed rule does not provide for review of determinations by the Secretary, which specifically limits the Secretary's authority.

*Discussion:* As we make clear elsewhere here, the Department will undertake any action to recover against a school under specific procedures that are being developed and will ensure an opportunity for the school to present its defenses and be heard. The process will be comparable to that provided under part 668, subpart G for actions to fine, or to limit, suspend or terminate participation of, a school, and under part 668, subpart H for audit and program review appeals. The hearing will be conducted by a Department

official who is independent of the component of the Department bringing the action. This is currently done for appeals under subparts G and H, and like those procedures, the new procedures would include an opportunity for an appeal to the Secretary. Any final decision reached in these proceedings would be reviewable under section 706 of the APA, 5 U.S.C. 706, as are final decisions under subparts G and H. The separation of functions under those subparts fully complies with the requirements that would apply under the APA, to which some commenters have alluded, and would be mirrored in the procedure used for recoveries against schools. However, neither the APA nor other applicable law requires the Department to provide an appeal from an administrative decision maker to the Secretary or other senior authority, and the decision of the official designated the authority to adjudicate individual claims is final agency action, similarly reviewable in an action brought under section 706 of the APA. The Department has conducted a great number of such individual adjudications of borrower objections to Federal payment offset and wage garnishment over the past decades, and neither those procedures, nor those used for Federal salary offset, include any provision for an appeal from the decision of the designated official to the Secretary. 34 CFR 30.33, 34 CFR part 31, 34 CFR part 34.

*Changes:* None.

*Comments:* One commenter expressed support for restricting borrowers from receiving relief where relief was already granted for the same complaint through a separate source. Conversely, another commenter requested additional legal recourse to collect damages beyond the borrower defense to repayment process.

*Discussion:* The individual application process in § 685.222(e)(1)(i)(C) requires the borrower to inform the Department of any other claim based on the same information and any payments or credits received resulting from such a claim. The NPRM included performance bond holders and tuition recovery programs as examples of sources of these payments or credits. The statutory authority in section 455(h) of the HEA provides for defense to repayment of a Direct Loan. The Department's ability to provide relief for borrowers is predicated upon the existence of the borrower's Direct Loan, and that relief is limited to the extent of the Department's authority to take action on such a loan. By providing relief appropriate to the borrower's loss, and based on the amount borrowed, the Department

would provide relief under the relevant statutory authority. A borrower may pursue the payment of other damages for costs not covered by the Direct Loan in court or via other available avenues without restriction.

*Changes:* None.

*Comments:* Several commenters expressed concern for frivolous, false, exaggerated, or politically driven claims and the accompanying administrative burden and cost this process will place on institutions and the Department. Commenters suggested a firm statute of limitations for filing claims, increasing the burden of proof for the student, limiting opportunities to reopen cases, and a prominently stated penalty for filing false claims on the application form to prevent false or exaggerated claims.

*Discussion:* We believe the commenters' suggestions, though well intentioned, would do little to reduce any potential frivolous claims. As outlined earlier, we believe we have established a strong position for the limitations periods and the burden of proof in these regulations.

Additionally, an individual borrower may only request reconsideration of an application when he or she introduces new information not previously considered. The borrower defense application form includes a certification statement that the borrower must sign indicating that the information contained on the application is true and that making false or misleading statements subjects the borrower to penalties of perjury. We believe these protections against false or frivolous claims are sufficient.

*Changes:* None.

*Comments:* Several commenters and groups of commenters contended that the Department should provide equal relief to Direct Loan and FFEL borrowers. These commenters objected to the Department's proposed process in § 685.206, which would require FFEL borrowers who want to apply for a borrower defense to consolidate their FFEL Loans into the Direct Consolidation Loans. These commenters noted that over 40 percent of borrowers with outstanding Federal loans have FFEL Loans and conveyed that borrowers were typically not able to choose among Federal loan programs. One commenter noted the inequities pertain not only to borrowers, but also to schools. Institutions with significant FFEL volume face reduced risk of Department efforts to recover funds. One commenter specifically indicated that requiring FFEL borrowers to consolidate obliterates the use of the group process because FFEL borrowers

cannot be automatically included in the group without further action on their part.

These commenters also noted inequities in relief for FFEL borrowers, which includes no mechanism to seek refund of amounts already paid by the borrower. Thus, the commenters asked the Department to stop all collection activities upon receipt of a FFEL borrower's application to at least reduce the amount the borrower pays on the loan. Additionally, these commenters requested that the Department apply forbearance to FFEL borrowers in the same manner as with Direct Loan borrowers.

While expressing a strong preference for identical treatment of Direct Loan and FFEL borrowers, one commenter also recognized that this might not be possible, and suggested that the Department could lessen the imbalance by specifying that a referral relationship existed between lenders and institutions when a large number of borrowers at a school had the same lender. Another commenter suggested that the Department make findings of groups of borrowers entitled to discharge of their loans and require FFEL lenders to comply with them.

One commenter articulated that the Department could take additional steps to assist FFEL borrowers in multiple ways. First, the commenter suggested that the Department could compel a lender or guaranty agency to discharge a loan. This commenter further suggested that borrowers who dispute a FFEL Loan who are denied can appeal a lender or guaranty agency's decision to the Secretary, giving the Department final authority in each case. Finally, the commenter indicated that the Department could move groups of loans under the Department's responsibility as it would in cases where a guaranty agency closes. The commenter claimed that the Department previously took such action for false certification and closed school discharges.

*Discussion:* We seek to provide an effective process for all borrowers within the Department's ability under applicable laws and regulations.

Current regulations do not require a FFEL lender to grant forbearance under these circumstances except with regard to a FFEL borrower who seeks to pay off that FFEL Loan with a Consolidation Loan, and that requirement provides a time-limited option. 34 CFR 682.211(f)(11). Because the Secretary has designated that section of the final regulations for early implementation, lenders may implement this provision before it becomes a requirement on July 1, 2017. Thus, when these borrower

defense regulations take effect on July 1, 2017, FFEL Program lenders must grant administrative forbearance when the Department makes a request on behalf of a borrower defense claimant, pursuant to § 682.211(i)(7).

We also do not believe we have adequate data to identify those lenders and schools that established a referral relationship.

We believe we have outlined the best possible path to relief for the remaining FFEL borrowers within our legal abilities. We appreciate the commenters' suggestions for other ways to assist FFEL borrowers in pursuing borrower defenses, but do not believe those suggestions are practicable. We recognize that this process requires additional steps for FFEL borrowers. To mitigate this, as described in the preamble to the NPRM, we will provide FFEL borrowers with a preliminary determination as to whether they would be eligible for relief on their borrower defense claims under the Direct Loan regulations, were they to consolidate their FFEL Loans into a Direct Consolidation Loan. FFEL borrowers may receive such a determination without having to establish a referral relationship between the lender of the underlying FFEL Program Loan and the school. The notice of preliminary determination will provide information on the Loan Consolidation process and instructions on how to begin the process. As described in § 685.212(k), after the borrower consolidates into the Direct Loan program, he or she may receive an appropriate amount of relief on the principal balance.

*Changes:* None.

**Process for Individual Borrowers (§ 685.222(e))**

*Comments:* Multiple commenters and groups of commenters suggested that the Department unfairly limited the rights of institutions and exceeded its authority to recoup funds resulting from borrower defense claims. They noted that they believe that the HEA grants no such authority. Moreover, these commenters pointed out the difference between such silence and the specific authority in the HEA regarding closed school discharges, false certification discharges, and regarding Perkins Loans.

The same commenters who asserted that the Department exceeded its authority with recoupment of successful borrower defense claims stated that the Department should outline the details of its process if it proves it has such authority. Several commenters requested more information about the recovery process from schools, focusing

on the institution's involvement in the process. Furthermore, some commenters requested a specific appeal process for attempts to recover funds from schools.

*Discussion:* As discussed more fully elsewhere in this preamble, the Department has ample legal authority to recover losses on borrower defenses from schools, and the absence of an explicit statutory provision authorizing such recovery does not affect its authority. We are developing specific procedures for conducting such recovery actions that will reflect current regulations for appeals of audit and program review claims and actions to fine the school, or to limit, suspend, or terminate its participation.

*Changes:* None.

*Comments:* Multiple groups of commenters supported the preponderance of evidence standard in the Department's individual process proposed in § 685.222(e) and appreciated that borrowers would not need legal counsel to pursue a borrower defense. Multiple commenters also commented on the desire that the process not penalize borrowers for the absence of written documentation. They noted that many borrowers may not have items such as enrollment agreements or other items that might assist the Department in reviewing their claims. The commenters added that this should not be held against the borrowers, as schools frequently do not provide borrowers with copies of such documents, and borrowers may encounter difficulties in obtaining them.

One commenter suggested that, when documents are not available because of the school's failure to provide the borrower with proper documentation, the burden should shift to the school to disprove the claims from the borrower's attestation.

Another commenter suggested that the Department specify that it will accept a student's sworn testimony, absent independent corroborating evidence contradicting it, as fulfilling the preponderance of the evidence standard (which requires the borrower to persuade the decision maker that it is more likely than not that events happened or did not happen as claimed). In other words, the commenter suggested that, when a borrower submits sworn testimony but does not submit corroborating evidence, the Department should not take this to mean that there was no substantial misrepresentation or breach of contract. Another group of commenters suggested that the Department track similar claims and consider those claims as evidence when reviewing applications.

Another group of commenters recommended that the Department accept information on the application form as sufficient for the claim, requesting additional information only when necessary. This group of commenters pointed out that misrepresentations were often from oral statements made to the borrower that did not include any written evidence. Furthermore, this group of commenters requested that the Department fully use all available information it and other Federal agencies possess, rather than requesting it from borrowers.

*Discussion:* We disagree that the final regulations should specify what weight might be given to different types of evidence, such as borrower testimony or statements, under the preponderance of the evidence standard specified in § 685.222(a)(2) for borrower defenses under the Federal standard for loans first disbursed after July 1, 2017. Under § 685.222(a)(2), the borrower has the burden of demonstrating, by a preponderance of the evidence, that it is more likely than not that the facts on which his or her borrower defense claim rests have been met. However, § 685.222(e)(3) provides that for individually filed borrower defense applications, the designated Department official will also consider other information as part of his or her review of the borrower's claim. As noted in the NPRM, 81 FR 39337, in practice, the decision maker in a borrower defense proceeding would assess the value, or weight, of all of the evidence relating to the borrower's claim that has been produced to prove that the borrower defense claim as alleged is true. The kind of evidence that may satisfy this burden will necessarily depend on the facts and circumstances of each case, including factors such as whether the claimant's assertions are corroborated by other evidence. Accordingly, we decline to elaborate further on what specific types of evidence may or may not be viewed as satisfying the preponderance of evidence standard.

*Changes:* None.

*Comments:* Several groups of commenters encouraged the Department to adopt a simple, accessible, and transparent process for borrowers. These commenters indicated support for a process that reduces inequities in resources so that borrowers interact only with the Department, even when additional information is needed from the school. In particular, numerous commenters expressed appreciation that, under the proposed regulations, borrowers would not be pitted against institutions, which generally possess significantly more resources.

While generally supportive of the Department's process, another group of commenters expressed concern for the potentially overwhelming number of applications that would be filed in connection with potential borrower defense claims and questioned the Department's capacity to employ enough capable staff to handle the large workload. The same group noted the benefits of specifying timeframes for actions within the process, despite recognizing the difficulty in doing so.

*Discussion:* With these regulations, the Department works toward evening the playing field for students. Individual claims will be decided in a non-adversarial process managed by a Department official, and group claims would be brought by the Department against the school, not by students. Thus, the process does not require students to directly oppose schools. We appreciate the support that some commenters expressed for these processes.

As we discussed in the NPRM, the Department may incur administrative costs and may need to reallocate resources depending on the volume of applications and whether a hearing is required.

After having received only a few borrower defense claims in over 20 years, the Department has now received more than 80,000 claims in just over two years. We responded by building an entirely new process and hiring a new team to resolve these claims. Our ability to resolve claims quickly and efficiently has grown and will continue to grow. Particularly because we are still growing our capacity, we are unable to establish specific timeframes at this point for processing claims. Additionally, processing time is considerably affected by the varied types and complexities of claims.

*Changes:* None.

*Comments:* One group of commenters strongly supported the Department's pledge to provide written determinations to borrowers who submit borrower defense claims.

*Discussion:* We appreciate the support of these commenters.

*Changes:* None.

*Comments:* Another group of commenters noted the difficulty that many borrowers face in completing even seemingly simple forms and in explaining wrongdoing in a way that clearly makes a complex legal argument.

*Discussion:* We appreciate the commenters' concern and do not expect borrowers to submit a complicated, lengthy narrative requiring any legal analysis by the borrower to apply for relief. We specifically set out to design

a process that would not be onerous for borrowers and that would not require third-party assistance, such as but not limited to an attorney.

*Changes:* None.

*Comments:* Two commenters suggested using existing school complaint processes to resolve borrower defense claims prior to a Department review to reduce administrative burden on the Department and on institutions.

*Discussion:* Nothing in these regulations prohibits a borrower from directly contacting an institution to resolve a complaint. Additionally, a borrower may pursue other paths to relief, such as filing a claim with a State consumer bureau or filing a lawsuit. However, at the point where a borrower approaches the Department for assistance, we take seriously the obligation to review the claim and to respond to the borrower. We believe this process provides the best avenue for relief when a borrower applies for a borrower defense claim. In addition to using data collected from the Department's "FSA Feedback System," the Department will also continue to partner with other Federal agencies that are engaged in the important work aimed at protecting the rights of students. Depending on the specifics of the case, these agencies may include the CFPB, DOJ, FTC, the SEC, and the Department of Defense among others. The Department will also look to State officials and agencies responsible for education quality, student financial assistance, law enforcement, civil rights, and consumer protection.

*Changes:* None.

*Comments:* Multiple commenters expressed support for the proposed prohibition on capitalization of interest when the Department suspends collection activity following receipt of a borrower defense application. However, one of these commenters objected to the Department prohibiting interest capitalization when collection resumes as a result of the borrower's failure to submit appropriate documentation. The commenter believed this could lead to false claims by borrowers seeking to avoid repayment.

*Discussion:* We appreciate the commenters' support for the prohibition of interest capitalization and believe it is in line with our concept of the appropriate use of capitalization, as the borrower is not newly entering repayment. Accordingly, we disagree with the commenter who objected to prohibiting capitalization upon resumption of collection activity where a borrower did not submit appropriate documentation. We believe more legitimate avenues exist for struggling

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations **75963**

borrowers to postpone or reduce payment rather than filing false borrower defense claims, and do not believe that the prohibition of interest capitalization in this narrow circumstance provides significant incentive for borrowers to incur the significant risks associated with filing false claims.

*Changes:* None.

*Comments:* One group of commenters noted the importance of reconsideration of borrower defense claims, especially for borrowers completing applications without assistance. This group, however, encouraged the Department to clearly explain the borrower's right to reconsideration, rather than merely allowing borrowers to request reconsideration with the Department having discretion on whether to consider the application.

Multiple commenters and groups of commenters expressed concern with the borrower's ability to introduce new evidence for reconsideration in proposed § 685.222(e)(5). Specifically, these commenters noted concerns that individual claims could continue indefinitely. These commenters indicated that the Department should include reasonable time limitations for reconsideration of claims.

Another commenter suggested that the Department official who made the determination of the original claim should not be permitted to review a request for reconsideration and suggested using a panel or board for such claims.

*Discussion:* We highlight the distinction between reconsideration of an application and an appeal process. A borrower must submit new evidence in order for the Department to reconsider an application, and there is no appeal process. We believe it is important to allow a borrower to submit new evidence, which he or she may have only recently acquired. We do not intend to limit borrowers' rights. However, there needs to be finality in the borrower defense process as well, and we do not believe it is appropriate to consider applications regarding claims that have already been decided unless there is clear demonstration that new evidence warrants that reconsideration. We will consider the commenters' suggestions regarding the explanation of the reconsideration process in our communications with borrowers.

We believe the limitations periods for borrower defense claims adequately address the concern about time limits and do not agree with imposing an artificial limitation on borrower applications for reconsideration for new evidence based on a specific number or time period.

We see no basis for requiring this evaluation of new evidence to be made by an individual other than the original decision maker. This is a reconsideration, not an appeal, and the original decision maker is in a position to efficiently make that decision.[31] Therefore, we do not prohibit the same official from hearing the reconsideration claim.

*Changes:* None.

*Comments:* One commenter asked that we restrict a borrower's ability to present new evidence in support of a claim already rejected. The commenter said that borrowers should be required to show good cause for why the evidence was not previously available.

*Discussion:* We disagree that borrowers should be required to show good cause for why evidence was not previously available. We recognize that borrowers may not have the same access to information that the Department or the school may have. Furthermore, we believe that the requirements for "new evidence" provide clear guidelines for what is required. Section 685.222(e)(5)(i) specifies that "new evidence" must be evidence that the borrower did not previously provide, but also must be relevant to the borrower's claim, and was not identified by the decision-maker as being relied upon for the final decision. For "new evidence" to meet this standard, the evidence cannot just be cumulative of other evidence in the record at the time, but must also be relevant and probative evidence that might change the outcome of the decision being reconsidered.

*Changes:* None.

*Comments:* Multiple commenters suggested that the Department specifically permit schools to appeal decisions on any individual claim. One commenter added that schools would not file frivolous appeals, as the resulting workload is too time-consuming. The commenter further suggested that if schools are not provided with an appeal process, that the Department should provide schools with an opportunity to challenge the Department official's decision during any related recoupment action.

*Discussion:* We do not include an appeals procedure in the individual borrower claim process. We believe the reconsideration process adequately allows borrowers to submit new evidence. However, as one commenter requested, the regulations do afford an opportunity to present a defense when the Department seeks to hold a school liable and recover funds in both the individual and group claim processes.

*Changes:* None.

*Comments:* Although the Department outlined a separate process to recover funds from an institution, a group of commenters stated that the Department needed to include the borrower to ensure a fair process for the institution.

*Discussion:* We believe that using a separate proceeding to determine whether a group of borrowers have meritorious claims, and if so, to recover from the school for losses on those claims, is an appropriate method to achieve a fair result. The procedure will accord the institution the right to confront witnesses on whom the Department would rely, and to call witnesses on its own, as it currently has under procedures under subpart G of part 668. We also note that under § 685.222(j), borrowers are required to reasonably cooperate with the Secretary in any such separate proceeding.

*Changes:* None.

*Comments:* One commenter suggested that borrowers should not be permitted to bring individual claims when the facts and circumstances have already been considered by hearing official in a group claim. The commenter expressed concern that proposed § 685.222(h) would allow for this to happen, effectively providing borrowers a second bite at the apple and violating the legal principle of res judicata.

*Discussion:* We discuss the treatment of individual claims from a student who opted out of a group proceeding, or who disputes the outcome of the group proceeding decision as it pertains to his or her claim, in our discussion of the group process.

*Changes:* None.

*Comments:* A group of commenters suggested that the Department modify language in proposed § 685.222(e)(1)(i)(A) so that references to the school more clearly emphasize that we mean the school named on the borrower defense to repayment application.

*Discussion:* We agree that the commenter's suggested change clarifies the intent of the regulation.

*Changes:* We revised § 685.222(e)(1)(i)(A) to reference "the" named school.

*Comments:* One commenter suggested that the Department make available on an annual basis a list of all borrower

---

[31] This is hardly unusual: Under Social Security regulations, the hearing officer who conducts the disability hearing ordinarily conducts the reconsideration determination. 20 CFR 404.917(a). In addition, requests for relief from judgments—a somewhat comparable plea to the request for reconsideration at issue here are routinely considered by the judge that issued the original decision. Fed. R. Civ. P. 60.

defense applications submitted (minus any personally identifiable information) along with outcome of the request. The goal of this list would be to provide transparent information to borrowers.

*Discussion:* We support transparency in this process and will consider this suggestion as we move forward with implementation of the individual and group processes.

*Changes:* None.

*Comments:* One commenter suggested that the Department proactively conduct a review of all federally guaranteed loans back to 1995 (when the commenter considers the regulations to have been last considered) to determine potentially eligible loans for a defense to repayment. The commenter recommended that the Department identify loans for which there is a high likelihood of granting a discharge stemming from lawsuits, investigations, etc.

*Discussion:* We do not believe that the Department possesses adequate information to accurately identify potentially eligible loans on such a large scale. As borrowers have had the ability to bring borrower defense claims under the current regulations for some time, we do not believe a review of data over more than 20 years is warranted. Additionally, the Department cannot determine through such a review whether specific students were subjected to misrepresentation, for example, whether they relied on such misrepresentations, and how they were affected if they did so. The Department must determine if relief is warranted, and merely obtaining a loan to attend an institution is not adequate to suggest relief is due.

*Changes:* None.

*Comments:* None.

*Discussion:* In further reviewing proposed § 685.222(e)(3)(ii), we have determined that including an affirmative duty upon the Department to identify to the borrower records that may be relevant to the borrower's borrower defense claim is too burdensome because it would require the expenditure of administrative resources and time, even if not desired by the borrower. As a result, we have revised the § 685.222(e)(3)(ii) to provide that the Department will identify records upon the borrower's request.

We note that we expect that consideration of individual borrower defense claims will lead to information gathering as part of enforcement investigations. When such an investigation is ongoing, we may defer release of records obtained in that investigation to individual claimants to protect the integrity of the investigation.

If requested, records will be made available to individual claimants after the investigation is complete and prior to the borrower defense decision. We may defer consideration of individual claims where we determine that releasing potentially relevant records prior to the completion of the investigation would be undesirable.

We have also determined that the parallel identification of records to schools, which under the proposed regulations was permissive, would also cause unnecessary administrative delay, given that the fact-finding process described in § 685.222(e) will not decide any amounts schools must pay the Secretary for losses due to the borrower defense at issue. The school will have the right and opportunity to obtain such evidence, and present evidence and arguments, in the separate proceeding initiated by the Secretary under § 685.222(e)(7) to collect the amount of relief resulting from the individually filed borrower defense claim.

*Changes:* We have revised § 685.222(e)(3)(ii) to provide that the designated Department official will identify to the borrower the records the Department official considers relevant to the borrower defense upon request. We have also revised § 685.222(e)(3)(ii) to remove the identification of records to schools.

*Comments:* One commenter expressed support for the Department's proposal to allow claims made by individuals as well as groups. However, the commenter suggested that a right of appeal for both institutions and borrowers be provided in the individual claims process as to open schools.

*Discussion:* During the negotiated rulemaking sessions, the Department heard from negotiators as to the importance of a timely and streamlined process for borrower defense claims. In consideration of such concerns, the Department believes that it is appropriate that decisions made by the designated Department official presiding over the fact-finding process for individually filed applications be final agency decisions to avoid delays that may be caused by an appeals process. Borrowers are able to seek judicial review of final agency decisions in Federal court if desired. *See* 5 U.S.C. 702 & 704. Additionally, the borrower will also be able to request that the Secretary reconsider his or her claim upon the identification of new evidence under § 685.222(e)(5).

Although the fact-finding process described in § 685.222(e) provides schools with an opportunity to submit information and a response, as discussed in the NPRM, 81 FR 39347,

the fact-finding process for individually filed applications do not determine the merits of any resulting claim by the Department for recovery from the school. Rather, § 685.222(e)(7) provides that the Secretary may bring a separate proceeding for recovery, in which the school will be afforded due process similar to what schools receive in the Department's other administrative adjudications for schools. Given that the institution's potential liability for the Department's recovery is to be adjudicated in this separate process, the Department does not believe that an appeal right for schools should be included in the § 685.222(e) fact-finding process. As discussed earlier in this section, the Department is developing rules of agency practice and procedure for borrower defenses that will be informed by the Department's rules and protections for its other administrative adjudications.

*Changes:* None.

*Comments:* None.

*Discussion:* In further reviewing proposed § 685.222(e)(5), the Department has determined that if a borrower defense application is under review because a request for reconsideration by the Secretary has been granted under § 685.222(e)(5)(i) or because a borrower defense application has been reopened by the Secretary under § 685.222(e)(5)(ii), the borrower should be granted forbearance or, if the borrower is in default on the loan at issue, then the procedure for a defaulted loan should be followed, as when the borrower filed an initial borrower defense to repayment application.

*Changes:* We have revised § 685.222(e)(5) to provide that the forbearance and defaulted loan procedures will be followed when the Secretary has granted a request for reconsideration or has reopened a borrower defense application.

**Group Process for Borrower Defenses**

*Statutory Authority*

*Comments:* Some commenters argued that the Department's proposed group borrower defense process would violate the HEA. These commenters stated that section 455(h) of the HEA specifically limits the Department's authority to specifying acts or omissions that an individual borrower, as opposed to a group, may assert as a defense to repayment. These commenters argued that the creation of a process that would award relief to a borrower who has not asserted a defense to repayment exceeds the Department's statutory authority. A few commenters also stated that the HEA does not authorize the Department

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations **75965**

to act as a class action attorney, and stated that such authority requires specific statutory authorization. One commenter suggested that any provision providing that the Secretary may identify borrowers who have not filed a borrower defense application as part of a group process for borrower defense should be removed.

One commenter stated a recent recommendation from the Administrative Conference of the United States found that, while the APA does not specifically provide for aggregate adjudication, it does not foreclose the possibility of such procedures. The recommendation also stated that agencies generally have broad discretion in formal and informal adjudications to aggregate claims.

*Discussion:* We disagree with commenters' assertion that the proposed group process is in violation of the HEA. The Department's statutory authority to enact borrower defense regulations is derived from section 455(h) of the HEA, 20 U.S.C. 1087e(h), which states that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan. . . ." While the language of the statute refers to a borrower in the singular, it is common default rule of statutory interpretation that a term includes both the singular and the plural, absent a contrary indication in the statute. *See* 1 U.S.C. 1. We believe that, in giving the Secretary the discretion to "specify which acts or omissions" may be asserted as a defense to repayment of loan, Congress also gave the Department the authority to determine such subordinate questions of procedure, such as the scope of what acts or omissions alleged by borrowers meet the Department's requirements, how such claims by borrowers should be determined, and whether such claims should be heard contemporaneously as a group or successively, as well as other procedural issues. *See FCC* v. *Pottsville Broad. Co.,* 309 U.S. 134, 138 (1940).

We believe that this discretion afforded the Secretary under the statute not only allows it to determine borrower defense claims on a group basis and to establish such processes and procedures, but also authorizes the Department to proactively identify and contact borrowers who may qualify for relief under the borrower defense regulations based upon information in its possession. As described in § 685.222(f), the Department would notify such borrowers of the opportunity to participate in the group process, and inform such borrowers that by opting out, the borrower may choose

to not assert a borrower defense. By such notice and opt-out, borrowers who had not previously filed an application for borrower relief may assert a borrower defense for resolution in the group borrower defense process.

In response to comments that the Department is not authorized to act as a class action attorney, we note that, in bringing cases before a hearing official in the processes described in § 685.222(f), (g), and (h), the Department would not be bringing claims as the representative of the borrowers. Although the Department would be presenting borrower defense claims for borrowers, with their consent as described above, the Department official would be bringing claims on its own behalf as the administrator of the Direct Loan Program, or alternatively as a beneficiary of the fiduciary relationship between the school and the Department as explained earlier in "Borrower Defenses—General." *See also Chauffeur's Training School* v. *Spellings,* 478 F.3d 117 (2d Cir. 2007). We believe that the group process we adopt here will facilitate the efficient and timely adjudication of not only borrower defense claims for large numbers of borrowers with common facts and claims, but will also conserve the Department's administrative resources by also adjudicating any contingent claim the Department may have for recovery from an institution.

*Changes:* None.

### Independence of Hearing Officials

*Comments:* Many commenters expressed concerns that the group borrower defense process would present conflict of interest or separation of powers issues and would be unfair, given that the proposed process involves a Department-designated employee presenting evidence to a hearing official who also has been appointed by the Secretary, with appeals to be decided by the Secretary. Several commenters stated that this issue was of particular concern, given the limited or unclear role afforded to institutions to participate in the borrower defense process and to appeal decisions proposed by the Department. One commenter acknowledged that while other Federal agencies, such as the FTC, allow agencies to act as both prosecutor and judge, such proceedings are governed by the APA, 5 U.S.C. 554. The commenter stated that the APA provides statutory safeguards that ensure fair proceedings, such as prohibitions on ex parte communications and prosecutorial supervision of the employee presiding over the proceeding. This commenter

suggested that group borrower defense claims be presided over by the Department's Office of Hearings and Appeals.

One commenter stated that determinations in the group process should be made by a representative who is not affiliated with the Department. Another commenter stated that the office responsible for presenting the claim on behalf of a group in a group borrower defense proceeding should not be the same office that decides the group claim. Several commenters suggested specifically that determinations be made by administrative law judges or their equivalent, who have a level of expertise and independence from the Department. One commenter stated that the regulations should provide for determinations in group borrower defense processes to be made by an administrative judge.

One commenter stated that the Department should seek and use independent hearing officials with experience in handling complex disputes, given the large numbers of students that may be impacted by such proceedings.

One commenter stated that the Department's proposed group borrower defense process violates both the separation of powers doctrine in Article III and the jury trial requirement of the Seventh Amendment of the Constitution, by vesting in the Department exclusive judicial power to determine private causes of action without a jury.

*Discussion:* The Department understands the concerns raised by commenters regarding the objectivity and independence of the hearing official in group borrower defense cases. However, administrative agencies commonly combine both investigatory and adjudicative functions, *see Winthrow* v. *Larkin,* 421 U.S. 35 (1975), and due process does not require a strict adherence to the separation of those functions, *see Hortonville Joint School District No. 1* v. *Hortonville Educ. Ass'n.,* 426 U.S. 482, 493 (1976). The Department is no different and performs both investigative and adjudicative functions in other contexts, including

**75966**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

those that involve borrower debts [32] and institutional liabilities.[33]

We disagree that the regulations should specify that the hearing official presiding over the fact-finding processes in § 685.222(f) to (h) must be an administrative law judge or an administrative judge. As explained in the NPRM, 81 FR 39340, the Department uses the term "hearing official" in its other regulations, such as those at 34 CFR part 668, subparts G and H. In those contexts, hearing officials make decisions and determinations independent of the Department employees initiating and presenting evidence and arguments in such proceedings. Similarly, the Department would structure the group borrower defense fact-finding processes so that they are presided over by hearing officials that are independent of the employees performing investigative and prosecutorial functions for the Department.

As stated in the NPRM, 81 FR 39349, the group borrower defense process involving an open school [34] under § 685.222(h) would be structured to provide the substantive and procedural due process protections both borrowers and the school are entitled to under applicable law, including any required under the APA, 5 U.S.C. 554. The Department is developing rules of agency procedure and practice governing the fact-finding processes described in § 685.222(e) and § 685.222(f) to (h), which will be informed by the procedures and protections established by the Department in its other administrative proceedings, such as 34 CFR part 668, subparts G and H.

As explained under "General," we also disagree that the proposed regulations violate Article III and the Seventh Amendment of the Constitution. The rights at issue in the

[32] For example, the Department provides both schools and borrowers the opportunity to request and obtain an oral evidentiary hearing in both offset and garnishment actions against a borrower and in an offset action against a school. *See* 34 CFR 30.25 (administrative offset generally); 34 CFR 30.33 (federal payment offset); 34 CFR 34.9 (administrative wage garnishment).

[33] *See* 34 CFR part 668, subparts G and H (proceedings for limitation, suspension, termination and fines, and appeal procedures for audit determinations and program review determinations).

[34] As described in § 668.222(g), the "closed school" group borrower defense process would apply only when the school in question has both closed and provided no financial protection available to the Secretary from which to recover losses arising from borrower defenses, and for which there is no entity from which the Secretary may recover such losses. Or, in other words, when there is no entity from whom the Department may obtain a recovery.

proposed borrower defense proceedings have the character of public rights, which may be consigned by Congress to the Department for adjudication.

*Changes:* None.

*Single Fact-Finding Process*

*Comments:* One commenter stated that the Department's proposed single fact-finding process for group claims described in § 685.222(f) to (h), where a hearing official makes determinations as to both institutional liability and relief for borrower defense claims, is not justified. This commenter stated that the Department had not presented a factual basis for the change from the approach in § 685.206(c), which states that the Department may initiate a proceeding to require the school to pay the amount of the loan to which a successful borrower defense lies.

A group of commenters stated that the Department should not engage in a single fact-finding process for group claims. These commenters suggested that the Department should gather and consider evidence regarding borrower defenses, render a decision on borrower relief, and then initiate a separate proceeding for recovery from schools. The commenters stated that this approach would be similar to the Department's proceedings for group borrower defense claims against closed schools and for individually filed applications, as well as the Department's proposed processes for closed school and false certification discharges.

*Discussion:* We disagree with commenters that relief for borrower defense claims should be determined in a separate proceeding from the Department's right to recovery from schools for the open school group borrower defense process described in § 685.222(h). For borrower defenses asserted as to an open school, the Department is not only responsible for making determinations on relief for claims, but may also be entitled to recover against the school. This right to recover, which will also turn on the facts of the borrower defense claim, must be decided in a proceeding where the school is afforded procedural and substantive due process protections. Particularly in situations where the Department has determined that there are multiple claims against a school with common facts and claims, we believe that a single fact-finding proceeding to determine both borrowers' rights to relief, the amount of relief to be provided, and the Department's contingent right of recovery against an institution will better serve the interests of adjudicative

efficiency and of conserving agency resources than individual borrower defense determinations followed by separate proceedings against the school.

*Changes:* None.

*Group Process: Bifurcation*

*Comments:* One commenter suggested that the Department use a bifurcated process so that the group process is used to resolve common questions of fact and law, and then require borrowers in the putative group to file individual claims to determine the appropriate amount of relief. Such bifurcated proceedings, argued the commenter, would avoid windfalls to borrowers who would not have otherwise sought out relief and provide exact damages to students seeking relief.

*Discussion:* Section 685.222(f)(1) provides the Department with the discretion to form groups that may be composed only of borrowers who have filed applications through the process in § 685.222(e) or who the Department has identified from other sources, as well as groups that may include borrowers with common facts and claims who have not filed applications. In situations when groups may be composed only of borrower defense applicants, or if the hearing official determines that relief for a group with non-applicants can be ascertained without more individualized evidence, bifurcated proceedings may not be necessary or suitable. However, we believe that the regulations do not prevent a hearing official from using his or her discretion to structure a fact-finding process under § 685.222(g) or (h) as necessary based upon the circumstances of each group case, and including ordering a bifurcated process if appropriate.

*Changes:* None.

*Meet and Confer Prior to Initiation of Group Process*

*Comments:* Several commenters suggested that the Department require or allow borrowers to confer with institutions to allow schools to remedy claims, prior to a borrower's participation in the Department's borrower defense process.

*Discussion:* We acknowledge that borrowers and schools may communicate and confer outside of the formal processes established for borrower defense. However, we do not believe it is necessary that the regulations include a specific requirement for schools and borrowers to meet and confer prior to a borrower's participation in a group borrower defense process under § 685.222(f) to (h).

*Changes:* None.

**75967**

## Initiation of Group Process: Secretarial Discretion

*Comments:* Many commenters supported the inclusion of a group borrower defense process. However, these commenters objected to the Department's proposal in § 685.222(f) that the initiation of a group borrower defense process be at the discretion of the Secretary. Some commenters argued that the discretion to initiate a group borrower defense process should not be given to the Secretary, whose decision may be influenced by policy or political considerations. These commenters also objected to the Department's proposal that the decision to initiate a group process would consider fiscal impact as a possible factor for consideration, stating that the decision to grant relief to large numbers of students should not be based upon cost.

Other commenters stated that the Department should provide clear guidelines, triggers, or conditions for requiring the initiation of a group process, particularly for groups of borrowers who have not filed applications with the Department (also referred to as automatic group discharges). A group of commenters suggested that such conditions should include petitions presenting plausible prima facie cases, evidence found by the Department that might present plausible *prima facie* cases, or some threshold number of cases. One commenter suggested that the regulation include provisions whereby multiple individual claims would be grouped together if the borrowers had attended the same school or trigger an investigation by the Department as the claims and the feasibility of initiating a group process. Another commenter suggested that the regulation include a non-exhaustive list of situations that would require the initiation of a group process, absent a written explanation from the Department as to why such a group process is not appropriate, or why borrowers who had not filed an application were not included if a group process was initiated.

One commenter stated that borrowers should be allowed to initiate group borrower defense claims, either for themselves or through representation by consumer advocates, legal aid organizations, or other entities, in addition to the Secretary. This commenter stated that possible concerns that allowing independent representation would give rise to an industry seeking to take advantage of borrowers, do not apply if claims are submitted by entities such as legal aid organizations, consumer advocates, and law enforcement agencies.

A few commenters stated that borrowers should be allowed to access borrower defense discharges as a group on the bases of actions by local, State, and Federal entities.

One commenter stated that to protect taxpayers, group claims should be initiated only in extreme cases, and should only come after a final, non-appealable decision has been made by a Federal or State agency or court in a contested proceeding.

*Discussion:* We disagree with commenters that factors or conditions mandating the initiation of a group process should be included in the regulation. As explained in the NPRM, 81 FR 39348, we believe that the Department is best positioned to make a determination as to whether the circumstances at hand would warrant the initiation of a group process. We also believe that it is also appropriate for the Department to consider the factors listed in § 685.222(f), such as the existence of common facts and claims among a putative group of borrowers, fiscal impact, and the promotion of compliance. As explained earlier in this section and elsewhere in this preamble, the group process will not only determine relief for borrower defenses for the group, but will also serve as the method by which the Department will receive an adjudication as to its right of recovery against a school on the basis of its losses from any relief awarded to borrowers in the group. We believe that it is important that the Department retain the discretion to decide if the circumstances warrant the initiation of a group process to decide its right of recovery from a school. However, we do not believe that the initiation of the group process will prevent borrowers from being able to proactively seek relief. Borrowers may choose to file individual applications for relief under § 685.222(e) or, even if their applications are identified by a designated Department official for a group process, choose to opt-out of the group process and receive determinations through the individual application process if desired. As noted in the NPRM, 81 FR 39348, the Department welcomes information from any source, including State and other Federal enforcement agencies, as well as legal aid organizations, that may assist it in deciding whether to initiate group borrower defense process under § 685.222(f), (g), and (h).

We explain our reasoning as to the different standards that may form the basis of a borrower defense in the respective sections for those standards.

We believe it is appropriate that group proceedings should be initiated for claims based upon any of the allowed standards, as opposed to just one of the standards or standards outside of those described in the regulations.

*Changes:* None.

## Third-Party Petitions for Initiation of Group Process

*Comments:* Many commenters stated that outside entities, such as student advocates, State AGs, and legal aid attorneys should be given a formal role in the group borrower defense process. Some of these commenters urged the Department to adopt language proposed at the third session of negotiated rulemaking in March 2016, which would have explicitly established that State or Federal enforcement agencies, or legal aid organization, may submit a written request to the Department identifying a group of borrowers for the initiation of a group borrower defense process. Under this proposed language, the Department would have responded to such requests in writing. These commenters argued that such entities have direct contact with borrowers and are likely to have necessary information for proving borrower defense claims. Commenters also stated that allowing third party petitions is important, given that the borrower defense process only allows an individual borrower to dispute a group borrower defense decision in the proposed regulation by filing an individual application. One commenter stated that allowing such third party requests will result in faster adjudications for borrowers and administrative cost-savings for taxpayers. Another commenter stated that a formal referral process would recognize both the states' role in the triad of higher education oversight and the States' efforts to protect consumers through State general consumer protection laws.

A group of commenters argued that a right for such outside entities should be included given that group determinations will result in the most widespread relief, will be the easiest way for borrowers to access relief, and are the only proposed method by which borrowers who have not filed applications may access relief.

In response to the Department's reasoning in the NPRM, 81 FR 39348, that informal communication facilitates cooperation with such entities, one commenter stated that providing such third parties with a formal petition in the regulation would not preclude informal contact and communication, but would rather increase transparency and efficiency. The commenter also

suggested that, to address any concerns that parties that may take advantage of borrowers, that the final rule should allow the Secretary to decline to respond to a petition if the organization does not appear to be a bona fide organization that represents borrowers.

*Discussion:* We disagree that a formal right of petition for entities such as State AGs, advocacy groups, or legal aid organizations should be included in the regulations. As explained in the NPRM, 81 FR 39348, in the Department's experience, cooperation with such outside entities has been best facilitated through informal communication, which allows for more candor and flexibility between the Department and interested groups and parties. The Department always welcomes cooperation and input from other Federal and State enforcement entities, as well as legal assistance organizations and advocacy groups. To this end, the Department anticipates creating a designated point of contact for State AGs to allow for active communication on borrower defense issues and also actively encourages a continuation of cooperation and communication with other interested groups and parties. As also reiterated in the NPRM, *id.,* the Department is ready to receive and make use of evidence and input from any interested party, including advocates and State and Federal agencies.

We also reiterate our position that the determinations arising from the borrower defense process should not viewed as having any binding effect on issues, such as causes of actions that borrowers may have against schools under State or other Federal law, that are not properly within the purview of the Department. We also encourage borrowers and their representatives to weigh all available avenues for relief, whether it is through the borrower defense process or through avenues outside of the Department.

*Changes:* None.

*Challenges to the Initiation of a Group Process*

*Comments:* Many commenters expressed concern that the group borrower defense process would not include an opportunity for schools to dispute the initiation of a group process and the formation of the group. One commenter stated that the lack of a provision for schools to contest the formation of the group was in violation of due process. Several commenters expressed concern that schools are not given a right to contest the Department's decision as to whether there are ''common facts and claims'' to initiate a

group process and requested clarification of that factor. Several commenters stated that the Department's proposal effectively would allow the Department to certify a class, without any of the procedural protections available to defendants in a class proceeding under Federal Rule of Civil Procedure 23. One commenter expressed concern that the proposed regulation does not require that the Department initiate a group process only where common facts and claims are found among the borrowers in the group, but rather gives the Secretary discretion to consider a nonexclusive list of factors. One commenter stated that the Department should define the sources of information the Department would use to identify borrowers for inclusion in a group process.

One commenter stated that by not providing a review of the Department's initiation or group certification decision by the hearing official or allowing a challenge by the school, and by proposing that the Department's decision to initiate a group process may consider the factor of ''compliance by the school or other Title IV participants,'' that the purpose of the group borrower defense process is to hold schools accountable and make them examples to the industry, and not to efficiently handle claims before the Department.

*Discussion:* We disagree that the regulations should include an explicit step by which an institution may dispute the formation or composition of a group under § 685.222(f). As discussed previously in this section, the Department is developing agency rules of practice and procedure for borrower defense, which will be informed by the legal requirements for administrative adjudications and the due process protections provided in the Department's other administrative adjudications. For instance, we will consider the proceedings including those under 34 CFR part 668, subparts G and H, which allow for standard motion practice and interlocutory appeals. We believe that, as proposed, § 685.222(f), (g), and (h) provides hearing officials with the flexibility and discretion to allow motions by parties as is deemed appropriate.

We believe that it is appropriate that § 685.222(f) notes that the Department may generally consider a nonexhaustive list of factors in deciding to initiate a group claim. As described earlier, we believe it is important for the Department to retain discretion in deciding whether to initiate a proceeding to adjudicate its right of recovery from a school, as a contingent

claim to a hearing official's relief determination for the borrower defense claims of a group of borrowers in the same process. Similarly, we believe that it is important for the Department to retain the flexibility to bring groups of varying sizes or types before a hearing official in a group process, including groups that are formed in a manner more akin to a joinder of parties under Federal Rule of Civil Procedure 20 than to a class action under Federal Rule of Civil Procedure 23.

Regarding the sources of information the Department will use to identify borrowers for inclusion in a group process, as explained in the NPRM, in addition to applications submitted through the process in § 685.222(e), the Department also may identify borrowers from records within its possession or from information that may be provided to the Department by outside sources. We do not believe further clarification as to such sources of the information is necessary.

We disagree that consideration of the compliance impact of a group borrower defense claim is inappropriate for the initiation of a group process and also disagree that this factor lends an appearance of bias or unfairness to the fact-finding processes described in § 685.222(f), (g), and (h). As discussed above, the procedure we will use for the group process will provide the institution with due process protections very similar to those that the Department now uses when it fines an institution or terminates the eligibility of an institution to participate in the title IV, HEA programs, which are found in current subpart G of part 668. These rules do not preclude motion practice, nor will the rules we develop. Moreover, given that such proceedings will involve the Department's right of recovery against schools, we believe that is appropriate for the regulations to reflect that the Department will consider a number of factors in its decision whether to initiate a process for the adjudication of such recovery by the Department. As stated in the NPRM, the group borrower defense process is intended to provide simple, accessible, and fair avenues to relief for borrowers, and to promote greater efficiency and expediency in the resolution of borrower defense claims, and we believe this structure furthers that goal.

*Changes:* None.

*Members of the Group*

*Comments:* Many commenters supported the Department's proposal under § 685.222(f)(1)(ii) that borrowers who may not have filed an application for borrower defense may be included as

members of a group for a determination of relief. Such commenters urged the Department to establish criteria requiring the initiation of such a group process.

A number of other commenters opposed the proposal and suggested that only borrowers who have filed an individual claim be included in the group process. These commenters stated that limiting group members to applicants would ensure that only borrowers who have actually been harmed would receive relief. Other commenters also argued that non-applicants should not be included in the group process, due to concerns about the use of borrowers' personal information and consent.

Other commenters stated that borrowers should only be allowed to participate in the group process if they affirmatively opt-in to the process. Several of these commenters also cited concerns about the use of borrowers' personal information and consent if an opt-out method is used.

*Discussion:* We appreciate the commenters' support for the use of a group process to resolve claims for a group with non-applicant borrowers as described in § 685.222(f)(1)(ii). However, as discussed earlier in this section, we believe that it is appropriate that the Department retain the discretion to initiate the group process, given that the Department will have the most information regarding the circumstances and the Department's contingent interest in the proceedings.

We disagree with the commenters that suggested the group processes described in § 685.222(f), (g), and (h) should only include borrower defense applicants or that we should require borrowers to affirmatively opt-in to the process. We believe that, where the Department has decided to bring a group borrower defense proceeding and non-applicant borrowers with common facts and claims can be identified, such borrowers should also be entitled to the benefits of the designated Department official's advocacy and the opportunity to obtain relief and findings in such proceedings. Additionally, providing such borrowers with an opportunity to opt-out of the proceedings, given sufficiency of the notice to be provided by the Department to such borrowers, follows well-established precedent in class action law. *See, e.g., Phillips Petroleum Co.* v. *Shutts,* 472 U.S. 797 (1985).

The Department will continue to safeguard borrowers' personal information in this process, according to its established procedures.

*Changes:* None.

*Comments:* None.
*Discussion:* In further reviewing proposed § 685.222(f)(2), the Department has determined that if a group process for borrower defense is initiated, and the Secretary has identified a borrower who has not filed a borrower defense application pursuant to § 685.222(f)(1)(ii), the borrower should be granted forbearance or, if the borrower is in default on the loan at issue, then the procedure for a defaulted loan should be followed, as if the borrower had filed a borrower defense to repayment application under § 685.222(e)(2).

*Changes:* We have revised § 685.222(f)(2) to provide that the forbearance and defaulted loan procedures will be followed for members of a group identified by the Secretary who have not filed a borrower defense application.

*Opt-Out for Group Discharge; Reopening by the Secretary After Determination Is Made*

*Comments:* A number of commenters objected to the Department's proposal in § 685.222(i)(2) that borrowers would be given an opportunity to opt-out of a group determination of relief. One commenter stated that providing borrowers with an opt-out would provide borrowers with the ability to bring successive, identical claims in the group and individual processes, and would create unpredictability and administrative inefficiencies. The commenter stated that borrowers who have agreed to be part of the group process should be bound by any resulting decision. One commenter stated that allowing only one opportunity for a borrower to opt-out of the group process would be consistent with Federal Rule of Civil Procedure 23, prevent uncertainty and inconsistency, and would further the purpose of the group borrower defense process to promote efficiency and expediency in the resolution of claims.

Other commenters stated that allowing borrowers to opt-out of a denial of a group claim, to file an individual claim, would place an undue burden on schools to defend the same claim multiple times. Some of these commenters stated that this situation would deprive schools of protection from double jeopardy. These commenters expressed concern that the financial resources schools would have to expend to defend such claims would lead to tuition increases for students. Several commenters stated that allowing such an opt-out would allow students to file multiple, unjustified claims for the purpose of delaying repayment.

One commenter also suggested that a time limit be imposed upon the Secretary's ability to reopen a borrower's application is bound by any applicable limitation periods. Several commenters stated that relief in the group process should be opt-out only.

*Discussion:* We appreciate the concern raised by commenters that allowing an opt-out for borrowers after a determination for relief has been made will subject schools to continuing litigation risk and uncertainty. As a result, we will modify § 685.222(i) to remove the post-determination opt-out opportunity for borrowers in group proceedings.

We disagree that a time limit should be placed on the Secretary's ability to reopen a borrower's application. We believe that if the Department becomes aware of new evidence that would entitle a borrower to relief under the regulations, then the borrower is entitled to relief regardless of the passage of time.

*Changes:* We have revised § 685.222(i) to remove the opportunity for a borrower to opt-out of the proceedings after a determination for relief has been made in a group proceeding.

*Comments:* None.
*Discussion:* In further reviewing proposed § 685.222(g)(4) and (h)(4), the Department has determined that if a borrower defense application is under review because a borrower defense application has been reopened by the Secretary under § 685.222(e)(5)(ii), the borrower should be granted forbearance or, if the borrower is in default on the loan at issue, then the procedure for a defaulted loan should be followed, as when the borrower filed an initial borrower defense to repayment application.

*Changes:* We have revised § 685.222(g)(4) and (h)(4) to provide that the forbearance and defaulted loan procedures will be followed when the Secretary has reopened a borrower defense application.

*Due Process Proceedings*

*Comments:* Several commenters stated that the proposed regulations do not provide details of how and what schools may dispute in the group borrower defense fact-finding process, and requested clarification in the final regulations. Other commenters expressed concern that the proposed group fact-finding process does not provide sufficient due process protections for schools. These commenters emphasized that participation by schools would create a more fair process and increase the reliability of the results.

**75970**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

One commenter stated that the limited protections in the proposed group borrower defense process does not provide schools with an opportunity to confront and cross-examine adverse witnesses and thus does not satisfy the due process requirements established in *Mathews* v. *Eldridge,* 424 U.S. 319 (1976); *Goldberg* v. *Kelly,* 397 U.S. 254 (1970); and *Greene* v. *McElroy,* 360 U.S. 474 (1959) for depriving schools of their property rights to funds already received. Several commenters suggested that the Department use the procedures in 34 CFR part 668, subpart H, to ensure due process protections for schools.

Commenters expressed concern about institutions' opportunities to receive notice and evidence in the proposed group borrower defense process. Many of these commenters expressed concern and requested clarification regarding the Department's proposal in § 685.222(f)(2)(iii) that notice to the school of the group process would occur "as practicable." One commenter suggested that we include language specifying that no notice will be provided if notice is impossible or irrelevant due to a school's closure. Other commenters expressed concern that the proposed regulations do not specify whether the scope of a group will be disclosed to schools and stated that schools must be aware of the members of the group in order to be able to raise a defense. Another commenter expressed concern that the proposed regulations do not require the Department to notify the school as to the basis of the group; the initiation of the borrower defense process; of any procedure or timeline for requesting records, providing information to the Department, or making responses; or provide schools with an opportunity to appear at a hearing.

Several commenters stated that institutions should be provided with notice and copies of all the evidence presented underlying the borrower defense claims in a group process. Another commenter stated that the proposed regulation gives the Department complete discretion as to what evidence the trier of fact will use to make decisions. This commenter stated that, when combined with the proposal that the persons advocating for students, as well as the persons making decisions, in the group borrower defense process are all chosen by the Department, this discretion appears to favor students over schools in the group process.

Several commenters also stated that institutions should be given an opportunity to provide a written response to the substance of the group borrower defense claim within a certain number of days (45 or 60) after the resolution of any appeal on the Department's basis for a group claim or of the notification to the school of the group process if no challenge to the group is filed, provided with copies of any evidence and records to be considered or deemed relevant by the hearing official, be allowed to present oral argument before the hearing official, and provided with a copy of the hearing official's decision in the group process. One commenter emphasized that the decision should include the calculation used by the hearing official for the amount of relief given by the decision. These commenters also stated that institutions should be provided with a right of appeal to the hearing official's decision in both the closed and open school group processes. One commenter expressed concern that the proposed process does not include any process for how an appeal may be filed.

Several commenters expressed concerns that the process does not appear to provide to any opportunities for schools to conduct discovery or to cross-examine witnesses. Some of these commenters expressed the view that, in cases where the rebuttable presumption proposed in § 685.222(f)(3) applies, schools will need to be able to question borrowers in order to rebut the presumption.

One commenter stated that the group borrower defense process should allow for both students to present their own claims and institutions to have the same opportunity to present a defense, including any affirmative defenses, and to appeal adverse decisions. The commenter stated that both the school and the borrower should have such opportunities to present evidence and arguments in any proceeding or process to determine claims, not just proceedings where recovery against the school is determined. The commenter emphasized that permitting school participation would lead to correct results, since schools often have information as to any alleged wrongdoing.

*Discussion:* The Department understands commenters' concerns regarding the broad guidelines for the group fact-finding process established in § 685.222(f), (g), and (h). As noted throughout this section, the group borrower defense process involving an open school [35] in § 685.222(h) would be

structured to provide the substantive and procedural due process protections both borrowers and schools are entitled to under applicable law, including those provided under the APA, 5 U.S.C. 554, and under the Department's other administrative proceedings. Such protections would include those regarding notice; the opportunity for an oral evidentiary hearing where the parties may confront and cross-examine adverse witnesses if warranted,); or those for the submission and exchange written material, as provided under enforcement procedures at 34 CFR part 668, subpart G. The Department is developing procedural rules to govern the fact-finding processes described in both § 685.222(e) and (f) to (h), which will establish these details more firmly and be informed by the procedures and protections established by the Department in its other administrative proceedings, such as 34 CFR part 668, subparts G and H.

We appreciate the concern that § 685.222(f)(2)(iii) is not clear as to the Department's intent that notice of a group proceeding will occur unless there is no party available to receive such notice—in other words, as would be the case under the closed school group borrower defense process described in § 685.222(g). We are revising § 685.222(f)(2)(iii) to clarify that no notice will be provided if notice is impossible or irrelevant due to a school's closure.

*Changes:* We have revised § 685.222(f)(2)(iii) to clarify that no notice will be provided if notice is impossible or irrelevant due to a school's closure.

*Rebuttable Presumption of Reliance*

*Comments:* A number of commenters objected to § 685.222(f)(3), which provides that a rebuttable presumption of reasonable reliance by members of the group applies if a group borrower defense claim involves a substantial misrepresentation that has been widely disseminated. One commenter stated that reliance cannot be presumed any more than the occurrence of a misrepresentation can be presumed, and that such an approach does not comply with general legal principles. Another commenter expressed concern that the rebuttable presumption of reasonable reliance would impermissibly preclude schools from presenting evidence as to the main fact of a group borrower defense case. These commenters expressed concern that the presumption

---

[35] As described in § 668.222(g), the "closed school" group borrower defense process would apply only when the school has both closed and provided no financial protection available to the Secretary from which to recover losses arising from borrower defenses, and for which there is no entity from which the Secretary may recover such losses. Or, in other words, when there is no entity from whom the Department may obtain a recovery.

would be difficult or impossible for schools to rebut. One commenter expressed concern that a school would be unable to rebut the presumption for borrowers who are unknown or not named as being part of the group for the group borrower defense process. One commenter expressed concern that the rebuttable presumption of reliance would be difficult for schools to disprove, particularly in situations where disproving a claim would require documentation that falls outside of the record retention requirements.

One commenter stated that the presumption would set up a system by which omissions by school employees or agents or misunderstandings by students may be considered substantial misrepresentations, without the Department needing to show reliance or that the misconduct caused the harm at issue. The commenter expressed general concern that the Department has proposed a negligence standard that is not contemplated by the HEA, and that this expansion in the standard has not been justified by the Department. The commenter argued that the presumption would allow claims based on accusations of omissions or misunderstandings on which the borrower did not rely.

One commenter stated that the presumption would threaten institutions with high liability and impose high costs on taxpayers. A couple commenters stated that the presumption is unfair, absent an intent or materiality requirement.

One commenter stated that it objected to the establishment of the rebuttable presumption generally, but requested clarification as to what the Department means by "widely disseminated," specifically the size of the audience that would be required for a statement to be considered to have been widely disseminated and methods of dissemination that would trigger the presumption.

Several commenters supported the inclusion of a presumption of reasonable reliance on a widely disseminated misrepresentation is consistent with existing consumer protection law. One commenter stated that the presumption recognizes that it is unfair and inefficient to require cohorts of borrowers to individually assert claims against an actor engage in a well-documented pattern of misconduct.

*Discussion:* We disagree that the presumption established in § 685.222(f)(3) does not comport with general legal principles. It is a well-established principle that administrative agencies may establish evidentiary presumptions, as long as there is a rational nexus between the proven facts and the presumed facts. *Cole* v. *U.S. Dep't of Agric.,* 33 F.3d 1263, 1267 (11th Cir. 1994); *Chem. Mfrs. Ass'n* v. *Dep't of Transp.,* 105 F.3d 702, 705 (D.C. Cir. 1997). As explained in the NPRM, 81 FR 39348, we believe that if a representation that is reasonably likely to induce a recipient to act is made to a broad audience, it is logical to presume that those audience members did in fact rely on that representation. We believe that there is a rational nexus between the wide dissemination of the misrepresentation and the likelihood of reliance by the audience, which justifies the rebuttable presumption of reasonable reliance upon the misrepresentation established in § 685.222(f)(3). A similar presumption exists in Federal consumer law. *See, e.g., F.T.C.* v. *Freecom Commc'ns, Inc.,* 401 F.3d 1192, 1206 (10th Cir. 2005); *F.T.C.* v. *Sec. Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1315–16 (8th Cir. 1991).

We disagree that the rebuttable presumption establishes a different standard than what is required under the current regulations. As explained under "Substantial Misrepresentation," the Department's standard at part 668, subpart F, has never required intent or knowledge as an element of the substantial misrepresentation standard. Additionally, the current standard for borrower defense allows "any act or omission of the school . . . that would give rise to a cause of action under applicable State law." 34 CFR 685.206(c)(1). As explained under "Federal Standard" and "Substantial Misrepresentation," under many States' consumer protection laws, knowledge or intent is not a required element of proof for relief as to an unfair or deceptive trade practice or act. Moreover, we disagree with any characterization that the rebuttable presumption would remove the reliance requirement for substantial misrepresentation in group proceedings. The rebuttable presumption does not change the burden of persuasion, which would still be on the Department. As § 685.222(f)(3) states, the Department would initially have to demonstrate that the substantial misrepresentation had been "widely disseminated." Only upon such a demonstration and finding would the rebuttable presumption act to shift the evidentiary burden to the school, requiring the school to demonstrate that individuals in the identified group did not in fact rely on the misrepresentation at issue. This echoes the operation of the similar presumption of reliance for widely disseminated misrepresentations

under Federal consumer law described above. *See Freecom Commc'ns, Inc.,* 401 F.3d at 1206. A school would be entitled to introduce any relevant evidence to rebut the presumption and what may constitute relevant evidence may vary depending on the facts of each case. Similarly, what may be viewed as "wide dissemination" may also vary from case to case.

There appears to be confusion as to whether schools would be required to rebut the presumption of reliance as to "unknown" or "unidentified" members of the group. Under § 685.222(f)(1)(ii), the Department will identify all members of the group. Although the group may include borrowers who did not file an application through the process in § 685.222(e), the members of the group will be known in the group process.

We appreciate the support of commenters supporting the establishment of a rebuttable presumption. As discussed earlier, one of the reasons we are establishing a rebuttable presumption in cases of a widely disseminated substantial misrepresentation is that we believe that there is a rational nexus between a well-documented pattern of misconduct in the instance of a wide dissemination of the misrepresentation and the likelihood of reliance by the audience.

We also disagree that a materiality or intent element is necessary, as explained earlier under "Claims Based on Substantial Misrepresentation."

*Changes:* None.

*Representation in the Group Process*

*Comments:* Many commenters expressed concern that the Department would designate a Department official to present borrower claims in the group borrower defense fact-finding process, when schools would be permitted to obtain their own representation in the process. These commenters stated that they should be allowed to obtain their own outside representation. Some commenters stated that such outside representation should be either paid for by the Department, or that schools should not be allowed to participate in the group process until after the school's liability has been determined.

One commenter stated that borrowers should be allowed to have their own representatives in the group borrower defense process, either at their own expense or pro bono. This commenter stated that borrowers should at least be allowed to act as "intervenors" in a group borrower defense process, with separate representation, to protect their interests.

One commenter suggested that the Department establish procedures for individual borrowers and their legal representatives to petition the Department to initiate a group proceeding or, in the alternative, establish a point of contact for borrowers to notify the Department of potential candidates for group claims. The commenter also suggested that borrowers be allowed to file appeals to the Secretary in group proceedings, given borrowers' vested interest in obtaining favorable adjudications that will make obtaining relief easier for borrowers.

*Discussion:* We disagree that borrowers should be allowed to initiate group borrower defense claims or be able to retain their own counsel and present evidence and arguments before a hearing official in a group borrower defense process. As explained earlier in this section, we acknowledge that the designated Department official responsible for presenting the group borrower defense claim and initiating a group borrower defense process would not be the borrower's legal representative. However, as the holder of a claim to recovery that is contingent upon the relief awarded to a group's borrower defense claims, we believe that the Department is the appropriate party to present both the group's borrower defense claims and the Department's claim for recovery against the institution in question. As explained in the NPRM, 81 FR 39348, we also believe that the Department's fulfillment of this role will reduce the likelihood of predatory third parties seeking to take advantage of borrowers unfamiliar with the borrower defense process. Additionally, we note that, under § 685.222(f)(2)(ii), borrowers may also choose to opt-out of a group process and participate in the process established in § 685.222(e), if they are not satisfied with the Department's role in the group proceeding. Borrowers may also reach out to the designated Department official if they have questions about the process.

As discussed earlier in this section, in consideration of borrowers' desire for timely and efficient adjudications, we disagree that borrowers should be provided with a right of appeal to the Secretary. However, we note that borrowers may also seek judicial review in Federal court of the Department's final decisions or request a reconsideration of their claims by the Department upon the identification of new evidence under § 685.222(e)(5).

*Changes:* None.

*Appeals*

*Comments:* Several commenters expressed concern that, in the group borrower defense process, liability will be automatically assigned to a school, and that schools will have no opportunity to dispute the liability. One commenter stated this is unfair to school owners, and to principals and affiliates of schools, from whom the Department proposes to seek repayment in certain situations.

*Discussion:* The commenters are incorrect. Section 685.222(h)(2) provides both schools and the designated Department official in the open school group hearing process with the opportunity to file an appeal with the Secretary from a hearing official's decision. Further, § 685.222(g), which does not provide for such an appeal, applies only if a school has closed and has provided no financial protection available to the Secretary from which to recover losses arising from borrower defenses, and for which there is no other entity from which the Secretary can otherwise practicably recover such losses. If the Secretary seeks to recover borrower defense losses from the principal or affiliate of a ''closed school,'' the open school process in § 685.222(h) would apply.

*Changes:* None.

*Open and Closed School Group Processes*

*Comments:* Several commenters expressed concern about schools' participation in the closed school group process. One commenter expressed concern that in the group process for closed schools described in proposed § 685.222(g), that the hearing official deciding the claims at issue may consider additional information or responses from the school that the designated Department official considers to be necessary. This commenter stated that if there are persons affiliated with the school who are prepared to participate, then those persons should be given full rights of participation in the closed school group borrower defense process. One commenter stated that institutions should be provided with a right of appeal to the hearing official's decision in both the closed and open school group processes.

One commenter requested clarification as to claims filed by borrowers who have attended a school that has since closed, but where the school has posted a letter of credit or other surety with the Department.

Another commenter supported the distinction between the open school and closed school group processes.

*Discussion:* The commenters are incorrect about the nature of the closed school borrower defense group process described in § 685.222(g). As described, the standard provides that § 685.222(g) will apply only if a school is closed, there is no financial protection available to the Secretary from which to recover losses from borrower defense claims, and there is no other entity from which the Secretary may recover. If there is a letter of credit or some other surety that the school has posted to the Department and that is currently available to pay losses from borrower defense claims, the open school, borrower defense group process under § 685.222(h) will apply. If there is no ability for the Department to recover on any losses resulting from an award of relief in the closed school, group borrower defense process, then the Department will be unable to exercise its right to recovery against a school and the school will not face any possible deprivation of property. As a result, we believe it is appropriate that schools do not receive a right of administrative appeal in the closed school group process. If there are persons affiliated with the school who disagree with the final decision resulting from the process, however, such persons may still seek judicial review in Federal court under 5 U.S.C. 702 and § 704.

*Changes:* None.

*Public Databases*

*Comments:* A group of commenters suggested that decision makers be required to document decisions so that they may be appealed and reviewed in Federal court. These commenters and others also requested that the regulations require public reporting of borrower defense adjudications and that the Department maintain a public, online database of decisions resulting from any group process or individual application. The commenters stated that such public reporting would allow political representatives and advocates to review such decisions, suggest improvements, and ensure consistency in the Department's decision making.

One commenter also stated that the Department should develop a publicly available information infrastructure, such as a docketing system, to allow users to identify and track cases that may be candidates for group proceedings or informal aggregation and to allow users to learn from Departmental decisions.

*Discussion:* We appreciate the commenters' concerns regarding transparency and consistency in the borrower defense process, and will consider their suggestions as we move

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations **75973**

forward with the implementation of these regulations. All of the Department's administrative determinations are presumptively available for public disclosure, subject to privacy concerns. We will contemplate and evaluate appropriate methods for the release of information about borrower defense claims on an ongoing basis as the processes and procedures in the regulations take effect.

*Changes:* None.

### Informal Aggregation

*Comments:* One commenter suggested that, in addition to the group borrower defense process, the Department allow hearing officials to informally aggregate, or to allow borrowers to petition for informal aggregation of, separate but related cases to be heard in front of the same trier of fact. The commenter stated that such informal aggregation would expedite the resolution of similar claims, enhance consistency, and conserve resources.

*Discussion:* We appreciate the suggestion by the commenter, but do not believe it is necessary to modify the regulations to provide for informal aggregation. Such aggregation would be within the discretion of the hearing officials presiding over the group processes as part of their routine caseload management responsibilities.

*Changes:* None.

### FFEL Borrowers

*Comments:* Several commenters stated that FFEL borrowers should be included in any group discharges for borrower defense. One commenter suggested that the Department allow FFEL borrowers to participate in the group and individual borrower defense processes without having to consolidate FFEL Loans into Direct Consolidation Loans or by having to prove any relationship between the borrowers' schools and lenders. This commenter argued that not all FFEL borrowers are eligible for Direct Consolidation Loans, and that the proposed regulations do not address the needs of such FFEL borrowers.

*Discussion:* We disagree with the suggestion that FFEL borrowers be included in any group discharges for borrower defense. As explained under "Expansion of Borrower Rights," FFEL Loans are governed by specific contractual rights and the process adopted here is not designed to address those rights. We can address potential relief under these procedures for only those FFEL borrowers who consolidate their FFEL Loans into Direct Consolidation Loans. As cases are received, the Department may consider

whether to conduct outreach to FFEL borrowers who may be eligible for borrower defense relief by consolidating their loans into Direct Consolidation Loans under § 685.212(k) as appropriate.

*Changes:* None.

### Abuse by Plaintiffs' Attorneys

*Comments:* Several commenters expressed concern that the group process would create opportunities for plaintiffs' attorneys. The commenters stated that the proposed regulations would encourage attorneys to have borrowers file suspect claims with the Department, while also bringing class actions in court. The commenters stated that this would result in the Department initiating a group process, identifying members of a putative class for the court proceeding, and obtaining determinations that class action attorneys would then be able to use in court to their advantage, while collecting attorneys' fees.

*Discussion:* We disagree that the regulations will create opportunities for plaintiffs' attorneys. Under the regulations, the Department has the discretion to decide whether a group borrower defense process will be initiated, and the filing of individual claims may not necessarily lead to the initiation of a group borrower defense process. Additionally, we recognize that borrowers may seek to utilize other avenues for relief outside of the borrower defense process and provide in § 685.222(k) that if the borrower has received relief through other means, the Department may reinstate the borrower's obligation to repay the loan to protect the Federal fiscal interest and avoid receipt by the borrower of multiple recoveries for the same harm.

*Changes:* None.

## Borrower Relief

### Process Arbitrary and Outside the Scope of Department Authority

*Comments:* Some commenters argued that the proposal for calculation of borrower relief is arbitrary and that the Department is neither qualified nor authorized to conduct this calculation. According to one commenter, implementation of the proposed framework for calculating relief would constitute arbitrary agency adjudication under relevant case law. One commenter cited 20 U.S.C. 3403(b) and section 485(h)(2)(B) of the HEA as imposing statutory limits on the Department's authority to direct or control academic content and programming, and argued that the Department would be exceeding its authority by attempting to assess the

value of an education by including the quality of academic programming among the factors to be considered in carrying out an adjudication on any borrower defense claim.

*Discussion:* We disagree that the Department's proposal to adjudicate or calculate borrower relief is arbitrary. By directing the Secretary to designate acts and omissions that constitute borrower defenses to repayment in section 455(h) of the HEA, Congress has explicitly charged the Department, under the current and new regulations, to adjudicate the merits of claims brought alleging such acts and omissions. Such adjudications necessarily require the Department to determine the relief warranted by a proven claim against an institution. If a court adjudicating a borrower's cause of action against the institution would assess the value of the education provided in order to determine relief, section 455(h) requires and authorizes the Department to do so as well.

Further, we do not agree that the Department's adjudications on borrower defense claims will involve an "exercise [of] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system . . . or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law." 20 U.S.C. 3403(b). As described above earlier, the Department's adjudications will determine whether a school's alleged misconduct constitutes an "act[] or omission[] of an institution of higher education a borrower may assert as a defense to repayment of a loan . . .", 20 U.S.C. 1087e(h), and provide relief to borrowers and a right of recovery to the Department from schools, in a manner that is explicitly authorized by statute. Notwithstanding, we believe that the provision of relief, as the result of and after any conduct by the school, through the borrower defense process is not the same as the active "exercise [of] any direction, supervision, or control" over any of the prohibited areas.

*Changes:* None.

### Presume Full Relief

*Comments:* A number of commenters argued in favor of a presumption of full relief for borrowers. These commenters recommended that Appendix A be either deleted or modified to eliminate or alter the proposed partial relief calculations. The commenters contended that the proposed partial

relief calculation process would be complex and subjective and potentially deny relief to deserving borrowers.

Multiple commenters argued that calculating partial relief would be excessively complicated, expensive, and time consuming. According to these commenters, the process of calculating relief would lead to the waste of Department resources and cause unnecessary delays in the provision of relief to borrowers. Additionally, commenters were concerned about the possibility that this process would be confusing and difficult for borrowers to navigate.

Some commenters argued that the proposed partial relief calculation process would unfairly subject borrowers who had already succeeded on the merits of their claims to a burdensome secondary review process. Commenters noted that, in the case of a claim based on a school's substantial misrepresentation, borrowers would have already demonstrated entitlement to relief by meeting the substantial misrepresentation standard. Consequently, these commenters suggested that the relief calculation process would create an unnecessary hurdle to the appropriate relief for these borrowers. The commenters argued that, after being defrauded by their schools, student borrowers should not be required to undergo an extensive process of calculating the value of their education. Further, these commenters argued that the partial relief system would be unfair because it affords a culpable school the presumption that its education was of some value to the borrower.

Other commenters suggested that it would be unfair for the borrower to bear the burden of demonstrating eligibility for full relief. Instead, these commenters proposed that the Secretary should bear the burden of demonstrating why full relief is not warranted. The commenters proposed that full relief be automatic for borrowers when there is evidence of wrongdoing by the school. These commenters suggested either eliminating partial relief or limiting it to cases in which compelling evidence exists that the borrower's harm was limited to some clearly delimited part of their education.

Commenters suggested that, in addition to being difficult to calculate, partial relief would be insufficient to make victimized borrowers whole. To support the argument in favor of a presumption of full relief, these commenters asserted that many Corinthian students never would have enrolled had the institution truthfully represented its job placement rates.

Some commenters raised concerns about the subjectivity of the process for calculating partial relief for borrowers. These commenters were concerned that the methods proposed in Appendix A for calculating relief are too vague, afford excessive discretion to officials, and could lead to potential inconsistencies in the treatment of borrowers. Some commenters suggested that Appendix A should prescribe one particular method for calculating relief, rather than providing multiple options in order to increase certainty and consistency.

Some commenters raised concerns about the potential impact of resource inequities between schools and borrowers on the partial relief calculation process. Specifically, these commenters argued that because schools will be able to afford expensive legal representation, schools would likely be able to find technicalities in the relief calculation process, potentially resulting in the denial of relief to deserving borrowers. These commenters were particularly concerned about disadvantages faced by borrowers who cannot afford legal representation. Commenters also noted that borrowers may feel pressure to retain legal counsel, which they contended would frustrate the Department's intent to design a process under which borrowers do not need legal representation, and are shielded from predatory third-party debt relief companies.

One commenter suggested that the provision of partial relief would lead to an excessive number of claims, particularly when implemented in conjunction with what was described as a low threshold for qualified claims.

Several commenters also supported the presumption of full relief by stating that this approach would be consistent with existing legal approaches to relief for fraudulent inducement or deceptive practices. Some commenters urged the Department to adopt the approach used for false certification and closed school discharges—providing full discharges for all meritorious claims, including cancellation of outstanding balances and refunds of amounts already paid.

As an alternative to fully eliminating partial relief, some commenters suggested limiting the availability of partial relief to claims based on breach of contract, based on the proposition that when a school breaches a contractual provision, it is possible that a borrower nevertheless received at least a partial benefit from his or her education.

Several commenters argued that Appendix A should be fully removed because it adds confusion to the process

and it is not clear when or how it should be applied. Some commenters argued that we should remove Appendix A and revise proposed § 685.222(i) so that full relief is provided upon approval of a borrower defense, except where the Department explains its reasoning and affords the borrower the opportunity to respond.

*Discussion:* As noted in the NPRM, the Department has a responsibility to protect the interests of Federal taxpayers as well as borrowers. We discuss below that while the borrowers' cost of attendance (COA), as defined in section 472 of the HEA, 20 U.S.C. 1087ll, is the starting point in cases based on a substantial misrepresentation for determining relief, we do not believe, in proceedings other than those brought under § 685.222(h), that establishing a legal presumption of full relief is justified when losses from borrower defenses may be borne by the taxpayer. While the Department's other loan discharge processes for closed school discharges, 34 CFR 685.214; false certification, 34 CFR 685.215; and unpaid refunds, 34 CFR 685.216, do provide for full loan discharges and recovery of funds paid on subject loans, the factual premises for such discharges are clearly established in statute and are relatively straightforward. In contrast, we anticipate that determinations for borrower defense claims will involve more complicated issues of law and fact. Generally under civil law, determinations as to whether the elements of a cause of action have been met so as to state a claim for relief and then to establish liability are determinations separate from those for the amount or types of relief the plaintiff may receive. To balance the Department's interest in protecting the taxpayer with its interest in providing fair outcomes to borrowers, when a borrower defense based in misrepresentation has been established, the Department will determine the appropriate relief by factoring in the borrower's COA to attend the school and the value of the education provided to the borrower by the school. Importantly, the COA reflects the amount the borrower was willing to pay to attend the school based on the information provided by the school about the benefits or value of attendance. The Department may also consider any other relevant factors. In determining value, the Department may consider the value that the education provided to the borrower, or would have provided to a reasonable person in the position of the borrower. Moreover, in some circumstances, the Department

will consider the actual value of the education in comparison to the borrower's reasonable expectation, or to what a reasonable person in the position of the borrower would have expected under the circumstances given the information provided by the institution. Accordingly, any expectations that are not reasonable will not be incorporated into the assessment of value.

We acknowledge commenters' concerns that references to "calculations" or "methods" in the regulations may be confusing. As a result, we are revising § 685.222(i) to remove such references. Additionally, to address concerns that the proposed relief determination requirements appear complicated, we are also revising § 685.222(i) to directly establish the factors to be considered by the trier-of-fact: The COA paid by the borrower to attend the school; and the value of the education. The Department will incorporate these factors in a reasonable and practicable manner. In addition, the Department may consider any other relevant factors. In response to concerns that the proposed methods in Appendix A are confusing, we have also replaced the methods with conceptual examples intended to serve as guidance to borrowers, schools, and Department employees as to what types of situations may lead to different types of relief determinations. As it receives and evaluates borrower defense cases under the Federal standard, the Department may issue further guidance as to relief as necessary.

The Department emphasizes that in some cases the value of the education may be sufficiently modest that full relief is warranted, while in other cases, partial relief will be appropriate. In certain instances of full or substantial value, no relief will be provided. Thus, it is possible a borrower may be subject to a substantial misrepresentation, but because the education provided full or substantial value, no relief may be appropriate. As revised, § 685.222(i) states that the starting point for any relief determination for a substantial misrepresentation claim is the full amount of the borrower's COA incurred to attend the institution. As explained later, the COA includes all expenses on which the loan amount was based under section 472 of the HEA, 20 U.S.C. 1087ll. Taken alone, these costs would lead to a full discharge and refund of amounts paid to the Secretary. Section 685.222(i) then provides that the Department will consider the value of the education in the determination of relief and how it compares to the value the borrower could have reasonably expected based on the information

provided by the school. In some cases, the Department expects that this analysis will not result in reduction of the amount of relief awarded. This could be because the evidence shows that the school provided value that was sufficiently modest to warrant full relief or what the school provided was substantially different from what was promised such that the value would not be substantially related to the value the school represented it would provide. The presence of some modest value does not mean full relief is inappropriate.

We also note that the revised regulations require value to be factored in to determinations for relief, but do not prescribe any particular approach to that process. Because there will be cases where the determination of value will be fact-specific to an individual or group of individuals—and the determination of value may pose more significant difficulties in certain situations than in others—the Department believes that the official needs substantial flexibility and discretion in determining how to incorporate established factors into the assessment of value. The fact that the case has reached the phase of relief determination necessarily means that a borrower has experienced some detriment and that a school has engaged in substantial misrepresentation or breached a contract, or was found culpable in court of some legal wrong. At that point in the process, we intend that the Official be able to employ a practicable and efficient approach to assessing value and determining whether the borrower should be granted relief and if so how much. Relief will be determined in a reasonable and practicable manner to ensure harmed borrowers receive relief in a timely and efficient manner.

We have also revised § 685.222(i) to provide that in a group borrower defense proceeding based on a substantial misrepresentation brought at an open school under § 685.222(h), the school has the burden of proof as to showing any value or benefit of the education. The Department will promulgate a procedural rule that will explain how evidence will be presented and considered in such proceedings, taking full account of due process rights of any parties. We believe that these revisions address many of the concerns that borrower defense relief determinations may be confusing or complicated.

We also note that the process for determining relief in a borrower defense claim has no bearing on the Department's authority or processes in

enforcing the prohibition against misrepresentation under 34 CFR 668.71. Schools may face an enforcement action by the Department for making a substantial misrepresentation under part 668, subpart F. As described under "Substantial Misrepresentation," for the purposes of borrower defense, absent the presumption of reliance in a group claim, actual, reasonable, detrimental reliance is required to establish a substantial misrepresentation under § 685.222(d). However, for the purposes of the Department's enforcement authority under part 668, subpart F, the scope of substantial misrepresentation is broader in that it includes misrepresentations that could have reasonably been relied upon by any person, as opposed to misrepresentations that were actually reasonably relied upon by a borrower. It is also conceivable that there could be a case in which a borrower did experience detriment through reasonably relying on a misrepresentation—for example, by having been induced to attend a school he or she would not have otherwise— yet the school provided sufficient value to the borrower or would have provided sufficient value to a reasonable student in the position of the borrower so as to merit less than full, or no, relief. Nevertheless, the school in such a case may still face fines and other enforcement consequences by the Department under its enforcement authority in part 668, subpart F, because a borrower reasonably relied on the school's misrepresentation to his or her detriment.

We disagree that the relief determination process would be subjective. Agency tribunals and State and Federal courts commonly make determinations on relief. We do not believe the process proposed provides a presiding designated Department official or hearing official presiding, as applicable, with more discretion than afforded triers-of-fact in other adjudicative forums.

We also disagree with commenters who expressed concerns that borrowers may be disadvantaged due to resource inequities between students and schools. As discussed under "Process for Individual Borrowers (§ 685.222(e))," under the individual application process, a borrower will not be involved in an adversarial process against a school. In the group processes described in § 685.222(f) to (h), the Department will designate a Department official to present borrower claims, including through any relief phase of the fact-finding process. If a borrower does not wish to have the Department official

assert his or her claim in the group borrower defense process, the borrower may opt-out of the process and pursue his or her claim under the individual borrower defense process under § 685.222(e).

We note that, in determining relief for a borrower defense based on a judgment against the school, where the judgment awards specific financial relief, the relief will be the amount of the judgment that remains unsatisfied, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations. Where the judgment does not award specific financial relief, the Department will rely on the holding of the case and applicable law to monetize the judgment, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations. In determining relief for a borrower defense based on a breach of contract, relief in such a case will be determined according to the common law of contract subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations.

*Changes:* We have revised § 685.222(i) to remove references to methods or calculations for relief. We have included factors that will be incorporated by a designated Department official or hearing official deciding the claim, including the COA paid by the borrower to attend the school, as well as the value of the education to the borrower. In addition, the Department official or hearing official deciding the claim may consider any other relevant factors.

We have revised § 685.222(i) to clarify how relief is determined for a borrower defense based upon a judgment against the school or a breach of contract by the school.

We include that for group borrower defense claims under § 685.222(h), the school has the burden of proof as to any value or benefit of the education.

We have also revised Appendix A to describe conceptual examples for relief.

*Calculation of Relief*

*Comments:* Some commenters raised concerns about the appropriateness of the specific factors for consideration, and methods to be applied, in calculating partial relief. Specifically, some commenters were concerned about relying on student employment outcomes to determine the value of a borrower's education. These commenters noted that graduates exercise substantial discretion in determining what type of employment to pursue after graduation, which would likely impact relevant calculations. These commenters also cited variations in median income throughout the

country as another factor that could potentially complicate the calculation process. One commenter objected to consideration of the expected salary for the field, because expected salaries in certain professions are so low. These commenters recommended that earnings benchmarks not be considered in the calculation of relief because of the risk of discrepancies associated with those considerations.

Some commenters were concerned about the reliability of the proposed methods for calculating relief in Appendix A. Specifically, commenters raised concerns about the method for calculating relief in paragraph (A). Under this method, relief would be provided in an amount equivalent to the difference between what the borrower paid, and what a reasonable borrower would have paid absent the misrepresentation. These commenters suggested that this assessment would be unreliable because it would involve speculation by the official tasked with valuing a counterfactual.

In addition, some commenters disapproved of the method in paragraph (C), which would cap the amount of economic loss at the COA. These commenters suggested that legally cognizable losses often exceed the COA. Some commenters also disapproved of the proposal to discount relief when a borrower acquires transferable credits or secures a job in a related field. According to these commenters, the discounted relief would not reflect the true harm experienced by the borrowers. These commenters stated that transferable credits often lose their value because they are either not used, or used at another predatory or low-value school. These commenters also argued that discounting relief based on transferable credits could penalize borrowers with otherwise meritorious defenses who opt to take a teach out. Some commenters also argued that discounting relief when a borrower obtains a job in the field with typical wages may penalize borrowers who succeed at finding work despite the failings of their programs. One commenter was concerned that the method in paragraph (C) may be read to place a burden on the borrower to produce evidence that the education he or she received lacks value.

One commenter suggested minimizing the potential for subjectivity by replacing the proposed methods of calculation with a system for scheduling relief based on the nature of the claim. This commenter recommended providing a table outlining the percentage of loan principal to be relieved for each of a series of specific

enumerated claims. Another commenter suggested that the Department specify a single theory for calculating damages that would apply in each class of borrower defense cases.

Some commenters requested additional information about the circumstances that may impact partial relief determinations.

*Discussion:* We acknowledge commenters' concerns with the various methods in proposed Appendix A, some of which highlighted specific concerns about different methods' applicability to various fact-specific scenarios. As discussed earlier, we also appreciate that references to calculations or methods for relief may be confusing. As a result, we have revised Appendix A to reflect conceptual examples to provide guidance to borrowers, schools, and Department employees as to different scenarios that might lead to full, partial, or no relief. As stated in revised § 685.222(i), the examples are not binding on the Department or hearing official presiding over a borrower defense claim. Rather, they are meant to be simple, straight-forward examples demonstrating possible relief scenarios, and the outcomes of any borrower defense case may vary from the examples depending on the specific facts and circumstances of each case.

*Changes:* We have revised Appendix A to describe conceptual examples for relief.

*Comments:* Some commenters were concerned that the proposed regulations would grant Department officials the authority to make determinations for which they are not qualified. Specifically, commenters were concerned that the proposed regulations do not require the Department to rely on expert witnesses for certain calculations, despite the fact that they may be necessary in some cases.

Commenters also stressed the importance of ensuring the independence of the officials involved in making relief determinations. Similarly, some commenters requested more specificity and transparency regarding who will be calculating relief and how they will be conducting those calculations.

*Discussion:* We believe that Department officials designated to hear individual claims, and the Department hearing officials who preside over the group claim proceedings have the capability to evaluate borrower defense claims based upon the Federal standard, similar to how Department employees perform determinations in other agency adjudications.

As discussed under ''General'' and ''Group Process for Borrower Defense,''

the Department will structure the borrower defense proceedings in ways to ensure the independence and objectivity of the Department employees presiding over such processes. With regard to commenters' concerns about transparency and specificity, as established in § 685.222(e), (g) and (h), the decisions made in the proceedings will be made available to involved parties and will specify the basis of the official's determination. All of the Department's administrative determinations are presumptively available for public disclosure, subject to privacy concerns.

*Changes:* None.

*Group Relief*

*Comments:* Some commenters argued that group relief should be limited to situations in which a preponderance of the evidence shows that no member of the group received any identifiable benefit from his or her education. These commenters suggested that group relief would frustrate the Department's efforts to ensure that borrowers receive only the relief to which they are entitled. These commenters suggested that in the limited circumstances where group relief is provided, the amount should be determined based on a statistically valid sample of students. Some commenters also opposed the Department's proposal to consider potential cost to taxpayers in making group relief determinations.

*Discussion:* Section 685.222(a)(2), for loans first disbursed after July 1, 2017, explicitly states that borrower defenses must be established by a preponderance of evidence. This requirement applies regardless of whether the borrower defenses at issue are raised in the procedure for an individual borrower in § 685.222(e) or in the group processes under § 685.222(f) to (h). However, for group claims, § 685.222(f) establishes that the group process may be initiated upon the consideration of factors including the existence of common facts and claims among the members of the group. How the preponderance of evidence requirement may apply in group borrower defenses cases may vary from case to case. Additionally, as discussed earlier, for cases of substantial misrepresentation, the starting point for any relief determination is the full amount of the borrower's costs incurred to attend the institution. We have revised § 685.222(i) to provide that in such cases against an open school, the burden shifts to the school to prove the existence of any offsetting value to the borrowers provided by the education paid for with the proceeds of the loans at issue.

We disagree with commenters that the regulation should specify that relief should be based upon a statistically valid sample of students at this time. While a statistically valid sample may be appropriate for some cases, we believe the determination of what may be the criteria for an appropriate sample for group borrower defense cases should be developed on a case by case basis.

We discuss our reasons for including fiscal impact as a factor for consideration in the initiation of group processes under "Group Process for Borrower Defense." Section 685.222(i), which pertains to the relief awarded for either a group or individual borrower defense claim, does not include a consideration of fiscal impact.

*Changes:* We have revised § 685.222(i) to provide that in group borrower defense cases against an open school, the burden shifts to the school to prove the existence of any offsetting value to the students provided by the education paid for with the proceeds of the loans at issue.

**Expand the Scope of Available Relief**

*Comments:* Some commenters argued that full relief must extend beyond loans, costs, and fees to account for other expenses associated with school attendance. These commenters cited expenses such as travel expenses, costs of not pursuing other opportunities, child care expenses, consequential losses, and nonfinancial harms including pain and suffering. Commenters also noted that borrowers who attend fraudulent schools often lose out on portions of their lifetime Federal loan and grant eligibility, effectively losing several thousands of dollars in Pell grants that could be used towards other educational opportunities. To support the expansion of relief, one commenter cited State unfair and deceptive practices laws, under which all types of harms—direct and consequential, pecuniary and emotional—may provide the basis for relief.

Some commenters argued that relief should include updates to consumer reporting agencies to remove adverse credit reports. Citing the impact of negative credit reports on borrowers' ability to find employment, own a home, etc., commenters urged the Department to adopt language clarifying that any adverse credit history pertaining to any loan discharged through a borrower defense will be deleted. Some commenters suggested that the language in proposed § 685.222(i)(4)(ii) conform to the language in proposed § 685.206(c)(2)(iii), which requires the

Department to fix adverse credit reports when it grants discharges. Additionally, some commenters argued that relief should include a determination that the borrower is not in default on the loan and is eligible to receive assistance under title IV.

One commenter requested simplification of the language describing available relief, specifically, removal of the portion of § 685.222(i)(5) describing the unavailability of non-pecuniary relief on the basis that the provision would cause confusion.

*Discussion:* The Department's ability to provide relief for borrowers is predicated upon the existence of the borrower's Direct Loan, and the Department's ability to provide relief for a borrower on a Direct Loan is limited to the extent of the Department's authority to take action on such a loan. Section 455(h) of the HEA, 20 U.S.C. 1087e(h), gives the Department the authority to allow borrowers to assert "a defense to repayment of a [Direct Loan]," and discharge outstanding amounts to be repaid on the loan. However, section 455(h) also provides that "in no event may a borrower recover from the Secretary . . . an amount in excess of the amount the borrower has repaid on such loan." As a result, the Department may not reimburse a borrower for amounts in excess of the payments that the borrower has made on the loan to the Secretary as the holder of the Direct Loan.

Additionally, § 685.222(i)(8) also clarifies that a borrower may not receive non-pecuniary damages such as damages for inconvenience, aggravation, emotional distress, or punitive damages. We recognize that, in certain civil lawsuits, plaintiffs may be awarded such damages by a court. However, such damages are not easily calculable and may be highly subjective. We believe that excluding non-pecuniary damages from relief under the regulations would help produce more consistent and fair results for borrowers.

The Department official or the hearing official deciding the claim would afford the borrower such further relief as the Department official or the hearing official determines is appropriate under the circumstances. As specifically noted in § 685.222(i)(7), that relief would include, but not be limited to, determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the HEA, and updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan. We do not

**75978** **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

believe a modification of this provision to conform with § 685.206(c)(2)(iii) is necessary.

*Changes:* None.

*Comments:* Some commenters suggested that the proposed regulations could result in excessive institutional liability. These commenters argued that institutions should be liable under a successful claim only for costs related to tuition and fees, rather than all amounts borrowed. Commenters supported limiting claims for relief to the payment of loans issued under title IV, and only the portion of loans directly related to the costs of the education. Some commenters proposed that relief be limited to funds actually received by the institution. One commenter cited the measure of student loan debt contained in the Department's Gainful Employment regulations to support this proposed cap on relief. In support of this position, several commenters argued that some students borrow excessively, and institutions play a limited role in determining the level or purpose of student borrowing. These commenters opposed holding institutions liable for loans borrowed to support a student's living expenses because of the attenuated nature of the nexus between any act or omission underlying a valid borrower defense claim and a student's living expenses while enrolled. These commenters were concerned that assigning responsibility to schools in excess of tuition and fees would constitute an unjustifiable, unprecedented expansion of potential institutional liability.

*Discussion:* Since their inception, the Federal student loan programs were designed to support both tuition and fees and living expenses in recognition of the fact that students need resources such as food and housing when they are pursuing their educations. Indeed, the HEA's definition of cost of attendance, 20 U.S.C. 1087ll, includes tuition, fees, books, supplies, transportation, miscellaneous personal expenses including a reasonable allowance for the documented rental or purchase of a personal computer, room and board, childcare, and expenses related to a student's disability if applicable. When a student makes the choice to attend an institution, he is also choosing to spend his time in a way that may require him to take out Federal loans for living expenses, and very likely to forgo the opportunity to work to defray those costs from earnings. If he had not chosen to attend the institution, he would not have taken out such loans for living expenses: His Federal aid eligibility depends on his attendance at the institution. Therefore we believe

that an institution's liability is not limited to the loan amount that the institution received, since it does not represent the full Federal loan cost to students for the time they spent at the institution.[36] Regarding comments suggesting that some students borrow excessively and that institutions play a limited role in determining borrowing levels, it is important to note that institutions have the discretion to determine a reasonable COA based on information they have about their students' circumstances. Limiting gainful employment measurements to amounts borrowed for tuition and fees was reasonable for the context in which that approach was taken—measurement of eligibility of an entire program, based on borrowing decisions made by an entire cohort of completers. That context is not the paradigm for considering actual loss to individual borrowers. As discussed here, an institution may already face exposure in a private lawsuit for amounts greater than the amount the institution charged and received as tuition and fees, and the commenter offers no reason, and we see none, why a different rule should apply to determining the extent of the institution's liability for the same kinds of claims if successfully proven in the borrower defense context.

*Changes:* None.

*Fiscal Impact Considerations Inappropriate*

*Comments:* Commenters argued that full relief should be provided without consideration of fiscal concerns. Some commenters were concerned that consideration of fiscal impact would lead to groups of borrowers being denied relief to which they are entitled because of financial concerns. These commenters acknowledged taxpayer interests, but stated that taxpayers would benefit in the long term from a presumption of full relief because the presumption would deter fraud and

increase institutional accountability. Some commenters also suggested that partial relief would negatively impact Department incentives and conduct by, for example, reducing the Department's incentive to monitor schools appropriately on the front end. One commenter opposed consideration of fiscal impact because of concerns about the Department's potential to profit off of the student loan program.

*Discussion:* We discuss our reasons for including fiscal impact as a factor for consideration in the initiation of group processes under "Group Process for Borrower Defense." Section 685.222(i), which pertains to the relief awarded for either a group or individual borrower defense claim, does not include a consideration of fiscal impact.

*Changes:* None.

## Institutional Accountability

*Financial Responsibility*

General Standards § 668.171

Scope of Rulemaking

Retroactivity and Authority

*Comments:* Commenters argued that the proposed financial protection triggers exceeded the Department's authority under the HEA to assess financial responsibility on the ground that the proposed regulations would be impermissibly retroactive. In particular, commenters objected to the proposed requirement in § 668.171(c)(3) that a school is not financially responsible if it has been required by its accreditor to submit a teach-out plan because of a Department action to limit, suspend, or terminate the school, or if its accreditor has taken certain actions due to failure to meet accreditor standards and not later notified the Department that the failure has been cured.

Others objected that proposed § 668.171(c)(1)(i)(A) is also impermissibly retroactive by providing that a school that, currently or during the three most recently completed award years, is or was required to pay a debt or liability arising from a Federal, State, or other oversight entity audit or investigation, based on claims related to the making of a Federal loan or the provision of educational services, or that settles or resolves such an amount that exceeds the stated threshold, is not financially responsible. Under proposed § 668.171(f)(1)(i), an institution affected by either § 668.171(c)(1)(i)(A) or (c)(3) could continue to participate in the title IV, HEA programs only under provisional certification and by providing financial protection in an amount not less than 10 percent of the amount of Direct Loan funds or title IV,

---

[36] Common law recognizes that a party who may rescind a transaction and obtain restitution from the defendant of amounts paid to the defendant may also assert a claim for related expenditures made in reliance on the rescinded transaction.

Compensation of such loss by an award of damages is a remedy different in kind from rescission and restitution, but the remedies are not necessarily inconsistent when the claimant's basic entitlement is to be restored to the status quo ante. Damages measured by the claimant's expenditure can be included in the claimant's compensation for rescission, in order to do complete justice in a single proceeding. Recovery of what are commonly called "incidental damages" may thus be allowed in connection with rescission, consistent with the remedial objective of restoring the claimant to the precontractual position.

Restatement (Third) of Restitution and Unjust Enrichment, § 54 note (i).

HEA funds, respectively, received in the most recently completed fiscal year.

*Discussion:* None of the litigation or other provisions of the regulation are impermissibly retroactive. They attach no new liability to an event or transaction that was permissible at the time it occurred and that occurred prior to the effective date of the regulations. They simply address the risk that certain events that occurred prior to the effective date of the regulations create risks that warrant protection now. The risks in these instances are that these suits, and the other events included in § 668.171(c), can cause the institution to close or so substantially reduce operations as to generate closed school discharge claims, borrower defense claims, or both, from the students who are directly affected by the action at issue. The school is liable for borrower defense claims and closed school discharge claims; the requirement that the school provide financial protection does not increase any liability that would otherwise attach, but merely provides a resource that the Department may access to meet liabilities that would already arise if borrowers were to seek discharges on either ground. In either case, the Department would establish any such liability in the same manner in which it would were there no protection provided, and would release or refund any portion of the financial protection that was not needed to satisfy any claims established under those procedures, in which the school would have the same opportunity to object to the claims and be heard on those objections as it would have if no protection had been provided.

Regulated parties have repeatedly challenged Department rules that attached particular new consequences to actions that have already occurred. Courts have regularly rejected claims that regulations that operate like the regulations adopted here are impermissibly retroactive. A regulation is unconstitutionally retroactive if it "alter[s] the *past* legal consequences of past actions" [37] or, put another way, if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." [38]

Thus, whether a regulation "operates retroactively" turns on "whether the new provision attaches new legal consequences to events completed before its enactment." [39] It is, however, well settled that "[a] statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment." [40] Nor is a statute impermissibly retroactive simply because it "upsets expectations based in prior law." [41] Like each of the regulations challenged in these cases, the present regulations in some instances would mandate consequences for certain actions that occurred prior to the effective date of the regulations, but would not attach any new liability to those actions or transactions that were permissible when the events occurred.

Moreover, we have clarified that the regulations apply to any triggering events that occur on or after July 1, 2017. We have also removed the two triggers highlighted by these commenters as looking to certain past events in a way that mitigates almost all of the commenters' concerns. First, we modified the accrediting agency actions trigger substantially, to assess as an automatic trigger [42] only the effect of a closure of a school or location pursuant to a teach-out requirement, and consider other accreditor actions occurring in the past three years only as a discretionary trigger. There is no three-year look-back in the automatic trigger. For this and other discretionary triggers, there is an opportunity for further review of the impact of those events. We have removed the three-year look-back in the lawsuits and other actions trigger. These

changes are described in more detail in the sections specific to these triggers. Finally, as we have described, the final regulations permit an institution to demonstrate, either when it reports the occurrence of a triggering event or in an action for failure to provide a required letter of credit or other financial protection, that an event or condition no longer exists or has been resolved or that it has insurance that will cover the debts and liabilities that arise at any time from that triggering event.

*Changes:* We have revised §§ 668.90(a)(iii) and 668.171(h) to include consideration of insurance; we have removed the three-year period for review from § 668.171(c); we have revised the teach-out provisions in § 668.171(c)(1)(iii) to consider only the effect on the overall institutional financial capability of closures of locations or institutions as determined by recalculating the institution's composite score, as discussed more fully under the heading "Teach-out Plan"; and we have revised § 668.171(b) to provide that the regulations address only those triggering events or conditions listed in § 668.171(c) through (g) that occur after July 1, 2017.

*Comments:* Several commenters contended that the proposed triggers in § 668.171(c) fail to take into account the provisions in section 498(c)(3) of the HEA that require the Secretary to determine that an institution is financially responsible if the school can show, based on an audited and certified financial statement, that it has sufficient resources to ensure against precipitous closure, including the ability to meet all of its financial obligations. To support this contention, the commenters stated that the proposed regulations do not provide a process or procedural mechanism for an institution to make this statutory showing before the Department would require the institution to submit a letter of credit in response to running afoul of an automatic trigger.

Similarly, some commenters stated that requiring financial protection by reason of the occurrence of a single triggering event was contrary to the requirement in section 498(c)(1) of the HEA that the Department assess the financial responsibility of the institution in light of the total financial circumstances of the institution.

Other commenters stated that section 498(c) of the HEA requires the Department to assess financial responsibility based solely on the audited financial statements provided by the institution under section 487(c) of the HEA.

---

[37] *Ass'n of Private Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d 176, 196 (D.D.C. 2015), *aff'd sub nom. Ass'n of Private Sector Colleges & Universities* v. *Duncan,* 640 F. App'x 5 (D.C. Cir. 2016) (internal citations removed).

[38] *Ass'n of Proprietary Colleges* v. *Duncan,* 107 F. Supp. 3d 332, 356 (S.D.N.Y. 2015) (gainful employment measured by using debt and earnings incurred prior to effective date of new rule); see also: *Ass'n of Accredited Cosmetology Sch.* v.

*Alexander,* 774 F. Supp. 655, 659 (D.D.C. 1991), *aff'd,* 979 F.2d 859 (D.C. Cir. 1992), and *order vacated in part sub nom. Delta Jr. Coll., Inc.* v. *Riley,* 1 F.3d 45 (D.C. Cir. 1993) and *Ass'n of Accredited Cosmetology Sch.* v. *Alexander,* 979 F.2d 859, 864 (D.C. Cir. 1992) (application of cohort default rate to eligibility using pre-rule data).

[39] Id.

[40] *Ass'n of Proprietary Colleges* v. *Duncan,* 107 F. Supp. 3d at 356.

[41] Id.

[42] Under the proposed regulations, an institution would not be financially responsible for at least one year if it was subject to a triggering event that exceeded a materiality threshold or for a State or accrediting agency action, three years after that action. In these final regulations, an institution is not financially responsible if an automatic triggering event such as a lawsuit or loss of GE program eligibility produces a recalculated composite score of less than 1.0 or for a 90/10 or CDR violation or SEC action, the occurrence of that violation or action. In both the NPRM and these final regulations, discretionary triggers refer to actions, conditions, or events that are evaluated by the Department on a case-by-case basis to determine whether they have a material adverse impact on the financial condition or operations of the institution.

*Discussion:* Section 498(c) of the HEA directs the Secretary to determine whether the institution "is able . . . to meet all of its financial obligations, including (but not limited to) refunds of institutional charges and repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary.'' 20 U.S.C. 1099c(c)(1). The statute uses the present tense to direct the Secretary to assess the ability of the institution to meet current obligations. The statute then provides that the Secretary shall also develop criteria based on financial ratios, which are to be measured and reported in audited financial statements. 20 U.S.C. 1099c(c)(2), (5). Obligations that accrued in the past may be reflected in financial statements showing the institution's financial status as of the close of the most recent institutional fiscal year, which are to be submitted to the Department "no later than six months after the last day of the institution's fiscal year.'' 34 CFR 668.23(a)(4). Obligations that accrue after the close of that fiscal year are not included in those statements, and those losses that are considered probable may receive limited recognition in those statements. Potential losses from pending litigation that are not yet considered probable are not included in those statements.

Thus, as the commenters state, the statute directs the Secretary to take into account "an institution's total financial circumstances in making a determination of its ability to meet the standards herein required.'' 20 U.S.C. 1099c(c)(2). Far from precluding the Secretary from giving controlling weight to a single significant occurrence in making this determination, the statute recognizes that the Secretary may do so if certain enumerated single adverse events have occurred in the past two to five years (*e.g.*, audit liabilities exceeding five percent of the institution's prior year title IV, HEA funding, or a limitation, suspension or termination action or settlement of such an action). 20 U.S.C. 1099c(e). The Secretary has since, at least the 1994 regulations, consistently considered even one such "past performance'' event as sufficient grounds to render an institution not financially responsible even if it met or exceeded the requisite composite financial score, and if the Secretary nevertheless permitted the institution to participate, the institution was required to do so under provisional certification with financial protection. 34 CFR 668.174(a), 668.175(f), (g). The current regulations have also considered an institution not financially responsible if the institution is currently

delinquent by at least 120 days on trade debt, and at least one creditor has sued. 34 CFR 668.171(b)(3). Thus, in considering the institution's total financial circumstances, the Secretary has consistently regarded a single such occurrence as a sufficient threat to the institution's ability "to meet . . . its financial obligations'' as to make the institution not financially responsible. In so doing, the current regulations do not delegate to the suing creditor, or to the guarantor that brought the limitation, suspension, or termination action, the determination of the financial responsibility of the institution. To the contrary, the current regulations already identify particular past or present events as raising significant threats to the institution's ability to meet current obligations to creditors, to students, and to the taxpayer. The changes to the financial responsibility regulations articulate a more comprehensive list of adverse events that similarly call into question the institution's ability to meet current and impending obligations.

*Changes:* None.

*Comments:* Some commenters argued that under the APA, the Department cannot enact regulations applicable to time periods prior to the enactment of those regulations and therefore must remove the proposed § 668.171(c)(3), which would impose penalties on an institution that is currently, or was any time during the three most recently completed award years, subject to an action by its accrediting agency.

*Discussion:* As discussed above, in response to the commenters' objection that the rules are impermissibly retroactive, they are not because they affect only future participation. In light of the adoption of the composite score methodology, in this section, we evaluate risks under that methodology as they affect the current financial responsibility of the institution. We evaluate on a three-year look-back period, as a discretionary triggering event, only certain accreditor actions.

*Changes:* We have revised § 668.171(c)(1)(i) so that it does not include events that occurred in the prior three years, we have revised § 668.171 to apply to events occurring on or after July 1, 2017, and we have relocated accreditor actions regarding probation and show cause to § 668.171(g)(5) as discretionary triggers.

Penalty-Financial Protection

*Comments:* A commenter stated that requiring the institution to provide financial protection constituted a penalty on the institution, and that requiring the institution to provide such

protection from its own funds constituted a deprivation of the institution's property interest in those institutional funds. The commenter stated that the requirement would also deprive the institution of its liberty interest by stigmatizing it. The commenter stated that the proposed requirement offered the institution no opportunity to dispute the requirement prior to the deprivation of these interests, and thus the deprivation would be imposed without the due process required by applicable law. The commenter stated that Congress requires the Department to provide schools with meaningful procedures before the imposition of a significant penalty. Specifically, the commenter stated that section 487 of the HEA requires the Department to afford schools "reasonable notice and opportunity for hearing'' before imposing a "civil penalty.'' This requirement applies when the Department seeks to limit, suspend, or terminate the school's participation in any title IV, HEA program; determine that a school has made a substantial misrepresentation; or determine that a school has violated statutes or regulations concerning the title IV, HEA programs, each of which carry severe penalties. The commenter asserted that the required financial protection under this rule constitutes a civil penalty under the HEA, and is in fact far more onerous than the other examples in the HEA. Accordingly, the commenter contended that the Department must afford parties the same process that Congress contemplated in analogous circumstances.

*Discussion:* The requirement that the school provide financial protection is not a "penalty'' under the HEA, which clearly labels as "civil penalties'' what the regulations refer to as "fines.'' 20 U.S.C. 1094(c)(3)(B); 34 CFR 668.84. In contrast, section 498(c) of the HEA refers to financial protections using completely different terms: "third party guarantees,'' "performance bonds,'' and "letters of credit.'' The fact that the financial protections may inconvenience or burden the school in no way makes their requirement a "penalty.'' However, current regulations already require the Department to provide the school with the procedural protections that the commenter seeks. 34 CFR 668.171(e) requires that the Department enforce financial responsibility standards and obligations using the procedures pertinent to the school's participation status; for fully certified schools, the regulations require the Department to use termination or limitation actions under subpart G of

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations **75981**

part 668 to enforce the requirement that the school's participation be terminated for lack of financial responsibility, or that the school's continued participation be reduced to provisional participation status and further conditioned on the provision of financial protection. Current regulations already assure that the school will receive all the procedural protections to which the HEA entitles it, not because the Department would deprive the school of its property right in its funds (which the financial standards would not do), but because the method of enforcing the financial responsibility obligation is through a termination or limitation action, subject to the procedural protections of an administrative hearing. 34 CFR part 668, subpart G. These requirements will not change under the new regulations.

Section 668.90(a) affords the school the opportunity to demonstrate, in the administrative proceeding, that a proposed limitation or termination is "unwarranted." That same regulation, however, includes some 14 specific circumstances in which the hearing official has no discretion but to find that the proposed action is "warranted" if certain predicate facts are proven. Among these restrictions is a provision that, in a proposed enforcement action based on failure to provide "surety" in an amount demanded, the hearing official must find the action warranted unless the hearing official concludes that the amount demanded is "unreasonable." In addition, § 668.174 provides explicit, detailed, curative or exculpatory conditions that must be met for a school subject to a past performance issue to participate. However, these substantive requirements are not incorporated in subpart G of part 668, the regulations regarding the conduct of limitation or termination proceedings. This may have created the impression that an institution subject to the requirements of § 668.174 could raise a challenge to those requirements in an administrative action to terminate or limit the institution that does not meet the requirements of § 668.174. This was never the intent of the Department. We therefore revise the regulations in § 668.90 governing hearing procedures to make clear that the requirements in current § 668.174 that limit the type and amount of permitted curative or exculpatory matters apply in any administrative proceeding brought to enforce those requirements. As for the restriction in the final regulations on challenges to a requirement that the school provide the "surety" or other

protection, the Department is updating and expanding one of the existing 14 provisions in which an action must be found warranted if a predicate fact is proven—in this case, the occurrence of certain triggering events, established through notice-and-comment rulemaking, that pose significant risk warranting the provision of adequate financial protection, in a minimum amount also established as sufficient through this same notice-and-comment rulemaking, with any added amount demanded and justified on a case-by-case basis. The Department is significantly revising the triggers proposed in the NPRM to simplify and reduce the number of conditions or occurrences that qualify as automatic triggers. As we discuss in adopting the composite score methodology, we measure the effect of most of the triggering events not in isolation, but only as each may affect the overall financial strength of the institution, as that strength was most recently assessed under the financial ratio analysis adopted in current regulations. § 668.172. And, for all discretionary triggers, the Department undertakes to assert a demand for protection only on a case-by-case basis, with full articulation of the reasons for the requirement.[43] For these discretionary triggers, a school may contest not only whether the predicate facts have actually occurred, but also whether the demanded "surety"—financial protection—is reasonable.

*Changes:* We have revised § 668.90(a)(3) to incorporate the limitations contained in current § 668.174, as well as the limits on challenges to demands for financial protection based on the automatic triggers in § 668.171(c)–(f) as modified in these final regulations.

*Composite Score and Triggering Events*

General

*Comments:* Some commenters believed that the Department should not promulgate new financial responsibility requirements, or have otherwise

---

[43] As discussed with regard to determining the appropriate amount of financial protection, ordinarily the expected result of closure or a significant reduction in operations is closed school discharge claims. We recognize that in some instances financial protection may be warranted for an institution that does not participate in a title IV, HEA loan program, and its closure thus cannot generate closed school claims. Such an institution remains subject to a demand based on a discretionary assessment of other potential losses, and we have revised § 668.90(a)(3) to ensure that such an institution can object to a demand for financial protection if that demand was based *solely* on the 10 percent minimum requirement generally applicable.

engaged in a rulemaking to do so, without reviewing and making changes to the composite score methodology used in the current financial responsibility standards in subpart L of part 668, particularly in view of changing accounting standards, and the manner in which the Department applies, calculates, and makes adjustments to the composite score.

Similarly, other commenters contrasted the process used to develop these financial responsibility amendments with the process used by the Department to develop the subpart L standards. The commenters noted that, in developing the subpart L standards, the Department engaged in systematic, sustained efforts to study the issue and develop its methodology through the formal engagement and aid of KPMG, an expert auditing firm, with significant community involvement. That process took approximately two years, and began with empirical studies by KPMG into the potential impact of the rule over a year before the issuance of any proposed language. The commenters stated that, in this case, the Department is rushing out these revisions without the necessary and appropriate analysis. Commenters noted that the Department produced draft language on the triggers and letter of credit requirements in the second negotiated rulemaking session, but with no significant accompanying analysis or basis for its proposal, and did not consult effectively or sufficiently with affected parties or prepare sufficient information and documentation to convey, or for the negotiated rulemaking panel to understand, the impact of this portion of the proposed regulations.

Some commenters were concerned that the Department did not harmonize the proposed financial responsibility provisions with the current composite score requirements and questioned whether it was reasonable for the Department to require an institution with the highest composite score of 3.0 to secure one or more letters of credit based on triggering events. The commenters further questioned why the Department proposed numerous and overlapping requirements, if the Department believes that the current composite score is a valid indicator of an institution's financial health.

Overlapping Triggers

Some commenters argued that it would be unnecessarily punitive to list as separate triggering events, and thereby impose stacking letter of credit requirements for, items that may be connected to the same underlying facts or allegations. For example, a lawsuit or

administrative proceeding settled with a government oversight agency for an amount exceeding a set threshold could lead an institution's accrediting agency to place the institution on probation, or an institution that fails the 90/10 revenue requirement might thereby violate a loan covenant.

As another example, commenters noted that an institution could be subject to a lawsuit or multiple lawsuits about the same underlying allegations, an accrediting agency may take action against the institution in connection with the same allegations, and a State agency may cite the institution for failing State requirements that relate to those same allegations. The commenters stated that multiple triggering events did not necessarily warrant additional financial protection and believed that this "stacking" of triggers is especially punitive to publicly traded institutions, which may be required to or voluntarily elect to disclose certain triggering events, such as lawsuits in reports to the SEC where making such disclosures is then itself an independent trigger. In this case, the commenters believed it was unfair to penalize a publicly traded institution twice, while any other institution with fewer shareholders or one that opts to raise capital privately would be subject to only one letter of credit requirement.

Commenters objected that it would be theoretically possible that a school could be required to post letters of credit exceeding 100 percent of the title IV, HEA funds the school receives, effectively crippling the school. The commenters cautioned that the Department should not require multiple letters of credit stemming from the same underlying facts or allegations—rather, the rules should reflect a more refined approach for setting an appropriate level of financial protection for each unique set of facts or allegations. The commenters suggested that to ensure that an institution provides the amount of financial protection that relates specifically to its ability to satisfy its obligations, the Department should evaluate each triggering event that occurs to determine whether any additional financial protection is needed.

A few commenters suggested that, rather than applying the proposed triggering events in a one-size-fits-all manner, the Department should consider other institutional metrics that serve to mitigate concerns about institutional viability and title IV, HEA program risks. For example, the commenters suggested that the Department could presumptively exclude from many of the new triggers

those institutions that have low and stable cohort default rates, consistently low 90/10 ratios, a general lack of accrediting or State agency actions, or any combination of these items. The commenters reasoned that, in the context of the NPRM, these attributes would generally indicate strong student outcomes and less likelihood of borrower defense claims arising from the institution. Or, the Department could provide that institutions with cohort default rates and 90/10 ratios below specified thresholds would not be required to post cumulative letters of credit under the new general standards of financial responsibility. Similarly, the commenters urged the Department to assess the circumstances of each triggering event to determine whether any additional protection is needed rather than requiring cumulative letters of credit for each of the triggering events. The commenters believed that by taking these alternate approaches, the financial responsibility regulations could be tailored to assess institutional risk profiles on a more holistic basis, rather than in the generally non-discerning manner reflected by the NPRM.

Other commenters requested that the Department specify in the final regulations the duration of each letter of credit for each triggering event, noting that in the preamble to the NPRM, the Department stated that schools subject to an automatic trigger would not be financially responsible for at least one year based on that trigger, and in some instances, for as long as three years after the event.

A commenter asserted that the institution should be provided the opportunity to demonstrate by audited financial statements that it had the resources to ensure against precipitous closure pursuant to section 498(c)(3)(C) of the HEA.

*Discussion:* After carefully considering the comments, the objective of the changes that we proposed, and the availability of other measures, we are changing the method of assessing the effect of many of the triggering events. We explain here briefly the composite methodology currently used to evaluate financial strength, and how we will use the composite score methodology to evaluate whether, and how much, those triggering events actually affect the financial capability of the particular institution. In addition, as discussed later in this preamble, we are revising and refining the triggers to consider as discretionary triggering events several of the events included as automatic triggers in the NPRM.

The composite score methodology in subpart L used under current regulations is the product of a comprehensive study of the issue and of numerous financial statements of affected institutions, as well as substantial industry involvement. The 1997 rulemaking that adopted this method established a basic model for evaluating financial responsibility that was intended to serve as the core of the Department's evaluation process for proprietary and private non-profit institutions, replacing a piecemeal approach still reflected in § 668.15(b)(7), (8), and (9). The regulations in subpart L were adopted to replace the prior structure, in which an institution was required to satisfy a minimum standard in each of three independent tests. The Department replaced that with "a ratio methodology under which an institution need only satisfy a single standard—the composite score standard. This new approach is more informative and allows a relative strength in one measure to mitigate a relative weakness in another measure." 62 FR 62831 (Nov. 25, 1997).[44] However, we note that even the prior financial responsibility standards considered whether the school was subject to a pending administrative action or suit by a Federal agency or State entity. § 668.15(d)(2)(ii)(C). Section 668.15 contained, and still contains, provisions addressing matters that may well occur after the audited period—for example, delinquency on an existing debt obligation, and a suit by at least one creditor, § 668.15(b)(4)(ii), as well as the same familiar past performance standards regarding parties with substantial control over the institution or the institution itself. 34 CFR 668.15(c).[45]

Although the 1997 regulations replaced the three independent financial ratio tests with the new composite score methodology as the core measure of financial responsibility,

---

[44] The composite score methodology assesses three aspects of financial strength but, unlike the prior method, assigns relative weights to each of the three assessments to produce a single, "composite" score.

[45] The 1994 financial responsibility regulations implemented the provision of section 498(c)(3)(C) of the HEA that would have allowed an institution that failed other financial responsibility to demonstrate by audited financial statements that it would not pose a risk of "precipitous closure." § 668.15(d)(2)(ii). The 1997 regulations supplanted the standards in § 668.15 with new subpart L, which centered the assessment of financial responsibility on the composite score methodology. The Department there adopted the "zone" assessment to assess "precipitous closing" rather than the separate audited financial statement showing previously permitted. 62 FR 62860–62862 (1997).

those regulations retained most of the accompanying provisions dealing with examples of financial risks that would not necessarily or even ordinarily be reflected in the audited financial statements on which the composite score rests. The Department made clear in the NPRM that, despite requests to revisit or modify the composite score component of the financial responsibility regulations, we were not doing so. 81 FR 31359. Thus, we retain here unchanged the methodology that the commenters laud as the product of careful, comprehensive, and engaged development.

In these final regulations the Department addresses the significance of new events that occur after the close of an audited period, or that are not recognized, or not fully recognized, and reflected in audited financial statements, to assess whether the school, regardless of its composite score, "is able to provide the services described in its publications and statements, to provide the administrative resources necessary to comply with the requirements of this title [title IV of the HEA], and to meet all its financial obligations. . . ." 20 U.S.C. 1099c(c)(1). In doing so, we are expanding the consideration of events that would make a school not financially responsible in the near term—from the single example in current regulations (commercial creditor lawsuits) to other major lawsuits and other events that pose a potential material adverse risk to the financial viability of the school. In the negotiated rulemaking meetings, and in the NPRM, we articulated the adverse events that recent history indicates pose a significant risk to the continued ability of an institution to meet these several obligations. We address elsewhere in this preamble comments directed at events that pose particular risks, but discuss here the manner in which these events will be evaluated.

The composite score methodology, as commenters stressed and as we acknowledge, is designed to measure the viability of an institution from three different aspects and develop a score that assigns relative weight to each aspect to produce a score showing the relative financial health and viability of the institution. In general, institutions with a composite score of 1.5 or more are financially responsible; those with a score between 1.0 and 1.5 are in the "zone" and subject to increased reporting and monitoring; those with a score below 1.0 are not financially responsible, and may participate only on conditions that include providing financial protection to the Department.

However, the limitations of the existing composite score methodology are two-fold: The score is calculated based on the audited financial statements for the most recent fiscal year of the institution, and the audited financial statements recognize threatened risks only if accounting rules require the institution to recognize those events. If those events are recognized, however, the composite score can readily assess their effect on the viability of the institution, with due regard for the actual financial resources of the institution, including its ability to meet exigencies with internal resources and to borrow to meet them. The institution's composite score in each instance has already been calculated; to assess the effect of a threat or event identified in these regulations, the institution's financial statements on which that composite score was calculated will be adjusted to reflect the amount of loss attributed to, and other impacts of, that threat, and based on the adjusted statements, the Department will recalculate the institution's composite score. This recalculation will occur regularly as threats or events identified in these regulations are identified. By adopting this approach, the final regulations provide an individualized assessment rather than the one-size-fits-all method proposed in the NPRM that commenters found unrealistic. Unless other conditions apply, under the current regulations, an institution that undergoes a routine assessment of financial responsibility and achieves a composite score of 1.5 or greater may continue to participate without providing financial protection; an institution with a score between 1.0 and 1.5 may participate subject to heightened reporting and scrutiny; and an institution with a composite score below 1.0 is not financially responsible and may participate only with financial protection.[46] §§ 668.171(b)(1), 668.175(c), 668.175(f). Under the approach we adopt here, where the recognition of the triggering event produces a recalculated composite score of 1.0 or greater, we will regard the event as not posing a risk that makes or is likely to make the institution not financially responsible, and will therefore not require financial protection. If the recognition of the

event or risk produces a failing composite score—less than 1.0—the institution is required to provide financial protection.[47]

For the purpose of recalculating an institution's composite score, as detailed in Appendix C to these regulations, the Department will make the following adjusting entries to the financial statements used to calculate an institution's most recent composite score. For clarity, the adjusting entries refer to the line items in the balance sheet and income statements illustrated in Appendix A for proprietary institutions and Appendix B for non-profit institutions.

For a proprietary institution, for events relating to borrower-defense lawsuits, other litigation, or debts incurred as a result of a judicial or administrative proceeding or determination, or for a withdrawal of owner's equity, the Department will debit Total Expenses, line item #32, and credit Total Assets, line item #13, for the amount of the loss—the amount of relief claimed, the debt incurred, the amount withdrawn, or other amount as determined under § 668.171(c)(2). Except for the withdrawal of owner's equity, the corresponding entries for a non-profit institution are a debit to Total Expenses, line item 38b (unrestricted), and a credit to Total Assets, line item #12, for the amount of the loss.

For a proprietary institution, for events relating to a closed institution or institution or the potential loss of eligibility for GE programs, the Department will debit Total Income, line item #27, and credit Total Assets, line item #13, for the amount of the loss. The loss is the amount of title IV, HEA funds the institution received in the most recently completed fiscal year for the location or institution that is closing or for the GE programs that are in jeopardy of losing their eligibility for title IV, HEA funds in the next year. In addition, the Department will debit Total Assets, line item #13, and credit Total Expenses, line item #32, for an amount that approximates the educational costs that the institution would not have incurred if the programs at the closing location or the affected GE programs were not offered. We believe it is reasonable that this reduction in costs is proportional to the ratio of Cost of Goods Sold (line item #28) to Operating Income (line item #25)—that is, the amount it cost the institution to provide all of its

---

[46] As provided under § 668.175(f)(3), an institution that has a composite score of less than 1.0 is not financially responsible until it achieves a composite score of 1.5 or higher. In other words, if an institution with a composite score of less than 1.0 has in the following year a composite score between 1.0 and 1.5, the institution is still subject to the requirements under the provisional certification alternative, including the letter of credit provisions, even though it scores in the zone.

[47] As the Department stated in the 1997 rulemaking, "However, an analysis of data of closed institutions indicates that institutions that fail the ratio test should not be allowed to continue to participate without some additional surety to protect the Federal interest."

educational programs divided by the revenue derived from offering those programs.

The corresponding entries for a non-profit institution are, for the loss, a debit to Total Revenue, line item #31b, and a credit to Total Assets, line item #12. The reduction in costs is calculated by dividing Operating Expenses, line item #32, by Tuition and Fees, line item #27, and multiplying the result by the amount of the loss, the amount of title IV, HEA funds received by the location or affected GE programs. To account for the reduction in costs, the Department will debit Total Assets, line item #12, and credit Total Expenses, line item 38b.

Recognition of recent or threatened events can be appropriately measured under the composite score methodology if the event causes or is likely to cause a loss that can be quantified. All but two of the events that we retain as automatic triggers pose risks that we can quantify in order to assess their impact on the institution's composite score. Lawsuits, new debts of any kind, borrower defense discharge claims, closure of a location, loss of eligibility of gainful employment programs, and withdrawal of owner equity all have effects that may be quantified so that their effects can be assessed using the composite score methodology.

In at least two instances, there is no need to attempt to quantify the loss, because the loss is self-evident. An institution that fails the requirement to derive at least 10 percent of its revenues from non-title IV sources is so dependent on title IV, HEA funds as to make the loss of those funds almost certainly fatal, and we see no need to quantify that amount through the composite score methodology. That risk requires financial protection regardless of the most recent composite score achieved by the institution. Similarly, an institution whose cohort default rate exceeds 30 percent in two consecutive years is at risk of losing title IV, HEA eligibility the following year and requires no composite score calculation. These risks require financial protection regardless of the most recent composite score achieved by the institution.

An action taken by the SEC to suspend trading in, or delist, an institution's stock directly impairs an institution's ability to raise funds—creditors may call in loans or the institution's credit rating may by downgraded. However, unlike lawsuits and other threats, it is difficult to quantify readily the amount of risk caused by that action and assess that new risk using the prior year's financials and the composite score

derived from those statements. Nevertheless, because the impaired ability to raise funds caused by these actions is potentially significant, that risk warrants financial protection without the reassessment of financial health that can be readily performed for more quantifiable risks. Nevertheless, because the impaired ability to raise funds caused by these actions is potentially significant, that risk warrants financial protection without the reassessment of financial health that can be readily performed for more quantifiable risks.

We recognize that the institution's current year financial strength may differ from that reported and analyzed for the prior fiscal year. That difference, however, can be favorable or unfavorable, and would be difficult to reliably determine in real time. Given that uncertainty, we consider it a reasonable path to use as the baseline the data in the most recent audited financials for which we have computed a composite score, and adjust that data to reflect the new debt or pending threat. Any disadvantage this may cause an institution will be temporary, because the baseline will be corrected with submission, evaluation, and scoring of the current year's audited financial statements. In assessing the composite score of the new financial statements for purposes of these standards, we will continue to recognize, for purposes of requiring financial protection, any threats from triggering events that would not yet be fully recognized under accounting standards. However, improvements in positions demonstrated in the new audited financials may offset the losses recognized under these regulations. If those improved positions produce a composite score of 1.0 or more, despite the loss recognized under these regulations, the institution may no longer be required to provide financial protection.

With regard to the suggestion by the commenters that the Department allow an institution to submit new month-end or partial-year audited financial statements from which the composite score would be recalculated, we believe that doing so would be costly and unworkable, because those financial statements do not reflect a full year's transactions, and would potentially recognize only new debts, or partially recognize new litigation or other claims for which the institution determines that a loss is probable. We note that the composite score methodology was designed to measure the financial performance of an institution over an entire 12-month operating cycle, the

institution's fiscal year, and believe that attempting to calculate a composite score for a partial year would produce anomalous results. In addition, it is not clear how an institution could produce audited financial statements by the end of the month in which a triggering event occurred. Further, the suggestion does not appear to offer a realistic approach because separate actual or threatened losses may occur throughout the year, and for each event, this proposal would require a new set of financial statements.

This approach will affect only institutions that have a recalculated composite score of less than 1.0. If recognition of the event produces a recalculated composite score of between 1.0 and 1.5 for an institution that had a routine composite score of 1.5 or more, the recalculated score does not change the existing score to a zone score, so the institution is not required to comply with the zone requirements. §668.175(d). For some institutions, a single event or threat may produce a failing composite score, while for others, a series of actions or events may together place the institution at substantial risk. Using the composite score methodology to assess new or threatened risks, instead of using a dollar- or percentage-based materiality threshold for individual triggering events, allows the Department to assess the cumulative effect on the institution of individual threats or events regardless. Thus, we will require financial protection only when the recalculated composite score is failing and the cumulative effect produces a failing score.

In response to the commenters who objected that the proposed triggering scheme would arbitrarily "stack" protection requirements, the composite score methodology distinguishes among levels of financial strength, and as we explain below, permits the Department to align the amount of protection required with the relative risk or weakness posed by successive triggering events or conditions. We agree with the commenters that an institution should not be required to provide financial protection for every automatic triggering event for which the underlying facts or circumstances are the same or where a direct causal relationship exists between two or more events, like the circumstance noted by the commenters where a 90/10 violation causes a loan agreement violation, or a settlement generates an accreditor sanction.

In response to the objection that these regulations could require financial protection equal to all of the title IV, HEA funds received in the prior year,

we adopt here an approach that tailors the amount of protection required to a minimum amount we consider sufficient to cover the losses to the government reasonably likely to occur upon closure, plus any additional amount that we estimate is reasonable to expect based on the circumstances presented by the risks posed for the particular institution. Under current regulations, an institution that does not meet financial responsibility standards may participate under provisional certification requirements by providing a letter of credit equal to at least 10 percent of the prior fiscal year title IV, HEA program funds received. § 668.175(f)(2)(i). This restriction applies to any institution that no longer qualifies for continued participation in the zone, or, as particularly pertinent here, achieves anything less than a score of 1.0—for example, a score of .90. Because the composite score makes these kinds of distinctions among scores, current regulations give dispositive weight to its results in critical determinations regarding an institution's ability to participate. Thus current regulations have long attached controlling significance to what may be relatively slight differences in composite score outcomes. We adopt here a rule that an institution that receives an adjusted composite score of less than 1.0 must provide financial protection in an amount not less than 10 percent of the prior fiscal year's title IV, HEA funding, and, as the composite score decreases, the institution may be required to provide an added amount of protection where supported by the particular facts and circumstances— including the history of the institution, the nature of the risks posed, the presence of existing liabilities to the Department, the presence, amount, and rate at which borrower defense claims are being filed, and the likelihood that the risk will result in increases in borrower defense claims.

The requirement to provide at least a 10 percent letter of credit is rooted in the 1994 regulations regarding provisional certification of institutions that did not meet generally applicable financial responsibility standards. 34 CFR 668.13(d)(1)(ii)(1994). We adopt here this 10 percent as a minimum requirement because we consider financial protection in the amount of 10 percent of prior year title IV, HEA funding to be the minimum amount needed to protect the taxpayer from losses reasonably expected from an institution's closing. These losses include, at a minimum, costs of closed school discharges. Closed school

discharges can affect all loans— including PLUS loans—obtained to finance attendance at the closing institution. This includes any loans obtained for enrollment in years before the year in which the institution closes, not merely those loans received by students for attendance at the institution in the year in which it closes. Thus, a closure could, in some instances, generate closed school discharge losses in amounts exceeding the total amount of Direct Loan funds that the institution received in the year preceding the year of that closure.

Liabilities of an institution could also include liabilities for funds unaccounted for by audit, because the institution as a fiduciary is liable for the costs of title IV, HEA funds it received unless it affirmatively demonstrates by the required compliance audit that it spent those funds properly. An institution that closes may have neither the resources nor the incentive to secure an audit of its expenditures of these funds. The liability of an institution that fails to account for those funds includes the full amount of Pell Grant funds received, and, for loans that are received for that period and are not discharged, the subsidy costs for those loans, which varies from year to year among loan types.[48] An institution that closes may also owe liabilities to the Department for debts arising from audits, program reviews, or fine actions, or from borrower defense claims. Closure of the institution would also jeopardize recovery of all these liabilities, and the risk to the taxpayer in those instances is considerably greater than the costs of closed school discharges.

We have already experienced closed school discharge claim losses in one of the most recent and significant school closures, that of Corinthian, that permits development of estimates of liabilities. Corinthian was composed of three chains of some 37 separate institutions, operating at 107 campuses, with 65,000 students enrolled in 2014. It received

$1.439 billion in title IV, HEA funding in FY 2013, the last full fiscal year preceding its closure. During the year preceding its closure, Corinthian sold 50 campuses, with some 30,000 students enrolled, to a new entity, a transaction that allowed a major portion of Corinthian students to complete their training. In addition, under agreement with the Department, Corinthian continued training at the campuses it retained until its closure in April 2015.

The Department has to date granted closed school discharges of some $103.1 million for some 7,858 Corinthian borrowers, with the average discharge some $13,114.[49] Additionally, the Department has thus far approved 3,787 borrower defense discharges, totaling $73.1 million. Together, Corinthian's liabilities through both closed school and borrower defense total more than $176 million, with additional claims expected to be approved later. A letter of credit at the level of 10 percent of prior year title IV, HEA funding would have been $143 million—enough to cover the estimated total closed school discharges and far too little to cover the school's total liabilities on individual student loan losses.[50]

From this history, we estimate that an institution that closes in an orderly wind down, under which the majority of the students are able to continue their education by transfer or otherwise, will generate closed school discharge claims of at least 10 percent of the amount of all title IV, HEA funding received in the last complete fiscal year prior to the year in which the institution finally closes. Therefore, we adopt 10 percent of prior year title IV, HEA funding as the minimum amount of financial protection required of an institution that achieves a recalculated composite score of less than 1, or otherwise faces the risks (90/10, cohort default rates, SEC action) for which we do not recalculate a composite score. This is consistent with many years of Department practice.

Obviously, not all closures will arise in such fortuitous situations. It is realistic to expect that for other closures, including those that are more precipitous, a far greater percentage of borrowers will qualify for closed school discharges. Moreover, these regulations are expected to increase the number of instances in which we will give a closed school discharge by providing relief without an application where we have sufficient information to determine eligibility. In addition, based on the Corinthian experience, we expect that

---

[48] Because every institution must affirmatively account for the title IV, HEA funds it has caused to be awarded during an entire fiscal year as properly spent, an institution receiving funds on the cash monitoring or reimbursement method does not meet this obligation simply by having payments approved under the requirements applicable to funding under those methods, which do not necessarily involve the comprehensive examination conducted in an audit. Similarly, because the institution must make this accounting on a fiscal year basis, the fact that an institution may offer short programs several of which may be completed within a fiscal year does not limit the potential loss in the case of a precipitous closure to the amount of funds received for a program that may be curtailed by such a closure, rather than all the funds for which it was responsible for the entire fiscal year.

[49] As of October 2016.

[50] The Department also fined Corinthian $30 million.

the law enforcement agency actions that can constitute triggering events will generate borrower defense claims as well.[51] Other liabilities to the Department may already exist or are expected to arise. Under these regulations, therefore, the Department demands greater financial protection in cases in which these risks are identified, in addition to the minimum 10 percent. We include other conditions as discretionary triggering events, but in particular circumstances, those conditions can separately indicate that the potential losses that may arise warrant levels of financial protection greater than 10 percent. If the Department demands greater financial protection than the 10 percent level, the Department articulates the bases on which that added protection is needed, which can include any of the considerations discussed here. If an institution has already arranged financial protection, the Department credits the amount of protection already provided toward the amount demanded, if the protection already provided has the same terms and extends for the duration of the period for which protection is required pursuant to these regulations. In determining the proper amount of financial protection, then, we intend to look closely at any evidence that these kinds of liabilities may ensue from the risk posed by adverse events to a particular institution. We note, in particular, that section 498(e)(4) of the HEA, by indicating which specific histories of compliant behavior are enough to bar the Department from requiring personal guarantees from owners or institutions, has identified those histories that indicate future risk. 20 U.S.C. 1099c(e). Since 1994, the Department has implemented the statute in precisely this way, by adopting these histories as per se financial responsibility failures, warranting surety and provisional certification. §§ 668.174(a), 668.175(f)(1)(ii).

Similarly, section 498(c)(1)(C) of the HEA specifically directs the Secretary to consider whether the institution is able

to meet its refund obligations to students and the Department. 20 U.S.C. 1099c(c)(1)(C). The Department has implemented this provision by requiring an institution that has a performance rate of less than 95 percent in either of the two most recently completed fiscal years to provide surety in an amount of 25 percent of the amount of refunds owed during the most recently completed fiscal year. § 668.173(d). We intend to apply these long-standing and statutorily sanctioned predictors of potential liabilities in determining the amount of financial protection that we may require over and above that minimum amount to cover the costs of closed school discharges. Thus, we may determine that the potential loss to the taxpayer of the closure or substantial reduction in operations of an institution that has failed the 95 percent refund performance standard to be 25 percent of refund obligations in the prior year, in addition to the 10 percent of prior year title IV, HEA funding needed to cover closed school discharges. We may determine that the potential loss to the taxpayer of the closure or substantial reduction in operations of an institution that has had audit or program liabilities in either of the two preceding fiscal years of five percent or more of its title IV, HEA funds to present a potential loss of that same percent of its most recent title IV, HEA funding, in addition to the 10 percent of funding needed to defray closed school discharge losses. We may determine that the closure or substantial reduction in operations of an institution that has been cited in any of the preceding five years for failure to submit in a timely fashion required acceptable compliance and financial statement audits presents a potential loss of the full amount of title IV, HEA funds for which an audit is required but not provided, in addition to any other potential loss identified using these predictors.

Relying on the composite score methodology also helps clarify how long financial protection for risks or conditions should be maintained, because some events have already occurred, and will necessarily be assessed in the next audited financial statements and the composite score, which is routinely calculated. Others, such as pending suits or borrower defense claims, will not be reflected in the new financial statements, and those risks may still warrant continuing the financial protection already in place. Along these lines, we will maintain the full amount of the financial protection provided by the institution until the Department determines that the

institution has (1) a composite score of 1.0 or greater based on the review of the audited financial statements for the fiscal year in which all losses from any triggering event on which the financial protection was required have been fully recognized, or (2) a recalculated composite score of 1.0 or greater, and that any triggering event or condition that gave rise to the financial protection no longer applies.

We believe it is reasonable to require an institution to maintain its financial protection to the Department as noted above until the consequences of those events are reflected in the institution's audited financial statements or until the institution is no longer subject to those events or conditions. If the institution is not financially responsible based on those audited statements, or the triggering events continue to apply, then the financial protection on hand can be used to cover all or part of the amount of protection that would otherwise be required. Doing so minimizes the risks to the Federal interests by having financial protection in place in the event that an institution does not sufficiently recover from the impact of a triggering event—any cash or letter of credit on hand would be retained and any funds under a set-aside arrangement would reduce or eliminate the need to offset current draws of the title IV, HEA funds.

With regard to the comment that a letter of credit could exceed 100 percent of the title IV, HEA funds received by an institution, we note that the regulations adopted here set 10 percent of prior year title IV, HEA funding as the minimum financial protection required for an institution that achieves a recalculated score below a 1, or fails the 90/10, cohort default rate, or SEC triggers, and permit the Department to demand greater protection when the Department demonstrates that the risk to the Department is greater.

*Changes:* We have revised § 668.171(c)(1) to provide that losses from events or risks listed as triggering events are generally evaluated by determining whether the amount of loss recognized for this purpose, if included in the financial statements for which a composite score was most recently calculated under § 668.172, would produce a composite score less than 1.0. In § 668.171(c)(2) we have specified that the actual or potential losses from the actions or events in § 668.171(c)(1) are accounted for by revising an institution's most recent audited financial statements and that the Secretary recalculates the institution's composite score based on the revised statements regularly. If the recalculated

---

[51] These losses can be very substantial. The Department has already granted $73 million in borrower defense discharge relief to some 3800 Corinthian Direct Loan borrowers under § 685.206, and thousands of Corinthian borrower claims are pending. The average amount of loan indebtedness discharged for these 3800 was $19,300; many thousands of other Corinthian borrowers may have valid claims for relief, and the Department has been reaching out to some 335,000 of these individuals. See: United States Department of Education Fourth Report of the Special Master for Borrower Defense to the Under Secretary, June 29, 2016. If even 20 percent of these other borrowers qualify for relief, the loss to the Federal taxpayer would add another billion dollars to the $73 million in losses already experienced.

composite score is less than 1.0, the institution is not financially responsible and must provide financial protection.

*Triggering Events*

*Comment:* Some commenters objected that the Department had produced no data to support the assertion that the triggering events in fact pose the risks that would warrant their use. Other commenters stated that the requirement to provide financial protection based on the mere filing of a lawsuit seeking the proposed recoveries was speculative, not based on actual data showing that an adverse result was reasonably expected to result from that suit and was thus arbitrary and lacked a reasonable basis. Another commenter asserted that the Department's reference to the Corinthian situation does not support adopting the rule proposed here, and that current regulations were sufficient to enable the Department to obtain from Corinthian the protections needed to mitigate or eliminate the risks now cited to justify the new rules. The commenter asserted that Corinthian failed financial responsibility tests in FY 2011, could have been required to post a letter of credit, but was not required to do so, nor was it required to post a letter of credit for FY 2014, when Corinthian again failed the tests.

*Discussion:* As discussed for each of the triggers, each reflects a new financial obligation already incurred and not yet reflected in the composite score for the institution, or a new financial risk that is realistically imminent, whether or not yet recognized in the audited financial statements. Current regulations permit the Department to demand 10 percent or more financial protection, but provide no structured scheme to assess whether a particular event actually jeopardizes the institution, and if so, by how much, and what amount of protection is needed beyond that 10 percent minimum described in the regulations. We described in the NPRM the history of Corinthian's evaluation under the existing financial responsibility scheme.[52] Even if Corinthian's financial statements had been accurate when presented, they would not have accounted for the risk posed by the pending California attorney general action, that ended in a judgment for $1.1

billion, and the LOC that would likely have been demanded—a small fraction of the title IV, HEA funding for the prior year—would barely have covered the liabilities already established by the Department against Corinthian. The Corinthian experience highlighted the need to identify events that posed realistic jeopardy in the short term, and to secure financial protection before the loss was incurred and the institution on account that that loss no longer had the ability to provide that protection. Similarly, current standards would not require protection where an institution was on the very cusp of loss of title IV, HEA eligibility, as with cohort default rate and 90/10 sanctions.

*Changes:* None.

**Automatic Triggering Events**

*Lawsuits and Other Actions § 668.171(c)(1)(i)*

Lawsuits Settlements/Resolutions

*Comments:* Under proposed § 668.171(c)(1)(i)(B), (ii), and (iii), a school may not be financially responsible if it is currently being sued by a State, Federal, or other oversight entity, or by private litigants in actions, including qui tam suits under the False Claims Act, that have survived a motion for summary judgment.

Some commenters objected that requiring financial protection based on suits by private parties was unreasonable because the commenters considered those suits to have no bearing on the financial responsibility and administrative capability of the institution. Others considered reliance on the filing of suits that had not yet resulted in judgments against the institution to constitute an unreasonable standard that deprived the institution of its due process rights to contest the lawsuits. A commenter objected to the inclusion of government suits because the commenter considered proprietary institutions to often be the target of ill-planned and discriminatory suits by State and Federal agencies. A commenter stated that suits filed by State AGs have been shown in some cases to be politically motivated and argued that such suits should not be the basis for a letter of credit as they may unfairly target unpopular members of the higher education industry, depending on the party affiliation of the AG. The commenter stated that the suits are not required to be based in fact and rarely lead to a finding, that the judicial process should be allowed to follow its usual course, and that requiring schools to post letters of credit prior to a judicial ruling in the case amounts to finding a school guilty and requiring the school to

prove innocence. The commenter stated that the risk posed by the filing of a suit cannot be determined simply from the complaint filed in the suit, and the actual risk posed by such suits, some commenters urged, could be reasonably determined only after determining the merits of the suit.

Commenters objected that these triggering events would require a school to submit a letter of credit before there was any determination of merit or wrongdoing by an independent arbiter, and stated that such suits should not be taken into account until judgment. The commenters stated that they believed that, contrary to the Department's statement in the preamble that suits by State and Federal agencies are likely to be successful, most cases settle due to the outsized leverage of the government, despite their merits. In addition, the commenters believed that suits filed by State AGs should not be the basis for a letter of credit because these suits have been shown in some cases to be politically motivated and to unfairly target institutions.

Another commenter urged the Department to remove the lawsuit triggers, arguing that the mere filing of an enforcement action by a State, Federal, or other oversight entity based on the provision of educational services should not be considered a trigger. The commenter stated that lawsuits are easy to file, allegations are not facts, and, even assuming good faith on the part of State and Federal regulatory agencies, sometimes mistakes are made. The commenter contended that the litigation process creates the incentive for sweeping allegations that may or may not be verifiable, or there may be cases filed by an agency in the hope of making new law or establishing a new standard for liability or mode of recovery beyond that applied by courts in ruling on such claims. A commenter was concerned that an "other oversight agency" could refer to a town or county zoning board or land use agency that could threaten to file a multi-million dollar suit for pollution, or a nuisance suit like a violation of a local sign ordinance, or failure to recycle soda cans, as a way to leverage concession from the institution for other reasons. These suits would be covered under proposed § 668.171(c)(1)(ii) even though they have nothing to do with the educational mission of the school. The commenter contended that giving such unbridled power to non-State, non-Federal, non-education-related oversight entities would effectively place the "sword of Damocles" over the head of every college president who needs to negotiate a dorm or a new parking facility.

---

[52] Applying the routine tests under current regulations did not result in financial protection, because Corinthian appeared at the time it provided the Department with its audited financial statements to pass those tests. Only later—too late to secure financial protection—did further investigation reveal that Corinthian in fact had failed the financial tests in current regulations. 81 FR 39361.

**75988**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

Many commenters objected to consideration of settlements with government agencies under proposed § 668.171(c)(1). As proposed, the regulation might make a school not financially responsible if during the current or three most recently completed award years it was required to pay a debt to a government agency, including a debt incurred under a settlement. Commenters viewed this provision as overly broad and punitive, and suggested that settlements be excluded from this provision. A commenter believed that an institution under investigation will have a strong incentive to avoid a settlement that would precipitate the triggering event in proposed § 668.171(c)(1)(i)(A), which would require it to provide the Department a potentially expensive or unobtainable letter of credit. A commenter noted that bringing suit can be an important tool in facilitating settlement, and cited a case where a State AG filed a consumer fraud suit against an institution. The parties were able to negotiate a settlement that provided $2.1 million in loan forgiveness and $500,000 in refunds for students. Imposing a letter of credit in such situations would deter such favorable settlements. Commenters asserted that many businesses settle claims with the government due to the cost of litigation and the outsized leverage of the government, regardless of the merits of the underlying claims.

Commenters objected to consideration of debts already paid, asserting that if a school pays a liability as a result of an agency action, the school has already paid an amount that was deemed appropriate by the agency and should not be subject to the additional punitive requirement of posting a letter of credit. The commenters argued that this is especially true if the school's payment resulted in repayments to students such that a letter of credit is no longer necessary to provide for possible student claims.

Similarly, other commenters claimed that lawsuit triggers would create every incentive for borrowers who get behind in their loan payments to file claims or suits against an institution, regardless of how frivolous those suits or claims may be, and therefore these triggers should not be part of the borrower defense rulemaking.

Evaluation

A commenter urged the Department to make the lawsuit and investigation triggers in § 668.171(c)(1) evaluative instead of automatic, so that the Department would evaluate the type of suit, the merit of the claims, the amount

of money at stake, and the likelihood of success. With this system in place, only institutions with a serious financial risk would be required to obtain a letter of credit, leaving other institutions room to negotiate with State AGs or other enforcement entities.

Other commenters objected to assessing the value of the lawsuits (in proposed § 668.171(c)(v)) by using ''the tuition and fees the institution received from every student who was enrolled at the institution during the period for which the relief is sought'' as wrongly presuming that every student in the period (or three years if none is stated) would receive a full refund, and may have no relation to the event on which suit was brought. While the commenters do not suggest using the damages proposed in any complaint, which they claim are often speculative and designed to grab media attention rather than reflect a true damage calculation, a better way to assess value would be an analysis of the merits of the specific litigation at issue, guided by past recoveries and settlements for similar actions. Some commenters objected that State AGs and private litigants will likely include demands for relief in pleadings that equal or exceed the thresholds set by the Department in order to gain additional leverage over an institution. Other commenters objected that State AG suits will also exceed the thresholds because they will state no dollar amount of relief, and thus be deemed to seek restitution in the amount of all tuition received for a period.

Some commenters believed that an institution should be afforded the opportunity to demonstrate, by an independent analysis, that the actual amount at issue is below the thresholds set for the applicable action and therefore the action is not material. Some commenters suggested that the Department allow an institution to seek an independent appraisal from a law firm, accounting firm, or economist that would state the actual amount at issue in the lawsuit. Others stated that this analysis could be accomplished as part of an appeal process with a hearing official deciding the amount based on evidence from the institution and the Department.

Threshold

Some commenters stated that it is common for plaintiffs suing colleges and universities to allege damages far exceeding any amount that could feasibly be obtained in either a settlement or final judgment, as a tactic to maximize any final settlement amount and contingency fees to the

attorney. For this reason, the commenters argued that requiring a letter of credit based solely on a claim exceeding 10 percent of an institution's assets is arbitrary and unwarranted, as the claimed amounts often have little factual basis or legal support. Further, the commenters were concerned that enacting this new standard would lead to plaintiffs' attorneys stating claims in excess of the 10 percent threshold to create negotiating leverage.

Other commenters believed that the $750,000 and 10 percent of current assets thresholds were arbitrary because they do not take into account that the size of schools varies significantly and, as such, their exposure may vary significantly. The commenters reasoned that a larger school that serves a greater number of students may be subject to a larger liability, but may also be able to adequately withstand that liability. For these reasons, the commenters suggested that the triggering events in § 668.171(c)(1) should be removed entirely, but if they are not removed, the commenters urged the Department to exclude the settlement provisions and the $750,000 threshold because debts of that size are not indicative of the financial stability of the school.

Some commenters noted that Federal and State settlements are often very small, and therefore believed those settlement amounts would not likely reach or exceed the proposed threshold of 10 percent of current assets. The commenters urged the Department to eliminate the 10 percent threshold in the final regulations, arguing that a settlement, in and of itself, should be sufficient to trigger a letter of credit. Other commenters believed that the threshold of $750,000 for the lawsuit triggers was so low that an auditor would not consider that amount to be material and therefore would not include the lawsuit in the footnotes of an institution's financial statements. They suggested that the Department set the materiality threshold as the higher, rather than the lesser, of $750,000 or 10 percent of current assets. The commenters reasoned that the lesser amount would almost always be the audit threshold ($750,000) which, in the case of any large school, will not be material. Alternatively, the commenters suggested that the Department remove the audit-based threshold and simply rely on the 10 percent of current assets threshold.

No Amount Claimed

Objecting to the method of calculating a claim in a suit in which the plaintiff does not state a dollar amount of relief, a commenter noted that in a number of

State courts—in New York, Maryland, and Maine, for example—a specific dollar-amount demand is not permitted in many civil actions. In such cases, proposed § 688.171(c)(1)(v)(A) would require that the amount be calculated "by totaling the tuition and fees the institution received from every student who was enrolled at the institution during the period for which relief was sought, or if no period is stated, the three award years preceding. . . ." The commenter feared that applying this principle would result in a "deemed" ad damnum of at least three years' total revenue—and it would be a fortunate institution that maintained sufficient current assets to keep the made-up "deemed" ad damnum below 10 percent of current assets. In addition, the commenter notes that other States, like Virginia, do not permit recovery in excess of the written ad damnum, regardless of what a jury may award—for example, if the demand is $10,000 and the jury awards ten million dollars, only the demanded amount is awarded. The commenter opined that in those States, the incentive is to massively over-plead the value of the case, so that an attorney's client is not forced to accept less money after encountering a generous jury. The underlying point is the same: Neither a stated ad damnum in any lawsuit nor the "deemed" ad damnum of proposed § 688.171(c)(1)(v)(A) bears any necessary relationship to the actual value of the suit, to the likely range of recovery, or to the effect of the suit on the financial responsibility of the educational institution.

Second, the commenter argued that a pending private lawsuit seeking large damages should not be considered a trigger event, as proposed in § 688.171(c)(1)(iii). The commenter cautioned that considering filed-but-not-decided litigation to impair the financial responsibility of an institution would overly empower opportunistic or idealistic members of the plaintiff's bar. The commenter asserted that the proposed position would give every lawyer with a draft lawsuit containing enormous damage claims a chokehold on any school. The commenter noted that although proposed § 688.171(c)(1)(iii)(A) is intended to restrict this triggering event to only those claims that survive summary judgment, the commenter asserted that in some States, this restriction would be ineffective. The commenter asserted that, for example, in New York State courts, a plaintiff can file a "Motion For Summary Judgment in Lieu of Complaint," under CPLR Section 3213,

to initiate the case. A plaintiff can demand a response on the date an answer would otherwise be due; if the defendant were to file a cross-motion for summary judgment as a response, the court ostensibly would deny both and treat the cross-motions as an answer and complaint, and the case would go forward. But the case would have "survived a motion for summary judgment by the institution," and would then constitute a trigger event at its outset.

The commenter further asserted that California State courts permit not only summary judgment, but also a separate procedure for resolution of entire claims by "summary disposition." Cal. Code of Civ. Pro. Section 437c. The grant of judgment to the institution on any relevant claim by summary disposition would not seem to affect whether a trigger event has occurred, even if the only relevant claim was disposed of. The commenter asserted as well that in Virginia, summary judgment is technically available, but, as a practical matter, the commenter states that it is never granted because a motion for summary judgment cannot procedurally be supported by documents, affidavits, depositions, or other similar evidence. Moreover, the real effect of this provision would be to deter institutions from ever moving for summary judgment, fearing that the motion would be denied therefore generating a triggering event.

For these reasons, the commenter concluded that institutions would have to bring every covered private case to trial, at much greater financial and emotional expense not only to the school but also to the opposing parties. The commenter expressed concern that the proprietary school sector was a target for enterprising trial lawyers, and that because of the heightened scrutiny faced by financial institutions making lending decisions, it would be impossible for many institutions facing one of these triggering events to obtain a sufficient letter of credit to comply with the regulations. The commenter cautioned that an institution in such a circumstance would have little choice but to cease operations, even if its financial basis remained fundamentally sound—and even if the claims represented by the proposed triggering events were insubstantial or frivolous.

Similarly, another commenter stated that in litigation, plaintiffs are able to survive a motion for summary judgment due to a variety of factors. The commenter said that judges may decline to dispose of a case on summary judgment because there remains an issue of material fact that may have little

to do with the underlying false claim or provision of educational services. The commenter offered that a final judgment requires a higher level of proof than a motion for summary judgment and would therefore be a fairer threshold. In addition, the commenter noted that private rights of action are fundamentally different than agency or government actions that are subject to well-established policies and procedures. Further, the commenter anticipated that private parties will likely request relief in excess of the proposed thresholds of $750,000 or 10 percent of current assets to gain additional leverage in seeking a settlement.

With regard to proposed § 668.171(c)(1)(iii), some commenters asked the Department to clarify whether the mere filing of a False Claims Act case is a triggering event or if paragraphs (A) and (B) apply to that case (as well as private litigation). The commenters offered that the mere filing of a False Claims Act case should not subject an institution to a letter of credit. While the commenters recognized the seriousness of a False Claims Act case, they stated that these cases do not garner intervention from the Federal government and are typically settled for amounts that are dramatically less than the stated damages in the complaint. Further, while the commenters appreciated the Department's attempt to ensure it was only capturing meritorious private litigation under § 668.171(c)(1), they believed that the provision would penalize an institution for settling a case for nuisance value or harming a school for filing a motion for summary judgment which it ultimately loses.

*Discussion:* Proposed § 668.171(c)(1) included a range of governmental actions and certain actions by private parties, and proposed § 668.171(c)(6)(ii) included any other litigation that the institution was required to report in a filing with the SEC. Regardless of the substantive basis or motivation of the party suing, each of these suits could pose a serious potential threat to the continued existence and operation of the school, and as such, they affect the assessment of the school's ability to meet its financial obligations. We see no basis for ignoring that risk simply because some suits in each of these types may in fact be frivolous, assert exaggerated demands, rest on attempts to make new law, or attempt to extract concessions from the school in what the commenter calls areas unrelated to the school's educational mission. We consider pending suits under these regulations for two reasons. First, a

judgment entered in any of these suits may significantly jeopardize the existence or continued operations of the institution, and that threat bears directly on the statutory requirement that the Secretary determine whether the institution for the present and near future, the period for which the assessment is made, "is able to meet . . . all its financial obligations." 20 U.S.C. 1098c(c)(1)(C). Second, that consideration looks not merely at obligations already incurred, but looks as well to the ability of the institution to meet "potential liabilities"—whether the institution has the resources to "ensure against precipitous closure"—and thus demands that we assess threats posed by suits not yet reduced to judgments that would be recognized in the financial statements submitted annually and evaluated under the current composite score methodology. In response to the comment regarding treatment of qui tam suits under the False Claims Act, we confirm that those actions are evaluated like any other litigation not brought by a Federal or State agency enforcing claims that may relate to borrower defenses. They are evaluated under the summary judgment test.

Responding to the objection that we should consider only claims reduced to judgment, we stress that ignoring the threat until judgment is entered would produce a seriously deficient assessment of ability to meet financial obligations, and worse, would delay any attempt by the Department to secure financial protection against losses until a point at which the institution, by reason of the judgment debt, may be far less able to supply or borrow the funds needed to provide that protection. We reject this suggestion as contrary to the discharge of the duty imposed on the Department by section 498 of the HEA. Similarly, we see no basis for the contention that taking into account risk posed by pending suits somehow deprives an institution of its due process right to contest the suit. If the risk posed is within the statutory mandate to assess, as we show above, taking that risk into account in determining whether an institution qualifies to participate in the title IV, HEA programs cannot deprive the institution of any constitutionally protected right. The institution remains free to respond to the suit in any way it chooses; it is frivolous to contend that we are barred from considering whether that risk warrants financial protection for the taxpayer as a condition for the continued participation by that institution in this Federal program.

Besides these general objections to the consideration of pending suits, the comments we received addressed several distinct aspects of the proposed consideration. These included comments addressed to the inclusion of suits by an oversight entity, which may include a local government component, in the category of government suits; the proposal that suits be evaluated on their merits by a third party, by Department officials, or by a Department hearing official; objections to inclusion of debts arising from settlements; objections that the thresholds in the proposed rule were unrealistic or arbitrary; objections to the proposed method of calculating the amount claimed where the institution contends that the amount claimed exceeds the amount that applicable law would support; objections to the proposed calculation of the amount in actions that did not seek a stated amount of relief; objections to the proposed use of summary judgment as a test of the potential risk posed by the suit; and objections to consideration of debts already incurred and paid in prior years. We discuss each in turn and, as discussed earlier explaining the use of an adapted composite score methodology, we are modifying the proposed regulations in several regards that we intend and expect to assess the risk posed by pending suits in a manner that alleviates several of major concerns raised by commenters.

We address first the changes to the proposed thresholds, because adoption of the composite score methodology of assessing risk affects the response to those objections and other concerns as well. Each institution is well aware of its most recent composite score, and as explained above, the amount of risk posed by each suit considered under the regulations will be assessed by recognizing that loss in the financial statements on which that composite score was based, and determining whether that recognition will produce a failing composite score. Any institution can readily evaluate that effect and take that result into account in responding to the suit. A pending suit that produces a failing score will be recognized as a threat until the suit is resolved and that result produces a score of 1.0 or more, whether by favorable judgment or settlement. Second, we include an opportunity for an institution to demonstrate that loss from any pending suit is covered by insurance. Commenters advised that we should not treat lawsuits as potential triggering events because the risks posed by these suits are commonly covered by insurance. If the institution

demonstrates that insurance fully covers the risk, the suit is simply not considered under these financial responsibility standards. The institution can demonstrate that insurance fully or partially covers risk by presenting the Department with a statement from the insurer that the institution is covered for the full or partial amount of the liability in question.

In response to the proposal that the regulations should provide for an evaluation of the merit of a suit by a third party, by a Department official, or by a Department hearing official, we see no practical way to implement such a procedure. Litigants already have the ability to engage in court-sponsored or independent mediation, in which both parties can adequately present their positions; if both parties are amenable to such a two-party assessment, the parties can readily pursue that course through mediation, and we see no need for the Department to undertake that role. We see little or no value in entertaining and evaluating a presentation solely from a defendant institution, whether that evaluation were to be performed by a Department official or an administrative hearing official in a Department proceeding. As noted, a party whose defense is financed by insurance may find the insurer conducting precisely such an evaluation in conducting the litigation, and that assessment will influence the conduct of the litigation.

In addition, the proposal that the Department or a third party assess the merit of an action by a government agency would require the Department or a third party to interpret the statutes and regulations on which that agency based its actions as well as assess whether the action was a reasonable exercise of the agency's authority. We have no authority to second guess the actions of another agency in the exercise of its authority, and we would neither presume to do so nor adopt a procedure in which we would credit such second-guessing by a third party.

The proposed regulation would treat "oversight authority" actions like actions of Federal or State agencies. By this term, we include local government entities with power to assert and recover on financial claims. This consideration applies only to affirmative government financial claims against the institution, not to government actions that deny approvals or suits that seek only injunctive or other curative relief but make no demand for payment. Local authorities can take enforcement actions that can pose a serious financial risk to the institution, and we see no basis for disregarding that risk or undertaking any internal or third-party assessment of

the merit of the claim. Given the wide range of such government actions, we agree that those that do not directly seek relief that affects or relates to borrower defenses under this regulation might warrant a different assessment of risk than those closely related to borrower defenses. Generally the risks posed by the events deemed automatic triggers are events that threaten the viability of the institution, and the risks to the taxpayer posed by those threats include risks posed by closed school discharges and unaccounted-for Federal grant and loan funds. Federal or State agency suits asserting claims related to the making of a Direct Loan or the provision of educational services, as the latter term is considered under Department regulations, pose an additional risk and warrant a different assessment of risk, because these Federal or State actions not only pose a threat to the viability of the institution but are also reasonably expected to give rise to, and support, borrower defense claims. For those suits, we continue to consider it reasonable to treat the amount claimed in the suit or discernable from the scope of the allegations to quantify the potential loss from these suits.[53] However, we acknowledge the value of having the obligation to require financial protection depend on something more than the mere filing of a lawsuit if delaying surety does not jeopardize our ability to obtain appropriate financial protection. The summary judgment scheme we adopt for all other litigation may result in significant delay before protection is required for borrower defense-related suits, which may impair our ability to obtain adequate surety. Rather than delaying protection requirements until summary judgment or even a point close to trial, or creating some third-party evaluation of the merit of government agency suits involving borrower defense-related claims, we will rely on the outcome of the initial opportunity available in the litigation process itself for an institution to challenge the viability of the suit—the motion to dismiss. Thus, under these regulations, a government suit related to potential borrower defenses is a potential triggering event only if the suit remains pending 120 days after the institution is served with the complaint. This change provides the institution with ample time

to move to dismiss the suit on any ground, including failure to state a claim on which relief can be granted.[54]

For suits by a Federal or State agency not directly implicating borrower defenses, and suits by other government agencies, we consider the summary judgment test applicable to private party lawsuits—not a motion to dismiss test— to provide a reasonable basis for testing the degree of risk posed.[55] Moreover, the threat posed by any of these suits may have no substantial effect on the composite score of the institution; as explained above, threats evaluated here require financial protection only if the threats together jeopardize a failing composite score under these regulations.

We recognize that settlements may well achieve highly desirable outcomes, and that regulations should not create a disincentive to settlements. Regardless of the position taken in these regulations, a debt actually incurred under a settlement entered into in the current fiscal year will be recognized in the financial statements of the institution eventually submitted for the current year, and will be part of the financial information on which the institution's composite score will be calculated for the current year. The concerns raised about treatment of settlement obligations are therefore concerns only about how the regulations treat during the current fiscal year those settlement debts incurred during the current year, not their subsequent treatment. A settlement debt that the institution can meet will likely not jeopardize its financial score when actually evaluated, and we approach such debts from the same perspective by assessing their effect when incurred using the composite score method as

adopted here. We do not expect that an institution will enter into a settlement that jeopardizes its viability, and by removing the thresholds and assessing that debt in a holistic manner, we believe that the regulation will remove any disincentive to enter into settlement. If an adjusted composite score includes a potential liability from a suit or oversight action that eventually results in a settlement, the previously recorded risk will be accordingly adjusted downward to the settlement amount.

We are retaining the summary judgment test for all non-governmental suits, because awaiting a final judgment that may cripple the institution would substantially frustrate our objective to acquire financial protection at a time when a significant threat is posed and while the institution is far more likely to be able to afford to provide that coverage. That alternative is unacceptable for those reasons, and those who object to use of a summary judgment standard pose no alternative judicial test that avoids these problems. We recognize that a complaint that lacks substantive merit may avoid dismissal if sufficiently well pled, but that such a suit survives summary judgment only with a showing of some evidence sufficient to support recovery.[56] The

---

[53] The most prominent recent example of such government actions that have resulted in judgments—those against Corinthian—does not suggest that assigning this level of risk to a government borrower defense-related suit is unreasonable, and, for that reason, as well, we decline the proposal to consider claims that such suits should be discounted.

[54] The Federal Rules of Civil Procedure require an answer or motion to dismiss to be filed within 20 days of service of the complaint, and also allow a defendant to move at any time for summary judgment. Fed. R. Civ. Proc. 12(a), (b); 56(b).

[55] The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." . . . Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment.

*Celotex Corp.* v. *Catrett,* 477 U.S. 317, 327, 106 S. Ct. 2548, 2555, 91 L. Ed. 2d 265 (1986).

[56] As one writer has observed, "summary judgment stands as the only viable postpleading protector against unnecessary trials." Martin H. Redish, *Summary Judgment and the Vanishing Trial: Implications of the Litigation Matrix* (2005), 57 Stan. L. Rev. 1329. The comments that some States adopt summary judgment or summary adjudication procedures that differ either in labels (*e.g.,* California) or in some detail from the Federal standard do not show that the test is not available or sufficient to meet this objective. Where a plaintiff asserts several causes of action, a summary adjudication under Cal.C.C.P. § 437c(f) or similar law, or partial summary judgment that disposes of some but not all causes of action, those claims not disposed of remain pending and proceeding to trial, and therefore continue to pose risk. Furthermore, the regulations treat a failure to file for summary disposition by a defendant as a concession that the plaintiff has sufficient evidence to withstand a motion, and therefore that the claim has sufficient support to merit presentation to a jury. The fact that a State permits a plaintiff to seek summary judgment immediately upon commencement of the action (*e.g.,* N.Y. C.P.L.R., rule 3213, 28 U.S.C.A. (McKinney) does not frustrate use of this summary judgment test by a defendant institution; the institution is required merely to answer the plaintiff's motion. N.Y. Uniform Dist. Ct. Act § 1004 (McKinney). The institution is not required to make a cross motion for summary judgment, and may move later for summary judgment. N.Y. C.P.L.R., rule 3212, 28 U.S.C.A. (McKinney). The comment cites Virginia law as restricting the defendant's use of declarations and affidavits as making summary judgment less effective a test there. Even if this support is disfavored, the defendant is free to support the motion with "admissions, interrogatories, and documents produced" in discovery. *Nicoll* v. *City of Norfolk Wetlands Bd.,* 90 Va. Cir. 169 (Va. Cir. Ct. 2015). The tool,

Continued

obvious inference from a choice not to file for summary judgment is that a defendant fears that such a motion would not be well-founded, an assessment that implies a concession that the suit does pose a risk. Such a suit is at that point hardly frivolous, and constitutes a significant threat to the viability of the institution. Summary judgment is available in Federal court litigation, in which we expect a significant amount of even private party litigation to be brought, such as qui tam actions under the False Claims Act. As to the shortcomings of the summary judgment test under particular State law as asserted by the commenter, we note that the commenter pointed to only a few States in which the commenter asserted that summary judgment (or summary disposition) is less effectively available than in Federal courts. Institutions are already subject to those limitations, and face scrutiny by any party from whom the institution seeks investment or loans for the risks posed by such suits. The consideration we undertake here is no different in kind.

In response to the commenters who raised concerns about assessing the potential recovery sought in an action that articulates no specific financial recovery, we cannot ignore the threats posed by such suits. The fact that a particular suit may avoid stating a dollar amount of damages in the complaint in no way affects whether the suit poses a significant risk to the school. The potential recovery in such suits may not be obvious from a complaint, but will ordinarily be articulated in a number of different ways, at least one of which would be routinely available. For example, the plaintiff may have articulated a specific financial demand in a written demand made prior to suit. Second, a plaintiff may have offered to settle the claim for a specific amount.[57] Third, defendants engage in discovery, the amount of financial relief claimed is highly relevant to the handling of the suit, and we expect that a defendant would invariably seek such information in discovery. We recognize that suits

therefore, remains substantially available to test meritless cases.

[57] We recognize the settlement negotiations are privileged, and this option does not in any way diminish that privileged status. Private parties commonly disclose voluntarily to government agencies material that is privileged without risk of losing that privilege, and parties that share a settlement proposal with the Department under this option would not lose that protection, Thus, the Department would not disclose, in response to a Freedom of Information Act request, material regarding settlements if that material fell within exemption 4 of that Act, 5 U.S.C. 552(b)(4). 34 CFR 5.11. Such information includes commercial or financial information provided voluntarily and not customarily disclosed by the party to the public.

brought by Federal and State authorities may and commonly do seek "rescission," "restitution," and "disgorgement" in unstated amounts from the school, with civil penalties, for patterns and practices affecting students enrolled for years up to the filing.[58] The institution may be able to demonstrate that the complaint seeks unstated financial relief that as pled, pertains only to students enrolled in a particular program, location, or period of enrollment, and not all students enrolled at the institution, and may calculate the maximum recovery sought using data for that cohort.

Together, these changes are expected and designed to enable a school faced with the kinds of suits the commenters describe to either vigorously contest the suits as the school sees fit or to settle them. In either case, even a suit or settlement that might warrant financial protection in one year, that protection would be required only until the institution later may achieve a passing composite score despite recognition of the settlement obligation.

*Changes:* We have revised § 668.171(c)(1) to remove both the $750,000 and 10 percent of current asset threshold amounts for events that constitute an automatic trigger. Section 668.171(c) is revised to consider government actions unrelated to borrower defense claim subjects, and any private party lawsuits, to constitute a triggering event only if the suit has survived a motion for summary judgment or disposition, or the institution has not attempted to move for summary judgment and the suit progresses to a pretrial conference or trial. Section 668.171(c)(2) is revised to identify the sources from which an institution may discern the amount of financial recovery sought if that amount is not stated in the complaint.

*Accrediting Agency Actions*

*Teach-Out Plan § 668.171(c)(1)(iii)*

*Comments:* Under proposed § 668.171(c)(3)(i), an institution is not financially responsible if it is currently or was at any time during the three most recently completed award years required by its accrediting agency to submit a teach-out plan, for a reason described in § 602.24(c)(1), that covers

[58] We derive the default recovery amount of three years of tuition and fees from actions such as *Consumer Fin. Prot. Bureau v. Corinthian Colleges, Inc.,* No. 1:14–CV–07194, 2015 WL 10854380 (N.D. Ill. Oct. 27, 2015) (claims for actions over three year period); see also *California v. Heald College,* No. CGC–13–534793, Sup. Ct. Cty of San Francisco (March 23, 2016). (claims based on actions of varying duration). An institution may demonstrate that lesser amounts are applicable.

the institution or any of its branches or additional locations.

Some commenters suggested making the submission of a teach-out plan under 34 CFR 602.24(c) a separate, automatic trigger. The commenters argued that, unlike accreditor sanctions, the teach-out provisions are clearer circumstances that suggest the institution may imminently close.

Commenters argued that a letter of credit for institutions that trigger the teach-out provision is unnecessary and duplicative of existing protections in the regulations. The commenters stated that in the scenario of a closing institution, it is highly unlikely that the school will be able to obtain a letter of credit, and argued that, as a result, requiring the closing school to submit a letter of credit could convert a planned, orderly closing into a sudden shut down, thus leaving students stranded and harming taxpayers.

Some commenters warned that including the voluntary closure as a trigger would have unwanted effects. The commenters argued that this trigger would incent schools to keep locations open, despite the fact that the locations may no longer be serving its purpose and its continued presence may constitute a drain on institutional resources. Forced to choose between a location that is running slightly in the red and a letter of credit calculated against the entire institution's title IV expenditures, the commenters believed institutions may have no choice but to keep the doors open.

Moreover, the commenters argued that requiring a letter of credit makes little sense in the circumstance in which a school closes one or more locations, but the institution remains open. The commenters offered that in any scenario involving the closure of a location but not the main campus, the Department may pursue derivative student claims against an institution when those students receive a loan discharge pursuant to proposed § 685.214.

Some commenters also contended that the closure of locations is typically designed to increase the financial soundness of an institution and believed that the Department's records would show that most individual locations are closed only after an orderly teach-out and without triggering many (or any) closed school discharges. They argued that the closing of one or more locations of a school does not necessarily signal financial instability of a school; it may signal prudent fiscal controls. Closing locations that are not profitable or that cannot effectively serve students makes the institution as a whole more financially responsible and better able

to serve its remaining students. Consequently, the commenters cautioned that schools should not be punished for making reasonable business decisions to conduct an orderly wind down of an additional location. The commenters recommended that no letter of credit be imposed in the circumstance of the proposed closure of individual locations, and that the Department address on a case-by-case basis the appropriateness of requiring a letter of credit from a school that announces a teach out of the entire school. Alternatively, if the Department maintains the letter of credit requirement based on a school's intention to close a location, the commenters suggested that the letter of credit should only apply to locations that service 25 percent or more of the institution's students.

Similarly, other commenters suggested that the Department adopt a materiality threshold, such as the number of students enrolled or affected or the title IV dollar amount associated with those students, because the closure of an additional location may have no adverse effect on an institution.

In response to the Department's request for comment on whether a threshold should be established below which the closure of a branch or additional location would not trigger the letter of credit requirement, as noted previously, commenters urged the Department to eliminate the closure of a branch or additional location as a triggering event, or at minimum, make the trigger discretionary rather than mandatory. If the Department does not do so, the commenters asserted that a threshold is then both necessary and appropriate, but the commenters believed that a letter of credit should be required only if the closure of a branch or additional location would have a material financial impact on the school as a whole. The commenters offered that the Department could request a letter of credit if the closure of a branch or additional location:

• Would reduce total school enrollment by 30 percent or more;
• Would reduce total school title IV receipts by 30 percent or more; or
• Would reduce total school tuition revenues by 30 percent.

Other commenters suggested that the Department extend the 10 percent materiality concept to this situation and apply the letter of credit requirement only if the closure of a location involves more than 10 percent of the school's population.

Some commenters noted that locations are often part of campus models that, among other things, bring postsecondary education to areas that might otherwise have none, and believed that institutions may elect to forgo these innovative efforts if they are unable to close a location without incurring a significant financial penalty.

Other commenters suggested that the Department clarify whether the letter of credit provisions would be applied based on the title IV, HEA funds received by the main or branch campus, and how the letter of credit provisions would apply to teach-out plans that might be submitted for a teach-out plan instead of the entire main campus.

*Discussion:* Under the teach-out provisions in 34 CFR 602.24(c)(1), an accrediting agency must require an institution to submit a teach-out plan whenever (1) the Department initiates an emergency action or an action to limit, suspend, or terminate the institution's participation in the title IV, HEA programs, (2) the accrediting agency acts to withdraw, terminate, or suspend the institution's accreditation, (3) the institution notifies the accrediting agency that it intends to cease operations entirely or close a location that provides 100 percent of a program, or (4) a State licensing or authorizing agency notifies the accrediting agency that the institution's license or authority to provide an educational program has been or will be revoked. The occurrence of any of these actions may call into question an institution's ability to continue, placing at risk the welfare of students attending the institution. However, in keeping with our treatment for other automatic triggering events, instead of using a materiality threshold, the Department will recalculate the institution's composite score (1) based on the loss of title IV, HEA funds received by students attending the closed location during the most recently completed fiscal year, and (2) by reducing the expenses associated with providing programs to those students, as specified in Appendix C to these regulations. We believe that this approach will corroborate the position of some of the commenters that closing an unprofitable location was a good business decision in cases where the recalculated composite score is higher but not less than the original score. Otherwise, a failing recalculated composite score shows that closing the location had an adverse impact on the institution's financial condition.

*Changes:* We have added a new § 668.171(c)(1)(iii) to provide that an institution is not financially responsible if it is required by its accrediting agency to submit a teach-out plan under § 602.24(c) that covers the institution or any of its branches or additional locations if, as a result of closing that institution or location, the institution's recalculated composite score is less than 1.0. In addition, we provide in Appendix C to subpart L, the adjustments to the financial statements that are needed to recalculate the composite score.

*Show Cause or Probation § 668.171(g)(5)*

*Comments:* Under proposed § 668.171(c)(3)(ii), an institution is not financially responsible if it is currently, or was at any time during the three most recently completed award years, placed on probation or issued a show-cause order, or placed on an accreditation status that poses an equivalent or greater risk to its accreditation by its accrediting agency for failing to meet one or more of the agency's standards, and the accrediting agency does not notify the Secretary within six months of taking that action that it has withdrawn that action because the institution has come into compliance with the agency's standards.

Some commenters were concerned that the scope of the proposed accrediting agency triggering events is too broad because it includes matters that do not necessarily pose any existential threat to the viability of an institution. The commenters stated that an institution placed on probation or show-cause status does not, in all cases, signal an imminent threat to the continued viability of the institution that should automatically require a letter of credit; in the tradition of accreditation, while these designations are meant to identify and make public areas of concern at an institution, the goal remains that of self-improvement and correction.

Other commenters agreed that an institution placed on show cause by most accrediting agencies is typically at substantial risk of losing its accreditation, and loss of accreditation would likely have some impact on its finances and operations. However, the commenters noted that, in many cases, the agency placed the institution on show cause because it had demonstrated significant financial and operational deficiencies that were already having an impact on its business and educational outcomes. Therefore, the commenters cautioned that in many cases, it is the reason behind the show cause order (*i.e.,* concerns about the financial and operational capacity of the institution), and not the show-cause status itself, that suggests an institution is not financially responsible.

Some commenters stated that in many cases, an accrediting agency places an

institution on probation for issues of academic quality or dysfunction at the governance level even while the institution's operations and finances remain strong. The commenters stated that, while the issues that lead to the probation are certainly not minimal, it would take an institution longer than six months to correct them. In addition, the agency will need time to evaluate the changes and determine that the institution is now in compliance. Moreover, the commenters maintain that there is no clear evidence that institutions on probation routinely or uniformly experience operational or financial outcomes as a result of being on probation, particularly when the issues leading to the probation are unrelated to finance or operations. Again, the commenters cautioned that uniformly concluding that all institutions on probation that cannot correct non-compliance issues in six months are not financially responsible is overly broad. In addition, the commenters noted that it effectively punishes an institution that is on probation for issues not related to financial and operational deficiencies by requiring the institution to provide a letter of credit and participate in the title IV, HEA programs under a provisional certification.

The commenters believed that if the Department intends to rely on accrediting actions to determine financial responsibility, then the Department must review the content of the accrediting actions and act based on the reasons for those actions. As a matter of due process, each accrediting agency action imposing probation makes highly individualized findings of non-compliance that provide clear indicators regarding the institution's risk, as determined by the agency. For these reasons, the commenters suggested that the Department revise the show cause and probation provisions to refer specifically to agency standards related to finances, operations, or institutional ethics or integrity or related areas.

Other commenters supported tying accrediting agency actions to financial or operational issues but, in the alternative, would also support the Department's suggestion during the negotiated rulemaking process that there be a way for an accrediting agency to inform the Department as to why its probation or show-cause action will not have an adverse effect on the institution's financial or operating condition (see 81 FR 39364). Along somewhat similar lines, other commenters believed that, if an accrediting agency takes an action against a school based on financial responsibility concerns, that action should not supplant the Department's own analysis under subpart L of the regulations.

Other commenters stated that accreditors do not consider a show-cause order a negative action—to the contrary, accreditors routinely use it as a mechanism to promote institutional change and compliance. The commenters argued the Department itself has not previously taken the view that a show-cause order or probation was a significant threat to an institution's financial health by noting that a recent report listing the institutions the Department required to submit letters of credit did not identify an accrediting agency action as the basis for requiring any of those letters of credit. The commenters also noted that the Department's recent spreadsheet listing the institutions on heightened cash monitoring indicates that 13 of the 513 institutions were placed there for Accreditation Problems, which the Department defined as "accreditation actions such as the school's accreditation has been revoked and is under appeal, or the school has been placed on probation." The commenters asserted the spreadsheet establishes (1) that the Department already has a mechanism for seeking financial protection from institutions experiencing accreditation problems, and (2) that a mere show cause order historically has not been viewed as posing the same risk as revocation or probation. In addition, the regulations governing recognized accreditors permit an accreditor to afford an institution up to two years to remedy a show-cause before it must take action, and the commenters believe that this allowable timeframe effectively codifies the notion that a show-cause order is neither a sign of impending financial failure, nor a matter than an institution would expect to resolve in six months' time. See 34 CFR 602.20.

Other commenters agreed with the Department that actions taken by an accreditor could be a sign that the institution may imminently lose access to Federal financial aid. In those cases, the commenters believed that asking for additional funds upfront would be a sensible step as an advance protection for taxpayers. However, the commenters point to recent review of accreditor actions over the last five years showing that the current sanctions system is highly inconsistent. The commenters stated this inconsistency was true with respect to terminology, the frequency with which actions happen, and how long an institution stays on a negative status. (Antoinette Flores's "Watching the Watchdogs," published in June 2016). Given this inconsistency, the commenters recommend making the following changes to the proposed accrediting triggering events.

Commenters suggested that the Department make accreditor actions a discretionary trigger because, given the inconsistency among accreditors, establishing an automatic trigger tied to negative sanctions may be difficult. They stated that accreditors do not interpret what it means to be on probation or show cause in the same way. In addition, the commenters stated that making sanctions by accreditors an automatic trigger also risks making them unlikely to take action when they should.

The commenters note that a clear finding from the research, "Watching the Watchdogs," is that many accreditors put institutions on a negative status for a very short period of time, while other accreditors required institutions facing a sanction to stay in that status for at least a year. The commenters were concerned that setting a clear threshold of six months would give an institution too much leverage to argue that its accreditor should withdraw the sanctions sooner than the accreditor otherwise would.

*Discussion:* In view of the significant number of comments that a probation or show cause action taken by an accrediting agency may not be tied to a financial reason or have financial repercussions, and could have serious unintended consequences as an automatic trigger, we are revising this trigger to make it discretionary. As such, we will work with accrediting agencies to determine the nature and gravity of the reasons that a probation or show cause action was taken and assess whether that action is material or would otherwise have an adverse impact on an institution's financial condition or operations. Moreover, under this approach, the proposed six-month waiting period for an institution to come into compliance with accrediting agency standards is no longer necessary.

*Changes:* We have reclassified and relocated the automatic probation and show-cause trigger in proposed § 668.171(c)(3)(ii) as a discretionary trigger under § 668.171(c)(5) and revised the trigger by removing the six-month compliance provision.

### Gainful Employment § 668.171(c)(1)(iv)

*Comments:* Under proposed § 668.171(c)(7), an institution would not be financially responsible if, as determined annually by the Secretary, the number of title IV recipients

enrolled in gainful employment (GE) programs that are failing or in the zone under the D/E rates measure in § 668.403(c) is more than 50 percent of the total number of title IV recipients who are enrolled in all the GE programs at the institution. An institution is exempt from this provision if fewer than 50 percent of its title IV recipients are enrolled in GE programs.

Some commenters noted that many institutions subject to the GE regulations have limited program offerings, and in some cases offer only one program. For those institutions, a single program scoring in the zone will result in more than 50 percent of its students being enrolled in zone-scoring programs. The commenters further noted that the GE regulations provide for a runway for institutions to bring programs into compliance, and institutions do so through cost reductions that are passed along to students. The commenters reasoned that imposing a letter of credit requirement on such an institution would deprive it of curative resources and ultimately lead to a closure of the program, rather than its remediation.

In response to the Department's request for comment on whether the majority of students who enroll in zone or failing GE programs is an appropriate threshold, commenters offered several observations and recommendations.

First, the commenters believed that a simple tally of the number of GE programs that may be failing or in the zone at a given point in time will not produce a consistently accurate assessment of an institution's current or future financial stability. The first set of debt-to-earnings rates, for example, are based on debt and earnings information for students who graduated between the 2008–09 and 2011–12 award years (assuming an expanded cohort). See generally 34 CFR 668.404. By the time the associated debt-to-earnings ratio for these programs are released (likely early 2017), many institutions will be offering new or different programs that are designed to perform favorably under the GE framework. Though, as of 2017, a significant number of the students may still be enrolled in the institution's older GE programs, these programs will no longer be integral to the institution's business model, and indeed, may be in a stage of phase-out. For this reason, the commenters suggested that any reasonable assessment of an institution's financial health would need to account for the phase-out of older GE programs and the strength of the newer ones.

Second, the commenters recommended that the Department exclude from this determination any GE programs that are in the zone, or at a minimum, GE programs that have only been in the zone for two or fewer years. The commenters argued that, because a GE program must be in the zone for four consecutive years for which rates are calculated before it loses eligibility, the inclusion of a zone program prior to this point does not justify the presumption that the program may lose eligibility.

Finally, the commenters suggested that, rather than exempting institutions where fewer than 50 percent of the title IV recipients are enrolled in GE programs, the regulations should simply compare the number of students who receive title IV, HEA funds and are enrolled in failing GE programs to the total number of students. The commenters believed this approach would be a better and more straightforward measure of the risk of financial failure posed to the entire institution.

*Discussion:* We appreciate the concerns and suggestions made by the commenters regarding the GE trigger and are persuaded that the trigger should be revised to (1) account for the time that an institution has to improve a GE program in the zone, and (2) focus more on the financial impact of failing programs instead of the percentage of students enrolled in GE programs.

We proposed including zone programs in the GE trigger because there are no assurances that an institution will attempt to improve or succeed in improving those programs. However, we agree that the proposed trigger could influence an institution to discontinue an improving program prematurely or hold an institution accountable for poorly performing programs that it voluntarily discontinues. In proposing the 50 percent threshold, we were attempting to limit this trigger to those situations where the potential loss of program eligibility would have a material financial impact on an institution. But, as alluded to by the commenters, the percentage threshold based on title IV recipients may not apply to situations where an institution discontinues a zone program, or cases where 50 percent of the title IV recipients enrolled at an institution account for a small fraction of (1) the total number of students enrolled, or (2) institutional revenue.

To address these concerns, we are revising the GE trigger by considering only those programs that are one year away from losing their eligibility for title IV, HEA program funds and assessing the impact of that program's closure and any potential loss under the recalculated composite score approach. Specifically, the Department will use the amount of title IV, HEA program funds the institution received for those programs during its most recently completed fiscal year as the potential loss and recalculate the composite score based on that amount and an allowance for reductions in expenses that would occur if those programs were discontinued.

*Changes:* We have revised the GE trigger as described above. We have also revised the GE trigger in § 668.171(c)(1)(iv) to provide that the loss used in recalculating the institution's composite score under § 668.171(c)(2) is the amount of title IV, HEA program funds the institution received for affected programs during the most recently completed fiscal year. Lastly, we specify in Appendix C to subpart L, the changes needed to reflect that loss of funding and the reduction in educational expenses associated with discontinuing those programs.

*Withdrawal of Owner's Equity § 668.171(c)(1)(v)*

*Comments:* Under proposed § 668.171(c)(8), an institution whose composite score is less than 1.5 is not financially responsible if there is any withdrawal of owner's equity from the institution by any means, including by declaring a dividend.

Some commenters appreciated the provision in § 668.171(d)(2) that would allow an institution whose composite score is based on the consolidated financial statements of a group of institutions, to report that an amount withdrawn from one institution was transferred to another entity within that group. However, the commenters argued that, since the Department is aware of the institutions whose composite scores are calculated based on consolidated financial statements, requiring those institutions to report every intercompany funds transfer imposes an unnecessary burden because the reporting provides little if any benefit to the Department. Therefore, the commenters recommend amending proposed § 668.171(c)(8) to expressly exclude any withdrawal of equity that falls within the circumstances described in § 668.171(d)(2).

Other commenters assumed that this provision is intended to apply only to proprietary institutions because nonprofits do not have owners. However, because in financial reporting, the term "equity" is often used conceptually to refer both to owner's equity for businesses or net assets for nonprofits, the commenters recommended that the Department clarify in the final regulations that this provision applies only to proprietary institutions.

*Discussion:* We agree that, where a composite score is calculated based on the consolidated financial statements of a group of institutions, funds transfers between institutions in the group should not be reported as withdrawals of owner's equity. The trigger for the withdrawal of owner's equity was based on the reporting requirement under the zone alternative in current § 668.175(d)(2)(ii)(E), which applies only to proprietary institutions. We agree to clarify in the regulations that as a triggering event under § 668.171(c), the withdrawal of owner's equity applies only to proprietary institutions.

In addition, by recalculating the composite score we capture the impact of withdrawals of owner's equity in cases where the withdrawals were not made solely to meet tax liabilities.

*Changes:* We have revised the withdrawal of owner's equity trigger now in § 668.171(c)(1)(v) to specify that it applies only to a proprietary institution and that it does not include transfers to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated. In addition, we specify in § 668.171(c)(2)(iv)(B) that except for a withdrawal used solely to meet tax liabilities, as provided under § 668.171(h)(3)(ii), the Secretary will recalculate the institution's composite score to account for that withdrawal.

*Cohort Default Rates § 668.171(f)*

*Comments:* Under proposed § 668.171(c)(9), an institution is not financially responsible if its two most recent official cohort default rates are 30 percent or greater, unless the institution files a challenge, request for adjustment, or appeal with respect to its rates for one or both of those fiscal years and that action remains pending, results in reducing below 30 percent the official cohort default rate for either or both years, or precludes the rates from either or both years from resulting in a loss of eligibility or provisional certification.

Some commenters urged the Department to remove the cohort default rate trigger, citing concerns that this trigger would have unintended consequences. The commenters believed that, because of the corresponding letter of credit requirements, it is likely that banks would curtail their lending to affected institutions making it more difficult for those institutions to initiate, or continue with, innovative educational efforts that are often capital-intensive.

In response to the Department's request for comment on whether a cohort default rate of 30 percent or more for a single year should be a triggering

event, some commenters believed that the proposed two-year trigger should not be changed. One commenter suggested that this trigger should apply to any institution whose most recent cohort default rate is 30 percent or higher, arguing that keeping default rates below 30 percent is a very low standard for an institution to meet— only 3.2 percent of institutions have a default rate of 30 percent or higher. The commenter noted that, among all students attending institutions of higher education where the default rate is 30 percent or higher, 85 percent attend public institutions and just 11 percent attend proprietary institutions. The commenter urged the Department not to exempt public institutions from this trigger if the Department's goal is to protect as many students as possible.

*Discussion:* We wish to make clear that the Department will not apply the cohort default rate trigger until any challenge, request for adjustment, or appeal that an institution qualifies to file, under subpart N of the General Provisions regulations, is resolved. If that action is resolved in favor of the institution, the Department will take no further action and make no further requests of the institution with regard to this trigger. Otherwise, after the challenge, request, or appeal is resolved, the Department will apply the cohort default rate trigger and request the corresponding financial protection from the institution.

We disagree with the notion that a bank will curtail its lending to an institution solely because the Department requests financial protection under this trigger. Like other creditors, a bank would assess the risks inherent in making a lending decision, including regulatory risks. In this case, under the statutory provisions in section 435(a)(2) of the HEA, pending any appeal for, or adjustment to, its cohort default rates the institution is one year away from losing its eligibility for title IV, HEA funds. Although an institution's intention to initiate or continue innovative educational efforts are laudable, we believe it is questionable that a bank would jeopardize funds requested by the institution after having assessed the risks of whether the institution could repay those funds in the event that the institution's eligibility under the title IV, HEA programs is terminated in the near term.

With regard to the Department's request for comment, we are persuaded to maintain the proposed two-year threshold.

With respect to the comment that, to protect as many students as possible,

the Department should not exempt a public institution from the cohort default rate trigger, we note that while cohort default rates for all institutions are publicly available and can be used by students and parents in making enrollment decisions for particular institutions, the purpose of this trigger is to protect the Federal interest in the event an institution loses its eligibility for title IV, HEA funds in the coming year. In that circumstance for a public institution, we already have financial protection in the form of full faith and credit of the State to cover any liabilities that may arise (see the discussion under the heading "Public Domestic and Foreign Institutions").

*Changes:* None.

*Non-Title IV Revenue (90/10) § 668.171(d)*

*Comments:* Under proposed § 668.171(c)(5), a proprietary institution is not financially responsible if it does not derive at least 10 percent of its revenue from sources other than title IV, HEA program funds during its most recently completed fiscal year.

Some commenters believed this trigger was unjustified, arguing that an institution's eligibility to participate in the title IV, HEA programs is not at risk after a one-year failure. The commenters stated that section 487(d)(2) of the HEA provides that no penalties are imposed on an institution until it loses title IV eligibility by failing the 90/10 revenue test for two consecutive years, and that the sanctions that are specified do not include the financial responsibility consequences proposed under this trigger. For these reasons, the commenters concluded that, lacking specific statutory authority, the Department should remove this trigger from the final regulations.

Other commenters were concerned that institutions actively game the 90/10 requirements by (1) delaying title IV disbursements until the next fiscal year; (2) combining locations that exceed the 90 percent revenue limit with those that do not, and (3) raising tuition, which forces students to take out private loans that increase revenue from non-title IV sources. The commenters believed that these gaming strategies are the reason that only a few institutions fail the 90/10 revenue test each year (14 institutions for the 2013–14 reporting period) and urged the Department to limit the use of these strategies, recommending for example, that Department track for three years the 90/10 compliance for each location included at the institution's request under a single PPA or that the Department should not grant those

requests when institutional 90/10 compliance is in question.

*Discussion:* As we noted in the preamble to the NPRM, an institution that fails the 90/10 revenue test for one year, is one year away from losing its title IV eligibility. Under § 668.28(c)(3), an institution that fails the revenue test must notify the Department of that failure no later 45 days after the end of its fiscal year. If the institution fails again in the subsequent fiscal year, it loses its eligibility for title IV, HEA funds on the day following the end of its fiscal year, not at the end of the 45-day reporting period. After the end of its fiscal year, the institution's ability to continue to make disbursements to enrolled students is severely limited under the provisions in § 668.26. Consequently, in view of the institution's dependence on revenues from title IV, HEA funds that it is no longer eligible to receive, it is likely that the institution would close, possibly precipitously, leading to closed school discharges and program liabilities owed to the Department. These are the same outcomes that would result from an existential threat, such as a crippling lawsuit or loss of accreditation, for which financial protection is authorized under the financial responsibility provisions in section 498(c) of the HEA.

Contrary to the commenters' assertion that there is no risk to an institution's eligibility after a one-year failure, the HEA contemplates that risk under section 487(d)(2)(B) by providing that after a one year failure, the institution automatically becomes provisionally certified and remains on that status for the following two years, unless it fails the 90/10 revenue test in the subsequent year and loses eligibility. Moreover, the Department's authority to establish 90/10 as a basis for determining whether an institution is financially responsible is anchored under the provisions in section 498(c)(1) of the HEA, not the provisions governing the institution's eligibility under the 90/10 revenue provisions.

With regard to the comments about institutions evading the 90/10 requirements, we note that changes to these requirements are beyond the scope of this rulemaking. Administratively however, the Department will continue to diligently enforce the 90/10 requirements and work closely with the Office of the Inspector General to help ensure that institutions properly calculate their 90/10 rates.

*Changes:* None.

## *Publicly Traded Institutions § 668.171(e)*

### General

*Comments:* Under proposed § 668.171(c)(6), a publicly traded institution is not financially responsible if the SEC warns the institution that it may suspend trading on the institution's stock, the institution's stock is delisted involuntarily from the exchange on which it was traded, the institution disclosed in a report to the SEC that it is subject to a judicial or administrative proceeding, the institution failed to file timely a required report with the SEC, or the exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements.

Commenters believed that the NPRM did not provide meaningful rationale for some of the provisions that the Department asserts require financial protection, pointing for example to an institution's failure to file a timely report with the SEC, or noncompliance with exchange requirements, and noting that the Department only suggested that such events could lead to institutional failure. In response to the Department's request for comment regarding how these triggers could be more narrowly tailored to capture only those circumstances that could pose a risk to an institution's financial health, the commenters offered that the final regulations should provide that in every instance where an SEC action occurs, the Department will only take action after it affords the institution a notice and hearing and thereafter makes a reasoned determination that the event is likely to result in a material adverse effect. The commenters further stated that, to be a triggering event, any SEC action should be a final, non-appealable judgment or suspension and not merely a warning or notification. The commenters also stated that because many companies inadvertently and regularly miss a periodic filing deadline, the final regulations should require a finding of materiality, as applied to the delinquency of the filing, and the Department should consider whether the filing failure is an isolated incident or part of a pattern of conduct, and whether the missed filing was the fault of the institution.

Similarly, in response to the Department's request for comment, other commenters identified the following situations that they believed would provide for a more appropriate set of triggers for publicly traded institutions:

(1) The institution is in default on an obligation to make payments under a credit facility, or other debt instrument,

and the default involves an amount in excess of 10 percent of the institution's current assets, and the default is not cured within 30 days;

(2) An event of default has been declared by the relevant lender or trustee under any outstanding credit facility or debt instrument of the institution or its parent, including any bond indenture, and the default is not cured within 30 days; or

(3) The institution or its parent declares itself insolvent, files a petition for reorganization or bankruptcy under any Federal bankruptcy statute, or makes an assignment for the benefit of creditors.

The commenters believed that adopting the recommended triggers would enable the Department to efficiently identify those cases in which a publicly traded institution is in financial trouble, and would avoid conflating investor-facing disclosures or nonmaterial administrative matters (*e.g.,* failure to timely file a required report, notification of non-compliance with exchange requirements) with reliable indicators of financial distress.

*Discussion:* With regard to the suggestion that the Department apply these triggering events only when an SEC action is what the commenter describes as a final, non-appealable judgment or suspension, and not a warning or notification, doing so would further distance these events as early but significant indicators of serious financial distress. We understand that the warning is issued by the SEC only after repeated efforts have already been made to alert the delinquent party of the need to file, and despite these attempts, the registrant continues to fail to respond. We understand that the consequences of failure to file timely required reports after this warning include significant burdens should the institution wish to raise capital, and that not uncommonly, the reason a registrant becomes so delinquent as to be issued this warning is that the registrant has ceased operations. We are not capturing, or requiring contemporaneous reporting of, the actions and circumstances that give rise to an SEC or exchange action—information that may at an early stage forecast operational or financial difficulties—because that would be unmanageable and could lead to erroneous conclusions. Instead, we are relying on the conclusions reached by the SEC and the stock exchange that the actions taken by the institution warrant a significant and corresponding reaction.

With regard to the proposal that the Department take action to impose financial protection based on an SEC or

exchange action only after providing the institution an opportunity for a hearing and a case-by-case evaluation of the significance of the particular event on which the SEC or exchange acted, we note that § 668.171(h)(3)(iv) provides the institution with an opportunity at the time it reports the event to demonstrate that the condition no longer exists, has been cured or, that it has insurance that will cover any and all debts and liabilities that arise at any time from that triggering event. The liabilities referred to here are those that arise from a precipitous closure of an institution, including, but not limited to losses from closed school discharges, and liabilities for grant and loan funds not accounted for as properly spent by the statutorily required compliance audit. If the Department takes an enforcement action based on this trigger, or any other automatic triggering events, to condition the continuing participation of the institution on providing the required financial protection, § 668.90(a)(3)(iii)(A) provides the institution a more formal opportunity to demonstrate these defenses. The event itself is of such significance that the Department considers only these defenses, and not contentions that the event itself is not grounds for requiring protection.

While we appreciate the suggestions made by the commenters to streamline the triggers for publicly traded institutions, particularly with regard to making payments under a credit facility, as discussed more thoroughly under the heading "Violation of Loan Agreement," we have made these provisions discretionary and they apply to all institutions. While we agree that some of the situations described would signal serious distress, under these regulations we will make those determinations on a case-by-case basis. As previously noted, if the lender files suit as a result of the delinquency, that suit would be considered under the private litigation assessment in § 668.171(c)(1)(ii).

*Changes:* None.

Delisting

*Comments:* With regard to the triggers pertaining to a warning from the SEC that it may suspend trading and the involuntary delisting of an institution's stock, some commenters found the correlation the Department was attempting to make between an institution's failure to comply with exchange requirements and its ability to meet its financial obligations troublesome.

The commenters argued that, while a delisting is significant, correlating an institution's financial health to its

delisting incorrectly assumes that the delisting is generated as a result of financial problems and the delisting will materially impact the institution's financial health. Even where the delisting is itself related to something that is measured in dollars, like a minimum bid price, that measure is not necessarily indicative of the health of an institution, as opposed to the market value of a share of the institution.

*Discussion:* While the commenters are technically correct that an involuntary delisting does not necessarily mean that an institution has financial problems, it could equally or more likely mean that it does. Even worse, the delisting may be a prelude to bankruptcy. Generally speaking, financially healthy institutions are not involuntarily delisted. As discussed in the preceding comment, the regulations provide the institution ample informal and formal opportunities to show that the risks that the triggering event may cause have been removed by curing the event itself. These liabilities are those that ensue from a precipitous closure, as described above. An institution's financial viability under the Department's composite score methodology assesses, as explained earlier, the ability of the institution to borrow and access capital as needed. Delisting and SEC actions directly affect the ability of a publicly-traded institution to access capital. An institution may contend that the event on which the action was premised does not portend closure, but the action by the exchange or SEC unquestionably affects the ability of the institution to obtain financing, a critical aspect of financial viability. While the negative effect of that impairment may be difficult to quantify, and cannot immediately be assessed under the composite score methodology, that impairment warrants requiring financial protection.

*Changes:* None.

SEC Filings Regarding Judicial or Administrative Proceeding

*Comments:* With regard to judicial or administrative proceedings, some commenters noted that the SEC's requirements are designed to encourage disclosure of information to potential investors and cautioned that the proposed regulations may discourage those disclosures. The commenters believed that although the proposed reporting requirements under § 668.171(d)(i) would permit an institution to explain why a particular litigation or suit does not constitute a material adverse event that would pose an actual risk to its financial health, a publicly traded institution that elects to

make broad disclosures to the SEC and potential investors would be dependent on the Department agreeing with the institution's position. If the Department disagrees, the commenters opined that the institution would face a financial penalty (*i.e.*, be required to submit a letter of credit) for a situation where the disclosure may not have been required by the SEC in the first place. Along similar lines, other commenters noted that the reporting provisions do not require the Department to act on any evidence provided by the institution, and do not specify what opportunity, if any, the institution would have to discuss these events with the Department. For these reasons, the commenters suggested that the Department should not implement regulations that would interfere with the primary purpose of SEC disclosures—to permit potential investors to make their own decisions about whether to invest in the institution.

Similarly, other commenters believed this triggering event would run counter to the long-standing practice of publicly traded institutions generally erring on the side of disclosing legal and regulatory events to the public and their shareholders. More specifically, the commenters asserted that publicly traded institutions tend to over-disclose these events, particularly since the materiality of those events often cannot be reasonably determined at their onset.

*Discussion:* We acknowledge that a judicial or administrative proceeding reported by an institution to the SEC may or may not be material. We believe that proceedings reported in SEC filings that seek substantial recovery but may not be meritorious pose a risk similar to the risk posed by non-governmental actions. The institution may succeed in dismissing such a suit, or at least testing its merit by moving for summary judgment or disposition. The institution may also have insurance that fully protects the institution from loss from the suit.

*Changes:* We have added a new § 668.171(c)(1)(ii) to treat all private party litigation as a triggering event only if the action survives a motion for summary judgment or disposition, or the institution has chosen not to file for summary judgment, and have amended § 668.171(h) to enable the institution to demonstrate that all actual and potential losses stemming from that litigation are covered by insurance.

SEC Reports Filed Timely

*Comments:* With respect to the trigger for filing timely SEC reports under proposed § 668.171(c)(6)(iii), some commenters warned that the

Department should not assume that an institution is unable to meet its financial or administrative obligations and impose punitive actions based on a failure to meet SEC filing requirements. As an initial matter, the commenters argued that the proposed trigger is more stringent than the SEC's rules, which allow an institution to file a notification of late filing, that enables the institution to file the report by an extended deadline, and once filed the institution would be deemed to have timely filed the report. In addition, the commenters stated that an institution's failure to file a report may not necessarily reflect that the institution is unable to meet its financial or administrative obligations, because the report could be late for many reasons outside of financial problems at an institution, including the unavailability of an individual required to sign the report, an unforeseen circumstance with an institution's auditors, or the need to address a financial restatement done for technical reasons. Similarly, other commenters urged the Department to apply this trigger only where the filing would be considered late under SEC rules. The commenters explained that pursuant to SEC rules, an institution that fails to timely file a report must file a Form 12b–25, reporting the failure to file no later than one business day after the report was due. If the Form 12b–25 is properly filed, the institution will have 15 additional calendar days to file an annual report or five additional calendar days to file a quarterly report. If the institution files the late report within the extended deadline, the SEC considers that the report was timely filed.

*Discussion:* A late SEC filing, or failure to file, may precipitate an adverse action against an institution by the SEC or a stock exchange. For example, an AMEX or Nasdaq-listed institution that files a late SEC report is cited for failing to meet exchange requirements and will be required by the exchange to submit a plan for regaining compliance with listing requirements. The exchange may suspend trading on the institution's stock if it does not come into compliance with those requirements. Or, a late filing may limit the institution's ability to conduct certain types of registered securities offerings. In addition, capital markets tend to react negatively in response to late filings. All told, the consequences of late SEC filing may impact the institution's capital position or its ability to raise capital, and we believe that it remains a significant event to include as an automatic trigger.

*Changes:* None.

*Discretionary Triggering Events § 668.171(g)*

*Comments:* Under proposed § 668.171(c)(10), an institution is not financially responsible if the Secretary determines that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution, including but not limited to whether (1) there is a significant fluctuation in the amount of Direct Loan or Pell Grant funds received by the institution that cannot be accounted for by changes in those programs, (2) the institution is cited by a State licensing or authorizing agency for failing State or agency requirements, (3) the institution fails a financial stress test developed or adopted by the Secretary to evaluate whether the institution has sufficient capital to absorb losses that may be incurred as a result of adverse conditions, or (4) the institution or its corporate parent has a non-investment grade bond or credit rating.

Commenters believed that the proposed discretionary triggers were unreasonable for several reasons. First, the commenters noted that the discretionary provisions do not afford institutions any opportunity to communicate with the Department regarding a possible materiality determination. Instead, it appeared to the commenters that the Department may determine unilaterally, and without engaging the school, that there is an event or condition that is reasonably likely to have a material adverse effect and proceed to demand financial protection, violating the school's due process. Moreover, the commenters argued that any standard of financial responsibility that does not permit the receipt and review of information from the school cannot produce consistent and accurate results and, as such, fails to satisfy the reasonability standard put into place by Congress.

Second, the commenters noted that the Department did not define the term "material adverse effect" and made no mention of the concept in the preamble to the proposed regulations. The commenters asserted that the Department must define this term to ensure that the regulations are consistently applied, particularly where an institution could be significantly penalized (required to submit a letter of credit) pending the result of the determination.

Third, the commenters argued that by requiring under proposed § 668.171(d) that an institution must report any automatic or discretionary trigger within 10 days, the proposed regulations are unworkable—because the discretionary triggers are not exhaustive, an institution would have an obligation to speculate as to the types of events the Department might determine would have a material adverse effect and report those events. Conversely, the commenters were concerned that the Department could argue that an institution's failure to report an event, that the Department might deem likely to have material adverse effect, is a failure to provide timely notice under § 668.171(d), and grounds to initiate a proceeding.

Fourth, the commenters argued that the six examples of events that the Department might consider "reasonably likely" to have a material adverse effect on an institution are vague, and asserted that the Department offered no factual support in the preamble for the notion that these events regularly, or even more often than not, lead to financial instability at an institution. The commenters stated that the only rationale the Department offers for including these six events is that each could, in theory, signal financial stress. For example, they noted that a citation from a State-authorizing agency for failing a State requirement could concern almost any aspect of an institution's operations. The commenters contended that routine citations occur with great frequency in annual visit reports and routine audits. Therefore, under the proposed regulations, an institution would be required to report every citation, without regard to materiality, frequency, or the relationship to the institution's financial health. According to the commenters, events such as "high annual dropout rates," a "significant fluctuation" in the amount of Federal financial aid funds received by an institution, an undisclosed stress test, and an adverse event reported on a Form 8–K with the SEC are equally problematic and vague. Commenters stated that it was unclear what these thresholds or events represent, how they would be evaluated, or how an institution would know that one has occurred and report it to the Department.

Other commenters believed that the Secretary should not have open-ended discretion to determine which categories of events or conditions would be financial responsibility triggers. Like other commenters, these commenters argued that as a practical matter it

would likely be impossible for an institution to comply with the reporting requirements in proposed § 668.171(d) for any event or condition that is not specifically identified by the Secretary because the institution would have to guess which additional events or conditions might be of interest. Similarly, some commenters believed the discretionary triggers should be exhaustive with established parameters so that institutions know the events they must comply with and report to the Department.

Some commenters believed that the discretionary triggers constitute an open invitation for litigation by anyone with an "axe to grind" with any school. The commenters were concerned that the Secretary could use the expanded authority under the discretionary triggers to take actions against institutions for any reason.

*Discussion:* As a general matter, the discretionary triggers are intended to identify factors or events that are reasonably likely to, but would not in every case, have an adverse financial impact on an institution. Compared to the automatic triggers, where the impact of an action or event can be reasonably and readily assessed (*e.g.*, claims, liabilities, and potential losses are reflected in the recalculated composite score), the materiality or impact of the discretionary triggers is not as apparent. The Department will have to conduct a case-by-case review and analysis of the factors or events applicable to an institution to determine whether one or more of those factors or events has an adverse financial impact. In so doing, the Department may request additional information or clarification from the institution about the circumstances surrounding the factors or events under review. If the Department determines that the factors or events have a material adverse effect on the institution's financial condition or operations, the Department notifies the institution of the reasons for, and consequences of, that determination. As for the comment that we should define "material adverse effect," we do not intend to adopt a specific measure here, because identification of those events that cause such an effect is a particularized judgment.[59] We disagree with the notion

that it is inappropriate for the Department to determine which factors or events may be used as discretionary triggers, or that the list of factors and events in the regulations should be exhaustive. Each discretionary trigger rests on a particularized judgment that a factor or event has or demonstrates such a substantial negative condition or impact on the institution as to place continued operations in jeopardy.[60] In this regard, as explained more fully under the heading "Reporting Requirements," an institution is

responsible for reporting only the actions and events specified in these regulations.

We address specific concerns and suggestions about the discretionary triggers in the following discussion for each factor or event. In addition, we have added pending borrower defense claims as a discretionary trigger because it is possible that an administrative action could cause an influx of borrower defense claims that we can expect to be successful, though that will vary on a case-by-case basis.

*Changes:* None.

## Discretionary Triggering Events

*Bond or Credit Rating, Proposed § 668.171(c)(11)*

*Comments:* Commenters argued that a non-investment grade bond or credit rating is not a reliable indicator of financial problems. The commenters stated that, because the rating assigned by a rating agency is a measure designed for the benefit of creditors concerned solely with pricing the institution's debt, a rating below investment grade does not necessarily mean that an institution cannot meet its financial obligations. Moreover, the commenters questioned how the Department would determine that an institution or its corporate parent had a non-investment grade rating, since there are multiple rating agencies and the agencies may not necessarily assign the same rating to a particular institution or in the case where the institution or its corporate parent have multiple ratings, some of which are investment grade. The commenters stated that this financial structuring is not unusual and has no impact on the ability of the institution to meet its obligations. For these reasons, the commenters suggested that, if the Department retains bond or credit ratings as a triggering event, it should specify how those ratings are determined. In addition, the commenters were concerned that applying this trigger could potentially increase costs to institutions because, in an effort to avoid this risk of a non-investment grade rating, an institution may seek not to have a credit rating in the first place, so obtaining alternate financing could increase its costs of capital.

Other commenters argued that assuming that schools with noninvestment grade bond ratings are somehow deficient is unwarranted. The commenters noted that the majority of nonprofit colleges and universities do not have a bond rating at all, since they have not issued public debt, citing the data provided by the Department in the

---

[59] Accounting rules do not set a specific figure for such effects. However, SEC regulations require the registrant to disclose resources the loss of which would have a material adverse effect on the registrant, and in that rule explicitly require the registrant to disclose an investment of 10 percent or more of company resources in an entity, 17 CFR 210.1–02(w), and identify any customer or revenue source that accounts for 10 percent or more of the registrant's consolidated revenues, if the loss of that revenue would constitute a material adverse effect.

[17] CFR 229.101(c)(1)(i), (vii). While not defining material adverse effect, the selection of this threshold supports an inference that loss of this magnitude can be expected to constitute a material adverse effect. A popular characterization of the significance of such a loss states that material adverse effect is a term that commonly denotes an effect that

. . . usually signals a severe decline in profitability and/or the possibility that the company's operations and/or financial position may be seriously compromised. This is a clear signal to investors that there is something wrong . . . Material adverse effect is not an early warning signal, but rather a sign that a situation has already deteriorated to a very bad stage. Investopedia *www.investopedia.com/articles/analyst/112702.asp#ixzz4JKIpsbwk.*

[60] The assessment would look to the factors identified in recent revisions to Financial Accounting Standards Board rules regarding the expectations regarding whether the entity's ability to continue as a going concern. FASB Standards Update, No. 2014–15, Presentation of Financial Statements—Going Concern (Subtopic 205–40):

205–40–55–2  The following are examples of adverse conditions and events that may raise substantial doubt about an entity's ability to continue as a going concern. The examples are not all-inclusive. The existence of one or more of these conditions or events does not determine that there is substantial doubt about an entity's ability to continue as a going concern. Similarly, the absence of those conditions or events does not determine that there is no substantial doubt about an entity's ability to continue as a going concern. Determining whether there is substantial doubt depends on an assessment of relevant conditions and events, in the aggregate, that are known and reasonably knowable at the date that the financial statements are issued (or at the date the financial statements are available to be issued when applicable). An entity should weigh the likelihood and magnitude of the potential effects of the relevant conditions and events, and consider their anticipated timing. a. Negative financial trends, for example, recurring operating losses, working capital deficiencies, negative cash flows from operating activities, and other adverse key financial ratios. b. Other indications of possible financial difficulties, for example, default on loans or similar agreements, arrearages in dividends, denial of usual trade credit from suppliers, a need to restructure debt to avoid default, noncompliance with statutory capital requirements, and a need to seek new sources or methods of financing or to dispose of substantial assets. c. Internal matters, for example, work stoppages or other labor difficulties, substantial dependence on the success of a particular project, uneconomic long-term commitments, and a need to significantly revise operations. d. External matters, for example, legal proceedings, legislation, or similar matters that might jeopardize the entity's ability to operate; loss of a key franchise, license, or patent; loss of a principal customer or supplier; and an uninsured or underinsured catastrophe such as a hurricane, tornado, earthquake, or flood.

NPRM that shows that only 275 private institutions have been rated by Moody's (some others likely have used other rating agencies like Fitch or Standards & Poor). The commenters contended that institutions that have a rating are arguably in better financial condition than those that do not, so rather than being a trigger for additional scrutiny, the existence of a credit rating and outstanding public debt would, in itself, be an indication of financial responsibility. Further, the commenters noted that a bond rating seeks to assess the creditworthiness and risk of nonpayment over an extended time period—typically 20 to 30 years—that is well beyond the much shorter timeframe contemplated by the financial responsibility regulations.

*Discussion:* In considering the complexities and difficulties noted by the commenters in using and relying on bond or credit ratings, we are removing this triggering event.

*Changes:* We have removed bond or credit ratings as a discretionary trigger.

*Adverse Events Reported on Form 8–K, Proposed § 668.171(c)(11)*

*Comments:* Commenters believed that the trigger regarding the reporting of adverse events on the SEC's Form 8–K is too narrow since it is not used to identify adverse events at non-publicly traded institutions and too broad since it would capture events reported on Form 8–K that are not indicative of an institution's financial health. Although the commenters acknowledged that it may be efficient to use existing disclosure channels to identify potential issues of concern, they nevertheless believed that it was unfair for the Department to impose burdens on publicly traded institutions, but not on other institutions that may be experiencing adverse events. In addition, the commenters stated that many events listed on Form 8–K have no bearing on an institution's ability to meet its financial obligations, so the Department should identify the events it considers to be adverse. Once identified, the commenters suggested that the Department could develop a broader list of adverse events that would be applicable to all institutions.

Also, the commenters believed that, because of the proposed trigger, publicly traded institutions would have an incentive not to report events on Form 8–K that could potentially be adverse events, but in the ordinary course would have provided useful information to investors. In conclusion, the commenters feared that, without clear guidelines from the Department about what constitutes an adverse event,

publicly traded institutions would have to make their own decisions as to whether to treat something as an adverse event. Commenters were concerned that, even where institutions make that decision in good faith, they could potentially be exposing themselves later to an action by the Department if the Department exercises its own judgment in hindsight.

Similarly, other commenters believed that a number of events on Form 8–K have little or no relationship to the institution's continued capacity to operate or to administer the title IV, HEA programs. Instead of using a trigger based on Form 8–K reporting, the commenters suggested that the financial responsibility regulations should be focused on potential risks to the title IV, HEA programs and, as a related matter, institutional outcomes that risk.

*Discussion:* While we are not convinced that some of the reportable items on Form 8–K will not have an adverse financial impact on an institution, we will not require an institution to report any Form–8K event because that information is otherwise publicly available to the Department. We may, however, evaluate the effect of an event reported in a Form 8–K as if it were a discretionary triggering event, on a case by case basis, or in light of the effect on an institution's composite score as applied under these regulations.

*Changes:* We have removed the discretionary trigger regarding an adverse event reported by an institution on a Form 8–K under proposed § 668.171(c)(10)(vii).

*High Drop-Out Rates and Fluctuations in Title IV, HEA Funding*

Drop-Out Rates § 668.171(g)(4)

*Comments:* Some commenters urged the Department to define how it will calculate high annual dropout rates and provide an opportunity for the pubic to comment on the methodology employed. The commenters noted that in the preamble to the NPRM, the Department stated that it uses high dropout rates to select institutions for program reviews, as described in 20 U.S.C. 1099c–1(a), and that ''high dropout rates may signal that an institution is employing high-pressure sales tactics or is not providing adequate educational services, either of which may indicate financial difficulties and result in enrolling students who will not benefit from the training offered and will drop out, leading to financial hardship and borrower defense claims'' (81 FR 39366 (emphasis added)).

Although the commenters agreed that those statements may be true, they argued that when the Department conducts a program review, it investigates whether high dropout rates are in fact signs of financial difficulties. Under the NPRM, the commenters surmised that the Department would have the discretion to impose a requirement to provide a letter of credit or other financial protection without any review of institutional practice or other investigation to find a causal connection between high dropout rates and financial difficulties, thus depriving the institution of fair process.

Other commenters were concerned that this trigger is arbitrary because it is unlikely that a high dropout rate is related to a school's financial stability. The commenters pointed to a study published in December 2009 by Public Agenda showing that the most common reason students dropped out of school is because they needed to work. Other reasons cited in the study include: Needing a break from school, inability to afford the tuition and fees, and finding the classes boring or not useful. Based on this study and survey results from the Pew Research Center, the commenters concluded that the reasons students drop out of school typically have very little to do with school itself, and therefore suggested that the Department remove this triggering event.

Some commenters argued that the use of the dropout rate as a trigger fails to account for the various missions that title IV institutions represent, or the extended time to graduation that many contemporary students face as they balance career, family and higher education. The commenters believed that establishing a dropout rate as a trigger for a letter of credit creates a perverse incentive for institutions to enroll and educate only those students who are most likely to succeed, instead of continuing to extend access to higher education to the broader population. In addition, the commenters believed that measures of academic quality are best left to accreditors, but if the Department chooses to take on this role, it should consider instead triggering a letter of credit if an institution's persistence rate decreases significantly between consecutive award years, or over a period of award years. The commenters believed this approach would account for the significant variances in mission and student body across higher education without potentially limiting access.

*Fluctuations in Funding § 668.171(g)(1)*

Commenters believed the proposed trigger for a significant fluctuation between consecutive award years, or a period of award years, in the amount of Pell Grant and Direct Loan funds received by an institution, is overly vague. The commenters noted that year-over-year fluctuations can occur when an institution decides to discontinue individual programs or close campus locations, often because those campuses or programs are under-performing financially even where the overall institution is financially strong and argued that because these are sound business decisions made in the long-term interests of the institution, they should not give rise to a letter of credit requirement.

Some commenters believed that a decrease in total title IV expenditures should not trigger a letter of credit requirement because the decreases in the amount of the title IV, HEA funds disbursed puts the Department at less risk of financial loss. In addition, the commenters stated that a decrease in title IV, HEA funding to a school is largely out of the school's control—it is usually a result of decreased enrollments or the Department's rulemaking actions.

Other commenters agreed that big changes in the amount of financial aid received by an institution could be a sign that growth that is too fast, or an enrollment decline may signal a school is in serious trouble. The commenters argued, however, that at small schools, big percentage changes could simply be the result of small changes in the number of students. While the commenters were confident that the actual implementation of this rule would not result in the Department holding a small school accountable for what is a minor change, they believed the Department should clarify that the change in Federal aid would need to be large both in percentage and dollar terms as a way of proactively assuaging this concern.

One commenter noted that the phrase ''significant fluctuation'' was not defined, and that the Department implied on page 39393 of its NPRM that it believes a reasonable standard would be a 25 percent or greater change in the amount of title IV, HEA funds a school receives from year to year, after accounting for changes in the title IV, HEA programs. The commenter urged the Department to clarify in the final regulations precisely what this phrase means so that institutions would know how to comply. Moreover, the commenter argued that the Department

may be evaluating institutions by the wrong metric, stating that the for-profit sector has seen six-fold enrollment growth over the past 25 years where significant fluctuations in title IV, HEA program volume may be a reflection of that expansion. Said another way, a significant fluctuation in title IV, HEA program volume, without looking at important contextual clues, is insufficient to determine whether there is questionable conduct at the institution. In addition, the commenter warned that including significant fluctuation as a trigger may serve to deter institutional growth, since a large increase in enrollment would trigger the financial protection requirement even if that increase was perfectly legitimate.

In addition, the commenter believed that, while the Department has a compelling interest in ensuring that institutions do not raise tuition unnecessarily to take advantage of title IV, HEA aid, the Department should try to address this problem in a way that does not discourage institutions from expanding their enrollment.

For these reasons, the commenter suggested revising the trigger so it refers to a significant fluctuation in title IV, HEA program volume per aid recipient, not program volume overall. The commenters believed this approach would guard against increases in tuition designed to take advantage of the title IV, HEA programs while not penalizing institutions with rapid enrollment growth.

*Discussion:* We intend to use the high drop-out rate and fluctuations in funding triggers only when we make a careful, reasoned analysis of the effect of any of these events or conditions on a particular institution, and conclude that the condition or event is likely to have a material adverse effect on the institution. An institution that challenges this determination may present an argument disputing this determination. If we are not persuaded, we will take enforcement action under 34 CFR part 668, subpart G to limit the institution's participation to condition further participation on supplying the financial protection demanded. The institution may obtain an administrative hearing to dispute the determination, and unlike with the automatic triggers, the institution may present and have considered both evidence and argument in opposition to the determination that the condition may constitute a material adverse effect, but also whether the amount of financial protection demanded is warranted.

As noted in the introductory discussion of this section and noted by some commenters, the materiality or

relevance of factors like dropout rates and fluctuations in funding must be evaluated on a case-by-case basis in view of the circumstances surrounding or causes giving rise to what may appear to be excessive or alarming outcomes. In other words, what may be a high dropout rate or significant fluctuation in funding at one institution may not be relevant at another institution. In this regard, we appreciate the suggestions made by the commenters for how the Department could view or determine whether or the extent to which these factors are significant.

While a case-by-case approach argues against setting bright-line thresholds, to mitigate some of the anxiety expressed by the commenters as to what may be a high dropout rate or fluctuation in funding, we may consider issuing guidance or providing examples of actual cases where the Department made an affirmative determination.

*Changes:* None.

*State or Agency Citations § 668.171(g)(2)*

*Comments:* With respect to the discretionary trigger under proposed § 668.171(c)(10)(ii), some commenters noted that because State agencies may issue citations for minor violations of State requirements and not subject an institution to any penalties, the Department should remove this triggering event. The commenters believed this triggering event would unnecessarily capture citations for minor violations, such as failure to update the institution's contact information. It would also capture violations for which the State agency has decided no penalty is necessary. The commenters questioned why the Department should substitute its judgment for that of the State agency and determine that an otherwise non-punitive citation is indicative of financial problems. In the alternative, the commenters suggested that the final regulations should provide that this trigger would only be invoked if an institution's failure to comply with State or agency requirements was material. In addition, the commenters suggested that the final regulations should define ''State licensing or authorizing'' agency in this context to mean only the primary State agency responsible for State authorization, not specialized State agencies, such as boards of nursing, that have responsibility for professional licensure and other matters that would not have a material impact on the overall financial condition of the institution.

Other commenters recommend that the Department apply the State agency-

based trigger only if the citation by the State authorizing agency is final and relates to the same bases that can support a borrower defense claim. Or, because State agencies frequently cite institutions for findings of noncompliance that are remedied appropriately and timely, the commenters supported applying the trigger only if the State agency has initiated an action to suspend or terminate its authorization of the institution.

Some commenters were concerned that the Department did not provide any evidence that would support that an institution that chooses to discontinue State approval for a single program at a single location would implicate the financial stability of an entire institution, much less a large institution with a wide range of programming and multi-million dollar endowment.

*Discussion:* The State agency-based trigger and other discretionary triggers are intentionally broad to capture events that may have an adverse financial impact on an institution. With regard to the comments that the Department should not require an institution to report State agency actions for events or violations (1) that the institution considers minor, (2) for which the agency did not penalize the institution, or (3) that are remedied timely, we believe that doing so under any of these circumstances defeats the purpose of the trigger. There is little or no reporting burden on an institution that is sporadically cited for a violation by a State agency, but where the institution is cited repeatedly the reporting burden is warranted because even if individual violations are minor, collectively those violations may signal a serious issue at the institution.

A State licensing or authorizing agency, for the purpose of this trigger, includes any agency or entity in the State that regulates or governs (1) whether an institution may operate or offer postsecondary educational programs in the State, (2) the nature or delivery of those educational programs, or (3) the certification or licensure of students who complete those programs. In this regard, we disagree with the assertion that actions by a State agency responsible for professional licensure would never have a material impact on the financial condition of the institution. To the contrary, because the State agency enforces standards that restrict professional practice to individuals who, in part, satisfy rigorous educational qualifications, a citation or finding by the agency could impact how an institution offers or delivers an educational program.

Finally, with regard to the comment about an institution voluntarily discontinuing State approval for a program at a particular location, we note that, unless the State cited the institution for discontinuing the program, this is not a reportable event.

*Changes:* None.

*Comments:* Some commenters believed that considering "claims of any kind" against an institution, in proposed § 668.171(c)(1)(ii), would invite a broad set of claims that may not cause financial damages. Others objected to the apparent ability under proposed § 668.171(c)(10) to add other events or conditions as it wished without public comment. Commenters believed that proposed triggers do not focus just on fiscal solvency; rather, they assert, the proposed triggers include events not related to financial solvency: Accrediting agency actions, cohort default rates, and dropout rates. The commenters opined that the Department was inappropriately attempting to shift the emphasis of these regulations from financial oversight into much broader accountability measures and to insert the Federal government into institutional decision-making.

*Discussion:* To the extent that the proposed regulations would have included events other than explicit claims, we are revising the regulations to include only events that pose an imminent risk of very serious financial impact. An institution that could lose institutional eligibility in the next year is indeed at serious risk of severe financial distress. Other events cited here we agree pose a risk only under particular circumstances, and should not be viewed as per se risks.

*Changes:* Section 668.171 has been revised to make clear that accreditor sanctions and government citations, are considered, like high dropout rates, as triggering events only on a reasoned, case-by-case basis under § 668.171(g)(2) and (5).

*Stress Test § 668.171(g)(3)*

*Comments:* Commenters believed that a trigger based on the proposed stress test is redundant because the Department uses the existing composite score methodology as the primary means of evaluating the financial health of an institution. In addition, the commenters were concerned that the Department did not provide schools with enough information regarding what the financial stress test will be and if it will be developed through negotiated rulemaking. The commenters suggested removing the stress test as a trigger, but if the Department does implement a

stress test, it should first be developed through negotiated rulemaking.

Other commenters echoed the suggestion to develop the stress test through negotiated rulemaking, arguing that developing a test would not only be time consuming and complex, but have serious implications for institutions—all the reasons why institutions and other stakeholders should have an opportunity to provide their views and analyses.

Some commenters argued that it was premature and unreasonable to include reference to a stress test, which has yet to be developed, and which schools have not had a chance to review and offer comment on.

*Discussion:* We do not intend to replace the composite score methodology with a financial stress test. The stress test could be used to assess an institution's ability to deal with an economic crisis or adverse event under a scenario-based model, whereas the composite score methodology focuses primarily on actual financial performance over a fiscal year operating cycle.

We certainly understand the community's desire to participate in any process the Department undertakes to develop a stress test, or evaluate adopting an existing stress test, but cannot at this time commit to a particular process. However, we wish to assure institutions and other affected parties that we will seek their input in whatever process is used.

*Changes:* None.

*Violation of Loan Agreement § 668.171(g)(6)*

*Comments:* Under proposed § 668.171(c)(4), an institution is not financially responsible if it violated a provision or requirement in a loan agreement with the creditor with the largest secured extension of credit to the institution, failed to make a payment for more than 120 days with that creditor, or that creditor imposes more stringent loan terms or sanctions as a result of a default or delinquency event.

Some commenters noted that because the largest secured extension of credit may be for a very small dollar amount, the Department should specify a minimum threshold below which a violation of a loan agreement is not a triggering event.

Other commenters believed that a school that satisfies the composite score requirements should not be required to post a letter of credit relating to violations of loan agreements. The commenters cautioned that this provision could have the unintended impact of altering the relationship

between schools and their creditors because creditors would have additional leverage in negotiations regarding violations of loan agreements. The commenters believed that, because this additional leverage could potentially place a school's financial stability at risk where it otherwise was not, this triggering event should be deleted.

Along the same lines, other commenters warned that the proposed loan agreement triggers would create significant leverage for banks that does not presently exist. The commenters opined that a bank potentially could threaten to trigger a violation of a loan agreement or obligation, thereby exercising inappropriate leverage over the institution and its operations to the detriment of its educational mission, students, and employees. The commenters believed this outcome would be a significant threat that the Department must consider this "countervailing evidence" in rationalizing the reasonableness of this proposed trigger. *See Am. Fed'n of Labor & Cong. of Indus. Organizations* v. *Occupational Safety & Health Admin., U.S. Dep't of Labor,* 965 F.2d 962, 970 (11th Cir. 1992) (*quoting AFL–CIO* v. *Marshall,* 617 F.2d 636, 649 n. 44 (D.C. Cir. 1979)).

Other commenters agreed that, in certain circumstances, the violation of a loan agreement or other financial obligation may signal the need for financial protection. However, the commenters believed the proposed triggering events were overly broad and could result in financially sound institutions being regularly penalized. The commenters recommended that the Department revise the triggering events in two ways.

First, the Department should include a materiality threshold in proposed § 668.171(c)(4)(i) so that this provision is only triggered when a default is material and adverse to the institution. In addition, the commenters suggested that this provision should apply only to any undisputed amounts and issues that are determined by a final order after all applicable cure periods and remedies have expired. With regard to proposed § 668.171(c)(4)(ii), because cross-defaults are prevalent in most material loan agreements, commenters suggested that the Department should focus on defaults that are material and adverse to the institution as a going concern, as opposed to narrowing the trigger to the institution's largest secured creditor.

Second, commenters suggested that the language in proposed § 668.171(c)(4)(iii) should be revised to exclude events where the institution it permitted to cure the violation in a timely manner in accordance with the loan agreement. They noted that this type of "curing" is a common occurrence and specifically contemplated in the agreements between the parties.

Other commenters believed that the Department should include allowances for instances in which the creditor waives any action regarding a violation of a provision in a loan agreement, or the creditor does not consider the violation to be material. The commenters note that although the reporting requirements under proposed § 668.171(d)(3) permit an institution to notify the Department that a loan violation was waived by the creditor, it does not explicitly state that such a waiver would make the institution financially responsible. The commenters urged the Department to revise this provision to clearly state that a waiver of a term or condition granted by a creditor cures the triggering event so that financial protection is not required. According to the commenters, certified public accountants use this standard when assessing a school's ability to continue as a going concern—if a waiver is issued or granted by the creditor the certified public accountant does not mention this event in the school's audited financial statements because it is no longer an issue for the debtor.

Some commenters believed that the proposed loan agreement provisions were too broad and would unnecessarily impact institutions that pose no risk. The commenters stated that loan agreements may include a number of events that are not related to the failure of the institution to make payments that trigger changes to the terms of the agreement, and in that case the proposed provisions would seem to capture the change in terms as a reportable event. The commenters noted that nonprofit institutions have access to and use variable rate loans, and that some nonprofit institutions have synthetically converted their variable rate interest borrowings into fixed rate debt by entering into an interest rate swap agreement. The commenters believed that, under these circumstances, it would be incorrect to assume that changes to the interest rates negatively impact the institution. Further, while the loan provision in the proposed regulations is narrower than the current one since it only applies to an institution's largest secured creditor, rather than all creditors, the commenters believed the Department should establish a materiality threshold and/or make a determination that any changes to the interest rate or other terms would have a material impact on the institution. In addition, the commenters noted that the exception provided under § 668.171(d)(3), allowing the institution to show that penalties or constraints imposed by a creditor will not impact the institution's ability to meet its financial obligations, only applies if the creditor waived a violation and questioned whether the end result would be the same if the creditor did not waive the violation, but the penalties or changes to the loan nevertheless would not have an adverse impact.

*Discussion:* In considering the comments regarding the materiality of loan violations, and whether the sanctions or terms imposed by a creditor as a result of a default or delinquency event are relevant or adverse, we are making the provisions in proposed § 668.171(c)(4) discretionary triggers under § 668.171(g)(6). We believe that evaluating a delinquency or default on a loan obligation under the discretionary triggers addresses the commenters' concerns that the Department should review or assess a loan violation on a case-by-case basis to determine whether that violation is material and sufficiently adverse to warrant financial protection. This case-by-case review eliminates the need to qualify or limit the scope of loan violations to the largest secured creditor. Moreover, making these discretionary triggers maintains the Department's objective of identifying and acting on early warning signs of financial distress. We expect that making the proposed provisions discretionary will abate the concerns raised by the commenters that an automatic action by the Department in response to a loan violation would prompt or create an unfair advantage for creditors, because that action is no longer certain. In addition, we note that if a creditor files suit in response to a loan violation, that suit is covered under the provisions in § 668.171(c)(1)(ii) as an automatic triggering event.

*Changes:* We have relocated the proposed loan agreement provision to § 668.171(g)(6), reclassified those provisions as discretionary events, and removed the qualifier that the loan violation is for the largest secured creditor.

### Borrower Defense Claims § 668.171(g)(7)

*Comments:* None.

*Discussion:* After further consideration, the Department concluded that, in instances in which the Department can expect an influx of successful borrower defense claims as a

result of a lawsuit, settlement, judgment, or finding from a State or Federal administrative proceeding, we may wish to require additional protection. However, since such instances are fact-specific, we have decided to make such a trigger discretionary.

*Changes:* We have added a new discretionary trigger in § 668.171(g)(8) relating to claims for borrower relief as a result of a lawsuit, settlement, judgment, or finding from a State or Federal administrative proceeding.

*Reporting Requirements § 668.171(h)*

*Comments:* Some commenters believed that the proposed mandatory reporting requirements under § 668.171(d) are outside the scope of the Department's authority. The commenters argued that statutory provisions cited by the Department, that the Secretary has authority ''to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department,'' and that the Secretary is authorized ''to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department'' (20 U.S.C. 1221e–3), are ''implementary rather than substantive,'' meaning that they ''can only be implemented consistently with the provisions and purposes of the legislation.'' *New England Power Co.* v. *Fed. Power Comm'n.,* 467 F.2d 425, 430 (D.C. Cir. 1972), aff'd, 415 U.S. 345 (1974) (citation omitted).

*Discussion:* The Secretary cited 20 U.S.C. 1221e–3 as authority for revisions to 34 CFR 30.70, 81 FR 39407, and the repayment rate disclosures proposed as new § 668.41(h). 81 FR 39371. As pertinent here, the Department cited as authority for the proposed changes to § 668.171, which includes the new reporting requirements under § 668.171(h), sections 487 and 498(c) of the HEA, 20 U.S.C. 1094 and 1099c. Section 487 states that the Secretary ''notwithstanding any other provision of this title (title IV of the HEA), shall prescribe such regulations as may be necessary to provide . . . in matters not governed by specific program regulations, the establishment of reasonable standards of financial responsibility . . . including any matter the Secretary deems necessary to the sound administration of the financial aid programs, such as the pertinent actions of any owner, shareholder, or person exercising control over an

eligible institution.'' 20 U.S.C. 1094(c)(1)(B). Section 498 states that the Secretary is to determine whether an institution is able to meet its financial obligations to all parties, including students and the Secretary, including adopting financial criteria ratios. 20 U.S.C. 1099c(c). These provisions give the Secretary ample substantive authority to adopt regulations that require the institution to provide audited financial statements and other records needed to evaluate the financial capability of the institution. This authority is direct and specifically authorizes the required reporting by participating institutions, unlike the charge imposed by the Federal Power Commission in *New England Power Co.* v. *Fed. Power Comm'n,* cited by the commenter to support its view. The court there concluded that the Commission lacked authority to impose that charge on the industry member for costs incurred not for the benefit of the member but for the general public. *New England Power Co.* v. *Fed. Power Comm'n,* 467 F.2d 425, 427 (D.C. Cir. 1972), *aff'd,* 415 U.S. 345 (1974). Here, the HEA expressly authorizes the Secretary to adopt regulations governing the conditions for participation in the title IV, HEA programs, and in particular, the assessment of the institution's financial capability.

*Changes:* None.

*Comments:* Under the reporting requirements in proposed § 668.171(d), an institution must report any action or event identified as a trigger under § 668.171(c) no later than 10 days after the action or event occurs. For three of the reportable actions or events— disclosure of a judicial or administrative proceeding, withdrawal of owner's equity, and violations of loan agreements—the institution may show that those actions or events are not material or relevant.

Commenters were concerned that the Department would not be bound to act or consider any evidence an institution would provide under proposed § 668.171(d)(2) regarding the waiver of a violation of a loan agreement, or provide any opportunity to the institution to discuss the waiver. Moreover, the commenters were concerned that the waiver reporting provisions would permit the Department to disregard any such evidence if the creditor imposes additional constraints or requirements as a condition of waiving the violation, or imposes penalties or requirements. Absent a materiality modifier, the commenters believed that the waiver ''carve out'' would become meaningless. Ostensibly, the commenters feared that the Department could proceed to

demand financial protection even if a creditor waived the underlying violation and the institution effectively demonstrated that the additional requirements imposed would only have a negligible impact on the institution's ability to meet current and future financial obligations. The commenters recommended that at a minimum, proposed § 668.171(d)(2) should be modified to require a material adverse effect on the institution's financial condition.

Other commenters believed that requiring institutions to report the widely disparate events reflected in the proposed triggering events within 10 days is unreasonable, particularly for large, decentralized organizations. The commenters believed that it was one thing to demand that type of prompt reporting on a limited number of items from institutions that already have been placed on heightened monitoring but quite different to require hyper-vigilance from all institutions. The commenters argued that various offices across the institution might be involved and have contemporaneous knowledge of the triggering events, but the individuals dealing with an unrelated agency action, a lawsuit, or a renegotiation of debt are unlikely to have a Department reporting deadline on the top of minds. Moreover, the commenters believed that individuals at an institution who are charged with maintaining compliance with Department regulations are unlikely to learn about some of these events within such a short period of time.

*Discussion:* In view of these comments and other comments discussing the triggering events, we clarify in these final regulations the reporting requirement that applies to each triggering event. As shown below, an institution must notify the Department no later than:

1. For the lawsuits and other actions or events in § 668.171(c)(1)(i), 10 days after a payment was required, a liability was incurred, or a suit was filed, and for suits, 10 days after the suit has been pending for 120 days;

2. For lawsuits in § 668.171(c)(1)(ii), 10 days after the suit was filed and the deadlines for filing summary judgment motions established, and 10 days after the earliest of the events for the summary judgments described in that paragraph;

3. For accrediting agency actions under § 668.171(c)(1)(iii), 10 days after the institution is notified by its accrediting agency that it must submit a teach-out plan.

4. For the withdrawal of owner's equity in § 668.171(c)(1)(v), 10 days

after the withdrawal is made. 5. For the non-title IV revenue provision in § 668.171(d), 45 days after the end of the institution's fiscal year, as provided in § 668.28(c)(3).

6. For the SEC and exchange provisions for publicly traded institutions under § 668.171(e), 10 days after the SEC or stock exchange notifies or takes action against the institution, or 10 days after any extension granted by SEC.

7. For State or agency actions in paragraph (g)(2), 10 days after the institution is cited for violating a State or agency requirement;

8. For probation or show cause actions under paragraph (g)(5), 10 days after the institution's accrediting agency places the institution on that status; or

9. For the loan agreement provisions in paragraph (g)(6), 10 days after a loan violation occurs, the creditor waives the violation, or imposes sanctions or penalties in exchange or as a result of the waiver. We note that the proposed loan agreement provisions are discretionary triggers in these final regulations, and as such facilitate a more thorough dialogue with the institution about waivers of loan violations and creditor actions tied to those waivers.

We also are providing that an institution may show that a reportable event no longer applies or is resolved or that it has insurance that will cover the debts and liabilities that arise at any time from that triggering event.

In addition, we are providing that an institution may demonstrate at the time it reports a State or Federal lawsuit under § 668.171(c)(1)(i)(B) that the amount claimed under that lawsuit exceeds the potential recovery. We stress that this option does not include any consideration of the merit of the government suit. It addresses only the situation in which the government agency asserts a claim that the facts alleged, if accepted as true, and the legal claims asserted, if fully accepted, could still not produce a recovery of the deemed or claimed amount for reasons totally distinct from the merit of the government suit. Thus, the regulations in some instances deem a suit to seek recovery of all tuition received by an institution, but the allegations of the complaint describe only a limited period, or a given location, or specific programs, and the institution can prove that the total amount of tuition received for that identified program, location, or period is smaller than the amount claimed or the amount of recover deemed to be sought.

*Changes:* We have revised § 668.171(h)(1) to specify the reporting requirements that apply to a triggering event, as described above. We have also provided in revised paragraph (g)(3) that an institution may show (1) that a reportable event no longer exists, has been resolved, or that it has insurance that will cover debts and liabilities that arise at any time from that triggering event; or (2) that the amount claimed in a lawsuit under § 668.171(c)(1)(i)(B) exceeds the potential recovery the claimant may receive.

*Public Domestic and Foreign Institutions § 668.171(i)*

Domestic Public Institutions

*Comments:* Commenters were concerned that the proposed regulations would unfairly target private institutions, noting that public institutions would be exempt from the triggering events requiring letters of credit, even as recent events have shown that public institutions are not necessarily more financially stable than other institutions.

Other commenters believed that the Department intended to exempt public institutions, as it currently does, from the financial responsibility standards, including the proposed triggering events, but the Department did not explicitly do so in the NPRM.

*Discussion:* We rely, and have for nearly 20 years relied, on the full-faith and credit of the State to cover any debts and liabilities that a public institution may incur in participating in the title IV, HEA programs. Under the current regulations in §§ 668.171(b) and (c), a public institution is not subject to the general standards of financial responsibility and is considered financially responsible as long as it does not violate any past performance provision in § 668.174. The Department has on occasion placed public institutions on heightened cash monitoring for failing to file required audits in a timely manner, but even then has never required a public institution to provide financial protection of any type because we already have it in the form of full-faith and credit. We would like to clarify that we are not changing long-standing policy for public institutions with these final regulations. In other words, the triggering events in § 668.171(c) through (g) of these regulations do not apply to public institutions.

*Changes:* None.

Foreign Institutions

*Comments:* Commenters believed that the actions and events that could trigger a letter of credit under § 668.171(c) are not applicable to foreign institutions, and requested that foreign institutions be exempted from these regulations, at least until the composite score methodology is revised. In addition, the commenters reasoned that a foreign institution with thousands of students from the institution's home country and perhaps a few dozen U.S. students should not be required to post warnings for all of its students based on this U.S. regulatory compliance issue.

*Discussion:* While we agree that some triggering events in §§ 668.171(c) through (g) may not apply to foreign institutions, that circumstance does not justify exempting those institutions from the triggering events that do apply. In addition, we see no reason to grant a temporary exemption until the composite score methodology is revised because it is unlikely that accounting-based revisions to a financial statement-centered methodology will affect triggering events like lawsuits that are applied contemporaneously, or title IV, HEA program compliance requirements like cohort default rate and gainful employment. We note that foreign public institutions, like U.S.-based public institutions, are currently exempt, and continue to be exempt in these final regulations, from most of the general standards of financial responsibility, including the composite score.

*Changes:* None.

*Alternative Standards and Requirements § 668.175*

*Provisional Certification Alternative § 668.175(f)*

*Amount of Financial Protection § 668.175(f)(4)*

Cost of Letter of Credit

*Comments:* One commenter stated that, years ago, letters of credit were both widely available and very inexpensive; it was not unusual for a bank to issue a small letter of credit on behalf of a client for no charge and without any collateral. However, the commenter stated that the bursting of the stock bubble in the late 1990s and the new rules regulating banks after the financial crisis has had a tremendous effect on the ability of banks to issue letters of credit, the price charged for them, and the amount of collateral required to issue one.

According to the commenter, a $1,000,000 letter of credit that might have cost $5,000 to issue with no collateral 30 years ago now costs $10,000–$20,000 and requires $500,000 to $1,000,000 of cash to collateralize it. The commenter opined that while this is still relatively easy for the wealthiest

schools with the largest endowments to meet, it would place a tremendous burden on smaller schools, vocational schools, and schools that serve the poorest students in the poorest areas because it will tie up a significant portion of their cash as collateral. For these reasons the commenter urged the Department to accept alternatives to bank-issued letters of credit, noting that performance bonds are used widely in business to guarantee satisfactory performance of construction, services, and delivery of goods. The commenter stated that most States that have regulations to protect students from poorly run schools allow performance bonds already.

According to the commenter, a performance bond guarantees the performance of a task on behalf of the client. In the case of a borrower defense, the Department is using the letter of credit to guarantee to successful completion of the education for which the Department issued title IV loans. By allowing performance bonds, according to the commenter, the Department could protect itself from poorly run schools that harm students without harming thinly capitalized schools by forcing them to purchase more expensive products. The commenter stated that a typical surety bond for $1,000,000 might cost $5,000–$15,000 and only require 25 percent collateral or less. This means that the schools get to keep more of their cash to better deliver education to students and the Department is still adequately protected against a claim from a closed school.

Some commenters noted that the Department has the statutory authority under section 498(c)(3)(A) of the HEA to accept performance bonds and should use that authority because surety bonds cost far less than letters of credit and are equally secure.

Other commenters were concerned that the cost of securing required letters of credit could be prohibitive and cause some schools to close. These and other commenters believed that schools are finding that it is increasingly more difficult to secure letters of credit because of high cost and the regulatory uncertainties facing the higher education sector. The commenters noted that these costs include fees to the lenders and attorneys each time the underlying credit facility is negotiated to expand the letters of credit (schools are required to pay their attorney's fees as well as lender attorney fees for these transactions). Moreover, the commenters stated that because of the Department's compliance actions against proprietary schools, many lenders will no longer lend to

proprietary institutions. Therefore, if schools are forced to obtain large letters of credit they will need to turn to second or third tier lenders, or lenders who offer crisis loans, who will charge significant fees for these letters of credit.

In view of the cost and financial resources needed to secure a letter of credit, some commenters believed that the Department should apply a cap of 25 percent on the amount of the cumulative letters of credit that a provisionally certified institution could be required to post under the revised regulations.

Other commenters suggested that if a letter of credit is imposed for an accrediting agency trigger relating to closing a location, the letter of credit should be based on a percentage of the amount of title IV, HEA funds the closing location received, not a percentage of title IV, HEA funds received by the entire institution. The commenters reasoned that if the financial impact of the closing of the branch or additional location will have a material negative impact on the school, then the Department should set the letter of credit amount based on 10 percent of the branch or additional location's title IV, HEA funds, arguing that this approach is straight-forward: Any liabilities that the school may incur resulting from the closure of a branch or additional location would relate only to the students attending the closing location. In contrast, the commenter believed that imposing the letter of credit based on the total title IV, HEA funds received by the school would be disproportionate to the financial impact of the potential student issues to which a letter of credit may relate. The commenters noted that the NPRM expressly recognized the cost of securing letters of credit and the difficulties a school may have in obtaining a letter of credit within 30 days. 81 FR 39368. If a school cannot secure a letter of credit within that timeframe, the Department would set aside title IV, HEA funds, which according to the commenters would almost assuredly have a catastrophic financial impact on the institution. Therefore, the commenters concluded that imposing a larger letter of credit on the school than is necessary will impose cost and financial burden on the school far greater than any possible benefits that the Department could obtain from the larger letter of credit, and will negatively impact students in the process.

*Discussion:* With regard to the comment that the Department cap any cumulative letters of credit to 25 percent of amount that would otherwise be

required, we believe setting an inflexible cap would defeat the purpose of requiring financial protection that is commensurate with the risks posed by one or more of the triggering events. The Secretary currently has the discretion to establish the amount of financial protection required for a particular institution, starting at 10 percent of the amount the title IV, HEA program funds the institution received in the prior award year, and that discretion is not limited by these regulations. As noted previously in this preamble under the heading "Composite Score and Triggering Events," the amount of the financial protection required is based on a recalculated composite score of less than 1.0—the total amount of financial protection required is, at a minimum, 10 percent of the title IV, HEA funds the institution received during its most recently completed fiscal year, and such added amount as the Secretary demonstrates is warranted by the risk of liabilities with regard to that institution.

We do not disagree with the general notion that the costs associated with a letter of credit have increased over time and that some institutions may not be able to secure, or may have difficulty securing, a letter of credit. We acknowledged this in the preamble to the NPRM and offered the set-aside as an alternative to the letter of credit. With regard to other alternatives, we are not aware of any surety instruments that are as secure as bank-issued letters of credit and that can be negotiated easily by the Department to meet the demands of protecting the Federal interests in a dependable and efficient manner. However, if surety instruments come to light, or are developed, that are more affordable to institutions than letters of credit but that offer the same benefits to the Department, we will consider accepting those instruments. To leave open this possibility, we are amending the financial protection requirements in § 668.175(f)(2)(i) to provide that the Department may, in a notice published in the **Federal Register**, identify acceptable surety alternatives or other forms of financial protection. We wish to make clear that the Department will not accept, or entertain in any way, surety instruments or other forms of financial protection that are not specified in these final regulations or that are not subsequently identified in the **Federal Register**. In this vein, the Department is continuing to examine generally the alternatives to a letter of credit to ensure that such alternatives strike a reasonable balance between protecting the interests of the taxpayers and the Federal Government and

providing flexibility to institutions, and is revising the regulations to provide that all alternatives to a letter of credit or a set-aside arrangement, including cash, will be permitted only in the Secretary's discretion.

Lastly, as discussed previously throughout this preamble, an institution that can prove that it has sufficient insurance to cover immediate and potential debts, liabilities, claims, or financial obligations stemming from each triggering event, will not be required to provide financial protection of any kind.

With regard to the amount of financial protection stemming from the teach-out trigger for closed locations under §668.171(c)(iv), by considering only closures of locations that cause the composite score to fall below a 1.0, we identify those events that pose a significant risk to the continued viability of the institution as a whole, and the financial protection needed should be based on the risk of closure and attendant costs to the taxpayer, not merely the expected costs of closed school discharges to students enrolled at the closed location.

Finally, the Department has long had discretion, under current regulations, in setting the amount of the required financial protection, and we are revising §668.175(f)(4) to memorialize our existing discretion to require financial protection in amounts beyond the minimum 10 percent where appropriate.

*Changes:* We have revised §668.175(f)(2)(i) to provide that the Secretary may identify acceptable surety instruments or other forms of financial protection in a notice published in the **Federal Register**. In each place in the regulations where we address acceptable forms of financial protection, we have revised the regulations to provide that alternatives to letters of credit and set-aside arrangements will be permitted in the Secretary's discretion. In addition, we have revised §668.175(f)(4) to provide the minimum amount of financial protection required, specifically to set 10 percent of prior year title IV, HEA funding as the minimum required protection amount, with a minor exception for institutions that do not participate in the loan program, and to authorize the setting of such larger added amount as the Secretary determines is needed to ensure that the total amount of financial protection provided is sufficient to fully cover any estimated losses, provided that the Secretary may reduce this added amount only if an institution demonstrates that this added amount is unnecessary to protect, or is contrary to, the Federal interest. We made a

conforming change to §668.90(a)(3)(iii)(D).

*Set-Aside §668.175(h)*

*Comments:* Commenters believed that the set-aside under proposed §668.175(h) as an alternative a letter of credit or cash would not be a viable option. The commenters argued that most schools rely on title IV, HEA funds for cash flow purposes, so administratively offsetting a portion of those funds would likely force many schools to close. Similarly, if a school is placed on Heightened Cash Monitoring 2 (HCM2) or reimbursement because it cannot secure a letter of credit, the commenters asserted that the school would likely close because historically the Department and institutions have not been able to timely process funds under HCM2.

Other commenters acknowledged the Department's concern about getting financial protection in place quickly, but believed that 90 days would be a more reasonable timeframe. The commenters stated that under current conditions in the financial markets, even with the best efforts it is almost impossible to get a letter of credit approved within the proposed 30-day timeframe. Also, the commenters suggested that if the Department implements the set-aside because of a school's delay in providing the letter of credit, this section needs to allow for the set-aside agreement to be terminated once the school is able to provide the letter of credit.

Other commenters agreed that the Department needs some way to obtain funds from institutions that fail to provide a letter of credit. The commenters believed, however, that the proposed set-aside provisions are overly generous in terms of time and amount. In particular, the commenters suggested the following changes:

(1) *Make set-aside amounts larger than letter of credit requests.* An institution's inability to obtain a letter of credit may in and of itself be a warning sign that private investors do not trust the institution enough to be involved with it. Therefore, the commenters suggested that any amounts covered by the set-aside provision should be set at 1.5 times the size of a letter of credit. This would both encourage colleges to obtain letters of credit and also send a strong message that the set-aside is a last resort action.

(2) *Implement other limitations on colleges that cover letters of credit through set asides.* According to the commenters, the set-aside is not the ideal way to get institutions to provide their financial commitments.

Accordingly, they proposed that this provision should come with greater protections for students and taxpayers or, at the very least, include some sort of limitation on Federal financial aid that prevents the institution from increasing the number of Federal aid recipients at the school and potentially even considers not allowing for new enrollment of federally aided students. Absent such protections, commenters noted that schools may face perverse incentives where they are encouraged to grow enrollment as a way of meeting the set-aside conditions.

(3) *Lessen the time period for collecting set-aside amounts.* Commenters noted that nine months is a long period of time for collecting amounts that an institution would otherwise be expected to provide in 30 days through a letter of credit. Nine months is also a long time in general—almost an entire academic year. Commenters stated that collecting the funds in this amount of time makes it possible for institutions to still enroll a large number of students and then run the risk of shutting down, and suggested that the Department shorten this time period to no more than half an academic year.

*Discussion:* While a set-aside may not be an option for an institution that is unable to compensate for a temporary loss of a percentage of its title IV, HEA funding, either by using its own resources or obtaining some form of financing, it is unlikely that the institution has any other options. For other institutions with at least some resources, we believe the set-aside is a viable alternative.

We disagree with the assertion that an institution is likely to close if it is placed on HCM2. Based on data available on the Department's Web site at *https://studentaid.ed.gov/sa/about/data-center/school/hcm,* approximately 60 percent of the institutions on HCM2 as of March 2015 were still on that status as of June 2016.

With regard to extending the time within which an institution must submit a letter of credit, we adopt in these regulations the Department's current practice of allowing an institution 45 days.

In addition, we are providing in the final regulations that when an institution submits a letter of credit, the Department will terminate the corresponding set-aside agreement and return any funds held under that agreement. With regard to the comments that the Department should increase the amount of the set-aside or shorten the time within which the set-aside must be fully funded, we see no justification for

either action. The Department proposed the set-aside as an alternative for an institution that is unable to timely secure a letter of credit, so that inability cannot be used as a reason to increase the amount of financial protection under the set-aside arrangement. For the funding timeframe, the Department proposed nine months, roughly the length of an academic year, as a reasonable compromise between having financial protection fully in place in the short term and minimizing the consequences of reducing an institution's cash flow. We believe that shortening the funding timeframe may put unnecessary financial stress on an institution that would otherwise fulfill its obligations to students and the Department. We continue to analyze, and will publish in the **Federal Register**, the terms on which an institution may provide financial protection other than a letter of credit or set-aside arrangement.

*Changes:* We have revised § 668.175(h) to increase from 30 to 45 days the time within which an institution must provide a letter of credit to the Department and provide that the Secretary will release any funds held under a set-aside if the institution subsequently provides the letter of credit or other financial protection required under the zone or provisional certification alternatives in § 668.175(d) or (f).

*Provisional Certification (Section 668.175(f)(1)(ii))*

*Comments:* Some commenters were concerned that the Department would place a school on provisional certification simply because of a triggering event in § 668.171(c), such as the school's cohort default rate, 90/10 ratio, or D/E rates under the GE regulations. The commenters argued that the regulations covering these measures did not intend or contemplate their use as reasons for placing an institution on provisional certification, so schools should not be subject to additional penalties.

Other commenters questioned whether the Department made a change in the applicability of the provisional certification alternative in § 668.175(f) that was not discussed in the NPRM. The commenters stated that it was unclear whether excluding the measures in § 668.171(b)(2) and (b)(3) from either zone alternative or the provisional certification alternatives in proposed § 668.175(d) and (f) was intentional or if the reference to § 668.171(b)(1) should just be § 668.171(b). In addition, the commenters noted that only the provisional certification alternative in

proposed § 668.175(f) refers to the proposed substitutes for a letter of credit (cash and the set-aside), whereas both the NPRM and proposed § 668.175(h), by cross-reference to § 668.175(d), refer to the substitutes as applicable to the zone alternative.

One commenter noted that the current regulations create multiple options for institutions with a failing financial responsibility score, but the terms between the zone and provisional certification alternatives are not sufficiently equal. The commenter also contended that the time limits associated with the alternatives are unclear. To address this, the commenter recommended the following changes to the current regulations.

(1) Increase the minimum size of the initial letter of credit for institutions on provisional status.

Currently, an institution choosing this option only has to provide a letter of credit for an amount that in general is, at a minimum, 10 percent of the amount of title IV, HEA funds received by the institution during its most recently completed fiscal year, while an institution that chooses to avoid provisional certification must submit a 50 percent letter of credit. The commenter recognized that part of this difference reflects the bigger risks to an institution that come with being provisionally certified but believed the current gap in letters of credit is too large. The commenter recommended that the Department increase the minimum letter of credit required from provisionally certified institutions that enter this status after the final regulations take effect to 25 percent.

(2) Automatically increase the letter of credit for institutions that renew their provisional status.

The commenter stated that § 668.175(f)(1) of the current regulations suggests that an institution may participate under the provisional certification alternative for no more than three consecutive years, whereas § 668.175(f)(3) suggests that the Secretary may allow the institution to renew this provisional certification and may require additional financial protection.

The commenter requested that the Department clarify the terms on which it will renew a provisional status. In particular, the commenter recommended that we require the institution, as part of any renewal, to increase the size of the letter of credit to 50 percent of the institution's Federal financial aid. This amount would align with the current requirements for an institution with a failing composite score that does not choose the

provisional certification alternative and, according to the commenter, would reflect that an institution has already spent a great deal of time in a status that suggests financial concerns.

(3) Limit how long an institution may renew its provisional status.

The commenter stated that § 668.175(f)(3) of the current regulations suggests an institution could potentially stay in provisional status forever. The commenter asked the Department to place a time limit on these renewals that would ideally be no longer than the period during which institutions can continue to participate in the title IV, HEA programs while subject to other conditions under the Department's regulations, which tends to be three years. However, the commenter believed that even six years in provisional status may be an unacceptably long amount of time.

*Discussion:* Contrary to the comments that the current cohort default rate, 90/10, and GE regulations do not contemplate provisional certification, we note the 90/10 and cohort default rate provisions do just that after a one- or two-year violation of those standards. In addition, we clarify that an institution under either the zone or provisional certification alternative may provide a letter of credit or, in the Secretary's discretion, provide another form of financial protection in a form or under terms or arrangements that will be specified by the Secretary or enter into a set-aside arrangement. The set-aside arrangement is not available to an institution that seeks to participate for the first time in the title IV, HEA programs or that failed the financial responsibility standards but seeks to participate as a financially responsible institution, because in either case the institution must show that it is financially responsible. That is, the institution must show that it has the financial resources to secure, or a bank is willing to commit the necessary resources on behalf of the institution to provide, a letter of credit. For the references to the general standards and triggering events, an institution that fails the general standards under § 668.171(b)(1) or (3), as reflected in the composite score or the triggering events under § 668.171(c), or no longer qualifies under the zone alternative, is subject to the minimum financial protection required under § 668.175(f). With respect to the numerous changes the commenter proposed for how the Department should treat institutions on provisional certification, since we did not propose any changes to the provisional certification requirements under § 668.175(f) or § 668.13(c), or to

the long-standing minimum letter of credit requirements, the suggested changes are beyond the scope of these regulations.

*Changes:* None.

**Financial Protection Disclosure**

*General*

*Comments:* One commenter asserted that the proposed financial protection disclosure requirements exceed the Department's statutory authority because the financial responsibility provisions in the HEA, unlike other provisions of the Act, do not mention disclosures. The commenter maintained that such omissions must be presumed to be intentional, since Congress generally acts intentionally when it uses particular language in one section of the statute but omits it from another.

*Discussion:* We do not agree with the commenter. The financial protection disclosure requirements do not conflict with the financial responsibility provisions in the HEA. Furthermore, the lack of specific mention of such disclosures in the provisions of the HEA related to financial responsibility does not preclude the Department's regulating in this area. Courts have recognized that the Department under its general rulemaking authority may require disclosures of information reasonably considered useful for student consumers.[61]

As noted above, the Department continues to assert both its authority to require disclosures related to financial responsibility and the usefulness of those disclosures for student consumers. However, in the interest of clarity and ensuring that disclosures are as meaningful as possible, we have made several changes to proposed § 668.41(i). Under the proposed regulations, institutions required to provide financial protection to the Secretary must disclose information about that financial protection to enrolled and prospective students. These final regulations state that the Department will rely on consumer testing to inform the identification of events for which a disclosure is required. Specifically, the Secretary will consumer test each of the

events identified in § 668.171(c)–(g), as well as other events that result in an institution being required to provide financial protection to the Department, to determine which of these events are most meaningful to students in their educational decision-making. The Department expects that not all events will be demonstrated to be critical to students; however, events like lawsuits or settlements that require financial protection under § 668.171(c)(1)(i) and (ii); borrower defense claims that require financial protection under § 668.171(g)(7); and two consecutive years of cohort default rates of at least 30 percent, requiring financial protection under § 668.171(f) are likely to be of more relevance to students. Findings resulting from the Department's administrative proceedings are included among these triggering events. The issue of students being ill-informed about ongoing lawsuits or settlements with their institutions was raised by students, particularly Corinthian students, during negotiated rulemaking, as well as by commenters during the public comment period. We also believe that students will have a particular interest in, and deserve to be made aware of, instances in which an institution has a large volume of borrower defense claims; this may inform their future enrollment decisions, as well as notify them of a potential claim to borrower defense they themselves may have. Finally, we believe that cohort default rate is an important accountability metric established in the HEA, and that ability to repay student loans is of personal importance to many students. Any or all of these items may be identified through consumer testing as important disclosures.

*Changes:* We have revised § 668.41(i) to clarify that all actions and triggering events that require an institution to provide financial protection to the Department will be subject to consumer testing before being required for institutional disclosures to prospective and enrolled students.

*Comments:* A few commenters expressed strong overall support for requiring disclosures to prospective and enrolled students of any financial protection an institution must provide under proposed § 668.175(d), (f), or (h). The commenters cited the significant financial stake an institution's students have in its continued viability, and a resulting right to be apprised of financially related actions that might affect that viability.

However, some commenters who supported the proposed requirements raised the concern that unscrupulous

institutions might intentionally attempt to undermine the disclosures by burying or disguising them. Accordingly, those commenters suggested that the Department should prescribe the wording, format, and labeling of the disclosures. Other commenters expressed disappointment that the proposed regulations do not require institutions to deliver financial protection disclosures to prospective students at the first contact with those students, and strongly supported including such a requirement in the final regulations. Though acknowledging several negotiators' objections that establishing a point of first contact would prove too difficult, one commenter was unconvinced, and asserted the importance of requiring delivery of critical student warnings at a point when they matter most. The same commenter found the proposed regulatory language on financial protection disclosures to be vague, and requested clarification as to whether proposed § 668.41(h)(7) (requiring institutions to deliver loan repayment warnings in a form and manner prescribed by the Secretary) applies to financial protection disclosures as well. The commenter further asserted that information regarding financial protection is even more important to consumers than repayment rates, and therefore institutions' promotional materials should be required to contain financial protection disclosures in the same way that the proposed regulations require such material to contain repayment rate warnings.

Finally, some commenters urged that, notwithstanding the proposed financial protection disclosures required of institutions, the Department should itself commit to disclosing certain information about institutions that are subject to enhanced financial responsibility requirements. Specifically, the commenters suggested that the Department disclose the amount of any letter of credit submitted and the circumstances that triggered the enhanced financial responsibility requirement.

For several reasons described in this section, many commenters opposed either the concept of requiring institutions to make financial protection disclosures, or the way in which such disclosures are prescribed under the proposed regulations. One commenter suggested removing financial protection disclosure requirements solely on the grounds that students will neither take notice of nor care about this information. The commenter expressed the belief that most people do not really know what a letter of credit is, and that

---

[61] *See, e.g., Ass'n of Private Colleges & Universities* v. *Duncan,* 870 F. Supp. 2d 133 (D.D.C. 2012)(Department has broad authority ''to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department.'' 20 U.S.C. 1221e–3 (2006); *see also id.* § 3474 (''The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.''). The financial protection disclosures fall comfortably within that regulatory power.

therefore informing them of an institution's obligation to secure such an instrument would only cause confusion.

*Discussion:* We thank those commenters who wrote in support of the proposed financial protection disclosures. In response to the commenter who raised concerns about unscrupulous institutions attempting to undermine the proposed disclosures and warnings, including by burying or disguising them, we share those concerns and drafted the applicable regulatory language accordingly. Section 668.41(i)(1) of the final regulations requires that an institution disclose information about certain actions and triggering events (subject to and identified through consumer testing) it has experienced to enrolled and prospective students in the manner described in paragraphs (i)(4) and (5) of that section, and that the form of the disclosure will be prescribed by the Secretary in a notice published in the **Federal Register**. Before publishing that notice, the Secretary will also conduct consumer testing to help ensure the warning is meaningful and helpful to students. This approach both holds institutions accountable and creates flexibility for the Department to update warning requirements, including specific language and labels, as appropriate in the future. Based on these comments, and the comment expressing confusion as to which of the delivery requirements in this section apply to financial protection disclosures, we have revised § 668.41(i) to make the requirements that apply to the actions and triggering events disclosure and the process by which the language of the disclosure will be developed and disseminated more explicit.

While mindful of the potential benefit to prospective students of receiving disclosures early, we are not convinced that requiring institutions to deliver such disclosures at first contact with a student is necessary or efficacious. In many cases and at certain types of institutions, it is impractical if not impossible to isolate the initial point of contact between a student and an institutional representative. Such a requirement would place a significant burden on compliance officials and auditors as well as on institutions. Section 668.41(i)(5) of the final regulations requires institutions to provide disclosures to prospective students before they enroll, register, or enter into a financial obligation with the institution. We believe this provides prospective students with adequate advance notice.

Regarding whether requirements in the proposed regulations pertaining to the delivery of loan repayment warnings to prospective and enrolled students apply to financial protection disclosures as well, we are revising the regulations to separately state the requirements for loan repayment warnings and financial protection disclosures. Section § 668.41(i) states that, subject to consumer testing as to which events are most relevant to students, an institution subject to one or more of the actions or triggering events identified in § 668.171(c)–(g) must disclose information about that action or triggering event to enrolled and prospective students in the manner prescribed in paragraphs (i)(4) and (5).

However, the actions and triggering events disclosures are not required to be included in an institution's advertising and promotional materials. We concur with the commenter that such financial protection disclosures will provide critical information to students, but maintain that delivery of those disclosures to students through the means prescribed in revised § 668.41(i)(4) and (5), and posting of the disclosures to the institution's Web site as included in revised § 668.41(i)(6), are most appropriate for this purpose. The loan repayment warning provides information on the outcomes of all borrowers at the institution, whereas the financial protection disclosure pertains directly to the institution's compliance and other matters of financial risk. We believe this type of disclosure is better provided on an individual basis, directly to students, and that it may require a longer-form disclosure than is practicable in advertising and promotional materials.

Regarding the commenters' suggestion that the Department itself disclose certain information about institutions subject to enhanced financial responsibility requirements, we understand the value of this approach, especially with respect to uniformity and limiting the opportunity for unscrupulous institutions to circumvent the regulations. However, we remain convinced that schools, as the primary and on-the-ground communicators with their students, and the source of much of the information students receive about financial aid, are well-placed to reach their students and notify them of the potential risks of attending that institution. We do not believe there are any practical means through which the Department might similarly convey to individual students the volume of information suggested by commenters. Nevertheless, we intend to closely monitor the way in which institutions

comply with the actions and triggering events disclosure requirements, and may consider at some point in the future whether the Department should assume responsibility for making some or all of the required disclosures. Additionally, the Department may, in the future, consider requiring these disclosures to be placed on the Disclosure Template under the Gainful Employment regulations, to streamline the information flow to those prospective and enrolled students.

We respectfully disagree with the commenter who suggested removing the financial protection disclosure requirements on the grounds that students will neither take notice of nor care about this information. Some of the information conveyed in the disclosures would undoubtedly be of a complex nature. We also recognize that many people have limited familiarity with financial instruments such as letters of credit. For that reason, and to minimize confusion, we proposed consumer testing of the disclosure language itself, in addition to consumer testing of the actions and triggering events that require financial protection, to ensure that the disclosures are meaningful and helpful to students. As discussed above, in the final regulations we are revising proposed § 668.41(i) to require consumer testing prior to identifying the actions and/or triggering events for financial protection that require disclosures. We believe this change will result in disclosures that are more relevant to students, and that relate directly to actions and/or events that potentially affect the viability of institutions they attend or are planning to attend. In keeping with the intent of the proposed regulations to ensure that disclosures are meaningful and helpful to students, the final regulations retain the use of consumer testing, not only in determining the language to be used in such disclosures but also the specific actions and triggering events to be disclosed.

*Changes:* We have revised § 668.41(i) to require consumer testing of disclosures of the actions and triggering events that require financial protection under § 668.171(c)–(g).

*Comments:* Several commenters contended that the proposed regulations inappropriately equate financial weakness with lack of viability, and would require institutions to make disclosures that are misleading or untrue. For example, an institution that is financially responsible may experience a triggering event that nevertheless requires the institution to disclose to students that it is financially at risk. In the opinion of one

**76012**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

commenter, this constitutes compelling untrue speech and violates the First Amendment.

Echoing this overall concern, one commenter expressed the belief that warnings based on triggering events that have not been rigorously proven to demonstrate serious financial danger would destroy an institution's reputation based on insinuation, not fact. The commenter proposed that an institution should have the opportunity to demonstrate that it is not in danger of closing before requiring disclosures.

Strenuously objecting to financial protection disclosures, one commenter described the relationship between some of the triggering events listed in § 668.171(c) and the institution's value to students or its financial standing as tenuous. The commenter further argued that the "zone alternative" found in current § 668.175(d) recognizes the potential for an institution to be viable in spite of financial weakness; and that the proposed regulations weaken the zone alternative.

A commenter, although acknowledging that students should be made aware of some triggering events, took particular exception to the Department's assertion that students are entitled to know about any event significant enough to warrant disclosures to investors, suggesting that SEC-related disclosures are not a reliable basis on which to require disclosures to students. In support of this position, the commenter noted that SEC disclosure requirements may or may not indicate that a publicly traded institution will have difficulty meeting its financial obligations to the Department, because such disclosures serve a different purpose, namely to assist potential investors in pricing the publicly traded institution's securities. The commenter stated that linking financial protection disclosures to SEC reporting may create false alarms for students and cause them to react impulsively.

*Discussion:* We do not agree that the proposed regulations either inappropriately equate financial weakness with lack of viability, or require institutions to issue misleading or untrue disclosures.

Under the regulations, an institution is required to provide financial protection, such as an irrevocable letter of credit, only if that institution is deemed to be not financially responsible because of an action or event described in § 668.171(b). As described in the NPRM, we believe that the factors necessitating an institution to provide financial protection could have a significant impact on a student's ability

to complete his or her education at an institution.

However, we recognize that not all of the actions and triggering events for financial protection will be relevant to students. Therefore, we have revised the requirement to clarify that the Secretary will select particular actions and events from the new triggers specified in § 668.171(c)–(g), as well as other events that result in an institution being required to provide financial protection to the Department, based on consumer testing. The events that are demonstrated to be most relevant to students will be published by the Secretary, and schools subject to financial protection requirements for those events will be required to make a disclosure, with language to be determined by the Secretary, to prospective and enrolled students about the event. In addition to making required disclosures more useful and understandable to students, while accurately reflecting concerns about the institution's financial viability, this change will ensure that the action or triggering events behind the disclosure are relevant to students.

As the actions and triggering events identified in proposed § 668.171(c) may affect an institution's ability to exist as a going concern or continue to deliver educational services, we continue to believe that, having made a substantial investment in their collective educations, students have an absolute interest in being apprised of at least several of these actions and events. This is not, as the commenter suggests, destruction of an institution's reputation by insinuation in place of facts, but rather the providing of factual information to students on which they can make a considered decision whether to attend or continue to attend that institution.

We agree with the commenter that noted that the purposes of disclosures to investors required by the SEC and these proposed disclosures are different in some respects. As discussed under "Automatic Triggering Events," we are revising the triggers in § 668.171(c) to ensure that the triggers, including the proposed triggers that were drawn from SEC disclosure requirements, are tailored to capture events that are most relevant to an institution's ability to provide educational services to its students. With these changes, we believe that each of these triggers and the related disclosure will serve the Department's stated purpose.

We understand the commenters' concern that some students may draw undesirable or even erroneous conclusions from the disclosures or act

impulsively as a result of the disclosures. As students must decide for themselves the value of any institution and the extent to which that value is affected by the event or condition that triggered the disclosure, there might always be some subjectivity inherent to an individual's reading of the required disclosure. However, we believe the benefit to those students in being apprised of actions or events that might affect an institution's viability outweighs this potential concern. Moreover, as previously discussed, the Department will conduct consumer testing to ensure that both the events that result in institutions being required to provide financial protection to the Department, as well as the language itself, is meaningful and helpful to students before requiring disclosures of those events. Our intent is for the required disclosures to convey accurate, important information.

Finally, with regard to the suggestion made by one commenter that institutions be afforded the opportunity to demonstrate that they are not in imminent danger of closing before having to provide financial protection and the accompanying financial protection disclosures, as discussed above under "Reporting Requirements," we are revising § 668.171(h) to permit an institution to demonstrate, at the time it reports a triggering event, that the event or condition no longer exists, has been resolved or that it has insurance that will cover any and all debts and liabilities that arise at any time from that triggering event. If such a demonstration is successfully made, the institution will not be required to provide financial protection, and will not be subject to the financial protection disclosure requirement.

We agree with the commenter who pointed out that the "zone alternative" in current § 668.175(d) recognizes the potential for an institution to be viable in spite of financial weakness, but we do not concur with the assertion that the regulations would weaken the zone alternative. The zone alternative is specific to an institution that is not financially responsible solely because the Secretary determines its composite score is less than 1.5 but at least 1.0. Such an institution may nevertheless participate in the title IV, HEA programs as a financially responsible institution under the provisions of the zone. We are not proposing to change current regulations related to the zone alternative. Participation under the zone alternative is not an action or triggering event and would, therefore, not result in an institution having to make a disclosure.

*Changes:* We have revised § 668.41(i) to require consumer testing of disclosures of the actions and triggering events that require financial protection under § 668.171(c)–(g).

Scope of the Disclosure Requirement

*Comments:* Several commenters requested clarification as to the scope of the financial protection disclosure requirements. One commenter expressed concern about proposed § 668.41(i), which stated that an institution required to provide financial protection to the Secretary such as an irrevocable letter of credit under § 668.175(d, or to establish a set-aside under § 668.175(h), must provide the disclosures described in § 668.41(i)(1)–(3). The commenter contended that it is not clear whether the disclosure requirement pertains only to financial protections resulting from the new triggers in the proposed regulations, or whether the disclosures would be required for any financial protections, including those required under existing financial responsibility standards, such as the 50 percent letter of credit provided under current § 668.175(c). The commenter added that when an institution provides a letter of credit pursuant to current § 668.175(b) and (c), it qualifies as a financially responsible institution, and thus there should be no need for disclosures in these situations. However, the commenter asserted that the Department's frequent use of the undefined phrase "financial protection," throughout § 668.175, has resulted in a lack of clarity. The commenter asked that the Department limit financial protection disclosures to the new triggers in § 668.171.

Another commenter noted that the zone alternative under § 668.175(d) does not include a requirement to provide financial protection to the Department and therefore should not be referenced in the disclosure requirement.

*Discussion:* We thank the commenter who brought to our attention the unintentional reference in § 668.41(i) to financial protection provided to the Secretary under § 668.175(d). As the commenter pointed out, § 668.175(d) relates to the zone alternative and does not include a requirement to provide financial protection. Proposed § 668.41(i) is intended to reference only financial protection provided to the Secretary under § 668.175(f), or the set-aside under § 668.175(h).

To clarify the scope of proposed § 668.41(i), that section would have required disclosures for any financial protection an institution is required to provide under § 668.175(f) or for any set-aside under § 668.175(h), not just

financial protection provided as a result of the new triggering actions and events established in these regulations.

However, as described above, we are revising the financial protection disclosures so that the Secretary will conduct consumer testing to identify which actions and triggering events should be disclosed. Institutions will be required to disclose information about those events only if it is found to be relevant to students.

*Changes:* As described above, we have revised § 668.41(i) to require consumer testing of disclosures of the actions and triggering events that require financial protection under § 668.171(c)–(g).

*Harm to Institutions*

*Comments:* Several commenters addressed the potential harm to institutions they believe will result from the proposed financial protection disclosures. These commenters warned of irreparable damage to an institution's reputation that could drive away students, alarm potential donors, diminish access to capital, and unfairly brand an unknown number of institutions as untrustworthy. One commenter envisioned a cascading series of events in which declining enrollment and alumni and donor support forces tuition hikes, which in turn lead to further declines in enrollment and the institution's eventual closure.

Underlying the commenters' concern over potential negative outcomes was the opinion that the required disclosures are based on flawed financial standards that are not truly indicative of whether an institution is carrying out its educational mission. One commenter suggested that the Department might cause lasting and perhaps grave harm to institutions not currently at risk of failure, turning disagreements about accounting issues into existential enrollment threats. Another commenter pointed out that some nonprofit institutions operate close to the margin of sustainability because of their mission, or a charitable commitment to supporting needy students. The proposed financial protection disclosures would, in the opinion of the commenter, thrust such institutions into a cycle of failure.

*Discussion:* We understand the concern regarding the potential for the financial protection disclosures that were initially proposed, as well as the financial protection disclosures in these final regulations, to damage an institution's reputation. However, we do not believe that the possibility of harm to an institution's reputation is reason enough to withhold from students, who

in many cases have borrowed heavily to finance their educations, information on the financial viability of the institutions they attend. Regarding the catastrophic series of events predicted by some commenters, we believe such occurrences are unlikely. However, in the event that some institutions do fall into what one commenter termed a cycle of failure, we believe that is more appropriately attributable to the actions or failures of the institutions themselves than to the financial protection disclosures.

We address earlier in this section the commenters' contention that the financial responsibility standards on which the actions and triggering events disclosure requirements are based are flawed and not indicative of institutions' actual financial positions. We do not agree with the observation of one commenter that the proposed regulations require financial protection disclosures for what are essentially disagreements about accounting issues. As discussed under "Triggering Events," our analysis and assessment of the triggering actions and events which necessitate providing financial protection indicates they would have a demonstrable effect on an institution's financial position.

Lastly, with regard to the point made by one commenter that some nonprofit institutions operate close to the margin in adherence to a mission or particular commitment to funding needy students, the Department commends the efforts of such institutions. We do not believe that for the most part, such institutions have a heightened risk of experiencing a triggering action or event. The financial stress on institutions operating close to the margin of sustainability for the reasons noted above is most likely to reflect in a lower composite score than might otherwise be the case. Those institutions are frequently able to operate as financially responsible institutions under the zone alternative, and would not be subject to financial protection disclosures.

*Changes:* None.

*Warnings to Students—General*

*Comments:* Some commenters contended that the proposed provisions related to mandatory warnings to students are not consistent with the provisions and purposes of the HEA. They noted that the HEA enumerates an extensive list of information that institutions must "produce . . . and [make] readily available upon request" to current and prospective students (20 U.S.C. 1092(a)(1)), which includes, among other things, graduation rates and crime statistics, but makes no

reference to any requirement to disclose information that bears on the institution's financial viability or its need to provide financial protection. *See id.* §§ 1092(a)–(m). Moreover, the commenters opined that the mandatory warning requirements run afoul of the First Amendment, arguing that compelled speech, as included in the proposed regulation's required warnings, is subject to strict scrutiny and permissible only if "reasonably related to the State's interest in preventing deception of consumers." *R.J. Reynolds Tobacco Co.* v. *FDA,* 696 F.3d 1205, 1212 (D.C. Cir. 2012).

*Discussion:* Section 668.41(h)(3) and (i)(4) and (5) requires the institution to provide what are described as "warnings" to students, regarding the repayment rate of its alumni, through advertising and promotional materials, and "disclosures" regarding the actions and triggering events for any financial protection, identified pursuant to consumer testing, directly to prospective and enrolled students. The repayment rate provision requires the institution to state in its disclosure that: "A majority of recent student loan borrowers at this school are not paying down their loans"—a statement that will rest squarely on factual determinations of repayment patterns demonstrated by a recent cohort of student borrowers from that institution, derived from data validated through a challenge process in which the institution may contest the accuracy of the data elements. The statement does not, unlike the warning criticized in a prior court ruling, state that the prospective student should expect difficulty in repayment.[62] It merely provides a factually accurate statement that ascribes no adverse quality to the institution itself as the cause of this pattern.[63] The regulation does not compel the institution to articulate a government position on the cause of that pattern, or to engage in or disseminate as true what is "uncertain, speculative estimates." *Association of Private Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d 176, 199

(D.D.C. 2015), *aff'd* 640 Fed.Appx. 5 (D.C. Cir. 2016). Rather, the repayment rate provision simply requires disclosure of a factual statement that the Department considers valuable information to the consumer. The institution is free to explain, if it wishes, why it believes that pattern exists, or why it believes that the pattern does not indicate that it is unable to deliver a quality education. The statement falls well within the grounds upheld for other required disclosures.

Furthermore, the form, place, and even the actual language of this warning may change based on consumer testing or other factors to help ensure that the warning is meaningful and helpful to students, and if so, the Department will publish those matters in a notice in the **Federal Register**. § 668.41(h)(3). For the financial protection disclosures, the Secretary will also conduct consumer testing to determine precisely which actions and triggering events that require financial protection would be most relevant and important for prospective and enrolled students to know, and to determine the appropriate language for a disclosure. § 668.41(i).

We note first that the governmental interest in compelling speech is not limited to "preventing deception," as the commenter appears to suggest.[64] This follows from the nature of the test applied to First Amendment challenges to compelled speech, as demonstrated in recent litigation challenging disclosures mandated by the Department's GE regulations. Because the required disclosures/warnings are commercial speech, the government may require the commercial disclosure of 'purely factual and uncontroversial information' as long as there is a rational justification for the means of disclosure and it is intended to prevent consumer confusion." *Ass'n of Private Colleges & Universities* v. *Duncan,* 870 F. Supp. 2d 133, 155 (D.D.C. 2012). As that court noted in upholding a requirement that an institution offering GE programs make disclosures about its programs, costs, and student outcomes: ". . . The Department has broad authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. 1221e–3 (2006); *see also id.* § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."). The

disclosures mandated here fall comfortably within that regulatory power, and are therefore within the Department's authority under the Higher Education Act.

*Ass'n of Private Colleges & Universities* v. *Duncan,* 870 156.[65] The regulations accord the institution a challenge process regarding the calculation of the repayment rate itself, as well as an opportunity for a hearing to consider challenges to a requirement to provide financial protection. These procedures will produce a factual outcome; the factual outcome—like the disclosures about costs, placements, completion rate and repayment rate mandated in the GE regulations already upheld—may themselves also be "vanilla" disclosures of unpleasant, but factually accurate determinations. How alumni are repaying their loans, and whether the school has experienced actions or triggering events that pose financial risk to the government (and students), are of direct interest to consumers. We believe disclosures—and warnings—that convey determinations on those matters fall well with the kind of disclosures the courts have upheld.

*Changes:* None.

## Proprietary Institution Loan Repayment Warning

### General: Repayment Rate

*Comments:* A number of commenters supported requiring warnings for prospective and enrolled students at proprietary institutions with poor repayment rates. They argued that the warnings will provide useful information for students as they make educational and borrowing decisions. One group of commenters urged the Department to release all loan repayment rates publicly, including for

---

[62] "[A] student who enrolls or continues to enroll in the program should expect to have difficulty repaying his or her student loans." Debt Measure Rule, 76 Fed.Reg. at 34,432. . . . the court doubts that the statement that every student in a program "should expect to have difficulty repaying his or her student loans" is a purely factual one. *Association of Private Colleges and Universities* v. *Duncan,* 870 F. Supp. 2d 133, 155 (D.D.C. 2012).

[63] Similarly, the statement simply describes whether borrowers are paying "down" their loans, a readily understood term meaning that the payments made are not *reducing* the loan amount—not whether they are repaying under whichever repayment plan they chose, or are in default.

[64] *Am. Meat Inst.* v. *U.S. Dep't of Agric.,* 760 F.3d 18, 22 (D.C. Cir. 2014) (upholding country of origin labelling requirements; overruling prior opinions of that court that limited requirements to those aimed at preventing deception).

[65] In contrast, the court there doubted that the language of the warning also required under those regulations (that every student in a program "should expect to have difficulty repaying his or her student loans") would have been "purely factual and uncontroversial information." *Ass'n of Private Colleges & Universities* v. *Duncan,* 870 F. Supp. 2d 155. When that regulation was reissued and later challenged on First Amendment grounds, this same court upheld the disclosures required in the new rule, and in doing so contrasted the "graphic, compelled speech" challenged by tobacco advertisers in R.J. Reynolds, on which the commenters relay, with "the vanilla, estimated-cost disclosures at issue" in the Department regulation. *Id.* Moreover, the court further noted that even "*R.J. Reynolds* acknowledged that the *Zauderer* standard applies not just to purely factual and uncontroversial information, but also to 'accurate statement[s].' . . . The 'total cost' estimates contemplated here certainly meet that description." *Ass'n of Private Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d 176, 200 n.12 (D.D.C. 2015), *aff'd sub nom. Ass'n of Private Sector Colleges & Universities* v. *Duncan,* 640 F. App'x 5 (D.C. Cir. 2016).

institutions that are not required to deliver loan repayment warnings under § 668.41(h).

However, several commenters argued that, because repayment behavior is not controllable by the institution, the repayment rate is not an appropriate institutional performance measure. Another argued that loan repayment rate reflects financial circumstances, but not educational quality, so it is not appropriate to require institutions to issue warnings based on their loan repayment rate.

Several commenters also raised concerns that § 668.41(h) would place an undue burden on institutions and duplicates other established disclosure requirements. They contended that the requirement is unnecessary, particularly because the proprietary institutions required to comply with § 668.41(h) are already subject to the GE reporting and disclosure requirements, including a repayment rate disclosure if specified by the Secretary; and because the Department already publishes both cohort default rates and institutional repayment rates on the College Scorecard. Other commenters suggested that the measure would increase costs of higher education due to higher administrative burden, and contended that the disclosures were not likely to make much impact, given the large number of mandated disclosures already in place.

*Discussion:* We appreciate the comments supporting the repayment rate warning provision. We agree that this provision will provide critical information for students that will help them to make well-informed decisions about where to go to college and their financial aid use. Repayment rates provide a key indicator of students' post-college repayment outcomes, which are of vital interest to students considering their families' personal financial circumstances, as well as to taxpayers and policymakers. The Department has already worked to promote greater access to such information through the GE regulations and the College Scorecard; we believe that the repayment rate warning requirement in these regulations will provide an important complement to those other efforts.

We do not agree with the commenters who stated that repayment does not constitute a measure of educational quality, or the commenter who argued that repayment rate is a measure of students' financial backgrounds and not academic quality. We believe that all students deserve to have information about their prospective outcomes after leaving the institution. Particularly for

students who expect to borrow Federal loans to attend college, it is critical to know whether other students have been able to repay their debts incurred at the institution.

However, while we believe that this information is very important for prospective students to be aware of and to consider, we agree with the concerns that creating a new rate could confuse the borrowers who will also receive the GE program-level repayment rate disclosures using a different calculation and different cohorts for measuring borrower outcomes. While not decisive, we also recognize and understand the comments from those who raised concerns that the requirement may be overly burdensome because of the differences with the data used in the GE calculation. Requiring a separate data corrections process for proprietary institutions, which are already subject to reporting requirements for repayment rate under GE for virtually all of their borrowers, may be needlessly burdensome given the virtually complete overlap in students covered.

To avoid any confusion resulting from a new repayment rate calculation, as well as to limit burden on institutions, we are revising the repayment rate provision. Under this revised provision, the repayment rate data that proprietary institutions report at the program level will be used to calculate a comparable repayment rate at the institution level. Specifically, the Department will calculate, for those borrowers who entered repayment during a particular two-year cohort period, the repayment rate as follows: The number of borrowers in GE programs who are paid in full or who are in active repayment (defined as the number of borrowers who entered repayment and, during the most recently completed award year, made loan payments sufficient to reduce the outstanding balance of loans received for enrollment in the program by at least one dollar), divided by the number of borrowers reported in GE programs who entered repayment. Institutions with a repayment rate showing that the median borrower has not either fully repaid the borrower's loans by the end of the third year after entering repayment, or reduced their outstanding balance by at least one dollar, over the third year of repayment (which, under the calculation methodology, is equivalent to a loan repayment rate of less than 0.5) will be subject to a requirement that they include a warning, to be prescribed in a later **Federal Register** notice by the Secretary, in advertising and promotional materials. We are also removing the proposed requirement for

direct delivery of repayment rate warnings to prospective and enrolled students, recognizing that the GE regulations already require those proprietary institutions to deliver a program-level disclosure template that includes repayment rate to those students. We believe that these changes will reduce administrative burden on institutions considerably, and help to ensure that increased administrative burden is not passed on by institutions in greater costs to students.

We disagree with the commenters who argued that the disclosures would not make much impact. A large and growing body of research suggests that in many cases, students and families react to information about the costs and especially the value of higher education, including by making different decisions.[66] To maximize the potential for effective warnings to students, the Department has revised the regulatory language about the warnings that must be included in advertising and promotional materials to maximize the likelihood that such information will be well presented in a timely manner. We believe that this information will build upon, and not conflict with, other disclosures that institutions currently make. In particular, we believe that the institutional warning requirement in advertising and promotional materials will provide a valuable caution to students in their early stages of considering which colleges to attend. We also believe that the institutional warning requirement will act as a complement to other disclosure requirements, including the disclosure template required to be provided under the GE regulations and the Department's own efforts to promote greater transparency and better-informed decision-making through the College Scorecard and the Financial Aid Shopping Sheet. The Department will also promote this information through its own channels to reach students, including through the College Scorecard or the FAFSA, after consideration of the most effective and efficient ways to do so.

[66] Wiswall, M., and Zafar, B. (2015). How Do College Students Respond to Public Information about Earnings? Journal of Human Capital, 9(2), 117–169. DOI: 10.1086/681542. Retrieved from ; Hastings, J., Neilson, C.A., and Zimmerman, S.D. (June 2015). The Effects of Earnings Disclosure on College Enrollment Decisions. Cambridge, MA: National Bureau of Economic Research. NBER Working Papers 21300. Retrieved from *www.nber.org/papers/w21300;* and Hoxby, C. and Turner, S. (2015). What High-Achieving Low-Income Students Know About College. Cambridge, MA: National Bureau of Economic Research. NBER Working Paper No. 20861. Retrieved from *www.nber.org/papers/w20861.pdf.*

*Changes:* We have revised the loan repayment rate calculation in § 668.41(h), altered the loan repayment rate issuing process to reflect that any corrections will occur under the GE regulations, and provided that proprietary institutions with a sufficiently large number of borrowers who are not covered under GE reporting may be exempt from the warning requirement (as described in more detail later in this section). We have made conforming changes to separate the loan repayment warning delivery provisions, which require a warning to be included in advertising and promotional materials but no individual disclosure to students, from the delivery provisions for the financial protection disclosure required under § 668.41(i) of the final regulations, which require delivery of the disclosure to prospective and enrolled students.

*Legal/Process Concerns*

*Comments:* Noting that the proposed loan repayment warning was not included in the Department's notice announcing its intent to establish a negotiated rulemaking committee published in the **Federal Register** on August 20, 2015 (80 FR 50588), one commenter contended that the requirement falls outside the scope of the rulemaking process.

*Discussion:* The first session of negotiated rulemaking, held January 12–14, 2016, included a discussion of the potential consequences for "conditions that may be detrimental to students," including the possibility of disclosure requirements and student warnings. The Department proposed regulatory text concerning a repayment rate warning at the second negotiated rulemaking session (February 17–19, 2016), and the committee discussed the proposal during the second and third sessions. Moreover, the negotiated rulemaking process ensures that a broad range of interests and qualifications are considered in the development of regulations. We believe that sufficient notice was provided about the potential for inclusion of the repayment rate warning, and that the negotiators involved in developing these regulations were well-qualified to explore the option.

*Changes:* None.

*Comments:* One commenter argued that the loan repayment rate provision does not constitute "reasoned decision-making," because the Department did not explain the evaluation of repayment on an individualized basis; the use of a median, rather than an average, borrower to determine the school's rate; the zero percent threshold; the length of

the measurement window; and the exemption of in-school and military deferments only in the final year. Another commenter asserted that the requirement is arbitrary and capricious because several points in the preamble (such as the level of the calculation and the data challenge process) were unclear.

*Discussion:* We disagree with the commenters who stated that the repayment rate warning provision is arbitrary and capricious, and that it does not constitute reasoned decision-making. The repayment rate measure identified in the proposed regulations, while different from other repayment rate measures the Department has used in other contexts, was designed to measure repayment outcomes in greater detail than existing measures do (for instance, by looking at the percentage of the balance repaid rather than the share of borrowers who met a binary threshold of paying down at least one dollar in principal).

However, as described earlier, the Department has revised the repayment rate provision in the final regulations to mirror the program-level rates used under the GE regulations. Those rates calculate the share of borrowers who have made progress in repaying their loans, and will rely exclusively on data reported already under the GE regulations. We believe that these changes address the concerns of the commenters.

*Changes:* We have revised the calculation of the loan repayment rate in § 668.41(h), as previously described.

*Proprietary Sector Requirement*

*Comments:* Several commenters wrote that limiting the repayment rate provision to proprietary institutions is reasonable, given the differences in structure between those institutions and other sectors and the data that indicate poor repayment outcomes are widespread in the for-profit sector.

However, many commenters disagreed with the Department's proposal to limit the requirement to proprietary institutions. One commenter questioned the validity of the Department's argument that limiting the applicability of § 668.41(h) to proprietary institutions reduces the burden on institutions because only certain institutions benefit from the reduced burden. Noting that there is no similar limitation applicable to financial protection disclosures, one commenter suggested that the Department's limitation of the repayment rate provision to proprietary institutions was inconsistent. Some commenters argued that the Department was ignoring the

needs of students at the estimated 30 percent of public and private nonprofit institutions with similarly low repayment rates that are not subject to the warning requirement, particularly because a majority of Federal student loan borrowers attend public institutions. Others stated that a repayment rate warning requirement for public and private nonprofit institutions is necessary to help students understand their choices and contextualize the information available to them. Several of these commenters proposed that public and private nonprofit institutions be required to disclose that the Department had not calculated a loan repayment rate for the institution and that it is therefore not possible to know whether the institution's repayment rate is acceptable.

Some commenters contended that there is no rationale for limiting the warning requirement to the proprietary sector. Other commenters stated that the Department lacked sufficient research to support the proposed regulations. Several commenters argued that the information cited as justification for limiting the repayment rate warning requirement to the proprietary sector was overstated or invalid. One commenter suggested that the Department cited inaccurate data from the College Scorecard. Several commenters noted that they could not replicate their Scorecard repayment rates due to inconsistencies in the National Student Loan Data System (NSLDS) data underlying the measure. Another commenter suggested that the cohort used to support the analysis did not reflect typical cohorts, since those students entered repayment during a recession. Several other commenters contended that the decision to limit the warning requirement to proprietary institutions violates GEPA and has no basis in the HEA.

A number of commenters suggested removing the loan repayment warning provision entirely, while several proposed expanding its application to all institutions with low repayment rates, regardless of sector. Several commenters suggested limiting the repayment rate warning requirement to institutions at which a majority of students are enrolled in programs subject to the Department's GE regulations, because, according to the commenters, students at career-oriented institutions frequently have misconceptions about their likely earnings. Alternatively, commenters suggested limiting the requirement to schools with "financially interested boards" to include proprietary

institutions that have converted to nonprofit status.

*Discussion:* We appreciate the comments supporting the limitation of the repayment rate warning to proprietary institutions in light of the concentration of poor repayment outcomes in the proprietary sector and the risk of excessive and unnecessary burden to institutions with a far lower likelihood of poor repayment rates. As discussed in both the NPRM [67] and in the Gainful Employment final regulations,[68] a wide body of evidence demonstrates that student debt and loan repayment outcomes are worse for students in the proprietary sector than students in other sectors.

Most students in the proprietary sector borrow Federal loans, while borrowing rates among public and private nonprofit institutions are far lower; and debt levels are often higher. For instance, as also noted in the final Gainful Employment regulations, in 2011–2012, 60 percent of certificate students who were enrolled at for-profit two-year institutions took out Federal student loans during that year, compared with 10 percent at public two-year institutions. Of those who borrowed, the median amount borrowed by students enrolled in certificate programs at two-year for-profit institutions was $6,629, as opposed to $4,000 at public two-year institutions. Additionally, in 2011–12, 66 percent of associate degree students who were enrolled at for-profit institutions took out student loans, while only 20 percent of associate degree students who were enrolled at public two-year institutions did so. Of those who borrowed in that year, for-profit two-year associate degree enrollees had a median amount borrowed during that year of $7,583, compared with $4,467 for students at public two-year institutions.[69]

In addition to higher rates of borrowing, students at proprietary schools also default at higher rates than borrowers who attend schools in other sectors. Proprietary institutions have higher three-year cohort default rates than other sectors (15.0 percent, compared with 7.0 percent at private nonprofit institutions and 11.3 percent at public institutions in fiscal year 2013), and enroll a disproportionate share of students who default relative to all borrowers in the repayment cohort.[70]

In the final regulations, the Department seeks to reduce confusion among students and families by using rates that parallel the Gainful Employment program-level repayment rate, including using the same cohorts of students as the GE rates do. As a result of these changes, the repayment rate will be calculated using data that institutions already report to the Department through the GE regulations, rather than through a distinct data reporting and corrections process. This eliminates many of the concerns raised by commenters and discussed in the NPRM about the burden to institutions of complying with the repayment rate calculation provision.

However, the Department believes that, because of the changes, it would be inappropriate to apply an institutional warning to sectors other than the proprietary sector, because public and private nonprofit institutions are not typically comprised solely of GE programs and the repayment rate warning may not be representative of all borrowers at the school. Federal student loan borrowers also typically represent a relatively small proportion of the student population in the public sector, whereas borrowing rates are much higher, on average, at proprietary institutions (for instance, among full-time undergraduates enrolled in 2011–12, 19.7 percent borrowed Stafford loans at public less-than-two-year institutions, compared with 82.9 percent at for-profit less-than-two-year institutions and 83.3 percent at for-profit two-year-and-above institutions).[71] Moreover, the mix of programs at public and private nonprofit institutions may shift from year to year, changing the share of GE borrowers at the institution on an annual basis; including such institutions in the repayment rate requirement would require the Department to expend annual efforts to identify schools that are comprised entirely of GE programs for a relatively small number of schools. Therefore, this requirement is limited only to proprietary institutions. We recognize that some proprietary institutions may have Federal student loan borrowers in non-GE programs under section 102(b)(1)(ii) of the HEA. Accordingly, the final regulations specify that proprietary institutions with a failing repayment rate may appeal to the Secretary for an exemption from the warning requirement if they can demonstrate that including non-GE borrowers in the rate would increase the rate to passing.

With these changes, we believe that the Department's decision to limit the repayment rate warning to proprietary institutions is well-founded and does not raise concerns about excessive burden or inaccurate representation of student outcomes, and we disagree with the commenters who stated that the limitation to proprietary schools is not appropriate.

In response to the commenter who asserted that requiring only proprietary institutions to disclose repayment rates is inconsistent, as noted earlier, we decided to limit the repayment rate warning requirement to the sector of institutions where the frequency of poor repayment outcomes is greatest. Also as described earlier, the Department's analysis of data shows the financial risk to students to be far more severe in the proprietary sector; and data suggest that an institution-wide warning about borrower outcomes is more appropriate in the proprietary sector, given higher rates of borrowing among students (particularly in GE programs).

While we recognize some users' concerns with specific elements of the data cited in the NPRM, we believe that the data corrections process that will be established through the GE regulations will ensure the accuracy of the information on which the warning in advertisements and promotional materials is based. We recognize the concerns of the commenter who stated that the data cited in the NPRM reflect a cohort that entered repayment during the recession, but believe that this regulation will appropriately capture the actual outcomes of students, given that even students who enter repayment during a recession will be required to repay their loans in accordance with the terms and conditions of the Federal student loan programs. The provision of GEPA to which the commenter refers requires uniform application of regulations throughout the United States. 20 U.S.C. 1232(a). The HEA authorizes the Department to adopt disclosure regulations as does the general authority of the Secretary in 20 U.S.C. 1221e–3 and 20 U.S.C. 3474. *Assn. of Private Coll. and Univs.* v. *Duncan,* 870 F. Supp. 2d at 156. We believe that our analysis of the outcomes provides a reasonable basis on

[67] *www.regulations.gov/document?D=ED-2015-OPE-0103-0221.*

[68] *www.regulations.gov/document?D=ED-2014-OPE-0039-2390.*

[69] National Postsecondary Student Aid Study (NPSAS) 2012. Unpublished analysis of restricted-use data using the NCES PowerStats tool.

[70] "Comparison of FY 2013 Official National Cohort Default Rates to Prior Two Official Cohort Default Rates.'' U.S. Department of Education. Calculated August 6, 2016: *http://www2.ed.gov/offices/OSFAP/defaultmanagement/schooltyperates.pdf.*

[71] U.S. Department of Education, National Center for Education Statistics, 2007–08 and 2011–12 National Postsecondary Student Aid Study (NPSAS:08 and NPSAS:12). (This table was prepared July 2014.) *https://nces.ed.gov/programs/digest/d15/tables/dt15_331.90.asp?current=yes.*

**76018** **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

which to focus this requirement on for-profit schools.

We disagree with the commenters who propose to remove the repayment rate warning provision from the regulations. The Department believes that this information is critical to ensure students and families have the information they need to make well-informed decisions about where to go to college. Given the concerns discussed earlier about the inaccuracy of applying a warning to an entire institution based on data that do not necessarily represent all borrowers at the school, and the added burden both on public and private nonprofit institutions and on the Department to identify the relatively few institutions that might be accurately represented by such a rate, we believe it is appropriate to maintain the repayment rate warning provision only for proprietary schools. We appreciate the comments from those who suggested tying the repayment rate warning requirement to those institutions with a significant proportion of students in GE programs, and have adopted a version of that requirement (*i.e.*, the warning requirement applies only to those institutions at which a majority of GE borrowers are not in active repayment or repaid in full; and only at proprietary institutions, where effectively all programs are subject to the GE requirements). While we appreciate the comments from those who proposed instead limiting the requirement to "financially interested boards" to prevent certain institutions from avoiding the requirements, we believe that the requirements as stated in the final regulations will cover the vast majority of students at institutions with such boards, and that the added burden of identifying those institutions in another way would not yield much additional coverage for the requirement.

*Changes:* We have revised § 668.41(h) to provide that, if a proprietary institution has a repayment rate that shows that the median borrower has not either fully repaid, or made loan payments sufficient to reduce by at least one dollar, the outstanding balance of the borrower's loans, it may seek to demonstrate to the Secretary's satisfaction that it has borrowers in non-GE programs who would increase the school's repayment rate above the threshold for the warning requirement if they were included in the calculation. If an institution demonstrates this to the Secretary's satisfaction, it will receive an exemption from the warning requirement.

*Income-Driven Repayment (IDR) Enrollment*

*Comments:* A number of commenters asserted that § 668.41(h) conflicts with the Administration's income-based repayment plan enrollment campaigns. One commenter pointed to a Council of Economic Advisers report that states that borrowers on IDR plans are from more disadvantaged backgrounds than those on the standard repayment plans, suggesting that borrowers' investments in higher education pay off over time. That commenter contended that measuring borrowers' repayment behavior in the first five years is not appropriate because of the long-term payoff of postsecondary education. Other commenters argued that institutions would be unfairly—and retroactively—penalized for encouraging students to sign up for IDR plans.

Several commenters proposed to remove from the repayment rate calculation any borrower making payments under any Federal repayment plan, including IDR plans. Alternatively, one of the commenters proposed that the Department should allow institutions to include in the warning to students that the negative amortization of its borrowers occurred because of federally authorized repayment plans where that is the case.

*Discussion:* We disagree with the commenters' statements that income-driven repayment plans conflict with the loan repayment warning provision. The IDR plans that Congress and the Department provide to borrowers were created to act as a safety net for struggling borrowers—those whose debts are sufficiently high, or incomes are sufficiently low, to make repaying them on the expected timeline exceedingly difficult. However, a post-college safety net program for borrowers does not eliminate the responsibility the institution has to provide a high-quality education that ensures borrowers are able to, at a minimum, afford to pay down their loans, even in the first years after entering repayment. Moreover, the Department agrees with the commenter who noted that many of the borrowers currently enrolled in income-driven repayment (IDR) plans would otherwise be in distress on their loans, and may thus be in negative amortization regardless of whether they were on an IDR plan or may have defaulted. For instance, a recent report from the Council of Economic Advisers found that over 40 percent of borrowers who entered repayment in fiscal year 2011 and later enrolled in income-driven repayment had defaulted, had an unemployment or economic hardship deferment, or had a single forbearance of more than two months in length before entering their first income-driven repayment plan.[72] While the report shows that measurements of short-term distress were mitigated for the borrowers who enrolled in income-driven repayment plans, the Department believes that the fact that such borrowers experienced types of financial distress—whether failure to pay down the outstanding balance of the loans or deferments, forbearances, and defaults that suggest acute problems in repaying in the initial several years after leaving school—constitute critical information that prospective students and potential borrowers should be aware of prior to making enrollment or financial aid decisions. To that point, we do not agree with the commenters who stated that enrollment in IDR plans among students would unfairly penalize institutions; on the contrary, borrowers who enroll in IDR plans and still do not have sufficiently high incomes or low debts to pay down the balance on their loans are experiencing precisely the negative post-college outcomes about which students, taxpayers, and the Department should have concerns. This argument is especially relevant for institutions that are eligible for title IV, HEA aid on the basis of providing educational programs that prepare students for gainful employment in a recognized occupation. Students considering such programs should be warned if the majority of borrowers do not have sufficient income to pay down their Federal student debt, even if those borrowers are protected from default by enrolling in IDR plans.

*Changes:* None.

*Inconsistency of Rates*

*Comments:* Several commenters noted that the Department has considered many variations of a repayment rate calculation in recent years. They stated that none of these rates has been subject to peer-review research and that the Department has not sufficiently supported its proposal with research. Several commenters raised concerns that the use of multiple repayment rates would lead to significant confusion. These commenters urged the Department to use an existing definition of repayment rate, or to remove the provision entirely.

*Discussion:* We appreciate the commenters' concerns that multiple

---

[72] "Investing in Higher Education: Benefits, Challenges, and the State of Student Debt." Council of Economic Advisers. July 2016: *www.whitehouse.gov/sites/default/files/page/files/20160718_cea_student_debt.pdf.*

repayment rates, particularly where provided to the same students, may lead to confusion. While we believe that this is important information for students and families to consider while deciding where to apply and enroll in college, we do not wish to create confusion for borrowers.

To that end, as described earlier, the Department has revised the repayment rate provision in the final regulations to mirror the program-level rates used under the GE regulations. Those rates calculate the share of borrowers who have made progress in repaying their loans; and will rely exclusively on data already reported under the GE regulations. We believe that these changes address the commenters' concerns. Moreover, the GE definition of "repayment rate" has been subjected to research, analysis, and consumer testing by the field.

*Changes:* We have revised the calculation of the loan repayment rate in § 668.41(h), as described in more detail earlier in this section.

*Technical Comments About the Calculation*

*Comments:* A number of commenters suggested specific changes to the repayment rate. One commenter disagreed with the Department's proposed use of a median repayment rate, rather than a mean. Several others argued that an institutional median is not appropriate because post-college repayment outcomes may vary significantly by program. One commenter was confused as to whether the loan repayment rate would be calculated on a per-borrower or a per-loan basis. Another commenter proposed to separate out, and create distinct loan repayment rates and warnings for graduate, undergraduate, and Parent PLUS Loan debts. Several commenters stated that the treatment of consolidation loans was unclear. One commenter suggested changing treatment of payments on consolidation loans by attributing the same payments to loans at multiple institutions, rather than attributing payments based on the share of debt from each institution.

One commenter expressed confusion over the use of "accrued interest" in the definition of "original outstanding balance," and the use of "capitalized interest" in the definition of current outstanding balance for the repayment measure. Another commenter proposed that, for graduate programs that prepare students for medical residencies, the original outstanding balance should be defined as the principal balance after the medical residency forbearance period.

Other commenters suggested minor changes to the proposed calculation. One commenter argued that the Department proposed inconsistent treatment of borrowers who default on their loans. This commenter urged the Department to ensure that all defaulters appear as a zero percent repayment rate, or that defaulters are given no distinct treatment. Another commenter proposed that, under § 668.41(h)(6)(i), there should be a minimum of 30 students in the cohort, rather than 10, before requiring a loan repayment warning.

As noted earlier, several commenters argued that the zero percent repayment rate threshold was not supported by any evidence or analysis, and one contended that it is legally unsupportable.

Several commenters raised concerns about the five-year window for measuring borrowers' repayment. Some argued that the five-year measurement period is not predictable because of insufficient data. Some commenters argued that a two- or three-year measurement period would be better supported; or alternatively, proposed to use a 10-year window. Another commenter stated that analysis of data from the College Scorecard found that three- or seven-year repayment rates would be more reliable. One commenter argued that the repayment rate window for medical schools should be seven years, as in the Gainful Employment regulations; while another commenter proposed that repayment rates for graduate programs that prepare students for medical residencies should be measured five years from the end of their medical residency forbearance period.

Several commenters raised concerns about excluding from the measurement only those students who are in certain deferments during the measurement year. One commenter proposed to extend the measurement window of borrowers who spend several years in in-school deferments, while others proposed to exclude any borrower who entered an in-school or military deferment at any point during the measurement period.

Several commenters argued that borrowers' backgrounds affect their repayment rates; one commenter asserted that when borrowers' backgrounds are taken into consideration, repayment rates of low-income students and students enrolled at proprietary institutions are similar to those of their higher-income peers. One commenter suggested that the Department should revise the loan repayment rate methodology to exclude all borrowers with an Expected Family

Contribution of zero dollars in any year of attendance. Another proposed to disclose the percentage of Pell Grant recipients or adjust the threshold at institutions with a high enrollment of Pell Grant recipients.

*Discussion:* We appreciate the commenters' concerns about the specific calculation of the repayment rate. We have made changes to the calculation of the repayment rate, as described earlier, that address or eliminate many of the concerns raised, including clarifying that the median rate over a mean is comparable to a proportion of borrowers; the use of program-level data to calculate an institution-level rate, ensuring that borrowers in GE programs receive warnings if either or both rates raise cause for concern; and whether the rate would be calculated on a per-borrower or per-loan basis (because the rate was replaced by a proportion of borrowers who have not repaid at least one dollar in outstanding balance). We disagree with the commenter who suggested that creating distinct repayment rates and warning requirements for particular programs is necessary, because such rates will already be made available at the educational program level through the GE regulations; this warning requirement is designed to complement and supplement that rate with a broader measure of the entire institution.

We believe that we have clarified the treatment of consolidation loans, which will mirror the treatment of such loans in the GE regulations. We also believe that additional clarification of the definitions of "accrued" and "capitalized" interest, and one commenter's proposed change to the definition for graduate programs that prepare students for medical residencies, is not necessary because the repayment rate will instead rely on data already reported under the GE regulations. Similarly, the treatment of defaulted student loans will mirror the GE data that are already reported to the Department. We will continue to use a minimum cohort size of 10, rather than 30 as one commenter proposed, because 10 is a sufficiently large size to meet both minimum requirements and best practices for the protection of student privacy; a minimum count of 10 borrowers is also the standard already used in the GE regulations for repayment rate and other metrics. With respect to concerns from several commenters about the use of negative amortization as a threshold for requiring warnings, we disagree that there is no support in research for doing so. Based on internal analysis of data from the National Student Loan Data System

**76020** **Federal Register**/Vol. 81, No. 211/Tuesday, November 1, 2016/Rules and Regulations

(NSLDS), the typical borrower in negative amortization—more than half of those who have made no or negative repayment progress in the third year after entering repayment—experienced long-term repayment hardship such as default. Those borrowers are especially unlikely to satisfy their loan debt in the long term.[73] Additionally, several public comments received and papers published during the negotiations for the Department's GE regulations include reference to negative-amortization thresholds for student loan repayment rates.[74] Moreover, we believe this will be an understandable measure to help inform consumer choice.

We agree with commenters who stated that a measurement three years after entering repayment (e.g., examining borrowers' outcomes three years after they enter repayment) is well supported. Given the other changes to the repayment rate calculation made to mirror the GE repayment rate metric, we will use this period, rather than the five-year period included in the proposed regulations, to calculate the institutions' rate. We believe that a 10-year window, as some commenters proposed, would be too long to provide relevant and timely data; such long-term outcomes would fail to incorporate improvement in quality or other changes at the institution since those borrowers entered repayment, and would likely fail to capture many of the signs of short-term financial distress that some borrowers experience. We agree with the commenter who stated that the repayment rate window should be lengthened for medical schools; we are revising the provision to provide that the same period will be used for this requirement as is used in the GE regulations.

With respect to comments raised about students who use in-school or military deferments, we will again mirror the provisions outlined in the GE regulations. Because that calculation measures active repayment during the most recently completed award year, we believe that we have addressed concerns about borrowers who may have used

deferments in the interim. For the purposes of this calculation, the Department plans to rely on the data reporting and data corrections under the GE regulations for the purposes of calculating repayment rates.

We disagree with the commenters who stated that borrowers' backgrounds drive their ability to repay, and that institutions should therefore not be held accountable for their repayment rates. One of the central missions of institutions of higher education is to ensure low-income students receive an education that will help them to earn a living and successfully repay their loans. At institutions where more than half of borrowers do not successfully pay down the balance on their loans, the Department believes that students have the right to know—before they enroll or borrow financial aid—that the majority of borrowers have not repaid even one dollar in outstanding balance three years out of school.

*Changes:* We have revised § 668.41(h) as described earlier in this section.

*Challenge Process*

*Comments:* One commenter asked the Department to clarify whether institutions will have an opportunity to challenge the Department's student-level data. Another commenter recommended that the Department use a 20.8 percent borrowing rate in place of the proposed two-step borrowing rate calculation in order to simplify the calculation and reduce the associated burden.

*Discussion:* We appreciate the commenter's concern for the accuracy of the data. Given the changes to the rate described earlier, there will be no additional data corrections process beyond the one already provided for in the GE regulations. Institutions will already be responsible for reporting accurate data under the GE regulations, and for making any necessary corrections to the data. The Department will use those already-corrected data to derive the institution-level repayment rate. However, a proprietary institution at which the median borrower has not repaid in full, or paid down the outstanding balance of, the borrower's loans may receive an exemption from the warning requirement if the institution demonstrates that not all of its programs constitute GE programs and that if the borrowers in the non-GE programs were included in the calculation of the loan repayment rate, the loan repayment rate would be equal to or greater than 0.5, meaning that the median borrower had paid down the outstanding balance of the borrower's loans by at least one dollar.

Additionally, we do not believe the participation rate index (*i.e.*, the index comparable to the 20.8 percent borrowing rate percentage) appeal is still necessary under this revised version of the repayment rate. The GE repayment rate calculation does not include such an exception, and limiting the warning requirement only to proprietary institutions means that the rates will cover all borrowers at the institution, accurately representing the universe of students with Federal loan debt. In the interest of ensuring consistency between the GE repayment rates and this one, and of reducing burden on both institutions and the Department, we have removed the participation rate index appeal.

*Changes:* We have revised § 668.41(h) to remove the data corrections process and the participation rate index appeal. We have also added § 668.41(h)(4)(ii), which creates an exemption to the warning requirement for institutions that demonstrate that they have borrowers in non-GE programs and that, if those borrowers were included in the loan repayment rate calculation, the loan repayment rate would meet the threshold.

*Warnings*

*Comments:* Several commenters supported using a plain-language warning that has been tested with consumers, and that is timely for students. One commenter supported incorporating those warnings into institutional promotional materials, and suggested expanding the definition of "promotional materials" to include all materials and services for which an institution has paid or contracted. Several commenters requested that we further clarify how the warning must be presented, so that it is not difficult for the public to see. Other commenters expressed disappointment that the proposed regulations do not require institutions to deliver repayment rate warnings to prospective students at the first contact with those students, when the information may be most valuable to students, and strongly supported including such a requirement in the final regulations.

However, several commenters suggested that the loan repayment warning raises First Amendment concerns. Some commenters believed that the requirement would both target institutions at which borrowers are appropriately using IDR plans and excuse private nonprofit and public institutions with similarly poor loan repayment rates. One commenter raised concerns that the specific language provided for illustrative purposes in the

---

[73] Analysis of NSLDS data was based on a statistical sample of two cohorts of borrowers with FFEL Loans and Direct Loans entering repayment in 1999 and 2004, respectively. The repayment statuses of the loans were tracked at 10 and 15 years after entry into repayment, depending on the age of the cohort.

[74] For instance, "TICAS Detailed Comments on Proposed Gainful Employment Rule," The Institute for College Access and Success. May 27, 2014. *http://ticas.org/content/pub/ticas-detailed-comments-proposed-gainful-employment-rule;* and Miller, Ben. "Improving Gainful Employment: Suggestions for Better Accountability." New America. *www.newamerica.org/education-policy/policy-papers/improving-gainful-employment/.*

NPRM did not accurately describe the loan repayment rate.

One commenter believed that the warning would be most effective if it were included within other loan and borrowing information, rather than delivered separately along with other disclosures. The commenter also stated that institutions should not be required to provide the warning to students who do not intend to borrow Federal student loans.

Several commenters argued that requiring institutions to include the entire content of the warning in advertising and promotional materials would be cost-prohibitive. Instead, commenters proposed that institutions provide a briefer statement, similar to the requirements in the Gainful Employment regulations.

*Discussion:* We appreciate the support of commenters who stated that they agreed with the Department's proposed use of a plain-language, consumer-tested warning. We also agree with commenters who supported incorporating warnings into a wider range of promotional materials, and have strengthened the definitions for warnings and promotional materials accordingly. We recognize and agree with the concerns of commenters who suggested additional clarity around the presentation of the warning to prevent obfuscation. To that end, we have clarified the requirements for promotional materials to ensure the warning will be prominent, clear, and conspicuous, including a variety of conditions both for advertising and promotional materials. The Secretary may require the institution to modify its materials if the Department determines that the warning is not sufficiently prominent or conspicuous. The Secretary may also issue guidance describing form, place, and manner criteria that would make the warning sufficiently prominent, clear, and conspicuous.

We also appreciate the perspective of commenters who supported hand-delivered warnings at early stages in a student's college search. However, we recognize that many of these goals will be accomplished under the GE regulations, which require that program-level data be provided on a GE disclosure template to students. To that end, we have removed the requirement that an institution-level warning also be provided directly to prospective and enrolled students, and instead will require that the warnings be provided through advertising and promotional materials. This also resolves the concerns of the commenter who believed that the warning would be

most effective if accompanied by other loan and borrowing information; and the commenter who argued that institutions should be required to provide the warning directly to only those students who intend to borrow Federal student loans.

While we recognize that some institutions believe providing these warnings in advertising and promotional materials would be cost-prohibitive, we believe that this is important information to help students themselves make critical cost-benefit analyses prior to investing their time and money in an institution.

We address the First Amendment concerns above in the section "Warnings" and do not repeat them here. We also remind commenters that the warning language included in the final regulations may be subject to consumer testing and may change in accordance with the results of that testing. The precise warning language, if revised, will be published in the **Federal Register** by the Secretary.

*Changes:* We have revised § 668.41(h) to remove the delivery of a repayment rate warning to prospective and enrolled students. Instead, we have strengthened the requirements under § 668.41(h)(3) to ensure the materials are appropriately provided in advertising and promotional materials.

**Agreements Between an Eligible School and the Secretary for Participation in the Direct Loan Program (Section 685.300)**

*Legal Authority and Basis for Regulating Class Action Waivers and Arbitration Agreements*

*Comments:* Several commenters objected that the Department lacks the legal authority to ban either mandatory predispute arbitration agreements or class action waivers. These commenters strongly believed that by this regulation, the Department would be inappropriately interfering with institutional operations, violating established Federal law, and interfering with parties' freedom to contract. Commenters suggested that the Department has ignored clear messages from both Congress and the Supreme Court indicating Federal policy favoring arbitration.

Many commenters argued that the Federal Arbitration Act (FAA) precludes the Department from restricting the use of arbitration agreements. Commenters noted that the FAA makes arbitration agreements "valid, irrevocable, and enforceable as written," reflecting a national preference for resolving disputes by arbitration. These

commenters believed that the proposed regulations run counter to public policy and violate the FAA. According to commenters, the prohibition on arbitration in the proposed regulations is precisely the type of agency action that Congress sought to curtail with the FAA.

The commenters asserted that the Supreme Court has repeatedly demonstrated its support for the FAA and for arbitration as an effective method of dispute resolution. Commenters cited cases in which they view the Supreme Court as having struck down regulations and statutes that are inconsistent with the pro-arbitration policy established by the FAA, such as *DirecTV* v. *Imburgia,* 136 S.Ct. 463 (2015). Commenters further cited to a line of Supreme Court precedent favoring arbitration, including *Hall St. Assocs., L.L.C.* v. *Mattel, Inc.,* 552 U.S. 576 (2008), and *Moses H. Cone Mem. Hosp.* v. *Mercury Constr. Corp.,* 460 U.S. 1 (1983). According to these commenters, the Department's proposed regulations are contrary to well-established law.

Commenters contended that, under the FAA, the Department may not issue the proposed regulations absent a clear congressional command, which they argued the Department lacks. According to commenters, when Federal law is silent as to whether Congress intended to override the FAA for a claim, the FAA requires that an arbitration agreement be enforced according to its terms. Here, in the absence of explicit congressional command, commenters believed that the Department is not authorized to restrict arbitration. To support this position, commenters noted that Congress has granted the necessary authority to other agencies in other circumstances. Commenters suggested that because Congress has granted agencies this authority in the past, but has not granted this authority to the Department, this silence means that Congress did not intend for the Department to exercise such authority.

Specifically, commenters stated that the HEA does not authorize the Department to supersede the FAA. As a result, commenters contended that the proposed ban on arbitration must yield to the FAA. Specifically, commenters noted that sections 454(a)(6) and 455(h) of the HEA, which the Department cites in the proposed regulations, provide no indication that the Department is authorized to override the FAA. One commenter contended that the Department has misinterpreted its statutory mandate by relying on these provisions to justify the proposed arbitration ban. Specifically, this

**76022**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

commenter asserted that, unlike other sections of the HEA, section 454(a)(6) does not contain a provision that expressly makes the FAA inapplicable. According to the commenter, the Department should interpret this distinction to mean that the Department may not disregard the FAA in its actions pursuant to this provision.

Further, another commenter stated that section 454(a) of the HEA does not relate to contracts between students and schools and that none of the current regulatory requirements governing PPAs regulate contracts between students and the institution. These commenters objected that the Department is acting outside the scope of its statutory authority by attempting to become involved in contractual relationships between students and institutions.

Other commenters, in contrast, asserted that the Department has authority to regulate the use of arbitration. One commenter stated that the FAA does not limit the Department's ability to require schools to remove forced arbitration clauses and class action waivers from enrollment contracts. The commenter noted that the FAA legal analysis is not triggered in the absence of an arbitration clause and that the FAA does not preclude laws or regulations preventing parties from placing arbitration provisions in their contracts. This commenter asserted that the history of the FAA and judicial treatment of arbitration provisions does not suggest an absolute right to impose an arbitration agreement.

Another commenter strongly asserted that the Department may condition Federal funding on a school's agreement not to use forced arbitration clauses without violating the FAA. This commenter cited to section 2 of the FAA, stating that agreements to arbitrate are "valid, irrevocable, and enforceable," except where grounds "exist at law or in equity for the revocation of any contract." This commenter suggested that the proposed regulations would not interfere with existing arbitration agreements and that students would still have the ability to arbitrate if they chose to do so. One commenter noted that the Department's authority to adopt stand-alone conditions on funding as part of its PPAs is broad with respect to the Direct Loan Program, and stated that barring predispute arbitration agreements is within the scope of this authority. The commenter noted that including this restriction in PPAs would force schools to internalize the cost of their misconduct and minimize costs imposed on the public.

Another commenter cited the Spending Clause of the Constitution in support of its position that the Department is authorized to impose conditions of this nature on Federal funding recipients. The commenter stated that the Supreme Court has recognized the constitutionality of such conditional funding in *South Dakota* v. *Dole,* 483 U.S. 203 (1987). In addition to citing this holding, the commenter noted that other agencies, such as the U.S. Commodity Futures Trading Commission (CFTC) and the U.S. Department of Defense (DoD) place similar conditions on recipients of their funding.

*Discussion:* Addressing the comment that the Department lacks legal authority to ban either class action waivers or predispute arbitration agreements regarding borrower-defense type claims, we repeat the position and rationale for each as stated in the NPRM. As we stressed there, the HEA gives the Department the authority to impose conditions on schools that wish to participate in a Federal benefit program. In this regulation, the Department is exercising its broad authority, as provided under the HEA, to impose conditions on schools that wish to participate in the Federal Direct Loan Program. Section 452(b) of the HEA states, "No institution of higher education shall have a right to participate in the [Direct Loan] programs authorized under this part [part D of title IV of the HEA]." 20 U.S.C. 1087b(b). If a school chooses to participate in the Direct Loan Program, it must enter into a Direct Loan Program participation agreement (PPA). 20 U.S.C. 1087d. Section 454(a)(6) of the HEA authorizes the Department to include in that PPA "provisions that the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program. 20 U.S.C. 1087d(a)(6); 81 FR 39383.

This regulation addresses class action waivers and predispute arbitration agreements separately, because the proscriptions adopted here are distinct and apply to each separately. As we explained in the NPRM, recent experience with class action waivers demonstrates that some institutions, notably Corinthian, aggressively used class action waivers to thwart actions by students for the very same abusive conduct that government agencies, including this Department, eventually pursued. Corinthian used these waivers to avoid the publicity that might have triggered more timely enforcement agency action, which came too late for Corinthian to provide relief to affected

students. 81 FR 39383.[75] Corinthian's widespread use of these waivers and mandatory arbitration agreements resulted in grievances against Corinthian being asserted not against the now-defunct Corinthian, but as defenses to repayment of taxpayer-financed Direct Loans, with no other party from which the Federal government may recover any losses. As noted, Corinthian was not alone in this practice. The absence of class action risk coincided with the use of deceptive practices in the industry during this same period, as recounted in the NPRM and in the earlier NPRM for Program Integrity: Gainful Employment. 79 FR 16426 (March 24, 2014). We infer that from the continued misconduct and from the extensive use of class action waivers that the waivers effectively removed any deterrent effect that the risk of such lawsuits would have provided. These claims, thus, ended up as defenses to repayment of Direct Loans. This experience demonstrates that class action waivers for these claims substantially harm the financial interest of the United States and thwart achievement of the purpose of the Direct Loan Program. Accordingly, section 454(a)(6) of the HEA authorizes the Department to ban Direct Loan participant institutions from securing class action waivers of borrower-defense type claims.

Separately, we considered the effect of predispute arbitration agreements on the achievement of Direct Loan Program objectives and the Federal interest, as evidenced during the same period. A major objective of the program is protecting the taxpayer investment in Direct Loans. That objective includes preventing the institutions empowered to arrange Direct Loans for their students from insulating themselves from direct and effective accountability for their misconduct, from deterring publicity that would prompt government oversight agencies to react, and from shifting the risk of loss for that misconduct to the taxpayer. Predispute arbitration agreements, like class action waivers, do each of these, and thus jeopardize the taxpayer investment in Direct Loans. Aligned with these steps

---

[75] As one commenter noted, during the period in question—2011 to 2015—very few Corinthian students pursued arbitration, according to records maintained by the American Arbitration Association, and even fewer received any award. *www.regulations.gov/document?D=ED-2015-OPE-0103-10723,* citing Consumer Arbitration Statistics, Provider Organization Report, available at *www.adr.org.* This data supports our conclusion that widespread use of mandatory arbitration agreements effectively masked serious misconduct later uncovered in government enforcement actions, while providing minimal relief for students.

to protect the taxpayer investment in Direct Loans, we note that these regulations replace, for new loans, the State law cause of action standard with a new Federal standard. Negotiators had objected to that change, and we retained the State law option for those State law claims reduced to judgment. Mandatory predispute arbitration agreements would have made this standard a null option.

For all these reasons, as explained in the NPRM, we concluded that agreements barring individual or joint actions by students frustrate Federal interests and Direct Loan Program objectives for the same reasons as did class action waivers. Therefore, we concluded that section 454(a)(6) of the HEA authorizes the Department to regulate the use of predispute arbitration agreements.

As explained in the NPRM, we acknowledge that the FAA assures that agreements to arbitrate shall be valid, and may not be invalidated "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. 2. Contrary to the commenters' assertion, none of the case authority to which the commenters cite addresses Federal regulations that may affect arbitration, and the disputes addressed in that case authority appear to involve litigation between private parties regarding rights arising under Federal, State, or local law or contracts between those parties.

As we also stated in the NPRM, the Department does not have the authority, and does not propose, to displace or diminish the effect of the FAA. 81 FR 39385. These regulations do not invalidate any arbitration agreement, whether already in existence or obtained in the future. Moreover, the Department does not have the authority to invalidate any arbitration agreement, did not propose to do so, and does not in this final rule attempt to do so.

However, as we explained in the NPRM, and repeat under "Class Action Waivers" here, the Department considers the regulation of class action waivers and predispute arbitration agreements to be justified because they affect Direct Loan borrowing.[76] The arguments that, by these regulations, the Department attempts to override, displace, or disregard the FAA mischaracterize the regulations. The regulations do not control the conduct of purely private transactions between private parties, transactions unrelated to the Direct Loan Program.[77] Direct Loans

are not purely private transactions; but for the Direct Loan, the student may very likely not have enrolled at all in a chosen school. The terms of enrollment agreements between the institution and the student loan recipient, and the school's performance with respect to the education financed by that loan, directly affect the Direct Loan program. These regulations impose a condition on the participation by a school in this specific Federal program, a Federal program in which Congress explicitly stated that "no institution shall have a right to participate . . ." 20 U.S.C. 1087b(b). The final regulations do not bar schools from using any kind of predispute arbitration agreements, or class action waivers, so long as they pertain only to grievances unrelated to the Direct Loan Program. The regulations merely require that a school that participates in the Direct Loan program cannot enter into a predispute arbitration agreement regarding borrower defense-type claims with a student who benefits from aid under that program.

These requirements are well within the kind of regulation upheld by courts that address the authority of the government to impose conditions that limit the exercise of constitutional rights by beneficiaries. That case law gives strong support for the position that the Department has authority to impose limits of the kind adopted here on the use of class action waivers and predispute arbitration agreements. For example, the government may impose a restriction on the exercise of a recipient's First Amendment rights so long as that restriction does not extend beyond the recipient's participation in the Federal program:

Our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.

*Agency for Int'l Dev.* v. *All. for Open Soc'y Int'l, Inc.,* 133 S. Ct. 2321, 2330–31 (2013), *quoting Rust* v. *Sullivan,* 500 U.S. 173, 197 (1991).[78] Here, the scope

of the federally funded program—the Direct Loan Program—extends far beyond the simple act of originating the loan on behalf of the Department; the HEA itself regulates a broad range of school actions *as they relate to Direct Loan participation,* from advertising and recruiting practices that lead to enrollment to refunding tuition payments after a student drops out. *See, e.g.,* 20 U.S.C. 1094(a)(20) (incentive compensation); 20 U.S.C. 1094(a)(22) (refund requirements). Section 454 of the HEA provides that under the Direct Loan program, the school acts as the Department's loan originator, and accepts responsibility and financial liability for failure to perform its functions pursuant to the Direct Loan PPA. 20 U.S.C. 1087d(a)(3). The HEA gives the Secretary the authority to modify the terms of the PPA as needed to protect Federal interests and promote the objectives of the program. 20 U.S.C. 1087d(a)(6). The Department issues these regulations pursuant to that authority, to regulate conduct well within the "scope of the federally funded program" at issue here. As we explained in the NPRM and earlier in this discussion, the restrictions involve terms, conditions, and practices that directly and closely affect the objectives of the Federal Direct Loan Program.[79]

For several reasons, the fact that Congress gave certain agencies power to regulate arbitration, or outright banned mandatory arbitration, supports no inference that Congress considered other agencies, such as the Department, to lack the power to regulate.[80] First, these enactments regulate purely private transactions between private parties. As such, transactions in these contexts fall squarely within the terms of the FAA, a Federal statute, and arbitration clauses in these transactions would be deemed valid and enforceable if Congress had not, by Federal legislation, barred or nullified their use, or explicitly

---

[76] 81 FR 39382–39383.

[77] Purely private transactions are the kinds of relationships that the CFPB may regulate under

section 1028(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. 5518(b) (authority to regulate the use of agreements between covered persons and consumers).

[78] The Spending Clause of the Federal Constitution grants Congress the power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The clause provides Congress broad discretion to tax and spend for the "general Welfare," including by funding particular State or private programs or activities. That power includes the authority to impose limits on the use of such

funds to ensure they are used in the manner Congress intends. *Rust* v. *Sullivan,* 500 U.S. 173, 195, n. 4, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use."). *Agency for Int'l Dev.* v. *All. for Open Soc'y Int'l, Inc.,* 133 S. Ct. 2321, 2327–28, (2013).

[79] See 81 FR 39383–84.

[80] See, *e.g.,* 10 U.S.C. 987(f)(4), (h) (authorizing the DoD to regulate use of mandatory arbitration in extensions of credit to servicemembers); 12 U.S.C. 5518 (authorizing the CFPB to regulate use of arbitration in consumer financial services); 15 U.S.C. 78o (authorizing the SEC to regulate use of mandatory arbitration in certain investment relationships); 15 U.S.C. 1639c(e) (barring mandatory arbitration in extensions of credit secured on the principal dwelling of a consumer); and 18 U.S.C. 1514A(e) (prohibiting use of arbitration in regard to certain whistleblower proceedings regarding securities).

authorized a Federal agency to do so by regulation. Federal legislation was therefore essential to achieve the intended restriction of arbitration in that context. None of the situations cited involve the terms and conditions of participation in a Federal benefit program.[81] Second, these latter enactments offer no legislative interpretation of the 1993 amendment to the 1965 Higher Education Act, which enacted section 454, because they deal with different subject matters. Thus, courts interpret statutes *with similar language,* and which address *the same general subject matter,* "as if they were one law." *See* Erlenbaugh v. *United States,* 409 U.S. 239, 243–44 (1972). In such a case, a "later act can . . . be regarded as a legislative interpretation of (an) earlier act . . ." *United States* v. *Stewart,* 311 U.S. 60, 64–65 (1940) (construing two statutes that both address the scope of the tax exemption afforded farm loan bonds).

Here, newer enactments addressing arbitration provide no "legislative interpretation" of the HEA, because they share neither language nor subject matter with the 1965 Higher Education Act in general or the 1993 Direct Loan Program statute in particular. To the contrary, Congress has generally rejected any inference that other Federal law regulating consumer lending, most prominently, the Truth in Lending Act (TILA), operates on "the same general subject matter" as Federal education loans financed under the HEA. See, *e.g.,* 15 U.S.C. 1603(7) (exempting from TILA those loans made, insured, or guaranteed pursuant to a program authorized by title IV of the Higher Education Act of 1965). Section 454 itself—the statutory basis for adopting "other provisions" needed to protect Federal interests evidences this distinction in subject matter by repeatedly referencing not other Federal laws addressing consumer lending, but specific disclosure requirements in the HEA itself, as well as provisions barring the school from charging fees for arranging Direct Loans. 20 U.S.C. 1087d(a)(1)(E). This context compels the conclusion that the scope of the power to regulate under section 454 was to be governed by reference to the Federal objectives stated in this very statute, not by inferences drawn from subsequent legislation addressing very different objectives in transactions involving different—private—participants. The objection that section 454(a)(6) of the HEA does not authorize the Department

[81] Congress's power to regulate in these matters rests, thus, on the Commerce Clause, not the Spending Clause.

to involve itself in the contractual relationships—or impair its freedom to contract with others and exercise rights under existing contracts—ignores a host of HEA provisions that regulate the "contractual relationships" between the school and other parties. These provisions restrict, and in some instances ban, the exercise of rights that the school may already have under existing contracts or wish to include in future contracts. The HEA thus regulates contractual relationships with students: The qualifications for enrollment of students who may become borrowers, 20 U.S.C. 1091(a), (d); the manner in which the school must determine whether the student borrower is making academic progress while enrolled, 20 U.S.C. 1091(c); banning the school from imposing penalties and late fees on students whose tuition payments may be delayed for various reasons, 20 U.S.C. 1094(a)(19); and determining when that student has ceased enrollment and whether and how much the school must refund to the student and the Department of tuition payments the school has already received for that student, 20 U.S.C. 1091b. The HEA, moreover, imposes significant prohibitions that ban the institution from the exercise of rights it may have under its existing contracts with its employees and third parties, or may wish to include in future contracts with those employees and with third parties. Thus, an institution cannot compensate its employees on the basis of success in securing enrollments ("incentive compensation"). 20 U.S.C. 1094(a)(20). More recently, section 487 of the HEA was amended by Public Law 110–315, the Higher Education Opportunity Act of 2008, to impose significant new restrictions on the exercise by institutions and affiliated entities of rights under existing contracts with lenders that provided financing for their students. That act mandated adoption and compliance by institutions with a code of conduct governing their relationships with lenders that made both Federal loans and private loans for their students, and banned numerous practices in widespread use at the time under arrangements between the institution, affiliated entities, its own employees and their family members, and lenders. 20 U.S.C. 1094(a)(25), (e). These amendments were effective on the date of enactment. Public Law 110–3110–315, § 3, August 14, 2008, 122 Stat 3078. Thus, the HEA itself repeatedly conditions participation in title IV, HEA programs on an institution's refraining from exercising rights the institution may already have under existing

contracts or may acquire under new contracts. These regulations similarly operate within the very scope of the Federal program in which these HEA provisions operate, to bar the institution from exercising certain rights it may have already acquired or wished to acquire by contract. In doing so, neither the HEA nor these regulations improperly infringe on the institution's freedom of contract or freedom of expression.

*Changes:* None.

*Comments:* A few commenters suggested that the proposed regulations may violate the rights of institutions under the First Amendment, by compelling speech, and under the Takings and Due Process Clauses of the Fifth Amendment by interfering with or depriving the institution of its contractual rights in arbitration and class action waiver agreements. Several commenters objected that by applying to existing contracts, the regulations are impermissibly retroactive.

*Discussion:* The regulations effect neither a deprivation of a property right of an institution in agreements it already has with students, nor an impairment of those contracts. The regulation affects the terms on which an institution may continue to participate in a Federal program. The institution has no property right to continue to participate on the terms under which the institution previously participated. See *Ass'n of Private Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d at 198. Rights acquired by the institution under agreements already executed with students remain fully enforceable on their own terms.

Like any new regulations, these regulations impose requirements on the future conduct of institutions that intend to continue to participate in the Direct Loan Program. Regulations commonly change the future consequences of permissible acts that occurred prior to adoption of the regulations, and such regulations are not retroactive, much less impermissibly retroactive, if they affect only future conduct, and impose no fine or other liability on a school for lawful conduct that occurred prior to the adoption of the regulations. The regulations do not make an institution prospectively ineligible because it has already entered into contracts with arbitration provisions. The regulations impose no fine or liability on a school that has already obtained such agreements. The regulations address only future conduct by the institution, and only as that conduct is related to the institution's participation in the Federal Direct Loan Program. The institution is not obligated

to continue to participate in the Direct Loan program. If it chooses to continue to participate, it agrees to do so under rules such as these that change—prospectively—the conduct in which it can engage. These rules thereafter bar the institution that chooses to continue to participate from exercising rights acquired by the institution under agreements already executed with students. The regulations abrogate none of those agreements; an institution that chooses not to continue to participate is free to rely on those agreements.

In response to the assertion that requiring the institution to include provisions in any arbitration agreement it has obtained or obtains in the future violates the First Amendment, we note that the regulations compel action, not merely speech. The requirements of § 685.300(e)(1) and (2) and (f)(1) and (2) are different than the warnings required under § 668.41, and those warnings and disclosures regarding gainful employment programs that were challenged and upheld in *Ass'n of Private Sector Colleges & Universities* v. *Duncan,* 110 F. Supp. 3d 176, 182 (D.D.C. 2015), *aff'd sub nom. Ass'n of Private Sector Colleges & Universities* v. *Duncan,* 640 Fed. Appx 5 (D.C. Cir. 2016). Section 685.300(e) and (f) requires an institution that has obtained a class action waiver or predispute arbitration agreement that included borrower defense-type claims to, most importantly, take no action to enforce that waiver or agreement and, secondly, to notify the affected student that it does not intend to enforce the agreement. The regulations further require the institution to avoid certain actions, or to conduct those actions in a particular manner, which include adding a clause to new agreements to advise the student of its commitment. To the extent that the regulations compel speech, they compel commercial speech, like other communications with students required by Department regulations, and the content of the speech is limited to stating that the institution agrees to comply with a particular Federal regulation. The regulations do not require the institution to express the viewpoint of any other party on the value of arbitration, much less to disparage arbitration. Nor do they prevent the institution from advocating in its communications with students its opinion of the benefits of arbitration and the disadvantages of litigation, or from encouraging students who have a grievance with the institution from agreeing to arbitration. To the extent that the regulations compel speech,

therefore, they compel only factual, non-controversial speech.

*Changes:* None.

*Comments:* Several commenters considered the Department's proposed arbitration and class action waiver bans to be arbitrary and capricious agency actions, adopted without proper, reasoned decision-making. Some commenters contended that the Department did not gather sufficient evidence to support its positions in the NPRM. Commenters also believed that the Department relied too heavily on a CFPB study that they believed was not relevant to the public student loan context at issue. Additionally, commenters believed that the Department did not sufficiently consider conflicting evidence, such as the benefits of arbitration and the drawbacks of class actions. A commenter cited to literature and academic studies that the commenter asserts demonstrate the merits of arbitration.

*Discussion:* As discussed elsewhere, we do not deny the merits of arbitration, and the regulations do not ban arbitration. The Department gathered substantial evidence to support the position taken in the regulations, as described in detail in the NPRM. That evidence showed that the widespread and aggressive use of class action waivers and predispute arbitration agreements coincided with widespread abuse by schools over recent years, and effects of that abuse on the Direct Loan Program. It is undisputable that the abuse occurred, that a great many students were injured by the abuse, that the abusive parties aggressively used waivers and arbitration agreements to thwart timely efforts by students to obtain relief from the abuse, and that the ability of the school to continue that abuse unhindered by lawsuits from consumers has already cost the taxpayers many millions of dollars in losses and can be expected to continue to do so.

Regarding the commenter that objected to our reliance on the CFPB study because that study may not be relevant to the Federal student loan market, the CFPB's study did analyze the prevalence of arbitration agreements for private student loans as well as disputes concerning those loans. Schools participating in the Direct Loan Program not infrequently provide or arrange private student loans to their students; these private loan borrowers may also have Direct Loans, and in any case can be expected often to share characteristics with Direct Loan borrowers.

*Changes:* None.

*Comments:* One commenter stated that the arbitration ban falls outside the scope of topics the Department announced that it would be addressing in development of these regulations and therefore the Department is not authorized to address the issue.

*Discussion:* The proposal to include consideration of arbitration agreements and class action waivers was presented in writing by at least one negotiator during the negotiated rulemaking proceedings, and was the subject of significant discussion during the final negotiated rulemaking session. The issue was highly relevant to the consideration of borrower defense claims, the core of the rulemaking exercise, and was duly and properly considered.

*Changes:* None.

*Class Action Waivers*

*Comments:* Commenters offered opposing views on the treatment of class action waivers under the regulations. Several commenters approved of the Department's proposal to prohibit the use of class action waivers, noting the government's obligation to protect taxpayers and students from misuse of funds dispensed through the Direct Loan Program. One commenter cited research from the CFPB showing that class actions are more effective at securing relief for consumers than individual arbitrations. This commenter suggested that arbitration agreements prevented Corinthian students from receiving relief from the institution, and that class actions are essential to safeguarding taxpayer money. This commenter asserted that the provisions in the proposed regulations addressing class action waivers are narrowly tailored, consistent with precedent established in *Rust* v. *Sullivan*, 500 U.S. 173 (1991).

Another commenter suggested that class actions are beneficial to students because they minimize resource obstacles often faced by students. According to this commenter, class actions are powerful tools that can rectify wrongs and create incentives for industries to change behavior. Further, this commenter noted that class actions enable students to band together to seek relief, rather than bringing such grievances to the Department as defenses to repayment of taxpayer-funded Direct Loans.

Other commenters disapproved of the Department's proposed ban on class action waivers. These commenters contended that class actions only benefit lawyers and are not helpful to students. A few commenters noted that an individual participant in a class

action often receives only nominal returns for his or her claim, while attorneys receive disproportionately large returns. One commenter suggested that class actions cannot be effective because the needs and particular circumstances of individuals within the class cannot be properly considered, so students cannot receive the appropriate tailored relief.

Another commenter criticized class actions as being incredibly time consuming and yielding minimal public benefit. The commenter stated that attorneys are less likely to represent students from small schools in class actions because of the lower potential rewards, leaving injured students at small schools without adequate recourse.

One commenter rejected the Department's position that class actions are likely to have a deterrence effect, contending that plaintiffs' lawyers often pursue frivolous claims for which institutions could not anticipate liability and therefore could not effectively monitor their own behavior.

One commenter stated that the ban on class action waivers would be harmful to schools, particularly private institutions that lack the legal protections afforded to public institutions. A commenter contended that the rule would expose institutions to frivolous lawsuits and thus would divert funds needed for educational expenses to pay the costs of litigation.

*Discussion:* In the NPRM, we described in detail the actual effect that class action waivers have had in the postsecondary education field on students and Federal taxpayers. 81 FR 39382. Nothing in the comments opposing the regulation demonstrates that these effects are exaggerated or mischaracterized, that the substantial problems created by the use of class action waivers can be reduced or eliminated by more modest measures, that the disadvantages and burdens the regulation would place on schools outweigh the costs and harm that use of class action waivers has already caused, or that there is any reason to expect that this pattern will change so that such waivers will not cause these same problems in the future. It is possible that banning class action waivers may increase legal expenses and could divert funds from educational services, or lead to tuition increases.[82] We expect that

the potential exposure to class actions will motivate institutions to provide value and treat their student consumers fairly in order to reduce the likelihood of suits in the first place.[83]

We expect that institutions, like other parties that provide consumer services, already monitor, and will continue to monitor, court rulings to guide these efforts. By strengthening the incentive for all institutions to serve consumers fairly, and thereby reduce both grievances by students and attendant scrutiny by the Department (and other enforcement agencies), we expect that the limits we adopt here will tend to reduce the likelihood that an institution that neglects these efforts will enjoy a competitive advantage over those that engage in these efforts. Although it is possible that frivolous lawsuits may be brought, and that institutions will incur costs to defend such suits, institutions already face that risk and expense. We do not dismiss this risk, but we have no basis from which to speculate how much this regulation might increase that risk and attendant expense. We see that risk as outweighed by the benefits to students and the taxpayer in allowing those students who wish to seek relief in court the option to do so.

Commenters who oppose the regulations on the ground that class actions benefit lawyers more than consumers, and may result in modest returns for an individual member of the class, disregard the need for this regulation in this field. Contrary to the assertion that class actions provide only modest returns, we note that the CFPB found, in its study, that the 419 consumer finance class actions during the five-year period it studied produced some $2.2 billion in net cash or in kind relief to consumers in those markets.[84] Whether or not consumer class actions have produced minimal or no actual benefit to the consumers who comprise the class, there is little evidence that this has happened in the postsecondary education industry.[85] Rather, precisely

because of schools' widespread and aggressive use of class action waivers, and even opposition to class arbitration, as described in the NPRM, there appears to be no history of such minimal benefits in this market.

We do not suggest that class actions are a panacea, and the criticisms of class actions in other markets may also apply to class actions in the postsecondary education market if such suits were available. We stress that class actions have significant effects beyond financial recovery for the particular class members, including deterring misconduct by the institution, deterring misconduct by other industry members, and publicizing claims of misconduct that law enforcement authorities might otherwise have never been aware of, or may have discovered only much later. The CFPB described these effects in its proposed rule,[86] and as we demonstrated in the NPRM, recent history shows the significant consequences for students and taxpayers in an industry that has effectively barred consumers from using the class action tool. As to the comment that class actions would harm private non-profit institutions, we note that these institutions are already subject to that risk, and nevertheless, only a small percentage of non-profit institutions currently use arbitration agreements with their students.[87] This suggests that institutions in this sector have generally felt no need for such protection, and we see no reason to expect that this regulation will change the exposure of non-profit institutions to class actions or other suits.

*Changes:* None.

*Comments:* A commenter objected that the proposed regulations would improperly restrict borrowers' choices regarding how they are represented. This commenter expressed concern that borrowers from small schools would be overlooked under the proposed regulations because they would not be able to share the costs of litigation with a larger group. Another commenter objected that the regulations would adversely affect students who could not successfully pursue class actions because their claims would not meet the commonality and predominance requirements for class actions. This commenter asserted that alternative forms of aggregate litigation other than class action suits are essential to ensuring that students are able to obtain

---

[82] It is probable that institutions against whom arbitrations have been filed are already incurring legal costs for arbitration. The CFPB study found that on the average, over 90 percent of the companies involved in the arbitrations it surveyed were represented by counsel in those proceedings. CFPB, Arbitration Study, § 5.5.3.

[83] "[C]lass actions increase negative publicity of for-profits and draw attention to deceptive recruiting in a much more public fashion than bilateral arbitration.'' Blake Shinoda, *Enabling Class Litigation As an Approach to Regulating for-Profit Colleges,* 87 S. Cal. L. Rev. 1085 (2014).

[84] 81 FR 32858.

[85] It appears that at least in the postsecondary education market, the claim is unfounded; in one of the few class actions to proceed to trial, a class of students obtained two million dollars in relief from a for-profit school. *Jamieson* v. *Vatterott Educational Centers, Inc.,* 259 FRD. 520 (D. Kan. 2009); Nick DeSantis, *Missouri Court Upholds Ex-Student's Win in Suit Against Vatterott College,* Chronicle of Higher Education, The Ticker (Aug. 27, 2014), available at *www.chronicle.com/blogs/ticker/mo-appeals-court-upholds-ex-students-win-in-suit-against-vatterott-college/84777.*

[86] See, *e.g.,* 81 FR 32861–32865.

[87] Tariq Habash and Robert Shireman, *How College Enrollment Contracts Limit Students' Rights,* The Century Foundation, (April 28, 2016), available at *https://tcf.org/content/report/how-college-enrollment-contracts-limit-students-rights/.*

judicial relief, and found the regulations insufficient to enable those actions.

*Discussion:* The objective of § 685.300(e) is to ensure that those students who choose to pursue their claims against a voluntarily participating school by a class action are not prevented from doing so by agreements they are compelled to enter in order to enroll at the school. The Department cannot change the rules and practical consequences of class action litigation so that groups of students would be spared the costs and risks incurred by class action litigants, and did not intend to do so in these regulations. Similarly, the Department has neither the mandate nor the authority to create alternative forms of aggregate litigation in other forums, but the regulations, by ensuring that individuals are free to retain the right to sue for relief, necessarily enable those individuals to enjoy the benefits of joinder under Fed. R. Civ. Proc. 20 or comparable State rules, as an alternative to class actions.

*Changes:* None.

*Arbitration Agreements*

*Comments:* Several commenters urged the Department to bar the use of any predispute arbitration agreements by schools. Commenters asserted that limiting the regulation to mandatory predispute agreements would prove ineffective for several reasons: The agreement could be presented to the student as part of a packet of enrollment materials, or included as another term in a mandatory enrollment agreement with merely an opportunity to agree or decline; the agreement could be required as a condition of other benefits, even if not a condition of enrollment; or the clause could be included, with an "opt-out" provision. The commenters stressed that for a student to understand the significance of the agreement, the school would have to explain its significance, a duty that the proposed rule did not impose. The commenters further contended that even if the student were to be aware of the clause, it is reasonable to expect that the student would not understand the significance of entering into such an agreement. A commenter stated that numerous student consumers represented by the commenter had agreed to arbitration, stating that they did so even, in some instances, where the agreement was labeled voluntary, because they did not understand the significance of the agreement itself or their ability to opt out, or because they relied on misstatements by recruiters.[88] Other commenters stressed that the literature is replete with evidence that consumers do not understand the terms of agreements governing the consumer financial transactions in which they engage, making it unlikely that the student would fully understand either the significance of the agreement itself or a warning that the student need not agree to arbitration in order to enrollment. A commenter provided declarations and statements from students attesting to their lack of understanding either that they had executed agreements to arbitrate, or what arbitration meant, or both.[89]

Commenters also addressed the issue of "opt-out" clauses with similar concerns. A comment signed by sixteen attorneys general urged that the regulation ban the use of "opt-out" clauses, which they viewed as unfair as mandatory arbitration clauses. They asserted that predatory for-profit schools, in particular, have a history of using arbitration clauses to violate the rights of their students, and that in their experience, students often do not consider the consequences of an arbitration agreement, or the value of opting out, until they have a legitimate complaint against the school, at which point it is too late to opt out of any arbitration agreement that may have appeared in the student's enrollment agreement. Other commenters strongly believed that arbitration agreements containing opt-out clauses should still be considered mandatory, and should be prohibited under § 685.300(f). According to these commenters, opt-out provisions are highly ineffective because students misunderstand the provisions or choose not to accept them to avoid being disagreeable. Commenters also asserted that recruiters at proprietary institutions are trained to manipulate students and may be able to convince them to sign agreements even if students are apprehensive about the meaning and consequences. Some commenters noted that students are unable to make informed decisions about whether to accept these optional agreements because students must understand and exercise the option well before any disputes arise. One commenter cited to a CFPB study that found that, even when consumers are afforded the opportunity to opt-out of arbitration clauses, many are either unaware of this option or do not exercise this right. Another commenter cited to examples from court records indicating that students who receive an opt-out provision rarely take advantage.

Based on these concerns, commenters recommended that the Department prohibit schools from entering into any predispute arbitration agreements, even those containing opt-out provisions. Commenters cautioned that the Department's failure to explicitly prohibit these agreements would create an exception that swallows the Department's proposed rule on forced arbitration. Some commenters suggested that failure to ban opt-out clauses would actually make students worse off than if the agreements had no such option. According to these commenters, students who unknowingly sign arbitration agreements containing opt-out provisions may face greater hurdles in any efforts to circumvent them by demonstrating their unconscionability, as is generally required for challenges to arbitration agreements. Additionally, commenters suggested that, as proposed, it would be more difficult for the Department to take enforcement actions against schools that take advantage of loopholes in the regulations.

Another commenter believed that allowing the enforcement of arbitration agreements containing opt-out provisions would be highly beneficial to both students and the Department. This commenter believed that these provisions afford students a higher degree of choice and control over their situations. Additionally, this commenter believed that allowing such provisions would relieve the Department of a potential influx of claims.

*Discussion:* The Department solicited comments on how the regulations should treat agreements that would mandate arbitration of borrower defense claims but that contain opt-out clauses. We have considered the comments received, as well as the findings of the CFPB cited by the commenter as relevant to this question. We have considered as well the comments about students' lack of awareness either that they were executing an agreement to arbitrate, or that doing so had significant consequences that they did not understand, or both. The same considerations that apply to opt-out clauses apply as well to our proposal in the NPRM that would ban only mandatory predispute arbitration.

Our proposal in the NPRM to bar only mandatory "take it or leave it" predispute arbitration agreements rested on the expectation that a student consumer could make an informed choice prior to a dispute to agree to arbitrate such a dispute, and that this

[88] *www.regulations.gov/document?D=ED-2015-OPE-0103-10729.*

[89] *www.regulations.gov/document?D=ED-2015-OPE-0103-10723.*

**76028**  **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

objective could realistically be accomplished by having the agreement presented to the student in a manner that would separate the agreement from the bulk of enrollment material presented to the borrower on or at the beginning of class, with a clearly-worded notice that the student was free not to sign the agreement. These comments have persuaded us that the steps we proposed in the NPRM would not produce an informed decision, because even if the agreement were to be presented to students in this manner, it is unrealistic to expect the students to understand what arbitration is and thus what they would be relinquishing by agreeing to arbitrate. The submissions from commenters provide specific evidence of this lack of understanding in the postsecondary education market among students enrolled in the very sector of that market that far more commonly uses predispute arbitration agreements.[90] They are not alone. The literature regarding use of arbitration agreements in consumer transactions provides repeated anecdotal and empirical evidence that consumers commonly lack understanding of the consequences of arbitration agreements.[91] In its survey of credit card users, the CFPB found generally that "consumers generally lack awareness regarding the effects of arbitration agreements" and specifically that "[r]espondents were also generally unaware of any opt-out opportunities afforded by their issuer." CFPB,

[90] Indeed, a commenter noted testimony in one case that the school official shared her students' lack of understanding: None of [the students] knew what arbitration was or asked any questions about the arbitration provision. Ms. Dennison testified that, although she interviews hundreds of applicants each year, she has never been asked a question about the arbitration provision and she has not mentioned it when meeting with prospective students. In fact, Ms. Dennison testified that she did not understand the arbitration provision herself.

*Rude* v. *NUCO Edn. Corp.,* 2011 WL 6931516 Ohio Ct. App. Dec. 30, 2011.

[91] See: Jeff Sovern, et al., "*Whimsy Little Contracts*" *with Unexpected Consequences,* 75 Md. L. Rev. 1, at 21 (2015): The degree of literacy required to comprehend the average disclosure form and key contract terms simply is not within reach of the majority of American adults." Judge Posner has explained "not all persons are capable of being careful readers." Former Federal Reserve Chair Ben S. Bernanke, whose agency was responsible for administering the Truth in Lending disclosures, among others, has said that "not even the best disclosures are always adequate. . . . [S]ome aspects of increasingly complex products simply cannot be adequately understood or evaluated by most consumers, no matter how clear the disclosure." And noted scholar and now-Senator Elizabeth Warren . . . has been quoted as saying about a credit card contract: "I teach contract law at Harvard, and I can't understand half of what it says."

Arbitration Agreements, 81 FR 32843 (May 24, 2016).[92]

We see no reason to expect that students who are now enrolled or will enroll in the future will be different than those described or included in the comments. We see no realistic way to improve this awareness, and thus, we do not believe that the use of predispute agreements to arbitrate will result in well-informed choices, particularly by students in the sector of the market in which such agreements are most commonly used. Based on the lack of understanding of the consequences of these agreements evidenced in the CFPB survey of credit card users, in the literature dealing with credit cards and other financial products, and in the examples of individual postsecondary students' lack of awareness, we consider predispute arbitration agreements, whether voluntary or mandatory, and whether or not they contain opt-out clauses, to frustrate achievement of the goal of the regulation—to ensure that students who choose to enter into an agreement to arbitrate their borrower defense type claims do so freely and knowingly.

*Changes:* We have revised § 685.300(f)(1) to delete the words "will not compel a student"; we have revised § 685.300(f)(1), (2), and (3)(i) and (ii) to remove the word "mandatory" each time it appears; we have revised § 685.300(g)(1)(ii) to delete the word "predispute"; and we have revised § 685.300(i) to delete paragraph (i)(4). We also have removed the definition of a "voluntary agreement" from § 685.300(f)(1)(ii) and revised the definition of "predispute arbitration agreement" in § 685.300(i).

*Comments:* Several commenters believed that the proposed regulations would unfairly deny students the opportunity to seek relief through arbitration. Commenters suggested that if given the option, many students would choose to seek relief through arbitration, rather than litigation. Multiple commenters suggested that limiting the availability of arbitration would be highly burdensome for students, particularly those from low-income backgrounds who are less likely to be able to afford attorneys and fees associated with litigation. These commenters suggested that without arbitration, many low-income students may be prevented from actively pursuing relief. These commenters contended that arbitration is beneficial

[92] The CFPB stated that it focused on use of credit card users, a subset of the financial products included in its Study, because "credit cards offer strong market penetration across the nation." Id.

to students and should remain available to those students who would like to pursue it as a means of obtaining relief.

Some commenters lauded arbitration as fair and legally sound. One commenter noted that under a particular arbitration agreement, students received a fair and impartial hearing, comprehensive review of evidence, and an impartial ruling by an independent arbitrator. This commenter also noted that the arbitration agreement in question is governed by State law, which the commenter believes provides sufficient legal oversight.

Other commenters noted that arbitrators generally have more subject area expertise than judges, which makes them more qualified to issue an informed decision on a particular matter. One commenter suggested that students benefit from widespread arbitration because administrators learn to run more effective and service-oriented schools by participating in arbitration proceedings. One commenter noted that the benefits of arbitration are particularly profound in smaller institutions with closer relationships between students and administrators.

Further, commenters suggested that arbitration is more efficient than litigation, and suggested that limiting the availability of arbitration would unduly delay provision of relief to students. Some commenters suggested that students benefit from the flexibility afforded by arbitration agreements. According to a few commenters, the flexibility available in arbitration proceedings allows participants to schedule events around their availability. Additionally, commenters believed that parties benefit from not being restricted by requirements that they adhere to traditional rules of evidence or civil procedure.

One commenter asserted that arbitrators are generally very fair to students. This commenter opined that the consumer arbitration rules are particularly friendly to plaintiffs, particularly because of lower fees associated with proceedings. Another commenter asserted that plaintiffs prevail in arbitration proceedings at least as frequently as they do in court. Some commenters believed that the arbitration process often facilitates more positive outcomes because both students and institutions participate fully in the process, and are more invested in the outcomes.

Additionally, some commenters suggested that in the absence of widespread arbitration, legal fees associated with litigation would take money away from institutions that could be used towards resources that

would improve educational outcomes for students. Several commenters suggested that the arbitration ban may ultimately lead to tuition increases as institutions are required to spend more money on litigation. These commenters also noted that the arbitration ban will be particularly harmful to smaller institutions that lack the resources necessary to hire robust legal teams. One commenter believed that some smaller institutions may be forced to close if responsible for funding costly litigation. This commenter also worried about ''ambulance chasing'' attorneys encouraging students to bring frivolous suits.

On the other hand, a number of commenters supported the proposed ban on mandatory predispute arbitration agreements for various reasons. Several commenters suggested that arbitration systems create structures that the commenters view as inherently biased against students. Commenters noted that arbitrators are often paid on a case-by-case or hour-by-hour basis, which can create incentives for them to rule in favor of institutions, which are more likely than individuals to be able to produce repeat business for them. One commenter cited to empirical evidence that the commenter viewed as supporting its position that arbitration is harmful to consumers. Additionally, commenters noted that because arbitrators are not bound by adhering to precedent, their decisions are less predictable and reliable.

Further, commenters stated that arbitration can be extremely costly. Commenters attributed the high costs of arbitration to the private nature of the system, noting that individual parties are often responsible for paying costs associated with arbitration, which may include high fees that arbitrators may tack on to total costs without sufficient notice. One commenter also cited the procedural limitations of arbitration as another detriment. This commenter stated that students may miss out on the opportunity for discovery in arbitration because the discovery process is not formalized in the same manner as civil lawsuits. According to the commenter, students are often denied access to information that is essential to their claims. Additionally, the commenter noted that there is a lack of oversight in arbitration proceedings, which may result in a lack of accountability among arbitrators for following by their own established procedures. This commenter also believed that the appeal process under arbitration is inadequate and that the narrow grounds and limited time frame for appeals ultimately harms students. Several commenters also

suggested that the lack of transparency in the arbitration system works to the detriment of students. These commenters believed that the public and parties benefit from the transparency offered by civil litigation. Unlike civil litigation, arbitration is generally not public, transcripts are not provided to the public at large, and some proceedings include gag clauses to maintain privacy.

One commenter believed that forced arbitration impedes the Department's ability to effectively oversee Federal assistance programs and ensure proper use of taxpayer dollars. This commenter also suggested that forced arbitration is unfair to students and deprives them of the opportunity to receive an education in a well-regulated system. Several commenters lauded the Department for taking measures to ensure that students who are wronged by unscrupulous schools receive their day in court. These commenters were particularly concerned that many students have been signing their rights away upon enrollment and urged the Department to prevent the continuation of that practice.

*Discussion:* We appreciate the support for the proposed regulations from many of the commenters. For those commenters that did not support § 685.300(f), many of their objections incorrectly suggested the regulations pose an outright ban or effectively preclude any use of arbitration. The regulations do not bar the use of arbitration and therefore do not deny students the benefits that the commenters ascribe to arbitration. Rather, consistent with the scope of our statutory authority, the regulations ban predispute arbitration agreements for borrower defense-type claims.

The regulations do not bar the school from seeking to persuade students to agree to arbitrate, so long as the attempt is made after the dispute arises. The regulations, moreover, extend only to predispute agreements to arbitrate borrower defense-type grievances. They do not prohibit a school from requiring the student, as a condition of enrollment or continuing in a program, to agree to arbitrate claims that are not borrower defense-related grievances. Consistent with our statutory authority to regulate Direct Loan participation terms, the regulations address only predispute arbitration agreements for claims related to borrower defenses and not for other claims.

*Changes:* None.

*Comments:* A commenter suggested that the private nature of arbitration affords a level of protection to parties. According to this commenter, because

arbitration proceedings are not public, parties need not be concerned about private information being revealed during arbitration.

*Discussion:* The regulations do not ban arbitration entirely, but only arbitration achieved through predispute arbitration agreements for borrower defense-type claims. Students and institutions are free under this rule to agree to arbitration if privacy is an important consideration to the student. We expect that a student who chooses to litigate rather than pursue arbitration is already aware that generally litigation is a public proceeding, or becomes aware of that fact very quickly, and accepts that fact voluntarily. The regulations simply assure that a student will have the option to choose that forum.

*Changes:* None.

*Comments:* A few commenters addressed the effect of delegation clauses within arbitration agreements— provisions that assign, or delegate, to the arbitrator, not a court, the power to decide whether a particular claim or grievance falls within the agreement to arbitrate. The commenters considered such delegation clauses problematic because they allow arbitrators who, according to the commenters, may have financial incentives that impact their neutrality, to make decisions regarding whether a claim belongs in court or arbitration. The commenters suggested that if the Department does not address delegation provisions, the proposed regulations may not fulfill their intended purpose. The commenters urged the Department to prohibit the use of delegation clauses to ensure that any questions about the enforceability or scope of predispute arbitration agreements are resolved by a court rather than an arbitrator, so that schools cannot force students into time-consuming arbitration proceedings to resolve threshold questions about enforceability.

*Discussion:* The commenters identify an important issue, one made particularly significant because § 685.300(e) and (f) distinguish between borrower defense-type claims or grievances, which the regulations address, and other student claims, which it does not. The commenters rightly argue that the objective of the regulation may be frustrated if the school resists a suit by moving to compel arbitration and the arbitrator, not the court, were to have authority under the agreement to decide whether the claim is one that the student must arbitrate. In the NPRM, we described the recent history of aggressive actions to compel arbitration of student claims,

and consider it reasonable to expect that schools will continue to oppose lawsuits by moving to compel arbitration, and would rely on delegation clauses in arbitration agreements to support these efforts. We did not explicitly address in the NPRM the use of delegation clauses, but we proposed there to preclude attempts, where the student had agreed to a class action waiver, to "seek[ ] dismissal, deferral or stay" of "any aspect of a class action," § 685.300(e)(2)(i), or, if the student had entered into a mandatory predispute arbitration agreement, to "seek[ ] dismissal, deferral or stay" of "any aspect of a judicial action filed by the student." § 685.300(f)(2)(i).[93] These prohibited actions could rest on an express delegation clause committing to the arbitrator the determination whether the claim was a borrower-defense type claim. We did not intend to allow that action, and in response to the commenters who stressed the significance of this issue, we are adding language making it clear that the court, not the arbitrator, is to decide the scope of any arbitration agreement or class action waiver. Of course, if the student has in fact agreed to arbitrate some or all claims in a post-dispute agreement, then the school has every right, pursuant to these terms of its Direct Loan agreement with the Department, to oppose litigation by relying on that arbitration agreement. However, the regulation is intended to protect the rights of students who agree, predispute, only to arbitration of other kinds of claims, to have their borrower defense claims heard by a court. To ensure that goal is achieved, we believe that any arbitration agreement with a Direct Loan borrower should place power to decide the scope of the agreement in the court, not the arbitrator.

*Changes:* We have modified §§ 685.300(e)(3) and 685.300(f)(3) to add to the required provisions and notices the statement that "we agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained."

*Comments:* A few commenters recommended alternatives to proposed § 685.300(f). One commenter recommended that the Department eliminate its ban and instead provide

suggested best practices to facilitate dispute resolution. Another commenter recommended that the Department develop rules to govern arbitration proceedings rather than banning them entirely. Some rules proposed by the commenter included: (1) A neutral arbitrator, (2) more than minimal discovery, (3) a written arbitration award, (4) all forms of relief available in court available in arbitration, and (5) prohibition on imposing unreasonable costs in arbitration. Another commenter suggested that the Department establish an annual threshold for the number of arbitration settlements for all institutions. Under this proposal, institutions would only be held accountable if their number of arbitration proceedings exceeded this threshold.

*Discussion:* The regulations do not ban arbitration entirely, as suggested by some of the commenters. Rather, the regulations ban predispute arbitration agreements for borrower defense-type claims. We discussed at some length in the last negotiated rulemaking session the proposal to regulate the conduct of arbitration, rather than banning compelled predispute arbitration agreements, but in issuing this final rule, we conclude that limiting agreements to arbitrate borrower defense claims to those entered into after a dispute has arisen will achieve the goal of an informed decision by the borrower. Therefore, we have no reason to set a limit on the number of such arbitrations a school may conduct. The regulations do, however, require information from the school about the substance and outcomes of arbitration.

*Changes:* None.

*Comments:* One commenter suggested that eliminating mandatory arbitration would be overly burdensome on our judicial system because many claims that otherwise would have gone to arbitration will wind up in court.

*Discussion:* The regulations allow students who agree to arbitration to use that method, rather than pursuing relief through a lawsuit, and we have no expertise or experience from which to estimate the effect of the regulation on judicial filings.

*Changes:* None.

*Comments:* One commenter contended that the Department's position is logically inconsistent, because the commenter viewed the Department as simultaneously asserting that courts do not provide adequate relief for students, while also asserting that access to the judicial system is essential for students to obtain relief.

*Discussion:* We do not believe, and did not state, that the judicial system

provides inadequate relief for students; to the contrary, we noted that recent history shows that access to the judicial system was denied by widespread use of mandatory predispute arbitration agreements and class action waivers. Far from implying that the judicial system did not or could not provide relief, we included in the new borrower defense Federal standard, for new loans, an alternative that rests entirely on a court judgment on a borrower defense claim based on State law.

*Changes:* None.

*Comments:* One commenter stated that permitting only post-dispute arbitration agreements would be entirely ineffective and cautioned the Department against allowing only post-dispute arbitration as an option to students. Another commenter urged the Department to implement additional safeguards to protect students under post-dispute arbitration agreements. This commenter was concerned that schools could potentially force students to sign post-dispute arbitration agreements with prohibitions limiting their ability to seek relief and urged the Department to take measures to prevent schools from engaging in this activity.

*Discussion:* Section 685.300(f) does not limit the ability of the school to enter into a post-dispute arbitration agreement, even one that would include arbitration of a borrower defense-type claim. A student with an actual claim has every reason to question the consequences of agreeing to arbitrate the claim, as opposed to filing suit, and at that point we expect such a decision to be an informed choice by the student.

*Changes:* None.

*Comments:* A commenter noted that some students would have difficulty joining in a class action for various reasons, and would lack the resources to pursue an individual suit, but that recently consumers have had success by participating in aggregate litigation. The commenter feared that the NPRM by barring class action waivers would not have barred the institution from attempting to force an individual student to pursue litigation alone and not as part of a combined suit.

*Discussion:* The regulation as proposed would bar an institution from relying on a mandatory predispute arbitration agreement by "dismissal, deferral, or stay of any aspect of a judicial action filed by the student." § 685.300(f)(2)(i). We consider that language to include the action described by the commenter, such as actions to challenge the student's joinder in a single suit under Fed. R. Civ. Proc. 20 or a similar rule by which individual litigants may consolidate their actions.

---

[93] Indeed, in at least two of the cases cited in the NPRM, an essential element of the ruling turned on whether the student had agreed to arbitration of issues about the arbitrability of the claims at issue. *Eakins* v. *Corinthian Colleges, Inc.,* No. E058330, 2015 WL 758286 (Cal. Ct. App. Feb. 23, 2015); *Kimble* v. *Rhodes College,* No. C–10–5786, 2011 WL 2175249 (N.D. Cal. June 2, 2011).

We clarify that in this final regulation. An institution remains free to seek relief on grounds other than that the individual is barred from joinder in an action by reason of the terms of the arbitration agreement.

*Changes:* Section 685.300(f)(2)(i) is revised to include opposing joinder in a single action.

### Internal Dispute Processes

*Comments:* One commenter expressed strong approval for § 685.300(d), which would ban schools from requiring students to use the school's internal complaint process before seeking remedies from accrediting agencies or government agencies. However, a few commenters strongly believed that students should exhaust internal grievance procedures before seeking relief externally. These commenters noted that internal grievance procedures offer students adequate opportunities to seek relief. A few of these commenters touted the transparency and collaboration between students and institutions that results from engaging in these proceedings.

*Discussion:* The regulations do not discourage the use and promotion of internal grievance procedures, and we encourage schools to adopt those procedures in order to remedy grievances before they become claims that lead to litigation or arbitration. The regulations also do not bar the institution from addressing the grievance as fully as it may wish immediately, whether or not the student chooses to raise the complaint to authorities. The institution may succeed in resolving the matter. However, if the student believes that the grievance is significant enough to warrant the attention of law enforcement officials or bodies empowered to evaluate academic matters, we believe that the benefit of bringing that complaint to their attention outweighs the benefits of attempting to compel the student to delay. The regulations do not impose any duty on an authority or accreditor to take any particular action, and they may choose to defer or delay consideration of the complaint until completion of the institutional process. However, the regulations would help those authorities better monitor institutional performance by making timely notice of complaints more likely.

*Changes:* None.

*Comments:* One commenter suggested that proposed § 685.300(d) conflicts with State law that requires that students exhaust internal dispute resolution procedures prior to seeking other relief.

*Discussion:* State law may require a consumer to make a written demand on a merchant before filing suit, and the regulations do not supersede such a law. Some State laws or case law may also require a student to exhaust a school's administrative appeal process before filing suit on a grievance.[94] Section 685.300(d) addresses not the filing of a lawsuit, but rather a very different matter: Seeking redress from the State agency with authority to address the complaint, or the accreditor for the school. If those authorities decline to intervene, the student is left in effect with the need to pursue any internal grievance process. The regulations in no way require those authorities to exercise their independent judgment. The regulations simply bar the school from attempting to block the student from seeking redress from those authorities. The regulations leave the school free to respond to a student's lawsuit by contending that applicable law precludes judicial review of the claim or requires the litigant to first exhaust available internal procedures.

*Changes:* None.

### Forbearance (Sections 685.205(b)(6) and 682.211)

*Comments:* Several commenters expressed support for the Department's proposal to grant an administrative forbearance to a Direct Loan borrower who applies for relief under the borrower defense provisions. Commenters were also supportive of the proposal to grant FFEL borrowers the same type of administrative forbearance that Direct Loan borrowers would receive.

Multiple comments supported the Department's proposed use of forbearance (along with information about how to decline forbearance and providing information about income-driven repayment plans). One commenter, however, recommended that the Department require borrowers to request forbearance instead of expecting borrowers to decline forbearance (opting-in rather than opting-out). Commenters also expressed the view that forbearance should apply to all loan types.

Another commenter suggested that the use of administrative forbearance or the suspension of collection activity would lead to frivolous claims intended to delay repayment.

A group of commenters recommended that forbearance for a borrower who files a borrower defense claim be granted in yearly increments, or for some other

explicit time frame designated by the Department, during which the Department will make a determination of eligibility for a borrower defense claim. These commenters noted that servicing systems generally require periods of forbearance to have explicit begin and end dates. The commenters believed that the proposed change would resolve the servicing requirement and permit the Department to designate an explicit time frame for servicers (such as one to three years) during which the Department would make a determination of eligibility for relief under a borrower defense claim.

Under the commenters' proposal, upon receiving the notification of the Department's determination of eligibility for relief under borrower defenses, FFEL Loan servicers would either end the forbearance and resume servicing or maintain the forbearance until the borrower's loans are consolidated into a Direct Consolidation loan. A group of commenters recommended that, if the Department plans to begin the process for prequalification or consolidation before the effective date of the final regulations, the Department consider permitting early implementation of the new mandatory administrative forbearance under § 682.211(i)(7). The commenters noted that without the new authority to grant mandatory administrative forbearance, discretionary forbearance can be used to suspend servicing and collection. However, these commenters pointed out that discretionary forbearance requires a borrower's request and agreement to the terms of the forbearance. A discretionary forbearance may also be subject to a borrower's cumulative maximum forbearance limit. If a borrower has reached his or her maximum forbearance limit, the loan holder would have no other remedy but to provide a borrower relief during the review period. The commenters believed that early implementation of § 682.211(i)(7) would be more efficient and provide a necessary benefit for borrowers that have reached their cumulative maximum forbearance limit while the Department makes a discharge eligibility determination.

One commenter noted that, under the proposed regulation, a borrower who files a defense to repayment claim will experience immediate relief due to forbearance or suspension of collection. However, any interest that is not paid during forbearance will be capitalized. This commenter suggested that a borrower should not be discouraged from mounting a defense to repayment that could involve extended

---

[94] See, e.g., *Susan M.* v. *New York Law Sch.,* 76 N.Y.2d 241, 556 NE.2d 1104 (1990).

investigation by having accrued interest capitalized if the claim is rejected. The commenter recommended that the Department set a limit on the interest that can be capitalized or limit the length of time for which accrued interest can be capitalized.

A group of commenters recommended a conforming change to § 682.410(b) to address defaulted loans held by a guaranty agency. In such cases, a guaranty agency is the holder of a loan for which the Department is making a determination of eligibility, not a lender. Under the conforming change, when the guarantor is the holder of a loan, the Department will notify the guarantor to suspend collection efforts, comparably to when a lender is notified by the Department under § 682.211(i)(7) of a borrower defense claim. Upon receiving notification of the Department's determination, a guarantor would either resume collection efforts or maintain the suspension until the borrower's loans are consolidated into a Direct Consolidation loan.

*Discussion:* We appreciate the commenters' support for granting forbearance and providing information about alternatives and believe it will aid all borrowers while the Department reviews their applications. Forbearance is available to Direct Loan borrowers and administered by the loan servicers.

The Department will allow lenders and loan holders to implement § 682.211(i)(7) early, so that they may grant the forbearance prior to July 1, 2017. Lenders and loan holders will be required to grant such forbearance as of July 1, 2017, the effective date of these regulations.

We disagree that forbearance should be an opt-in process, as we believe that the majority of borrowers will want to receive the forbearance, making an opt-out process both more advantageous to borrowers and more efficient.

We also disagree that providing forbearance and suspending collection activities will lead to substantial numbers of frivolous claims. Borrowers experiencing difficulty with their monthly loan obligations may avail themselves of income-driven repayment plans, loan deferment, and voluntary forbearance upon request. Additionally, because applicants for forbearance are required to sign a certification statement that the information contained on their application is true and that false statements are subject to penalties of perjury, we do not expect a sizeable increase in fraudulent claims.

We disagree with the recommendation that the Department set a limit on the amount of accrued interest that may be capitalized, or the

length of time that interest may be allowed to accrue, during the administrative forbearance. We have seen no evidence that capitalization of interest that accrues during a forbearance period while a discharge claim is being reviewed discourages borrowers from applying for loan discharges. Even in situations when the suspension of collection activity may be for an extended period of time—such as during bankruptcy proceedings— interest that accrues during the suspension of collection activity is capitalized. We see no justification for limiting capitalization of interest during the period in which a borrower defenses claim is being evaluated by the Department.

We agree with the commenters that it is preferable to have a set time period for mandatory forbearances granted during the period that the Department is reviewing a borrower defense claim. In addition to resolving the systems issues raised by the commenters, it would help borrowers to have precise begin and end dates for the forbearance. Granting these forbearances in yearly increments, with the option to end the forbearance earlier if the borrower does not qualify, would be consistent with most of the other mandatory forbearances in the FFEL Program, which are granted in yearly increments, or a lesser period equal to the actual period of time for which the borrower is eligible for the forbearance. In most cases, we do not believe that the full year for the forbearance will be required.

We also agree to make the conforming changes that would address defaulted loans held by a guaranty agency.

*Changes:* We have modified § 682.211(i)(7) to specify that the administrative forbearance is granted in yearly increments, until the loan is consolidated or the Department notifies the loan holder to discontinue the forbearance.

We have added a new § 682.410(b)(6)(viii), requiring a guaranty agency to suspend collection activities on a FFEL Loan held by the guaranty agency for borrowers seeking relief under § 682.212(k) upon notification by the Department.

**Closed School Discharges (Sections 674.33, 682.402 and 685.214)**

*General*

*Comments:* Several commenters supported the proposed closed school discharge regulations. These commenters appreciated the Department's proposal to provide more closed school discharge information to borrowers and to increase access to

closed school discharges. One commenter strongly supported the proposed changes to the closed school discharge regulations that would require greater outreach and provision of information to students at schools that close, and would automatically discharge the loans of students from closed schools who do not re-enroll within three years. This commenter believed that too many students at schools that close neither receive a closed school discharge nor complete their program at another school.

A group of commenters also felt that too few eligible borrowers apply for closed school discharges, primarily because these borrowers are unaware of their eligibility. These commenters believed that amending the regulations to provide additional closed school discharge information to borrowers, to make relief automatic and mandatory for borrowers who do not re-enroll within one year, and to provide for review of guaranty agency denials, would ensure that eligible students get relief.

One commenter supported strengthening regulations to hold institutions accountable and protect student borrowers from fraudulent and predatory conduct. This commenter applauded the Department's efforts on behalf of Latino students who are overrepresented in institutions that engage in this conduct, while suggesting that more must be done to ensure the success of these students.

A group of commenters recommended that the Department broaden the scope of the proposed regulation to apply to any planned school closures, rather than only school closures for which schools submit teach-out plans. These commenters noted that very few closing schools arrange for teach-outs at other schools, and that many of the recent school closures did not involve teach-outs. These commenters believed that the proposed regulations would fail to ensure that students at closing schools that do not submit teach-out plans receive accurate, complete, and unbiased information about their rights prior to the school closure.

One commenter recommended that the Department require institutions to facilitate culturally responsive outreach and counseling to students who opt-in to teach-out plans to ensure that they understand the benefits and consequences of their decision.

*Discussion:* We thank the commenters for their support. We agree that these are important provisions, and note that through our intended early implementation of the automatic closed school discharge provisions, students

affected by the recent closure of Corinthian will be able to benefit from a more streamlined, automatic process for relief sooner. However, we do not believe that it is necessary to broaden the scope of the regulations to apply to "any planned school closures" because the current regulations already cover all planned school closures. Current 34 CFR 668.14(a)(31) requires a school to submit a teach-out plan under several conditions, including a school intending to close a location that "provides at least 100 percent of at least one program" or if the school "otherwise intends to cease operations." 34 CFR 668.14(a)(31)(iv) and (v). Therefore, the provision of the teach-out plan triggers the provision of the closed school disclosures and application form.

Although we agree that schools should provide culturally responsive outreach and counseling to students who opt-in to teach-out plans, we believe that it would be difficult to establish standards for such outreach and counseling or to define "culturally responsive" through regulation. However, we expect institutions to be cognizant of the needs of their student population, and to provide appropriate outreach and counseling for their students. At a future date, the Department may consider providing resources, guidance, or technical assistance to institutions to facilitate a culturally responsive dissemination of information.

*Changes:* None.

*Availability of Disclosures*

*Comments:* Many commenters supported the Department's proposed regulations that increase disclosure requirements for schools that are closing. These commenters shared the Department's concern that many borrowers are unaware of their eligibility for a closed school discharge because of insufficient outreach and information. These commenters noted that, in some instances, closing schools inform borrowers of the option to complete their program through a teach-out, but either fail to advise them of the option for a closed school discharge, or advise them of the option in a way that discourages them from pursuing a discharge. According to these commenters, students often receive a closed school loan discharge application from the Department after deciding whether to enroll in teach-out programs. The commenters believe that students must receive clear, accurate, and complete information much earlier in the process when they are making major decisions. The commenters speculated that students who have enrolled in, but

have not completed, a teach-out program may not realize they are still eligible for a closed school discharge, and may feel committed to pursuing the teach-out even though it is not in their best interest to do so.

A group of commenters urged the Department to clarify that closed school discharges may be available to eligible students who have re-enrolled in another institution. These commenters argued that relief should not be limited to students who do not re-enroll in a title IV-eligible institution. Commenters stated that the HEA and current regulations provide that a borrower is eligible for closed school discharge if the borrower did not complete a program due to school closure and did not subsequently complete the program through a teach-out or credit transfer. Students who participate in a teach-out or who transfer credits but do not complete their program remain eligible for a closed school discharge, as do students who re-enroll in a different institution but do not transfer credits or transfer some credits to an entirely different program. According to these commenters, this clarification is particularly important because students attending closing institutions have reported frequent instances of having been misled by closing institutions and recruiters from proprietary schools.

In these commenters' view, the low application rate for closed school discharges is due to a lack of understandable and accessible information about closed school discharges.

A group of commenters noted that in some cases it may be unclear when loan discharge information should be provided because the 60-day forbearance or suspension of collection activity period may expire while the borrower is still within the six-month grace period before collection begins. Therefore collection activities will not be resumed by the guaranty agency or lender under § 682.402(d)(6)(ii)(H), or by the Department under § 685.214(f)(4). These commenters urged the Department to revise the regulations to clarify that the closed school discharge information must be provided either when collection first begins (when a borrower enters repayment after the grace period and will be more inclined to exercise their discharge rights) or when collection is resumed, whichever is applicable.

A group of commenters supported the Department's proposal to require closing schools to provide discharge information to students. When schools announce that they are closing, they currently have no obligation to inform

their students about their loan discharge rights and options. According to these commenters, students feel compelled to continue their educations in ways that may not be in their best interests because they lack sufficient information. For example, commenters contended that when a teach-out is offered, students often believe they are obligated to participate, even though they have a right to opt for a closed school discharge instead. Alternatively, although instruction may be seriously deteriorating, students may feel compelled to complete the program at the closing school, unaware that they have a right to withdraw within 120 days of the closure and receive a closed school discharge. These commenters also suggested that students may feel compelled to accept another school's offer to accept their credits, without understanding that by accepting the offer they may become ineligible for a closed school discharge.

Because of the issues discussed above, these commenters supported the Department's proposal to require schools to provide borrowers with a notice about closed school discharge rights when they submit a teach-out plan after the Department initiates an action to terminate title IV eligibility or other specified events.

A group of commenters recommended that we revise the regulations to require that whenever a school notifies the Department of its intent to close, it must provide a written notice to students about the expected date of closure and their closed school discharge rights, including their right to a discharge if they withdraw within 120 days prior to closure.

One commenter stated that the proposed regulations would require the dissemination of a closed school discharge application to students who are not and will not be eligible for discharge. The commenter recommended that the Department revise proposed § 668.14(b)(32) so that an institution would not be required to disseminate a closed school discharge application if the institution's teach-out plan provides that the school or location will close only after all students have graduated or withdrawn. According to this commenter, if a school that plans to close remains open until all students have graduated or withdrawn, few if any students would be eligible for a loan discharge.

The commenter believed that the proposed regulations create incentives to withdraw that are contrary to public policy favoring program completion. The commenter recommended that proposed § 668.14(b)(32) be revised to

**76034**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

provide that when an institution arranges a teach-out opportunity that would permit a student to complete his or her program, the institution would only be required to provide the discharge application and accompanying discharge application if the student declines the teach-out opportunity. The commenter suggested that the Department require that institutions inform students of their opportunity to discharge their loans before the school closes and before the student makes any decision as to whether to participate in the teach-out. The commenter believed that it is unrealistic to assume that students will not take advantage of the opportunity to discharge their loan debt, particularly when students can simply enroll in another institution and complete their program after receiving a discharge.

Another commenter disagreed with the inclusion of voluntary school closures in § 668.14(b)(31)(iv) where the institution intends to close a location that provides 100 percent of at least one program. The commenter stated that when a school decides that a particular location is no longer desirable or viable, and makes plans to responsibly teach-out the enrolled students itself, the school should not be treated like a school which has lost State approval, accreditation, or Federal eligibility. The commenter believed that the proposed regulation would discourage schools from acting responsibly and undertaking the considerable expense to voluntarily teach-out a location because after receiving a discharge application, students would be more likely to withdraw and seek a discharge rather than finishing their education. This commenter recommended limiting the requirement that closing schools provide a discharge application and a written disclosure to situations described in § 668.14(b)(31)(ii) and (iii), where there is some likelihood that the school's behavior may have disadvantaged students.

Some commenters urged the Department to locate the provision requiring closing schools to provide a discharge application and written disclosures in § 668.26, rather than § 668.14, the section of the regulations pertaining to the PPA. These commenters asserted that placing this provision in the PPA could lead to potential False Claims Act liability centered around disputes of fact that cannot be resolved absent undergoing discovery in a court proceeding. According to these commenters, schools would face the risk of costly litigation to address issues of fact regarding whether students received proper

notice, even where schools have documented the proper provision of notice.

One commenter recommended a technical change for non-defaulted loans, by moving the proposed requirement to provide a second application from guarantor responsibilities in § 682.402(d)(6)(ii)(J) to lender responsibilities in § 682.402(d)(7)(ii).

*Discussion:* We appreciate the support of the commenters who agreed with our proposed changes to the disclosure requirements. The commenters are correct that a borrower may receive a closed school discharge even if the borrower re-enrolls at another institution of higher education. Under current § 685.214(c)(1)(C), an otherwise eligible borrower who re-enrolled at another institution may qualify for a closed school discharge if the borrower did not complete the program of study at another school, or by transferring credits earned at the closed school at another school.

With regard to the recommendation that the Department revise the regulations to specify that closed school discharge information be provided either when collection first begins, or when collection resumes, whichever is applicable, we do not believe that a lender in the FFEL program would find the use of the term "resume" confusing. We note that current regulations in § 682.402(d)(7)(i) use the term "resume." We are not aware of any cases in which a FFEL lender failed to meet the requirements in the current regulations to "resume" collections activities because the lender had not yet begun collection activities.

We disagree with the recommendation that a school that plans to keep a closing location open until all of the students have either graduated or withdrawn should be exempted from the requirement to provide its students with the closed school disclosures or the application. Because all students at such a school or location are entitled to the option of a closed school discharge, we believe that all such borrowers should receive this information, so that they have full knowledge of their options. While many of the students at such a school location may plan to take advantage of the teach-out, not all necessarily will.

We disagree with the recommendation that the closed school discharge form only be provided to borrowers who decline the teach-out. As other commenters pointed out, students may accept a teach-out not realizing that they have other options. The disclosure information and the information on the

discharge application form will apprise borrowers of their options, and help the borrower to make an informed decision based on full knowledge of the borrower's options.

We disagree with the comment suggesting that the proposed regulations create an incentive to withdraw that is contrary to public policy. Although public policy generally favors higher rates of program completion, it is not always in the individual borrower's best interest to continue a program through graduation. In a closed school situation, the value of the degree the borrower obtains may be degraded, depending on the reasons for the school closure. Borrowers at closing schools may incur unmanageable amounts of debt in exchange for relatively low-value degrees. We do not believe that it is good public policy to require these borrowers to repay that debt if they cannot or choose not to complete the program and are eligible for a closed school discharge.

Similarly, we disagree with the recommendation that voluntary school closures be exempted from the requirements. As noted earlier, the teach-out requirements in 34 CFR 668.14(a)(31) apply whether the school is forced to close or voluntarily closes. We see no basis for exempting schools that voluntarily close from the closed school discharge requirements promulgated in these final regulations.

With regard to schools being discouraged from acting responsibly and voluntarily providing teach-outs, as noted above, closing schools are *required* to provide teach-outs. A school that declines to provide teach-outs as a result of these final regulations would be in violation of the requirements specified in the school's PPA.

We do not agree with the recommendation that a school be required to provide disclosures whenever a school notifies the Department of its intent to close. The regulations as proposed require a school to provide disclosures as result of any of the events in section 668.14(b)(31)(ii)–(v), which includes "an institution otherwise intends to cease operations." We disagree with the recommendation that the provision in § 668.14 be moved to § 668.26. We believe the provision is more appropriately included in § 668.14, which enumerates the requirements of a school's PPA. We do not agree that schools are at greater risk of costly litigation if the provision is located in § 668.14 than they would be if the provision were located in § 668.26. To the extent that a closed school would face potential liability under the False

Claims Act for claims for Federal funds made after the school failed to comply with this requirement, we see little difference in the risk based on where the regulatory requirement is located in the Code of Federal Regulations.

We agree with the recommended technical change that, for non-defaulted FFEL Program loans, the regulations should include the requirement to provide a borrower a second closed school application under lender responsibilities in § 682.402(d)(7).

*Changes:* We have revised § 682.402(d)(7)(ii) to require a lender to provide a borrower another closed school discharge application upon resuming collection.

*Content of Disclosures*

*Comments:* Under the proposed regulations, institutions are responsible for providing written disclosures to students to inform them of the benefits and consequences of a closed school discharge. A group of commenters made recommendations for the content of the written materials that schools would be required to provide to students under proposed § 668.14(b)(32). Specifically, these commenters suggested that the written disclosure describing the benefits and consequences of a closed school discharge as an alternative to program completion through a teach-out should encourage program completion, because earning a degree can lead to employment. These commenters encouraged the Department to work with the postsecondary education community to draft discharge applications and disclosures that encourage program completion.

This group of commenters also recommended modifications to the closed school discharge regulations, to proscribe the content of the disclosures. These commenters believed that if the Department provided or approved the written disclosures, it would help ensure that borrowers are able to make better-informed choices over how they proceed with their higher education.

These commenters believed that the Department should not rely on failing schools to ensure that students receive this information prior to closure. According to these commenters, because these schools can be liable for the closed school discharges, closing schools often provide inaccurate closed school discharge information or provide information in a format that students are unlikely to read or notice.

To prevent misleading disclosures, which would defeat the purpose of the proposed regulation, these commenters recommend that the Department amend proposed § 668.14(b)(32) to require that the written disclosure the school gives to its students be in a form provided or approved by the Secretary.

This group of commenters recommended that the closed school disclosures also include the expected closure date. These commenters asserted that when schools announce that they are closing, but plan on teaching out all the existing programs themselves, they currently have no obligation to inform their students about the expected date of closure. These commenters suggest that, as a result, students who experience a deterioration in the level of instruction are hesitant to withdraw and in many cases do not know they have the right to withdraw. These commenters contend that even students who are aware of their right to withdraw do not know when they can withdraw while remaining eligible for a closed school discharge.

To provide borrowers with more choice over how they proceed with their higher education, these commenters recommended that, upon notifying the Department of its intent to close and teach-out all existing students, the regulations require a school to provide a written notice to students about the expected date of closure and their right to a discharge if they withdraw within 120 days prior to closure.

One commenter contended that schools required to post letters of credit before closing have a strong financial incentive to minimize the number of students who choose to take a closed school discharge, regardless of what is in each student's best interest. In addition, this commenter suggested that unscrupulous schools often aggressively recruit students from closed schools. This commenter recommended that, to ensure students at closing schools receive clear, accurate, and complete information about their options, the Department should require schools to use standard language and/or a standard fact sheet approved by the Department in their disclosures.

This group of commenters recommended that the disclosures clearly explain the student's closed school discharge rights. The commenters asserted that closing schools often obfuscate a borrower's discharge rights and options. In the commenters' view, the Department's proposal would only encourage continued obfuscation. Under the proposed regulations, a school must provide a disclosure that describes the benefits and consequences of a closed school discharge as an alternative to a teach-out agreement. The commenters believe that a school could comply with this proposed requirement by providing a long, complicated disclosure about benefits and consequences, while burying a borrower's right to obtain a closed school discharge instead of participating in a teach-out. To prevent obfuscation and confusion the commenters recommended that the Department revise proposed § 668.14(b)(32) to require a clear and conspicuous written disclosure informing students of their right to seek a closed school discharge as an alternative to a teach-out.

*Discussion:* We do not have plans to develop written closed school discharge disclosure materials for schools to use, although we may develop such materials in the future if warranted. In addition, we may provide technical assistance to schools required to develop school discharge disclosure materials. We note that the Department already provides information on closed school discharges on our *studentaid.gov* Web site.

The current closed school discharge form provided to borrowers, *Loan Discharge Application: School Closure,* is a Department form. The Department has developed this form in consultation with the student financial aid community. The form is due to expire on August 31, 2017. In the coming months, we will revise the form to reflect the changes in the closed school discharge regulations. The revised version of the form will go through two public comment periods before it is implemented.

We disagree with the recommendation that we require schools to provide students with the expected date of a school closure. The expected date of closure may not be the actual closure date, and the school may actually close earlier or later than that date. Providing a date that may or not be accurate could be confusing to borrowers. It may also discourage borrowers from continuing in their education programs when, in some cases, it may be beneficial for them to complete their programs at that institution.

*Changes:* None.

*Procedures for Providing Disclosures*

*Comments:* A group of commenters expressed support for the Department's closed school discharge proposal, but strongly recommended several modifications to further the Department's goal of increasing the numbers of eligible students who receive closed school discharges. Under current § 685.214(f)(2), after the Department confirms the date of a school closure, the Department mails a closed school discharge application to

borrowers affected by the closure. The Department suspends collection efforts on applicable loans for 60 days. If the borrower does not submit the closed school discharge application within that timeframe, the Department resumes collection on the loan, and grants forbearance for the 60-day period as provided for under § 685.214(f)(4). These commenters noted that, currently, after a school closes, the Department or guaranty agency is required to provide discharge applications to borrowers who appear to have been enrolled at the time of the school's closure or to have withdrawn not more the 120 days prior to closure. The Department or guaranty agency often sends this information one to six months after the school has closed. Then, the Department or guaranty agency must refrain from collecting on the loans obtained to attend the closed school for 60 days. If the borrower does not apply for a closed school discharge during that time, the Department or guaranty agency is required to resume collection on their loans if the loans are not still within the six-month grace period that begins when a borrower ceases to be enrolled at an eligible school on at least a half-time basis, as provided for under §§ 685.207(b)(2)(i) and 685.207(c)(2)(i).

Some commenters believed that many borrowers do not respond to the notice regarding closed school discharge because it is typically provided within the six-month grace period. At that time the borrower is focused on his or her school closure rather than debt burden. These commenters contend that providing another closed school discharge application when the loan is actually being collected, and the borrower faces the burden of loan payments, is likely to increase the borrower response rate.

Another group of commenters proposed that after one year, the Department or guaranty agency should provide a closed school discharge application and information to borrowers who have re-enrolled in a title IV institution, noting that borrowers who have re-enrolled may still qualify for a closed school discharge.

These commenters also recommended requiring that closed school discharge information be provided with the borrower's monthly payment statement upon beginning or resuming collection, or the appropriate entity if the borrower is in default. These commenters contended that many closed school borrowers receive fraudulent solicitations containing inaccurate information. These commenters asserted that many borrowers are confused about

which notifications are legitimate and which are not, and are most likely to trust and pay attention to the monthly payment statement from their loan servicer.

This group of commenters recommended that the Department take measures to ensure that disclosures are provided on a timely basis. In the commenters' view, the Department's proposal does not address a situation in which the school fails to provide the required information. The commenters noted that most schools close due to financial problems, and that by the time they submit teach-out plans (if they do submit such plans), most schools have lost significant personnel and their operations are in disarray. As a result, commenters suggested that some schools are likely to fail to provide the required notices. The commenters recommended that the Department clarify that, if a school fails to provide the notice required under proposed § 668.14(b)(32) within five days after submission of a teach-out plan, the Secretary would be required to provide timely disclosures before any student may take steps toward participation in a teach-out plan that may impact his or her discharge eligibility.

Similarly to teach-outs, a group of commenters recommended that whenever a school notifies the Department of its intent to close, the Department provide a written notice to students about the expected date of closure and their closed school discharge rights, including their right to a discharge if they withdraw within 120 days prior to closure, if the school fails to do so within five days of informing the Department of closure.

*Discussion:* Although we agree that providing the disclosures with the monthly payment statement would be an effective way of providing the disclosures to students, there are a variety of methods in which a loan holder can provide such disclosures to borrowers, and we do not believe that the Department should specify which method to use through regulation. However, nothing in the regulations prevents a loan holder from providing the closed school discharge disclosures in this manner.

We have concerns with the recommendation that a second closed school discharge application be provided to the borrower when payment resumes, either after the six-month grace period has elapsed or after the end of the 60-day forbearance period. We also have concerns about the recommendation that a second closed school discharge application be provided after one year if the borrower

has re-enrolled. Borrowers are often overwhelmed with information that is provided to them related to their student loans, either by the Department or other sources. Providing multiple copies of the discharge form to borrowers at different points in time would likely add to the information overload that student loan borrowers currently experience. We also point out that the Department's current closed school discharge form is easily available on the Department's *studentaid.gov* Web site.

We disagree with the recommendation that the Department provide the required disclosures if the school does not provide them within five days of submission of the teach-out plan. We do not believe that the commenters' suggestion is feasible or practical. The Department expects regulated parties to comply with regulatory requirements, and typically reviews for such compliance in program reviews or audits. It would be difficult for the Department to determine whether the school has provided the disclosures within five days of submission of the teach-out plan without such a review or audit.

*Changes:* None.

*Discharge Without An Application*

*Comments:* The Department proposed revisions to § 674.33(g)(3), § 682.402(d)(8), and § 685.214(c)(2) that would permit the Department to discharge loans of borrowers who do not re-enroll in a title IV-eligible institution within three years of their school's closure. Several commenters supported the Department's proposal to grant a closed school discharge without a borrower application, based on information in its possession indicating that the borrower did not subsequently re-enroll in any title IV-eligible institution within three years after the date the school closed.

One commenter applauded this proposal, noting that 47 percent of all Direct Loan borrowers at schools that closed from 2008–2011 did not receive a closed school discharge or title IV, HEA aid to enroll elsewhere in the three years following the school's closure. The commenter asserted that students were left with debt but no degree, putting them at great risk of default. The commenter asserted that research has consistently shown that students who do not complete their programs are among the most likely to default on their loans, leaving them worse off than when they enrolled. The commenter recommended that the final preamble clearly state that after three years, an eligible borrower's loans shall be

discharged without an application and any amounts paid shall be refunded. This commenter believed that the preamble to the NPRM suggested discharge of loans without an application for students who have not re-enrolled within three years is optional, not required.

One of the commenters supportive of the proposal noted that the proposed regulations would not discharge the loans of students who enroll in a teach-out program but do not complete it and are not still enrolled within three years of a school's closure. The commenter noted that these borrowers may be unaware of their eligibility for a closed school discharge. The commenter recommended that the Department use available data on program completion among students receiving title IV, HEA aid to automatically discharge the loans of students who did not complete and are not enrolled in a comparable program within three years of their school closing.

A commenter recommended that the final regulation provide for automatic discharges of the loans, to the extent that data are available to identify them, for borrowers who:

• Transfer credits from a closed school and enroll in, but do not complete, a comparable program, and

• Transfer credits to enroll in a completely different program.

Several commenters did not support the automatic discharge provision of the proposed rule. One group of commenters contended that under the proposed regulations, the Department would discharge the loan absent any evidence that the failure of the student to re-enroll in another school was a result of the closed school or that the student did not receive any value for the education received from the closed school. This group of commenters believed the proposed rule would not serve the public interest, as it would minimize borrowers' incentives to continue educational pursuits. These commenters recommended that the automatic discharge provision be deleted from the final rule. These commenters further recommended that if the automatic discharge provision is not removed, that schools should not be held liable for loans that have been automatically discharged due to a student's failure to re-enroll in another school.

Another commenter believed that it would not be appropriate for the Department to grant a closed school discharge without a borrower application. In this commenter's view, a loan servicer may easily provide a borrower with the information

necessary to apply for a closed school discharge. This commenter noted that in many instances a student may have completed his or her education under a teach-out agreement without necessarily receiving any additional title IV, HEA aid, and NSLDS may not indicate that the student enrolled in another institution.

A group of commenters that supported the Department's proposal to allow loan holders to grant closed school discharges without applications to borrowers who do not re-enroll in a new institution within three years of their schools' closures noted that, although the disclosures discussed earlier in this section will increase the number of closed school discharge applications submitted by eligible borrowers, many borrowers will still not likely respond to the disclosures. These commenters noted that borrowers in closed school situations, even students who receive information about their rights from State agencies and the Department, are often confused by contradictory information from their schools, as well as aggressive solicitations from other proprietary schools and fraudulent student loan debt relief companies.

The commenters also urged the Department to make additional revisions in the final regulations. They recommended that the Department make automatic discharges mandatory for borrowers who have not re-enrolled in a title IV-eligible institution within three years of their schools' closures. These commenters believed that discharges under the proposed rule would be entirely discretionary, noting that under the proposed rule, loan holders "may" grant discharges in certain circumstances. The commenters expressed concern that, given that the Department and guaranty agencies have conflicting duties and motivations to collect on loans, the discretionary language could make this regulation meaningless. These commenters also noted that the proposed regulations lack a mechanism for allowing an organization, borrower, or attorney general to demand that the Department or guaranty agency implement the automatic discharge provision. These commenters recommended that the Department make automatic discharge mandatory, noting that the Department proposed to make this provision mandatory during the negotiated rulemaking sessions.

This group of commenters also recommended shortening the re-enrollment period from three years to one year. These commenters stated that the vast majority of closed school

borrowers who are able to transfer their credits do so within several weeks to several months after a school closes. They noted that other schools often market their programs to affected students immediately following a school closure. They also claimed that that other schools, including community colleges, often reach out to students within the first few weeks after a school closure, and that students actively search for a new school to accept their closed school credits.

Commenters contended that because very few students transfer their closed school credits after one year, all closed school borrowers who do not re-enroll in a title IV institution within one year should be granted a closed school discharge without any application. These commenters believed that it would be unfair to require these borrowers to wait three years for a closed school discharge, during which time they will make payments and may face burdensome involuntary debt collection tactics if they default.

This group of commenters anticipated that the vast majority of eligible borrowers would likely want a closed school discharge. However, these commenters asserted that some borrowers may not want a discharge. These commenters propose addressing this potential issue through an opt-out procedure, in which students receive notice of the consequences of the discharge and are afforded the opportunity to opt-out of a discharge within 60 days of receiving the notice.

One commenter raised concerns that the proposal to discharge loans without an application from a borrower would deny institutions due process. This commenter proposed revising the regulations to clarify whether there is a presumption that the borrower did not re-enroll absent evidence to the contrary, or whether the Department must have in its possession evidence that the borrower did not re-enroll in another institution. The commenter also recommended that the regulation be revised to afford the closed school with notice and the opportunity to contest the student's eligibility for a loan discharge (*e.g.*, whether the borrower was enrolled within 120 days of the closure or whether the borrower was enrolled at another institution or participated in a teach-out).

In the commenter's view, the procedures the Department follows to discharge a student loan and make a determination regarding amounts owed by an institution constitute informal agency adjudication, and even in the context of informal adjudication, an agency must provide fundamental due

process. The commenter contended that due process requires that a participant in an agency adjudication must receive adequate notice and "the opportunity to be heard at a meaningful time and in a meaningful manner." Though the Department has flexibility in the way it provides such due process, the Department may not deny closed institutions the opportunity to communicate with the Department prior to a discharge and recovery action. The commenter also expressed the view that, as a matter of public policy, it would benefit the Department to involve closed schools before discharging any loans in order to ensure that discharges are only granted to eligible borrowers.

Another group of commenters recommended eliminating the automatic discharge provision. These commenters expressed concern with the concept of an automatic closed school discharge, especially if the Department intends to rely on the school's NSLDS enrollment reporting process for information about student re-enrollment. In the school enrollment reporting process for NSLDS, schools are only required to include title IV recipients. Therefore, NSLDS may not identify students who re-enrolled but did not receive title IV, HEA aid. As a result, commenters suggested that borrowers who received credit from attending the closed school for the same or similar program of study could be improperly identified as eligible to receive a discharge.

Under proposed § 682.402(d)(6)(ii)(K)(*3*), if the Department determines that the borrower meets the requirements for a closed school discharge, the guaranty agency, within 30 days of being informed that the borrower qualifies, will take the actions described under § 682.402(d)(6) and (7). Section 682.402(d)(6) and (7) specifies the responsibilities of a guaranty agency. A group of commenters expressed the view that the cross-reference to § 682.402(d)(6) is too broad. Theses commenters believed that § 682.402(d)(6)(ii)(E) and § 682.402(d)(6)(H)(1) more specifically describe the required action by the guarantor and should replace § 682.402(d)(6) in the cross-reference. These commenters also stated that if the Department determines that the borrower is eligible for a discharge, the guaranty agency will pay the claim and the lender actions in § 682.402(d)(7)(iv) do not change.

These commenters also recommended changes to the regulations to provide that the guarantor pay the claim if the Department determines a borrower is eligible for a discharge. This change

would not impact lender actions in § 682.402(d)(7)(iv).

These commenters also recommended that, if the Department continues using NSLDS and providing an automatic discharge after three years, the Department should be responsible for monitoring identified borrowers during this period, and notifying the applicable guarantor when a closed school discharge must be processed.

*Discussion:* We agree with the commenters who recommended that the Department clarify the final regulations to provide that closed school discharges for Perkins, FFEL and Direct Loan borrowers who have not re-enrolled in a title IV-eligible institution within three years of their schools' closures are not discretionary. We have revised §§ 674.33(g)(3), 682.402(d)(8), and 685.214(c)(2) to clearly delineate the circumstances under which a closed school discharge is discretionary as opposed to required.

We recognize that some borrowers will qualify for closed school discharges, but will not receive an automatic closed school discharge because they re-enrolled in a title IV school within the three-year timeframe. If the borrower is not participating in a teach-out, or transferring credits from the closed school to a comparable program at the new school, the borrower would still be eligible for a closed school discharge. We do not agree, however, that the Department should automatically grant closed school discharges in these situations. A borrower in this type of situation still has access to a closed school discharge; however, the borrower must apply directly for the discharge. The provisions for discharges without an application are intended to provide closed school discharges to borrowers that the Department can readily determine qualify for the discharge, based on information in our possession. A borrower who re-enrolled within the three-year time period may or may not qualify for a closed school discharge, depending on whether the borrower transferred credits from the closed school to a comparable program. A borrower who re-enrolled, but still qualifies for a closed school discharge, would have to provide more detailed information to the Department through the closed school application process to allow for a determination of the borrower's eligibility for a closed school discharge. However, the Department has continued to increase and improve the quality of data reporting by institutions, including beginning the collection of program-level data for borrowers through recently implemented Gainful

Employment regulations and through recent Subsidized Stafford Loan reporting requirements. While current data limitations make it challenging to definitively identify a borrower who has enrolled in a comparable program or who has successfully transferred credits, in future years, the Department may be able to identify those eligible borrowers who did re-enroll, but *not* in a comparable program. In that case, the Department may revisit its ability to provide closed school discharges automatically to those borrowers, using the discretion available to the Secretary and mirroring the three-year provision set forth in these regulations. This will help to ensure that as many eligible borrowers as possible receive the discharges for which they qualify.

We disagree with the commenters who recommended eliminating automatic closed school discharges from the final regulations. We note that the current regulations already provide for a closed school discharge without an application, and believe that this is an important benefit to borrowers. We also believe that the final regulations provide sufficient safeguards to prevent abuse, such as the three-year period before an automatic closed school discharge is granted. Therefore, we also decline to accept the recommendation that we reduce the three-year time period to one year.

With regard to the three-year time period, we note that the discharge of a loan is a significant benefit to a borrower, with potentially significant fiscal impacts. Absent a closed school discharge application from a borrower, we do not believe that a one-year period of non-enrollment would be sufficient to discharge a borrower's debt.

We see no basis for exempting schools from liability for closed school discharges when the discharge is granted without an application.

We do not believe an opt-out notice for the automatic discharge without an application is necessary. It is unlikely that a sufficient number of borrowers will choose not to have their loans discharged to justify the administrative burden involved in sending the borrower an opt-out notice. We are also concerned that an opt-out notice could be confusing, and result in "false positives"—borrowers inadvertently choosing to opt out of the discharge.

We acknowledge that the automatic discharge process could result in discharges being granted to some borrowers who were able to complete their programs but we believe this would be a negligible number of borrowers. Even a borrower who does not receive title IV, HEA aid to attend

another school, may still receive an in-school deferment. Both receipt of additional title IV, HEA aid and receiving an in-school deferment would be reported to NSLDS. Unless the borrower is attending in a less-than-half-time status, the Department will be able to determine whether a borrower has re-enrolled at another title IV eligible institution during the three-year period. We believe that the likely minimal potential cost of granting discharges to a very small number of borrowers who do not qualify is counterbalanced by the benefit of granting closed school discharges to large numbers of borrowers who qualify for them, but do not receive them under our current procedures.

The comment regarding the Department monitoring borrowers during the three-year period relates to operationalization of the final regulations. The Department will develop procedures for determining whether borrowers qualify for a closed school discharge without an application, and the appropriate method of notifying guaranty agencies if the Department makes such a determination. We note, however, that the final regulations in § 682.402(d)(8)(iii) give guaranty agencies the authority to grant closed school discharges without an application based on information in the guaranty agency's possession.

We disagree with commenters who stated that closed school discharge procedures may deny schools of due process. The closed school discharge procedures do not currently involve the school in the determination process. The Department currently pursues recovery of the amounts lost through closed school and other discharges under section 437(c) of the HEA through the ordinary audit and program review process. Thus, in the final audit determination or the final program review determination issued upon closure of a school or one of its locations, the Department asserts a claim for recovery of the amounts discharged. The school may challenge that claim in an appeal under Subpart L of Part 668, as it can with any other audit or program review liability.[95]

*Changes:* We have revised §§ 674.33(g)(3), 682.402(d)(8), and 685.214(c)(2) to clearly delineate the circumstances under which a closed

school discharge is discretionary, as opposed to required.

*Comments:* None.

*Discussion:* Upon further review, the Department determined that the proposed regulations related to automatic closed school discharges needed to specify the period of time for which borrowers from closed schools would be evaluated to determine whether they would qualify for automatic discharges. The Department concluded that it would be administratively feasible to conduct such an evaluation for borrowers at schools that closed on or after November 1, 2013.

*Changes:* We have revised §§ 674.33(g)(3)(ii), 682.402(d)(8)(ii), and 685.214(c)(2)(ii) to specify that they apply with respect to schools that closed on or after November 1, 2013.

*Review of Guaranty Agency Denials*

*Comments:* Some commenters expressed strong support for the proposed regulation that would allow borrowers the right to appeal to the Department when guaranty agencies deny closed school discharges. One commenter noted that the right to appeal is paramount to due process. This commenter stated that the right to appeal provides qualified borrowers with a safety net for obtaining debt relief and also provides a framework for accountability in guaranty agency decisions.

These commenters noted that the guarantor in this case would need to notify the lender to resubmit the closed school claim for reimbursement.

A group of commenters recommended that the Department retain current language requiring the guaranty agency to state the reasons for its denial. The group of commenters supported the Department's proposal to provide for the review of guaranty agency denials of closed school discharge applications for FFEL Loans. These commenters averred that FFEL borrowers, whose loans are held by guaranty agencies, should have the same right to challenge an erroneous unpaid refund or closed school discharge denial as Direct Loan and FFEL Loan borrowers whose loans are held by the Department. The commenters noted that current FFEL Loan regulations do not provide borrowers with any right to seek review of guaranty agency denials of closed school discharges. The commenters also noted that, even when FFEL borrowers are entitled to administrative review, their right to seek further review in court is not clear, unlike Direct Loan borrowers. Commenters noted that the APA does not provide for judicial

review of decisions by private, non-governmental entities such as guaranty agencies, nor is there any explicit right to judicial review of guaranty agency decisions in the HEA.

As a result, commenters said that FFEL borrowers whose loans are held by guaranty agencies have no clear way to challenge an erroneous closed school discharge decision from a guaranty agency. Only Direct Loan and FFEL Loan borrowers whose loans are held by the Department may seek judicial review of administrative unpaid refund or closed school discharge denials. These commenters believe that the Department's proposed rule would address what the commenters consider an arbitrary denial of borrower due process.

This group of commenters recommended one modification to the proposed regulations. Under current § 682.402(d)(6)(ii)(F), if a guaranty agency denies a closed school discharge application, it must notify the borrower in writing of its determination and the reasons for the determination. Under the proposed regulation, a guaranty agency would still be required to notify the borrower of its determination, but would not be required to notify the borrower of its reasons for the determination. These commenters believed that removing this requirement would frustrate the purpose of the review process and urged the Department not to remove the notification requirement.

Multiple groups of commenters noted that the proposed regulations do not provide a time frame during which a borrower can request an appeal of a denied closed school discharge by the guarantor. These commenters recommended a 30-day timeframe, which would align with the timeframe allowed for an appeal of a false certification discharge denial. These commenters also proposed language that would allow a borrower to submit a request after the 30-day period.

One group of commenters proposed that the guarantor would still submit the appeal to the Department; however, collection of the loan would continue during the Department's review.

Another group of commenters also recommended additional language to address situations in which a borrower submits a request after the 30-day period. The commenters suggested that in this case, the guarantor would still submit the appeal to the Secretary; however, unlike with a timely request, collection of the loan (nondefaulted or defaulted) would continue during the Secretary's review.

---

[95] See, *e.g., In the Matter of Coll. of Visual Arts, Respondent,* Docket No.: 15–05–SP, 2015 WL 6396241, at *1 (July 20, 2015); *In the Matter of Pennsylvania Sch. of Bus., Respondent,* Docket No. 15–04–SA, 2015 WL 10459890, at *1 (Oct. 27, 2015).

**76040** **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

This group of commenters stated that the proposed regulations are not clear on the availability of an appeal option for non-defaulted borrowers. These commenters recommended adding language to clarify that non-defaulted borrowers should be afforded the same opportunity to appeal. Under the proposed regulations, a guarantor would be responsible for notifying a defaulted borrower of the option for review by the Secretary. For consistency, the commenters believed it would be reasonable for the guarantor to utilize this same process for non-defaulted borrowers.

These commenters also believed that it would be less confusing for a borrower for the guarantor to retain the loan until 30 days after the agency's notification to the borrower of the right to appeal. Commenters proposed that if the borrower appeals within 30 days, the loan should remain with the guarantor until the Secretary renders a final determination on the borrower's appeal. These commenters recommended that the guarantor should be responsible for notifying defaulted and non-defaulted borrowers of the option for review by the Secretary.

Under proposed § 682.402(d)(6)(ii)(K)(*3*), if the Department determines that the borrower meets the requirements for a closed school discharge, the guaranty agency, within 30 days of being informed that the borrower qualifies, will take the actions described under § 682.402(d)(6) and § 682.402(d)(7). Section 682.402(d)(6) specifies the responsibilities of a guaranty agency and 682.402(d)(7) specifies the responsibilities of a lender.

A group of commenters expressed the view that the cross-reference to § 682.402(d)(6) is too broad. These commenters believed that § 682.402(d)(6)(ii)(E) and 682.402(d)(6)(ii)(H)(1) more specifically describe the required action by the guarantor and should replace § 682.402(d)(6) in the cross-reference. These commenters also recommended that we clarify under § 682.402(d)(6)(ii)(K)(*3*) if the Department determines that the borrower is eligible for a discharge, the guaranty agency will pay the claim and the lender will be required to take the actions specified in § 682.402(d)(7)(iv).

*Discussion:* We do not believe that a 30-day timeframe for appealing a denial of a closed school discharge claim by a guaranty agency is sufficient. We have retained the language in the NPRM, which did not provide a timeframe for such an appeal.

We agree with the commenters who recommended that proposed § 682.402(d)(6)(ii)(F) be revised to specify that, when a guaranty agency notifies a borrower of the denial of a closed school discharge claim and of the opportunity to appeal the denial to the Department, that the notification from the guaranty agency should state the reasons for the denial. Since the proposed revision to the regulation is intended to provide borrowers an opportunity to appeal a negative decision, a borrower should have the opportunity to address the issues that led to the denial during the appeal process.

We agree with the commenters that the regulations should provide for an appeal process for non-defaulted FFEL borrowers (whose loans are held by lenders) as well as for defaulted FFEL borrowers (whose loans are held by guaranty agencies). Although the NPRM only addressed an appeal process for FFEL Program loans held by a guaranty agency, our intent was to provide an appeal process for FFEL Program loans held by either a lender or a guaranty agency.

We agree that the cross-references to § 682.402(d)(6)(ii)(K)(*3*) should be written more narrowly, and have made additional technical corrections to the FFEL regulations, based on the recommendations relating to the process for granting discharges in the FFEL Program. These technical corrections are identified in the "Changes" section, below.

*Changes:* We have revised § 682.402(d)(6)(ii)(F) to stipulate that a guaranty agency that denies a borrower's closed school discharge request must notify the borrower of the reasons for the denial.

We have revised the cross-references in § 682.402(d)(6)(ii)(K)(*3*), to more specifically describe the guarantor's action. We have also changed the cross-reference from (d)(7) to (d)(7)(iv), clarifying that after the guaranty agency pays the claim the lender actions in (d)(7)(iv) do not change.

We have made a technical correction to § 682.402(d)(6)(ii)(H), deleting the reference to a guaranty agency exercising a forbearance during the suspension of collection activity.

We have revised § 682.402(d)(7)(iii) to clarify that a borrower whose FFEL Loan is held by a lender, has the same appeal rights as a borrower whose loan is held by a guaranty agency if the guaranty agency denies the closed school discharge request.

*Miscellaneous Recommendations*

*Comments:* One commenter supported the proposed changes to the closed school discharge regulations, but believed that the proposal did not go far enough to provide displaced students with comprehensive assistance and an explanation of their right to debt relief. This commenter urged the Department to ensure that a clearly identifiable, knowledgeable, and accessible representative is made available on campus immediately after announcement of an impending closure, to provide in-person, meaningful assistance to displaced students.

In addition, this commenter recommended that the Department offer ongoing assistance through the creation of a student loan discharge hotline and/ or on-line computer chat, and hyper-links on the Department's Web site directing students to assistance in their local communities. The commenter averred that assistance should be made available in multiple formats (telephone, smartphone apps, mail, in person, and on-line), as many students at closing or closed schools do not own or have limited access to computers.

A group of commenters recommended that the discharge regulations for Perkins and Direct Loans be amended to extend the 120-day look back period by the number of days between the expected and actual date of closure whenever the actual closure date is later than the expected and disclosed closure date.

Another commenter recommended prohibiting the capitalization of interest when the collections process has been suspended because a student is filing for a closed school discharge.

A group of commenters recommended that the terminology throughout § 682.402(d) be updated for consistency with current § 682.402 regulations for other discharges types. Specifically, commenters suggested replacing references to written and sworn statements with references to applications.

*Discussion:* We appreciate the recommendations for additional steps the Department may take to assist borrowers in closed school situations. Many of these recommendations relate to activities that are not governed by regulations, or are out of the scope of this regulatory action.

With regard to the comment recommending that we extend the look-back period beyond 120 days if the expected closure date is different than the actual closure date, we do not believe such a change is necessary. Under current regulations in

§ 685.214(c)(1)(B), the Department has the authority to extend the look-back period due to "exceptional circumstances." We believe that this provision provides appropriate flexibility to the Department in cases where it may be necessary to extend the look-back period.

Under § 682.202(b)(2)(ii) and (iii) a lender may capitalize interest that accrues during a period of authorized deferment or forbearance. We see no justification for exempting the 60-day forbearance period from this practice.

We agree with the recommendation to update the terminology throughout § 682.402(d) for consistency with current § 682.402 for other discharges types, and will make those changes in the final regulations.

*Changes:* In §§ 682.402(d)(6)(ii)(B)(*1*), (d)(6)(ii)(B)(*2*), (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), and (d)(6)(ii)(H) of the FFEL closed school discharge regulations, we have replaced the terms "sworn statement" or "written request" with the term "application", to conform the regulations with the current closed school discharge application process.

*Data Requests*

*Comments:* A group of commenters recommended that the Department disclose, at the school level, information about closed school discharges, including information about the Department's outreach to borrowers, the number of applicants, the number of applicants who receive a discharge, the total amount discharged, and the amount collected from schools to offset the discharged amounts. Similarly, this group of commenters requested that the Department disclose, at the school and discharge type level, information about false certification discharges, including the number of applicants, the number of applicants who receive a discharge, and total amount discharged and related offsets. In addition, this group of commenters recommended that the Department disclose the number of borrowers for whom a death discharge has been requested, the number of borrowers for whom a death discharge has been granted, and the total discharged amount.

*Discussion:* We thank the commenters for their thoughtful reporting recommendations; however, we do not have plans to provide such information at this time. We note that publication of data at this level may require providing the school with the opportunity to review and challenge or correct inaccurate information. However, the Department may be able to publish more aggregated versions of these data for public review at a later date. The

Department is not prepared to implement such processes at this time, but will consider releasing these data moving forward.

*Changes:* None.

**False Certification Discharges (Section 685.215)**

*High School Diploma*

*Comments:* Commenters generally supported the proposed improvements to the false certification process. Some commenters noted that broadening the reasons that loans may be discharged due to false certification may provide a simpler process for loan discharge than borrower defense to repayment for many borrowers.

A group of commenters expressed support for the proposed regulatory changes that would provide a false certification loan discharge to borrowers whose schools have falsely reported that they earned a high school diploma, including schools that have facilitated the borrower's attainment of a fabricated high school diploma. The commenters noted that that proposed § 685.215(a)(1)(ii) would allow for discharge of a borrower's loan if the school falsified the borrower's high school graduation status; falsified the borrower's high school diploma; or referred the borrower to a third party to obtain a falsified high school diploma. The commenters viewed this proposed regulation as a critical improvement over the current false certification regulations.

However, several commenters expressed concern that some otherwise eligible borrowers may be denied discharges because their financial aid applications, which were completed by the school, indicate that they reported having earned a high school diploma.

A group of commenters recommended revisions to the final regulations regarding what they referred to as "unfair" evidentiary burdens. These commenters recommended that the Department clarify that students whose schools falsely certified that they have high school diplomas, including schools that do so by falsely certifying financial aid applications, are eligible for false certification discharges.

One group of commenters recommended that the Department further modify the regulatory language to clarify that borrowers who report to their school that they earned a high school diploma are ineligible for a false certification loan discharge, but that borrowers whose FAFSA falsely indicates the borrower had earned a high school diploma may be eligible for a false certification loan discharge.

Another group of commenters believed that the Department should revise the proposed regulations to ensure that a borrower will qualify for a false certification discharge only if the borrower can fulfill the bases for discharge. These commenters recommended that the Department revise proposed § 685.215(c) to require borrowers to demonstrate each element of the bases for discharge under proposed § 685.215(a)(l) in order to qualify for a discharge. The commenters also recommended that the Department provide guidance regarding acceptable online high schools.

These commenters observed that the Department's intent, as stated in the preamble to the NPRM, is that borrowers who provide false information to postsecondary schools regarding high school graduation status will not obtain a false certification discharge. Proposed § 685.215(a)(l) ("Basis for Discharge") states that a false certification discharge is available if a borrower reported to the postsecondary school that the borrower did not have a high school diploma. The commenters believed that the section of the proposed regulation regarding borrower qualifications for discharge does not reflect the Department's intent. Proposed § 685.215(c) ("Borrower qualification for discharge") does not require a borrower to demonstrate that the borrower presented accurate information regarding the borrower's high school graduation status to the postsecondary school.

These commenters believe that under the proposed regulations, taxpayers may be forced to pay for false certification discharges for borrowers who did not meet the test in proposed § 685.215(a)(l) and yet qualified under proposed § 685.215(c)(1). The commenters noted that the Department can seek recovery from institutions for certain losses determined under proposed § 685.2125(a)(l). However, if borrowers are granted discharges under the weaker standard at proposed § 685.215(c)(1), then in many cases the Department will be unable to collect from institutions under the stronger standard at proposed § 685.215(a)(l).

The commenters believed that schools should be able to rely on the fact that a high school is accredited by a reputable accrediting agency, absent a list of high schools that provide instruction to adult students and that are acceptable to the Department. Another commenter requested that the Department provide schools with a reliable source of information regarding appropriately accredited high school

diploma programs available to adults, including those that are offered online.

A group of commenters expressed concerns that the proposed false certification and unauthorized payment discharge rule would penalize institutions for the false certification of the student or the independent actions of a third party.

In addition, these commenters recommended that, under the evidentiary standards articulated in proposed § 685.215(c)(1), a borrower requesting a false certification loan discharge should be required to certify that, at the time of enrollment, he or she did not represent to the school, either orally or in writing, that he or she had a high school diploma. The commenters believed that this evidentiary requirement would help deter frivolous false certification claims.

Some commenters observed that, pursuant to proposed § 685.215(a)(l)(ii), a borrower would be eligible for a false certification loan discharge if the school the borrower attended certified the eligibility of a student who is not a high school graduate based on ''[a] high school diploma falsified by the school or a third party to which the school referred the borrower.'' The commenters recommended that the regulation be revised to clarify that a school is only penalized if it referred a student to a third party for the purpose of having the third party falsify the high school diploma. These commenters believed that it is not uncommon for a school to refer a student to a third-party servicer to verify the diploma, particularly in the case of students who graduated from foreign high schools. The commenters believed that institutions should not be penalized if a third-party verification entity falsified the legitimacy of the foreign credential without the school's knowledge.

*Discussion:* We thank the commenters who are supportive of the proposed revisions of the false certification of high school graduation status regulatory provisions. However, we do not agree that the regulations need further modification to address situations in which a borrower who is not a high school graduate states on the FAFSA that the borrower is a high school graduate. If a borrower falsely stated on the FAFSA that they were a high school graduate, but also reported to the school that they were not a high school graduate, and the school certified the eligibility of the borrower based on the FAFSA, the school would still have falsely certified the eligibility of the borrower. In this situation, the borrower would qualify for a false certification discharge—assuming the borrower did

not meet the alternative to high school graduation status in effect at the time—regardless of the information on the student's FAFSA. The same would hold true whether the FAFSA was actually completed by the borrower, or completed by the school. We note that, while a school may assist a student in completing a FAFSA, a school may never complete a FAFSA for a student. Conversely, if a borrower falsified the FAFSA on their own initiative, did not inform the school that they were not a high school graduate, and the school did not receive any discrepant information indicating that the borrower was not a high school graduate, the borrower would not qualify for a false certification discharge. Borrowers who deliberately provide misleading or false information in order to obtain Federal student loans do not qualify for false certification discharges based on the false or misleading information that the borrower provided to the school.

We agree with the commenters who noted a discrepancy between the language in proposed § 685.215(a)(l) and proposed § 685.215(c)(l). Section 685.215(a)(l) provides the basic eligibility criteria for a false certification discharge based on false certification of a borrower's high school graduation status. Section 685.215(c)(1) describes how a borrower qualifies for a discharge. The two sections are intended to mirror each other, not to establish slightly different standards for the discharge. If a borrower, in applying for the discharge, is only required to state that the borrower ''did not have a valid high school diploma at the time the loan was certified,'' the question of whether the borrower ''reported not having a high school diploma or its equivalent'' would not be addressed.

We also agree that the standards under which the Department may seek recovery for losses under § 685.215(a)(1) should not be different from the standards under which a borrower may receive a false certification discharge under § 685.215(c)(1).

The commenter who recommended that schools be able to rely on a high school's accreditation status by a ''reputable accrediting agency'' did not specify what criteria would be used to determine if an agency accrediting a high school is reputable, and does not suggest a process for making such determinations. Moreover, even if it were feasible for the Department to provide a list of acceptable high schools for title IV student financial assistance purposes or guidance regarding acceptable schools, there is no guarantee that a diploma purporting to come from such a school is legitimate.

We do not share the concern of commenters that the proposed regulations may penalize a school for relying on the independent actions of a third party. If a school is relying on a third party to verify the high school graduation status of a borrower, it is incumbent on the school to ensure that the third-party is providing legitimate verifications. We note that high school graduation status, or its approved equivalent, is a fundamental borrower eligibility criterion for title IV federal student assistance. Any school that wishes to participate in the title IV, HEA programs and outsources the determination of high school graduation status to a third party without ensuring that the third party is trustworthy, is acting irresponsibly.

We also note, in response to this comment, that the Department is not proposing revisions to the regulations governing false certification discharges due to unauthorized payment.

We also disagree with the comment recommending that a school should only be penalized if it referred a student to a third-party ''for the purpose of having the third party falsify the high-school diploma.'' This commenter raised this issue in particular with regard to students who graduated from foreign high schools. The commenter stated that schools often use third parties to verify the legitimacy of a foreign credential. We do not believe that the Department must demonstrate intent on the part of a school when assessing liabilities against a school due to false certification of borrower eligibility. We do not believe that a school that routinely certifies eligibility of borrowers who graduated from foreign high schools can credibly claim to be ignorant of the legitimacy of a third-party verification entity that the school uses for verification purposes.

We agree with the comment that the false certification loan discharge application should include a certification from the borrower that the borrower did not report to the school that the borrower had a high school diploma. The current form, *Loan Discharge Application: False Certification (Ability to Benefit),* expires on August 31, 2017. After these final regulations are published, we will revise the form to make it consistent with these final regulations. The revised version of the form will go through two public comment periods, with the intent of being finalized by the time these regulations become effective on July 1, 2017.

*Changes:* We have revised § 685.215(c)(1) to clarify that the borrower must have reported to the

school that the borrower did not have a high school diploma or its equivalent.

*Disqualifying Condition*

*Comments:* Current regulations under § 685.215(a)(1)(iii) provide for a discharge if a school certified the eligibility of a borrower who would not meet requirements for employment in the occupation for which the training program supported by the loan was intended. The proposed regulations would modify this provision to clarify that the relevant ''requirements for employment'' are ''State requirements for employment'' in the student's State of residence at the time the loan was originated.

A group of commenters sought confirmation that, while a borrower may be eligible for a false certification discharge due to a condition that disqualified them for employment in the field for which postsecondary education was pursued, the postsecondary institution would not be financially liable for the discharged loan. These commenters believed that this is the Department's intent because the remedial action provision at proposed § 685.308 does not list the disqualifying condition discharge provision at proposed § 685.215(a)(l)(iv) as a basis for institutional liability. These commenters observed that the current version of § 685.308 states the Department may seek recoupment if the loan certification resulted in whole or in part from the school's violation of a Federal statute or regulation or from the school's negligent or willful false certification.

These commenters averred that anti-discrimination laws limit schools' ability to deny admission to a prospective student, even when the individual would be disqualified for employment in the career field for which the program prepares students. The commenters recommended that the Department state explicitly in the preamble to the final regulations that disqualifying condition discharges will not result in institutional liabilities.

Another commenter asserted that it would be administratively burdensome for institutions to maintain the knowledge necessary to determine what conditions would disqualify a prospective student for employment in a specific field. This commenter suggested that this would be particularly challenging for distance education programs that serve students remotely, since these institutions would only be aware of potentially disqualifying conditions that the student discloses.

A group of commenters echoed this concern, stating that it would be administratively burdensome for distance education programs to comply with proposed § 685.215(c)(2). In these commenters' view, a primarily distance education institution may not have occasion to become aware of a student's disqualifying physical or mental condition unless and until the student voluntarily discloses such information. In addition, for institutions that operate in numerous States, the commenters stated that it would be administratively burdensome and near impossible for an institution to remain constantly vigilant about potential changes to State statutes, State regulations, or other limitations established by the States that may affect a student's eligibility for employment.

Since institutions must comply with various anti-discrimination laws when admitting students, several commenters argued that institutions should not be held liable for discharges based on disqualifying conditions unless it can be shown that the institution engaged in substantial misrepresentation. Another commenter stated that there are legitimate reasons why institutions— including, but not limited to, distance education institutions—may not be aware of a student's disqualifying physical or mental condition or criminal record. The commenter claimed that, under applicable Department regulations, an institution may not make a preadmission inquiry as to whether an applicant has a disability. The commenter cited regulations at 34 CFR 104.42(b)(2) limiting schools' ability to determine whether applicants have a disability.

Another commenter referenced the Department's publication *Beyond the Box: Increasing Access to Higher Education for Justice-Involved Individuals,* which encourages alternatives to inquiring about criminal histories during college admissions and provides recommendations to support a holistic review of applicants.

A commenter asked why the regulation does not specify that the institution knew about or could be expected to have known about the disqualifying condition. The commenter questioned whether a student who intentionally concealed a disqualifying condition should obtain a discharge. The commenter also raised the issue of a borrower whose disqualifying impairment occurs after the fact, but does not qualify for a disability discharge. In such situations, the commenter recommended that the Department clearly state that the school would not be subject to any penalty under § 685.308.

Another group of commenters recommended that the Department expand the regulation pertaining to disqualifying conditions to include certifications not provided by the State, such as those referenced in the Gainful Employment regulations such as professional licensure and certification requirements, including meeting the requirements to sit for any required licensure or certification exam.

A group of commenters noted their opposition to the Department's proposal which, in their view, narrows discharge eligibility for students whose schools falsely certify that they meet the requirements for employment in the occupations for which their programs are intended to train. These commenters asserted that some schools frequently recruit students they know will be barred from employment in their field after program completion.

These commenters objected to the proposed regulatory language, which addresses requirements imposed by the State, not by the profession. To the extent that this discharge provision is intended to provide relief to students whose schools recruit and enroll them despite the fact that they cannot benefit from the program, the commenters believed that the Department should not limit the scope of this protection. The commenters observed that while most professional licensing is found in State law and regulation, others—such as those from trade-specific entities—are not. In the commenters' view, the proposed change would unnecessarily restrict relief to students who are unemployable because they are ineligible for certifications not provided by a State.

The commenters also believed that this change would be inconsistent with the Department's Gainful Employment regulations, which requires schools to certify that each of their career education programs ''satisfies the applicable educational prerequisites for professional licensure or certification requirements in that State so that the student who completes the program and seeks employment in that State qualifies to take any licensure or certification exam that is needed for the student to practice or find employment in an occupation that the program prepares students to enter.'' 34 CFR 668.414(d)(3). As the Department noted in the preamble to the NPRM for the Gainful Employment regulations, a student's enrollment in a program intended to prepare them for a career for which they cannot be certified ''can have grave consequences for students' ability to find jobs and repay their loans after graduation.'' 79 FR 16478.

**76044**   **Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

The commenters believed that the consequences are equally grave for students who are unwittingly enrolled in programs that they personally can never benefit from, though their classmates might. In the view of these commenters, it is therefore unnecessary and unfair to narrow this standard for relief.

*Discussion:* The proposed regulations were not intended to absolve schools of financial liability in the case of false certification due to a disqualifying condition. The commenters point to proposed § 685.308, which inadvertently omitted a cross-reference to § 685.215(a)(1)(iv) in identifying provisions under which the Secretary ''collects from the school the amount of the losses the Secretary incurs and determines that the institution is liable to repay.'' We note that the proposed regulations include cross-references to the provisions covering false certification due to high school graduation status and unauthorized signature. We believe that discharge due to false certification of disqualifying status should be treated the same as the other types of false certification discharges, as it is under current regulations in § 685.308(a)(2).

The commenter who suggested that it would be administratively burdensome for schools to maintain the knowledge necessary to determine what conditions would disqualify a prospective student from employment in a specific field appears to be unaware of the current regulatory requirements. Under current § 685.215(a)(1)(iii), the Department considers a school to have falsely certified a borrower's eligibility for a title IV loan if the school ''certified the eligibility of a student who, because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary would not meet the requirements for employment (in the student's State of residence when loan was originated) in the occupation for which the training program supported by the loan was intended.'' The final regulations revise this provision to refer to ''State requirements,'' but make no additional changes to this provision. The change is consistent with our interpretation set forth in Dear Colleague Letter (DCL) GEN–95–42, dated September 1995. In that DCL, we clarified that for a borrower to qualify for a false certification discharge due to a disqualifying condition, a borrower must provide evidence that the borrower had a disqualifying condition at the time of enrollment and of ''a *State prohibition* (in that student's State of residence) against employment'' in that occupation based on the borrower's status.

We note in response to the commenters who were concerned about the administrative burden associated with compliance for distance education programs that these schools have been subject to this regulatory requirement for over 20 years. Neither the proposed regulations nor these final regulations would change the basic requirements regarding false certification due to a disqualifying condition.

The regulation at 34 CFR 104.42 refers to general postsecondary education admission procedures, not eligibility for title IV student financial assistance. While the requirements in § 685.215 do not apply to a school's evaluation of whether to admit a student to a particular program, they do apply to its certification of that student's eligibility for title IV student financial assistance for that program. Therefore, we do not believe that the further limitation suggested by the commenter is necessary.

The Department of Education *Beyond The Box* publication cited by commenters specifically addresses career-training programs. Further, the publication does not advise schools to ignore disqualifying characteristics, but rather not to be overbroad in their preclusion of otherwise eligible applicants:

Tailor questions about CJI [''Criminal Justice Information''] to avoid unnecessarily precluding applicants from entering training programs, and thus employment, for which they might be eligible. For career-oriented training programs, institutions should limit CJI inquiries to criminal convictions that pose barriers to certification and licensing. For example, if a State teacher's board will not grant a license to anyone with a felony conviction for sexual assault or rape, the teaching program could specifically ask, ''Have you ever been convicted of felony sexual assault or rape?'' instead of broadly asking, ''Have you ever been convicted of a crime?'' This specificity would enable the institution to adequately assess whether a student could face occupational licensing and credentialing barriers (*Beyond the Box: Increasing Access to Higher Education for Justice-Involved Individuals,* p. 25).

As stated in the *Beyond the Box* publication, we expect schools to be aware of disqualifying conditions for employment in the fields for which the schools are providing training. Schools that offer career-training programs need to be proactive in determining whether borrowers who are training for fields that have such employment restrictions do not have a disqualifying condition for that career.

In response to the comment regarding a student intentionally misleading a school, if the school could demonstrate that a student intentionally misled the school about a disqualifying condition, we would take that into account in determining the amount that the school is liable to repay under § 685.308(a). However, in our view, it seems unlikely that a borrower would knowingly go through the time, effort, and expense of enrolling in an education program that trains the borrower for an occupation for which the borrower is unemployable. A far more common scenario is unscrupulous schools recruiting students with disqualifying conditions who cannot possibly benefit from the training programs that the school offers.

With regard to borrowers who do not have a disqualifying condition at the time of enrollment, the regulations specify that a borrower qualifies for the discharge only if the borrower had a disqualifying condition that ''would have'' disqualified the borrower from employment in the occupation, and that the borrower ''did not meet'' State requirements for employment in the career. A condition that arose after the borrower was no longer enrolled at the school would not qualify the borrower for a false certification discharge due to a disqualifying condition.

We addressed the question of expanding the scope of this provision to include non-State requirements for employment in certain fields, such as employment standards established by professional associations during the negotiated rulemaking sessions and in the NPRM. As we noted earlier, employment standards established by professional associations could vary, and it would not be practical to require schools to determine which professional association standards to use. The reference to the Gainful Employment requirements is inapplicable here, as the Gainful Employment requirements relate to the quality of a school's program.

*Changes:* We have revised § 685.308(a) to clarify that Department assesses liabilities to schools for false certification due to disqualifying condition or identity theft.

### Satisfactory Academic Progress

*Comments:* A group of commenters supported the proposed regulation that would provide automatic false certification loan discharges for students whose satisfactory academic progress (SAP) was falsified by an institution. While the regulation specifies that these loan discharges are initiated by the Department, these commenters requested that borrowers be permitted to submit an application for false certification loan discharge due to the

falsification of satisfactory academic progress by an institution.

The commenters urged the Department to clarify that students may also apply for a discharge on this basis, rather than wait for the Department to grant discharges without applications. The commenters observed that there are often False Claims Act and government cases involving false certification of SAP, and that many students also know when their academic progress was falsified by schools, but are not covered by such cases.

The commenters suggested that information provided by students in discharge applications would also allow the Department to identify bad-acting schools and prevent abuse of title IV, HEA funding. These commenters recommended that the Department revise the proposed rules to provide a means for students to individually apply for discharge when their SAP is falsely certified by their school.

*Discussion:* We continue to believe that allowing individual borrowers to apply for false certification discharges due to falsification of SAP is not practical. As we discussed in the NPRM, schools have a great deal of flexibility both in determining and in implementing SAP standards. There are a number of exceptions under which a borrower who fails to meet SAP can continue to receive title IV loans. Borrowers who are in danger of losing title IV eligibility due to a failure to meet SAP standards often request reconsideration of the SAP determination. Schools often work with borrowers in good faith efforts to attempt to resolve the situation without cutting off the borrower's access to title IV assistance.

We do not believe that a school should be penalized for legitimate attempts to help a student who is not meeting SAP standards, nor do we believe a student who has successfully appealed a SAP determination should be able to use that initial SAP determination to obtain a false certification discharge on his or her student loans. In addition, we continue to believe that it would be very difficult for an individual borrower to sufficiently demonstrate that a school violated its own SAP procedures.

Given these considerations, the final regulations continue to limit false certification discharges based on falsification of SAP to discharges based on information in the Secretary's possession.

*Changes:* None.

## Ability To Benefit

*Comments:* A group of commenters requested that the Department reconsider the evidentiary standard for false certification of a borrower's ability to benefit. In these commenters' view, the requirement for additional corroborating evidence beyond the self-certification of the borrower is unreasonable. The commenters suggested that borrowers who are unable to obtain corroborating evidence should be able to submit a sworn statement in support of their false certification application.

These commenters referenced two DCLs the Department issued in connection with false certification of ability to benefit: DCL GEN–95–42 (dated September 1995) and DCL FP–07–09 (dated September 2009). The commenters characterized the DCLs as establishing a presumption that students who claim ability to benefit fraud are not telling the truth unless they submit independent corroborating evidence to support their discharge application. To support this claim, these commenters quoted the statement in DCL GEN–95–42 that the absence of findings of improper ability to benefit practices by authorities with oversight powers "raises an inference that no improper practices were reported because none were taking place."

The commenters asserted that many borrowers cannot provide proof of Federal or State investigations of particular schools because enforcement has been lenient in this area. They asserted that, in 1992, Congress provided for the false certification discharge and overhauled the student loan system because oversight of schools was inadequate.

A group of commenters criticized the Department's current approach, and noted that statements that a borrower makes on the current Loan Discharge Application: False Certification (Ability to Benefit) are made under penalty of perjury. According to commenters, if a borrower is unable to provide investigative findings supporting the borrower's claim, the Department or the guaranty agency will deny the discharge unless the borrower submits additional corroborating evidence (such as statements by school officials or statements made in other borrower claims for discharge relief).

The commenters noted that DCL FP–07–09 discusses guaranty agencies' consideration of "the incidence of discharge applications filed regarding that school by students who attended the school during the same time frame as the applicant," and suggested that

students have no way of knowing whether a guaranty agency has done so in evaluating their applications.

The commenters asserted that students do not have access to school employee statements and do not know whether other borrowers have filed similar claims for relief. When borrowers are able to find attorneys to help them, attorneys are often unable to obtain the required evidence through Freedom of Information Act requests. The commenters also asserted that the Department does not have possession of all false certification discharge applications and does not ensure that copies are retained when guaranty agencies go out of business or retain all potentially corroborating evidence. In addition, if the student has carried the debt for years before learning of their right to a false certification discharge, the school may have closed. At that point, key documents and corroborating evidence may no longer be available.

The commenters recommended that the Department revise its proposed regulations to specify that a student may establish a right to a false certification discharge through a "preponderance of the evidence," as it has provided for borrower defense claims. In addition, the commenters recommended that borrowers be presumptively eligible for discharge after application in the following circumstances:

• The school's academic and financial aid files do not include a copy of test answers and results showing that the borrower obtained a passing score on an ability-to-benefit test approved by the Secretary;

• No testing agency has registered a passing score on an ability-to-benefit test approved by the Secretary for the borrower; or

• The school directed the borrower to take an online test to obtain a high school degree, the borrower believed the test to be legitimate, and the high school diploma was invalid.

*Discussion:* In the NPRM, we removed the references to "ability to benefit" from the Direct Loan false certification regulatory language and replaced it with a cross-reference to section 484(d) of the HEA, and have retained that change in the final regulations. Section 484(d) establishes the current borrower eligibility requirements for students who are not high school graduates. The current alternative to graduation from high school requirements are substantially different from the earlier ability to benefit requirements. We have provided guidance describing the current alternative to high school graduation requirements in DCL GEN–16–09.

We disagree with the recommendation to revise the regulations pertaining to the evidentiary standards for false certification of ability to benefit. Any modifications to these regulations could only be applied prospectively. Schools can be held liable for false certification discharges, and we cannot impose retroactive requirements on schools.

We also disagree with the commenters' characterization of the guidance in DCL GEN–95–42 and DCL FP–07–09. DCL FP–07–09 does not require a borrower to provide additional corroborating evidence if the borrower is unable to do so. That DCL provides examples of "credible evidence" that would provide a guaranty agency with "an adequate basis for granting a discharge application" when there is no borrower-specific evidence that the borrower qualifies for a discharge due to false certification of ability to benefit.

We believe the two DCLs still provide an accurate description of the legal requirements for false certification, so we do not have plans to update them in the near future.

*Changes:* None.

**Interest Capitalization (Sections 682.202(b)(1), 682.405, and 682.410(b)(4))**

*Comments:* Several commenters supported the proposed changes in §§ 682.202(b)(1), 682.405, and 682.410(b)(4), providing that a guaranty agency may not capitalize unpaid interest after a defaulted FFEL Loan has been rehabilitated, and that a lender may not capitalize unpaid interest when purchasing a rehabilitated FFEL Loan.

A group of commenters noted that in the preamble to the NPRM, the Department characterized these changes as clarifications of existing regulations. The commenters disagreed with this characterization, stating that during the negotiated rulemaking sessions, negotiators representing guaranty agencies, lenders, and servicers did not agree that current regulations prohibit the capitalization of interest following loan rehabilitation. The commenters further stated that the negotiating committee agreed to add this issue to the negotiating agenda after an agreement was reached with the Department that the proposed changes represented a change in policy for prospective implementation. The commenters added that when the Department was asked by another member of the negotiating committee whether the proposed changes would have any retroactive impact, the Department responded that retroactive application was not the issue being negotiated. The commenter requested that the Department clarify in the final regulations that the changes to the FFEL Program regulations prohibiting the capitalization of interest following loan rehabilitation are amendments to the current rules, consistent with the commenters' understanding of what was agreed to during the negotiations. Based on that understanding, the commenters stated that FFEL Program guarantors, lenders, and servicers are planning to implement the changes for loans that go into default on or after the effective date of the regulations and are subsequently rehabilitated.

*Discussion:* We thank the commenters for their support of the changes to prohibit interest capitalization following loan rehabilitation. In response to the group of commenters who requested confirmation that the changes in §§ 682.202(b)(1), 682.405, and 682.410(b)(4) represent amendments to the current regulations and are to be applied only prospectively, we confirm that this is the intent.

*Changes:* None.

**Executive Orders 12866 and 13563**

**Regulatory Impact Analysis**

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

This final regulatory action will have an annual effect on the economy of more than $100 million because regulations would have annual federal budget impacts of approximately $1.9 billion in the low impact scenario to $3.5 billion in the high impact scenario at 3 percent discounting and $1.8 billion and $3.4 billion at 7 percent discounting, additional transfers from affected institutions to student borrowers via reimbursements to the Federal government, and annual quantified costs of $9.8 million related to paperwork burden. Therefore, this final action is "economically significant" and subject to review by OMB under section 3(f)(1) of Executive Order 12866. Notwithstanding this determination, we have assessed the potential costs and benefits, both quantitative and qualitative, of this final regulatory action and have determined that the benefits justify the costs.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these final regulations only on a reasoned determination that

their benefits justify their costs. In choosing among alternative regulatory approaches, we selected those approaches that maximize net benefits. Based on the analysis that follows, the Department believes that these regulations are consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or tribal governments in the exercise of their governmental functions.

In accordance with both Executive Orders, the Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action. The potential costs associated with this regulatory action are those resulting from statutory requirements and those we have determined as necessary for administering the Department's programs and activities.

In this Regulatory Impact Analysis (RIA) we discuss the need for regulatory action, the comments about the NPRM analysis and significant changes from the NPRM, the potential costs and benefits, net budget impacts, assumptions, limitations, and data sources, as well as regulatory alternatives we considered. Although the majority of the costs related to information collection are discussed within this RIA, elsewhere in this notice under *Paperwork Reduction Act of 1995,* we also identify and further explain burdens specifically associated with information collection requirements.

1. Need for Regulatory Action

These final regulations address several topics related to the administration of title IV, HEA student aid programs and benefits and options for borrowers.

As detailed in the NPRM, the Department last revised the borrower defense regulations over two decades ago, and until recently, use of borrower defense has been very limited. The lack of clarity in the current regulations has led to much confusion among borrowers regarding what protections and actions for recourse are available to them when dealing with cases of wrongdoing by their institutions. The Department received comments addressing this lack of clarity during the public comment period.

The need for a clearer and more efficient process was also highlighted when the collapse of Corinthian generated an unprecedented level of borrower defense claims activity. As detailed extensively in the NPRM, Corinthian, a publicly traded for-profit

higher education company that in 2014 enrolled over 70,000 students at more than 100 campuses nationwide, filed for bankruptcy in 2015 after being the subject of multiple investigations and actions by Federal and State governments. The Department committed itself to ensuring that students harmed by Corinthian's misrepresentations receive the relief to which they are entitled, and realized that the existing regulations made this process burdensome, both for borrowers and for the Department. Under the current process, the Department would be required to devote significant resources to reviewing individual State laws to determine which law to apply to each borrower's claim. The Department appointed a Special Master in June of 2015 to create and oversee the process of providing debt relief for these Corinthian students. As of October 2016, approximately 3,787 borrower defense discharges totaling $73.1 million had been completed and another 7,858 closed school discharges totaling approximately $103.1 million have been processed. Moreover, the Department has received thousands more claims—both from former Corinthian students and from students at a number of other institutions—that are pending a full review, and expects to receive more as the Department continues to conduct outreach to potentially affected students.

The Department remains committed to ensuring that borrowers with a valid defense to repayment are able to benefit from this option. Research has shown that large sums of student debt can reduce levels of participation in the economy, especially if borrowers are unable to obtain adequate income to repay their debts.[96] If the borrower is harmed such as by being provided with educational credentials worth significantly less than an institution's misrepresentation has led him or her to believe, the borrower may be entitled to some relief from the loans associated with such education. The changes to the borrower defense provisions in these final regulations will update the process and standard for determining relief and allow the Department to effectively address claims that arise in the modern postsecondary educational system.

The landscape of higher education has changed significantly over the past 20 years, including a substantial

increase in the number of students enrolled in distance education. Because distance education allows students to enroll in courses and programs based in other States and jurisdictions, it has created additional challenges as it relates to the Department's current borrower defense regulations.

The current regulations require an analysis of State law to determine the validity of a borrower defense claim. This approach creates complexities in determining which State law applies and may give rise to potential inequities, as students in one State may receive different relief than students in another State, despite common underlying facts and claims.

The expansion of distance education has also impacted the Department's ability to apply its borrower defense regulations. The current borrower defense regulations do not identify which State's law is considered the "applicable" State law on which the borrower's claim can be based.[97] Generally, the regulation was assumed to refer to the laws of the State in which the institution was located; we did not have much occasion to address differences in protection for borrowers in States that offer little protection from school misconduct or borrowers who reside in one State but are enrolled via distance education in a program based in another State. Some States have extended their rules to protect these students, while others have not.

The final regulations give students access to consistent, clear, fair, and transparent processes to seek debt relief. The new Federal standard will allow a borrower to assert a borrower defense on the basis of a substantial misrepresentation, a breach of contract, or a favorable, nondefault contested judgment against the school for its act or omission relating to the making of the borrower's Direct Loan or the provision of educational services for which the loan was provided. Additionally, the final regulations separately address predispute arbitration clauses, another possible obstacle to borrowers pursuing a borrower defense claim. These final regulations also prohibit a school participating in the Direct Loan Program from obtaining, through the use of contractual provisions or other agreements, a predispute agreement for arbitration to resolve claims brought by a borrower against the school that could also form the basis of a borrower defense under the Department's

---

[96] The Economics of Student Loan Borrowing and Repayment, Wen Li, Federal Reserve Bank of Philadelphia, available at *https:// philadelphiafed.org/-/media/research-and-data/ publications/business-review/2013/q3/brq313_ economics-of-student-loan-borrowing-and-repayment.pdf.*

[97] In the few instances prior to 2015 in which claims have been recognized under current regulations, borrowers and the school were typically located in the same State.

regulations. The final regulations also prohibit a school participating in the Direct Loan Program from obtaining an agreement, either in an arbitration agreement or in another form, that a borrower waive his or her right to initiate or participate in a class action lawsuit regarding such claims and from requiring students to engage in internal dispute processes before contacting accrediting or government agencies with authority over the school regarding such claims. In addition, the final regulations establish the conditions or events upon which an institution is or may be required to provide to the Department financial protection, such as a letter of credit, to help protect students, the Federal government, and taxpayers against potential institutional liabilities.

Additionally, to enhance and clarify other existing protections for students, these regulations update the basis for obtaining a false certification discharge, clarify the processes for false certification and closed school discharges, require institutions to provide applications and explain the benefits and consequences of a closed school discharge, and establish a process for a closed school discharge without an application for students who do not re-enroll in a title IV-participating institution within three years of an institution's closure. These regulations also codify the Department's practice that a discharge based on school closure, false certification, unpaid refund, or defense to repayment will result in the elimination or recalculation of the subsidized usage period associated with the loan discharged.

These regulations also amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; clarify rules regulating the capitalization of interest on defaulted FFEL Loans; require that proprietary schools at which the median borrower has not repaid in full, or paid down the balance of, the borrower's loans include a warning in advertising and promotional materials about those repayment rate outcomes; require that a school disclose on its Web site and to prospective and enrolled students about events for which it is required to provide financial protection to the Department; clarify the treatment of spousal income in the PAYE and REPAYE plans; and make other changes that we do not expect to have a significant economic impact.

## 2. Summary of Comments and Changes From the NPRM

A number of commenters expressed that the RIA in the NPRM was inadequate and did not support proceeding with the regulations without further study. Commenters noted that the accuracy of several of the Department's past budget estimates had been questioned by Congressional committees and other outside reviewers. Several commenters pointed out that the wide range in the estimate, from $646 million up to $41.3 billion over the 2017 to 2026 loan cohorts, indicated that the Department does not know the potential budget impact of the regulation. Other commenters noted that if the impact is at the higher end of the range, the analysis does not quantify benefits greater than the costs to justify the decision to proceed with the regulations.

Another set of comments focused on the impact of the regulations on higher education, the costs to institutions, and the potential for institutional closures. A number of commenters expressed concern that institutional closures related to the regulations, especially the financial responsibility provisions, will reduce access to higher education for low-income and minority students. Materials included with the comments analyzed National Postsecondary Student Aid Study 2012 (NPSAS 2012) data to demonstrate that students at for-profit institutions are, on average, more likely to be older, racial minorities, veterans, part-time, financially independent, responsible for dependents, and Pell Grant recipients. A number of commenters suggested that the costs of providing financial protection would result in increased costs for students and potentially limit access to higher education. Other commenters were concerned with a lack of analysis about the costs of the financial protection or the possibility that schools would be unable to obtain a letter of credit and would lose access to title IV, HEA funding and be forced to close. Several commenters suggested that the regulations would open the floodgates to frivolous claims that would overwhelm the Department and institutions, exacerbating the harmful effects on higher education.

One commenter argued that the proposed regulations would result in a large number of disappointed borrowers filing borrower defense claims without merit. Several commenters were concerned that the projected net budget impact referred to in the NPRM of as much as $42.698 billion during the coming decade would undermine the integrity of the Direct Loan Program and that neither American taxpayers, nor schools that have successfully educated students, could cover these costs if thousands of students or graduates start requesting discharges of their loans. The commenters argued that the regulations lack any quality control measure to ensure that the Department would not be hit with an influx of fraudulent claims. They cited a recent lawsuit in which a former law student unsuccessfully sued her law school for false advertising.

Finally, a number of commenters suggested the high cost estimate was overstated because schools would change their practices and limit behavior that would result in valid borrower defense claims. Another commenter questioned the characterization of the net budget impact as a cost based on the idea that the Department should not collect on loans established fraudulently. Several commenters noted that the potential fiscal impact should not factor into decisions about whether borrowers are eligible for relief.

We appreciate the comments about the RIA in the NPRM. As discussed in the NPRM, given the limited history of borrower defense claims and the limitations of available data, there is uncertainty about the potential impact of the regulations. Per OMB Circular A–4, in some cases, uncertainty may be addressed by presenting discrete alternative scenarios without addressing the likelihood of each scenario quantitatively. The uncertainty about borrower defense was acknowledged and reflected in the wide range of scenario estimates in the NPRM. The Department presented the range of scenarios and discussion of sources of uncertainty in the estimates in order to be transparent and encourage comments that might aid the Department in refining the estimates for the final regulations.

We do not agree that the analysis was inadequate to support proceeding with the regulations. Under Executive Orders 12866 and 13563, the Department must adopt a regulation only upon a reasoned determination that its benefits justify its cost. The Executive Orders recognize that some benefits and costs are difficult to quantify, and provide that costs and benefits include both quantifiable measures—to the fullest extent that they can be usefully estimated—as well as qualitative measures of costs and benefits that are difficult to quantify but "essential to consider." OMB Circular A–4 provides that in cases where benefit and cost estimates are uncertain, benefit and cost estimates that reflect the full

probability distribution of potential consequences should be reported. Where possible, the analysis should present probability distributions of benefits and costs and include the upper and lower bound estimates as complements to central tendency and other estimates. If a lack of knowledge prevents construction of a scientifically defensible probability distribution, the Department should describe benefits or costs under plausible scenarios and characterize the evidence and assumptions underlying each alternative scenario. The Department took this approach in the NPRM and presents the analysis with relevant revisions for the final regulations.

OMB Circular A–4 suggests that in some instances when uncertainty has significant effects on the final conclusion about net benefits, the agency should consider additional research prior to rulemaking. For example, when the uncertainty is due to a lack of data, the agency might consider deferring rulemaking, pending further study to obtain sufficient data. Delaying a decision will also have costs, as will further efforts at data gathering and analysis. The Department has weighed the benefits of delay against these costs in making the decision to proceed with the regulation. With respect to borrower defense, if the Department did not proceed with the final regulations, the existing borrower defense provisions would remain in effect and some of the costs associated with potential claims would be incurred whether or not the final regulations go into effect. The final regulations build in more clarity and add accountability and transparency provisions that are designed to shift risk from the taxpayers to institutions. Moreover, if the Department were to delay implementation of the final regulations to obtain further information about the scope of institutional behavior that could give rise to claims, it is not clear when a significant amount of relevant data would become available. Borrower responses in absence of the process established in the final regulations do not necessarily reflect the level of claims that will be processed under the final regulations. Delaying the regulations would delay the improved clarity and accountability from the regulations without developing additional data within a definite timeframe, and we do not believe the benefits of such a delay outweigh the costs. As with any regulation, additional data that becomes available will be taken into account in the ongoing re-estimates of the title IV, HEA aid programs.

We have considered the other comments received. Revisions to the analysis in response to those comments and our internal review of the analysis are incorporated into the *Discussion of Costs, Benefits, and Transfers* and *Net Budget Impacts* sections of this RIA as applicable. Table 1 summarizes significant changes made from the NPRM in response to comments and the Department's ongoing development of the final regulations.

TABLE 1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS

| Reg section | Description of change |
|---|---|
| **Financial Responsibility Triggers:** | |
| § 668.171(c)(1) ................................ | As detailed in Table 2, eliminates the $750,000 or 10 percent of current assets materiality threshold. Instead, losses from all of the automatic triggers except 90/10, cohort default rate (CDR), SEC delisting, and SEC warning, are used to recalculate the composite score. If the recalculated score is less than 1.0, the school is not financially responsible and must provide financial protection.<br>Removes Form 8–K trigger from proposed § 668.171(c)(10)(vii).<br>Eliminates discretionary trigger based on bond or credit ratings from proposed § 668.171(c)(10)(iv). |
| § 668.171(h) ................................... | Reclassifies proposed automatic triggers including those related to accreditor probation and show-cause actions, pending borrower defense claims, and violations of loan agreements as discretionary triggers.<br>Specifies that in its notice reporting a triggering event, an institution may demonstrate mitigating factors about the event, including that the reported action or event no longer exists or has been resolved or the institution has insurance that will cover part or all of the debts and liabilities that arise at any time from that action or event. |
| **Financial Protection Disclosures:** | |
| § 668.41(i) ...................................... | Revised to clarify that the Secretary will conduct consumer testing prior to establishing the actions and triggering events that require financial disclosures.<br>Further clarifies the requirements for testing with consumers before publishing the content of the disclosure, as well as the disclosure delivery requirements to prospective and enrolled students. |
| **Financial Responsibility:** | |
| § 668.175(f)(5) ............................... | Clarifies how long an institution must maintain the financial protection associated with a triggering event in § 668.171. |
| § 668.175(f)(2)(i) ............................ | Provides that the Secretary may identify other acceptable forms of financial protection. |
| § 668.175(h) .................................. | Provides that the Secretary will release any funds held under a set-aside if the institution subsequently provides cash, the letter of credit, or other financial protection required under the zone or provisional certification alternatives in § 668.175(d) or (f). |
| **Repayment Rate:** | |
| § 668.41(h)(3) ................................. | Clarifies that the Secretary will calculate a repayment rate based on the proportion of students who have repaid at least one dollar in outstanding balance, measured in the third year after entering repayment, using data reported and validated through the Gainful Employment program-level repayment rate calculation.<br>Removes the requirement that repayment rate warnings be delivered individually to all prospective and enrolled students. Enhances the requirement as to how repayment rate warnings must be presented in advertising and promotional materials. |

TABLE 1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS—Continued

| Reg section | Description of change |
| --- | --- |
| **Closed School Discharge:** | |
| § 682.402(d)(7)(ii) ............................ | Requires a lender to provide a borrower another closed school discharge application upon resuming collection. |
| §§ 674.33(g)(3), 682.402(d)(8), and 685.214(c)(2). | Revised to clearly delineate the circumstances under which a closed school discharge is discretionary, as opposed to required. |
| § 682.402(d)(6)(ii)(F) ....................... | Revised to stipulate that a guaranty agency that denies a borrower's closed school discharge request must notify the borrower of the reasons for the denial. |
| § 682.402(d) ................................... | Updates wording in FFEL closed school discharge regulations to refer to application instead of sworn statement or written request. |
| **False Certification Discharge:** | |
| § 685.215(c)(1) ................................ | Clarifies that a borrower must have reported to the school that the borrower did not have a high school diploma or its equivalent. |
| § 685.308(a) ................................... | Clarifies that the Department assesses liabilities to schools for false certification due to disqualifying condition or identity theft. |
| **Predispute Agreements** | |
| § 685.300 ........................................ | Eliminates the use of predispute arbitration agreements, whether or not they are mandatory, to resolve claims brought by a borrower against the school that could also form the basis of a borrower defense or to prevent a student who has obtained or benefited from a Direct Loan from participating in a class action suit related to borrower defense claim. |

3. Discussion of Costs, Benefits, and Transfers

In developing the final regulations, the Department made some changes to address concerns expressed by commenters and to achieve the objectives of the regulations while acknowledging the potential costs of the provisions to institutions and taxpayers. As noted in the NPRM, the primary potential benefits of these regulations are: (1) An updated and clarified process and a Federal standard to improve the borrower defense process and usage of the borrower defense process to increase protections for students; (2) increased financial protections for taxpayers and the Federal government; (3) additional information to help students, prospective students, and their families make educated decisions based on information about an institution's financial soundness and its borrowers' loan repayment outcomes; (4) improved conduct of schools by holding individual institutions accountable and thereby deterring misconduct by other schools; (5) improved awareness and usage, where appropriate, of closed school and false certification discharges; and (6) technical changes to improve the administration of the title IV, HEA programs. Costs associated with the regulations will fall on a number of affected entities including institutions, guaranty agencies, the Federal government, and taxpayers. These costs include changes to business practices, review of marketing materials,

additional employee training, and unreimbursed claims covered by taxpayers. The largest quantified impact of the regulations is the transfer of funds from the Federal government to borrowers who succeed in a borrower defense claim, a significant share of which will be offset by the recovery of funds from institutions whose conduct gave rise to the claims.

We have considered and determined the primary costs and benefits of these regulations for the following groups or entities that we expect to be impacted by the proposed regulations:
• Students and borrowers
• Institutions
• Guaranty agencies and loan servicers
• Federal, State, and local government

*Borrower Defense, Closed School Discharges, and False Certification Discharges*

*Students and Borrowers*

The fundamental underlying right of borrowers to assert a defense to repayment and obligation of institutions to reimburse the Federal government for such claims that are valid exist under the current borrower defense regulations. These final regulations aim to establish processes that enable more borrowers to pursue valid claims and increase their likelihood of discharging their loans as a result of institutional actions generating such claims. As detailed in the NPRM, borrowers will be the primary beneficiaries of these regulations as greater awareness of

borrower defense, a common Federal standard, and a better defined process may encourage borrowers who may have been unaware of the process, or intimidated by its complexity in the past, to file claims.

Furthermore, these changes could reduce the number of borrowers who are struggling to meet their student loan obligations. During the public comment periods of the negotiated rulemaking sessions, many public commenters who were borrowers mentioned that they felt that they had been defrauded by their institutions of higher education and were unable to pay their student loans, understand the borrower defense process, or obtain debt relief for their FFEL Loans under the current regulations. We received many comments on the NPRM echoing this sentiment.

Through the financial responsibility provisions, these final regulations introduce far stronger incentives for schools to avoid committing acts or making omissions that could lead to a valid borrower defense claim than currently exist. In addition, through clarification of circumstances that could lead to a valid claim, institutions may better avoid behavior that could result in a valid claim and future borrowers may be less likely to face such behavior.

Providing an automatic forbearance with an option for the borrower to decline the temporary relief and continue making payments will reduce the potential burden on borrowers pursuing borrower defenses. These borrowers will be able to focus on

supplying the information needed to process their borrower defense claims without the pressure of continuing to make payments on loans for which they are currently seeking relief. When claims are successful, there will be a transfer between the Federal government and affected student borrowers as balances are forgiven and some past payments are returned. In the scenarios described in the Net Budget Impacts section of this analysis, those transfers range from $1.7 billion for the minimum budget estimate to $3.3 billion in the maximum impact estimate annually, with the primary budget estimate at $2.5 billion annually.

Borrowers who ultimately have their loans discharged will not have been able to repay, and that debt relief can ultimately allow them to become bigger participants in the economy, possibly buying a home, saving for retirement, or paying for other expenses. Recent literature related to student loans suggests that high levels of student debt may decrease the long-term probability of marriage,[98] increase the probability of bankruptcy,[99] reduce home ownership rates,[100] and increase credit constraints, especially for students who drop out.[101] Further, when borrowers default on their loans, everyday activities like signing up for utilities, obtaining insurance, or renting an apartment can become a challenge.[102] Borrowers who default might also be denied a job due to poor credit, struggle to pay fees necessary to maintain professional licenses, or be unable open a new checking account.[103] While difficult to quantify because of the multitude of different potential borrowing profiles and nature of the claims of those who will seek relief through borrower defense and the possibility of partial relief, the discharge of loans for which borrowers have valid borrower defenses could have significant positive consequences for affected borrowers and associated spillover economic benefits.

Affected borrowers also will be able to return into the higher education marketplace and pursue credentials they need for career advancement. To the extent borrowers have subsidized loans, the elimination or recalculation of the borrowers' subsidized usage period could relieve them of their responsibility for accrued interest and make them eligible for additional subsidized loans, which could make returning to higher education a more acceptable option.

These regulations will also give borrowers more information with which they can make informed decisions about the institutions they choose to attend. An institution will be required to provide a disclosure for certain actions and triggering events, to be determined through consumer testing, for which it was required to obtain a letter of credit. Recent events involving closure of several large proprietary institutions have shown the need for lawmakers, regulatory bodies, State authorizers, taxpayers, and students to be more broadly aware of circumstances that could affect the continued existence of an institution. This disclosure, the content of which will be prescribed by the Secretary in a notice published in the **Federal Register**, will allow borrowers to receive early warning signs about an institution's risk for students, and therefore borrowers may be able to select a different college, or withdraw or transfer to an institution in better standing in lieu of continuing to work towards earning credentials that may have limited value.

Proprietary institutions will also be required to provide a warning through advertising and promotional materials if their loan repayment rate, based on the proportion of students who have repaid at least one dollar in outstanding balance and measured in the third year after entering repayment, using data reported and validated through the Gainful Employment repayment rate calculation, shows that the median borrower has not paid down his balance by at least one dollar. To estimate the effect of the repayment rate warning on institutions, the Department analyzed program-level repayment rate data prepared for the Gainful Employment regulation [104] and aggregated the proprietary institutions data to the 6-digit OPEID level and found that 972 of 1,345 institutions in the 2012 Gainful Employment data had a repayment rate that showed the median borrower had not paid down the balance of the borrower's loans by at least one dollar.

A number of commenters pointed to the Department's failure to quantify the benefits of the proposed regulations in the NPRM as an indication that the analysis did not support the implementation of the final regulations. As mentioned throughout the RIA, the extent of the private and public benefit from the regulations is difficult to quantify. We have limited experience with borrower defense claims to draw upon in generating a profile of those likely to make successful claims. There are different potential profiles of student loan borrowers in terms of loan amounts, loan type composition, likelihood of default, fields of employment, degree level, and other factors. We do not have a basis in the data from existing claims to know how borrower profiles and the distribution and nature of claims will intersect. The economic and psychological benefits of debt relief may vary for a graduate student with high income potential receiving partial relief on a high level of debt and a student who dropped out of a certificate program with a lower level of debt and lower earnings potential from that program of education. While we do not quantify the amount, we expect the benefits associated with the substantial transfers to students from successful borrower defense claims will be significant. Several commenters noted that students may face costs or other negative impacts from these final regulations. In particular, commenters expressed concern that the closure of institutions, especially proprietary institutions that serve many low-income, minority, first-generation, and non-traditional students, will hurt access to higher education, especially for those groups. The Department acknowledges that some institutions may close if their actions mean that they are required to provide a substantial amount of financial protection, or that a large number of successful claims are made against them. However, as the regulation comes into effect and examples of conduct that generates claims are better understood, we expect institutions will limit such behavior and compete for students without such conduct, and that closures will be reduced over time. The Department also believes that institutions that do not face significant claims will be able to provide opportunities for students in

---

[98] Gicheva, D. "In Debt and Alone? Examining the Causal Link between Student Loans and Marriage." Working Paper (2013).

[99] Gicheva, D., and U. N. C. Greensboro. "The Effects of Student Loans on Long-Term Household Financial Stability." Working Paper (2014).

[100] Shand, J. M. (2007). "The Impact of Early-Life Debt on the Homeownership Rates of Young Households: An Empirical Investigation." Federal Deposit Insurance Corporation Center for Financial Research.

[101] Id.

[102] *https://studentaid.ed.gov/repay-loans/default.*

[103] *www.asa.org/in-default/consequences/.*

[104] A privacy-protected version of the data is available at *http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/2013-repayment-rate-data.xls.* The Department aggregated all program numerators and denominators to each unique six-digit OPEID and calculated how many institutions had aggregate rates under the negative amortization threshold and at least 10 borrowers in the denominator. Note that these data reflect students who entered repayment in 2007 and 2008; analysis of later cohorts (those who entered repayment in 2011 and 2012) published through the College Scorecard, which calculate a similar repayment rate, showed 501 institutions with repayment rates below the negative amortization threshold.

the event of closures of other institutions that do.

Another possible impact on students mentioned by some commenters is that the costs of financial protection or other compliance measures will be passed on to students in tuition and fee increases. We believe potential tuition increases will be constrained by loan limits and other initiatives, such as the Department's Gainful Employment regulations, where institutions would be negatively affected by such increases.

*Institutions*

Institutions will bear many of this regulation's costs, which fall into three categories: Paperwork costs associated with compliance with the regulations; other compliance costs that may be incurred as institutions adapt their business practices and training to ensure compliance with the regulations; and costs associated with obtaining letters of credit or suitable equivalents if required by the institution's performance under a variety of triggers. Additionally, there may be a potentially significant amount of funds transferred between institutions and the Federal government as reimbursement for successful claims. Some institutions may close some or all of their programs if their activities generate large numbers of borrower defense claims.

A key consideration in evaluating the effect on institutions is the distribution of the impact. While all institutions participating in title IV loan programs are subject to the possibility of borrower defense, closed school, and false certification claims and the reporting requirements in these final regulations, the Department expects that fewer institutions will engage in conduct that generates borrower defense claims. Over time, the Department expects the number of schools that would face the most significant costs to come into compliance, the amount of transfers to reimburse the government for successful claims, costs to obtain required letters of credit, and disclosure of borrower defense claims against the schools to be reduced as some offenders are eliminated and other institutions adjust their practices. In the primary budget scenario described in the Net Budget Impacts section of this analysis, the annual transfers from institutions to students, via the Federal government, as reimbursement for successful claims are estimated at $994 million. On the other hand, it is possible that high-quality, compliant institutions, especially in the for-profit sector, will see benefits if the overall reputation of the sector improves as a result of (1) more trust that enforcement against bad actors will be effective, and (2) the removal of bad schools from the higher education marketplace, freeing up market share for the remaining schools.

The accountability framework in the regulations requiring institutions to provide financial protection in response to various triggers would generate costs for institutions. Some of the triggering provisions would affect institutions differently depending upon their type and control, as, for example, only publicly traded institutions are subject to delisting or SEC suspension of trading, only proprietary institutions are subject to the 90/10 rule, and public institutions are not subject to the financial protection requirements. To the extent data were available, we evaluated the financial protection triggers to analyze the expected impact on institutions. Several of the triggers are based on existing performance measures and are aimed at identifying institutions that may face sanctions and experience difficulty meeting their financial obligations. The triggers and, where available, data about their potential impact are discussed in Table 2. The consequences of an institution being found to be not financially responsible are set out in § 668.175 and include providing financial protection through a letter of credit, a set-aside of title IV, HEA funds, or other forms of financial protection specified by the Secretary in a notice published in the **Federal Register**. Alternatively, an institution that can prove it has insurance that covers the triggering risk is not considered to be not financially responsible and does not need to provide financial protection to the Department.

The Department will review the triggering events before determining whether to require separate financial protection for a triggering event that occurs with other triggering events. Another change from the NPRM concerns those triggers that include a materiality threshold. Instead of being evaluated separately, lawsuits, borrower protection repayments to the Secretary, losses from gainful employment and campus closures, withdrawal of owner's equity, and other triggers with a materiality threshold will be evaluated by their effect on the institution's most recent composite score, which will allow the cumulative effect of violation of multiple triggers to be taken into account. If the recalculated composite score is a failing score, institutions would be required to provide financial protection. For the triggers evaluated through the revised composite score approach, the required financial protection is 10 percent or more, as determined by the Secretary, of the total amount of title IV, HEA program received by the institution during its most recently completed fiscal year. For the other triggers, the amount of financial protection required remains 10 percent or more, as determined by the Secretary, of the total amount of title IV, HEA program received by the institution during its most recently completed fiscal year, unless the Department determines that based on the facts of that particular case, the potential losses are greater.

TABLE 2—FINANCIAL RESPONSIBILITY TRIGGERS

| Description | Impact |
| --- | --- |
| **Automatic Triggers Evaluated through Revised Composite Score Calculation** | |
| Institution found to be not financially responsible under § 668.171 and must qualify under an alternative standard if the addition of the triggering liability to the institution's most recently calculated composite score causes it to fail the composite score. Triggering liabilities that occur during the period between the fiscal year for which the Secretary last calculated the institution's composite score under § 668.172 and the next following fiscal year for which the Secretary calculates a composite score are evaluated. Requires financial protection of no less than 10 percent of prior year's title IV, HEA aid such additional amount as the Secretary demonstrates is needed to protect from other losses that may arise within the next 18 months. | |

TABLE 2—FINANCIAL RESPONSIBILITY TRIGGERS—Continued

| Description | Impact |
|---|---|
| **Lawsuits and Other Actions: § 668.171(c)(1)(i) and (ii)** | |
| Triggered if an institution is required to pay any debt or incur any liability arising from a final judgment in a judicial proceeding, or from an administrative proceeding or determination, or from a settlement.<br>Triggered if the institution is being sued in an action brought on or after July 1, 2017 by a Federal or State authority for financial relief on claims related to the making of the Direct Loan for enrollment at the school or the provision of educational services and the suit has been pending for 120 days.<br>Triggered if the institution is being sued in a lawsuit other than by a Federal or State authority related to the making of a Direct Loan or provision of educational services which has survived a motion for summary judgment or the time for such motion has passed.<br>If claims do not state a dollar amount and no amount has been set in a court ruling: (1) For Federal and State borrower defense-related action, the Department will calculate loss by considering claim to seek the amount set by a court ruling, or if no ruling has been issued, in a written demand or settlement offer by the agency, or the amount of all tuition and fees for the period in the suit, for the program or location described in the allegations. Institution allowed to show suit is limited to a smaller portion of the school and that tuition and fees for that portion should be used; and (2) For all other suits the potential loss (if none is stated in the complaint or in a court ruling) is the amount in a written demand pre-suit, the amount offered by the plaintiff to settle, or the amount stated in discovery leading up to a trial. | Since 2010, at least 25 institutions have been investigated or reached settlements with State AGs, with some being involved in actions by multiple States. Federal agencies, including the Department, DOJ, FTC, CFPB, and the SEC have been involved in actions against at least 20 institutions, with multiple actions against some schools. |
| **Accreditor Actions: (Teach-Outs) § 668.171(c)(1)(iii)** | |
| Triggered if institution required by its accrediting agency to submit a teach-out plan that covers the closing of the institution or any of its branches or additional locations.<br>The amount of title IV, HEA aid allocated in the previous year to the closed locations will be used to recalculate the composite score. | |
| **Gainful Employment: § 668.171(c)(1)(iv)** | |
| Triggered if the potential loss from the closure of programs that are one year away from losing their eligibility for title IV, HEA program funds causes the recalculated composite score to fall below 1.0.<br>The amount of title IV, HEA aid allocated in the previous year to programs that could lose eligibility in the next year will be used to recalculate the composite score. | |
| **Withdrawal of Owner's Equity: § 668.171(c)(1)(v)** | |
| The amount of equity withdrawn will be used to recalculate the composite score. Applies only to proprietary institutions and provides that funds transferred between institutions in a group that have a common composite score are not considered withdrawals of owner's equity. | |
| **Automatic Triggers Not Evaluated through Revised Composite Score Calculation** | |
| Institution found to be not financially responsible under § 668.171 and must qualify under an alternative standard if the triggering events occur. | |
| **Non-Title IV Revenue: § 668.171(d)** | |
| If an institution fails the 90/10 revenue test in its most recently completed fiscal year. Applies to proprietary institutions only. | In the most recent 90/10 report, 14 institutions received 90 percent or more of their revenues from title IV, HEA funds. The total title IV, HEA funding for those institutions in award year (AY) 2013–14 was $56.4 million. |
| **Publicly Traded Institutions—SEC or Exchange Actions: § 668.171(e)** | |
| The SEC warns the institution that it may suspend trading on the institution's stock.<br>The institution failed to file a required annual or quarterly report with the SEC within the time period prescribed for that report or by any extended due date under 17 CFR 240.12b–25. | |

TABLE 2—FINANCIAL RESPONSIBILITY TRIGGERS—Continued

| Description | Impact |
|---|---|
| The exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements, or its stock is delisted. | |
| **Cohort Default Rates: § 668.171(f)** | |
| Triggered if institution's two most recent official cohort default rates are 30 percent or above after any challenges or appeals. | From the most recently released official CDR rates, for FY2013 and FY2012, 20 of 3,058 non-public institutions that had CDR rates in both years were over 30 percent in both years. Title IV, HEA aid received by these institutions in AY2015–16 totaled $12.8 million. |
| **Discretionary Triggers** | |
| Institution found to be not financially responsible under § 668.171 and must qualify under an alternative standard if the Secretary determines that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution. | |
| § 668.171(g)(1): Significant fluctuations in title IV, HEA program funds .. | The Department looked at fluctuations in Direct Loan amounts and found that 1,113 of 3,534 non-public institutions had an absolute change in Direct Loan volume of 25 percent or more between the 2014–15 and 2015–16 award years and 350 had a change of 50 percent or more. |
| § 668.171(g)(2): Citation for failing State licensing or authorizing agency requirements. | |
| § 668.171(g)(3): Failing financial stress test developed or adopted by the Secretary. | |
| § 668.171(g)(4): High annual dropout rates, as calculated by the Secretary. | The Department analyzed College Scorecard data to develop a withdrawal rate within six years. Of 928 proprietary institutions with data, 482 had rates from 0 to 20 percent, 415 from 20 to 40 percent, 30 from 40 to 60 percent, and 1 from 60 to 80 percent. Of 1,058 private not-for-profit institutions with data, 679 had rates from 0 to 20 percent, 328 from 20 to 40 percent, 51 from 40 to 60 percent, and none above 60 percent. Of 1,476 public institutions with data, 857 had rates from 0 to 20 percent, 587 from 20 to 40 percent, 32 from 40 to 60 percent, and none above 60 percent. |
| § 668.171(g)(5): The institution was placed on probation or issued a show-cause order or a status that poses equivalent or greater risk to accreditation. | In the March 2015 accreditation report available at *http://ope.ed.gov/accreditation/GetDownLoadFile.aspx*, 278 of 33,956 programs were on probation and 5 were in the resigned under show cause status. Of the 283 programs in those statuses in the March 2015 accreditation report, 9 were closed by institutions or had their accreditation terminated and 147 remained in the same status for at least 6 consecutive months. |
| § 668.171(g)(6): Institution violates a provision or requirement in a loan agreement that enables a creditor to require an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees. | |
| § 668.171(g)(7): The institution has pending claims borrower relief discharge under § 685.206 or § 685.222. | |
| § 668.171(g)(8): The Secretary expects to receive a significant number of claims for borrower relief discharge under § 685.206 or § 685.222 as a result of a lawsuit, settlement, judgement, or finding from a State or Federal administrative proceeding. | |

In addition to any resources institutions would devote to training or changes in business practices to improve compliance with the final regulations, institutions would incur costs associated with the reporting and disclosure requirements of the final regulations. This additional workload is discussed in more detail under *Paperwork Reduction Act of 1995.* In total, the final regulations are estimated to increase burden on institutions participating in the title IV, HEA programs by 251,049 hours. The monetized cost of this burden on institutions, using wage data developed using BLS data available at *www.bls.gov/ncs/ect/sp/ecsuphst.pdf,* is $9,175,841. This cost was based on an hourly rate of $36.55.

*Guaranty Agencies and Loan Servicers*

Several provisions may impose a cost on guaranty agencies or lenders, particularly the limits on interest capitalization. Loan servicers may have to update their process to accept electronic death certificates, but increased use of electronic documents should be more efficient over the long term. As indicated in the Paperwork Reduction Act of 1995 section of this preamble, the final regulations are estimated to increase burden on guaranty agencies and loan servicers by 7,622 hours related to the mandatory forbearance for FFEL borrowers considering consolidation for a borrower defense claim and reviews of denied closed school claims. The monetized cost of this burden on guaranty agencies and loan servicers, using wage data developed using BLS data available at *www.bls.gov/ncs/ect/*

*sp/ecsuphst.pdf,* is $278,584. This cost was based on an hourly rate of $36.55.

*Federal, State, and Local Governments*

In addition to the costs detailed in the *Net Budget Impacts* section of this analysis, the final regulations will affect the Federal government's administration of the title IV, HEA programs. The borrower defense process in the final regulations will provide a framework for handling claims in the event of significant institutional wrongdoing. The Department may incur some administrative costs or shifting of resources from other activities if the number of applications increases significantly and a large number of claims require hearings. Additionally, to the extent borrower defense claims are not reimbursed by institutions, Federal government resources that could have been used for other purposes will be transferred to affected borrowers. Taxpayers will bear the burden of these unreimbursed claims. In the scenarios presented in the *Net Budget Impacts* section of this analysis, annualized unreimbursed claims range from $923 million to $2.1 billion.

The accountability framework and financial protection triggers will provide some protection for taxpayers as well as potential direction for the Department and other Federal and State investigatory agencies to focus their enforcement efforts. The financial protection triggers may potentially assist the Department as it seeks to identify, and take action regarding, material actions and events that are likely to have an adverse impact on the financial condition or operations of an institution. In addition to the current process where, for the most part, the Department determines annually whether an institution is financially responsible based on its audited financial statements, under these final regulations the Department may determine at the time a material action or event occurs that the institution is not financially responsible.

Other Provisions

The technical corrections and additional changes in the final regulations will benefit student borrowers and the Federal government's administration of the title IV, HEA programs. Updates to the acceptable forms of certification for a death discharge will be more convenient for borrowers' families or estates and the Department. The provision for consolidation of Nurse Faculty Loans reflects current practice and gives those borrowers a way to combine the servicing of all their loans. Many of

these technical corrections and changes involve relationships between the student borrowers and the Federal government, such as the clarification in the REPAYE treatment of spousal income and debt, and they are not expected to significantly impact institutions.

4. Net Budget Impacts

The final regulations are estimated to have a net budget impact in costs over the 2017–2026 loan cohorts of $16.6 billion in the primary estimate scenario, including a $381 million modification to cohorts 2014–2016 for the 3-year automatic closed school discharge. A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans.

As noted by many commenters, in the NPRM we presented a number of scenarios that generated a wide range of potential budget impacts from $1.997 billion in the lowest impact scenario to $42.698 billion in the highest impact scenario. As described in the NPRM, this range reflected the uncertainty related to the borrower defense provisions in the regulations and our intent to be transparent about the estimates to generate discussion and information that could help to refine the estimates. In response to comments and our own internal review, we have made a number of revisions to the borrower defense budget impact estimate that are described in the discussion of the impact of those provisions.

The provisions with the greatest impact on the net budget impact of the regulations are those related to the discharge of borrowers' loans, especially the changes to borrower defense and closed school discharges. As noted in the NPRM, borrowers may pursue closed school, false certification, or borrower defense discharges depending on the circumstances of the institution's conduct and the borrower's claim. If the institution does not close, the borrower cannot or does not pursue closed school or false certification discharges, or the Secretary determines the borrower's claim is better suited to a borrower defense group process, the borrower may pursue a borrower defense claim. The precise split among the types of claims will depend on the borrower's eligibility and ease of pursuing the different claims. While we recognize that some claims may be fluid in classification between borrower defense and the other discharges, in this

analysis any estimated effect from borrower defense related claims are described in that estimate, and the net budget impact in the closed school estimate focuses on the process changes and disclosures related to that discharge.

Borrower Defense Discharges

As the Department will eventually have to incorporate the borrower defense provisions of these final regulations into its ongoing budget estimates, we have moved closer to that goal in refining the estimated impact of the regulations to reflect a primary scenario. The uncertainty inherent in the borrower defense estimate given the limited history of borrower defense claims and other factors described in the NPRM is reflected in the additional sensitivity runs that demonstrate the effect of changes in the specific assumption being tested. Another change from the NPRM is the specification of an estimated baseline scenario for the impact of borrower defense claims if these final regulations did not go into effect and borrowers had to pursue claims under the existing borrower defense regulation. Similar to the NPRM, the estimated net budget impact of $14.9 billion attributes all borrower defense activity for the 2017 to 2026 cohorts to these final regulations, but with the baseline scenario, we present an estimate of the subset of those costs that could be incurred under the existing borrower defense regulation.

These final regulations establish a Federal standard for borrower defense claims related to loans first disbursed on or after July 1, 2017, as well as describe the process for the assertion and resolution of all borrower defense claims—both those made for Direct Loans first disbursed prior to July 1, 2017, and for those made under the regulations after that date. As indicated in this preamble, while regulations governing borrower defense claims have existed since 1995, those regulations have rarely been used. Therefore, we have used the limited data available on borrower defense claims, especially information about the results of the collapse of Corinthian, projected loan volumes, Departmental expertise, the discussions at negotiated rulemaking, comments on the NPRM analysis, and information about past investigations into the type of institutional acts or omissions that would give rise to borrower defense claims to refine the primary estimate and sensitivity scenarios that we believe will capture the range of net budget impacts

associated with the borrower defense regulations.

While we have refined the assumptions used to estimate the impact of the borrower defense provisions, the ultimate method of estimating the impact remains entering a level of net borrower defense claims into the student loan model (SLM) by risk group, loan type, and cohort. The net present value of the reduced stream of cash flows compared to what the Department would have expected from a particular cohort, risk group, and loan type generates the expected cost of the regulations. Similar to the NPRM, we applied an assumed level of school misconduct, borrower claims success, and recoveries from institutions (respectively labeled as Conduct Percent, Borrower Percent, and Recovery Percent in Tables 3–A and 3–B) to the President's Budget 2017 (PB2017) loan volume estimates to generate the estimated net borrower defense claims for each cohort, loan type, and sector.

The limited history of borrower defense claims and other factors that lead the Department to the range of scenarios described in the NPRM are still in effect. These factors include the level of school misconduct that could give rise to claims and institutions' reaction to the regulation to cut back on such activities, borrowers' response to the regulations including the consolidation of FFEL and Perkins borrowers to access the Direct Loan borrower defense process, the level of group versus individual claims, and the extent of full or partial relief applied to claims. Additionally, other regulatory and enforcement initiatives such as the Gainful Employment regulations, creation of the Student Aid Enforcement Unit, and greater rigor in the Department's review of accrediting agencies may have overlapping effects and may affect loan volumes and potential exposure to borrower defense claims at some institutions. To demonstrate the effect of the uncertainty about these factors, we estimated several scenarios to test the sensitivity of the various assumptions.

In refining our approach and estimating a primary scenario with several sensitivity runs, we also changed the assumptions from the NPRM in response to comments and our own review. The development of the estimated baseline scenario described in Table 3–B is one of the changes. Another major change is the incorporation of a deterrent effect of the borrower defense provisions on institutional behavior. In the NPRM, there was no change across cohorts in

the level of school misconduct giving rise to claims. Upon review, we believe it is more likely that the borrower defense provision will have an impact like that of other title IV policies such as the cohort default rate or 90/10 in that institutions will make efforts to comply as the rule comes into effect and the precedents for what constitutes behavior resulting in successful claims are developed. In the past, when provisions targeting specific institutional activities or performance have been introduced, there has generally been a period of several years while the worst performers are removed from the system and while other institutions adapt to the new requirements and a lower steady state is established. We expect a similar pattern to develop with respect to borrower defense, as reflected in the Conduct Percent in Table 3–A. Another change reflected by the Conduct Percent is an increase in maximum level of claims from public and private non-profit institutions to 3 percent. Many commenters expressed concern about the effect of the regulations on these sectors or questions about the type of misconduct leading to claims that exist in those sectors. A number of commenters pointed to graduate programs, especially law programs, as a potential source of claims. Graduate students took out approximately 36 percent of all Direct Loans in 2015–16.[105] Given the history of court decisions related to law school debt, the presumed greater sophistication of graduate borrowers, and the possibility of partial relief due to the value of the education received, we still do not expect many successful claims to come from these sectors but did increase the level to account for the possibility. The other major change is the introduction of a ramp-up in the Borrower Percent and the Recovery Percent to reflect an increase in borrower awareness and the effectiveness of the financial responsibility protections over time.

There are a number of other potential mitigating factors that we did not explicitly adjust in our estimates in order to avoid underestimating the potential cost of the borrower defense provisions. Several commenters expressed concern about the effect of the regulations on access to higher education, especially for low-income, minority, or first-generation students. It is possible that the mix of financial aid received by students could shift if they

attend different institutions than they would if the rule were not in place, but we believe that students whose choice of schools may have been affected by an institution's wrongdoing will find an alternative and receive similar amounts of title IV, HEA aid. Some students who may not have pursued higher education without the institution's act or omission may not enter the system, reducing the amount of Pell Grants or loans taken out, but we do not expect this to be a substantial portion of affected student borrowers. In the case of Pell Grants in particular, we do not want to estimate savings from potential reductions in aid related to borrower defense until such an effect is demonstrated in relevant data. Similarly, default discharges may decrease as borrowers seek discharge under the borrower defense provisions of these final regulations. If borrowers with valid borrower defense claims differ in their payment profile from the overall portfolio, the effect on the level of defaults, especially in some risk groups, could be substantial.

Table 3–A presents the assumptions for the primary budget estimate with the budget estimate for each scenario presented in Table 4. As in the NPRM, we also estimated the impact if the Department received no recoveries from institutions, the results of which are discussed after Table 4. As in the NPRM, we do not specify how many institutions are represented in the estimate, as the scenario could represent a substantial number of institutions engaging in acts giving rise to borrower defense claims or could represent a small number of institutions with significant loan volume subject to a large number of claims. According to Federal Student Aid data center loan volume reports, the five largest proprietary institutions in loan volume received 26 percent of Direct Loans disbursed in the proprietary sector in award year 2014–15 and the 50 largest represent 69 percent.[106]

As was done in the NPRM, the PB2017 loan volumes by sector were multiplied by the Conduct Percent that represents the share of loan volume estimated to be affected by institutional behavior that results in a borrower defense claim and the Borrower Percent that captures the percent of loan volume associated with potentially eligible borrowers who successfully pursue a claim to generate gross claims. The

---

[105] Federal Student Aid, *Student Aid Data: Title IV Program Volume by School,* available at *https://studentaid.ed.gov/sa/about/data-center/student/title-iv.*

[106] Federal Student Aid, *Student Aid Data: Title IV Program Volume by School Direct Loan Program AY2015–16, Q4,* available at *https://studentaid.ed.gov/sa/about/data-center/student/title-iv* accessed August 22, 2016. *https://studentaid.ed.gov/sa/about/data-center/student/title-iv* accessed August 22, 2016.

Federal Register / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations

Recovery Percent was then applied to the gross claims to calculate the net claims that were processed in the Student Loan Model as increased discharges. The numbers in Tables 3–A and 3–B are the percentages applied for the primary estimate and baseline scenarios for each assumption.

TABLE 3–A—ASSUMPTIONS FOR PRIMARY BUDGET ESTIMATE

| Cohort | 2Yr pub | 2Yr priv | 2Yr prop | 4Yr pub | 4Yr priv | 4Yr prop |
|---|---|---|---|---|---|---|
| **Conduct Percent** | | | | | | |
| 2017 | 3.0 | 3.0 | 20 | 3.0 | 3.0 | 20 |
| 2018 | 2.4 | 2.4 | 16 | 2.4 | 2.4 | 16 |
| 2019 | 2.0 | 2.0 | 13.6 | 2.0 | 2.0 | 13.6 |
| 2020 | 1.7 | 1.7 | 11.6 | 1.7 | 1.7 | 11.6 |
| 2021 | 1.5 | 1.5 | 9.8 | 1.5 | 1.5 | 9.8 |
| 2022 | 1.4 | 1.4 | 8.8 | 1.4 | 1.4 | 8.8 |
| 2023 | 1.3 | 1.3 | 8.4 | 1.3 | 1.3 | 8.4 |
| 2024 | 1.2 | 1.2 | 8 | 1.2 | 1.2 | 8 |
| 2025 | 1.2 | 1.2 | 7.8 | 1.2 | 1.2 | 7.8 |
| 2026 | 1.1 | 1.1 | 7.7 | 1.1 | 1.1 | 7.7 |
| **Borrower Percent** | | | | | | |
| 2017 | 35 | 35 | 45 | 35 | 35 | 45 |
| 2018 | 36.8 | 36.8 | 47.3 | 36.8 | 36.8 | 47.3 |
| 2019 | 38.6 | 38.6 | 49.6 | 38.6 | 38.6 | 49.6 |
| 2020 | 42.4 | 42.4 | 54.6 | 42.4 | 42.4 | 54.6 |
| 2021 | 46.7 | 46.7 | 60 | 46.7 | 46.7 | 60 |
| 2022 | 50 | 50 | 63 | 50 | 50 | 63 |
| 2023 | 50 | 50 | 65 | 50 | 50 | 65 |
| 2024 | 50 | 50 | 65 | 50 | 50 | 65 |
| 2025 | 50 | 50 | 65 | 50 | 50 | 65 |
| 2026 | 50 | 50 | 65 | 50 | 50 | 65 |
| **Recovery Percent** | | | | | | |
| 2017 | 75 | 23.8 | 23.8 | 75 | 23.8 | 23.8 |
| 2018 | 75 | 23.8 | 23.8 | 75 | 23.8 | 23.8 |
| 2019 | 75 | 26.18 | 26.18 | 75 | 26.18 | 26.18 |
| 2020 | 75 | 28.80 | 28.80 | 75 | 28.80 | 28.80 |
| 2021 | 75 | 31.68 | 31.68 | 75 | 31.68 | 31.68 |
| 2022 | 75 | 33.26 | 33.26 | 75 | 33.26 | 33.26 |
| 2023 | 75 | 34.93 | 34.93 | 75 | 34.93 | 34.93 |
| 2024 | 75 | 36.67 | 36.67 | 75 | 36.67 | 36.67 |
| 2025 | 75 | 37.4 | 37.4 | 75 | 37.4 | 37.4 |
| 2026 | 75 | 37.4 | 37.4 | 75 | 37.4 | 37.4 |

We also estimated a baseline scenario for the potential impact of borrower defense in recognition that many claims could be pursued under the existing State standards. The publicity and increased awareness of borrower defense could lead to increased activity under the existing regulations. In addition to the Corinthian claims, as of October 2016, the Department had received nearly 4,400 claims from borrowers of at least 20 institutions. The Federal standard in the final regulations will provide a unified standard across all States but is based on elements of relevant consumer protection law from the various States. We estimate that the final regulations could increase claims beyond those that could be pursued without it by an average of approximately 10 percent for the FY2017 cohort. This is based on our initial review of claims presented that does not reveal significant differences between the State and Federal standards, limiting the expected increase in claims from the adoption of the Federal standard. The baseline school conduct percentage does improve over time, but at a slower rate than occurs under the regulation. The borrower claim percentage for the baseline is based on the history of limited claims, informational sessions [107] during which during which 5 to 10 percent was presented as a reasonable rate when borrowers have to submit applications or otherwise initiate the process, and the level of effort used by the Department and advocates to get the Corinthian claims into the system. The recovery percentage reflects the fact that public institutions are not subject to the changes in the financial responsibility provisions because of their presumed backing by their respective States. Therefore, the baseline and primary recovery scenarios are the same for public institutions and set at a high level to reflect the Department's confidence in recovering the expected low level of claims against public institutions. Table 3–B presents the assumptions used to generate the share of the total net budget impact that we believe could have occurred even in the absence of these final regulations.

---

[107] Conference calls with the Department, non-Federal negotiators, and Professor Adam Zimmerman were held on March 9, 2016 and March 10, 2016 from 12:00 p.m. to 1:00 p.m.

TABLE 3–B—ASSUMPTIONS FOR ESTIMATED BASELINE SCENARIO

| Cohort | All sectors | 2Yr pub | 2Yr priv | 2Yr prop | 4Yr pub | 4Yr priv | 4Yr prop |
|---|---|---|---|---|---|---|---|
| **Conduct Percent** | | | | | | | |
| 2017 | | 2.7 | 2.7 | 18.0 | 2.7 | 2.7 | 18.0 |
| 2018 | | 2.6 | 2.6 | 17.1 | 2.6 | 2.6 | 17.1 |
| 2019 | | 2.4 | 2.4 | 16.2 | 2.4 | 2.4 | 16.2 |
| 2020 | | 2.3 | 2.3 | 15.4 | 2.3 | 2.3 | 15.4 |
| 2021 | | 2.2 | 2.2 | 14.7 | 2.2 | 2.2 | 14.7 |
| 2022 | | 2.1 | 2.1 | 13.9 | 2.1 | 2.1 | 13.9 |
| 2023 | | 2.0 | 2.0 | 13.2 | 2.0 | 2.0 | 13.2 |
| 2024 | | 1.9 | 1.9 | 12.6 | 1.9 | 1.9 | 12.6 |
| 2025 | | 1.8 | 1.8 | 11.9 | 1.8 | 1.8 | 11.9 |
| 2026 | | 1.7 | 1.7 | 11.3 | 1.7 | 1.7 | 11.3 |
| **Borrower Percent** | | | | | | | |
| 2017 | 8 | | | | | | |
| 2018 | 8.4 | | | | | | |
| 2019 | 8.8 | | | | | | |
| 2020 | 9.3 | | | | | | |
| 2021 | 9.7 | | | | | | |
| 2022 | 10.2 | | | | | | |
| 2023 | 10.7 | | | | | | |
| 2024 | 11.3 | | | | | | |
| 2025 | 11.8 | | | | | | |
| 2026 | 12.4 | | | | | | |
| **Recovery Pct** | | | | | | | |
| 2017 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2018 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2019 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2020 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2021 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2022 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2023 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2024 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2025 | | 75 | 5 | 5 | 75 | 5 | 5 |
| 2026 | | 75 | 5 | 5 | 75 | 5 | 5 |

As noted in the NPRM, and throughout this RIA, the Department recognizes the uncertainty associated with the factors contributing to the primary budget assumptions presented in Table 3–A. The baseline scenario defined by the assumptions in Table 3–B indicates the net costs of claims the Department assumes could occur in absence of these final regulations. The $4.9 billion estimated cost for the baseline scenario is provided for illustrative purposes and, as discussed above, is included in the $14.9 billion total estimated cost for the borrower

defense provisions. To demonstrate the effect of a change in any of the assumptions, the Department designed the following scenarios to isolate each assumption and adjust it by 15 percent in the direction that would increase costs, increasing the Conduct or Borrower percentages and decreasing recoveries. As the gross claims are generated by multiplying the PB2017 estimated volumes by the Conduct Percent and the Borrower Percent, the Con15 scenario demonstrates the effect of the change in either assumption. The recovery percentage is applied to the

gross claims to generate the net claims, so the REC15 scenario reduces recoveries by 15 percent to demonstrate the impact of that assumption. The final two runs adjust all the assumptions simultaneously to present a maximum and minimum expected budget impact. These sensitivity runs are identified as Con15, Rec15, All15, and Min15 respectively. The results of the various scenarios range from $14.9 billion to $21.2 billion and are presented in Table 4.

TABLE 4—BUDGET ESTIMATES FOR BORROWER DEFENSE SENSITIVITY RUNS

| Scenario | Estimated costs for cohorts 2017–2026 (Budget Authority in $mns) | Annualized cost to Federal Gov't (3% discounting) | Annualized cost to Federal Gov't (7% discounting) |
|---|---|---|---|
| Primary Estimate | $14,867 | $1,471 | $1,452 |
| Baseline Scenario Estimate | 4,899 | 485 | 478 |
| Con15 | 16,770 | 1,659 | 1,638 |
| Rec15 | 16,092 | 1,592 | 1,571 |
| All15 | 21,246 | 2,102 | 2,075 |
| Min15 | 9,459 | 936 | 923 |

The transfers among the Federal government and affected borrowers and institutions associated with each scenario above are included in Table 5, with the difference in amounts transferred to borrowers and received from institutions generating the budget impact in Table 4. The amounts in Table 4 assume the Federal Government will recover some portion of claims from institutions. In the absence of any recovery from institutions, taxpayers would bear the full cost of successful claims from affected borrowers. At a 3 percent discount rate, the annualized costs with no recovery are approximately $2.465 billion for the primary budget estimate, $637 million for the baseline scenario, $2.758 billion for the Con15 scenario, $3.279 billion for the All15 scenario, and $1.666 billion for the Min15 scenario. At a 7 percent discount rate, the annualized costs with no recovery are

approximately $2.414 billion for the primary budget estimate, $628 million for the baseline scenario, $2.699 billion for the Con15 scenario, $3.213 billion for the All15 scenario, and $1.627 billion for the Min15 scenario. This potential increase in costs demonstrates the significant effect that recoveries from institutions have on the net budget impact of the borrower defense provisions.

Closed School Discharge and False Certification Discharges

In addition to the provisions previously discussed, the final regulations also would make changes to the closed school discharge process, which are estimated to cost $1.732 billion, of which $381 million is a modification to cohorts 2014–2016 related to the extension of the automatic 3-year discharge and $1.351 billion is for cohorts 2017–2026. The final

regulations include requirements to inform students of the consequences, benefits, requirements, and procedures of the closed school discharge option, including providing students with an application form, and establish a Secretary-led discharge process for borrowers who qualify but do not apply and, according to the Department's information, did not subsequently re-enroll in any title IV-eligible institution within three years from the date the school closed. The increased information about and automatic application of the closed school discharge option and possible increase in school closures related to the institutional accountability provisions in the proposed regulations are likely to increase closed school claims. Chart 1 provides the history of closed schools, which totals 12,666 schools or campus locations through September 2016.



## Chart 1: History of School Closures



In order to estimate the effect of the changes to the discharge process that would grant relief without an application after a three-year period, the Department looked at all Direct Loan borrowers at schools that closed from 2008–2011 to see what percentage of them had not received a closed school discharge and had no NSLDS record of title-IV aided enrollment in the three years following their school's closure. Of 2,287 borrowers in the file, 47 percent had no record of a discharge or subsequent title IV, HEA aid. This does not necessarily mean they did not re-enroll at a title IV institution, so this assumption may overstate the potential

effect of the three-year discharge provision. The Department used this information and the high end of closed school claims in recent years to estimate the effect of the final regulations related to closed school discharges. The resulting estimated cost to the Federal government of the closed school provisions is $1.732 billion, of which $381 million is a modification related to extending the 3-year automatic discharge to cohorts 2014 through 2016 and $1.351 billion relates to the 2017 to 2026 loan cohorts.

The final regulations will also change the false certification discharge process to include instances in which schools

certified the eligibility of a borrower who is not a high school graduate (and does not meet applicable alternative to high school graduate requirements) where the borrower would qualify for a false certification discharge if the school falsified the borrower's high school graduation status; falsified the borrower's high school diploma; or referred the borrower to a third party to obtain a falsified high school diploma. Under existing regulations, false certification discharges represent a very low share of discharges granted to borrowers. The final regulations will replace the explicit reference to ability to benefit requirements in the false

certification discharge regulations with a more general reference to requirements for admission without a high school diploma as applicable when the individual was admitted, and specify how an institution's certification of the eligibility of a borrower who is not a high school graduate (and does not meet applicable alternative to high school graduate requirements) could give rise to a false certification discharge claim. However, we do not expect an increase in false certification discharge claims to result in a significant budget impact from this change. We believe that schools that comply with the current ability to benefit assessment requirement and that honor the current high school graduation requirements will continue to comply in the manner they now do, and we have no basis to believe that changing the terminology or adding false certification of SAP as an example of a reason the Secretary may grant a false certification discharge without an application will lead to an increase in claims that will result in a significant net budget impact.

Other Provisions

As indicated in the NPRM, there are a number of additional provisions in these final regulations that are not expected to have a significant net budget impact. These provisions include a number of technical changes related to the PAYE and REPAYE repayment plans and the consolidation of Nurse Faculty Loans, updates to the regulations describing the Department's authority to compromise debt, and updates to the acceptable forms of verification of death for discharge of title IV loans or TEACH Grant obligations. The technical changes to the REPAYE and PAYE plans were already reflected in the Department's budget estimates for those regulations, so no additional budget effects are included here. Some borrowers may be eligible for additional subsidized loans and no longer be responsible for accrued interest on their subsidized loans as a result of their subsidized usage period being eliminated or recalculated because of a closed school, false certification, unpaid refund, or defense to repayment discharge. However, we believe the institutions primarily affected by the 150 percent subsidized usage regulation are not those expected to generate many of the applicable discharges, so this reflection of current practice is not expected to have a significant budget impact. Allowing death discharges based on death certificates submitted or verified through additional means is convenient for borrowers, but is not estimated to substantially change the amount of death discharges. These updates to the debt compromise limits reflect statutory changes and the Secretary's existing authority to compromise debt, so we do not estimate a significant change in current practices. Revising the regulations to expressly permit the consolidation of Nurse Faculty Loans is not expected to have a significant budget impact, as this technical change reflects current practices. According to Department of Health and Human Services budget documents, approximately $26.5 million [108] in grants are available annually for schools to make Nurse Faculty Loans, and borrowers would lose access to generous forgiveness terms if they choose to consolidate those loans. Therefore, we would expect the volume of consolidation to be very small, and do not anticipate any significant budget impact from this provision.

Assumptions, Limitations, and Data Sources

In developing these estimates, we used a wide range of data sources, including data from the NSLDS; operational and financial data from Department systems; and data from a range of surveys conducted by the National Center for Education Statistics such as the 2012 National Postsecondary Student Aid Survey. We also used data from other sources, such as the U.S. Census Bureau.

5. Accounting Statement

As required by OMB Circular A–4 (available at *www.whitehouse.gov/sites/default/files/omb/assets/omb/circulars/a004/a-4.pdf*), in the following table we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these final regulations. This table provides our best estimate of the changes in annual monetized costs, benefits, and transfers as a result of the final regulations based on the assumptions described in the *Net Budget Impacts* and *Paperwork Reduction Act* sections of this preamble.

TABLE 5—ACCOUNTING STATEMENT

| Category | Benefits | |
|---|---|---|
| Updated and clarified borrower defense process and Federal standard to increase protection for student borrowers and taxpayers. | not quantified | |
| Improved awareness and usage of closed school and false certification discharges. | not quantified | |
| Improved consumer information about institutions' performance and practices. | not quantified | |
| **Category** | **Costs** | |
| | 3% | 7% |
| Costs of obtaining LOCs or equivalents ...................................................... | not quantified | |
| Costs of compliance with paperwork requirements ..................................... | 9.87 | 9.84 |
| **Category** | **Transfers** | |
| | 3% | 7% |
| Borrower Defense claims from the Federal government to affected borrowers (partially borne by affected institutions, via reimbursements. | Primary ............................................ | 2,465 | 2,414 |
| | Baseline ......................................... | 637 | 628 |

[108] Department of Health and Human Services, FY 2017 Health Resources and Services Administration   Justification of Estimates for Appropriations   Committees. Available at *www.hrsa.gov/about/budget/budgetjustification2017.pdf*.

TABLE 5—ACCOUNTING STATEMENT—Continued

| | | |
|---|---|---|
| Con15 ........................................... | 2,758 | 2,699 |
| REC15 ........................................... | 2484 | 2,434 |
| ALL15 ........................................... | 3,279 | 3,213 |
| MIN15 ........................................... | 1,666 | 1,627 |
| Reimbursements of borrower defense claims from affected institutions to affected student borrowers, via the Federal government. | Primary. | |
| Baseline ........................................... | 152 | 150 |
| CON15 ........................................... | 1,099 | 1,061 |
| REC15 ........................................... | 891 | 862 |
| ALL15 ........................................... | 1,176 | 1,138 |
| MIN15 ........................................... | 730 | 704 |
| Closed school discharges from the Federal government to affected students. | 178 | 185 |

### 6. Regulatory Alternatives Considered

In response to comments received and the Department's further internal consideration of these final regulations, the Department reviewed and considered various changes to the proposed regulations detailed in the NPRM. The changes made in response to comments are described in the *Analysis of Comments and Changes* section of this preamble. We summarize below the major proposals that we considered but which we ultimately declined to implement in these regulations.

In particular, the Department extensively reviewed the financial responsibility provisions and related disclosures, the repayment rate warning, and the arbitration provisions of these final regulations. In developing these final regulations, the Department considered the budgetary impact, administrative burden, and effectiveness of the options it considered.

### Final Regulatory Flexibility Analysis

*Description of the Reasons That Action by the Agency Is Being Considered*

The Secretary is amending the regulations governing the Direct Loan Program to establish a new Federal standard, limitation periods, and a process for determining whether a borrower has a borrower defense based on an act or omission of a school. We are also amending the Student Assistance General Provisions regulations to revise the financial responsibility standards and add disclosure requirements for schools. Finally, we are amending the discharge provisions in the Perkins Loan, Direct Loan, FFEL Program, and TEACH Grant programs. These changes will provide transparency, clarity, and ease of administration to current and new regulations and protect students, the Federal government, and taxpayers against potential school liabilities resulting from borrower defenses.

The U.S. Small Business Administration Size Standards define "for-profit institutions" as "small businesses" if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7,000,000. The standards define "non-profit institutions" as "small organizations" if they are independently owned and operated and not dominant in their field of operation, or as "small entities" if they are institutions controlled by governmental entities with populations below 50,000. Under these definitions, an estimated 4,365 institutions of higher education subject to the paperwork compliance provisions of the proposed regulations are small entities. Accordingly, we have prepared this final regulatory flexibility analysis to present an estimate of the effect of these regulations on small entities.

*Succinct Statement of the Objectives of, and Legal Basis for, the Final Regulations*

Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Current regulations in § 685.206(c) governing defenses to repayment have been in place since 1995, but have rarely been used. Those regulations specify that a borrower may assert as a defense to repayment any "act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." In response to the collapse of Corinthian in June of 2015 that the Department would develop new regulations to clarify and streamline the borrower defense process, in a manner that would protect borrowers and allow the Department to hold schools accountable for actions that result in loan discharges.

*Description of and, Where Feasible, an Estimate of the Number of Small Entities To Which the Regulations Will Apply*

These final regulations will affect institutions of higher education that participate in the Federal Direct Loan Program and borrowers. Approximately 60 percent of institutions of higher education qualify as small entities, even though the range of revenues at the non-profit institutions varies greatly. Using data from the Integrated Postsecondary Education Data System, the Department estimates that approximately 4,365 institutions of higher education qualify as small entities—1,891 are not-for-profit institutions, 2,196 are for-profit institutions with programs of two years or less, and 278 are for-profit institutions with four-year programs.

*Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Regulations, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record*

Table 6 relates the estimated burden of each information collection requirement to the hours and costs estimated in the *Paperwork Reduction Act of 1995* section of the preamble. This additional workload is discussed in more detail under the *Paperwork Reduction Act of 1995* section of the preamble. Additional workload is expected to result in estimated costs associated with either the hiring of additional employees or opportunity costs related to the reassignment of existing staff from other activities. In total, these changes are estimated to increase burden on small entities participating in the title IV, HEA programs by 109,351 hours. The monetized cost of this additional burden on institutions, using wage data developed using BLS data available at *www.bls.gov/ncs/ect/sp/ecsuphst.pdf,* is

$3,996,777. This cost was based on an hourly rate of $36.55.

### TABLE 6—PAPERWORK REDUCTION ACT FOR SMALL ENTITIES

| | Reg section | OMB control No. | Hours | Cost |
|---|---|---|---|---|
| Program Participation Agreement—requires school to provide enrolled students a closed school discharge application and written disclosure of the benefits of consequences of the discharge as an alternative to completing their educational program through a teach-out. | 668.14 | OMB 1845–0022 ....... | 985 | $36,004 |
| Advertising warning of repayment rate outcomes; and disclosure to prospective and enrolled students of actions and triggering events for financial protection. | 668.41 | OMB 1845–0004 ....... | 2,138 | 78,159 |
| Financial Responsibility—reporting of certain actions or triggering events in 668.171(c)–(g) no later than the time specified in 668.171(h). | 668.171 | OMB 1845–0022 ....... | 1,617 | 59,094 |
| Alternative Standards and Requirements—requires an institution to provide the Secretary financial protection, such as an irrevocable letter of credit, upon the occurrence of an action or triggering event described in § 668.171(c)–(g) if that event warrants protection as determined under § 668.175(f)(4). | 668.175 | OMB 1845–0022 ....... | 32,336 | 1,181,881 |
| Borrower defense process—provides a framework for the borrower defense process. Institutions could engage in fact-finding, provide evidence related to claims and appeal decisions. | 685.222 | OMB 1845–0142 ....... | 530 | 19,372 |
| Agreements between an eligible school and the Secretary for participation in the Direct Loan Program—prohibits predispute arbitration agreements for borrower defense claims, specifies required agreement and notification language, and requires schools to provide copies of arbitral and judicial filings to the Secretary. | 685.300 | OMB 1845–0143 ....... | 71,745 | 2,622,268 |

*Identification, to the Extent Practicable, of All Relevant Federal Regulations That May Duplicate, Overlap, or Conflict With the Regulations*

The final regulations are unlikely to conflict with or duplicate existing Federal regulations.

*Alternatives Considered*

As described above, the Department participated in negotiated rulemaking and reviewed a large number of comments when developing the regulations, and considered a number of options for some of the provisions. We considered multiple issues, including the group discharge process for borrower defense claims, the limitation periods, the appropriate procedure for considering borrower defense claims including the role of State AGs, the Department, borrowers, and institutions, and the continued use of State standards for borrower defense claims. While no alternatives were aimed specifically at small entities, limiting repayment rate warnings to affected proprietary institutions will reduce the burden on the private not-for-profit institutions that are a significant portion of small entities that would be affected by the final regulations. The additional options to provide financial protection may also benefit small entities, even though the changes were not specifically directed at them.

**Paperwork Reduction Act of 1995**

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that: The public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

Sections 668.14, 668.41, 668.171, 668.175, 682.211, 682.402, 685.222, and 685.300 contain information collection requirements. Under the PRA, the Department has submitted a copy of these sections and an Information Collections Request to OMB for its review.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number.

In these final regulations, we have displayed the control numbers assigned by OMB to any information collection requirements in this NPRM and adopted in the final regulations.

**Discussion**

*Section 668.14—Program Participation Agreement*

*Requirements:* Section 668.14(b)(32) of the final regulations will require, as part of the program participation agreement, a school to provide all enrolled students with a closed school discharge application and a written disclosure, describing the benefits and the consequences of a closed school discharge as an alternative to completing their educational program through a teach-out plan after the Department initiates any action to terminate the participation of the school in any title IV, HEA program or after the occurrence of any of the events specified in § 668.14(b)(31) that would require the institution to submit a teach-out plan.

*Burden Calculation:* From the Award Years 2011–12 to 2014–15 there were 182 institutions that closed (30 private, 150 proprietary, and two public). The number of students who were enrolled at the institutions at the time of the closure was 43,299 (5,322 at the private

institutions, 37,959 at the proprietary institutions, and 18 at the public institutions). With these figures as a base, we estimate that there could be 46 schools closing in a given award year (182 institutions divided by 4 = 45.5) with an average 238 students per institution (43,299 divided by 182 = 237.9).

We estimate that an institution will require two hours to prepare the required written disclosure to be sent with a copy of the closed school discharge application and the necessary mailing list for currently enrolled students. We anticipate that most schools will provide this information electronically to their students, thus decreasing burden and cost.

On average, we estimate that it will take the estimated eight private institutions 16 hours to prepare the written disclosure information required (8 institutions × 2 hours).

On average, we estimate that it will take the estimated eight private institutions that will close a total of 324 hours (1,904 students × .17 (10 minutes)) to process the required written disclosure with a copy of the closed school discharge application based on the mailing list for the estimated 1,904 enrolled students.

The burden for this process for private institutions is 340 hours.

On average, we estimate that it will take the estimated 38 proprietary institutions 76 hours to prepare the written disclosure information required (38 institutions × 2 hours).

On average, we estimate that it will take the estimated 38 proprietary institutions that will close a total of 1,537 hours (9,044 students × .17 (10 minutes)) to process the required written disclosure with a copy of the closed school discharge application based on the mailing list for the estimated 9,044 enrolled students.

The burden for this process for proprietary institutions is 1,613 hours.

For § 668.14, the total increase in burden is 1,953 hours under OMB Control Number 1845–0022.

*Section 668.41—Reporting and Disclosure of Information*

*Requirements:* Section 668.41(h) of the final regulations *Loan repayment warning for proprietary institutions* will expand the disclosure requirements under § 668.41 to provide that, for any award year in which a proprietary institution's loan repayment rate as reported to it by the Secretary shows that the median borrower has not paid down the balance of the borrower's loans by at least $1, the institution must provide a loan repayment warning in

advertising and promotional materials. An institution with fewer than 10 borrowers, or that demonstrates to the Secretary's satisfaction that it has borrowers in non-Gainful Employment programs who would increase the institution's repayment rate to meet the negative amortization threshold if included in the calculation, would not be required to provide the warning.

The process through which a proprietary institution will be informed of its repayment rate, and provide the opportunity to appeal that rate, is included in § 668.41(h)(2) of the final regulations. The Department notifies the institution of its repayment rate. Upon receipt of the rate the institution has 15 days to submit an appeal based on the two conditions in § 668.41(h)(2)(ii) to the Secretary.

Additionally, § 668.41(h)(3) of the final regulations stipulates the treatment of required disclosures in advertising and promotional materials. Under the provision, all advertising and promotional materials made available by or on behalf of an institution that identify the institution by name must include a warning about loan repayment outcomes as prescribed by the Secretary. The Secretary may conduct consumer testing to ensure meaningful and helpful language is provided to the students. All promotional materials, including printed materials, about an institution must be accurate and current at the time they are published, approved by a State agency, or broadcast. The warning must be prominent, clear and conspicuous, easily heard or read. The Secretary may require modifications to such materials if the warning does not meet the regulatory conditions.

*Burden Calculation:* There will be burden on schools to review the repayment rate identified in § 668.41(h)(1) and to submit an appeal to the accuracy of the information, as provided in § 668.41(h)(2). Additionally, there will be burden for those institutions that are required to include the necessary loan repayment warning in their promotional materials.

Based on an analysis of Departmental data, 972 of the 1,345 proprietary institutions with reported repayment rate data would not meet the negative amortization threshold for the repayment rate calculation.

We estimate that it will take the 972 institutions 30 minutes (.50 hours) or 486 hours to review the institutional repayment rate and determine if it meets one of the conditions to submit an appeal to the Secretary (972 institutions × .50 hours = 486 hours).

Of the 972 institutions that would not meet the negative amortization loan

repayment threshold, we anticipate that one percent or 10 institutions could meet the appeal criteria identified in 668.41(h)(2)(ii)(A).

We estimate that it will take the 10 institutions another 2 hours to produce the required evidence to submit with the appeal (10 institutions × 2 hours = 20 hours). We estimate it will take the approximate 10 institutions an additional 30 minutes (.50 hours) to submit the appeal to the Secretary (10 institutions × .50 hours = 5 hours) for a total of 25 hours.

We estimate that 5 institutions will be successful in their appeal, leaving 967 institutions that are required to include the necessary loan repayment warning in their promotional materials.

We estimate it will take each of the approximate 967 proprietary institutions a total of 5 hours to update their promotional materials (967 institutions × 5 hours = 4,835 hours).

For § 668.41(h), the total increase in burden is 5,346 hours under OMB Control Number 1845–0004.

*Requirements:* Revised § 668.41(i) *Financial protection disclosures* clarified the disclosure requirements regarding triggering events to both enrolled and prospective students, as well as on the institution's Web site. The Secretary will conduct consumer testing to determine which actions and triggering events will require disclosures; and will publish the prescribed content of the disclosures in a **Federal Register** notice after conducting consumer testing to ensure that it is meaningful and helpful to students. Institutions must provide the required disclosures to enrolled and prospective students and post the disclosure to their Web sites within 30 days of notifying the Secretary of the relevant triggering event. Institutions may hand-deliver the disclosure notification, or may send the disclosure notification to the primary email address or other electronic communication method used by the institution for communicating with the enrolled or prospective student. In all cases, the institution must ensure that the disclosure notification is the only substantial content in the message. Prospective students must receive the disclosure before enrolling, registering, or entering into a financial obligation with the institution.

*Burden Calculation:* There will be burden on schools to deliver the disclosures required by the Secretary to enrolled and prospective students and post it on the institution's Web site under this final regulation. However, as § 668.41(i) commits to consumer testing of both the specific actions and events

that will require a disclosure, and of the required disclosure itself, to be published by the Secretary in a **Federal Register** notice, burden will not be included here. Instead, the consumer testing procedures will follow information clearance review requirements. Prior to the implementation of the regulatory requirements under § 668.41(i) there will be an information clearance review package submitted to allow the public to comment.

The total increase in burden is 5,346 hours for OMB Control Number 1845–0004.

*Section 668.171—Financial Responsibility—General*

*Requirements:* We added a new paragraph 668.171(h) under which, in accordance with procedures to be established by the Secretary, an institution will notify the Secretary of any action or triggering event described in § 668.171(c) through (g) in the specified number of days after that action or event occurs.

In that notice, the institution may show that certain actions or events are not material or that those actions may be resolved. Specifically the institution may demonstrate that:

• The amount claimed in a lawsuit by a State or Federal authority for financial relief on a claim related to the making of a Direct Loan for enrollment at the school or the provision of educational services exceeds the potential recovery.

• The withdrawal of owner's equity was used solely to meet tax liabilities of the institution or its owners.

• The creditor waived a violation of a loan agreement. If the creditor imposes additional constraints or requirements as a condition of waiving the violation and continuing with the loan, the institution must identify and describe those constraints or requirements but would be permitted to show why these actions would not have an adverse financial impact on the institution.

• The reportable action or event no longer exists, has been resolved, or there is insurance to cover the liabilities that arise from the action or event.

*Burden Calculation:* There will be burden on schools to provide the notice to the Secretary when one of the actions or triggering events identified in § 668.171(c)–(g) occurs. We estimate that an institution will take two hours per action or triggering event to prepare the appropriate notice and provide it to the Secretary. We estimate that 169 private institutions may have two events annually to report for a total burden of 676 hours (169 institutions × 2 events × 2 hours). We estimate that 392

proprietary institutions may have three events annually to report for total burden of 2,352 hours (392 institutions × 3 events × 2 hours). For § 668.171, the total increase in burden is 3,028 hours under OMB Control Number 1845–0022.

*Section 668.175—Alternative Standards and Requirements*

*Requirements:* Under the provisional certification alternative in § 668.175(f), we added a new paragraph (f)(4) that requires an institution to provide the Secretary financial protection, such as an irrevocable letter of credit, upon the occurrence of an action or triggering event described in § 668.171(c)–(g) if that event warrants protection as determined under § 668.175(f)(4).

*Burden Calculation:* There will be burden on schools to provide the required financial protection, such as a letter of credit, to the Secretary to utilize the provisional certifications alternatives. We estimate that an institution will take 40 hours per action or triggering event to obtain the required financial protections and provide it to the Secretary. We estimate that 169 private not-for-profit institutions may have two events annually to report for a total burden of 13,520 hours (169 institutions × 2 events × 40 hours). We estimate that 392 proprietary institutions may have three events annually to report for total burden of 47,040 hours (392 institutions × 3 events × 40 hours).

For § 668.175, the total increase in burden is 60,560 hours under OMB Control Number 1845–0022.

The combined total increase in burden for §§ 668.14, 668.171, and 668.175 is 65,541 hours under OMB Control Number 1845–0022.

*Section 682.211—Mandatory Administrative Forbearance for FFEL Program Borrowers*

*Requirements:* The final regulations add a new paragraph § 682.211(i)(7) that requires a lender to grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has submitted an application for a borrower defense discharge related to a FFEL Loan that the borrower intends to pay off through a Direct Loan Program Consolidation Loan for the purpose of obtaining relief under § 685.212(k) of the final regulations. The administrative forbearance will be granted in yearly increments or for a period designated by the Secretary until the Secretary notifies the lender that the loan has been consolidated or that the forbearance should be discontinued. If the Secretary notifies the borrower that the borrower

will qualify for a borrower defense discharge if the borrower were to consolidate, the borrower will then be able to consolidate the loan(s) to which the defense applies and, if the borrower were to do so, the Secretary will recognize the defense and discharge that portion of the Consolidation Loan that paid off the FFEL loan in question.

*Burden Calculation:* There will be burden for the current 1,446 FFEL lenders to track the required mandatory administrative forbearance when they are notified by the Secretary of the borrower's intention to enter their FFEL loans into a Direct Consolidation Loan to obtain relief under a borrower defenses claim. We estimate that it will take each lender approximately four hours to develop and program the needed tracking into their current systems. There will be an estimated burden of 5,480 hours on the 1,370 for-profit lenders (1,370 × 4 = 5,480 hours). There will be an estimated burden of 304 hours on the 76 not-for-profit lenders (76 × 4 = 304 hours).

For § 682.211, the total increase in burden is 5,784 hours under OMB Control Number 1845–0020.

*Section 682.402—Closed School Discharges*

*Requirements:* Section 682.402(d)(6)(ii)(F) of the final regulations provides a second level of Departmental review for denied closed school discharge claims in the FFEL program. The final regulations require a guaranty agency that denies a closed school discharge request to inform the borrower in writing of the reasons for the denial, the opportunity for a review of the guaranty agency's decision by the Secretary, and how the borrower may request such a review.

Section 682.402(d)(6)(ii)(I) of the final regulations requires the lender or guaranty agency, upon resuming collection, to provide a FFEL borrower with another closed school discharge application, and an explanation of the requirements and procedures for obtaining the discharge.

Section 682.402(d)(6)(ii)(K) of the final regulations describes the responsibilities of the guaranty agency if the borrower requests such a review.

Section 682.402(d)(8)(ii) of the final regulations authorizes the Department, or a guaranty agency with the Department's permission, to grant a closed school discharge to a FFEL borrower without a borrower application based on information in the Department's or guaranty agency's possession that the borrower did not subsequently re-enroll in any title IV-

eligible institution within a period of three years after the school closed.

*Burden Calculation:* There will be burden on guaranty agencies to provide information to borrowers denied closed school discharge regarding the opportunity for further review of the discharge request by the Secretary. We estimate that it will take the 27 guaranty agencies 4 hours to update their notifications and establish a process for forwarding any requests for escalated reviews to the Secretary. There will be an estimated burden of 68 hours on the 17 public guaranty agencies (17 × 4 hours = 68 hours). There will be an estimated burden of 40 hours on the 10 not-for-profit guaranty agencies (10 × 4 hours = 40 hours).

There is an increase in burden of 108 hours under OMB Control Number 1845–0020.

There will be burden on guaranty agencies, upon receipt of the request for escalated review from the borrower, to forward to the Secretary the discharge form and any relevant documents. For the period between 2011 and 2015 there were 43,268 students attending closed schools, of which 9,606 students received a closed school discharge. It is estimated that 5 percent of the 43,268, or 2,163 closed school applications were denied. We estimate that 10 percent or 216 of those borrowers whose application was denied will request escalated review by the Secretary. We estimate that the process to forward the discharge request and any relevant documentation to the Secretary will take .5 hours (30 minutes) per request. There will be an estimated burden of 58 hours on the 17 public guaranty agencies based on an estimated 116 requests (116 × .5 hours = 58 hours). There will be an estimated burden of 50 hours on the 10 not-for-profit guaranty agencies (100 × .5 hours = 50 hours). There is an increase in burden of 108 hours under OMB Control Number 1845–0020.

The guaranty agencies will have burden assessed based on these final regulations to provide another discharge application to a borrower upon resuming collection activities with explanation of process and requirements for obtaining a discharge. We estimate that for the 2,163 closed school applications that were denied, it will take the guaranty agencies .5 hours (30 minutes) to provide the borrower with another discharge application and instructions for filing the application again. There will be an estimated burden of 582 hours on the 17 public guaranty agencies based on an estimated 1,163 borrowers (1,163 × .5 hours = 582 hours). There will be an estimated burden of 500 hours on the 10 not-for-

profit guaranty agencies (1,000 × .5 hours = 500 hours). There is an increase in burden of 1,082 hours under OMB Control Number 1845–0020.

There will be burden on the guaranty agencies to determine the eligibility of a borrower for a closed school discharge without the borrower submitting such an application. This determination requires a review of those borrowers who attended a closed school but did not apply for a closed school discharge to determine if the borrower re-enrolled in any other institution within three years of the school closure. We estimate that 20 hours of programming will be necessary to enable a guaranty agency to establish a process to review its records for borrowers who attended a closed school and to determine if any of those borrowers reenrolled in a title IV eligible institution within three years. There will be an estimated burden of 340 hours on the 17 public guaranty agencies for this programming (17 × 20 hours = 340 hours). There will be an estimated burden of 200 hours on the not-for-profit guaranty agencies for this programming (10 × 20 hours = 200 hours). There is an increase in burden of 540 hours under OMB Control Number 1845–0020.

For § 682.402, the total increase in burden is 1,838 hours under OMB Control Number 1845–0020.

The combined total increase in burden for §§ 682.211 and 682.402 is 7,622 hours under OMB Control Number 1845–0020.

*Section 685.222(e)—Process for Individual Borrowers*

*Requirements:* Section 685.222(e)(1) of the final regulations describes the steps an individual borrower must take to initiate a borrower defense claim. First, an individual borrower will submit an application to the Secretary, on a form approved by the Secretary. In the application, the borrower will certify that he or she received the proceeds of a loan to attend a school; may provide evidence that supports the borrower defense; and will indicate whether he or she has made a claim with respect to the information underlying the borrower defense with any third party, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation. The borrower will also be required to provide any other information or supporting documentation reasonably requested by the Secretary.

While the decision of the Department official will be final as to the merits of the claim and any relief that may be warranted on the claim, if the borrower

defense is denied in full or in part, the borrower will be permitted to request that the Secretary reconsider the borrower defense upon the identification of new evidence in support of the borrower's claim. "New evidence" will be defined as relevant evidence that the borrower did not previously provide and that was not identified by the Department official as evidence that was relied upon for the final decision.

*Burden Calculation:* There will be burden associated with the filing of the Departmental form by the borrower asserting a borrower defense claim. There is a separate information collection being processed to put the final form through the information collection review process to provide for public comment on the form as well as the estimated burden. A separate information collection review package will be published in the **Federal Register** and available through *Regulations.gov* for review and comment.

Additionally there will be burden on any borrower whose borrower defense claim is denied, if they elect to request reconsideration from the Secretary based on new evidence in support of the borrower's claim. We estimate that two percent of borrower defense claims received will be denied and those borrowers will then request reconsideration by presenting new evidence to support their claim. As of April 27, 2016, 18,688 borrower defense claims had been received. Of that number, we estimate that 467 borrowers including those that opted out of a successful Borrower Defense group relief would require .5 hours (30 minutes) to submit the request for reconsideration to the Secretary for a total of 234 burden hours (467 × .5 hours) under OMB Control Number 1845–0142.

*Section 685.222(f)—Group Process for Borrower Defenses—General*

*Requirements:* Section 685.222(f) of the final regulations provides a framework for the borrower defense group process, including descriptions of the circumstances under which group borrower defense claims could be considered, and the process the Department will follow for borrower defenses for a group.

Once a group of borrowers with common facts and claims has been identified, the Secretary will designate a Department official to present the group's common borrower defense in the fact-finding process, and will provide each identified member of the

group with notice that allows the borrower to opt out of the proceeding.

*Burden Calculation:* There will be burden on any borrower who elects to opt out of the group process after the Secretary has identified them as a member of a group for purposes of borrower defense. We estimate that one percent of borrowers who are identified as part of a group process for borrower defense claims would opt out of the group claim process. As of April 27, 2016, 18,688 borrower defense claims had been received. Of that number, we estimate that 187 borrowers would require .08 hours (5 minutes) to submit the request to opt out of the group process to the Secretary for a total of 15 burden hours (187 × .08 hours) under OMB Control Number 1845–0142.

*Section 685.222(g)—Group Process for Borrower Defense—Closed School*

*Requirements:* Section 685.222(g) of the final regulations establishes a process for review and determination of a borrower defense for groups identified by the Secretary for which the borrower defense is made with respect to Direct Loans to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses based on borrower defense claims, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses.

Under § 685.222(g)(1) of the final regulations, a hearing official will review the Department official's basis for identifying the group and resolve the claim through a fact-finding process. As part of that process, the hearing official will consider any evidence and argument presented by the Department official on behalf of the group and on behalf of individual members of the group. The hearing official will consider any additional information the Department official considers necessary, including any Department records or response from the school or a person affiliated with the school as described § 668.174(b) as reported to the Department or as recorded in the Department's records if practicable.

*Burden Calculation:* There will be burden on any school that elects to provide records or response to the hearing official's fact finding. We anticipate that each group will represent a single institution. We estimate that there will be four potential groups involving closed schools. We estimate that the fact-finding process would require 50 hours from one private closed school or persons affiliated with that closed school (1 private institution × 50

hours). We estimate that the fact-finding process will require 150 hours from three proprietary closed schools or persons affiliated with that closed school (3 proprietary institutions × 50 hours). We estimate the burden to be 200 hours (4 institutions × 50 hours) under OMB Control Number 1845–0142.

*Section 685.222(h)—Group Borrower for Defense—Open School*

*Requirements:* Section 685.222(h) of the final regulations establishes the process for groups identified by the Secretary for which the borrower defense is asserted with respect to Direct Loans to attend an open school.

A hearing official will resolve the borrower defense and determine any liability of the school through a fact-finding process. As part of the process, the hearing official will consider any evidence and argument presented by the school and the Department official on behalf of the group and, as necessary, any evidence presented on behalf of individual group members.

The hearing official will issue a written decision. If the hearing official approves the borrower defense, that decision will describe the basis for the determination, notify the members of the group of the relief provided on the basis of the borrower defense, and notify the school of any liability to the Secretary for the amounts discharged and reimbursed.

If the hearing official denies the borrower defense in full or in part, the written decision will state the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and will inform the borrowers that their loans will return to their statuses prior to the group borrower defense process. It also will notify the school of any liability to the Secretary for any amounts discharged. The Secretary will provide copies of the written decision to the members of the group, the Department official and the school.

The hearing official's decision will become final as to the merits of the group borrower defense claim and any relief that may be granted within 30 days after the decision is issued and received by the Department official and the school unless, within that 30-day period, the school or the Department official appeals the decision to the Secretary. A decision of the hearing official will not take effect pending the appeal. The Secretary will render a final decision following consideration of any appeal.

After a final decision has been issued, if relief for the group has been denied in full or in part, a borrower may file an individual claim for relief for amounts not discharged in the group process. In addition, the Secretary may reopen a borrower defense application at any time to consider new evidence, as discussed above.

*Burden Calculation:* There will be burden on any school which provides evidence and responds to any argument made to the hearing official's fact finding and if the school elects to appeal the final decision of the hearing official regarding the group claim. We anticipate that each group will represent claims from a single institution. We estimate that there will be six potential groups involving open schools. We estimate that the fact-finding process will require 150 hours from the three open private institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate that the fact-finding process will require 150 hours from the three open proprietary institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate the burden to be 300 hours (6 institutions × 50 hours).

We further estimate that the appeal process will require 150 hours from the three open private institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate that the appeal process will require 150 hours from the three open proprietary institutions or persons affiliated with that school (3 institutions × 50 hours). We estimate the burden to be 300 hours (6 institutions × 50 hours). The total estimated burden for this section will be 600 hours assessed under OMB Control Number 1845–0142.

Additionally, any borrower whose borrower defense claim is denied under the group claim may request reconsideration based on new evidence to support the individual claim. We believe that the estimate for the total universe of denied claims in § 685.222(e) includes these borrowers.

The combined total increase in burden for § 685.222 is 1,049 hours under OMB Control Number 1845–0142.

*Section 685.300—Agreements Between an Eligible School and the Secretary for Participation in the Direct Loan Program*

*Requirements:* Section 685.300(e) of the final regulations requires institutions who, after the effective date of the final regulations, incorporate a predispute arbitration agreement or any other predispute agreement addressing class actions in any agreements with Direct Loan program borrowers to include specific language regarding a

borrower's right to file or be a member of a class action suit against the institution when the class action concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Additionally, institutions that incorporated a predispute arbitration agreement or any other predispute agreement addressing class actions in any agreements with Direct Loan program borrowers prior to the effective date of the final regulations must provide borrowers with agreements or notices containing specific language regarding their right to file or be a member of a class action suit against the institution when the class action concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Institutions must provide this notice to borrowers no later than the date of the loan exit counseling for current students or the date the school files an initial response to an arbitration demand or complaint suit from a student who has not received such notice.

Section 685.300(f) of the final regulations requires institutions who, after the effective date of the final regulations, incorporate predispute arbitration agreements with Direct Loan program borrowers to include specific language regarding a borrower's right to file a lawsuit against the institution when it concerns acts or omissions surrounding the making of the Direct Loan or provision of educational services purchased with the Direct Loan. Additionally, institutions that incorporated predispute arbitration agreements with Direct Loan program borrowers prior to the effective date of the final regulations must provide borrowers with agreements or notices containing specific language regarding a borrower's right to file a lawsuit against the institution when the class action concerns acts or omissions surrounding

the making of the Direct Loan or provision of educational services purchased with the Direct. Institutions must provide this notice to such borrowers no later than the date of the loan exit counseling for current students or the date the school files an initial response to an arbitration demand or complaint suit from a student who hasn't received such notice.

*Burden Calculation:* There will be burden on any school that meets the conditions for supplying students with the changes to any agreements. Based on the Academic Year 2014–2015 Direct Loan information available, there were 1,528,714 Unsubsidized Direct Loan recipients at proprietary institutions. Assuming 66 percent of these students will continue to be enrolled at the time these regulations become effective, 1,008,951 students will be required to receive the agreements or notices required in § 685.300(e) or (f). We anticipate that it will take proprietary institutions .17 hours (10 minutes) per student to develop these agreements or notices, research who is required to receive them, and forward the information accordingly for an increase in burden of 171,522 hours (1,008,951 students × .17 hours) under OMB Control Number 1845–0143.

*Requirements:* Section 685.300(g) of the final regulations requires institutions to provide to the Secretary, copies of specified records connected to a claim filed in arbitration by or against the school regarding a borrower defense claim. The school must submit any records within 60 days of the filing by the school of such records to an arbitrator or upon receipt by the school of such records that were filed by someone other than the school, such as an arbitrator or student regarding a claim.

Section 685.300(h) of the final regulations requires institutions to provide to the Secretary, copies of specified records connected to a claim filed in lawsuit by the school by a

student or any party against the school regarding a borrower defense claim. The school must submit any records within 30 days of the filing or receipt of the complaint by the school or upon receipt by the school of rulings on a dipositive motion or final judgement.

*Burden Calculation:* There will be burden on any school that meets the conditions for supplying students with the changes to any agreements. We estimate that 5 percent of the 1,959 proprietary schools, or 98 schools would be required to submit documentation to the Secretary to comply with the final regulations. We anticipate that each of the 98 schools will have an average of four filings there will be an average of four submissions for each filing. Because these are copies of documents required to be submitted to other parties we anticipate 5 burden hours to produce the copies and submit to the Secretary for an increase in burden of 7,840 hours (98 institutions × 4 filings × 4 submissions/filing × 5 hours) under OMB Control Number 1845–0143.

The combined total increase in burden for § 685.300 is 179,362 hours under OMB Control Number 1845–0143.

Consistent with the discussion above, the following chart describes the sections of the final regulations involving information collections, the information being collected, the collections that the Department will submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the information collections. The monetized net costs of the increased burden on institutions, lenders, guaranty agencies, and borrowers, using wage data developed using BLS data, available at *www.bls.gov/ncs/ect/sp/ecsuphst.pdf*, is $9,458,484 as shown in the chart below. This cost was based on an hourly rate of $36.55 for institutions, lenders, and guaranty agencies and $16.30 for borrowers.

## COLLECTION OF INFORMATION

| Regulatory section | Information collection | OMB Control No. and estimated burden [change in burden] | Estimated costs |
|---|---|---|---|
| § 668.14—Program participation agreement. | The final regulation requires, as part of the program participation agreement, a school to provide to all enrolled students with a closed school discharge application and a written disclosure, describing the benefits and the consequences of a closed school discharge as an alternative to completing their educational program through a teach-out plan after the Department initiates any action to terminate the participation of the school in any title IV, HEA program or after the occurrence of any of the events specified in § 668.14(b)(31) that require the institution to submit a teach-out plan. | 1845–0022—This would be a revised collection. We estimate burden would increase by 1,953 hours. | $71,382 |

COLLECTION OF INFORMATION—Continued

| Regulatory section | Information collection | OMB Control No. and estimated burden [change in burden] | Estimated costs |
|---|---|---|---|
| § 668.41—Reporting and disclosure of information. | The final regulation clarifies in § 668.41(h) reporting and disclosure requirements to provide that, for any fiscal year in which the median borrower of a proprietary institution had not paid down the balance of the borrower's loans by at least one dollar, the institution must include a warning about that institution's repayment outcomes in advertising and promotional materials.<br>Additionally, the final regulation clarifies that certain actions and triggering events for financial protection may, under § 668.41(i), require disclosure to prospective and enrolled students. Both the actions and triggering events and the disclosure language are subject to consumer testing. | 1845–0004—This would be a revised collection. We estimate burden would increase by 5,346 hours. | 195,396 |
| § 668.171—Financial responsibility—General. | The final regulations add a new paragraph 668.171(h) under which, in accordance with procedures to be established by the Secretary, an institution will notify the Secretary of any action or triggering event described in § 668.171(c) through (g) in the specified number of days after that action or event occurs. | 1845–0022—This is a revised collection. We estimate burden will increase by 3,028 hours. | 110,673 |
| § 668.175—Alternative standards and requirements. | The final regulations add a new paragraph (f)(4) that requires an institution to provide the Secretary financial protection, such as an irrevocable letter of credit, upon the occurrence of an action or triggering event described in § 668.171(c)–(g) if that event warrants protection as determined under § 668.175(f)(4). | 1845–0022—This is a revised collection. We estimate burden would increase by 60,560 hours. | 2,213,468 |
| § 682.211—Forbearance. | The final regulations add a new paragraph § 682.211(i)(7) that requires a lender to grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has submitted an application for a borrower defense discharge related to a FFEL Loan that the borrower intends to pay off through a Direct Loan Program Consolidation Loan for the purpose of obtaining relief under § 685.212(k) of the final regulations. | 1845–0020—This is a revised collection. We estimate burden will increase by 5,784 hours. | 211,405 |
| § 682.402—Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments. | The final regulations provide a second level of Departmental review for denied closed school discharge claims in the FFEL program. The final language requires a guaranty agency that denies a closed school discharge request to inform the borrower of the opportunity for a review of the guaranty agency's decision by the Department, and an explanation of how the borrower may request such a review.<br>The final regulations require the guaranty agency or the Department, upon resuming collection, to provide a FFEL borrower with another closed school discharge application, and an explanation of the requirements and procedures for obtaining the discharge.<br>The final regulations describe the responsibilities of the guaranty agency if the borrower requests such a review.<br>The final regulations authorize the Department, or a guaranty agency with the Department's permission, to grant a closed school discharge to a FFEL borrower without a borrower application based on information in the Department's or guaranty agency's possession that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years after the school closed. | 1845–0020—This is a revised collection. We estimate burden will increase by 1,838 hours. | 67,179 |

COLLECTION OF INFORMATION—Continued

| Regulatory section | Information collection | OMB Control No. and estimated burden [change in burden] | Estimated costs |
|---|---|---|---|
| § 685.222—Borrower Defenses. | The final regulation describes the steps an individual borrower must take to initiate a borrower defense claim. The final regulations also provide a framework for the borrower defense group process, including descriptions of the circumstances under which group borrower defense claims could be considered, and the process the Department will follow for borrower defenses for a group. The final regulations establish a process for review and determination of a borrower defense for groups identified by the Secretary for which the borrower defense is made with respect to Direct Loans to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses based on borrower defense claims, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses. The final regulations establish the process for groups identified by the Secretary for which the borrower defense is asserted with respect to Direct Loans to attend an open school. | 1845–0142—This is a new collection. We estimate burden will increase by 1,049 hours (249 Individual hours 800 Institutional hours). | 33,299 |
| § 685.300 Agreements between an eligible school and the Secretary for participation in the Direct Loan Program. | The final regulations require institutions, following the effective date of the regulations, to incorporate language into agreements allowing participation by Direct Loan students in class action lawsuits as well as predispute arbitration agreements. There is required agreement and notification language to be provided to affected students. Additionally, the final regulations require institutions to submit to the Secretary copies of arbitral records and judicial records within specified timeframes when the actions concern a borrower defense claim. | 1845–0143—This is a new collection. We estimate burden will increase by 179,362 hours. | 6,555,681 |

The total burden hours and change in burden hours associated with each OMB Control number affected by the final regulations follows:

| Control No. | Total final burden hours | Final change in burden hours |
|---|---|---|
| 1845–0004 ........ | 24,016 | +5,346 |
| 1845–0020 ........ | 8,249,520 | +7,622 |
| 1845–0022 ........ | 2,281,511 | +65,541 |
| 1845–0142 ........ | 1,049 | +1,049 |
| 1845–0143 ........ | 179,362 | +179,362 |
| Total ............. | 10,735,458 | +258,920 |

**Assessment of Educational Impact**

Under § 668.171(h) of the final regulations, institutions are required to report to the Department certain events or occurrences that they may also be required to report to the SEC. Under SEC rules and regulations, institutions are generally required to report information that would be material to stockholders, including certain specified information, whereas the Department has identified events and occurrences unique to institutions of higher education that it believes could threaten an institution's financial viability and for which it requires specific and perhaps more timely reporting. We believe this reporting is necessary to ensure that institutions provide financial protection, for the benefit of students and taxpayers, against actions or events that threaten an institution's ability to (1) meet its current and future financial obligations, (2) continue as a going concern or continue to participate in the title IV, HEA programs, and (3) continue to deliver educational services.

*Accessible Format:* Individuals with disabilities can obtain this document in an accessible format (*e.g.*, braille, large print, audiotape, or compact disc) on request to the person listed under **FOR FURTHER INFORMATION CONTACT**.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys*. At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov*.

Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 30*

Claims, Income taxes.

*34 CFR Part 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 674*

Loan programs—education, Reporting and recordkeeping, Student aid.

*34 CFR Parts 682 and 685*

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

*34 CFR Parts 686*

Administrative practice and procedure, Colleges and universities, Education, Elementary and Secondary education, Grant programs—education,

Reporting and recordkeeping requirements, Student aid.

Dated: October 17, 2016.

**John B. King, Jr.,**

*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary of Education amends parts 30, 668, 674, 682, 685, and 686 of title 34 of the Code of Federal Regulations as follows:

## PART 30—DEBT COLLECTION

■ 1. The authority citation for part 30 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3(a)(1) and 1226a–1, 31 U.S.C. 3711(e), 31 U.S.C. 3716(b) and 3720A, unless otherwise noted.

■ 2. Section 30.70 is revised to read as follows:

### § 30.70  How does the Secretary exercise discretion to compromise a debt or to suspend or terminate collection of a debt?

(a)(1) The Secretary uses the standards in the FCCS, 31 CFR part 902, to determine whether compromise of a debt is appropriate if the debt arises under a program administered by the Department, unless compromise of the debt is subject to paragraph (b) of this section.

(2) If the amount of the debt is more than $100,000, or such higher amount as the Department of Justice may prescribe, the Secretary refers a proposed compromise of the debt to the Department of Justice for approval, unless the compromise is subject to paragraph (b) of this section or the debt is one described in paragraph (e) of this section.

(b) Under the provisions in 34 CFR 81.36, the Secretary may enter into certain compromises of debts arising because a recipient of a grant or cooperative agreement under an applicable Department program has spent some of these funds in a manner that is not allowable. For purposes of this section, neither a program authorized under the Higher Education Act of 1965, as amended (HEA), nor the Impact Aid Program is an applicable Department program.

(c)(1) The Secretary uses the standards in the FCCS, 31 CFR part 903, to determine whether suspension or termination of collection action on a debt is appropriate.

(2) Except as provided in paragraph (e), the Secretary—

(i) Refers the debt to the Department of Justice to decide whether to suspend or terminate collection action if the amount of the debt outstanding at the time of the referral is more than $100,000 or such higher amount as the Department of Justice may prescribe; or

(ii) May suspend or terminate collection action if the amount of the debt outstanding at the time of the Secretary's determination that suspension or termination is warranted is less than or equal to $100,000 or such higher amount as the Department of Justice may prescribe.

(d) In determining the amount of a debt under paragraph (a), (b), or (c) of this section, the Secretary deducts any partial payments or recoveries already received, and excludes interest, penalties, and administrative costs.

(e)(1) Subject to paragraph (e)(2) of this section, under the provisions of 31 CFR part 902 or 903, the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the Federal Family Education Loan Program authorized under title IV, part B, of the HEA, the William D. Ford Federal Direct Loan Program authorized under title IV, part D of the HEA, or the Perkins Loan Program authorized under title IV, part E, of the HEA.

(2) The Secretary refers a proposed compromise, or suspension or termination of collection, of a debt that exceeds $1,000,000 and that arises under a loan program described in paragraph (e)(1) of this section to the Department of Justice for review. The Secretary does not compromise, or suspend or terminate collection of, a debt referred to the Department of Justice for review until the Department of Justice has provided a response to that request.

(f) The Secretary refers a proposed resolution of a debt to the Government Accountability Office (GAO) for review and approval before referring the debt to the Department of Justice if—

(1) The debt arose from an audit exception taken by GAO to a payment made by the Department; and

(2) The GAO has not granted an exception from the GAO referral requirement.

(g) Nothing in this section precludes—

(1) A contracting officer from exercising his authority under applicable statutes, regulations, or common law to settle disputed claims relating to a contract; or

(2) The Secretary from redetermining a claim.

(h) Nothing in this section authorizes the Secretary to compromise, or suspend or terminate collection of, a debt—

(1) Based in whole or in part on conduct in violation of the antitrust laws; or

(2) Involving fraud, the presentation of a false claim, or misrepresentation on the part of the debtor or any party having an interest in the claim.

(Authority: 20 U.S.C. 1082(a) (5) and (6), 1087a, 1087hh, 1221e–3(a)(1), 1226a–1, and 1234a, 31 U.S.C. 3711)

## PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS

■ 3. The authority citation for part 668 is revised to read as follows:

**Authority:** 20 U.S.C. 1001–1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, 1099c–1, 1221–3, and 1231a, unless otherwise noted.

■ 4. Section 668.14 is amended:

■ A. In paragraph (b)(30)(ii)(C), by removing the word "and".

■ B. In paragraph (b)(31)(v), by removing the period and adding in its place "; and".

■ C. By adding paragraph (b)(32).

The addition reads as follows:

### § 668.14  Program participation agreement.

\* \* \* \* \*

(b) \* \* \*

(32) The institution will provide all enrolled students with a closed school discharge application and a written disclosure, describing the benefits and consequences of a closed school discharge as an alternative to completing their educational program through a teach-out agreement, as defined in 34 CFR 602.3, immediately upon submitting a teach-out plan after the occurrence of any of the following events:

(i) The initiation by the Secretary of an action under 34 CFR 600.41 or subpart G of this part or the initiation of an emergency action under § 668.83, to terminate the participation of an institution in any title IV, HEA program.

(ii) The occurrence of any of the events in paragraph (b)(31)(ii) through (v) of this section.

\* \* \* \* \*

■ 5. Section 668.41 is amended by adding paragraphs (h) and (i) and revising the authority citation to read as follows:

### § 668.41  Reporting and disclosure of information.

\* \* \* \* \*

(h) *Loan repayment warning for proprietary institutions*—(1) *Calculation of loan repayment rate.* For each award year, the Secretary calculates a proprietary institution's loan repayment rate, for the cohort of borrowers who entered repayment on their FFEL or Direct Loans at any time during the two-year cohort period, using the methodology in § 668.413(b)(3), provided that, for the purpose of this paragraph (h)—

(i) The reference to "program" in § 668.413(b)(3)(vi) is read to refer to "institution";

(ii) "Award year" means the 12-month period that begins on July 1 of one year and ends on June 30 of the following year;

(iii) "Borrower" means a student who received a FFEL or Direct Loan for enrolling in a gainful employment program at the institution; and

(iv) "Two-year cohort period" is defined as set forth in § 668.402.

(2) *Issuing and appealing loan repayment rates.* (i) For each award year, the Secretary notifies an institution of its final loan repayment rate.

(ii) If an institution's final loan repayment rate shows that the median borrower has not either fully repaid all FFEL or Direct Loans received for enrollment in the institution or made loan payments sufficient to reduce by at least one dollar the outstanding balance of each of the borrower's FFEL or Direct Loans received for enrollment in the institution—

(A) Using the calculation described in paragraph (h)(4)(ii) of this section, the institution may submit an appeal to the Secretary within 15 days of receiving notification of its final loan repayment rate; and

(B) The Secretary will notify the institution if the appeal is—

(*1*) Granted and the institution qualifies for an exemption from the warning requirement under paragraph (h)(4) of this section; or

(*2*) Not granted, and the institution must comply with the warning requirement under paragraph (h)(3) of this section.

(3) *Loan repayment warning*—(i) *Promotional materials.* (A) Except as provided in paragraph (h)(4) of this section, for any award year in which the institution's loan repayment rate shows that the median borrower has not either fully repaid, or made loan payments sufficient to reduce by at least one dollar the outstanding balance of, each of the borrower's FFEL or Direct Loans received for enrollment in the institution, the institution must, in all promotional materials that are made available to prospective or enrolled students by or on behalf of the institution, include a loan repayment warning in a form, place, and manner prescribed by the Secretary in a notice published in the **Federal Register**. The warning language must read: "U.S. Department of Education Warning: A majority of recent student loan borrowers at this school are not paying down their loans," unless stated otherwise by the Secretary in a notice

published in the **Federal Register**. Before publishing that notice, the Secretary may conduct consumer testing to help ensure that the warning is meaningful and helpful to students.

(B) Promotional materials include, but are not limited to, an institution's Web site, catalogs, invitations, flyers, billboards, and advertising on or through radio, television, video, print media, social media, or the Internet.

(C) The institution must ensure that all promotional materials, including printed materials, about the institution are accurate and current at the time they are published, approved by a State agency, or broadcast.

(ii) *Clarity of warning.* The institution must ensure that the warning is prominent, clear, and conspicuous. The warning is not prominent, clear, and conspicuous if it is difficult to read or hear, or placed where it can be easily overlooked. In written materials, including email, Internet advertising and promotional materials, print media, and other advertising or hard-copy promotional materials, the warning must be included on the cover page or home page and any other pages with information on a program of study and any pages with information on costs and financial aid. For television and video materials, the warning must be both spoken and written simultaneously. The Secretary may require the institution to modify its promotional materials, including its Web site, if the warning is not prominent, clear, and conspicuous.

(4) *Exemptions.* An institution is not required to provide a warning under paragraph (h)(3) of this section based on a final loan repayment rate for that award year if—

(i) That rate is based on fewer than 10 borrowers in the cohort described in paragraph (h)(1) of this section; or

(ii) The institution demonstrates to the Secretary's satisfaction that not all of its programs constitute GE programs and that if the borrowers in the non-GE programs were included in the calculation of the loan repayment rate, the loan repayment rate would show that the median borrower has made loan payments sufficient to reduce by at least one dollar the outstanding balance of each of the borrower's FFEL or Direct Loans received for enrollment in the institution.

(i) *Financial protection disclosures*—(1) *General.* An institution must deliver a disclosure to enrolled and prospective students in the form and manner described in paragraph (i)(3), (4), and (5) of this section, and post that disclosure to its Web site as described in paragraph (i)(6) of this section, within 30 days of notifying the Secretary under

§ 668.171(h) of the occurrence of a triggering event or events identified pursuant to paragraph (i)(2) of this section. The requirements in this paragraph (i) apply for the 12-month period following the date the institution notifies the Secretary under § 668.171(h) of a triggering event or events identified under paragraph (i)(2).

(2) *Triggering events.* The Secretary will conduct consumer testing to inform the identification of events for which a disclosure is required. The Secretary will consumer test each of the events identified in § 668.171(c) through (g), as well as other events that result in an institution being required to provide financial protection to the Department, to determine which of these events are most meaningful to students in their educational decision-making. The Secretary will identify the triggering events for which a disclosure is required under paragraph (i)(1) in a document published in the **Federal Register**.

(3) *Form of disclosure.* The Secretary will conduct consumer testing to ensure the form of the disclosure is meaningful and helpful to students. The Secretary will specify the form and placement of the disclosure in a notice published in the **Federal Register** following the consumer testing.

(4) *Delivery to enrolled students.* An institution must deliver the disclosure required under this paragraph (i) to each enrolled student in writing by—

(i) Hand-delivering the disclosure as a separate document to the student individually or as part of a group presentation; or

(ii)(A) Sending the disclosure to the student's primary email address or delivering the disclosure through the electronic method used by the institution for communicating with the student about institutional matters; and

(B) Ensuring that the disclosure is the only substantive content in the message sent to the student under this paragraph unless the Secretary specifies additional, contextual language to be included in the message.

(5) *Delivery to prospective students.* An institution must deliver the disclosure required under this paragraph (i) to a prospective student before that student enrolls, registers, or enters into a financial obligation with the institution by—

(i) Hand-delivering the disclosure as a separate document to the student individually, or as part of a group presentation; or

(ii)(A) Sending the disclosure to the student's primary email address or delivering the disclosure through the electronic method used by the institution for communicating with

prospective students about institutional matters; and

(B) Ensuring that the disclosure is the only substantive content in the message sent to the student under this paragraph unless the Secretary specifies additional, contextual language to be included in the message.

(6) *Institutional Web site.* An institution must prominently provide the disclosure required under this paragraph (i) in a simple and meaningful manner on the home page of the institution's Web site.

\*   \*   \*   \*   \*

(Authority: 20 U.S.C. 1092, 1094, 1099c)

■ 6. Section 668.71 is amended in paragraph (c), in the second sentence of the definition of ''Misrepresentation'', by removing the word ''deceive'' and adding in its place the words ''mislead under the circumstances'' and by adding a fourth sentence.

The addition reads as follows:

### § 668.71   Scope and special definitions.

\*   \*   \*   \*   \*

(c) \*   \*   \*

*Misrepresentation:* \*   \*   \*
Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading.

\*   \*   \*   \*   \*

■ 7. Section 668.90 is amended by revising paragraph (a)(3) to read as follows:

### § 668.90   Initial and final decisions.

(a) \*   \*   \*

(3) Notwithstanding the provisions of paragraph (a)(2) of this section—

(i) If, in a termination action against an institution, the hearing official finds that the institution has violated the provisions of § 668.14(b)(18), the hearing official also finds that termination of the institution's participation is warranted;

(ii) If, in a termination action against a third-party servicer, the hearing official finds that the servicer has violated the provisions of § 668.82(d)(1), the hearing official also finds that termination of the institution's participation or servicer's eligibility, as applicable, is warranted;

(iii) In an action brought against an institution or third-party servicer that involves its failure to provide a letter of credit or other financial protection under § 668.15 or 668.171(c) through (g), the hearing official finds that the amount of the letter of credit or other financial protection established by the Secretary under § 668.175(f)(4) is appropriate, unless the institution can demonstrate that the amount was not warranted because—

(A) For financial protection demanded based on events or conditions described in § 668.171(c) through (f), the events or conditions no longer exist or have been resolved or the institution demonstrates that it has insurance that will cover the debts and liabilities that arise from the triggering event or condition, or, for a condition or event described in § 668.171(c)(1)(iii) (teach out) or (iv) (gainful employment eligibility loss), the amount of educationally related expenses reasonably attributable to the programs or location is greater than the amount calculated in accordance with Appendix C of subpart L of this part. The institution can demonstrate that insurance covers risk by presenting the Department with a statement from the insurer that the institution is covered for the full or partial amount of the liability in question;

(B) For financial protection demanded based on a suit described in § 668.171(c)(1)(i) that does not state a specific amount of relief and on which the court has not ruled on the amount of relief, the institution demonstrates that, accepting the facts alleged as true, and assuming the claims asserted are fully successful, the action pertains to a period, program, or location for which the maximum potential relief is less than the amount claimed or the amount determined under § 668.171(c)(2)(ii);

(C) For financial protection demanded based on the ground identified in § 668.171(g), the factor or event does not and will not have a material adverse effect on the financial condition, business, or results of operations of the institution;

(D)(*1*) For financial protection demanded under § 668.175(f)(4)(i), the institution does not participate and has not participated for the prior fiscal year in a title IV, HEA loan program; and

(*2*) For any financial protection demanded of an institution described in paragraph (a)(3)(iii)(D)(*1*) of this section, and any portion of financial protection demanded of any other institution greater than 10 percent of the amount of title IV, HEA funds received by the institution in its most recently completed fiscal year—

(i) The risk of loss to the Secretary on the grounds demonstrated by the Secretary does not exist;

(ii) The loss as demonstrated by the Secretary is not reasonably likely to arise within the next 18 months; or

(*iii*) The amount is unnecessary to protect, or contrary to, the Federal interest;

(E) The institution has proffered alternative financial protection that provides students and the Department

adequate protection against losses resulting from the risks identified by the Secretary. In the Secretary's discretion, adequate protection may consist of one or more of the following—

(*1*) An agreement with the Secretary that a portion of the funds due to the institution under a reimbursement or heightened cash monitoring funding arrangement will be temporarily withheld in such amounts as will meet, no later than the end of a nine-month period, the amount of the required financial protection demanded; or

(*2*) Other form of financial protection specified by the Secretary in a notice published in the **Federal Register**.

(iv) In a termination action taken against an institution or third-party servicer based on the grounds that the institution or servicer failed to comply with the requirements of § 668.23(c)(3), if the hearing official finds that the institution or servicer failed to meet those requirements, the hearing official finds that the termination is warranted;

(v)(A) In a termination action against an institution based on the grounds that the institution is not financially responsible under § 668.15(c)(1), the hearing official finds that the termination is warranted unless the institution demonstrates that all applicable conditions described in § 668.15(d)(4) have been met; and

(B) In a termination or limitation action against an institution based on the grounds that the institution is not financially responsible—

(*1*) Upon proof of the conditions in § 668.174(a), the hearing official finds that the limitation or termination is warranted unless the institution demonstrates that all the conditions in § 668.175(f) have been met; and

(*2*) Upon proof of the conditions in § 668.174(b)(1), the hearing official finds that the limitation or termination is warranted unless the institution demonstrates that all applicable conditions described in § 668.174(b)(2) or § 668.175(g) have been met.

\*   \*   \*   \*   \*

■ 8. Section 668.93 is amended by redesignating paragraphs (h) and (i) as paragraphs (i) and (j), respectively, and adding a new paragraph (h) to read as follows:

### § 668.93   Limitation.

\*   \*   \*   \*   \*

(h) A change in the participation status of the institution from fully certified to participate to provisionally certified to participate under § 668.13(c).

\*   \*   \*   \*   \*

■ 9. Section 668.171 is revised to read as follows:

**§ 668.171   General.**

(a) *Purpose.* To begin and to continue to participate in any title IV, HEA program, an institution must demonstrate to the Secretary that it is financially responsible under the standards established in this subpart. As provided under section 498(c)(1) of the HEA, the Secretary determines whether an institution is financially responsible based on the institution's ability to—

(1) Provide the services described in its official publications and statements;

(2) Meet all of its financial obligations; and

(3) Provide the administrative resources necessary to comply with title IV, HEA program requirements.

(b) *General standards of financial responsibility.* Except as provided under paragraphs (e) and (f) of this section, the Secretary considers an institution to be financially responsible if the Secretary determines that—

(1) The institution's Equity, Primary Reserve, and Net Income ratios yield a composite score of at least 1.5, as provided under § 668.172 and appendices A and B to this subpart;

(2) The institution has sufficient cash reserves to make required returns of unearned title IV, HEA program funds, as provided under § 668.173;

(3) The institution is able to meet all of its financial obligations and otherwise provide the administrative resources necessary to comply with title IV, HEA program requirements. An institution may not be able to meet its financial or administrative obligations if it is subject to an action or event described in paragraph (c), (d), (e), (f), or (g) of this section. The Secretary considers those actions or events in determining whether the institution is financially responsible only if they occur on or after July 1, 2017; and

(4) The institution or persons affiliated with the institution are not subject to a condition of past performance under § 668.174(a) or (b).

(c) *Debts, liabilities, and losses.* (1) Except as provided under paragraph (h)(3) of this section, an institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if, after the end of the fiscal year for which the Secretary has most recently calculated an institution's composite score, the institution is subject to one or more of the following actions or triggering events, and as a result of the actual or potential debts, liabilities, or losses that have stemmed or may stem from those actions or events, the institution's recalculated composite score is less than 1.0, as determined by the Secretary under paragraph (c)(2) of this section:

(i) *Debts and borrower defense-related lawsuits.* (A) The institution is required to pay any debt or incur any liability arising from a final judgment in a judicial proceeding or from an administrative proceeding or determination, or from a settlement; or

(B) The institution is being sued in an action brought on or after July 1, 2017 by a Federal or State authority for financial relief on claims related to the making of the Direct Loan for enrollment at the school or the provision of educational services and the suit has been pending for 120 days.

(ii) *Other litigation.* The institution is being sued in an action brought on or after July 1, 2017 that is not described in paragraph (c)(1)(i)(B) of this section and—

(A) The institution has filed a motion for summary judgment or summary disposition and that motion has been denied or the court has issued an order reserving judgment on the motion;

(B) The institution has not filed a motion for summary judgment or summary disposition by the deadline set for such motions by the court or agreement of the parties; or

(C) If the court did not set a deadline for filing a motion for summary judgment and the institution did not file such a motion, the court has set a pretrial conference date or trial date and the case is pending on the earlier of those two dates.

(iii) *Accrediting agency actions.* The institution was required by its accrediting agency to submit a teach-out plan, for a reason described in § 602.24(c)(1), that covers the closing of the institution or any of its branches or additional locations.

(iv) *Gainful employment.* As determined annually by the Secretary, the institution has gainful employment programs that, under § 668.403, could become ineligible based on their final D/E rates for the next award year.

(v) *Withdrawal of owner's equity.* For a proprietary institution whose composite score is less than 1.5, any withdrawal of owner's equity from the institution by any means, including by declaring a dividend, unless the transfer is to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated.

(2) *Recalculating the composite score*—(i) *General.* Unless the institution demonstrates to the satisfaction of the Secretary that the event or condition has had or will have no effect on the assets and liabilities of the institution under paragraph (g)(3)(iv) of this section, as specified in Appendix C of this subpart, the Secretary

recognizes and accounts for the actual or potential losses associated with the actions or events under paragraph (c)(1) of this section, and based on that accounting, recalculates the institution's most recent composite score. The recalculation will occur regularly after associated actions or events are reported to the Secretary. The Secretary recalculates the composite score under this paragraph using the financial statements on which the institution's composite score has been calculated under § 668.172.

(ii) *Calculation of potential loss— debts and borrower defense-related lawsuits.* For a debt or a suit described in paragraph (c)(1)(i) of this section, the amount of loss is—

(A) The amount of debt;

(B) For a suit, the amount set by a court ruling, or, in the absence of a court ruling—

(*1*) The amount of relief claimed in the complaint;

(*2*) If the complaint demands no specific amount of relief, the amount stated in any final written demand issued by the agency to the institution prior to the suit or a lesser amount that the agency offers to accept in settlement of any financial demand in the suit; or

(*3*) If the agency stated no specific demand in the complaint, in a pre-filing demand, or in a written offer of settlement, the amount of tuition and fees received by the institution during the period, and for the program or location, described in the allegations in the complaint.

(iii) *Calculation of potential loss— other litigation.* For any suit described in paragraph (c)(1)(ii) of this section, the amount of loss is the amount set by a court ruling, or, in the absence of a court ruling—

(A) The amount of relief claimed in the complaint;

(B) If the complaint demands no specific amount of relief, the amount stated in any final written demand by the claimant to the institution prior to the suit or a lesser amount that the plaintiff offers to accept in settlement of any financial demand in the suit; or

(C) If the complainant stated no specific demand in the complaint, in a pre-filing demand, or in a written offer of settlement, the amount of the claim as stated in a response to a discovery request, including an expert witness report.

(iv) *Calculation of potential loss— other events.* (A) For a closed location or institution, or the potential loss of eligibility for gainful employment programs, as described in paragraph (c)(1)(iii) or (iv), the amount of loss is the amount of title IV, HEA program

funds the institution received in its most recently completed fiscal year for that location or institution, or for those GE programs.

(B) For the withdrawal of owner's equity, described in paragraph (c)(1)(v) of this section, the amount of loss is the amount transferred to any entity other than the institution.

(d) *Non-title IV revenue.* Except as provided under paragraph (h)(3) of this section, a proprietary institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if, for its most recently completed fiscal year, the institution did not derive at least 10 percent of its revenue from sources other than title IV, HEA program funds, as provided under § 668.28(c).

(e) *Publicly traded institutions.* Except as provided under paragraph (h)(3) of this section, a publicly traded institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if the institution is currently subject to one or more of the following actions or events:

(1) *SEC actions.* The SEC warns the institution that it may suspend trading on the institution's stock.

(2) *SEC reports.* The institution failed to file a required annual or quarterly report with the SEC within the time period prescribed for that report or by any extended due date under 17 CFR 240.12b–25.

(3) *Exchange actions.* The exchange on which the institution's stock is traded notifies the institution that it is not in compliance with exchange requirements, or its stock is delisted.

(f) *Cohort default rates.* Except as provided under paragraph (h)(3) of this section, an institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if the institution's two most recent official cohort default rates are 30 percent or greater, as determined under subpart N of this part, unless—

(1) The institution files a challenge, request for adjustment, or appeal under that subpart with respect to its rates for one or both of those fiscal years; and

(2) That challenge, request, or appeal remains pending, results in reducing below 30 percent the official cohort default rate for either or both years, or precludes the rates from either or both years from resulting in a loss of eligibility or provisional certification.

(g) *Discretionary factors or events.* Except as provided under paragraph (h)(3) of this section, an institution is not able to meet its financial or administrative obligations under paragraph (b)(3) of this section if the

Secretary demonstrates that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution, including but not limited to whether—

(1) There is a significant fluctuation between consecutive award years, or a period of award years, in the amount of Direct Loan or Pell Grant funds, or a combination of those funds, received by the institution that cannot be accounted for by changes in those programs;

(2) The institution is cited by a State licensing or authorizing agency for failing State or agency requirements;

(3) The institution fails a financial stress test developed or adopted by the Secretary to evaluate whether the institution has sufficient capital to absorb losses that may be incurred as a result of adverse conditions and continue to meet its financial obligations to the Secretary and students;

(4) As calculated by the Secretary, the institution has high annual dropout rates;

(5) The institution is or was placed on probation or issued a show-cause order, or placed on an accreditation status that poses an equivalent or greater risk to its accreditation, by its accrediting agency for failing to meet one or more of the agency's standards;

(6)(i) The institution violated a provision or requirement in a loan agreement; and

(ii) As provided under the terms of a security or loan agreement between the institution and the creditor, a monetary or nonmonetary default or delinquency event occurs, or other events occur, that trigger, or enable the creditor to require or impose on the institution, an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees;

(7) The institution has pending claims for borrower relief discharge under § 685.206 or § 685.222; or

(8) The Secretary expects to receive a significant number of claims for borrower relief discharge under § 685.206 or § 685.222 as a result of a lawsuit, settlement, judgement, or finding from a State or Federal administrative proceeding.

(h) *Reporting requirements.* (1) In accordance with procedures established by the Secretary, an institution must notify the Secretary of any of the following actions or events identified in paragraphs (c) through (g) of this section no later than—

(i) For lawsuits and for other actions or events described in paragraph (c)(1)(i) of this section—

(A) For lawsuits, 10 days after the institution is served with the complaint and 10 days after the suit has been pending for 120 days; and

(B) For debts arising from lawsuits and for other actions or events, 10 days after a payment was required or a liability was incurred.

(ii) For lawsuits described in paragraph (c)(1)(ii) of this section—

(A) Ten days after the institution is served with the complaint;

(B) Ten days after the court sets the dates for the earliest of the events described in paragraph (c)(1)(ii) of this section, provided that, if the deadline is set by procedural rules, notice of the applicable deadline must be included with notice of the service of the complaint; and

(C) Ten days after the earliest of the applicable events occurs;

(iii) For an accrediting agency action described in paragraph (c)(1)(iii) of this section, 10 days after the institution is notified by its accrediting agency that it must submit a teach-out plan;

(iv) For a withdrawal of owner's equity described in paragraph (c)(1)(v) of this section, 10 days after the withdrawal is made;

(v) For the non-title IV revenue provision in paragraph (d) of this section, 45 days after the end of the institution's fiscal year, as provided in § 668.28(c)(3);

(vi) For the SEC and stock exchange provisions for publicly traded institutions in paragraph (e), 10 days after the SEC or exchange warns, notifies, or takes an action against the institution, or 10 days after any extension granted by the SEC;

(vii) For State or agency actions in paragraph (g)(2) of this section, 10 days after the institution is cited for violating a State or agency requirement;

(viii) For probation or show cause actions under paragraph (g)(5) of this section, 10 days after the institution's accrediting agency places the institution on that status; or

(ix) For the loan agreement provisions in paragraph (g)(6) of this section, 10 days after a loan violation occurs, the creditor waives the violation, or the creditor imposes sanctions or penalties in exchange or as a result of the waiver.

(2) The Secretary may take an administrative action under paragraph (k) of this section against the institution if it fails to provide timely notice under this paragraph (h).

(3) In its notice to the Secretary, the institution may demonstrate that—

(i) For a suit by a Federal or State agency described in paragraph (c)(1)(i)(B) of this section, the amount claimed in the complaint or determined

under paragraph (c)(2)(ii) of this section exceeds the potential recovery because the allegations in the complaint, if accepted as true, and the claims asserted, if fully successful, cannot produce relief in the amount claimed or, if no amount was claimed, the amount deemed under paragraph (c)(2)(ii) because they pertain to a period, program, or location for which the full recovery possible is a lesser amount;

(ii) The reported withdrawal of owner's equity under paragraph (c)(1)(v) of this section was used exclusively to meet tax liabilities of the institution or its owners for income derived from the institution;

(iii) The reported violation of a provision or requirement in a loan agreement under paragraph (g)(6) of this section was waived by the creditor. However, if the creditor imposes additional constraints or requirements as a condition of waiving the violation, or imposes penalties or requirements under paragraph (g)(6)(ii) of this section, the institution must identify and describe those penalties, constraints, or requirements and may demonstrate that complying with those actions will not adversely affect the institution's ability to meet its current and future financial obligations; or

(iv) The action or event reported under this paragraph (h) no longer exists or has been resolved or the institution has insurance that will cover part or all of the debts and liabilities that arise at any time from that action or event.

(i) *Public institutions.* (1) The Secretary considers a domestic public institution to be financially responsible if the institution—

(i)(A) Notifies the Secretary that it is designated as a public institution by the State, local, or municipal government entity, tribal authority, or other government entity that has the legal authority to make that designation; and

(B) Provides a letter from an official of that State or other government entity confirming that the institution is a public institution; and

(ii) Is not subject to a condition of past performance under § 668.174.

(2) The Secretary considers a foreign public institution to be financially responsible if the institution—

(i)(A) Notifies the Secretary that it is designated as a public institution by the country or other government entity that has the legal authority to make that designation; and

(B) Provides documentation from an official of that country or other government entity confirming that the institution is a public institution and is backed by the full faith and credit of the country or other government entity; and

(ii) Is not subject to a condition of past performance under § 668.174.

(j) *Audit opinions.* Even if an institution satisfies all of the general standards of financial responsibility under paragraph (b) of this section, the Secretary does not consider the institution to be financially responsible if, in the institution's audited financial statements, the opinion expressed by the auditor was an adverse, qualified, or disclaimed opinion, or the auditor expressed doubt about the continued existence of the institution as a going concern, unless the Secretary determines that a qualified or disclaimed opinion does not significantly bear on the institution's financial condition.

(k) *Administrative actions.* If the Secretary determines that an institution is not financially responsible under the standards and provisions of this section or under an alternative standard in § 668.175, or the institution does not submit its financial and compliance audits by the date and in the manner required under § 668.23, the Secretary may—

(1) Initiate an action under subpart G of this part to fine the institution, or limit, suspend, or terminate the institution's participation in the title IV, HEA programs; or

(2) For an institution that is provisionally certified, take an action against the institution under the procedures established in § 668.13(d).

(Authority: 20 U.S.C. 1094 and 1099c and section 4 of Pub. L. 95–452, 92 Stat. 1101–1109)

■ 10. Section 668.175 is amended by:
■ A. Revising paragraphs (c) and (d).
■ B. Removing and reserving paragraph (e).
■ C. Revising paragraph (f).
■ D. Adding paragraph (h).
■ E. Revising the authority citation.
  The revisions and addition read as follows:

§ 668.175   Alternative standards and requirements.

\*   \*   \*   \*   \*

(c) *Letter of credit alternative for participating institutions.* A participating institution that is not financially responsible either because it does not satisfy one or more of the standards of financial responsibility under § 668.171(b) through (g), or because of an audit opinion described under § 668.171(j), qualifies as a financially responsible institution by submitting an irrevocable letter of credit or other form of financial protection specified by the Secretary in a notice published in the **Federal Register**, that is acceptable and payable to the Secretary, for an amount determined by the Secretary that is not less than one-half of the title IV, HEA program funds received by the institution during its most recently completed fiscal year.

(d) *Zone alternative.* (1) A participating institution that is not financially responsible solely because the Secretary determines that its composite score under § 668.172 is less than 1.5 may participate in the title IV, HEA programs as a financially responsible institution for no more than three consecutive years, beginning with the year in which the Secretary determines that the institution qualifies under this alternative.

(i)(A) An institution qualifies initially under this alternative if, based on the institution's audited financial statement for its most recently completed fiscal year, the Secretary determines that its composite score is in the range from 1.0 to 1.4; and

(B) An institution continues to qualify under this alternative if, based on the institution's audited financial statement for each of its subsequent two fiscal years, the Secretary determines that the institution's composite score is in the range from 1.0 to 1.4.

(ii) An institution that qualified under this alternative for three consecutive years, or for one of those years, may not seek to qualify again under this alternative until the year after the institution achieves a composite score of at least 1.5, as determined by the Secretary.

(2) Under the zone alternative, the Secretary—

(i) Requires the institution to make disbursements to eligible students and parents, and to otherwise comply with the provisions, under either the heightened cash monitoring or reimbursement payment method described in § 668.162;

(ii) Requires the institution to provide timely information regarding any of the following oversight and financial events—

(A) Any event that causes the institution, or related entity as defined in Accounting Standards Codification (ASC) 850, to realize any liability that was noted as a contingent liability in the institution's or related entity's most recent audited financial statement; or

(B) Any losses that are unusual in nature or infrequently occur, or both, as defined in accordance with Accounting Standards Update (ASU) No. 2015–01 and ASC 225;

(iii) May require the institution to submit its financial statement and compliance audits earlier than the time specified under § 668.23(a)(4); and

(iv) May require the institution to provide information about its current operations and future plans.

(3) Under the zone alternative, the institution must—

(i) For any oversight or financial event described in paragraph (d)(2)(ii) of this section for which the institution is required to provide information, in accordance with procedures established by the Secretary, notify the Secretary no later than 10 days after that event occurs; and

(ii) As part of its compliance audit, require its auditor to express an opinion on the institution's compliance with the requirements under the zone alternative, including the institution's administration of the payment method under which the institution received and disbursed title IV, HEA program funds.

(4) If an institution fails to comply with the requirements under paragraph (d)(2) or (3) of this section, the Secretary may determine that the institution no longer qualifies under this alternative.

*   *   *   *   *

(f) *Provisional certification alternative.* (1) The Secretary may permit an institution that is not financially responsible to participate in the title IV, HEA programs under a provisional certification for no more than three consecutive years if, as determined annually by the Secretary—

(i) The institution is not financially responsible because it does not satisfy the general standards under § 668.171(b)(1) or (3), its recalculated composite score under § 668.171(c)(2) is less than 1.0, is subject to an action or event under § 668.171(d), (e), (f),or (g) or because of an audit opinion described in § 668.171(i); or

(ii) The institution is not financially responsible because of a condition of past performance, as provided under § 668.174(a), and the institution demonstrates to the Secretary that it has satisfied or resolved that condition.

(2) Under this alternative, the institution must—

(i) Provide to the Secretary an irrevocable letter of credit that is acceptable and payable to the Secretary, agree to a set-aside under paragraph (h) of this section, or, at the Secretary's discretion, provide another form of financial protection specified by the Secretary in a notice published in the **Federal Register**, for an amount determined by the Secretary under paragraph (f)(4) of this section, except that this requirement does not apply to a public institution; and

(ii) Comply with the provisions under the zone alternative, as provided under paragraph (d)(2) and (3).

(3) If at the end of the period for which the Secretary provisionally certified the institution, the institution is still not financially responsible, the Secretary—

(i) May permit the institution to participate under a provisional certification, but—

(A) May require the institution, or one or more persons or entities that exercise substantial control over the institution, as determined under § 668.174(b)(1) and (c), or both, to provide to the Secretary financial protection for an amount determined by the Secretary under paragraph (f)(4) of this section; and

(B) May require one or more of the persons or entities that exercise substantial control over the institution, as determined under § 668.174(b)(1) and (c), to be jointly or severally liable for any liabilities that may arise from the institution's participation in the title IV, HEA programs; and

(ii) May permit the institution to continue to participate under a provisional certification but requires the institution to provide, or continue to provide, the financial protection resulting from an event described in § 668.171(c) through (g) until the institution meets the requirements of paragraph (f)(5) of this section.

(4)(i) The institution must provide to the Secretary the financial protection described under paragraph (f)(2)(i) in an amount that, together with the amount of any financial protection that the institution has already provided if that protection covers the period described in paragraph (f)(5) of this section, equals, for a composite score calculated under § 668.172, a composite score recalculated under § 668.171(c)(2), or for any other reason that the institution is not financially responsible—

(A) Ten percent of the total amount of title IV, HEA program funds received by the institution during its most recently completed fiscal year; and

(B) Any additional amount that the Secretary demonstrates is needed under paragraph (f)(4)(ii) of this section.

(ii) The Secretary determines the amount specified in paragraph (f)(4)(i)(B) of this section that must be provided by the institution in addition to the amount specified in paragraph (f)(4)(i)(A) of this section, and must ensure that the total amount of financial protection provided under paragraph (f)(4)(i) of this section is sufficient to fully cover any estimated losses. The

Secretary may reduce the amount required under paragraph (f)(4)(i)(B) only if an institution demonstrates that this amount is unnecessary to protect, or is contrary to, the Federal interest.

(5) The Secretary maintains the full amount of the financial protection provided by the institution under paragraph (f)(4) of this section until the Secretary first determines that the institution has—

(i) A composite score of 1.0 or greater based on the review of the audited financial statements for the fiscal year in which all losses from any event described in § 668.171(c), (d), (e), (f), or (g) on which financial protection was required have been fully recognized; or

(ii) A recalculated composite score of 1.0 or greater, and any event or condition described in § 668.171(d), (e), (f), or (g) has ceased to exist.

*   *   *   *   *

(h) *Set-aside.* If an institution does not provide a letter of credit or financial protection acceptable to the Secretary for the amount required under paragraph (d) or (f) of this section within 45 days of the Secretary's request, the Secretary offsets the amount of title IV, HEA program funds that an institution is eligible to receive in a manner that ensures that, no later than the end of a nine-month period, the total amount offset equals the amount of financial protection the institution would otherwise provide. The Secretary uses the funds to satisfy the debt and liabilities owed to the Secretary that are not otherwise paid directly by the institution, and provides to the institution any funds not used for this purpose during the period for which the financial protection was required, or provides the institution any remaining funds if the institution subsequently submits the financial protection originally required under paragraph (d) or (f) of this section.

*   *   *   *   *

(Authority: 20 U.S.C. 1094 and 1099c)

■ 11. Section 668.176 is added to subpart L to read as follows:

### § 668.176   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

(Authority: 20 U.S.C. 1094, 1099c)

■ 12. Appendix C to subpart L of part 668 is added to read as follows:

**Federal Register** / Vol. 81, No. 211 / Tuesday, November 1, 2016 / Rules and Regulations   **76077**

**Appendix C to Subpart L of Part 668 - Balance Sheet and Income Statement Adjustments for Recalculating Composite Score**

**Section 1: Proprietary Institutions**

| | Borrower-defense related lawsuits and other debts, §668.171(c)(1)(i) | | Other Litigation, §668.171(c)(1)(ii) | | Withdrawal of Owner's Equity, §668.171(c)(1)(v) | | Accrediting Agency Requires Teach-out Plan for Closed Location, §668.171(c)(1)(iii) | | Gainful Employment Programs, Loss of Eligibility, §668.171(c)(1)(iv) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Event** | Borrower-defense related lawsuits and other debts, §668.171(c)(1)(i) | | Other Litigation, §668.171(c)(1)(ii) | | Withdrawal of Owner's Equity, §668.171(c)(1)(v) | | Accrediting Agency Requires Teach-out Plan for Closed Location, §668.171(c)(1)(iii) | | Gainful Employment Programs, Loss of Eligibility, §668.171(c)(1)(iv) | |
| **Amount of Loss** | Debt, relief claimed, or other amount as determined under §668.171(c)(2)(ii) | | Relief claimed, or other amount as determined under §668.171(c)(2)(iii) | | Total amount withdrawn, §668.171(c)(2)(iv) | | Title IV funds received by the closed institution or location during the most recently completed fiscal year, §668.171(c)(2)(iii) | | Title IV funds received during the most recently completed fiscal year by GE programs in jeopardy of losing eligibility, §668.171(c)(2)(iv) | |
| **Allowance for Expenses** | Not applicable | | | | | | Cost of Goods Sold (#28) / Operating Income (#25) multiplied by Amount of Loss | | | |
| | **Entries for Loss** Line item from Section 2, Appendix A | | | | | | **Entries for Loss and Expenses** Line item from Section 2, Appendix A | | | |
| | Debit | Credit | Debit | Credit | Debit | Credit | Debit | Credit | Debit | Credit |
| **Adjusting Entries** | #32, Total Expenses | | #32, Total Expenses | | #23, Total Owners Equity | | #27, Total Income | | #27, Total Income | |
| | | #13, Total Assets | | #13, Total Assets | | #13, Total Assets | | #13, Total Assets | | #13, Total Assets |
| | NA | | NA | | NA | | #13, Total Assets (expense allowance) | | #13, Total Assets (expense allowance) | |
| | | NA | | NA | | NA | | #32, Total Expenses (expense allowance) | | #32, Total Expenses (expense allowance) |

Note that based on the changes to #27 Total Income and Line #32 Total expenses, the following line items may be recalculated: #34 Net Income Before Taxes, #36 Net Income After Taxes, #38 Net Income, #22 Retained Earnings, #23 Total Owner's Equity, and #24 Total Liabilities and Owner's Equity

## Section 2: Non-profit Institutions

| | Borrower-defense related lawsuits and other debts, §668.171(c)(1)(ii) | Other Litigation, §668.171(c)(1)(ii) | Accrediting Agency Requires Teach-out Plan for Closed Location, §668.171(c)(1)(iii) | Gainful Employment Programs, Loss of Eligibility, §668.171(c)(1)(iv) | | | |
|---|---|---|---|---|---|---|---|
| **Event** | | | | | | | |
| **Amount of Loss** | Debt, relief claimed, or other amount as determined under §668.171(c)(2)(ii) | Relief claimed, or other amount as determined under §668.171(c)(2)(iii) | Title IV funds received by the closed insitution or location during the most recently completed fiscal year, §668.171(c)(2)(iv) | Title IV funds received during the most recently completed fiscal year by GE programs in jeopardy of losing eligibility, §668.171(c)(2)(iv) | | | |
| **Allowance for Expenses** | Not applicable | | Operating expenses (#32) / Tuition & Fees (#27) multiplied by Amount of Loss | | | | |
| | **Entries for Loss** Line item from Section 2, Appendix B | | | | **Entries for Loss and Expenses** Line item from Section 2, Appemdix B | | |
| | Debit | Credit | Debit | Credit | Debit | Credit | Debit | Credit |
| **Adjusting Entries** | #38b, Total Expenses (Unrestricted) | | #38b, Total Expenses (Unrestricted) | | #31b, Total Revenue (Unrestricted) | | #31b, Total Revenue (Unrestricted) | |
| | | #12, Total Assets | | #12, Total Assets | | #12, Total Assets | | #12, Total Assets |
| | NA | | NA | | #12, Total Assets (expense allowance) | | #12, Total Assets (expense allowance) | |
| | | NA | | NA | | #38b, Total Expenses (expense allowance) | | #38b, Total Expenses (expense allowance) |

Note that based on the changes to #31b Total Revenue (Unrestricted) and #38b Total Expenses (Unrestricted), the following items may be recalculated: #39b Change in (Unrestricted) Net Assets, #41b (Unrestricted) Net Assets at end of year (will be same as #20 Unrestricted Net Assets), #25 Total Net Assets, #26 Total Liabilitites & Net Assets.

## PART 674—FEDERAL PERKINS LOAN PROGRAM

■ 13. The authority citation for part 674 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087aa—1087hh, unless otherwise noted.

■ 14. Section 674.33 is amended by:
■ A. Revising paragraph (g)(3).
■ B. Redesignating paragraphs (g)(8)(vi) through (ix) as paragraphs (g)(8)(vii) through (x), respectively.
■ C. Adding a new paragraph (g)(8)(vi).

The revision and addition read as follows:

### § 674.33   Repayment.

*      *      *      *      *

(g) * * *

(3) *Determination of borrower qualification for discharge by the Secretary.* (i) The Secretary may discharge the borrower's obligation to repay an NDSL or Federal Perkins Loan without an application if the Secretary determines that—

(A) The borrower qualified for and received a discharge on a loan pursuant to 34 CFR 682.402(d) (Federal Family Education Loan Program) or 34 CFR 685.214 (Federal Direct Loan Program), and was unable to receive a discharge on an NDSL or Federal Perkins Loan because the Secretary lacked the statutory authority to discharge the loan; or

(B) Based on information in the Secretary's possession, the borrower qualifies for a discharge.

(ii) With respect to schools that closed on or after November 1, 2013, the Secretary will discharge the borrower's obligation to repay an NDSL or Federal Perkins Loan without an application from the borrower if the Secretary determines that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date the school closed.

*      *      *      *      *

(8) * * *

(vi) Upon resuming collection on any affected loan, the Secretary provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

*      *      *      *      *

■ 15. Section 674.61 is amended by revising paragraph (a) to read as follows:

### § 674.61   Discharge for death or disability.

(a) *Death.* (1) An institution must discharge the unpaid balance of a borrower's Defense, NDSL, or Federal

Perkins loan, including interest, if the borrower dies. The institution must discharge the loan on the basis of—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the borrower's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the chief financial officer of the institution may approve a discharge based upon other reliable documentation of the borrower's death.

* * * * *

## PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM

■ 16. The authority citation for part 682 continues to read as follows:

**Authority:** 20 U.S.C. 1071–1087–4, unless otherwise noted.

### § 682.202 [Amended]

■ 17. Section 682.202 is amended in paragraph (b)(1) by removing the words "A lender" and adding in their place "Except as provided in § 682.405(b)(4), a lender".

■ 18. Section 682.211 is amended by adding paragraph (i)(7) to read as follows:

### § 682.211 Forbearance.

* * * * *

(i) * * *

(7) The lender must grant a mandatory administrative forbearance to a borrower upon being notified by the Secretary that the borrower has made a borrower defense claim related to a loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief in accordance with § 685.212(k). The mandatory administrative forbearance shall be granted in yearly increments or for a period designated by the Secretary until the loan is consolidated or until the lender is notified by the Secretary to discontinue the forbearance.

* * * * *

■ 19. Section 682.402 is amended:
■ A. By revising paragraphs (b)(2) and (d)(3).
■ B. In paragraph (d)(6)(ii)(B)(*1*) and (*2*), by removing the words "sworn statement (which may be combined)"

and adding in their place the word "application".
■ C. By revising paragraph (d)(6)(ii)(F) introductory text.
■ D. In paragraph (d)(6)(ii)(F)(*5*) removing the words "and sworn statement".
■ E. In paragraph (d)(6)(ii)(G) introductory text, by removing the words "request and supporting sworn statement" and adding, in their place, the words "completed application".
■ F. By revising paragraph (d)(6)(ii)(H).
■ G. By redesignating paragraph (d)(6)(ii)(I) as paragraph (d)(6)(ii)(J).
■ H. By adding new paragraph (d)(6)(ii)(I) and paragraph (d)(6)(ii)(K).
■ I. By revising paragraphs (d)(7)(ii) and (iii) and (d)(8).
■ J. In paragraph (e)(6)(iii), by removing the last sentence.

The revisions and additions read as follows:

### § 682.402 Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.

* * * * *

(b) * * *

(2)(i) A discharge of a loan based on the death of the borrower (or student in the case of a PLUS loan) must be based on—

(A) An original or certified copy of the death certificate;

(B) An accurate and complete photocopy of the original or certified copy of the death certificate;

(C) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(D) Verification of the borrower's or student's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(ii) Under exceptional circumstances and on a case-by-case basis, the chief executive officer of the guaranty agency may approve a discharge based upon other reliable documentation of the borrower's or student's death.

* * * * *

(d) * * *

(3) *Borrower qualification for discharge.* Except as provided in paragraph (d)(8) of this section, in order to qualify for a discharge of a loan under paragraph (d) of this section, a borrower must submit a completed closed school discharge application on a form approved by the Secretary. By signing the application, the borrower certifies—

* * * * *

(6) * * *

(ii) * * *

(F) If the guaranty agency determines that a borrower identified in paragraph

(d)(6)(ii)(C) or (D) of this section does not qualify for a discharge, the agency shall notify the borrower in writing of that determination and the reasons for it, the opportunity for review by the Secretary, and how to request such a review within 30 days after the date the agency—

* * * * *

(H) If a borrower described in paragraph (d)(6)(ii)(E) or (F) of this section fails to submit the completed application within 60 days of being notified of that option, the lender or guaranty agency shall resume collection.

(I) Upon resuming collection on any affected loan, the lender or guaranty agency provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

* * * * *

(K)(*1*) Within 30 days after receiving the borrower's request for review under paragraph (d)(6)(ii)(F) of this section, the agency shall forward the borrower's discharge request and all relevant documentation to the Secretary for review.

(*2*) The Secretary notifies the agency and the borrower of the determination upon review. If the Secretary determines that the borrower is not eligible for a discharge under paragraph (d) of this section, within 30 days after being so informed, the agency shall take the actions described in paragraph (d)(6)(ii)(H) or (I) of this section, as applicable.

(*3*) If the Secretary determines that the borrower meets the requirements for a discharge under paragraph (d) of this section, the agency shall, within 30 days after being so informed, take actions required under paragraphs (d)(6)(ii)(E) and (d)(6)(ii)(G)(*1*) of this section, and the lender shall take the actions described in paragraph (d)(7)(iv) of this section, as applicable.

* * * * *

(7) * * *

(i) * * *

(ii) If the borrower fails to submit a completed application described in paragraph (d)(3) of this section within 60 days of being notified of that option, the lender shall resume collection and shall be deemed to have exercised forbearance of payment of principal and interest from the date the lender suspended collection activity. The lender may capitalize, in accordance with § 682.202(b), any interest accrued and not paid during that period. Upon resuming collection, the lender provides the borrower with another discharge application and an explanation of the

requirements and procedures for obtaining a discharge.

(iii) The lender shall file a closed school claim with the guaranty agency in accordance with § 682.402(g) no later than 60 days after the lender receives a completed application described in paragraph (d)(3) of this section from the borrower, or notification from the agency that the Secretary approved the borrower's appeal in accordance with paragraph (d)(6)(ii)(K)(*3*) of this section.

\* \* \* \* \*

(8) *Discharge without an application.* (i) A borrower's obligation to repay a FFEL Program loan may be discharged without an application from the borrower if the—

(A) Borrower received a discharge on a loan pursuant to 34 CFR 674.33(g) under the Federal Perkins Loan Program, or 34 CFR 685.214 under the William D. Ford Federal Direct Loan Program; or

(B) Secretary or the guaranty agency, with the Secretary's permission, determines that the borrower qualifies for a discharge based on information in the Secretary or guaranty agency's possession.

(ii) With respect to schools that closed on or after November 1, 2013, a borrower's obligation to repay a FFEL Program loan will be discharged without an application from the borrower if the Secretary or guaranty agency determines that the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years after the school closed.

\* \* \* \* \*

■ 20. Section 682.405 is amended by redesignating paragraph (b)(4) as paragraph (b)(4)(i) and adding paragraph (b)(4)(ii).

The addition reads as follows:

**§ 682.405   Loan rehabilitation agreement.**

\* \* \* \* \*

(b) \* \* \*
(4) \* \* \*

(ii) The lender must not consider the purchase of a rehabilitated loan as entry into repayment or resumption of repayment for the purposes of interest capitalization under § 682.202(b).

\* \* \* \* \*

■ 21. Section 682.410 is amended:
■ A. In paragraph (b)(4) by adding, after the words "to the lender", the words and punctuation ", but shall not capitalize any unpaid interest thereafter".
■ B. By adding paragraph (b)(6)(viii).

The addition reads as follows:

**§ 682.410   Fiscal, administrative, and enforcement requirements.**

\* \* \* \* \*

(b) \* \* \*
(6) \* \* \*

(viii) Upon notification by the Secretary that the borrower has made a borrower defense claim related to a loan that the borrower intends to consolidate into the Direct Loan Program for the purpose of seeking relief in accordance with § 685.212(k), the guaranty agency must suspend all collection activities on the affected loan for the period designated by the Secretary.

**PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM**

■ 22. The authority citation for part 685 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.

■ 23. Section 685.200 is amended by adding paragraphs (f)(3)(v) and (f)(4)(iii) to read as follows:

**§ 685.200   Borrower eligibility.**

\* \* \* \* \*

(f) \* \* \*
(3) \* \* \*

(v) A borrower who receives a closed school, false certification, unpaid refund, or defense to repayment discharge that results in a remaining eligibility period greater than zero is no longer responsible for the interest that accrues on a Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan unless the borrower once again becomes responsible for the interest that accrues on a previously received Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan, for the life of the loan, as described in paragraph (f)(3)(i) of this section.

(4) \* \* \*

(iii) For a first-time borrower who receives a closed school, false certification, unpaid refund, or defense to repayment discharge on a Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan, the Subsidized Usage Period is reduced. If the Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan is discharged in full, the Subsidized Usage Period of those loans is zero years. If the Direct Subsidized Loan or a portion of a Direct Consolidation Loan that is attributable to a Direct Subsidized Loan is discharged in part, the Subsidized Usage Period may be reduced if the discharge results in the inapplicability of paragraph (f)(4)(i) of this section.

\* \* \* \* \*

■ 24. Section 685.205 is amended by revising paragraph (b)(6) to read as follows:

**§ 685.205   Forbearance.**

\* \* \* \* \*

(b) \* \* \*

(6) Periods necessary for the Secretary to determine the borrower's eligibility for discharge—

(i) Under § 685.206(c);
(ii) Under § 685.214;
(iii) Under § 685.215;
(iv) Under § 685.216;
(v) Under § 685.217;
(vi) Under § 685.222; or
(vii) Due to the borrower's or endorser's (if applicable) bankruptcy;

\* \* \* \* \*

■ 25. Section 685.206 is amended by revising paragraph (c) to read as follows:

**§ 685.206   Borrower responsibilities and defenses.**

\* \* \* \* \*

(c) *Borrower defenses.* (1) For loans first disbursed prior to July 1, 2017, the borrower may assert a borrower defense under this paragraph. A "borrower defense" refers to any act or omission of the school attended by the student that relates to the making of the loan for enrollment at the school or the provision of educational services for which the loan was provided that would give rise to a cause of action against the school under applicable State law, and includes one or both of the following:

(i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part.

(ii) A claim to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

(2) The order of objections for defaulted Direct Loans are as described in § 685.222(a)(6). A borrower defense claim under this section must be asserted, and will be resolved, under the procedures in § 685.222(e) to (k).

(3) For an approved borrower defense under this section, except as provided in paragraph (c)(4) of this section, the Secretary may initiate an appropriate proceeding to collect from the school whose act or omission resulted in the borrower defense the amount of relief arising from the borrower defense, within the later of—

(i) Three years from the end of the last award year in which the student attended the institution; or

(ii) The limitation period that State law would apply to an action by the borrower to recover on the cause of action on which the borrower defense is based.

(4) The Secretary may initiate a proceeding to collect at any time if the

institution received notice of the claim before the end of the later of the periods described in paragraph (c)(3) of this section. For purposes of this paragraph, notice includes receipt of—

(i) Actual notice from the borrower, from a representative of the borrower, or from the Department;

(ii) A class action complaint asserting relief for a class that may include the borrower; and

(iii) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower.

\* \* \* \* \*

### § 685.209  [Amended]

■ 26. Section 685.209 is amended:
■ A. In paragraph (a)(1)(ii), by adding '', for purposes of determining whether a borrower has a partial financial hardship in accordance with paragraph (a)(1)(v) of this section or adjusting a borrower's monthly payment amount in accordance with paragraph (a)(2)(ii) of this section,'' after the words ''*Eligible loan*''.
■ B. In paragraph (c)(1)(ii), by adding '', for purposes of adjusting a borrower's monthly payment amount in accordance with paragraph (c)(2)(ii) of this section,'' after the words ''*Eligible loan*''.
■ C. In paragraph (c)(2)(ii)(B) introductory text, by removing the word ''Both'' and adding in its place the words ''Except in the case of a married borrower filing separately whose spouse's income is excluded in accordance with paragraph (c)(1)(i)(A) or (B) of this section, both''.
■ D. In paragraph (c)(2)(v), by removing the words ''or the Secretary determines the borrower does not have a partial financial hardship''.
■ E. In paragraph (c)(4)(iii)(B), by removing the citations ''(c)(2)(iv), (c)(4)(v), and (c)(4)(vi)'' and adding, in their place, the citations ''(c)(2)(iv) and (c)(4)(v)''.
■ 27. Section 685.212 is amended by revising paragraphs (a)(1) and (2) and adding paragraph (k) to read as follows:

### § 685.212  Discharge of a loan obligation.

(a) *Death.* (1) If a borrower (or a student on whose behalf a parent borrowed a Direct PLUS Loan) dies, the Secretary discharges the obligation of the borrower and any endorser to make any further payments on the loan based on—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the borrower's or student's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the Secretary discharges a loan based upon other reliable documentation of the borrower's or student's death that is acceptable to the Secretary.

\* \* \* \* \*

(k) *Borrower defenses.* (1) If a borrower defense is approved under § 685.206(c) or § 685.222—

(i) The Secretary discharges the obligation of the borrower in whole or in part in accordance with the procedures in §§ 685.206(c) and 685.222, respectively; and

(ii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the loan that exceed the amount owed on that portion of the loan not discharged, if the borrower asserted the claim not later than—

(A) For a claim subject to § 685.206(c), the limitation period under applicable law to the claim on which relief was granted; or

(B) For a claim subject to § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.

(2) In the case of a Direct Consolidation Loan, a borrower may assert a borrower defense under § 685.206(c) or § 685.222 with respect to a Direct Loan, FFEL Program Loan, Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loan, or Nursing Loan made under part E of the Public Health Service Act that was repaid by the Direct Consolidation Loan.

(i) The Secretary considers a borrower defense claim asserted on a Direct Consolidation Loan by determining—

(A) Whether the act or omission of the school with regard to the loan described in paragraph (k)(2) of this section, other than a Direct Subsidized, Unsubsidized, or PLUS Loan, constitutes a borrower defense under § 685.206(c), for a Direct Consolidation Loan made before July 1, 2017, or under § 685.222, for a Direct Consolidation Loan made on or after July 1, 2017; or

(B) Whether the act or omission of the school with regard to a Direct Subsidized, Unsubsidized, or PLUS Loan made on after July 1, 2017 that was paid off by the Direct Consolidation Loan, constitutes a borrower defense under § 685.222.

(ii) If the borrower defense is approved, the Secretary discharges the appropriate portion of the Direct Consolidation Loan.

(iii) The Secretary returns to the borrower payments made by the borrower or otherwise recovered on the Direct Consolidation Loan that exceed the amount owed on that portion of the Direct Consolidation Loan not discharged, if the borrower asserted the claim not later than—

(A) For a claim asserted under § 685.206(c), the limitation period under the law applicable to the claim on which relief was granted; or

(B) For a claim asserted under § 685.222, the limitation period in § 685.222(b), (c), or (d), as applicable.

(iv) The Secretary returns to the borrower a payment made by the borrower or otherwise recovered on the loan described in paragraph (k)(2) of this section only if—

(A) The payment was made directly to the Secretary on the loan; and

(B) The borrower proves that the loan to which the payment was credited was not legally enforceable under applicable law in the amount for which that payment was applied.

\* \* \* \* \*

■ 28. Section 685.214 is amended by:
■ A. Revising paragraphs (c)(2) and (f)(4).
■ B. Redesignating paragraphs (f)(5) and (6) as paragraphs (f)(6) and (7), respectively.
■ C. Adding a new paragraph (f)(5).
The revisions and addition read as follows:

### § 685.214  Closed school discharge.

\* \* \* \* \*

(c) \* \* \*

(2) If the Secretary determines, based on information in the Secretary's possession, that the borrower qualifies for the discharge of a loan under this section, the Secretary—

(i) May discharge the loan without an application from the borrower; and

(ii) With respect to schools that closed on or after November 1, 2013, will discharge the loan without an application from the borrower if the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date the school closed.

\* \* \* \* \*

(f) * * *

(4) If a borrower fails to submit the application described in paragraph (c) of this section within 60 days of the Secretary's providing the discharge application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(5) Upon resuming collection on any affected loan, the Secretary provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

* * * * *

■ 29. Section 685.215 is amended by:
■ A. Revising paragraph (a)(1).
■ B. Revising paragraph (c) introductory text.
■ C. Revising paragraph (c)(1).
■ D. Redesignating paragraphs (c)(2) through (7) as paragraphs (c)(3) through (8), respectively.
■ E. Adding a new paragraph (c)(2).
■ F. Revising redesignated paragraph (c)(8).
■ G. Revising paragraph (d).
   The revisions and addition read as follows:

§ 685.215   Discharge for false certification of student eligibility or unauthorized payment.

(a) *Basis for discharge*—(1) *False certification.* The Secretary discharges a borrower's (and any endorser's) obligation to repay a Direct Loan in accordance with the provisions of this section if a school falsely certifies the eligibility of the borrower (or the student on whose behalf a parent borrowed) to receive the proceeds of a Direct Loan. The Secretary considers a student's eligibility to borrow to have been falsely certified by the school if the school—

(i) Certified the eligibility of a student who—

(A) Reported not having a high school diploma or its equivalent; and

(B) Did not satisfy the alternative to graduation from high school requirements under section 484(d) of the Act that were in effect at the time of certification;

(ii) Certified the eligibility of a student who is not a high school graduate based on—

(A) A high school graduation status falsified by the school; or

(B) A high school diploma falsified by the school or a third party to which the school referred the borrower;

(iii) Signed the borrower's name on the loan application or promissory note without the borrower's authorization;

(iv) Certified the eligibility of the student who, because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary, would not meet State requirements for employment (in the student's State of residence when the loan was originated) in the occupation for which the training program supported by the loan was intended; or

(v) Certified the eligibility of a student for a Direct Loan as a result of the crime of identity theft committed against the individual, as that crime is defined in paragraph (c)(5)(ii) of this section.

* * * * *

(c) *Borrower qualification for discharge.* To qualify for discharge under this section, the borrower must submit to the Secretary an application for discharge on a form approved by the Secretary. The application need not be notarized but must be made by the borrower under penalty of perjury; and in the application, the borrower's responses must demonstrate to the satisfaction of the Secretary that the requirements in paragraph (c)(1) through (7) of this section have been met. If the Secretary determines the application does not meet the requirements, the Secretary notifies the applicant and explains why the application does not meet the requirements.

(1) *High school diploma or equivalent.* In the case of a borrower requesting a discharge based on not having had a high school diploma and not having met the alternative to graduation from high school eligibility requirements under section 484(d) of the Act applicable at the time the loan was originated, and the school or a third party to which the school referred the borrower falsified the student's high school diploma, the borrower must state in the application that the borrower (or the student on whose behalf a parent received a PLUS loan)—

(i) Reported not having a valid high school diploma or its equivalent at the time the loan was certified; and

(ii) Did not satisfy the alternative to graduation from high school statutory or regulatory eligibility requirements identified on the application form and applicable at the time the institution certified the loan.

(2) *Disqualifying condition.* In the case of a borrower requesting a discharge based on a condition that would disqualify the borrower from employment in the occupation that the training program for which the borrower received the loan was intended, the borrower must state in the application that the borrower (or student for whom a parent received a PLUS loan)—

(i) Did not meet State requirements for employment (in the student's State of residence) in the occupation that the training program for which the borrower received the loan was intended because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary.

(ii) [Reserved]

* * * * *

(8) *Discharge without an application.* The Secretary discharges all or part of a loan as appropriate under this section without an application from the borrower if the Secretary determines, based on information in the Secretary's possession, that the borrower qualifies for a discharge. Such information includes, but is not limited to, evidence that the school has falsified the Satisfactory Academic Progress of its students, as described in § 668.34.

(d) *Discharge procedures.* (1) If the Secretary determines that a borrower's Direct Loan may be eligible for a discharge under this section, the Secretary provides the borrower an application and an explanation of the qualifications and procedures for obtaining a discharge. The Secretary also promptly suspends any efforts to collect from the borrower on any affected loan. The Secretary may continue to receive borrower payments.

(2) If the borrower fails to submit the application described in paragraph (c) of this section within 60 days of the Secretary's providing the application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended. The Secretary may capitalize any interest accrued and not paid during that period.

(3) If the borrower submits the application described in paragraph (c) of this section, the Secretary determines whether the available evidence supports the claim for discharge. Available evidence includes evidence provided by the borrower and any other relevant information from the Secretary's records and gathered by the Secretary from other sources, including guaranty agencies, other Federal agencies, State authorities, test publishers, independent test administrators, school records, and cognizant accrediting associations. The Secretary issues a decision that explains the reasons for any adverse determination on the application, describes the evidence on which the decision was made, and provides the borrower, upon request, copies of the evidence. The Secretary considers any response from the borrower and any additional information from the borrower, and notifies the borrower whether the determination is changed.

(4) If the Secretary determines that the borrower meets the applicable requirements for a discharge under paragraph (c) of this section, the Secretary notifies the borrower in writing of that determination.

(5) If the Secretary determines that the borrower does not qualify for a discharge, the Secretary notifies the borrower in writing of that determination and the reasons for the determination.

\*    \*    \*    \*    \*

**§ 685.220    [Amended]**

■ 30. Section 685.220 is amended by:
■ A. Removing the words "subpart II of part B" from paragraph (b)(21) and adding in their place the words "part E".
■ B. Removing paragraph (d)(1)(i).
■ C. Redesignating paragraph (d)(1)(ii) and (iii) as paragraphs (d)(1)(i) and (ii).
■ 31. Section 685.222 is added to subpart B to read as follows:

**§ 685.222    Borrower defenses.**

(a) *General.* (1) For loans first disbursed prior to July 1, 2017, a borrower asserts and the Secretary considers a borrower defense in accordance with the provisions of § 685.206(c), unless otherwise noted in § 685.206(c).

(2) For loans first disbursed on or after July 1, 2017, a borrower asserts and the Secretary considers a borrower defense in accordance with this section. To establish a borrower defense under this section, a preponderance of the evidence must show that the borrower has a borrower defense that meets the requirements of this section.

(3) A violation by the school of an eligibility or compliance requirement in the Act or its implementing regulations is not a basis for a borrower defense under either this section or § 685.206(c) unless the violation would otherwise constitute a basis for a borrower defense under this section or § 685.206(c), as applicable.

(4) For the purposes of this section and § 685.206(c), "borrower" means—
(i) The borrower; and
(ii) In the case of a Direct PLUS Loan, any endorsers, and for a Direct PLUS Loan made to a parent, the student on whose behalf the parent borrowed.

(5) For the purposes of this section and § 685.206(c), a "borrower defense" refers to an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided, and includes one or both of the following:

(i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part; and
(ii) A right to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

(6) If the borrower asserts both a borrower defense and any other objection to an action of the Secretary with regard to that Direct Loan, the order in which the Secretary will consider objections, including a borrower defense, will be determined as appropriate under the circumstances.

(b) *Judgment against the school.* The borrower has a borrower defense if the borrower, whether as an individual or as a member of a class, or a governmental agency, has obtained against the school a nondefault, favorable contested judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction. A borrower may assert a borrower defense under this paragraph at any time.

(c) *Breach of contract by the school.* The borrower has a borrower defense if the school the borrower received the Direct Loan to attend failed to perform its obligations under the terms of a contract with the student. A borrower may assert a defense to repayment of amounts owed to the Secretary under this paragraph at any time after the breach by the school of its contract with the student. A borrower may assert a right to recover amounts previously collected by the Secretary under this paragraph not later than six years after the breach by the school of its contract with the student.

(d) *Substantial misrepresentation by the school.* (1) A borrower has a borrower defense if the school or any of its representatives, or any institution, organization, or person with whom the school has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services, made a substantial misrepresentation in accordance with 34 CFR part 668, subpart F, that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a Direct Loan. A borrower may assert, at any time, a defense to repayment under this paragraph (d) of amounts owed to the Secretary. A borrower may assert a claim under this paragraph (d) to recover funds previously collected by the Secretary not later than six years after the borrower discovers, or reasonably could have discovered, the information constituting the substantial misrepresentation.

(2) For the purposes of this section, a designated Department official pursuant to paragraph (e) of this section or a hearing official pursuant to paragraph (f), (g), or (h) of this section may consider, as evidence supporting the reasonableness of a borrower's reliance on a misrepresentation, whether the school or any of the other parties described in paragraph (d)(1) engaged in conduct such as, but not limited to:

(i) Demanding that the borrower make enrollment or loan-related decisions immediately;
(ii) Placing an unreasonable emphasis on unfavorable consequences of delay;
(iii) Discouraging the borrower from consulting an adviser, a family member, or other resource;
(iv) Failing to respond to the borrower's requests for more information including about the cost of the program and the nature of any financial aid; or
(v) Otherwise unreasonably pressuring the borrower or taking advantage of the borrower's distress or lack of knowledge or sophistication.

(e) *Procedure for an individual borrower.* (1) To assert a borrower defense under this section, an individual borrower must—
(i) Submit an application to the Secretary, on a form approved by the Secretary—
(A) Certifying that the borrower received the proceeds of a loan, in whole or in part, to attend the named school;
(B) Providing evidence that supports the borrower defense; and
(C) Indicating whether the borrower has made a claim with respect to the information underlying the borrower defense with any third party, such as the holder of a performance bond or a tuition recovery program, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation; and
(ii) Provide any other information or supporting documentation reasonably requested by the Secretary.

(2) Upon receipt of a borrower's application, the Secretary—
(i) If the borrower is not in default on the loan for which a borrower defense has been asserted, grants forbearance and—
(A) Notifies the borrower of the option to decline the forbearance and to continue making payments on the loan; and
(B) Provides the borrower with information about the availability of the income-contingent repayment plans under § 685.209 and the income-based repayment plan under § 685.221; or

(ii) If the borrower is in default on the loan for which a borrower defense has been asserted—

(A) Suspends collection activity on the loan until the Secretary issues a decision on the borrower's claim;

(B) Notifies the borrower of the suspension of collection activity and explains that collection activity will resume if the Secretary determines that the borrower does not qualify for a full discharge; and

(C) Notifies the borrower of the option to continue making payments under a rehabilitation agreement or other repayment agreement on the defaulted loan.

(3) The Secretary designates a Department official to review the borrower's application to determine whether the application states a basis for a borrower defense, and resolves the claim through a fact-finding process conducted by the Department official.

(i) As part of the fact-finding process, the Department official notifies the school of the borrower defense application and considers any evidence or argument presented by the borrower and also any additional information, including—

(A) Department records;

(B) Any response or submissions from the school; and

(C) Any additional information or argument that may be obtained by the Department official.

(ii) Upon the borrower's request, the Department official identifies to the borrower the records the Department official considers relevant to the borrower defense. The Secretary provides to the borrower any of the identified records upon reasonable request of the borrower.

(4) At the conclusion of the fact-finding process, the Department official issues a written decision as follows:

(i) If the Department official approves the borrower defense in full or in part, the Department official notifies the borrower in writing of that determination and of the relief provided as described in paragraph (i) of this section.

(ii) If the Department official denies the borrower defense in full or in part, the Department official notifies the borrower of the reasons for the denial, the evidence that was relied upon, any portion of the loan that is due and payable to the Secretary, and whether the Secretary will reimburse any amounts previously collected, and informs the borrower that if any balance remains on the loan, the loan will return to its status prior to the borrower's submission of the application. The Department official also informs the borrower of the opportunity to request reconsideration of the claim based on new evidence pursuant to paragraph (e)(5)(i) of this section.

(5) The decision of the Department official is final as to the merits of the claim and any relief that may be granted on the claim. Notwithstanding the foregoing—

(i) If the borrower defense is denied in full or in part, the borrower may request that the Secretary reconsider the borrower defense upon the identification of new evidence in support of the borrower's claim. "New evidence" is relevant evidence that the borrower did not previously provide and that was not identified in the final decision as evidence that was relied upon for the final decision. If accepted for reconsideration by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans; and

(ii) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

(6) The Secretary may consolidate applications filed under this paragraph (e) that have common facts and claims, and resolve the borrowers' borrower defense claims as provided in paragraphs (f), (g), and (h) of this section.

(7) The Secretary may initiate a proceeding to collect from the school the amount of relief resulting from a borrower defense under this section—

(i) Within the six-year period applicable to the borrower defense under paragraph (c) or (d) of this section;

(ii) At any time, for a borrower defense under paragraph (b) of this section; or

(iii) At any time if during the period described in paragraph (e)(7)(i) of this section, the institution received notice of the claim. For purposes of this paragraph, notice includes receipt of—

(A) Actual notice from the borrower, a representative of the borrower, or the Department of a claim, including notice of an application filed pursuant to this section or § 685.206(c);

(B) A class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of a claim under this section or § 685.206(c);

(C) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower, for underlying facts that may form the basis of a claim under this section or § 685.206(c).

(f) *Group process for borrower defense, generally.* (1) Upon consideration of factors including, but not limited to, common facts and claims, fiscal impact, and the promotion of compliance by the school or other title IV, HEA program participant, the Secretary may initiate a process to determine whether a group of borrowers, identified by the Secretary, has a borrower defense.

(i) The members of the group may be identified by the Secretary from individually filed applications pursuant to paragraph (e)(6) of this section or from any other source.

(ii) If the Secretary determines that there are common facts and claims that apply to borrowers who have not filed an application under paragraph (e) of this section, the Secretary may identify such borrowers as members of a group.

(2) Upon the identification of a group of borrowers under paragraph (f)(1) of this section, the Secretary—

(i) Designates a Department official to present the group's claim in the fact-finding process described in paragraph (g) or (h) of this section, as applicable;

(ii) Provides each identified member of the group with notice that allows the borrower to opt out of the proceeding;

(iii) If identified members of the group are borrowers who have not filed an application under paragraph (f)(1)(ii) of this section, follows the procedures in paragraph (e)(2) of this section for granting forbearance and for defaulted loans for such identified members of the group, unless an opt-out by such a member of the group is received; and

(iv) Notifies the school of the basis of the group's borrower defense, the initiation of the fact-finding process described in paragraph (g) or (h) of this section, and of any procedure by which the school may request records and respond. No notice will be provided if notice is impossible or irrelevant due to a school's closure.

(3) For a group of borrowers identified by the Secretary, for which the Secretary determines that there may be a borrower defense under paragraph (d) of this section based upon a substantial misrepresentation that has been widely disseminated, there is a rebuttable presumption that each member

reasonably relied on the misrepresentation.

(g) *Procedures for group process for borrower defenses with respect to loans made to attend a closed school.* For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense is asserted with respect to a Direct Loan to attend a school that has closed and has provided no financial protection currently available to the Secretary from which to recover any losses arising from borrower defenses, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses—

(1) A hearing official resolves the borrower defense through a fact-finding process. As part of the fact-finding process, the hearing official considers any evidence and argument presented by the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official also considers any additional information the Department official considers necessary, including any Department records or response from the school or a person affiliated with the school as described in § 668.174(b), if practicable. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision states that determination and the relief provided on the basis of that claim as determined under paragraph (i) of this section.

(ii) If the hearing official denies the borrower defense in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that if any balance remains on the loan, the loan will return to its status prior to the group claim process.

(iii) The Secretary provides copies of the written decision to the members of the group and, as practicable, to the school.

(2) The decision of the hearing official is final as to the merits of the group borrower defense and any relief that may be granted on the group claim.

(3) After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (g)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

(4) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

(h) *Procedures for group process for borrower defenses with respect to loans made to attend an open school.* For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense is asserted with respect to Direct Loans to attend a school that is not covered by paragraph (g) of this section, the claim is resolved in accordance with the procedures in this paragraph (h).

(1) A hearing official resolves the borrower defense and determines any liability of the school through a fact-finding process. As part of the fact-finding process, the hearing official considers any evidence and argument presented by the school and the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision establishes the basis for the determination, notifies the members of the group of the relief as described in paragraph (i) of this section, and notifies the school of any liability to the Secretary for the amounts discharged and reimbursed.

(ii) If the hearing official denies the borrower defense for the group in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that their loans will return to their statuses prior to the group borrower defense process. The decision notifies the school of any liability to the Secretary for any amounts discharged or reimbursed.

(iii) The Secretary provides copies of the written decision to the members of the group, the Department official, and the school.

(2) The decision of the hearing official becomes final as to the merits of the group borrower defense and any relief that may be granted on the group borrower defense within 30 days after the decision is issued and received by the Department official and the school unless, within that 30-day period, the school or the Department official appeals the decision to the Secretary. In the case of an appeal—

(i) The decision of the hearing official does not take effect pending the appeal; and

(ii) The Secretary renders a final decision.

(3) After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (h)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

(4) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

(5)(i) The Secretary collects from the school any liability to the Secretary for any amounts discharged or reimbursed to borrowers under this paragraph (h).

(ii) For a borrower defense under paragraph (b) of this section, the Secretary may initiate a proceeding to collect at any time.

(iii) For a borrower defense under paragraph (c) or (d) of this section, the Secretary may initiate a proceeding to collect within the limitation period that would apply to the borrower defense, provided that the Secretary may bring an action to collect at any time if, within the limitation period, the school received notice of the borrower's borrower defense claim. For purposes of this paragraph, the school receives notice of the borrower's claim by receipt of—

(A) Actual notice of the claim from the borrower, a representative of the borrower, or the Department, including notice of an application filed pursuant to this section or § 685.206(c);

(B) A class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of a claim under this section or § 685.206(c); or

(C) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower, of underlying facts that may form the basis of a claim under this section or § 685.206(c).

(i) *Relief.* If a borrower defense is approved under the procedures in

paragraph (e), (g), or (h) of this section, the following procedures apply:

(1) The Department official or the hearing official deciding the claim determines the appropriate amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount.

(2) For a borrower defense brought on the basis of—

(i) A substantial misrepresentation, the Department official or the hearing official will factor the borrower's cost of attendance to attend the school, as well as the value of the education the borrower received, the value of the education that a reasonable borrower in the borrower's circumstances would have received, and/or the value of the education the borrower should have expected given the information provided by the institution, into the determination of appropriate relief. A borrower may be granted full, partial, or no relief. Value will be assessed in a manner that is reasonable and practicable. In addition, the Department official or the hearing official deciding the claim may consider any other relevant factors;

(ii) A judgment against the school—

(A) Where the judgment awards specific financial relief, relief will be the amount of the judgment that remains unsatisfied, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations; and

(B) Where the judgment does not award specific financial relief, the Department will rely on the holding of the case and applicable law to monetize the judgment; and

(iii) A breach of contract, relief will be determined according to the common law of contracts, subject to the limitation provided for in § 685.222(i)(8) and any other reasonable considerations.

(3) In a fact-finding process brought against an open school under paragraph (h) of this section on the basis of a substantial misrepresentation, the school has the burden of proof as to any value of the education.

(4) In determining the relief, the Department official or the hearing official deciding the claim may consider—

(i) Information derived from a sample of borrowers from the group when calculating relief for a group of borrowers; and

(ii) The examples in Appendix A to this subpart.

(5) In the written decision described in paragraphs (e), (g), and (h) of this

section, the designated Department official or hearing official deciding the claim notifies the borrower of the relief provided and—

(i) Specifies the relief determination;

(ii) Advises that there may be tax implications; and

(iii) Advises the borrower of the requirements to file a request for reconsideration upon the identification of new evidence.

(6) Consistent with the determination of relief under paragraph (i)(1) of this section, the Secretary discharges the borrower's obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay and, if applicable, reimburses the borrower for amounts paid toward the loan voluntarily or through enforced collection.

(7) The Department official or the hearing official deciding the case, or the Secretary as applicable, affords the borrower such further relief as appropriate under the circumstances. Such further relief includes, but is not limited to, one or both of the following:

(i) Determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act.

(ii) Updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan.

(8) The total amount of relief granted with respect to a borrower defense cannot exceed the amount of the loan and any associated costs and fees and will be reduced by the amount of any refund, reimbursement, indemnification, restitution, compensatory damages, settlement, debt forgiveness, discharge, cancellation, compromise, or any other financial benefit received by, or on behalf of, the borrower that was related to the borrower defense. The relief to the borrower may not include non-pecuniary damages such as inconvenience, aggravation, emotional distress, or punitive damages.

(j) *Cooperation by the borrower.* To obtain relief under this section, a borrower must reasonably cooperate with the Secretary in any proceeding under paragraph (e), (g), or (h) of this section. The Secretary may revoke any relief granted to a borrower who fails to satisfy his or her obligations under this paragraph (j).

(k) *Transfer to the Secretary of the borrower's right of recovery against third parties.* (1) Upon the granting of any relief under this section, the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary

any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the contract for educational services for which the loan was received, against the school, its principals, its affiliates, and their successors, its sureties, and any private fund. If the borrower asserts a claim to, and recovers from, a public fund, the Secretary may reinstate the borrower's obligation to repay on the loan an amount based on the amount recovered from the public fund, if the Secretary determines that the borrower's recovery from the public fund was based on the same borrower defense and for the same loan for which the discharge was granted under this section.

(2) The provisions of this paragraph (k) apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower, limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights.

(3) Nothing in this paragraph (k) limits or forecloses the borrower's right to pursue legal and equitable relief against a party described in this paragraph (k) for recovery of any portion of a claim exceeding that assigned to the Secretary or any other claims arising from matters unrelated to the claim on which the loan is discharged.

(Authority: 20 U.S.C. 1087a *et seq.;* 28 U.S.C. 2401; 31 U.S.C. 3702)

■ 32. Section 685.223 is added to subpart B to read as follows:

**§ 685.223   Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1087a *et seq.*)

■ 33. Appendix A to subpart B of part 685 is added to read as follows:

**Appendix A to Subpart B of Part 685— Examples of Borrower Relief**

The Department official or the hearing official deciding a borrower defense claim determines the amount of relief to award the borrower, which may be a discharge of all amounts owed to the Secretary on the loan at issue and may include the recovery of amounts previously collected by the Secretary on the loan, or some lesser amount. The following are some conceptual examples demonstrating relief. The actual relief awarded will be determined by the Department official or the hearing official deciding the claim, who shall not be bound by these examples.

1. A school represents to prospective students, in widely disseminated materials, that its educational program will lead to employment in an occupation that requires State licensure. The program does not in fact meet minimum education requirements to enable its graduates to sit for the exam necessary for them to obtain licensure. The claims are adjudicated in a group process.

Appropriate relief: Borrowers who enrolled in this program during the time that the misrepresentation was made should receive full relief. As a result of the schools' misrepresentation, the borrowers cannot work in the occupation in which they reasonably expected to work when they enrolled. Accordingly, borrowers received limited or no value from this educational program because they did not receive the value that they reasonably expected.

2. A school states to a prospective student that its medical assisting program has a faculty composed of skilled nurses and physicians and offers internships at a local hospital. The borrower enrolls in the school in reliance on that statement. In fact, none of the teachers at the school other than the Director is a nurse or physician. The school has no internship program. The teachers at the school are not qualified to teach medical assisting and the student is not qualified for medical assistant jobs based on the education received at the school.

Appropriate relief: This borrower should receive full relief. None of the teachers at the school are qualified to teach medical assisting, and there was no internship. In contrast to reasonable students' expectations, based on information provided by the school, the typical borrower received no value from the program.

3. An individual interested in becoming a registered nurse meets with a school's admissions counselor who explains that the school does not have a nursing program but that completion of a medical assisting program is a prerequisite for any nursing program. Based on this information, the borrower enrolls in the school's medical assisting program rather than searching for another nursing program, believing that completing a medical assisting program is a necessary step towards becoming a nurse. After one year in the program, the borrower realizes that it is not necessary to become a medical assistant before entering a nursing program. The borrower's credits are not transferable to a nursing program.

Appropriate relief: This borrower should receive full relief. Because it is not necessary to become a medical assistant prior to entering a nursing program, she has made no progress towards the career she sought, and in fact has received an education that cannot be used for its intended purpose.

4. A school tells a prospective student, who is actively seeking an education, that the cost of the program will be $20,000. Relying on that statement, the borrower enrolls. The student later learns the cost for that year was $25,000. There is no evidence of any other misrepresentations in the enrollment process or of any deficiency in value in the school's education.

Appropriate relief: This borrower should receive partial relief of $5,000. The borrower

received precisely the value that she expected. The school provides the education that the student was seeking but misrepresented the price.

5. A school represents in its marketing materials that three of its undergraduate faculty members in a particular program have received the highest award in their field. A borrower choosing among two comparable, selective programs enrolls in that program in reliance on the representation about its faculty. However, although the program otherwise remains the same, the school had failed to update the marketing materials to reflect the fact that the award-winning faculty had left the school.

Appropriate relief: Although the borrower reasonably relied on a misrepresentation about the faculty in deciding to enroll at this school, she still received the value that she expected. Therefore, no relief is appropriate.

6. An individual wishes to enroll in a selective, regionally accredited liberal arts school. The school gives inflated data to a well-regarded school ranking organization regarding the median grade point average of recent entrants and also includes that inflated data in its own marketing materials. This inflated data raises the place of the school in the organization's rankings in independent publications. The individual enrolls in the school and graduates. Soon after graduating, the individual learns from the news that the school falsified admissions data. Notwithstanding this issue, degrees from the school continue to serve as effective, well-regarded liberal arts credentials.

The Department also determines that the school violated the title IV requirement that it not make substantial misrepresentations pursuant to 34 CFR 668.71, which constitutes an enforceable violation separate and apart from any borrower defense relief.

Appropriate Relief: The borrower relied on the misrepresentation about the admissions data to his detriment, because the misrepresentation factored into the borrower's decision to choose the school over others. However, the borrower received a selective liberal arts education which represents the value that he could reasonably expect, and gets no relief.

■ 34. Section 685.300 is amended by:
■ A. Redesignating paragraph (b)(11) as paragraph (b)(12).
■ B. Adding a new paragraph (b)(11).
■ C. Adding paragraphs (d) through (i).
The additions read as follows:

§ 685.300   Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.

\*      \*      \*      \*      \*

(b) \* \* \*

(11) Comply with the provisions of paragraphs (d) through (i) of this section regarding student claims and disputes.

\*      \*      \*      \*      \*

(d) *Borrower defense claims in an internal dispute process.* The school will not compel any student to pursue a complaint based on a borrower defense claim through an internal dispute process before the student

presents the complaint to an accrediting agency or government agency authorized to hear the complaint.

(e) *Class action bans.* (1) The school will not seek to rely in any way on a predispute arbitration agreement or on any other predispute agreement with a student who has obtained or benefited from a Direct Loan, with respect to any aspect of a class action that is related to a borrower defense claim, including to seek a stay or dismissal of particular claims or the entire action, unless and until the presiding court has ruled that the case may not proceed as a class action and, if that ruling may be subject to appellate review on an interlocutory basis, the time to seek such review has elapsed or the review has been resolved.

(2) Reliance on a predispute arbitration agreement, or on any other predispute agreement, with a student, with respect to any aspect of a class action includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a class action.

(ii) Seeking to exclude a person or persons from a class in a class action.

(iii) Objecting to or seeking a protective order intended to avoid responding to discovery in a class action.

(iv) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action.

(v) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court has denied a motion to certify the class but before an appellate court has ruled on an interlocutory appeal of that motion, if the time to seek such an appeal has not elapsed or the appeal has not been resolved.

(vi) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court in that class action has granted a motion to dismiss the claim and, in doing so, the court noted that the consumer has leave to refile the claim on a class basis, if the time to refile the claim has not elapsed.

(3) *Required provisions and notices.* (i) The school must include the following provision in any agreements with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS Loan, a student for whom the PLUS loan was obtained, that include any agreement regarding predispute arbitration or any other predispute agreement addressing class actions and that are entered into after the effective date of this regulation: ''We agree that neither we nor anyone else will use this agreement to stop you from being part of a class action lawsuit in

court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Direct Loan or the provision by us of educational services for which the Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(ii) When a predispute arbitration agreement or any other predispute agreement addressing class actions has been entered into before the effective date of this regulation and does not contain a provision described in paragraph (e)(3)(i) of this section, the school must either ensure the agreement is amended to contain the provision specified in paragraph (e)(3)(iii)(A) of this section or provide the student to whom the agreement applies with the written notice specified in paragraph (e)(3)(iii)(B) of this section.

(iii) The school must ensure the agreement described in paragraph (e)(3)(ii) of this section is amended to contain the provision specified in paragraph (e)(3)(iii)(A) or must provide the notice specified in paragraph (e)(3)(iii)(B) to students no later than the exit counseling required under § 685.304(b), or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment.

(A) *Agreement provision.* ''We agree that neither we nor anyone else who later becomes a party to this agreement will use it to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit in court even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(B) *Notice provision.* ''We agree not to use any predispute agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even

if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(f) *Predispute arbitration agreements.* (1)(i) The school will not enter into a predispute agreement to arbitrate a borrower defense claim, or rely in any way on a predispute arbitration agreement with respect to any aspect of a borrower defense claim.

(ii) A student may enter into a voluntary post-dispute arbitration agreement with a school to arbitrate a borrower defense claim.

(2) Reliance on a predispute arbitration agreement with a student with respect to any aspect of a borrower defense claim includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a judicial action filed by the student, including joinder with others in an action;

(ii) Objecting to or seeking a protective order intended to avoid responding to discovery in a judicial action filed by the student; and

(iii) Filing a claim in arbitration against a student who has filed a suit on the same claim.

(3) *Required provisions and notices.* (i) The school must include the following provision in any predispute arbitration agreements with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS Loan, a student for whom the PLUS loan was obtained, that include any agreement regarding arbitration and that are entered into after the effective date of this regulation: ''We agree that neither we nor anyone else will use this agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to lawsuits concerning other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of

educational services for which the loan was obtained.''

(ii) When a predispute arbitration agreement has been entered into before the effective date of this regulation that did not contain the provision specified in paragraph (f)(3)(i) of this section, the school must either ensure the agreement is amended to contain the provision specified in paragraph (f)(3)(iii)(A) of this section or provide the student to whom the agreement applies with the written notice specified in paragraph (f)(3)(iii)(B) of this section.

(iii) The school must ensure the agreement described in paragraph (f)(3)(ii) of this section is amended to contain the provision specified in paragraph (f)(3)(iii)(A) of this section or must provide the notice specified in paragraph (f)(3)(iii)(B) of this section to students no later than the exit counseling required under § 685.304(b), or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment.

(A) *Agreement provision.* ''We agree that neither we nor anyone else who later becomes a party to this predispute arbitration agreement will use it to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit for such a claim or you may be a member of a class action lawsuit for such a claim even if you do not file it. This provision does not apply to other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(B) *Notice provision.* ''We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained.''

(g) *Submission of arbitral records.* (1) A school must submit a copy of the

following records to the Secretary, in the form and manner specified by the Secretary, in connection with any claim filed in arbitration by or against the school concerning a borrower defense claim:

(i) The initial claim and any counterclaim.

(ii) The arbitration agreement filed with the arbitrator or arbitration administrator.

(iii) The judgment or award, if any, issued by the arbitrator or arbitration administrator.

(iv) If an arbitrator or arbitration administrator refuses to administer or dismisses a claim due to the school's failure to pay required filing or administrative fees, any communication the school receives from the arbitrator or arbitration administrator related to such a refusal.

(v) Any communication the school receives from an arbitrator or an arbitration administrator related to a determination that a predispute arbitration agreement regarding educational services provided by the school does not comply with the administrator's fairness principles, rules, or similar requirements, if such a determination occurs.

(2) A school must submit any record required pursuant to paragraph (g)(1) of this section within 60 days of filing by the school of any such record with the arbitrator or arbitration administrator and within 60 days of receipt by the school of any such record filed or sent by someone other than the school, such as the arbitrator, the arbitration administrator, or the student.

(h) *Submission of judicial records.* (1) A school must submit a copy of the following records to the Secretary, in the form and manner specified by the Secretary, in connection with any claim concerning a borrower defense claim filed in a lawsuit by the school against the student or by any party, including a government agency, against the school:

(i) The complaint and any counterclaim.

(ii) Any dispositive motion filed by a party to the suit; and

(iii) The ruling on any dispositive motion and the judgment issued by the court.

(2) A school must submit any record required pursuant to paragraph (h)(1) of this section within 30 days of filing or receipt, as applicable, of the complaint, answer, or dispositive motion, and within 30 days of receipt of any ruling on a dispositive motion or a final judgment.

(i) *Definitions.* For the purposes of paragraphs (d) through (h) of this section, the term—

(1) "Borrower defense claim" means a claim that is or could be asserted as a borrower defense as defined in § 685.222(a)(5), including a claim other than one based on § 685.222(c) or (d) that may be asserted under § 685.222(b) if reduced to judgment;

(2) "Class action" means a lawsuit in which one or more parties seek class treatment pursuant to Federal Rule of Civil Procedure 23 or any State process analogous to Federal Rule of Civil Procedure 23;

(3) "Dispositive motion" means a motion asking for a court order that entirely disposes of one or more claims in favor of the party who files the motion without need for further court proceedings;

(4) "Predispute arbitration agreement" means any agreement, regardless of its form or structure, between a school or a party acting on behalf of a school and a student providing for arbitration of any future dispute between the parties.

\* \* \* \* \*

■ 35. Section 685.308 is amended by revising paragraph (a) to read as follows:

**§ 685.308   Remedial actions.**

(a) The Secretary collects from the school the amount of the losses that the Secretary incurs and determines that the institution is liable to repay under § 685.206, § 685.214, § 685.215(a)(1)(i), (ii), (iii), (iv) or (v), § 685.216, or § 685.222 or that were disbursed—

(1) To an individual, because of an act or omission of the school, in amounts that the individual was not eligible to receive; or

(2) Because of the school's violation of a Federal statute or regulation.

\* \* \* \* \*

■ 36. Section 685.310 is added to subpart C to read as follows:

**§ 685.310   Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1087a *et seq.*)

## PART 686—TEACHER EDUCATION ASSISTANCE FOR COLLEGE AND HIGHER EDUCATION (TEACH) GRANT PROGRAM

■ 37. The authority citation for part 686 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, *et seq.,* unless otherwise noted.

■ 38. Section 686.42 is amended by revising paragraph (a) to read as follows:

**§ 686.42   Discharge of an agreement to serve.**

(a) *Death.* (1) If a grant recipient dies, the Secretary discharges the obligation to complete the agreement to serve based on—

(i) An original or certified copy of the death certificate;

(ii) An accurate and complete photocopy of the original or certified copy of the death certificate;

(iii) An accurate and complete original or certified copy of the death certificate that is scanned and submitted electronically or sent by facsimile transmission; or

(iv) Verification of the grant recipient's death through an authoritative Federal or State electronic database approved for use by the Secretary.

(2) Under exceptional circumstances and on a case-by-case basis, the Secretary discharges the obligation to complete the agreement to serve based on other reliable documentation of the grant recipient's death that is acceptable to the Secretary.

\* \* \* \* \*

[FR Doc. 2016–25448 Filed 10–31–16; 8:45 am]

**BILLING CODE 4000–01–P**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS,** | |
| 2520 Venture Oaks Way #170<br>Sacramento, CA 95833 | **Civil Action No. _____** |
| **Plaintiff,** | |
| **v.** | |
| **BETSY DEVOS, in her official capacity as Secretary of the Department of Education,** | |
| Office of the Secretary<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202, and | |
| **THE DEPARTMENT OF EDUCATION,** | |
| 400 Maryland Avenue, SW<br>Washington, D.C. 20202 | |
| **Defendants.** | |

## COMPLAINT AND PRAYER
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff California Association of Private Postsecondary Schools ("CAPPS"), for its complaint against Defendants, the Honorable Betsy DeVos, Secretary of the Department of Education ("Secretary"), and the Department of Education (the "Department") alleges, by and through its attorneys, as follows:

**INTRODUCTION**

1.      This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706

("APA"), and the United States Constitution challenging regulations promulgated by the

Department on November 1, 2016, as well as supplemental regulations promulgated on

January 19, 2017.  *See* 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("Final Rule" or "Borrower

Defense Regulations"); 82 Fed. Reg. 6253 (Jan. 19, 2017) ("Borrower Defense

Procedures").  The Department stated that the Final Rule was adopted pursuant to Title

IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq*., which

governs federal financial aid for postsecondary education.  The regulations exceed the

Department's authority under the HEA and conflict with the Federal Arbitration Act

("FAA"), are arbitrary and capricious under the APA, and violate the United States

Constitution.

2.      Plaintiff CAPPS is a non-profit association of California private postsecondary schools.

CAPPS has a membership of around 150 institutions, including proprietary (*i.e*., for-

profit) and non-profit schools, most of whom are eligible for Title IV funding.  Nearly all

CAPPS schools offer curriculum-driven educational programs designed to prepare

students for occupations that are necessary to a thriving economy.  For example, CAPPS

schools train future nurses, ultrasound technicians, emergency medical technicians,

electricians, and individuals in numerous other occupations.  Neither the local nor the

national economy would function without workers in these fields.

3.      Most CAPPS member schools are smaller institutions, averaging less than 400 students

and one or two locations.  Moreover, CAPPS members serve many students who are non-

traditional, including students who did not attend college immediately after graduating

from high school, part-time students, students with full-time jobs, students who are

2

financially independent, students who have dependents, and students who have earned a

GED.  Students at CAPPS schools are also more likely to be low-income, older, and

minorities than are students at public or non-profit colleges and universities.

4.     The Final Rule threatens the existence of many CAPPS member institutions.  The

increased costs and the dramatically escalated threat of meritless claims and litigation,

both before the Department and in court, will be crippling for many schools.  The lack of

procedural safeguards and clear standards throughout the Final Rule severely exacerbates

these problems.

5.     The Borrower Defense Regulations are likely to shutter many vocational schools without

any reasonable justification and will needlessly leave many non-traditional students with

few or no educational options.  A wide range of industries across America will suffer

when their supply of qualified employees slows to a trickle.

6.     Many traditional liberal arts schools will suffer as well.  The Final Rule exposes all

schools to massive new liability, and likely will be particularly harmful to schools serving

low-income and minority students.  As a result, a wide and disparate group of citizens

and institutions, including many historically black colleges and universities ("HBCUs"),

have expressed concern about the unwarranted cost and burdens of the new rules.

7.     CAPPS supports thoughtful, appropriate regulation of the postsecondary education

sector.  CAPPS works with its schools to foster a strong culture of compliance.  CAPPS

also supports providing relief to students who have been victims of fraud, as the Final

Rule purportedly aims to do.  But the Final Rule is not a lawful, common-sense, well-

considered, reasoned regulatory intervention.  It goes far beyond aiding students who

have been the victims of fraud and threatens massive, unnecessary, harmful, and severe

3

consequences.  The Final Rule is a sprawling mass of thinly studied new requirements that, by the Department's own estimates, will cost schools almost one billion dollars per year.  The ten-year impact on the public fisc is estimated at $14.9 billion dollars.  It is necessary and important that regulations with such a profound fiscal impact be justified and supported by reasoned decision-making.  This Rule was not.

8.  The Final Rule creates a seismic shift in multiple areas of higher education regulation without legal basis or reasonable justification.  First, the Department has radically changed the grounds and processes for student borrowers to raise "borrower defenses" to Title IV loan repayment ("Borrower Defense Provisions").  Previously, as its name suggests, a so-called "borrower *defense*" could be raised by a student only as a defense in a proceeding *against* the student to collect on his or her debt, and only when a school had contravened state law.  But the Department has transformed the borrower "defense" into a wide-ranging affirmative cause of action that a student can use to have all of his or her Title IV debts cancelled, or even recover loan amounts previously paid, with the student's financial liability transferred to either the student's school or federal taxpayers.  Although Congress has created a handful of explicit and targeted debt forgiveness programs that help borrowers who commit their careers to public service, Congress has never intimated that borrower "defenses" were meant to erase debt for thousands of students who were reliably paying back their loans, or to charge schools for those losses.  Making matters worse, the Department has failed to provide sufficient procedural protections for affected educational institutions.

9.  Second, the Final Rule imposes sweeping new requirements regarding a school's "financial responsibility" ("Financial Responsibility Provisions").  These provisions fail

AR-A-000177

to appropriately account for an institution's total financial circumstances and go well

beyond assessing institutional financial responsibility.  Their far-reaching mandates and

automatic "triggers" may label a school financially unsound if it, for example, merely is

sued by a public entity, regardless of the merits of the suit.  Educational institutions that

trip one of these "triggers" may be required to post expensive and difficult-to-obtain

letters of credit for large sums of money.  And these same educational institutions may

now be required by law to report negatively on their financial situation to current and

prospective students – even if the school is able to demonstrate, despite a pending lawsuit

or regulatory filing, that it is otherwise financially sound.

10.    Third, the Department unjustifiably requires a new loan repayment rate warning that

applies only to proprietary institutions ("Repayment Rate Provisions").  These provisions

would require proprietary schools to "warn" prospective students when the median recent

alumnus or alumna is not paying his or her loans back quickly enough.  As commenters

explained, this new metric unjustifiably penalizes institutions whose students are on

income-based repayment plans, despite the Department and Congress's strong support for

those very plans.  It also penalizes schools based on students' educational and financial

background.  In addition, the Repayment Rate Provisions fail to apprise students and

prospective students at non-profit and public schools that have failed to meet the same

repayment rate requirements as proprietary schools.  The decision to adopt proprietary-

school-specific regulations was based on data that the Department now admits was

erroneous.

11.    Fourth, with no statutory authorization and in conflict with the strong federal policy

favoring arbitration, the Department prohibits institutions from including arbitration

AR-A-000178

provisions or class action waivers in their agreements with students ("Arbitration and Class Action Provisions").  The Department prohibits these clauses in contracts despite the fact that Congress and the United States Supreme Court have repeatedly emphasized the benefits of arbitration and of class action waivers, embodied in the FAA.  In addition to banning these provisions in future agreements, the Department forbids schools from enforcing their existing contracts regarding arbitration and class actions.

12.   The Final Rule harms institutions and their students, without legal authority and without a sound or adequate justification.  Each of the Final Rule's four categories of regulation promises to be extremely costly, especially to proprietary and career-oriented schools and other schools that serve underrepresented groups.  If the Final Rule takes effect, many schools serving non-traditional students, particularly small schools, may be forced to shut down due to the crushing burden of the regulations' cost, which are imposed without accompanying public benefit.

13.   These unfortunate outcomes are the product of a rushed and flawed rulemaking process. The Secretary gave students, lenders, schools, and others only 45 days to comment on this massive regulatory project.  Still, over 10,000 comments were filed.  The Department then purportedly read, considered, and responded to each material comment in its final draft in less than six weeks.  After that, the Department sent the final version of its rule to the Office of Management and Budget ("OMB") for review.  The OMB review process generally takes 90 days.  This review was complete in a little over 30 days, despite the regulations' $14.9 billion price tag.

14.   The Department's rush was aimed at finalizing the rule before November 1, 2016, which was one week before the presidential election and the last possible date under the

AR-A-000179

applicable statute for promulgating rules that will go into effect the next fiscal year.  The

hurried timetable is evident in the sloppy drafting of the Final Rule.

15.    The regulatory provisions published in the Federal Register lack any statutory basis,

demonstrate an absence of reasoned decision-making, and run headlong into contrary

provisions of the U.S. Constitution.

16.    The Final Rule is unlawful for several reasons.  First, the Rule exceeds the statutory

authority conferred by the HEA.  Contrary to the Final Rule's Borrower Defense

Provisions, the HEA does not allow borrowers to affirmatively move to cancel their debt;

nor does the HEA authorize the Department to pursue schools in an administrative setting

for whatever borrower liability the Department chooses to forgive.  Similarly, with regard

to the Financial Responsibility Provisions, the methods the Final Rule uses to determine

financial responsibility do not comport with the terms of the HEA.  Instead, the

Provisions fail to fulfill the statute's mandate to account for an institution's total financial

circumstances, impermissibly delegate tasks to third-party actors, and specify regulatory

consequences different from those in the statute.  With regard to the Repayment Rate

Provisions, the Department cites no relevant authority for mandating disclosures in all

marketing communications with prospective students.  And, with regard to the

Arbitration and Class Action Provisions, the HEA also does not authorize the

Department's sweeping changes to existing contracts between schools and students.  The

Department's actions expressly conflict with Congress's pro-arbitration policy embodied

in the FAA.

17.    Second, the Department's massive rewrite of current regulations suffers from a lack of

reasoned decision-making and is arbitrary and capricious under the APA.  Among other

things, the Final Rule does not explain why its creation of an affirmative right to cancel

debt through the Borrower Defense Provisions is reasonable, or why it affords schools

only minimal process before holding the institution liable for borrower defense to

repayment claims.  In the Financial Responsibility Provisions, the Department arbitrarily

imposes significant consequences, in some cases *automatically*, based on "triggering

events" that may have little or nothing to do with the school's financial soundness.  It

then estimates the impact of several events using a novel and unsound methodology

without employing standard accounting practices.  These "triggers" raise serious

problems regarding fairness, due process, and reasoned decision-making.  The

Department's Repayment Rate Provisions arbitrarily target proprietary schools and

punish institutions whose students use the Department's income-based repayment plans,

in contravention of the APA.  Moreover, the Department's Arbitration and Class Action

Provisions are arbitrary and capricious for numerous reasons, including, but not limited

to, a lack of reasoned discussion of the benefits of arbitration; significant reliance on a

study completed by a different agency unrelated to the federal student loan market; and

contradictions in the Department's reasoning in the preamble itself.

18.     Finally, the Final Rule violates the Constitution.  By providing schools with little process

before an administrative tribunal, the Borrower Defense Provisions violate the Due

Process clause of the Fifth Amendment, Article III of the Constitution, and the Seventh

Amendment right to a jury trial in a civil case.  The Financial Responsibility Provisions

also violate the Due Process clause by imposing penalties automatically, without the

ability to demonstrate a school's financial soundness.   The Repayment Rate Provisions

force schools to engage in broad, prophylactic speech that may misrepresent the school's

views, in violation of the First Amendment.  And the Department's retroactive
application of the Arbitration and Class Action waiver provisions creates significant
constitutional problems.

19.    The Court should vacate the challenged regulations and, if necessary, remand this matter
to the agency for further, more careful consideration.

**PARTIES**

20.    Plaintiff CAPPS is a voluntary, non-profit association of California private postsecondary
schools.  Its principal place of business is located in Sacramento, CA.  CAPPS has a
membership of approximately 150 institutions, including proprietary and non-profit
schools.  Most of CAPPS's member schools are smaller institutions, averaging less than
400 students.  The vast majority of CAPPS schools are accredited and participate in
financial aid programs under Title IV of the HEA.  20 U.S.C. §§ 1070-1099d.  They thus
will be subject to the Final Rule.  CAPPS schools will face additional regulatory burdens
and compliance costs as a result of the new regulations, and those costs are already
accruing.  These injuries are directly traceable to the Final Rule.  The injuries would be
remedied by a favorable judgment vacating the regulations.  The interests CAPPS seeks
to protect are germane to its purpose of promoting reasonable policy and regulation in the
postsecondary education sector, and the claims asserted and relief requested do not
require the participation of individual members.  CAPPS is also injured in its
administrative capacity because it will have to alter its own compliance and training
programs in light of these novel and unlawful regulations, which will cost the
organization substantial time and money.

21.    Defendant Betsy DeVos is the Secretary of Education.  She is sued in her official
capacity.  The Secretary's official address is 400 Maryland Avenue, SW, Washington,

9

D.C. 20202.  The Secretary, in her official capacity, is responsible for the Department's

promulgation of the Final Rule.

22.     Defendant Department of Education is an agency of the United States.  As such, it is

subject to the APA.  *See* 5 U.S.C. § 551(1).  The Department is located at 400 Maryland

Avenue, SW, Washington, D.C. 20202.

## JURISDICTION AND VENUE

23.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-06, and

the United States Constitution.  Jurisdiction lies in this Court pursuant to 28 U.S.C.

§ 1331.

24.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against

officers and agencies of the United States; because Defendant Department of Education

resides in this judicial district; because Defendant Secretary DeVos performs her official

duties in this judicial district; and because a substantial part of the events or omissions

giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### I.     CAPPS AND PRIVATE SECTOR SCHOOLS

25.     CAPPS is the only California state association that represents the full and diverse range

of private postsecondary schools in California.  CAPPS has a membership of

approximately 150 institutions, which includes proprietary and non-profit institutions.

CAPPS schools offer a wide range of degrees, from certificates, to associates degrees,

masters degrees, and professional degrees.

26.     CAPPS schools prepare workers for many occupations that are necessary to a thriving

economy.  CAPPS schools train future nurses, dialysis technicians, ultrasound

technicians, home health aides, emergency medical technicians, information technology

10

specialists, hardware and software experts, cyber-security specialists, HVAC and refrigeration technicians, heavy equipment specialists, electricians, paralegals, chefs, line cooks, cosmetologists, and even gunsmiths.  Some CAPPS members specialize in training injured workers to reenter the workforce, and others partner with workforce training organizations to educate their participants in labor-demand occupations.

27.    The economy would not function adequately without workers in these fields.  Local hospitals, labs, repair companies, and restaurants depend on a reliable stream of well-trained workers.  So do consumers.  Many elderly patients, for example, would suffer if home health aides or dialysis technicians were in short supply.  Registered nurses, whom many CAPPS schools train, are among the most in-demand workers in the national economy.  Without private schools supplying much-needed workers in these trades, industry would suffer.  Private sector schools supply approximately half of all technically trained workers entering the workforce each year.

28.    Many CAPPS schools are also small, family-owned businesses.  These small businesses offer upward mobility for their owners as well as their students.  These small schools, often labeled "technical colleges," differ from traditional higher education institutions in that they do not offer broad-based liberal arts degrees.  Instead, they offer degrees and certificates based on specific occupational skillsets that often require state or national licensing.  These educational institutions are closely connected to employers, and their presence ensures that businesses can recruit well-trained staff and remain competitive.  These occupational degrees and certificates allow consumers and companies to benefit from employees who are skilled in the latest techniques and tools of their craft.

11

29.     CAPPS is dedicated to protecting the interests of all of its members, including smaller

institutions.  Proprietary institutions are among the most intensely regulated entities in

California and nationally.  The California legislature has imposed dozens of legal

requirements that apply only to proprietary schools.  The California state regulatory

agency that oversees proprietary schools has also imposed multiple onerous regulations

implementing proprietary-school-only legislation.  There are also scores of statewide

boards, bureaus, and commissions that oversee the licensing of practitioners and approval

of programs concerning various occupations offered by CAPPS institutions.  In addition,

federal oversight of these schools has been increasing rapidly.

30.     On information and belief, the fiscal burden that the Final Rule imposes will pose a

serious threat to the viability of some CAPPS schools.

31.     The harm to students would be particularly acute if schools begin to close in large

numbers as a result of the unlawful and detrimental new regulations.

32.     Most CAPPS members are proprietary institutions, which serve a student population that

has a high percentage of low-income and minority individuals who otherwise are not well

served by traditional institutions.  For example, proprietary schools' students are more

likely to receive Pell grants, which provide financial aid exclusively for low-income

borrowers.  *See* Comments of CAPPS, ED-2015-OPE-0103, Attach. 1, Declaration of

Jonathan Guryan, Ph.D., ¶ 14 (Aug. 1, 2016).  Students at proprietary schools are also

likely to be the first in their family to graduate from college.  *Id*.  In addition, in 2011-12,

26 percent of students at proprietary schools were African-American, compared to only

15 percent at public schools and 14 percent at private non-profit schools.  *Id*. ¶ 10.  "The

fraction of students who were Hispanic at for-profit schools was 19 percent, similar to the

AR-A-000185

17 percent at public schools, but greater than the 10 percent at private not-for-profit schools." *Id*.  Students at proprietary schools are also more likely to be single parents, financially independent, and over the age of 25.

33.     These students are often drawn to proprietary schools based on the schools' flexible schedules and focused instruction.  Many proprietary schools offer classes on evenings and weekends, or even online.  Those programs are also tailored toward specific, in-demand occupations.  Since proprietary school students are likely to be financially independent – and many are single parents – this flexibility and responsiveness to the market is important.

34.     Proprietary schools have established a record of successful efforts to help those students, whom other schools might label "at risk," actually graduate.  As the former president of Northwestern University has noted, "The graduation rates of some for-profit institutions are well above 50% – as high or higher than those of many four-year public colleges, let alone community colleges and nonselective public and private colleges (which often have rates below 50%)," even given their non-traditional student populations.  Henry Bienen, *In Defense of For-Profit Colleges*, Wall St. J. (July 24, 2010), http://www.wsj.com/articles/SB10001424052748703724104575378933954267308.

35.     As the Department itself acknowledged, "there are many proprietary career schools and colleges that play a vital role in the country's higher education system."  81 Fed. Reg. at 75,934.

36.     If the new regulations are implemented, many non-traditional students may be unable to access postsecondary education.  For example, the Repayment Rate Provisions, which apply only to proprietary schools, are triggered if a loan "repayment rate" for students is

13

below a certain threshold.  These provisions penalize schools even when *students are current on their loans but repaying slowly* as they launch their careers and deal with daunting economic challenges.  Schools will therefore be required, under the new regulations, to issue disclosures that will harm their reputations and recruitment efforts based on statistics that are not clearly correlated with student achievement. Similarly, by targeting and forcing the closure of proprietary schools, the Final Rule harms the schools' students, many of whom are non-traditional.  This will negatively affect both the diversity of schools and the diversity of the American workforce.

## II.    STATUTORY FRAMEWORK

37.    Title IV of the HEA was enacted "to assist in making available the benefits of postsecondary education to" students who otherwise could not afford the cost of a degree or certificate.  20 U.S.C. § 1070(a).  Title IV programs are administered by the Department.

38.    The vast majority of postsecondary students – over two million each year – depend on Title IV funds to achieve their educational goals.  Around 83 percent of full-time, first-time undergraduate students rely on Title IV financial aid to help pay for their degrees. Nat'l Ctr. For Educ. Statistics, Digest of Education Statistics, Table 331.20 (Dec. 2016), https://nces.ed.gov/programs/digest/d15/tables/dt15_331.20.asp (outlining financial aid statistics for 2013-14 school year).  The average student receives over $7,000 in federal loans each year.  *Id*.  Title IV programs include many of the most familiar loan and grant programs: the Direct Loan Program, Federal Perkins Loans, and Pell Grants, among others.

39.    Congress already strictly regulates the provision and use of Title IV funds, including eligibility for participation in Title IV programs.  For example, to receive Title IV funds,

AR-A-000187

a school must be "legally authorized within [a] State to provide a program of education

beyond secondary education." 20 U.S.C. § 1001(a)(2).  Institutions must also be

"accredited by a nationally recognized accrediting agency or association" to receive those

funds.  *Id.* § 1001(a)(5).  Through these requirements, Congress has already ensured that

Title IV funds will flow only to legitimate, degree- or certificate-granting institutions.

40.     Congress also provided the Department with specific, carefully cabined tools to ensure

compliance with Title IV.

41.     For example, Section 487 of the HEA allows the Secretary to take action against an

institution upon "determination, after reasonable notice and opportunity for a hearing,

that an eligible institution has engaged in substantial misrepresentation of the nature of its

educational program, its financial charges, or the employability of its graduates." *Id.*

§ 1094(c)(3)(A).  When that happens, there are two specified remedies: the Secretary

may "suspend or terminate" an institution's "eligibility status" for Title IV loans or the

Secretary may "impose a civil penalty upon such institution of not to exceed $25,000 for

each violation." *Id.* § 1094(c)(3)(A)–(B).  When "determining the amount of such

penalty," the Secretary must consider "the appropriateness of the penalty to the size of

the institution of higher education subject to the determination, and the gravity of the

violation, failure, or misrepresentation." *Id.* § 1094(c)(3)(B)(ii).  Congress thus provided

specific, delineated penalties that may be imposed based on a substantial

misrepresentation.

42.     In addition, Congress provided that "the Secretary shall specify in regulations which acts

or omissions of an institution of higher education a borrower may assert *as a defense* to

AR-A-000188

repayment of a loan made under" Title IV.  *Id*. § 1087e(h) (emphasis added).  This provides a "defense" for students who should not be liable in repayment proceedings.

43.    Prior to the promulgation of the Borrower Defense Regulations, the Department interpreted this language as providing for *defenses* to be used in collection proceedings: "In any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  34 C.F.R. § 685.206(c)(1).

44.    Congress also imposed certain bookkeeping duties on institutions receiving Title IV funds.  These duties are written into the school's Title IV program participation agreement with the Department.  Those agreements outline the basic expectations for Title IV participants, and they, too, are governed by statute.  For example, under the HEA, an institution must agree to "provide a statement that certifies the eligibility of any student to receive a loan."  20 U.S.C. § 1087d(a)(1)(C).  The institution must also "set forth a schedule for disbursement of the proceeds of the loan in installments."  *Id*. § 1087d(a)(1)(D).  And the school must "provide assurances that [it] will comply with requirements established by the Secretary relating to student loan information," *id*. § 1087d(a)(2), and may "not charge any fees of any kind, however described, to student or parent borrowers for origination activities."  *Id*. § 1087d(a)(5).  As part of requiring institutions to adhere to these ministerial duties, the Secretary may "include such . . . provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program in program agreements.

AR-A-000189

*Id*. § 1087d(a)(6).  Congress thus ensured that loan disbursement and information

collection would proceed in an orderly manner.

45.     Over the years, Congress has also created several specific loan forgiveness programs for

student borrowers who have provided public service.  For example, Section 455(m)(1)

allows the Department to "cancel the balance of interest and principal due" for borrowers

who have dedicated their lives to public service and paid their loans for ten years.  *Id*.

§ 1087e(m).  The Higher Education Opportunity Act added a similar provision for service

in areas of national need.  *See* Pub. L. No. 110-315, § 430, 122 Stat. 3078, 3236-42

(2008).

46.     Congress also set a cap on the total amount of loans an individual student can take out.

*See, e.g.*, 34 C.F.R. § 685.203.  But schools are not permitted to limit the amount students

borrow from Title IV to, for example, cover only the cost of tuition.  *See* Dep't of Educ.,

2016-2017 Federal Student Aid Handbook 3–90 (2016) (A "school may not have a policy

of limiting Direct Loan borrowing on an across-the-board or categorical basis.  For

example, you may not have a policy of limiting borrowing to the amount needed to cover

the school charges, or not allowing otherwise eligible students to receive the 'additional'

Direct Unsubsidized Loan amounts that are available under the annual loan limits.").

47.     Congress also included detailed provisions requiring schools receiving Title IV funds to

be financially responsible.  Section 498(c)(1) of the Act provides that "[t]he Secretary

shall determine whether an institution has the financial responsibility required," based on

whether it is able to provide the services it claims to offer, provide the administrative

resources necessary to comply with the Act, and meet all of its financial obligations.  20

U.S.C. § 1099c(c)(1).

AR-A-000190

48.    The Act further provides that "[t]he Secretary shall take into account an institution's total financial circumstances in making a determination of its ability to meet the standards" for financial responsibility required under the Act.  *Id*. § 1099c(c)(2).  An institution may be required to provide "satisfactory evidence of its financial responsibility" if it "fails to meet criteria prescribed by the Secretary regarding ratios that demonstrate financial responsibility."  *Id*.  Such evidence may consist of, *inter alia*, a letter of credit, *id*. § 1099c(c)(3)(A), or a showing that it "has met standards of financial responsibility, prescribed by the Secretary by regulation, that indicate a level of financial strength not less than those required" by the ratio-based criteria, *id*. § 1099c(c)(3)(C).  The Act specifically provides that the Secretary's determinations under these provisions "shall be based on an audited and certified financial statement of the institution," and that the criteria "shall take into account any differences in generally accepted accounting principles, and the financial statements required thereunder, that are applicable to for-profit, public, and nonprofit institutions."  *Id*. § 1099c(c)(2), (5).

49.    In other words, Congress tasked the Department with ensuring financial responsibility based on an institution's total financial circumstances, an assessment that involves audits, accounting, and ratio-based criteria.  And Congress mandated that institutions have an opportunity to demonstrate their financial responsibility based on the institution's overall financial health before a school is deemed financially deficient.  *See id*. § 1099c(c)(2)– (3).

50.    In its detailed provisions outlining the administration of federal loans, the HEA does not contain any provisions related to repayment rate warnings and does not draw distinctions

on loan repayment rates between non-profit and proprietary institutions.  The HEA also does not address arbitration agreements or class action waivers.

### III.  THE DEPARTMENT'S RUSH TO REGULATE

51.  Despite the broad scope and enormous financial impact of the Final Rule, the Department's rushed rulemaking procedure crammed multiple, unrelated provisions into a single rule and left little time for public input or departmental revisions.  The result is an understudied, overbroad rule based on very little data or concrete evidence.

52.  Section 492 of the HEA requires the Secretary to obtain public involvement in the development of proposed regulations affecting Title IV programs.  20 U.S.C. § 1098a.

53.  After obtaining public input, the Secretary must subject the proposed regulations to a negotiated rulemaking process, collaborating with stakeholders to draft consensus rules. *Id*.

54.  In accordance with the statute, the Department attempted to reach consensus with a negotiating committee representing various stakeholders as to new borrower defense, financial responsibility, anti-arbitration and class-action waiver, and loan repayment disclosure regulations.  Of the 16 groups ultimately represented on the negotiating committee, only one group – consisting of two individuals – represented the interests of proprietary schools, large and small.

55.  Arbitration provisions and class-action waivers were not included in the original notice as topics for negotiated rulemaking.  Rather, the Department decided to jam those topics into the agenda once negotiated rulemaking had already commenced, without adding additional experts on the topic to the negotiating committee.

56.  After failing to reach consensus in March 2016, the Department set about finalizing its preferred regulations.  Less than three months after disbanding the negotiating

19

committee, the Department released a draft of its proposed regulations. The publicly

released draft was 530 pages long. The Notice of Proposed Rulemaking ("NPRM")

consumed 93 pages of the Federal Register when it was officially published on June 16,

2016. The Department announced that it planned to finalize the rules by November 1,

2016, slightly over four months later.

57.     Despite the broad scope of its regulatory effort and the tremendous impact it was

expected to have on the public and private fisc, the Department provided commenters

with a mere 45 days to respond to its proposed rules. By contrast, Executive Order 12866

contemplates a standard 60-day period for commenting on significant rules. *See*

Executive Order 12866, 58 Fed. Reg. 51,735 (Oct. 4, 1993). This rule is classified as

"significant," and has a far more expansive and costly impact than many "significant"

rules.

58.     Even in the face of this tight deadline, over 10,000 schools, students, legislators, and

public officials commented on the proposed rule by August 1, 2016.

59.     Schools, legislators, public interest groups, and others offered a broad range of criticisms.

Historically black colleges and universities, including Spelman College, noted that the

cumulative impact of the Department's Financial Responsibility Provisions could cause

an enormous and unjustified negative financial impact on HBCUs and other under-

resourced institutions that nevertheless provide quality educational opportunities. *See*

Comments of Spelman College, ED-2015-OPE-0103 (July 28, 2016). Then-

Representative Tom Price and Senator Mike Enzi – chairmen of the House and Senate

Budget Committees – wrote to the Secretary to express concern over the expense of the

proposed rule. *See* Letter from Rep. Tom Price, M.D., Chairman, House Budget Comm.,

& Sen. Mike Enzi, Chairman, Senate Budget Comm., to John B. King, Jr., Secretary,

U.S. Dep't of Educ. (July 14, 2016).  They noted that the "broad scope" of the proposed

rule "could increase tuition (by increasing schools' legal liability), bankrupt proprietary

schools, and potentially close down many nonprofit colleges, thus limiting higher

education options for students."  *Id*. at 2.  They commented that "under the proposed rule,

even an unintentional misrepresentation or omission of information in a school catalogue

could result in the Secretary certifying a claim for a group of thousands of borrowers."

*Id*.  Groups representing both non-profit and proprietary schools echoed those concerns.

*See, e.g*., Comments of Career Education Colleges and Universities, ED-2015-OPE-0103

(Aug. 1, 2016); Comments of American Council on Education *et al*., ED-2015-OPE-0103

(Aug. 1, 2016).  The Attorneys General of Arizona, Colorado, Michigan, Oklahoma, and

Texas also took issue with "triggers" that would penalize schools whenever the state or

federal government brings a lawsuit or administrative action against them.  *See*

Comments of Attorneys General of Arizona, Colorado, Michigan, Oklahoma, and Texas,

ED-2015-OPE-0103 (Aug. 1, 2016).  The Attorney General of Iowa also raised concerns

about the "chilling effect" the triggers would have on potential settlements between

institutions and state or federal oversight agencies.  *See* Comments of the Attorney

General of Iowa, ED-2015-OPE-0103 (Aug. 1, 2016).

60.     Despite these numerous comments, which the Department is obligated to review and

        consider when drafting its final rule, the Department sent a final draft to the OMB less

        than six weeks after the close of the comment period.

61.     Ordinarily, a thorough review by OMB consumes 90 days.  *See* Exec. Order No. 12866,

        58 Fed. Reg. 190 (Oct. 4, 1993).  Yet OMB purportedly completed its review of the

regulations – which are expected to have a $14.9 *billion* dollar impact on the public fisc

over the next ten years – in less than half the usual period (44 days).

62.     The Final Rule was published in the Federal Register on November 1, 2016.  It did not

include a description of the process to which schools were entitled before being held

liable for borrower defense claims, which was only fully explained in a subsequent

regulation issued on January 19, 2017.

63.     Under Section 482(c) of the HEA, final regulations must be published by November 1 in

order to be effective by July 1 of the following year.  *See* 20 U.S.C. § 1089.  The

Department barreled through the rulemaking process to meet this deadline and to finalize

the regulations before the end of the previous administration.

64.     This practice, known as "midnight regulation," has been criticized by scholars and

administrations alike as creating sloppy, under-analyzed, and legally problematic

regulations.

65.     The rushed rulemaking process is especially troubling in light of the scope and expense

of the Final Rule, as well as the profound impact it will have on schools and students.

## IV.     CHALLENGED REGULATIONS

66.     In the Final Rule, the Department instituted four major changes to its existing rules.

First, the Department radically altered the grounds and processes for student borrowers to

raise "borrower defenses" to Title IV loan repayment, including the transformation of the

borrower "defense" into an affirmative action.  Second, the Department imposed

sweeping new requirements regarding a school's "financial responsibility," including

novel automatic triggers for financial responsibility violations, as well as several

provisions that may require institutions to report on their financial situation to current and

prospective students.  Third, the Department introduced a new loan repayment rate

22

warning that applies only to proprietary institutions.  Fourth, the Department prohibited

institutions from including or enforcing certain arbitration provisions or class action

waivers in their enrollment agreements or any other pre-dispute agreements with

students.

### A.  Borrower Defense Provisions

67.  The new Borrower Defense Provisions contain at least three major changes.  First, the

Final Rule changes *how* borrowers may assert defenses for all Title IV loans, regardless

of when the loan was disbursed.  Under the prior regulations, which had been in place

since shortly after the borrower defense language was added to the HEA, the defense was

available only in a "proceeding to collect on a Direct Loan" that has already been

instituted against a borrower, such as wage garnishment proceedings, salary garnishment

proceedings, or tax offset proceedings.  34 C.F.R. § 685.206(c) (2012).  The defense has

for some time been exactly what its plain meaning suggests – a "defense" used when the

Department attempts to collect from the borrower.

68.  The Final Rule, however, would expand the rights of former students and allow any

borrower to initiate an action for affirmative debt relief in front of a Department official

at essentially any time.  *See* 81 Fed. Reg. at 75,956 (noting that borrower defenses now

cover "claims" as well as "defenses").  The Department does not point to any instance in

the first decade of the existence of borrower defenses in which the "defense" was used as

an affirmative claim for relief.  Thus, the regulations turn a defense into a novel

affirmative cause of action that will expose schools to massive liability.

69.  Second, for loans first disbursed on or after July 1, 2017, the Final Rule drastically

changes the standard for establishing a borrower defense.  For those loans, a borrower

AR-A-000196

defense is available when (i) a non-default, contested judgment is obtained against the

school based on any State or Federal law, whether obtained in a court or administrative

tribunal; (ii) the borrower demonstrates a breach of contract by the school; or (iii) the

borrower establishes a substantial misrepresentation by the school on which the borrower

reasonably relied to his or her detriment.  *See* 81 Fed. Reg. at 75,926; 34 C.F.R. §

685.222.  The Department will establish its own unspecified standard for contract and

misrepresentation claims, and will do so in the future through case-by-case proceedings,

rather than relying on established state or federal law.

70.     For loans disbursed before July 1, 2017, the Final Rule maintains the current definition of

a "borrower defense," which requires a borrower to show that some "act or omission of

the school attended by the student . . . would give rise to a cause of action against the

school under applicable State law."  34 C.F.R. § 685.206(c)(1).

71.     Third, the Final Rule creates a new "group borrower defense" process.  The preamble

stipulates that the Department may both prosecute and adjudicate claims as to groups of

students, much like a class or collective action.  *See, e.g.*, 81 Fed. Reg. at 75,960, 75,964-

65.  In a group proceeding, the Department is both judge and plaintiffs' counsel.  The

Department may institute a group proceeding on behalf of students even if those students

have not applied to the agency for debt relief, as long as the students do not opt out.  *See*

*id*.  The Department does not explain what this opt-out mechanism would entail or how

students would receive notice of the group proceeding.  In the case of allegedly

actionable misrepresentations, the Department has instituted a rebuttable presumption

that all students in the group relied on the misrepresentation when making educational

decisions.  *See id*. at 75,971.

AR-A-000197

72.    In addition, many of the procedural aspects of the borrower defense process were determined only after the Final Rule was promulgated, in a separate regulation that was not subject to notice and comment.  *See* 82 Fed. Reg. 6253 (Jan. 19, 2017).

### B.    Financial Responsibility Provisions

73.    The applicable statute directs that "[t]he Secretary shall determine whether an institution has the financial responsibility required" on the basis of whether the institution is able to: (i) provide the services described in its official publications; (ii) provide necessary administrative support; and (iii) meet all of its financial obligations, including refunds of institutional charges and repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary.  20 U.S.C. § 1099c(c)(1).

74.    In the past, the Department has evaluated whether an institution has the financial responsibility required to participate in Title IV loan programs using ratio-based criteria for evaluating the institution's "total financial circumstances" as contemplated by the HEA.  20 U.S.C. § 1099c(c)(2).  But the Financial Responsibility Provisions restructure the congressionally required framework by adding provisions that could substantially expand the set of institutions deemed not financially responsible.  These institutions would be required to obtain a letter of credit or other financial protection (such as cash equivalent to the amount of the letter of credit).  This determination could be made based on a single event without regard to an institution's overall financial condition, or based on the estimated impact of one or more events on an institution's financial condition according to a novel methodology created by the Department.

AR-A-000198

75.   Under the Final Rule, an institution is automatically required to provide a letter of credit

or other financial protection for at least 10 percent of the school's Title IV receipts for the

most recent fiscal year whenever one or more of several "triggering events" occurs.

76.   The automatic triggering events include failing to meet the "90/10 revenue test" as

provided under 34 C.F.R. § 668.28(c).  That test measures the ratio of funding institutions

receive from Title IV compared to other sources and applies only to proprietary

institutions.  The trigger results in a finding of a lack of financial responsibility after only

one year of failing to satisfy the 90/10 test, even though, by statute, a loss of eligibility

for Title IV funding occurs only after two years of failure to satisfy the test.  34 C.F.R.

§ 668.28(c)(1).

77.   The automatic triggering events also include having two consecutive "cohort default

rates" of 30 percent or greater.  The cohort default rate measures the percentage of

graduates who default on their loans within a given period of time.  The institution will

be required to provide financial protection pursuant to this trigger unless the institution

files a related challenge, request for adjustment, or appeal, and that action "results in

reducing below 30 percent the official cohort default rate for either or both years, or

precludes the rates from either or both years from resulting in a loss of eligibility or

provisional certification."  81 Fed. Reg. at 76,074.

78.   The automatic triggering events include, for publicly traded institutions, (i) being warned

by the SEC that it may suspend trading on the institution's stock, (ii) failing to timely file

certain required SEC filings, or (iii) being notified by the exchange on which the

institution's stock is traded that the institution is not in compliance with exchange

requirements or its stock is delisted.  These triggers target only proprietary institutions.

26

Institutions would be penalized for filing their quarterly reports "late" even in some cases where those reports are considered timely under the SEC's own rules.

79.    Under the Financial Responsibility Provisions, an institution is now automatically required to provide a letter of credit or other financial protection for at least 10 percent of the school's Title IV receipts for the most recent fiscal year when, after the end of its most recent fiscal year, it is subject to one or more triggering events that, according to the Final Rule, result in a recalculated financial responsibility composite score of less than 1.0.  The composite score, which is already computed for each institution pursuant to existing regulations, uses three ratios drawn from an institution's audited and certified financial statements to evaluate its overall financial health.  The Private Reserve ratio (which measures liquid resources), Equity ratio (total resource base), and Net Income ratio (annual gain or loss) are weighted and consolidated to create the composite score. *See id*. at 39,362-64.  Under the Final Rule, each time one or more of several triggering events occurs, the Department will recalculate the composite score based on the estimated actual or potential debts, liabilities, or losses that may stem from those events. In many cases, the Department assumes that the worst-case scenario will come to pass – even if the institution can demonstrate that it almost certainly will not incur excessive liability based on the triggering event.

80.    The triggering events that require a recalculation of the composite score include being sued by a Federal or State authority for education- or borrower defense-related claims, once the suit has been pending for 120 days.  If that occurs, the Final Rule provides that the amount of loss is calculated as the amount of relief demanded in the complaint, or, if the complaint demands no specific amount of relief, then the amount demanded by the

AR-A-000200

agency prior to the suit, or if it demanded no specific amount, then the amount of tuition

and fees received by the institution during the period described in the complaint for the

program or location described in the complaint.  The Department thus assumes not only

that the school will lose but that it will be liable for every penny the government requests.

The Department offers no data or study supporting this approach.

81.    The triggering events that require a recalculation of the composite score also include

being sued for claims of any kind, including by private parties, if the institution does not

file a motion for summary judgment or summary disposition within a certain timeframe

or if the institution does file such a motion and the court denies it or issues an order

reserving judgment on it.  If that occurs, the Financial Responsibility Provisions state

that, for purposes of the recalculation, the amount of loss is presumed to be the amount of

relief demanded in the complaint, or, if the complaint demands no specific amount of

relief, then the amount demanded by the claimant prior to the suit, or if it demanded no

specific amount, then the amount of the claim as stated in a response to a discovery

request.  Again, the Department assumes the school will lose and that the plaintiff's

demand is a reasonable measure of liability, without any study or data supporting that

conclusion from past lawsuits.

82.    In addition, the triggering events that require a recalculation of the composite score

include being required by the institution's accrediting agency to submit a teach-out plan

that covers the closing of the institution, any of its branches, or additional locations.  *See*

34 C.F.R. § 602.24(c)(1).  If that occurs, the Final Rule provides that, for purposes of the

recalculation, the amount of loss is calculated as the amount of Title IV funds the

institution received in its most recent fiscal year for the location, branch, or institution at

28

issue.  A voluntary action by an institution to teach out a program or location would require a teach-out plan by most accreditors even though such actions are routinely taken without financial risk to the institution.

83.   The triggering events that require a recalculation of the composite score include having gainful employment programs – typically career-oriented programs – that could become ineligible for Title IV funding in the next award year based on their students' debt-to-earnings rates.  *See id*. § 668.403.  If that occurs, the Final Rule provides that, for purposes of the recalculation, the amount of loss is presumed to be the amount of Title IV funds the institution received in its most recent fiscal year for the programs at issue.  The gainful employment regulations primarily affect proprietary schools.

84.   The triggering events that require a recalculation of the composite score include any withdrawal of owner's equity for an institution with a composite score of less than 1.5, subject to limited exceptions.  If that occurs, the Financial Responsibility Provisions state that, for purposes of the recalculation, the amount of loss is the amount of equity transferred to any entity other than the institution.

85.   The Final Rule also provides that an institution is required to provide a letter of credit or other financial protection for at least 10 percent of the school's Title IV receipts for the most recent fiscal year when "[t]he Secretary determines that there is an event or condition that is reasonably likely to have a material adverse effect on the financial condition, business, or results of operations of the institution."  81 Fed. Reg. at 76,074.  A non-exhaustive list of examples of such an "event or condition" includes a significant fluctuation in the amount of Direct Loan or Pell Grant funds received that cannot be accounted for by changes in those programs; a citation by a state licensing or authorizing

AR-A-000202

agency for failing any state or agency requirement; failure of a yet-to-be-announced

financial stress test adopted by the Secretary; high annual dropout rates; placement on

probation, show-cause, or similar status by the institution's accrediting agency for failing

to meet one of the accreditor's standards; violation of a provision in a loan agreement;

pendency of claims for borrower relief discharge; or the Secretary's expectation to

receive a significant number of borrower defense claims as a result of a judicial or

administrative proceeding.  The Department explicitly declines to explain what would

make an event "material."  Institutions thus have no way of knowing what will constitute

a discretionary trigger.

86.    The regulations provide that the Secretary may require, over and above the 10 percent

minimum financial protection, "any additional amount" that the Secretary "estimate[s] is

reasonable to expect based on the circumstances presented by the risks posed for the

particular institution."  *Id*. at 75,985.  The Secretary is required to ensure that the total

amount of financial protection provided "is sufficient to fully cover any estimated

losses."  *Id*. at 76,076.  The Secretary is not required to observe any maximum level of

financial protection.  Nor do the regulations cabin the Secretary's discretion by, for

example, prohibiting the imposition of a letter of credit that would put an institution out

of business.

87.    The Final Rule permits no opportunity to contest the imposition of a letter of credit or

other financial protection for many of the triggering events.  Institutions are permitted to

demonstrate to the Department only that certain triggering events should not require

financial protection, and only on narrow grounds.  In particular, an institution may

demonstrate that a lawsuit by a Federal or State agency, if fully successful on all claims,

AR-A-000203

could not recover the amount claimed; that a withdrawal of owner's equity was used solely to meet tax liabilities for income derived from the institution; and that a reported violation of a provision in a loan agreement was waived by a creditor.  An institution also may demonstrate that a triggering event no longer exists or has been resolved or that the institution has insurance that will cover part or all of the liabilities that may arise.  As for discretionary triggering events, an institution may demonstrate that the event "does not and will not have a material adverse effect on the financial condition, business, or results of operations of the institution."  *Id.* at 76,072.  Because the regulations are silent as to the definition of a "material" effect, it is unclear how an institution might demonstrate to the Department that an event is not material or how the Department would evaluate such a showing.

88.    For any portion of the Department's financial protection demand that is greater than 10 percent of the school's Title IV receipts for the most recent fiscal year, an institution may attempt to demonstrate that "[t]he amount is unnecessary to protect, or contrary to, the Federal interest."  *Id.*  However, a hearing officer no longer has authority to overturn the Department's demand for financial protection based on a finding that it is "unreasonable."  *See id.* at 39,375.  Previously, the Department had employed this "reasonableness" standard.

89.    Under the Final Rule, any institution that is required to provide financial protection may also be required to distribute a warning to students and prospective students in a form and manner to be prescribed by the Department communicating that the school is not financially responsible.  *See id.* at 76,071-72.

AR-A-000204

### C.      Loan Repayment Rate Warning Provision

90.      Under the Final Rule, a proprietary institution – and only a proprietary institution – may

be required to include in all promotional materials a loan repayment rate warning.  The

warning is required if the institution's median borrower has neither fully repaid all FFEL

or Direct Loans nor made loan payments sufficient to reduce the outstanding balance of

each loan by at least one dollar after three years.  *See id.* at 76,071.  Public and non-profit

schools with similar repayment rates are not required to furnish their students with any

warnings.  The decision to apply this provision only to proprietary schools was made

based on data that the Department now acknowledges was inaccurate.  *See* Dep't of

Educ., *Updated Data for College Scorecard and Financial Aid Shopping Sheet* (Jan. 13,

2017), https://ifap.ed.gov/eannouncements/011317UpdatedDataForCollegeScorecard

FinaidShopSheet.html.

91.      The warning language must read: ''U.S. Department of Education Warning: A majority

of recent student loan borrowers at this school are not paying down their loans."  81 Fed.

Reg. at 76,072; 34 C.F.R. § 668.41.

92.      The Department will calculate the median borrower's repayment status using the data and

methodology provided in the gainful employment regulations, which govern vocational

programs.  An institution is exempt from the requirement if it demonstrates to the

Secretary's satisfaction that, if borrowers in its non-gainful employment programs were

included in the calculation, it would have a passing loan repayment rate.  *See id.*

93.      An institution required to provide a warning under this rule will be notified by the

Department of its loan repayment rate and will then be allowed 15 days to appeal the

determination.  *See id.*

32

94.   Warnings required under this rule must be made in a form, place, and manner prescribed
      by the Secretary.  The warning must be prominent, clear, and conspicuous, and the
      Secretary may require an institution to modify its promotional materials, including its
      website, to ensure this requirement is met.  *See id*.

95.   An institution will not be permitted to argue that, for example, its students are repaying
      their loans slowly using Department-approved income-based repayment plans.  Nor will
      schools be allowed to show that their students are paying off their loans in the long term.
      The warnings will be based solely on a three-year snapshot of repayment rates.

      **D.     Arbitration and Class Action Provisions**

96.   Under the Final Rule, institutions that participate in the Direct Loan Program are
      prohibited from entering into a predispute agreement to arbitrate claims that could form
      the basis of a borrower defense. 81 Fed. Reg. at 76,066; 34 C.F.R. § 685.300(f).  Those
      same institutions are prohibited from obtaining agreement that a borrower waive his or
      her right to initiate or participate in a class action lawsuit regarding such claims. 81 Fed.
      Reg. at 76,067; 34 C.F.R. § 685.300(e).

97.   Additionally, the Final Rule bars institutions from enforcing existing arbitration
      provisions or class action waivers in their agreements with students to the extent those
      agreements would govern borrower defense-type claims.  81 Fed. Reg. at 76,067; 34
      C.F.R. §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii).   Schools must either notify borrowers of
      this change or amend their agreements. 81 Fed. Reg. at 76,067; 34 C.F.R.
      §§ 685.300(e)(3)(ii), 685.300(f)(3)(ii).

98.   Institutions are required to notify current students that arbitration provisions will not be
      enforced no later than the date on which they provide exit counseling or the date on

which the school files its initial response to a demand for arbitration or service of a

complaint from a student who has not already been sent a notice or amendment.  81 Fed.

Reg. at 76,067; 34 C.F.R. §§ 685.300(e)(3)(iii), 685.300(f)(3)(iii).

### THE CHALLENGED REGULATIONS EXCEED THE DEPARTMENT'S AUTHORITY, VIOLATE THE ADMINISTRATIVE PROCEDURE ACT, AND ARE UNCONSTITUTIONAL.

99.     Each of the four major regulatory initiatives in the Final Rule suffers from fatal legal

flaws.

**I.      The Final Rule Exceeds the Department's Authority and Conflicts with the HEA and FAA.**

100.    Each of the four major regulatory initiatives in the Final Rule oversteps the bounds of the

Department's authority.

**A.      The Borrower Defense Provisions Exceed the Department's Authority Under the HEA, GEPA, and the Organization Act.**

101.    The Borrower Defense Provisions exceed the statutory authority conferred by the HEA,

the General Education Provisions Act ("GEPA"), and the Department of Education

Organization Act ("Organization Act").

102.    First, the Department attempts to support the changes to the borrower defense regulations

by citing Section 455(h) of the HEA, the enabling statute for the borrower defense

regulations.  That Section allows the Secretary to specify "acts or omissions . . . a

borrower may assert as a defense to repayment of a loan."  20 U.S.C. § 1087e(h).

103.    The straightforward language of the statute allows the Department to create *defenses* to

be used by borrowers when certain collection proceedings are initiated against the

borrower.  But the statute does not support an affirmative action to cancel a student's

AR-A-000207

debt.  Rather, it uses the term "defense," which establishes that Congress enacted Section

455(h) for use by a borrower acting as a *defendant*.

104.    When Congress wants to authorize the Department to forgive or cancel student debt, it

does so explicitly.  Other provisions of Section 455 – for example, Section 455(m)(1) –

allow the Department to "cancel the balance of interest and principal due" for certain

borrowers, like those who have dedicated their lives to public service and who have

faithfully paid their loans for ten years.  20 U.S.C. § 1087e(m).  Section 455(h) does no

such thing.

105.    Moreover, Section 455(h) does not mention recovery from educational institutions.  If

Congress had intended Section 455(h) to be used to recoup funds from schools, it could

have and would have said so.  It did not.  That is especially important, because Congress

included other provisions in the HEA that expressly allow the Department to recover

funds from an educational institution.

106.    Similarly, Section 487 of the HEA, which the Department also identifies as a source of its

authority to issue these regulations, allows the Secretary to take action upon

"determin[ing], after reasonable notice and opportunity for a hearing, that an eligible

institution has engaged in substantial misrepresentation of the nature of its educational

program, its financial charges, or the employability of its graduates."  *Id*.

§ 1094(c)(3)(A).  When that happens, there are two specified remedies: the Secretary

may "suspend or terminate" an institution's "eligibility status" for Title IV loans or

"impose a civil penalty upon such institution of not to exceed $25,000 for each

violation."  *Id*. § 1094(c)(3)(A)-(B).

AR-A-000208

107.  This language is careful, specific, and limited.  Congress considered the issue and

decided to give the agency (as opposed to a court) jurisdiction over one type of action,

with the authority to impose two particular penalties on educational institutions.  The

regulations defy this cabined statutory regime by authorizing additional actions (based on

breach of contract or other state or federal legal claims) and the ability to impose

additional penalties (up to the full amount the Department lost on any given loan).  In so

doing, the Department attempts to rewrite the statute.

108.  In addition, the Department cites Section 437(c) of the HEA as a basis for the Borrower

Defense Provisions.  But Section 437(c) only allows the Department to discharge student

debt in three specific circumstances: upon the "closure of the institution" before the

student completes his or her program; "if such student's eligibility to borrow under this

part was falsely certified by the eligible institution"; or "if the institution failed to make a

refund of loan proceeds which the institution owed to such student's lender."  20 U.S.C.

§ 1087(c).  The fact that Congress expressly permitted loans to be discharged in those

circumstances, but not in others, reinforces the conclusion that the Borrower Defense

Provisions exceed the Department's statutory authority.

109.  Finally, the Department attempts to rely on Section 454(a) as a source of additional

statutory support.  Under Section 454(a)(6), in program participation agreements with

educational institutions, the Secretary may "include such . . . provisions as the Secretary

determines are necessary to protect the interests of the United States and to promote the

purposes of" the Direct Loan Program.  20 U.S.C. § 1087d(a)(6).

110.  The provision is a catch-all phrase that comes at the end of a series of ministerial

requirements for loan administration.  Under the precept of *ejusdem generis*, any

36

provision promulgated under Section 454(a)(6) should likewise deal with the calculating,

tracking, and disbursement of loan funds – or at least a similar ministerial function.

111.   Section 454(a)(6) is not a blank check for the Department to create new causes of action

against an institution for unrelated state or federal legal failings, or to set up a novel in-

house court.

112.   In the Final Rule, the Department – for the first time – cited two additional provisions

that it claims support the Borrower Defense Provisions: Section 410 of GEPA, 20 U.S.C.

§ 1221e-3, and Section 414 of the Organization Act, *id*. § 3474.   Section 410 permits the

Secretary "to make, promulgate, issue, rescind, and amend rules and regulations

governing the manner of operation of, and governing the applicable programs

administered by, the Department." *Id*. § 1221e-3.   This generic grant of rulemaking

authority does not give the Secretary unbridled discretion to issue *any* rule governing *any*

matter arguably related to education.   Rather, it allows the Secretary to promulgate rules

related to specific provisions of substantive statutory authority, as well as "rules of

agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

113.   Similarly, Section 414 authorizes the Secretary "to prescribe such rules and regulations as

the Secretary determines necessary or appropriate to administer and manage the functions

of the Secretary or the Department." 20 U.S.C. § 3474.   This is not a substantive grant of

authority and cannot support the creation of vast and novel liability for schools triggered

by the Borrower Defense Provisions.

114.   One additional, important aspect of the borrower defense regulations lacks any statutory

support.   The Department does not include *any* statutory basis for the creation of class-

action-like "group borrower defenses" that would enable the Department to discharge the

debt of certain borrowers who have not even filed an application with the Department.

The statute says nothing that would authorize collective actions against institutions, let

alone anything that would authorize the Department to institute processes and

presumptions that place institutions at a serious disadvantage in such proceedings.  The

Department's creation of this novel "group" action exceeds the Department's statutory

authority under the HEA or any other relevant statute.

B.    **The Financial Responsibility Provisions Exceed the Department's Authority Under the HEA.**

115.   The Department purports to base the Financial Responsibility Provisions on Section

498(c)(1) of the HEA.  *See* 20 U.S.C. § 1099c(c)(1).  But the statute does not support the

scope of the Final Rule.  Section 498(c)(1) provides that "[t]he Secretary shall determine

whether an institution has the financial responsibility required" based on whether it is

able to provide the services it claims to offer, provide the administrative resources

necessary to comply with the Act, and meet all of its financial obligations.  *Id*.  The next

paragraph provides that "[n]otwithstanding paragraph (1), if an institution fails to meet

criteria prescribed by the Secretary regarding ratios that demonstrate financial

responsibility," then it shall provide "satisfactory evidence of its financial responsibility"

in one of several other ways, one of which is to demonstrate that it "has met standards of

financial responsibility, prescribed by the Secretary by regulation, that indicate a level of

financial strength not less than those required" by the ratio-based criteria.  *Id*.

§ 1099c(c)(2)–(3).

116.   This language does not authorize the Secretary to prescribe whatever regulations he or

she might wish in the name of financial responsibility.  The Act specifically provides that

"[t]he Secretary shall take into account an institution's total financial circumstances in

AR-A-000211

making a determination of its ability to meet the standards herein required." *Id*.

§ 1099c(c)(2).  It further provides that "[t]he determination as to whether an institution

has met the standards of financial responsibility provided for in paragraphs (2) and (3)(C)

shall be based on an audited and certified financial statement of the institution," which

"shall be conducted by a qualified independent organization or person in accordance with

standards established by the American Institute of Certified Public Accountants." *Id*.

§ 1099c(c)(5).  The criteria used by the Secretary also "shall take into account any

differences in generally accepted accounting principles, and the financial statements

required thereunder, that are applicable to for-profit, public, and nonprofit institutions."

*Id*. § 1099c(c)(2).  Moreover, these provisions allow institutions to demonstrate financial

responsibility based on their overall financial health in various ways, including through

"the support of a financial statement audited by an independent certified public

accountant in accordance with generally accepted auditing standards." *Id*.

§ 1099c(c)(3)(c).

117.    The Department also purports to base its rules on Section 487(c)(1) of the HEA, which

provides that "in matters not governed by specific program provisions," the Secretary

shall prescribe "reasonable standards of financial responsibility . . . including any matter

the Secretary deems necessary to the sound administration of the financial aid programs,

such as the pertinent actions of any owner, shareholder, or person exercising control over

an eligible institution." *Id*. § 1094(c)(1)(B).  To the extent the Department seeks to rely

on this provision as a broad catch-all, that reliance fails.  Financial responsibility

standards for postsecondary institutions are governed by Section 498(c), which sets out

particular factors by which the Secretary is to judge an *institution's* financial

AR-A-000212

responsibility.  Section 487(c)(1) – the provision relied on by the Department – is plainly

meant to govern entities *other than* the educational institution itself.

118.   The Department's new financial responsibility regulations conflict with the framework

set forth in the HEA.  The Financial Responsibility Provisions include factors that do not

pertain to financial responsibility and evaluate the financial impact of "triggering events"

in novel ways that are not grounded in any concept of accounting principles and do not

account for an institution's total financial circumstances.  The Department's extra-

statutory scheme, which has little, if anything, to do with "financial responsibility," much

less "the sound administration of the financial aid programs," is not encompassed in the

Secretary's statutory authority under this provision.

119.   The Department's attempt to salvage the Financial Responsibility Regulations in the

Final Rule by citing a grab bag of HEA provisions that do not pertain to financial

responsibility also fails.  *See* 81 Fed. Reg. at 75,957.  Section 454 – Title IV's catch-all

provision governing program participation agreements – does not authorize the Secretary

to establish whatever terms he or she might wish for the Direct Loan participants,

especially in light of the HEA's specific financial responsibility provisions.  Section

455(h), which pertains to borrower defense claims, certainly does not authorize the

Financial Responsibility Regulations.  Nor do the various other sections the Department

cites authorize, individually or in combination, these rules.  As for the Department's

claimed authority under common law to recoup losses incurred under the Direct Loan

program, it is irrelevant and also inadequate to justify these regulations.  The Department

seeks not to recoup losses, but to require costly up-front guarantees against potential

AR-A-000213

losses based on a wide variety of events or conditions.  This approach is not contemplated or authorized by the statute.

120.   The Department attempts to minimize conflict with the HEA's language by claiming that the triggering events are necessary to allow for consideration of "a new financial risk that is realistically imminent" but not yet recognized in the audited financial statements.  81 Fed. Reg. at 75,987.  But this rationale is belied by the procedures the Department employs.  Under the Final Rule, once the Department has adjusted an institution's composite score to account for the "new risk," the adjustment continues to apply *even after* the institution submits updated audited and certified financial statements that take all liabilities into account, until the event or condition is resolved.  *Id*. at 76,076.  By requiring adjustments that do not comport with accounting principles, and requiring those adjustments to continue even after updated audited and certified financial statements are available, the Final Rules contravene the HEA's language.

121.   Despite Section 498(c)(1)'s explicit statutory mandate that financial responsibility determinations must be made by the Secretary, the Department proposes the use of triggers that are based on intervening acts of a third party, such as a state Attorney General, federal regulator, or private claimant.  These triggers by other actors fail to require a determination by the Secretary at all.  Instead, they simply rely on a third party's decisions to file litigation and to claim a certain amount of damages, an amount which – at a preliminary litigation stage – is then automatically counted against an institution's assets as if the third party had already succeeded on its claims.  This constitutes an impermissible delegation of authority that is contrary to the statutory structure as well as to its language ("the Secretary shall determine").

41

AR-A-000214

122.   The regulations' delegation to third parties also is particularly problematic when made to

a state entity: although other sections of the Act explicitly provide for state involvement

in certain decisions and processes, *see, e.g.*, 20 U.S.C. § 1070d-33, the Act's financial

responsibility section conspicuously does not.

123.   Additionally, the regulations single out proprietary institutions for stricter treatment

under the "trigger" framework, which is wholly unsupported by the statute.  Several of

the triggers apply exclusively to proprietary schools.

124.   The rules requiring notice to students and prospective students whenever the Department

deems an institution financially irresponsible also exceed its statutory authority.  The

HEA's financial responsibility provisions – unlike other provisions of the Act, *see, e.g.*,

*id*. § 1092(a)(1) – do not provide for mandatory notices.  *See id*. § 1099c.

125.   Thus, both the substantive requirements of the Financial Responsibility Provisions and

the attendant notice requirements exceed the Department's statutory authority.

**C.    The Loan Repayment Rate Provisions Exceed the Department's Authority
         Under the HEA.**

126.   The Repayment Rate Provisions exceed the Department's statutory authority.  The HEA

requires institutions to provide and make available to students and prospective students

information regarding an extensive list of topics.  That list notably does not include loan

repayment rates.  *See* 20 U.S.C. § 1092(a)(1).  Thus, Congress did not authorize the

notices required under the Repayment Rate Provisions.

127.   Additionally, the regulations single out proprietary institutions as the only institutions

required to provide loan repayment rate warnings.  This is also unsupported by the

statute.

AR-A-000215

128.   The Department fails to point to any substantive provision of the HEA that justifies the

Repayment Rate Provisions.

   **D.   The Arbitration and Class Action Provisions Exceed the Department's
        Authority Under the HEA and Violates the FAA.**

129.   The Department purports to find authority for the arbitration and class action waiver

provisions in Section 454(a)(6) of the HEA, a catch-all provision codified at 20 U.S.C.

§ 1087d(a)(6).  This catch-all provision allows the Department to impose ministerial

accounting or bookkeeping requirements similar to those found in Section 454(a)

subsections (1)-(5).  It does not empower the Department to impose novel and disruptive

regulations that govern the substance of contracts between schools and their students.

130.   Moreover, the arbitration and class action prohibitions conflict with Congress's pro-

arbitration policy embodied in the FAA.  The FAA provides that arbitration agreements

in contracts are enforceable.  However, the Final Rule seeks to retroactively invalidate

arbitration clauses in thousands of contracts and prohibit mandatory arbitration clauses in

thousands of prospective contracts.

131.   Congress has not explicitly afforded the Department authority to abrogate arbitration

provisions.  When Congress intends to give an agency the authority to abrogate

arbitration provisions, it has done so clearly and unambiguously.  For example, the

Consumer Financial Protection Bureau ("CFPB") was given explicit authority by

Congress to study the issue of mandatory arbitration and then to promulgate a rule

regarding mandatory arbitration, if the CFPB believed such a rule to be necessary after

completing the study.  Without such explicit authorization, the FAA prohibits an agency

from altering arbitration agreements.

43

132.   The Department contends that it is not invalidating arbitration or class action provisions in existing contracts.   Rather, it is simply preventing institutions from enforcing those provisions.   That is a distinction without a difference.   The FAA prohibits either course of action.

## II.   The Final Rule Is Arbitrary and Capricious Under the APA.

133.   The APA mandates that agency action be reasonable and reasonably explained.   The Final Rule is neither.

### A.   The Borrower Defense Provisions Violate the APA.

134.   Several aspects of the borrower defense regulations demonstrate a lack of reasoned decision-making and thus violate the APA.

135.   The Department offers no explanation regarding its decision to remove "borrower defenses" from the realm of collection proceedings and to instead initiate a novel administrative process for affirmative debt relief.   The Department contends that it needs to create a process for asserting borrower defenses because the current regulation "does not establish any process for doing so."   81 Fed. Reg. at 39,345.   That is a plainly inadequate statement.   There is no specific "process" for asserting borrower defenses because they are *defenses* and are asserted in *other proceedings* – for example, in proceedings to establish a tax offset.   *See* 34 C.F.R. § 685.206(c) (current borrower defense regulations).

136.   The Department attempts to explain this change by claiming that it is no change at all. Even though the *current regulations themselves* state that borrower defenses are to be employed only in a "proceeding to collect on a Direct Loan," the Department claims that this is not true.   Instead, the Department contends the borrowers are currently authorized

AR-A-000217

to bring affirmative "claims" based on language included in promissory notes used in the now-defunct FFEL program.  The use of those notes predated the addition of the borrower defense provision to the HEA, and those promissory notes are not and have never been used in the Direct Loan program.  It is unclear what relevance, if any, they have to the Final Rule.  But they plainly are inadequate to justify the sweeping change of the new rule.

137. Indeed, by pretending that no change in policy has taken place, the Department engages in a textbook case of arbitrary and capricious rulemaking.  While an agency may change its mind (as long as it is acting within the bounds of the statute), it must, at a minimum, acknowledge that it is doing so.

138. The Department also states, in an attempted justification, that the "current borrower defense regulation" has "rarely been used."  81 Fed. Reg. at 39,335.  But again, this explanation is insufficient.  The Department makes no effort to link this lack of frequent use to some specific, identified deficiency in the current regulation.

139. The Department also fails to explain other aspects of the Final Rule, such as why it did not adopt an alternative, less disruptive proposal when determining standards for borrower defenses.  For example, the Department indicates that its current regulations, which rely on causes of action under state law to provide the foundation for a borrower "defense," are problematic because it is difficult to know which state's law should apply in light of the growth of distance learning.  *Id.* at 39,336.  But if that is the problem, the Department could simply identify a way to determine which state's law to use – for example, the law of the borrower's state of residence, the law of the state in which the school is headquartered, or both.  The Department ignores the advantages of relying on

AR-A-000218

state law causes of action, in which the applicable standards have been defined by

appropriate and established limits in case law.

140.    Instead, the Department proposes to create an *entirely new jurisprudence* that it terms the

"Federal standard for breach of contract" and the "Federal standard" for substantial

misrepresentations.  *Id*. at 79,943-45.  According to the Department, this new

jurisprudence will not be governed by any particular body of state law or even by existing

federal precedents.  Rather, the Department will be making up the law "on a case-by-case

basis."  *Id*.  The Department fails to explain how this could possibly be more clear and

consistent than the current approach.  Indeed, the Department expressly declined to

address hypothetical situations posed by commenters seeking to clarify these new

standards, because it plans to rely on its "case-by-case" approach.  *Id*.  This

unpredictable, unbridled discretion cannot establish the consistency that the Department

claims motivated the Final Rule.

141.    Moreover, the Department indicates that it may be problematic to rely on state law

because state laws vary, and hence some borrowers will arbitrarily receive more

protection than others under the Department's regulations.  *Id*. at 75,938.  Of course, laws

and policies will often vary from state to state.  But even assuming that poses a problem,

the Department has not fixed it.  By relying on judgments obtained in state courts, the

new regulations continue to incorporate protections that will vary by state.

142.    The regulations also stretch the definition of "substantial misrepresentation" beyond the

point of reasonableness.  The Department expands the definition of a misrepresentation to

include, for example, a statement that "omits information in such a way as to make the

statement false, erroneous, or misleading."  *Id*. at 79,949.  By adding omissions to the

46

definition, without requiring any intent to deceive or indeed even any deception, the

Department has transgressed the bounds set by Congress, sweeping in statements that

would be both truthful and nondeceitful or merely confusing.

143.    Many of the provisions regarding an institution's right to process under these regulations

are insufficiently protective, given the Department's decision to import causes of action

that would ordinarily be determined in court by a jury with the full procedural protections

generally afforded to federal litigants.  That is especially true given the large sums of

money involved in many borrower defense claims.  For example, there is no mechanism

to challenge the certification of a group of borrowers, and, by aggregating many

dissimilar borrowers into one action, the group process may result in a windfall for some

borrowers and a shortfall for others.  In addition, schools are not entitled to receive all the

documents the Department has relied on in determining that the school might be liable

when it receives notice of its potential liability.  Hearings are also discretionary.  And,

while the school has a right to call witnesses, there is no mandate to ensure that

borrowers will appear so that the school can confront its accusers.  Many evidentiary and

procedural rules also appear to be *ad hoc* and undetermined.  *See* 82 Fed. Reg. 6256-59.

144.    To make matters worse, the Department does not explain why, in its view, the

adjudication provisions already set forth in either subpart H or subpart G of 34 C.F.R.

part 668 should not apply here.  The Department gives no explanation regarding why its

novel procedures for recovering sums from schools under the Borrower Defense

Provisions are preferable to the rules protecting institutions today, which already offer a

well-understood hearing and appellate review process.  81 Fed. Reg. at 75,960.

47

145.  Beyond that, the procedures do not provide schools with any finality.  Rather, a borrower can continually return to the Department with "new" evidence, even if the borrower previously lost his or her borrower defense action.  *Id*. at 79,969.  This lack of finality is unreasonable and unexplained.

146.  The process regarding group borrower defenses likewise is vaguely worded and unreasoned.  A group borrower defense may be initiated wherever the Department believes two or more borrowers have "common facts and claims" or where other factors, enumerated in a nonexclusive list, are present.  *Id*. at 75,968.  Borrowers may be included in a defense, unless they opt out, even if they have not submitted a claim form.  *Id*. at 75,969.  The Department does not explain what it means to have "common facts or claims."  It is unclear whether the Department intends to incorporate, for example, the rigorous standard of Federal Rule of Civil Procedure 23(a)–(b).  If not, the Department fails to explain why a lesser, unspecified standard is appropriate, given the severe burden imposed on institutions by class proceedings.  The Department also does not explicitly allow institutions to challenge the composition and appropriateness of the class or "group."  81 Fed. Reg. at 75,968.  This, too, is arbitrary and capricious.

147.  Equally troubling, in a group borrower defense proceeding, the Department creates a "rebuttable presumption that each member of the group reasonably relied on the misrepresentation."  *See id*. at 76,084-85.  But cases *cited by the Department itself* indicate that this is often not a fair or reasonable presumption.  *See, e.g*., *id*. at 39,347; *Rodriguez v. McKinney*, 156 F.R.D. 112, 116 (E.D. Pa. 1994) (individual questions regarding reliance on misrepresentations prevented class certification).  In addition, it is entirely unclear how an institution might rebut this presumption for every student

AR-A-000221

aggregated into the group, or how all those students might be made available for discovery or cross-examination.

148.   Finally, the Department also makes several unreasoned and unexplained decisions regarding how a borrower may demonstrate breach of contract.  For example, the Department concludes that a breach of contract need not be material and no injury need be shown for an institution to be held liable for the breach.  81 Fed. Reg. at 75,944.  This runs counter to the Department's insistence on reasonable reliance and injury when asserting a borrower defense based on misrepresentation.  *Id.* at 75,950.

149.   Moreover, the Department stated that it would not impose a materiality standard because the Department "is comfortable with its ability to grant relief commensurate to the injury to a borrower alleged."  *Id.* at 39,341.  Failing to provide a materiality standard and instead relying on the Department's unfettered discretion in any given case is arbitrary, unjustified, and unfair to institutions trying to defend themselves or anticipate future liability.

150.   In addition, the Final Rule indicates that proprietary and non-profit institutions may be treated differently in terms of their liability for similar transgressions.  In Appendix A, the Department includes an example of a student at a liberal arts college who was subject to a substantial misrepresentation.  *Id.* at 76,086-87.  Because the Department deems her education valuable, she receives no debt forgiveness, and her school is not liable.  *Id.* There is no similar example regarding a proprietary school.  The Department does not explain what factors or standards it will use (or even consider) in making this extremely consequential decision about whether a particular education is "valuable" or not.

AR-A-000222

**B.**      **The Financial Responsibility Provisions Violate the APA.**

151.   The Financial Responsibility Provisions violate the APA's notice requirements.  *See* 5

U.S.C. § 553.  The Department provided no notice of, or opportunity to comment on,

crucial substantive aspects of the Final Rule.  In particular, the Department gave no

notice of the mechanisms by which the Department now proposes to estimate and

incorporate the impact of various "triggering events" into the composite score

framework.  The Department's failure to do so threatens the ongoing viability of the

composite score methodology.

152.   The Department also has failed to provide notice of several additional "triggering events"

that were presented for the first time in the Final Rule.  Two discretionary triggers related

to borrower defense claims were not mentioned or addressed in negotiated rulemaking or

the NPRM.  *See* C.F.R. §§ 668.171 (g)(7), (8).  Another novel trigger gives the Secretary

discretion to require financial protection if he or she expects to receive a significant

number of borrower defense claims.  This compounds fairness and due process concerns

raised by the Final Rule.  Commenters did not have an opportunity to address these

issues.

153.   The Department also failed to provide notice of its new discretionary trigger for failing an

as-yet-undeveloped "stress test."  *See* 81 Fed. Reg. at 76,003.  The Department does not

explain what the "stress test" would consist of or when it will be revealed.  This vague

placeholder on a fundamental point fails to provide any information to regulated parties.

154.   The Department additionally failed to provide notice that it would remove the dollar

threshold for litigation-based triggers.  Under the Final Rule, institutions must provide the

Department with a notice and submit their composite score to recalculation whenever any

judgement or settlement is reached in any court or agency that impacts the institution. This is a substantial and unwarranted burden, especially for small settlements or fines that could not possibly impact a school's composite score.  Due to the lack of notice, institutions had no opportunity to raise these concerns before the Department.

155.   In addition, the Financial Responsibility Provisions are arbitrary and capricious under the APA.  For example, the Department's decision to base significant regulatory consequences on the mere pending status of lawsuits brought by state or federal actors violates reasoned decision-making and due process.  At a minimum, the Department has not adequately addressed these concerns.  This trigger provides institutions with no opportunity to be heard regarding the merits, or lack thereof, of any underlying claims. That regulatory approach appears to be unprecedented.  The regulations provide a limited opportunity for an institution to show that the government's claims, if fully proved, could not lead to the amount of damages alleged.  *See id*. at 76,074-75.  But the Department takes pains in the preamble to "stress that this option does not include any consideration of the merit of the government suit."  *Id*. at 76,006.  The Final Rule allows for 120 days to pass after a lawsuit is filed before regulatory consequences are triggered, purportedly giving institutions the opportunity to attempt to secure dismissal or summary disposition of the lawsuit.  However, the Department fails to account for the possibility that dispositive motions may not be decided, or even fully briefed, within that timeframe. The regulations' extraordinary "guilty unless judged innocent within 120 days" approach fails to meet the mandates of reasoned decision-making or due process.

156.   The manner in which the regulations would account for the impact of a lawsuit that does not specify a damages figure is also arbitrarily one-sided and onerous.  For a borrower-

AR-A-000224

defense-related lawsuit, the regulations employ the largest possible figure: the full amount of tuition and fees received by the institution during the relevant period for the program or location at issue. That measure is very likely to overestimate the impact of the lawsuit and does not appear to be grounded in evidence or studies.

157. The Department also does not seriously consider the likelihood that uneven enforcement based on various state laws and state agency requirements might result in unfairness for schools. In the Borrower Defense Provisions, the Department itself highlights the supposed importance of uniform rules to fairness. *See, e.g.*, *id*. at 75,939. Hence, triggers related to state or local enforcement action conflict with other aspects of the Department's reasoning.

158. The Financial Responsibility Provisions also incentivize certain litigation tactics by empowering state Attorneys General and other oversight entities – including local government entities, *id*. at 75,990 – to trigger important federal regulatory consequences unilaterally, even where a lawsuit may later be found meritless. This arbitrarily increases the risks institutions face to their financial stability from the mere filing of a lawsuit.

159. The Department's decision to base significant regulatory consequences on non-governmental parties' lawsuits that endure past the still-preliminary summary judgment stage raises similar concerns. Denial of a defendant's summary judgment motion – or a defendant's decision not to pursue such a motion – does not suggest the plaintiff is likely to prevail. Survival of summary judgment indicates only that issues of fact remain to be resolved before judgment can be rendered. Claims against educational institutions often raise primarily factual, not legal, issues and are thus not amenable to summary judgment even when meritless.

AR-A-000225

160.  The Department rejects any mechanism that would permit, much less require, it to consider the merit of a lawsuit.  Its reasoning on this critical point is insufficient.  The Department sees "little or no value" in considering a presentation from the institution regarding a pending lawsuit, and objects to "second-guessing" government agencies in the exercise of their litigation activities.  *Id.* at 75,990.  But commenters have not asked the Department to adjudicate cases, only to fairly evaluate the level of financial risk they pose.  By contrast, the assumption that the plaintiff will not only prevail but obtain the maximum possible recovery is arbitrary and capricious.  And it is the Department, not objecting commenters, that has chosen to use the mere filing of a lawsuit by state entities as the trigger for significant financial consequences.

161.  The regulations' litigation-based "triggering events" and their failure to provide due process not only violates reasoned decision-making and deprives institutions of basic regulatory fairness, but also deprives schools of their ability to effectively manage litigation risk.  The mere filing of a lawsuit with a large requested damages figure that survives for 120 days (or proceeds past summary judgment) may require a defendant institution to post a costly letter of credit.  Thus, plaintiff states, private parties, and their attorneys could bring enormous settlement pressure to bear on an institution at preliminary stages of litigation.  Institutions could be compelled to settle even meritless lawsuits following denial of summary judgment in order to address or ameliorate the coercive dynamic these regulations create.  Placing parties on such an uneven playing field threatens not only the financial stability of higher education institutions but also the integrity of the American litigation system.

AR-A-000226

162.   The regulations determine the impact of a lawsuit on an institution's composite score
        based on the plaintiff's demand for a certain amount of damages.  This is unjustified and
        unjustifiable.  The damages figure a plaintiff requests has no relationship to an
        institution's financial responsibility, especially since the claim may have no merit, and
        the damages figure has not been subjected to any sort of adversarial testing or
        independent evaluation.

163.   Overall, the Department's use of lawsuits as triggering events is unsupported by any data
        or study on the record.  The Department has not offered any evidence of what percentage
        of lawsuits that are pending for 120 days or proceed past summary judgment result in a
        decision against the defendant school.  Nor has the Department studied the relationship
        between the amount of damages demanded and the amount, if any, recovered by
        plaintiffs.  By contrast, commenters offered evidence showing that judgments against
        schools are extremely rare.  The Department's decision thus runs counter to evidence in
        the record.

164.   Additionally, the automatic "triggering event" based on cohort default rates effectively
        punishes institutions that attempt to serve underserved student populations, unnecessarily
        raising costs for those institutions in ways that threaten to diminish educational choice.
        "Cohort Default Rates tend to be higher at institutions that serve low-income and
        minority students including community colleges and HBCUs."  Kamille Wolff Dean,
        *Student Loans, Politics, and the Occupy Movement: Financial Aid Rebellion and Reform*,
        46 J. Marshall L. Rev. 105, 128 (2012).  The regulations threaten to push these
        institutions' costs measurably higher based on an automatic trigger, which may

AR-A-000227

unnecessarily cause some schools to shut down altogether.  That would leave taxpayers stuck with a large bill and underserved students with even fewer options.

165.   The Department has also created a trigger based on the failure of a gainful employment metric.  The use of a failure of a single programmatic gainful employment metric as a basis for a trigger requiring the recalculation of the institutional composite score inappropriately draws a conclusion of "financial risk" without supporting evidence.  Harvard University recently announced the teach out of its American Repertory Theater graduate program because of a failing gainful employment rate.  It is unlikely, however, that anyone would consider Harvard at financial risk because of this single program failing the gainful employment rule.

166.   The regulations also authorize the Secretary to require an institution to provide a letter of credit or other financial protection if the Secretary finds an "event or condition that is reasonably likely to have a material adverse impact on the financial condition, business, or results of operations of the institution."  81 Fed. Reg. at 76,074.  This language neither gives regulated parties notice of what is required of them nor provides sufficient guidance to ensure reasonable, non-arbitrary decision-making.  The Department, however, has refused to define "material adverse effect" in the Final Rule.  *See id*. at 76,000.

167.   Compounding this problem, the discretionary triggers offered as examples of "material" events have serious legal flaws.  The discretionary trigger for fluctuations in Direct Loan or Pell Grant funds is vague, yet the Department refuses to clarify what level of fluctuation it might consider to be material.  The discretionary trigger based on an accrediting agency's decision to place an institution on probation, show-cause, or similar status for failure to meet the agency's standards also risks disproportionately punishing

AR-A-000228

minor infractions and infractions that have no financial impact.  The discretionary trigger

for high dropout rates effectively punishes institutions that attempt to serve underserved

populations because, as commenters argued and the Department does not dispute, studies

show that the most common reason students drop out of school has nothing to do with

institutional quality.  Instead, students who drop out commonly state that, due to financial

circumstances, they needed to resume work.  *See id*. at 76,001.

168.    The Final Rule also unjustifiably singles out and targets proprietary institutions.  Several

of the regulations' "triggers" – such as the 90/10 trigger, the equity-distribution trigger,

and the SEC-related triggers – target *only* proprietary schools.  Others, such as the gainful

employment or default rate triggers, will also have a disproportionate effect on

proprietary schools.  That means the Financial Responsibility Provisions will

disproportionately burden proprietary schools and their vulnerable students.  The

Department fails to justify this differential, discriminatory, and arbitrary treatment.

169.    The Department's targeting of proprietary institutions is all the more troubling and

inadequately justified because its own studies have consistently found that those

institutions have a large percentage of low-income and minority students.  *See, e.g*., Nat'l

Ctr. for Educ. Statistics, *Students Attending For-Profit Postsecondary Institutions:

Demographics, Enrollment Characteristics, and 6-Year Outcomes* Table 2 (Dec. 2011),

http://nces.ed.gov/pubs2012/2012173.pdf.  Without proprietary schools, it is, at the very

least, unclear whether these students would be served at all.  The Department, however,

unjustifiably assumes that other institutions will accept all students who are displaced,

without citing any evidence whatsoever regarding those schools' capacity or risk

AR-A-000229

tolerance.  The Department does not cite any evidence in the record to support this assumption.

170.   Despite extensive comments raising the issue of minority and underserved borrowers' access to postsecondary education, the Department says little about this critical question in the Final Rule.  *See, e.g*., Comments of Spelman College, ED-2015-OPE-0103 (July 28, 2016); Comments of United Negro College Fund, Thurgood Marshall College Fund, National Association for Equal Opportunity in Higher Education, ED-2015-OPE-0103 (July 29, 2016).  When it does address the issue, the Department effectively concedes that its proposal to recalculate composite index scores based on triggering events will disproportionately impact institutions serving underserved borrowers.  As the Department acknowledges, those institutions will tend to have "a lower composite score than might otherwise be the case."  81 Fed. Reg. at 76,013.  The Department fails to offer a viable method of mitigating this disproportionate and harmful impact.

171.   During the comment period, numerous commenters pointed out that the Department has not been calculating the metrics under its existing regulations correctly or enforcing its rules consistently.  These commenters suggested that the Department undertake a review of its existing process before it proposes to add new financial-responsibility provisions.  *See, e.g*., Comments of National Association of College and University Business Officers (NACUBO), ED-2015-OPE-0103 (Aug. 1, 2016); Comments of North Carolina Independent Colleges and Universities, ED-2015-OPE-0103 (Aug. 1, 2016).  The Department has arbitrarily and capriciously rejected this invitation to fix what is broken and is instead plowing ahead with new, poorly-thought-out regulations that promise to create additional problems.

AR-A-000230

172. Overall, the "triggering events" in these regulations will impose significant costs even on institutions that are financially responsible by any reasonable definition of that term. The Department's refusal to tie the impact of triggers to any actual, evidence-based study in the record is arbitrary and will have an impact on schools that is not adequately addressed in the Final Rule. As CAPPS and others explained during the comment period, each letter of credit is generally required to be backed up by cash collateral. *See, e.g.*, Comments of CAPPS, ED-2015-OPE-0103 (Aug. 1, 2016); Comments of Education Affiliates Inc., ED-2015-OPE-0103 (Aug. 1, 2016). Often, an institution will have to provide a cash deposit sufficient to cover the entire letter of credit and pay additional fees. Letters of credit also are difficult to obtain in the current credit environment. For many schools, this means that the pending status of a lawsuit against it, no matter how meritless, may cost it millions of dollars as a result of the Department's new regulations. This perverse impact will be particularly devastating for smaller schools with no endowment.

173. The Department acknowledges that letters of credit have become more onerous in recent years, *see* 81 Fed. Reg. at 76,007, but fails to provide meaningful alternatives. Despite the fact that the Department has statutory authority to accept performance bonds under Section 498(c)(3)(A) of the HEA, the Department rejects out of hand the suggestion made by several commenters that they should be accepted as an alternative to letters of credit. *See id*. The Department fails to explain why these bonds would be less effective than a letter of credit, even while acknowledging that they are generally less expensive.

174. At minimum, the tremendous costs imposed by a letter of credit will unjustifiably divert resources away from the education services a school provides in accordance with its

AR-A-000231

mission and promises to students.  At worst, if an institution is unable to obtain a letter of credit it could effectively be forced out of business for that reason alone, needlessly harming both taxpayers and current and former students.  The HEA aims to protect against the precipitous closure of institutions.  *See, e.g.*, 20 U.S.C. § 1099(c)(3)(c).  But these regulations will likely have the consequence of *causing* precipitous (and unnecessary) school closures.  That is the definition of arbitrary and capricious.

175.  The regulations permit institutions some limited opportunities to dispute specified triggers, but narrowly circumscribe the Secretary's hearing officers' authority to reconsider certain demands for financial protection.  The regulations allow some discretion to reduce amounts demanded above the 10 percent minimum for letters of credit.  But there is no discretion to overturn a demand for financial protection based on automatic triggers or triggers that lead to a composite score of less than 1.0 under the Department's proposed method for calculating adjustments.  Hearing officers may no longer overturn a demand under 34 C.F.R. § 668.90(a)(3)(iii) on the basis that it is unreasonable.

176.  The Department's refusal, once it has calculated an adjusted composite score based on a triggering event, to accept the institution's next audited financial statements as the basis for its financial responsibility determination is also arbitrary and capricious.  This practice contradicts the Department's basic rationale for employing "triggering events": to account for "a new financial risk that is realistically imminent" but not accounted for in the last audited financial statement.  81 Fed. Reg. at 75,987.  There is no legitimate justification for holding possible negative financial developments against an institution

59

for years while failing to acknowledge, for example, similarly likely positive developments.

**C.      The Repayment Rate Provisions Violate the APA.**

177.    The Repayment Rate Provisions' method for calculating loan repayment rates would effectively punish institutions that attempt to better serve borrowers by encouraging students with low incomes or high debt to pay at a rate that is proportionate to what they are earning.  These income-based plans provide valuable flexibility for borrowers.  But in many cases, borrowers who are enrolled in such plans will have, at least for some time, an outstanding loan balance that is higher than their original loan balance.  *See* Federal Student Aid, U.S. Dep't of Educ., *Income-Driven Plans*, https://studentaid.ed.gov/ sa/repay-loans/understand/plans/income-driven (last visited May 10, 2017).  Therefore, under the regulations, institutions that have students signed up for these programs will be at greater risk of being required to distribute Department-issued warning letters.

178.    The Repayment Rate Provisions also irrationally punish institutions whose students choose to go into public service or to serve low-income communities.  A nurse or dentist that serves in a low-income clinic will likely harm the school's repayment rate relative to those who are employed in wealthier communities.

179.    Furthermore, the Repayment Rate Provisions apparently will be given retroactive effect by using data from students who graduated *years* ago, before the advent of the Final Rule.  Institutions that have already had students sign up for flexible loan repayment options offered and promoted by the government may now effectively face sanctions for doing so.  Punishing schools for actions that are now a matter of history – and which

were affirmatively encouraged by the Department when taken – is manifestly

unreasonable.

180.    The new loan-repayment-rate warning requirement applies only to proprietary

institutions.  The Department claims that institutions in this sector are more likely to have

poor repayment outcomes.  *See* 81 Fed. Reg. at 76,017.  The Department has now

conceded, however, that the decision to apply this provision only to proprietary schools

was made based on data that was completely inaccurate.  *See* Dep't of Educ., *Updated*

*Data for College Scorecard and Financial Aid Shopping Sheet* (Jan. 13, 2017),

https://ifap.ed.gov/eannouncements/011317UpdatedDataForCollegeScorecardFinaidShop

Sheet.html.

181.    In any event, the Department still does not explain why a traditional institution with a

loan repayment rate of zero percent or less should not also warn its students.  The

Department notes that non-proprietary institutions "are not typically comprised solely of

[gainful employment or vocational] programs and the repayment rate warning may not be

representative of all borrowers at the school," *id*., but fails to explain why it does not then

simply limit the requirement to those institutions with a significant proportion of students

in gainful employment programs rather than to proprietary institutions, *id*. at 76,018.  To

the extent the Department's decision to limit the requirement to proprietary institutions is

based on the "risk of excessive and unnecessary burden," *id*. at 76,017, that rationale is

unfair, arbitrary, and capricious.  The solution to an overly burdensome regulatory

approach is to reduce the burden it imposes on all parties, not to impose the onerous

burden only on some disfavored groups.

AR-A-000234

182. Singling out proprietary institutions threatens to further limit already scarce opportunities for poor, minority, and underserved populations.  Indeed, numerous education experts have raised alarms, suggesting that the Department's recent actions targeting proprietary schools will restrict access to higher education for those most in need.  That concern was also raised by numerous commenters here.  *See, e.g*., Comments of United Negro College Fund, Thurgood Marshall College Fund, National Association for Equal Opportunity in Higher Education, ED-2015-OPE-0103 (July 29, 2016).  The Department's only response to these comments is to reiterate its position that students should be provided the information in the warnings that the regulations require, 81 Fed. Reg. at 76,020, which is no response at all.

183. Additionally, the regulations unreasonably require loan repayment warnings if the median borrower has not at least "made loan payments sufficient to reduce by at least one dollar the outstanding balance on *each* of the borrower's FFEL or Direct Loans received for enrollment in the institution."  *Id*. at 76,071 (emphasis added).  Borrowers may prioritize paying down some loans over others, particularly if they have different interest rates.  Thus, requiring the median borrowers to have paid down each loan – rather than the total loan balance – is arbitrary and capricious and may impose loan-repayment-rate warning requirements on institutions unreasonably, with no legitimate justification.

**D.**    **The Arbitration and Class Action Provisions Violate the APA.**

184. The arbitration and class waiver regulations are arbitrary and capricious.  The Department failed to consider important factors raised by commenters and did not establish a reasonable connection between the facts found and the choice made.

62

185.   First, the Department failed to adequately weigh or discuss the benefits of individual

arbitration.  As discussed in the congressional record compiled to support the FAA and in

Supreme Court case law interpreting the FAA, the benefits of arbitration can be

substantial to all parties involved.  *See* 9 U.S.C. § 2.  Arbitration provides a prompt, fair,

and efficient method of dispute resolution for private individuals as well as educational

institutions.

186.   The Department itself has recognized the value and efficiency of arbitration elsewhere,

requiring an institution to "agree[] to submit any dispute involving the final denial,

withdrawal, or termination of accreditation to initial arbitration before initiating any other

legal action."  34 C.F.R. §§ 600.4(c), 600.5(d).  The Department's failure to consider the

benefits of arbitration – which are demonstrated by the Department's own rules –

highlights its unreasoned rush to promulgate these regulations, without consideration of

all the relevant factors or costs.

187.   The Department also failed to adequately consider the serious drawbacks of class actions

for students.  It is well-documented that class actions are often an ineffective means of

obtaining relief for consumers.  Cases are often drawn-out and unsuccessful, and counsel

is frequently compensated handsomely for small pay-outs to consumers.  In addition, in a

class action, plaintiffs must meet a high class certification burden, which often prevents

plaintiffs from obtaining relief.

188.   In support of its determination, the Department relies on a CFPB study.  But that study is

unrelated to the federal loan market and inapplicable to the student loan context.  The

CFPB study on consumer financial products and arbitration agreements concerned six

financial products including credit cards, checking accounts, general purpose reloadable

AR-A-000236

prepaid cards, payday loans, private student loans, and mobile wireless contracts

governing third-party billing services. *See* 81 Fed. Reg. at 32,840.  Federal student loans

pose far different risks to borrowers in a far different context, and the Department may

not, consistent with the mandates of reasoned decision-making, simply cut and paste

findings from an entirely separate legal and factual setting, made by a separate agency

with an entirely distinct statutory charter and mission.  Accordingly, the CFPB's study is

an obviously insufficient basis to sustain the arbitration and class action waiver

provisions.  In fact, the CFPB itself acknowledges the significant distinctions between

Federal student loans, like the Direct Loan Program, and private student loans.  *See*

Consumer Financial Protection Bureau, What Are the Main Differences Between Federal

Student Loans and Private Student Loans?, http://www.consumerfinance.gov/askcfpb/

545/what-are-main-differences-between-federal-student-loans-and-private-student-

loans.html (last visited May 10, 2017).  The significant differences are not discussed in

the preamble.

189.   Even if the CFPB study of consumer financial products were an adequate basis for

determining the costs and benefits of arbitration in the federal loan context, the study

itself suggested the possibility that arbitration agreements could benefit consumers by

reducing operating costs for companies and making their products more affordable.  In

other words, arbitration was not necessarily negative for consumers or students.

190.   The lack of consideration of the difference in context also violates the mandate of

reasoned decision-making with regard to class action agreements.  For example, voidable

student loan debts may be much larger than the extra interest charged by a credit card

company, and, accordingly, the calculus of costs and benefits of individual litigation is

AR-A-000237

far different than in the contexts considered by the CFPB.  Without specific study of federal student loans, the Department cannot meaningfully rely on the CFPB's study to support its arbitration and class action waiver provisions.

191.   The Department's reasoning regarding class action waivers is also contradictory on its face.  The Department claims that class action provisions are vital to ensuring that borrowers can collectively hold institutions accountable.  But as the Department acknowledged in the NPRM, "Federal and State rules impose requirements on class actions that may well prevent particular borrowers from bringing and successfully maintaining a class action."  81 Fed. Reg. at 39,383; *see also id.* at 39,384 n. 62 (discussing multiple cases involving borrowers dismissed based on the commonality issues that often bar borrowers from bringing class actions).  If class action litigation is not available to most borrowers because their lawsuits do not meet the prerequisites for class certification, then it is not likely that a ban on class action waivers will increase the availability of class actions in any meaningful way.  Moreover, the Department declines to discuss whether the availability of group borrower defenses eliminates the need for class actions brought in federal court.

192.   The Department also failed to adequately explain which categories of claims can no longer be arbitrated.  The Final Rule bars arbitration of disputes "with respect to any aspect of a borrower defense claim."  34 C.F.R. § 685.300.  But the Department clearly intends the Final Rule to cover claims that could be brought in court, not solely the Department's borrower defense process.  For example, schools are left to wonder whether lawsuits seeking repayment of tuition, not merely repayment of loans, are covered by this provision.  Exactly which legal causes of action map onto the Department's borrower

65

defense provisions is unclear and unexplained, and it will arbitrarily and capriciously cause difficulties for schools.

193. The Department additionally failed to properly consider the extent to which institutions have relied on the current regulatory framework.  Here, institutions have relied on arbitration provisions and class action waivers, at least in part, in determining the cost of tuition, obtaining insurance, and otherwise ordering their affairs.  Schools may also face unnecessary disputes with students who have already completed their studies, yet have gained newfound authority to bring wide-ranging claims and may create novel and unforeseen costs to their alma maters.

## III. The Final Rule Is Unconstitutional.

194. Each provision of the Final Rule creates serious constitutional problems.

### A. The Borrower Defense Provisions Violate the Constitution.

195. In addition to suffering from numerous statutory and administrative law flaws, the borrower defense regulations violate the Constitution.

196. First, the regulations would violate the Due Process Clause.  The regulations raise due process problems because Department officials are responsible for both prosecuting and hearing cases.  This prevents schools from being heard by a neutral and detached magistrate.

197. Second, the borrower defense regulations would also violate Article III and an institution's Seventh Amendment right to a civil jury trial.  They allow agency officials to adjudicate what is in essence a private right: the right of a student to recover for fraud or contract violations against his or her school.  Liability for such private rights can only be determined in court, by a jury.

AR-A-000239

**B.     The Financial Responsibility Provisions Violate the Constitution.**

198.     The Financial Responsibility Provisions violate the Constitution's Due Process Clause.

The decision to base significant consequences on the mere pending status of a lawsuit,

even when an institution has been offered no opportunity to be heard, does not comport

with the requirement of procedural due process.   The same is true of the decision to base

significant consequences on certain lawsuits surviving summary judgment, which

provides no protection for defendants where the legal claims at issue are primarily factual

in nature.   Additionally, the impermissible vagueness of the standard by which the

Secretary can decide to impose a letter of credit or other financial protection based on an

"event or condition" also conflicts with the requirements of due process.   And the

unjustified limits placed on opportunities to contest the application of various triggers, as

well as the lack of any opportunity generally for an institution to show that application of

a trigger is unreasonable, also deprives institutions of the crucial opportunity to be heard.

**C.     The Repayment Rate Provisions Violate the Constitution.**

199.     The mandatory reporting provisions violate the First Amendment by compelling speech.

As the result of a government fiat, they require a warning for which the Department

dictates the form, place, manner, and precise language.   Institutions would be required to

include this warning in all promotional materials and advertisements and to post it on the

school's website.   The Department would be empowered to require changes whenever it

deems the warning insufficiently prominent, clear, and conspicuous.   Broad prophylactic

rules forcing speech are deeply suspect under the First Amendment.   That is especially

true of regulations that are both over-inclusive and under-inclusive, like the disclosure

rule – which targets innocent schools whose borrowers are using income-based

AR-A-000240

repayment plans and excuses non-profit and public institutions with similarly low repayment rates.  The loan repayment rate warning requirement is precisely the type of broad prophylactic free speech restriction and forced speech of which courts are wary.  It is not sufficiently tailored to warrant restricting or forcing speech, even in a commercial speech context.

**D.    The Arbitration and Class Action Provisions Violate the Constitution.**

200.   To the extent that the Arbitration and Class Action Provisions are applied to contracts already in existence, or retroactively, the regulations violate the Due Process Clause.

### IRREPARABLE HARM

201.   CAPPS schools will experience irreparable harm due to the Final Rule.  The reputational harm that may stem from being subject to a borrower defense proceeding, or mandatory reporting and warnings, or a letter of credit and provisional certification will be difficult, if not impossible, to repair.  Prospective students likely would be deterred from enrolling in programs that would otherwise be beneficial to them based on arbitrary and capricious repayment rate or financial responsibility warning.  Current students likewise will look to transfer to programs that are not subject to or required to provide such warnings.  That will irreparably harm CAPPS institutions.  Some CAPPS members could be put out of business if a single letter of credit is required of them; based on the multiple mandatory triggers, CAPPS believes that a large number of members may be required to post letters of credit soon after the regulations go into effect.  If a school goes out of business, or fails to enroll a student who is troubled by the Department's arbitrary and unlawful warning provisions, that harm is irreparable.

AR-A-000241

## COUNT ONE
### (Borrower Defense Provisions: No Statutory Authority)

202.    CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

203.    The Borrower Defense Provisions are not authorized under the HEA, 20 U.S.C. § 1001 *et seq*.

204.    The regulations exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, GEPA, or the Organization Act.  Among other things, the regulations impermissibly turn a statutory defense into a novel cause of action; authorize penalties in excess of those expressly permitted by the HEA; and create a novel adjudicatory process out of whole cloth.

205.    Accordingly, the Borrower Defense Provisions are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT TWO
### (Borrower Defense Provisions: Arbitrary and Capricious)

206.    CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

207.    The Borrower Defense Provisions are arbitrary and capricious.  Among other things, the regulations do not explain the need for a massive new loan forgiveness program; do not adequately explain why or how a borrower "defense" is being converted into a borrower "offense" or affirmative right; do not outline adequate adjudicatory procedures or detail an institution's right to be heard; stretch the definition of a "substantial misrepresentation" past the point of reasonableness; and apply retroactively.

69

208.    Accordingly, the Borrower Defense Provisions are arbitrary, capricious, an abuse of

        discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT THREE
### (Borrower Defense Provisions: Violate the Constitution)

209.    CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set

        forth herein.

210.    The Borrower Defense Provisions violate the Due Process Clause of the United States

        Constitution by, among other things, depriving institutions of the right to be heard and to

        present evidence to a neutral magistrate before being deprived of property.

211.    By providing for the adjudication of contract and fraud claims in an administrative

        setting, the regulations violate the Seventh Amendment and Article III.

212.    Accordingly, the Borrower Defense Provisions are contrary to constitutional right, power,

        privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and are not in accordance

        with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT FOUR
### (Financial Responsibility Provisions: No Statutory Authority)

213.    CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set

        forth herein.

214.    The Financial Responsibility Provisions are not authorized under the HEA, 20 U.S.C.

        § 1001 *et seq*.

215.    The Financial Responsibility Provisions exceed the Department's statutory jurisdiction

        and authority and do not comport with the terms of the HEA.  Among other things, the

        regulations fail to fulfill the statute's mandate to account for an institution's total

        financial circumstances; impermissibly delegate tasks to third-party actors; and specify

        regulatory consequences different from those in the statute.

70

216.   Accordingly, the Financial Responsibility Provisions are in excess of statutory authority,

jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in

accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT FIVE
### (Financial Responsibility Provisions: Arbitrary and Capricious)

217.   CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set

forth herein.

218.   The Financial Responsibility Provisions are arbitrary and capricious.  Among other

things, the regulations impose significant financial and other consequences automatically

based on "triggering events" which may have little, if anything, to do with the school's

financial soundness, and give the Secretary virtually unbounded discretion to impose

sanctions for other reasons as well.  These automatic and discretionary "triggers" raise

serious problems regarding fairness, due process, and reasoned decision-making –

problems which the Department fails to address adequately.  Additionally, the

Department failed to provide notice of, or an opportunity to comment on, the integration

of these "triggers" into the composite score framework or the addition of several

discretionary triggers.

219.   Accordingly, the Financial Responsibility Provisions are arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C.

§ 706(2)(A), and violate the notice and comment requirements of 5 U.S.C. § 553.

### COUNT SIX
### (Financial Responsibility Provisions: Violate the Constitution)

220.   CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set

forth herein.

AR-A-000244

221.   The Financial Responsibility Provisions violate the Due Process Clause of the United States Constitution by, among other things, basing significant regulatory consequences on preliminary litigation developments, denying institutions an opportunity to be heard, and adopting an impermissibly vague standard by which the Secretary can decide to impose a letter of credit or other financial protection based on an "event or condition."

222.   Accordingly, the Financial Responsibility Provisions are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT SEVEN
### (Repayment Rate Provisions: No Statutory Authority)

223.   CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

224.   The Loan Repayment Rate Provisions are not authorized under the HEA, 20 U.S.C. § 1001 *et seq*.  Among other things, they provide for consequences not authorized under the statute, single out proprietary institutions in ways not authorized by the statute, and rely on provisions of the statute which provide no authority for these regulations.

225.   Accordingly, the Loan Repayment Rate Provisions are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT EIGHT
### (Repayment Rate Provisions: Arbitrary and Capricious)

226.   CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

AR-A-000245

227.   The Loan Repayment Rate Provisions are arbitrary and capricious.  Among other things, the regulations' method for calculating loan repayment rates would effectively punish institutions that have attempted to better serve borrowers and reduce default rates by highlighting pay-as-you-earn plans and other flexible loan repayment options; the regulations would apply that method retroactively, even though the federal government itself offers and encourages such options; and the regulations target proprietary schools and do not adequately explain why other institutions with similar loan repayment rates should not be subject to the same warning requirements.

228.   Accordingly, the Loan Repayment Rate Provisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT NINE
### (Repayment Rate Provisions: Violate the Constitution)

229.   CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

230.   The Loan Repayment Rate Provisions violate the First Amendment because the mandatory reporting provisions are broad, prophylactic rules that compel speech in the form of Department-issued warnings attached to advertising and promotional materials.

231.   Accordingly, the Loan Repayment Rate Provisions are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT TEN
### (Arbitration and Class Action Provisions: No Statutory Authority)

232.   CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

AR-A-000246

233.   The Arbitration and Class Action Provisions are not authorized under the HEA, 20

U.S.C. § 1001 *et seq*.

234.   The Arbitration and Class Action Provisions exceed the Department's statutory

jurisdiction and authority and do not comport with the terms of the HEA.  Among other

things, the regulations do note relate to any specific authority conferred by the HEA;

conflict with the FAA; and were not otherwise authorized by Congress.

235.   Accordingly, the Arbitration and Class Action Provisions are in excess of statutory

authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in

accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT ELEVEN
**(Arbitration and Class Action Provisions: Arbitrary and Capricious)**

236.   CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set

forth herein.

237.   The Arbitration and Class Action Provisions are arbitrary and capricious.  Among other

things, the regulations fail to confront or acknowledge the benefits of individual

arbitration; fail to show that class actions related to borrower defenses would be

permissible, even absent class waivers; and fails to consider industry reliance on the

terms of private contracts.

238.   Accordingly, the Arbitration and Class Action Provisions are arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C.

§ 706(2)(A).

AR-A-000247

## COUNT TWELVE
### (Arbitration and Class Action Provisions: Violate the Constitution)

239. CAPPS repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

240. The Arbitration and Class Action Provisions violate the Due Process Clause by retroactively voiding private contracts.

241. Accordingly, the Arbitration and Class Action Provisions are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

242. WHEREFORE, Plaintiff prays for an order and judgment:

(i) Declaring that the Department's Borrower Defense, Financial Responsibility, Repayment Rate, and Arbitration and Class Action Provisions were promulgated without statutory authority within the meaning of 5 U.S.C. § 706(2)(C) and not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A); that the entirety of the Final Rule is contrary to the Constitution within the meaning of 5 U.S.C. § 706(2)(B); and that the Final Rule is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

(ii) Declaring that any action previously taken by Defendants pursuant to the final regulations is null and void;

(iii) Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the final regulations;

AR-A-000248

(iv)    Vacating the final regulations;

(v)     Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred

in bringing this action; and

(vi)    Granting such other and further relief as this Court deems just and proper.


Dated: May 24, 2017                     Respectfully submitted,


                                        /s/ Clifford M. Sloan
BORIS BERSHTEYN                         CLIFFORD M. SLOAN, DC Bar No. 417339
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP CAROLINE S. VAN ZILE, DC Bar No. 1017942
4 Times Square                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
New York, NY 10036                      LLP
T: 212/735-3834                         1440 New York Avenue, NW
                                        Washington, DC 20005
GREGORY BAILEY                          T: 202/371-7000
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP F: 202/661-8340
155 N Upper Wacker Dr. #2700            Email: cliff.sloan@skadden.com
Chicago, IL 60606
T: 312/407-0739
F: 312/407-8604

ROBERT L. SHAPIRO, DC Bar No. 415854
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004
T:  202/776-7867
F:  202/330-5290


                        *Attorneys for CAPPS*

AR-A-000249

**CIVIL COVER SHEET**

JS-44 (Rev. 7/16 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS | BETSY DEVOS, in her official capacity as Secretary of the Department of Education, and THE DEPARTMENT OF EDUCATION |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Sacramento**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **DC**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Clifford M. Sloan
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
◉ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

○ **A.  Antitrust**

☐ 410 Antitrust

○ **B.  Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Product Liability

○ **C.  Administrative Agency Review**

☐ 151 Medicare Act

**Social Security**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**Other Statutes**
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

◉ **D.  Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

◉ **E.  General Civil (Other)**          OR          ○ **F.  Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 27 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Conditions
☐ 560 Civil Detainee—Conditions of Confinement

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**Other Statutes**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

☐ 470 Racketeer Influenced & Corrupt Organization
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 850 Securities/Commodities/Exchange
☐ 896 Arbitration
☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

AR-A-000250

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus – General** <br> ☐ **510 Motion/Vacate Sentence** <br> ☐ **463 Habeas Corpus – Alien Detainee** | ☐ **442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)** <br><br> **\*(If pro se, select this deck)\*** | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions (if Privacy Act)** <br><br> **\*(If pro se, select this deck)\*** | ☐ **152 Recovery of Defaulted Student Loan (excluding veterans)** |
| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **740 Labor Railway Act** <br> ☐ **751 Family and Medical Leave Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 Americans w/Disabilities – Employment** <br> ☐ **446 Americans w/Disabilities – Other** <br> ☐ **448 Education** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights – Voting (if Voting Rights Act)** |

**V. ORIGIN**

◉ **1 Original Proceeding**  ○ **2 Removed from State Court**  ○ **3 Remanded from Appellate Court**  ○ **4 Reinstated or Reopened**  ○ **5 Transferred from another district (specify)**  ○ **6 Multi-district Litigation**  ○ **7 Appeal to District Judge from Mag. Judge**  ○ **8 Multi-district Litigation – Direct File**

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
5 U.S.C. §§ 701-706 - Review of Department of Education's "Borrower Defense" rule

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 ☐ | **DEMAND $** <br> **JURY DEMAND:** | Check **YES** only if demanded in complaint <br> **YES** ☐   **NO** ☒ |
|---|---|---|---|
| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | **YES** ☐   **NO** ☒ | If yes, please complete related case form |

| **DATE:** ___May 24, 2017___ | **SIGNATURE OF ATTORNEY OF RECORD** ___/s/ Clifford M. Sloan___ |
|---|---|

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

**I.**   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

**VI.**   CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

AR-A-000251

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS | ) ) ) ) | |
| *Plaintiff(s)* | ) ) | Civil Action No. |
| v. | ) | |
| BETSY DEVOS, in her official capacity as Secretary of the Department of Education, and THE DEPARTMENT OF EDUCATION | ) ) ) ) | |
| *Defendant(s)* | ) ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   BETSY DEVOS, in her official capacity as Secretary of the Department of Education
Office of the Secretary
400 Maryland Avenue, S.W.
Washington, D.C. 20202

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Clifford M. Sloan
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
                                                                                        *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS | ) ) ) ) | |
| _Plaintiff(s)_ | ) ) | Civil Action No. |
| v. | ) | |
| BETSY DEVOS, in her official capacity as Secretary of the Department of Education, and THE DEPARTMENT OF EDUCATION | ) ) ) ) | |
| _Defendant(s)_ | ) ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   U.S. DEPARTMENT OF EDUCATION
400 Maryland Avenue, S.W.
Washington, D.C. 20202

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Clifford M. Sloan
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____                    _____
_Signature of Clerk or Deputy Clerk_

AR-A-000254

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AR-A-000255

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS | ) ) ) ) |
| _Plaintiff(s)_ | ) ) |
| v. | ) |
| BETSY DEVOS, in her official capacity as Secretary of the Department of Education, and THE DEPARTMENT OF EDUCATION | ) ) ) ) ) ) |
| _Defendant(s)_ | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   Channing D. Phillips
United States Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Clifford M. Sloan
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____     _____
_Signature of Clerk or Deputy Clerk_

AR-A-000256

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| CALIFORNIA ASSOCIATION OF PRIVATE POSTSECONDARY SCHOOLS <br><br>_____ <br>*Plaintiff(s)* <br>v. <br>BETSY DEVOS, in her official capacity as Secretary of the Department of Education, and THE DEPARTMENT OF EDUCATION <br>_____ <br>*Defendant(s)* | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Jefferson B. Sessions III
United States Office of the Attorney General
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Clifford M. Sloan
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____     _____
*Signature of Clerk or Deputy Clerk*

AR-A-000258

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AR-A-000259

the potential impact of regulations on small entities during rulemaking. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

The Corps certifies under 5 U.S.C. 605(b) that this rule would not have a significant economic impact on a substantial number of small entities. While some owners or operators of vessels that intend to transit the danger zone may be small entities, for the reasons stated in paragraph (a) above this rule would not have a significant economic impact on any vessel owner or operator. In addition, the danger zone is necessary to protect public safety during training exercises. Small entities can utilize navigable waters outside of the danger zone when the danger zone is activated. Small entities may also transit the danger zone when it is activated, as long as they obtain permission from the Commanding Officer, Naval Construction Battalion Center, Gulfport or his/her designees. After considering the economic impacts of this danger zone regulation on small entities, I certify that this action will not have a significant impact on a substantial number of small entities.

*c. Review Under the National Environmental Policy Act*

An environmental assessment (EA) has been prepared. We have concluded that the establishment of the restricted area will not have a significant impact to the quality of the human environment and, therefore, preparation of an environmental impact statement is not required. The final EA and Finding of No Significant Impact may be reviewed at the District Office listed at the end of the **FOR FURTHER INFORMATION CONTACT** section, above.

*d. Unfunded Mandates Reform Act*

This rule does not impose an enforceable duty among the private sector and, therefore, is not a Federal private sector mandate and is not subject to the requirements of Section 202 or 205 of the Unfunded Mandates Reform Act (Public Laws 104–4, 109 Stat. 48, 2 U.S.C. 1501 *et seq.*). We have also found, under Section 203 of the Act, that small governments will not be significantly or uniquely affected by this rule.

**List of Subjects in 33 CFR Part 334**

Danger zones, Marine safety, Navigation (water), Restricted areas, Waterways.

For the reasons stated in the preamble, the Corps is amending 33 CFR part 334 as follows:

**PART 334—DANGER ZONE AND RESTRICTED AREA REGULATIONS**

■ 1. The authority citation for 33 CFR part 334 continues to read as follows:

**Authority:** 40 Stat. 266 (33 U.S.C. 1) and 40 Stat. 892 (33 U.S.C. 3).

■ 2. Add § 334.784 to read as follows:

**§ 334.784   East Pearl River, within the acoustic buffer area of the John C. Stennis Space Center, and adjacent to lands, in Hancock County, Mississippi; danger zone.**

(a) *The area.* A danger zone is established in and to the extent of waters of the United States, as defined in 33 CFR part 329, in the following reaches of the East Pearl River south of a point located at latitude 30.4030° N., longitude −89.6815° W., to a point below the confluence of Mikes River, located at latitude 30.3561° N., longitude −89.6514° W. The datum for these coordinates is NAD 1983.

(b) *The regulation.* (1) No person, vessel, or other watercraft, other than a vessel owned and operated by the United States, shall enter or remain in the danger zone, or within a portion or portions thereof, when closed to public access, as provided in paragraph (b)(2) of this section, except by permission of the Commanding Officer, Naval Construction Battalion Center, Gulfport or such other person(s) as he or she may designate.

(2) The danger zone, or a portion or portions thereof, will be closed, for riverine, weapons, or other dangerous naval training, by placement of Government picket boats at the northern and southern boundaries in the East Pearl River, or at such other location(s) within the danger zone as may be determined to be sufficient to protect the public. Prior to closure, picket boats will transit the area(s) to be closed, to ensure that no persons, vessels, or other watercraft are present. Once the danger zone, or location(s) within the danger zone, has been cleared, picket boats will remain in position, upstream and downstream, until it is safe to re-open the area(s) to public access.

(3) Riverine, weapons, and other dangerous naval training may occur on any day of the week, typically, but not exclusively, in periods of two to eight hours, between 6 a.m. and 6 p.m. Training may occur at night, in darkness.

(c) *Enforcement.* The restrictions on public access in this section shall be enforced by the Commanding Officer, Naval Construction Battalion Center,

Gulfport or by such other person(s) as he or she may designate.

Dated: October 18, 2017.

**Thomas P. Smith,**
*Chief, Operations and Regulatory Division, Directorate of Civil Works.*

[FR Doc. 2017–23004 Filed 10–23–17; 8:45 am]

**BILLING CODE 3720–58–P**

**DEPARTMENT OF EDUCATION**

**34 CFR Parts 668, 674, 682, and 685**

[Docket ID ED–2017–OPE–0108]

**RIN 1840–AD25**

**Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Interim final rule; delay of effective date; request for comments.

**SUMMARY:** Consistent with section 553(b)(3)(B) and (d)(3) of the Administrative Procedure Act (APA), which allows Federal agencies to promulgate rules without advance notice and opportunity for comment for good cause, the Secretary issues this interim final rule with request for comment. This interim final rule delays until July 1, 2018, the effective date of selected provisions of the final regulations entitled Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan (FFEL) Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program (the final regulations), published in the **Federal Register** on November 1, 2016. The provisions this interim final rule delays are listed in the **SUPPLEMENTARY INFORMATION** section of this document. The original effective date of the final regulations was July 1, 2017.

**DATES:** *Effective date:* As of October 24, 2017, the effective date for the amendments to or additions of: §§ 668.14(b)(30), (31), and (32); 668.41(h) and (i); 668.71(c); 668.90(a)(3); 668.93(h), (i), (j); 668.171; 668.175 (c) and (d) and (f) and (h); Appendix C to Subpart L of Part 668; 674.33(g)(3) and (g)(8); 682.202(b)(1); 682.211(i)(7); 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H)

through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii); 682.405(b)(4); 682.410(b)(4) and (b)(6)(viii); 685.200(f)(3)(v) and (f)(4)(iii); 685.205(b)(6); 685.206(c); 685.212(k); 685.214(c)(2), (f)(4) through (7); 685.215(a)(1), (c)(1) through (c)(8), and (d); 685.222; Appendix A to Subpart B of Part 685; and 685.308(a), published November 1, 2016, at 81 FR 75926, and delayed until further notice on June 16, 2017, in 82 FR 27621, is further delayed until July 1, 2018.

*Comment date:* We must receive your comments on or before November 24, 2017.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

If you are submitting comments electronically, we strongly encourage you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Portable Document Format (PDF), we strongly encourage you to convert the PDF to print-to-PDF format or to use some other commonly used searchable text format. *Please do not submit the PDF in a scanned format.* Using a print-to-PDF format allows the Department to electronically search and copy certain portions of your submissions.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using *Regulations.gov,* including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "Help."

• *Postal Mail, Commercial Delivery, or Hand Delivery:* The Department strongly encourages commenters to submit their comments electronically. However, if you mail or deliver your comments about the interim final rule, address them to Jean-Didier Gaina, U.S. Department of Education, 400 Maryland Ave. SW., Washington, DC 20202.

*Privacy Note:* The Department's policy is to make all comments received from members of the public available for public viewing on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only

information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** Barbara Hoblitzell, U.S. Department of Education, 400 Maryland Ave. SW., Mail Stop 6W247, Washington, DC 20202. Telephone: (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

*Invitation to Comment:* We invite you to submit comments regarding this interim final rule. We will consider comments on the delayed effective date only and will not consider comments on the wording or substance of the final regulations. See **ADDRESSES** for instructions on how to submit comments.

During and after the comment period, you may inspect all public comments about this interim final rule by accessing *Regulations.gov.* You may also inspect the comments in person in Room 6W245, 400 Maryland Avenue SW., Washington, DC, between 8:30 a.m. and 4:00 p.m. Washington, DC time, Monday through Friday of each week, except Federal holidays. If you want to schedule time to inspect comments, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

*Assistance to Individuals With Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for this interim final rule. If you want to schedule an appointment for this type of accommodation or auxiliary aid, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

**Delay of Effective Date**

On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed a Complaint and Prayer for Declaratory and Injunctive Relief in the United States District Court for the District of Columbia (Court) challenging the final regulations in their entirety, and in particular those provisions of the regulations pertaining to the standard and process for the Department to adjudicate borrower defense claims, requirements pertaining to financial responsibility standards, provisions requiring proprietary institutions to provide warnings about

their students' loan repayment rates, and prohibitions against institutions including arbitration or class action waivers in their agreements with students. Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos,* No. 1:17–cv–00999 (D.D.C. May 24, 2017). As of the date of this interim final rule, the litigation is ongoing.

In light of the pending litigation, on June 16, 2017, the Department published in the **Federal Register** a notification of the partial delay of effective dates under section 705 of the APA (5 U.S.C. 705) (82 FR 27621) (705 Notice), to delay the effectiveness of certain provisions of the final regulations until the legal challenge is resolved. The 705 Notice postponed the effective date of the regulations to preserve the regulatory status quo while the litigation is pending and the Court makes a decision. As explained in the 705 Notice, the plaintiff has raised serious questions concerning the validity of certain provisions of the final regulations and has identified substantial injuries that could result if they go into effect before those questions are resolved. Given the legal uncertainty, maintaining the status quo is critical. For instance, if the final regulations took effect, institutions participating in programs under title IV of the Higher Education Act of 1965, as amended (HEA), would have been required, as of July 1, 2017, to modify their contracts in accordance with the arbitration and class action waiver regulations. Postponing the final regulations avoids the cost that institutions would incur in making these changes while the final regulations are subject to judicial review. Meanwhile, the Department is continuing to process borrower defense claims under the existing regulations that will remain in effect during the postponement.

Because the final regulations have been postponed beyond July 1, 2017, pursuant to the 705 Notice, the postponement of the final regulations must be for at least one year to comply with section 482 of the HEA (20 U.S.C. 1089). That section imposes a requirement (the "master calendar requirement") on the Department for the effective date of regulations affecting programs under title IV of the HEA. Under the master calendar requirement, a regulatory change that has been published in final form on or before November 1 prior to the start of an award year—which begins on July 1 of any given year—may take effect only at the beginning of the next award year, or

in other words, on July 1 of the next year. Any regulatory change that has not been published in final form by November 1 prior to the start of an award year may not become effective until the beginning of the second award year after the November 1 date.

The master calendar requirement provides that regulatory changes affecting the title IV programs must become effective at the beginning of an award year and does not authorize the Department to make a regulatory change affecting the title IV programs effective in the middle of an award year.[1] Accordingly, regulations promulgated under title IV of the HEA have an effective date of July 1. Congress enacted the master calendar requirement to ensure that institutions have sufficient notice of the timing of any regulatory change in order to implement regulatory changes at the start of each award year. In this way, institutions avoid incurring the costs of compliance on a rolling basis throughout the year and avoid any disruption to the timely delivery of title IV funds. *See* S. Rep. No. 99–296, at 11 (1986); *see also Reauthorization of the Higher Education Act, 1985: Hearings Before the S. Subcomm. On Educ., Arts and Humanities,* 99th Cong. 10 (1985) (statement of the Conference on Higher Education) ("Although progress will always require updating, there is an equally important need for stability so that proper planning by all those involved—including families, aid administrators, and agency officials—can be achieved.").

Congress has been clear that "the effective dates of all regulations on Title IV are driven by the Master Calendar requirements in Section 482," H.R. Rep. No. 102–447, at 77 (1992), and it has reaffirmed the breadth of the master calendar requirement by providing express waivers of the requirement only in specific limited circumstances. *See, e.g.,* Higher Education Opportunity Act, Public Law 110–315, sec. 402(b), 122 Stat. 3078, 3191 (2008); Higher Education Act—Technical Corrections, Public Law 111–39, sec. 409, 123 Stat. 1950, 1953 (2009). Accordingly, the Department has consistently interpreted and applied the master calendar requirement to provide that any regulatory change relating to student financial aid programs may take effect only at the beginning of an award year.

With respect to the final regulations, implementing this substantial regulatory change in the middle of an award year would frustrate the notice objectives of the HEA and deny schools the assurance of the master calendar. For the July 1, 2017, postponement to be consistent with the HEA, therefore, the effective date must be July 1, 2018 (or July 1 of a later year). Because the 705 Notice does not establish a specific effective date but is tied to the pending litigation, this interim final rule provides the public and regulated parties notice that even if the litigation concludes before July 1, 2018, the final regulations will not take effect until that date consistent with the master calendar requirement.

Separately, we note that the delayed effective date is consistent with the Memorandum for the Heads of Executive Departments and Agencies entitled "Regulatory Freeze Pending Review," published in the **Federal Register** on January 24, 2017 (Memorandum), which was intended to ensure that the President's appointees or designees have the opportunity to review any new or pending regulations and where appropriate to suggest changes. Among other things, the Memorandum directed the heads of executive departments and agencies to consider temporarily postponing the effective dates of all regulations that had been published in the **Federal Register** but had not yet taken effect. In addition, on February 24, 2017, the President issued Executive Order 13777, which requires each agency head to consider recommendations to repeal, replace, or modify existing regulations, consistent with applicable law. In accordance with these evaluative efforts, we announced on June 16, 2017, our intent to engage in negotiated and notice-and-comment rulemaking on the topics addressed by the final regulations on (82 FR 27640). The Department is reevaluating its regulations in this area and the burdens on regulated parties may change.

To provide adequate notice to these parties in accordance with the HEA's master calendar requirement, the Department has determined that it is necessary to delay until July 1, 2018, the effective date of the revisions to or additions of the following provisions of the final regulations in title 34 of the Code of Federal Regulations (CFR):

• § 668.14(b)(30), (31), and (32) Program participation agreement.
• § 668.41(h) and (i) Reporting and disclosure of information.
• § 668.71(c) Scope and special definitions.
• § 668.90(a)(3) Initial and final decisions.
• § 668.93(h), (i) and (j) Limitation.

• § 668.171 General.
• § 668.175(c), (d), (f), and (h) Alternative standards and requirements.
• Part 668 subpart L, Appendix C.
• § 674.33(g)(3) and (g)(8) Repayment.
• § 682.202(b)(1) Permissible charges by lenders to borrowers.
• § 682.211(i)(7) Forbearance.
• § 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.
• § 682.405(b)(4)(ii) Loan rehabilitation agreement.
• § 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.
• § 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.
• § 685.205(b)(6) Forbearance.
• § 685.206(c) Borrower responsibilities and defenses.
• § 685.212(k) Discharge of a loan obligation.
• § 685.214(c)(2), (f)(4) through (7) Closed school discharge.
• § 685.215(a)(1), (c)(1) through (c)(8), and (d) Discharge for false certification of student eligibility or unauthorized payment.
• § 685.222 Borrower defenses.
• Part 685 subpart B, Appendix A Examples of borrower relief.
• § 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.
• § 685.308(a) Remedial actions.

In addition, in connection with this delay, the Department interprets all references to "July 1, 2017" in the text of the above-referenced regulations to mean the effective date of those regulations. The regulatory text included references to the specific July 1, 2017, date in part to provide clarity to readers in the future as to when the regulations had taken effect. Because the regulations have not taken effect on July 1, 2017, we will read those regulations as referring to the new effective date established by this delay, *i.e.,* July 1, 2018.

We do not intend to delay the effective dates of the regulatory provisions published in 81 FR 75926 which: (1) Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower; (2) amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; (3) amend the

---

[1] We note that in the limited circumstance where the Secretary designates a regulation for early implementation pursuant to 20 U.S.C. 1089(c)(2), regulated parties may choose to implement the regulation before the July 1 effective date. Early implementation, however, does not change the effective date of the regulation.

regulations governing Direct Consolidation Loans to allow a borrower to obtain a Direct Consolidation Loan regardless of whether the borrower is also seeking to consolidate a Direct Program or FFEL loan, if the borrower has a loan type identified in 34 CFR 685.220(b); (4) address severability; and (5) make technical corrections. As established in 81 FR 75926, 34 CFR 682.211(i)(7) and 682.410(b)(6)(viii) remain designated for early implementation, at the discretion of each lender or guaranty agency.

*Waiver of Notice-and-Comment Rulemaking, Negotiated Rulemaking, and Delayed Effective Date under the APA:* Under the APA (5 U.S.C. 553), the Department generally offers interested parties the opportunity to comment on proposed regulations and publishes rules not less than 30 days before their effective dates. In addition, under section 492 of the HEA (20 U.S.C. 1098a), all regulations proposed by the Department for programs authorized under title IV of the HEA are subject to negotiated rulemaking requirements. However, the APA provides that an agency is not required to conduct notice-and-comment rulemaking or delay effective dates when the agency, for good cause, finds that the requirement is impracticable, unnecessary, or contrary to the public interest (5 U.S.C. 553(b)(3)(B) and (d)(3)). In addition, section 492(b)(2) of the HEA provides that negotiated rulemaking may be waived for good cause when doing so would be "impracticable, unnecessary, or contrary to the public interest." Section 492(b)(2) of the HEA also requires the Secretary to publish the basis for waiving negotiations in the **Federal Register** at the same time as the proposed regulations in question are first published.

The Department determined under the APA and the HEA that notice-and-comment and negotiated rulemaking are unnecessary and impracticable and therefore is waiving both requirements in this interim final rule. As noted previously, the 705 Notice delayed the effective date of the final regulations to maintain the status quo pending the outcome of the litigation, which could not be resolved before July 1, 2017. Given that delay, the next possible date for the regulations to become effective would be July 1, 2018, in accordance with the HEA's master calendar requirement. Thus, even if the litigation were resolved before July 1, 2018, under the HEA, July 1, 2018, would be the earliest the regulations could take effect. Given the Department's limited discretion to set an effective date under the master calendar requirement, the Department determined that both notice-and-comment and negotiated rulemaking are unnecessary. The Department also determined that it was impracticable to conduct notice-and-comment and negotiated rulemaking before the original July 1, 2017, effective date. The litigation was initiated on May 24, 2017; the Department would not have been able to conduct negotiated rulemaking or notice-and-comment rulemaking to obtain comment on a possible new effective date in the short amount of time between May 24, and July 1, 2017. And, once the July 1, 2017, date passed, under the master calendar requirement, the Department did not have any discretion to set an effective date earlier than July 1, 2018. For the same reasons, we are also waiving the 30-day delay of the effective date of this interim final rule under the APA. However, the Department is providing a 30-day comment period and invites interested persons to comment on the delay of the effective date of the final regulations from July 1, 2017, to July 1, 2018. In addition, the Department plans to issue a notice of proposed rulemaking to seek public comment on further delaying the effective date of the final regulations until July 1, 2019, to allow for completion of the negotiated rulemaking process before regulatory changes become effective in this area (see 82 FR 27640). The Department will seek public comments on whether such a further delay is desirable to avoid the costs to regulated parties of implementing regulations that may be subject to change in the near future.

**Executive Orders 12866, 13563 and 13771**

*Regulatory Impact Analysis*

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

The Department estimates the quantified annualized economic and net budget impacts of the delay of the effective date to be −$18.6 million in reduced costs to institutions and the Federal government. These reduced costs result from the delay of the borrower defense rules on the 2017 and 2018 loan cohorts, as well as from the delayed paperwork burden on institutions, and the delayed execution of the closed school automatic discharge. This final regulatory action is not a significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these

techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing this interim final rule only on a reasoned determination that its benefits justify its costs. Based on the analysis that follows, the Department believes that this interim final rule is consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

In accordance with both Executive Orders, the Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action.

The quantified economic effects and net budget impact associated with the delayed effective date are not expected to be economically significant.

Effects of One-Year Delay

As indicated in the Regulatory Impact Analysis (RIA) published with the final regulations on November 1, 2016, the final regulations were economically significant with a total estimated net budget impact of $16.6 billion over the 2017–2026 loan cohorts in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the provisions for a three-year automatic closed school discharge. As the net budget impact is based on the net present value of the cash flows of the relevant cohorts over a forty-year timeframe, simply delaying the final regulations for a year will have a much more limited effect, as discussed below. This analysis is limited to the effect of delaying the effective date of the final regulations, and does not account for any potential future substantive changes in the final regulations.

Even with the delayed effective date, borrowers will still be able to submit claims. The provisions of the final regulations pertaining to the process for review and determination of claims were not limited to specific cohorts designated by the effective date so the delay will not result in specific cohorts of borrowers being excluded from the process reflected in the final regulations, when implemented. Once in effect, the protection generated by the financial protection provisions will be available to be applied to claims from loans originated earlier, including the

period from July 1, 2017 to June 30, 2018. Loans made before July 1, 2017, were always subject to the State-based standard and their ability to bring claims under that standard is unchanged by the delay. For claims filed after the effective date of the regulations, the Federal standard established in the final regulations would apply. As discussed previously, the Department interprets all references to "July 1, 2017" in the text of the regulations to mean the effective date of the regulations. As a result, the delayed effective date means that loans made between July 1, 2017 and June 30, 2018, will be subject to the current State-based standard. As we noted in the final regulations, the Federal standard was designed to address much of the conduct already covered by the State-based standard, so the vast majority of claims associated with loans made between July 1, 2017, and the delayed effective date could be made under the current, State law-based standard as well.

In addition to borrowers, institutions are also affected by the delayed effective date. As indicated in the RIA for the final regulations, institutions bear the major costs of compliance, paperwork burden, and providing financial protection. The financial protection provisions of the final regulations depend on the effective date, so institutions will not incur these costs until the final regulations are in effect. In terms of cost savings for institutions, the estimated annual paperwork burden was approximately $9.4 million in the initial year of the final regulations. In the revised scenario developed to estimate the effect of the one-year delay in the effective date, transfers from institutions to students, via the Federal government, would be reduced by approximately $1.3 million for the 2017 and 2018 loan cohorts. The costs of providing financial protection were not quantified in the final regulations, and the Department has no additional data to estimate costs institutions may avoid from the delayed effective date of the financial protection provisions.

There is some uncertainty as to the regulatory baseline against which this interim final rule's impacts should be assessed. As noted previously, the 705 Notice delayed the effectiveness of certain provisions of the 2016 final regulations until a legal challenge is resolved. If the legal resolution were to be reached on or after July 1, 2018, then the 705 Notice would provide for the

delay of effectiveness between now and then, and the interim final rule would not have any impact. By contrast, if the legal resolution were to be reached earlier, this interim final rule could have substantial impacts associated with the avoidance of confusion and legal ambiguity regarding the interaction among the 705 Notice, the master calendar, and the 2016 final regulations. Although an analysis of a simple one-year delay does not exactly capture this collection of impacts (due to, among other reasons, the fact that July 1, 2018, is already less than a year away and thus this interim final rule cannot have a full year's impact), it can provide a general sense of the magnitude of upper bound effects.

Net Budget Impact

In order to estimate the net budget impact of the one-year delay in the effective date, the Department developed a scenario that revised the primary estimate assumptions from the final regulations from the affected 2017 and 2018 loan cohorts. The assumptions for the primary scenario from the 2016 final regulation were the basis for the President's Budget 2018 (PB2018) baseline that assumed the regulation would go into effect on July 1, 2017. The scenario developed for this interim final rule is designed to capture the incremental change from the PB2018 baseline associated with the one-year delay in the effective date. Table 1 presents assumptions for the primary estimate from the final regulations and the revised estimate for the one-year delay in the effective date. In this scenario, the conduct percent is 90 percent of the primary scenario from the final regulation and the borrower percent is the same. The financial protection provided was always expected to increase over time so the delayed effective date in the near term is not expected to significantly affect the amount of recoveries over the life of any particular loan cohort, limiting any net budget impact from the delay. To estimate the potential reduction in recoveries related to the delayed effective date, we reduced recoveries for the affected portion of the 2017 and 2018 cohorts by five percent for the private not-for-profit and proprietary sectors. As in the final regulations, recoveries from public institutions were held constant at 75 percent across scenarios.

TABLE 1—REVISED ASSUMPTIONS FOR ONE-YEAR DELAY

| Cohort | 2017 | | 2018 | |
| --- | --- | --- | --- | --- |
| | Public/private not for profit | Proprietary | Public/private not for profit | Proprietary |
| Conduct Percent: | | | | |
|    Final Primary | 3.0 | 20 | 2.4 | 16 |
|    Delay Revised | 2.7 | 18 | 2.16 | 14.4 |
| Borrower Percent: | | | | |
|    Final Primary | 35 | 45 | 36.8 | 47.3 |
|    Delay Revised | 35 | 45 | 36.8 | 47.3 |
| | Public | Priv/Prop | Public | Priv/Prop |
| Recovery Percent: | | | | |
|    Final Primary | 75 | 23.8 | 75 | 23.8 |
|    Delay Revised | 75 | 22.61 | 75 | 22.61 |

The net budget impact associated with these effects of the one-year delay in the effective date on the borrower defense provisions only is approximately −$37.7 million from the 2017 and 2018 loan cohorts.

As the amount and composition of borrower defense claims and estimated recoveries over the lifetime of the relevant loan cohorts are not expected to change greatly due to the delayed effective date, the Department does not estimate an economically significant net budget impact from the delay itself, with a potential net budget impact related to borrower defense claims of −$37.7 million in reduced costs.

The closed school automatic discharge provisions were the other significant source of estimated net budget impact in the final regulations. Under credit reform scoring, the modification to older cohorts for the automatic discharge provision estimated to cost $364 million was expected to occur in FY 2017 in the President's Budget for FY 2018 (PB2018). As a result of the delay in the effective date, the Department will not execute the modification in FY 2017.

The Department does expect to incur the costs associated with the three-year automatic discharge after the delayed effective date, but moving the execution of the modification beyond FY 2017 will require a new cost analysis with economic assumptions from the fiscal year of the execution. This will result in a change of cost, but at this point it is not possible to know the discount rates in future fiscal years, so the cost of the modification will be determined in the year that it is executed. While the actual cost of the future modification cannot be determined at this time, the Department did approximate the effect of the delay by shifting the timing of the relevant discharges back by a year and recalculating a modification using the discount rates and economic assumptions used for the calculation of the PB2018 modification. When calculated in this manner, the delay in the modification is expected to result in estimated savings of less than $10 million.

As the delay does not change the substance of the automatic discharge, we would expect the amount and composition of loans affected by the automatic discharge not to change significantly. The closed school three-year automatic discharge provisions were applicable to loans made on or after November 1, 2013, and were not linked to the effective date of the final regulations. Therefore, delaying the effective date of those provisions will not change the set of loans eligible for this automatic discharge. Additionally, borrowers would have the ability to apply for a closed school discharge before July 1, 2018, if they did not want to wait for the automatic discharge to be implemented. For future cohorts, the delay is not significant as the three-year period will fall beyond the delayed effective date. Any significant change to the estimated net budget impact associated with the closed school automatic discharge depends on any substantive changes made to the provisions as a result of the upcoming rulemaking and changes to economic assumptions when the modification is executed.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated that this interim final rule will result in cost savings. Therefore, this interim final rule is considered an Executive Order 13771 deregulatory action.

Accounting Statement

In evaluating whether a regulation is economically significant, a key consideration is whether the annual effect in any given year is over $100 million. To evaluate this, the Department looked at the difference in the undiscounted cashflows related to the death, disability, and bankruptcy (DDB) claims in which borrower defense claims are included for the PB2018 baseline and the one-year delay scenario described in the *Net Budget Impacts* section of this interim final rule. The difference from subtracting the one-year delay scenario from the baseline for the 2017 and 2018 cohorts for FY2017 to FY 2026 is summarized in Table 2.

TABLE 2—DIFFERENCE IN UNDISCOUNTED NET CASHFLOWS FOR THE 2017 AND 2018 LOAN COHORTS FROM ONE-YEAR DELAY IN 2016 BORROWER DEFENSE RULE FOR FY2017 TO FY2026

| | 2017 | 2018 | 2019 | 2020 | 2021 |
| --- | --- | --- | --- | --- | --- |
| Change in DDB Cashflow | 406,737 | 846,076 | 514,402 | 4,457,479 | 11,564,985 |
| | 2022 | 2023 | 2024 | 2025 | 2026 |
| Change in DDB Cashflow | 9,114,464 | 635,180 | (2,086,812) | (981,585) | 166,597 |

Table 3 shows the effects when those differences in the DDB cashflows are discounted at 7 and 3 percent and annualized.

| Category | Benefits | |
|---|---|---|
| Institutions may not incur compliance costs or costs of obtaining financial protection until the rule is in effect ... | Not Quantified | |
| Category | Costs | |
| | 7% | 3% |
| Continued use of state law based standard .......................... Delay in providing consumer information about institution's performance and practices. Potential decreased awareness and usage of closed school and false certification discharges. | Not Quantified | |
| Savings associated with delay in compliance with paperwork requirements ........................................................ | −9.5 | −9.51 |
| Category | Transfers | |
| | 7% | 3% |
| Reduction in transfers from the Federal Government to affected borrowers in the 2017 and 2018 cohorts that would have been partially borne by affected institutions via reimbursements ........................................ | −3.8 | −3.8 |
| Reduced reimbursements from affected institutions to affected students, via the Federal government as loan cohorts 2017 and 2018 are subject to the existing borrower defense regulation ................................. | −1.3 | −1.2 |
| Delay in closed school automatic discharge .......................... | −6.6 | −6.6 |

*Paperwork Reduction Act of 1995*

As indicated in the Paperwork Reduction Act section published in the final regulations, the assessed estimated burden was 253,136 hours, affecting both institutions and individuals, with an estimated annual cost of $9,458,484. The table below identifies the regulatory sections, OMB Control Numbers, estimated burden hours, and estimated costs of the final regulations.

| Regulatory section | OMB control No. | Burden hours | Estimated cost $36.55/hour institution $16.30/hour individual |
|---|---|---|---|
| 668.14 .......................................................... | 1845–0022 | 1,953 ............................. | 71,382 |
| 668.41 .......................................................... | 1845–0004 | 5,346 ............................. | 195,396 |
| 668.171 ........................................................ | 1845–0022 | 3,028 ............................. | 110,673 |
| 668.175 ........................................................ | 1845–0022 | 60,560 ........................... | 2,213,468 |
| 682.211 ........................................................ | 1845–0020 | 5,784 ............................. | 211,405 |
| 682.402 ........................................................ | 1845–0020 | 1,838 ............................. | 67,179 |
| 685.222 ........................................................ | 1845–0142 | 249 (Individuals) ........... | 4,059 |
| 685.222 ........................................................ | 1845–0142 | 800 (Institutions) ........... | 29,240 |
| 685.300 ........................................................ | 1845–0143 | 179,362 ......................... | 6,555,681 |
| Total ........................................................ | .......................... | 258,920 ......................... | 9,458,484 |
| Cost savings due to delayed effective date excluding 682.211, for which early implementation is allowed. | .......................... | 253,136 ......................... | 9,247,079 |
| Burden remaining ............................................... | .......................... | 5,784 ............................. | 211,405 |

This interim final rule delays the effective date of all of the cited regulations and would result in a cost savings of the total amount of $9,247,079. This cost savings equals the cost savings from delaying the effective date of all of the identified provisions of the final regulations other than § 682.211(i)(7), regarding mandatory forbearance based on a borrower defense claim, with an estimated 5,784 hours and $211,405 cost, as such section has been designated for early implementation. Lenders may have elected to invoke early implementation, and, therefore, those specific costs and hours remain applicable and have been subtracted from the overall estimated cost savings. Based on the delayed effective date of July 1, 2018, the revised estimated annual cost savings to institutions and individuals is $9,247,079 ($9,458,484 − $211,405) with an estimated burden hours savings of 253,136 (258,920 − 5,784).

*Regulatory Flexibility Act*

The Secretary certifies that this interim final regulation will not have a significant economic impact on a substantial number of small entities. The small entities that are affected by these regulations are small postsecondary institutions. As stated above, this delayed effective date is not expected to have a significant economic impact generally. This same analysis applies with regard to affected small entities.

*Intergovernmental Review*

These programs are not subject to Executive Order 12372 and the regulations in 34 CFR part 79.

*Assessment of Educational Impact*

Based on our own review, we have determined that these final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT**.

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register**. Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: www.*Federal Register.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

## List of Subjects

*34 CFR Part 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 674*

Loan programs—education, Reporting and recordkeeping requirements, Student aid.

*34 CFR Parts 682 and 685*

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

Dated: October 16, 2017.

**Betsy DeVos,**

*Secretary of Education.*

[FR Doc. 2017–22851 Filed 10–20–17; 4:15 pm]

**BILLING CODE 4000–01–P**

## DEPARTMENT OF VETERANS AFFAIRS

### 38 CFR Part 3

**RIN 2900–AP84**

### Extension of the Presumptive Period for Compensation for Gulf War Veterans

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Final rule.

**SUMMARY:** The Department of Veterans Affairs (VA) is issuing this final rule to affirm its adjudication regulations regarding compensation for disabilities resulting from undiagnosed illnesses suffered by veterans who served in the Persian Gulf War. This amendment is necessary to extend the period during which disabilities associated with undiagnosed illnesses and medically unexplained chronic multi-symptom illnesses must become manifest in order for a Veteran to be eligible for compensation. The intended effect of this amendment is to provide consistency in VA adjudication policy, preserve certain rights afforded to Persian Gulf War (GW) veterans, and ensure fairness for current and future GW veterans.

**DATES:** This final rule is effective October 24, 2017.

**FOR FURTHER INFORMATION CONTACT:** Janel Keyes, Policy Analyst, Regulations Staff (211D), Compensation Service, Veterans Benefits Administration, 810 Vermont Avenue NW., Washington, DC 20420, *Janel.Keyes@va.gov,* (202) 461–9700. (This is not a toll-free telephone number.)

**SUPPLEMENTARY INFORMATION:** On October 17, 2016, VA published in the **Federal Register** an interim final rule (81 FR 71382) amending its adjudication regulation regarding compensation for disabilities suffered by veterans who served in the Southwest Asia Theater of Operations during the GW. In order to ensure that benefits established by Congress are fairly administered, VA extended the evaluation period in which disabilities associated with undiagnosed illnesses and chronic multi-symptom illnesses must become manifest in order for a veteran to be eligible for compensation. Accordingly, VA removed the date, December 31, 2016, from 38 CFR 3.317(a)(1)(i) and added, in its place, December 31, 2021.

VA invited interested persons to submit written comments on or before December 16, 2016. VA received 22 comments in response to the interim final rule. VA received comments from military service members, veterans,

family members, and one veteran service organization, which was Veterans of Foreign Wars. Some comments addressed more than one issue. In those instances, VA reviewed and considered each issue independently. VA also grouped together by similar topic all of the issues raised by the commenters that concerned at least one portion of the rule. VA organized the responses to the comments by topic. VA responds to all commenters as follows.

### I. Supportive

VA received five comments expressing support for the extension. One commenter provided personal testimony as a GW veteran that his symptoms had a delayed-onset; therefore, an extension was appropriate and justified. Another commenter provided personal testimony as a spouse of a GW veteran stating that her husband's symptoms have "steadily gotten worse over the years". VA appreciates the feedback and support. VA makes no change based on these comments.

### II. Elimination of Expiration Date

The majority of commenters, some of whom thanked VA for the extension, asserted that VA should eliminate the expiration date. One commenter stated, "I think that the deadline for [GW] presumptive claims should be totally taken away since there is still not an official end to the [GW] and we do not know when there will be one." Another stated, "It took about 5 years after getting out to see a pattern of illness and at a level to make me concerned. It took even longer to see and feel the full extent of my conditions." Additionally, Veterans of Foreign Wars requested an open-ended presumptive period "without an artificial time limit".

VA makes no change based on these comments. Section 102(7) of the Persian Gulf War Veterans' Benefits Act, Title I of the Veterans' Benefits Improvement Act of 1994, Public Law 103–446, states Congress' finding that further research must be undertaken to determine the causes of GW veterans' illnesses and that

pending the outcome of such research, veterans who are seriously ill as the result of such illnesses should be given the benefit of the doubt and be provided compensation to offset the impairment in earning capacities they may be experiencing.

Hence, Congress contemplated an ongoing process for investigating the nature and causes of GW veterans' illnesses that is reflected in the current statutory and regulatory scheme. See 38 U.S.C. 1117 and 38 CFR 3.317.

GAO, p. 8, 30, 159, 291, 346, 353

**Calendar No. 646**

| 99TH CONGRESS 2d Session | SENATE | REPORT 99–296 |
| --- | --- | --- |

HIGHER EDUCATION AMENDMENTS
OF 1986

—————

REPORT

OF THE

COMMITTEE ON LABOR
AND HUMAN RESOURCES
UNITED STATES SENATE

TO ACCOMPANY

S. 1965

together with
ADDITIONAL VIEWS



MAY 13 (legislative day, MAY 12), 1986.—Ordered to be printed

11

paid, untaxed income and benefits, the number of family members, and the number of family members in postsecondary education.

*Section 184* of the bill provides that in order to assure adequate notification and timely delivery of student aid funds, the Secretary shall adhere to the Master Calendar as included in this section for the development and distribtuion of Federal and multiple data entry forms, allocation of campus-based and Pell Grant funds and the reallotment of any such funds. Additionally, the Secretary must notify both the Senate Committee on Labor and Human Resources and the House of Representatives Committee on Education and Labor of the completion of such calendar and, in the event that a deadline is not met, a report as to why such deadline has not been met and a plan for the completion.

*Section 185* of the bill amends sec. 484 of the law by allowing the institutions to use up to 10% of the funds allotted to serve less than half time students under the SEOG, CWS, and NDSL programs.

*Section 186* of the bill amends sec. 484 of the law by adding additional requirements for student eligibility in the financial aid programs. First of all, this section requires that a student must be working towards a degree or certificate in order to receive financial aid under this title. Additionally, this section defines satisfactory progress as maintaining a cumulative C average, or its equivalent or academic standing consistent with the requirements for graduation at the instituiton, by the end of the second academic year. Once a student drops below that average, he or she can receive aid once the grade point average is brought back up to a cumulative C. The Secretary of Education through the Office of Education Research and Improvement, shall conduct a study on the impact of this section on the grades of students receiving financial aid under this Title.

*Section 187* of this bill further amends the student eligibility section by requiring that, in order to receive aid under this Title, a student must not owe a refund on any grant or be in default on any loan from any institution. Furthermore, a student must file with the institution, a statement of education purposes which includes the student's social security number, or an equivalent identification.

*Section 188* of the bill adds a new sec. 484A which allows an instition to file suit for collection of a refund from a student on a grant made or work assistance awarded for at least six years after the date the refund became due; a guaranty agency to file suit for collection on a loan due for at least six years after the date which the agency reimburses the previous holder of the loan for its loss; an institution to file suit for collection on a loan due for at least six years after the date of default; and subject to provisions of the United States Code, the Attorney General to file suit for payment of a refund of a grant in which the refund was due, or the loan was assigned, transferred, or referred to the Secretary. A borrower shall be responsible for reasonable collection costs incurred, and shall not claim infancy as a defense.

*Section 189* of the bill provides that, upon the request of the borrower, each lender shall provide a combined repayment plan for all loans eligible for consolidation under sec. 428C of the act and for

S. Hrg. 99-63, Pt. 3

# REAUTHORIZATION OF THE HIGHER EDUCATION ACT, 1985

## HEARINGS

BEFORE THE

### SUBCOMMITTEE ON EDUCATION, ARTS AND HUMANITIES

OF THE

### COMMITTEE ON LABOR AND HUMAN RESOURCES UNITED STATES SENATE

NINETY-NINTH CONGRESS

FIRST SESSION

ON

EXAMINATION OF RECOMMENDATIONS AND PROPOSALS OF THE AD-
MINISTRATION AND OTHER EDUCATIONAL COUNCILS REGARDING
THE REAUTHORIZATION OF THE HIGHER EDUCATION ACT

SEPTEMBER 9, 1985, NOTRE DAME, IN
SEPTEMBER 10 AND 12, 1985, WASHINGTON, DC

PART 3



Printed for the use of the Committee on Labor and Human Resources

Public Law 99-498, 10/17/86
FW: 99th, S. 1965

10

There is need for both grant resources and low-interest loans to both undergraduate and graduate students, administered by private lenders, insured by state and non-profit private loan insurance programs, and expanded work-study, self-help programs.

III. General Guidelines

A. In determining financial need and providing financial assistance, there should be continued use and improvement of the Uniform Methodology, annually monitored and updated by the professionals of the National Student Aid Coalition and the Education Department. This Uniform Methodology provides a single national standard and procedure for measuring a family's ability to pay and provides for consistent treatment within a framework of sensitivity to and discretion in responding to varied family and campus circumstances. Along with the Uniform Methodology there should be continued use of Multiple Data Entry forms to assure consistent and equitable administration of student assistance programs by the federal government and various agencies, institutions, and organizations involved in student aid processes. If any changes in the formula and allocation practices are made, there should be assurance that such changes will not result in sudden and precipitous dislocation of funds.

B. Given the need for informed judgment and administration of student aid, the campus-based concept of student aid administration should be retained, which provides flexibility to campus student aid administrators who are in the best position to exercise judgment and to follow national guidelines and put together student assistance packages that assure balanced grant, loan, work, family contribution, institutional and self-help components and to meet varied circumstances of individuals and families.

C. There is need for timely award of financial aid, with a national master calendar for student aid which is faithfully used. Delays, changes, and last-minute processes in determining eligibility and making awards clearly jeopardize the ability of millions of students and their families to obtain reliable information and make sound decisions about college choice and attendance. One of the most difficult problems has been the uncertainty created by constant changing of rules and regulations and by delays experienced in promulgating them. Although progress will always require updating, there is an equally important need for stability so that proper planning by all those involved—including families, aid administrators, and agency officials—can be achieved.

D. To correct whatever abuses actually exist in student aid awarding processes—and they have been grossly exaggerated—processes can and should be strengthened for verification of eligibility through required submission of data needed to document educational costs and financial need. Headlines about loan defaults and program abuses have caused irreparable harm in loss of public confidence. Wherever such problems exist, they must be addressed and removed. However, they are not representative nor are they so extensive that they require the elimination of any program. Better ways to administer the programs as they are currently configured, rather than elimination or reconfiguration, must be found, not only because stability is needed but, more important, because the programs do work and they do provide substantial benefits. "If it ain't broken, don't fix it. If a part malfunctions, repair it, but don't throw away the whole."

AR-B-000381

H.R. REP. 102-447, H.R. Rep. No. 447, 102ND Cong., 2ND
Sess. 1992, 1992 WL 40807, 1992 U.S.C.C.A.N. 334 (Leg.Hist.)
**334  P.L. 102-325,  *1  HIGHER EDUCATION AMENDMENTS OF 1992
DATES OF CONSIDERATION AND PASSAGE
Senate: February 29, 21, June 30, 1992
House: March 25, 26, July 8, 1992
Cong. Record Vol. 138 (1992)
Senate Report (Labor and Human Resources Committee) No. 102-204,
Nov. 12, 1991 (To accompany S. 1150)
House Report (Education and Labor Committee) No. 102-447,
Feb. 27, 1992 (To accompany H.R. 3553)
House Conference Report No. 102-630,
June 29, 1992 (To accompany S. 1150)

HOUSE REPORT NO. 102−447

February 27, 1992
[To accompany H.R. 3553]

The Committee on Education and Labor, to whom was referred the bill (H.R. 3553) to amend and extend the Higher Education Act of 1965, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

**0  The amendment strikes out all after the enacting clause of the bill and inserts a new text which appears in italic type in the reported bill.

EXPLANATION OF AMENDMENT

The committee amendment strikes out all after the enacting clause and inserts a substitute text. The provisions of substitute text are explained hereafter in this report.

HEARINGS AND COMMITTEE ACTION

In February, 1991, 160 organizations, associations and governmental bodies were invited to submit to the Subcommittee on Postsecondary Education their legislative recommendations for the reauthorization of the Higher Education Act. The Subcommittee received recommendations from 149 respondents, both from those who were invited to submit recommendations as well as some from those who learned of the invitation and submitted recommendations. **335  *2  Some who were invited to submit recommendations chose not to respond. Those submitting recommendations to the Subcommittee were:

Advisory Committee on Student Financial Assistance.

American Association of Colleges for Teacher Education.

American Association of Colleges of Nursing.

American Association of Colleges of Osteopathic Medicine.

sciences. An institution's ability to establish articulation agreements is preserved, as is a students ability to receive credit for their coursework, where applicable, when transferring from one program to another. The Committee intends that, if all of the coursework in a less than two year vocational program is fully acceptable for credit in a two- or four-year degree program at the institution, then the institution can measure all of the coursework in credit hours.

The Committee heard testimony that one potential for abuse in the Title IV programs occurs when an institution changes ownership or when a new branch is created. The Committee heard of cases where a reputable institution was sold to a new owner who had no interest in maintaining the integrity of the institution or the Title IV programs. H.R. 3553 amends Section 481 of the Higher Education Act to provide that institutions that undergo a change of ownership shall be considered a "new institution" for the purposes of establishing eligibility to participate in Title IV programs. The Committee intends that a change in ownership will result in new Departmental certification and state approval. The Department of Education would have to visit the school. The Committee intends, however, that the institutions need not have been in existence under the new ownership for two years as is otherwise required in the case of new institutions. Moreover, the bill also provides that, where there has been a change of ownership, the institution is eligible to receive conditional certification to participate in Title IV programs.

The Committee intends that taken together, these provisions assure that the qualifications of the institution under its new ownership to participate in Title IV programs are closely examined and monitored. The Committee does not intend that these provisions be used to cause a protracted period of interruption of participation in student assistance programs whenever there has been a change of ownership. It is the Committee's intent that the conditional certification authority of the Secretary or the authority to certify an institution for a short time be used during the period in which the Secretary is reviewing the institution. It is not the intent of the Committee that Federal student financial assistance will be needlessly delayed or denied to students attending an institution that changes ownership.

H.R. 3553 also clarifies the intent of the Committee that branch campuses should be treated as separate institutions for the purposes of Title IV. This would mean that branch campuses would have to be certified as eligible institutions separately by the Secretary and approved by state approving agencies. The Committee notes that the problems caused by branch campuses are in large part due to Department of Education regulations which facilitated branching and which failed to carefully monitor new branches.

The Committee is concerned that the provisions limiting the effective date of regulations has been interpreted too narrowly in the past. The Secretary has interpreted current law to apply to only those regulations deemed to affect the "general administration" of the Federal student aid programs. Under the Secretary's interpretation, only those provisions affecting all programs have been **410 *77 bound by the December 1 deadline. The Committee intends that the effective dates of all regulations on Title IV are driven by the Master Calendar requirements in Section 482.

One of the major goals of the Committee during this reauthorization was to simplify the process for applying for Federal aid for students and their parents. In testimony presented to the Committee, students informed us that the multiplicity and complexity of the forms were a deterrent for many students. As a result, the Committee made changes to need analysis in Part F and the application form in Part G to reduce many of the questions on the form.

H.R. 3553 requires that students apply for Federal student financial assistance on a Federal form that will be free of charge to the student. The Committee intends that the Secretary develop a single Federal financial aid form for all students applying for Federal aid. The Committee intends that the Secretary is prohibited from allowing this form to be embedded in any other financial aid form. The Committee is concerned that students know that they are receiving Federal aid and realize which data elements are required of them by the Federal Government.

In order to simplify the process for the student, H.R. 3553 also provides that states and institutions shall have access to this Federal data free of charge from the Federal Government. However, the Committee intends that all data collected

message can be received without jeopardizing the safety or security of people, places or vessels.

## V. Public Participation and Request for Comments

We view public participation as essential to effective rulemaking, and will consider all comments and material received during the comment period. Your comment can help shape the outcome of this rulemaking. If you submit a comment, please include the docket number for this rulemaking, indicate the specific section of this document to which each comment applies, and provide a reason for each suggestion or recommendation.

We encourage you to submit comments through the Federal eRulemaking Portal at *http:// www.regulations.gov*. If your material cannot be submitted using *http:// www.regulations.gov*, contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions.

We accept anonymous comments. All comments received will be posted without change to *http:// www.regulations.gov* and will include any personal information you have provided. For more about privacy and the docket, visit *http:// www.regulations.gov/privacynotice*.

Documents mentioned in this NPRM as being available in this docket and all public comments, will be in our online docket at *http://www.regulations.gov* and can be viewed by following that Web site's instructions. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted or a final rule is published.

## List of Subjects in 33 CFR Part 117

Bridges.

For the reasons discussed in the preamble, the Coast Guard proposes to amend 33 CFR part 117 as follows:

## PART 117—DRAWBRIDGE OPERATION REGULATIONS

■ 1. The authority citation for part 117 continues to read as follows:

**Authority:** 33 U.S.C. 499; 33 CFR 1.05–1; Department of Homeland Security Delegation No. 0170.1.

■ 2. Suspend § 117.879 from 6 a.m. on February 26, 2018, through 6 p.m. on July 31, 2019.

■ 3. Add a new temporary § 117.T879, from 6 a.m. on February 26, 2018, through 6 p.m. on July 31, 2019, to read as follows:

**§ 117.T879 Isthmus Slough.**

The draw of the Oregon State secondary highway bridge, mile 1.0, at Coos Bay, shall operate in single leaf, and open half the draw on signal if at least 24 hours notice is given. The vertical clearance of the non-functioning leaf will be reduced up to ten feet.

Dated: October 13, 2017.

**Brendan C. McPherson,**
*Captain, U.S. Coast Guard, Acting Commander, Thirteenth Coast Guard District.*

[FR Doc. 2017–23052 Filed 10–23–17; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF EDUCATION

### 34 CFR Parts 668, 674, 682, and 685

[Docket ID ED–2017–OPE–0112]

RIN 1840–AD28

### Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Secretary proposes to further delay, until July 1, 2019, the effective date of selected provisions of the final regulations entitled Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan (FFEL) Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program (the final regulations), published in the **Federal Register** on November 1, 2016. The Secretary proposes this further delay to ensure that there is adequate time to conduct negotiated rulemaking and, as necessary, develop revised regulations. The provisions for which we propose to further delay the effective date are listed in the **SUPPLEMENTARY INFORMATION** section of this document. The current effective date of selected provisions of the final regulations is July 1, 2018, in accordance with the interim final rule (IFR) published elsewhere in this issue of the **Federal Register**.

**DATES:** We must receive your comments on or before November 24, 2017.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

If you are submitting comments electronically, we strongly encourage you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Portable Document Format (PDF), we strongly encourage you to convert the PDF to print-to-PDF format or to use some other commonly used searchable text format. *Please do not submit the PDF in a scanned format.* Using a print-to-PDF format allows the Department to electronically search and copy certain portions of your submissions.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using Regulations.gov, including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "Help."

• *Postal Mail, Commercial Delivery, or Hand Delivery:* The Department strongly encourages commenters to submit their comments electronically. However, if you mail or deliver your comments about the notice of proposed rulemaking, address them to Jean-Didier Gaina, U.S. Department of Education, 400 Maryland Ave. SW., Mail Stop 6W248, Washington, DC 20202.

*Privacy Note:* The Department's policy is to make all comments received from members of the public available for public viewing on the Federal eRulemaking Portal at *www.regulations.gov*. Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** Barbara Hoblitzell, U.S. Department of Education, 400 Maryland Ave. SW., Mail Stop 6W248, Washington, DC 20202. Telephone: (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov*.

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

*Invitation To Comment:* We invite you to submit comments regarding this notice of proposed rulemaking. We will consider comments on the further delayed effective date only and will not consider comments on the wording or substance of the final regulations. See

**ADDRESSES** for instructions on how to submit comments.

During and after the comment period, you may inspect all public comments about this notice of proposed rulemaking by accessing *Regulations.gov*. You may also inspect the comments in person in room 6W245, 400 Maryland Avenue SW., Washington, DC, between 8:30 a.m. and 4:00 p.m. Washington, DC time, Monday through Friday of each week, except Federal holidays. If you want to schedule time to inspect comments, please contact the person listed under **FOR FURTHER INFORMATION CONTACT**.

*Assistance to Individuals With Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public-rulemaking record for this notice of proposed rulemaking. If you want to schedule an appointment for this type of accommodation or auxiliary aid, please contact the person listed under **FOR FURTHER INFORMATION CONTACT**.

Elsewhere in this issue of the **Federal Register**, the Department is publishing an IFR delaying until July 1, 2018, the effective date of selected provisions of the final regulations. The original effective date of the final regulations published November 1, 2016 (81 FR 75926) was July 1, 2017. On June 16, 2017, the Department published in the **Federal Register** a notification of the partial delay of effective dates under section 705 of the Administrative Procedure Act (5 U.S.C. 705) (82 FR 27621) (705 Notice), to delay the effectiveness of certain provisions of the final regulations until a legal challenge by the California Association of Private Postsecondary Schools is resolved. *See* Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos*, Civil Action No. 1:17–cv–00999 (D.D.C. May 24, 2017). As explained in the IFR, because the final regulations have been postponed by the 705 Notice beyond July 1, 2017, they must become effective no earlier than July 1, 2018, to comply with section 482 of the Higher Education Act of 1965, as amended (HEA) (20 U.S.C. 1089), also known as the ''master calendar requirement.''

Also on June 16, 2017, the Department announced its intent to convene a committee to develop proposed regulations to revise the regulations on borrower defense to repayment of Federal student loans and other matters. Given that the first negotiated rulemaking session is scheduled for November 13–15, 2017, we cannot complete the negotiated rulemaking process and the development of revised regulations by November 1, 2018. Under the master calendar, a regulatory change that has been published in final form on or before November 1 prior to the start of an award year—which begins on July 1 of any given year—may take effect only at the beginning of the next award year, or in other words, on July 1 of the next year. In light of this requirement, the regulations resulting from negotiated rulemaking could not be effective before July 1, 2019.

As noted previously, elsewhere in this issue of the **Federal Register**, the Department is publishing an IFR delaying the effective date of the final regulations until July 1, 2018. The Department could implement the final regulations on July 1, 2018, pursuant to the IFR, or, through notice and comment rulemaking, we could delay the effective date until July 1, 2019, or a future July 1. We propose to further delay the effective date of the final regulations, to continue to preserve the regulatory status quo, until July 1, 2019. The Department would continue to process borrower defense claims under the existing regulations that will remain in effect during the delay so that borrowers may continue to apply for the discharge of all or a part of their loans.

Based on the above considerations, the Department is proposing to delay until July 1, 2019, the effective date of the following provisions of the final regulations in title 34 of the Code of Federal Regulations (CFR):

• § 668.14(b)(30), (31), and (32) Program participation agreement.
• § 668.41(h) and (i) Reporting and disclosure of information.
• § 668.71(c) Scope and special definitions.
• § 668.90(a)(3) Initial and final decisions.
• § 668.93(h), (i), and (j) Limitation.
• § 668.171 General.
• § 668.175(c), (d), (f), and (h) Alternative standards and requirements.
• Part 668 subpart L, Appendix C.
• § 674.33(g)(3) and (g)(8) Repayment.
• § 682.202(b)(1) Permissible charges by lenders to borrowers.
• § 682.211(i)(7) Forbearance.
• § 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.
• § 682.405(b)(4)(ii) Loan rehabilitation agreement.

• § 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.
• § 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.
• § 685.205(b)(6) Forbearance.
• § 685.206(c) Borrower responsibilities and defenses.
• § 685.212(k) Discharge of a loan obligation.
• § 685.214(c)(2) and (f)(4) through (7) Closed school discharge.
• § 685.215(a)(1), (c)(1) through (c)(8), and (d) Discharge for false certification of student eligibility or unauthorized payment.
• § 685.222 Borrower defenses.
• Part 685 subpart B, Appendix A Examples of borrower relief.
• § 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.
• § 685.308(a) Remedial actions.

As noted in the IFR, the Department interprets all references to ''July 1, 2017'' in the text of the above-referenced regulations to mean the effective date of those regulations. The regulatory text included references to the specific July 1, 2017, date in part to provide clarity to readers in the future as to when the regulations had taken effect. Because the regulations did not take effect on July 1, 2017, we would, in connection with this proposed additional delay of effective date, read those regulations as referring to the new effective date established by this further delay, *i.e.*, July 1, 2019.

This proposed delay of the final regulations will not delay the effective dates of the following regulatory provisions published in 81 FR 75926 which: (1) Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower; (2) amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; (3) amend the regulations governing Direct Consolidation Loans to allow a borrower to obtain a Direct Consolidation Loan regardless of whether the borrower is also seeking to consolidate a Direct Loan Program or FFEL Program loan, if the borrower has a loan type identified in 34 CFR 685.220(b); (4) address severability; and (5) make technical corrections. As established in 81 FR 75926, 34 CFR 682.211(i)(7) and 682.410(b)(6)(viii) would remain designated for early implementation, at the discretion of each lender or guaranty agency.

*Waiver of Negotiated Rulemaking:* Under section 492 of the HEA (20 U.S.C. 1098a), all regulations proposed by the Department for programs authorized under title IV of the HEA are subject to negotiated rulemaking requirements. However, section 492(b)(2) of the HEA provides that negotiated rulemaking may be waived for good cause when doing so would be "impracticable, unnecessary, or contrary to the public interest." Section 492(b)(2) of the HEA also requires the Secretary to publish the basis for waiving negotiations in the **Federal Register** at the same time as the proposed regulations in question are first published.

For the reasons stated above, it would not be practicable, before the July 1, 2018 effective date specified in the IFR, to engage in negotiated rulemaking and publish final regulations. There is, therefore, good cause to waive negotiated rulemaking pertaining to this delay.

## Executive Orders 12866, 13563, and 13771

### Regulatory Impact Analysis

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

The Department estimates the quantified annualized economic and net budget impacts of the delay of the effective date to be -$26.9 million in reduced costs to institutions and the Federal government. These reduced costs result from the delay of the borrower defense provisions of the final regulations as they would apply to the 2017 to 2019 loan cohorts, as well as from the delayed paperwork burden on institutions, and the delayed execution of the closed school automatic discharge. This proposed regulatory action is a significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866.

We have also reviewed this proposed rule under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing this proposed rule only on a reasoned determination that its benefits justify its costs. Based on the analysis that follows, the Department believes that this proposed rule is consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

In accordance with both Executive orders, the Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action.

The quantified economic effects and net budget impact associated with the delayed effective date are not expected to be economically significant.

### Effects of One-Year Delay

As indicated in the Regulatory Impact Analysis (RIA) published with the final regulations on November 1, 2016, the final regulations were economically significant with a total estimated net budget impact of $16.6 billion over the 2017–2026 loan cohorts in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the provisions for a three-year automatic closed school discharge. As the net budget impact is based on the net present value of the cash flows of the relevant cohorts over 40 years, delaying the final regulations for an additional year will have limited effect, as discussed below. This analysis is limited to the effect of delaying the effective date of the final regulations an additional year from July 1, 2018 to July 1, 2019, and does not account for any potential changes in the final regulations.

Even with the further delayed effective date, borrowers will still be able to submit claims. The provisions of the final regulations pertaining to the process for review and determination of claims were not limited to specific cohorts designated by the effective date so the delay will not result in specific cohorts of borrowers being excluded from the process reflected in the final regulations, when implemented. Once in effect, the protection generated by the financial protection provisions will be available to be applied to claims from loans originated earlier, including the period from July 1, 2018 to June 30, 2019. Loans made before July 1, 2017, were always subject to the State-based standard and borrowers' ability to bring claims under that standard is unchanged by the delay. For claims filed after the effective date of the regulations, for loans made on or after July 1, 2019, the Federal standard established in the final regulations would apply. As discussed previously, the Department interprets all references to "July 1, 2017" in the text of the final regulations to mean the effective date of the final regulations. As a result, the further delay in the effective date means that loans made between July 1, 2018 and June 30, 2019, will be subject to the

current State-based standard. As we noted in the final regulations, the Federal standard was designed to address much of the conduct already covered by the State-based standard, so the vast majority of claims associated with loans made between July 1, 2017, and the delayed effective date could be made under the current, State-based standard as well.

In addition to borrowers, institutions are also affected by the delayed effective date. As indicated in the RIA for the final regulations, institutions bear the major costs of compliance, paperwork burden, and providing financial protection. The financial protection provisions of the final regulations depend on the effective date, so institutions will not incur these costs until the final regulations are in effect. In terms of cost savings for institutions, the estimated annual paperwork burden was approximately $9.4 million in the initial year of the final regulations. In the revised scenario developed to estimate the effect of the additional one-year delay in the effective date, transfers from institutions to students, via the Federal government, would be reduced by approximately $9.3 million for the 2017 and 2018 loan cohorts. The costs of providing financial protection were not quantified in the RIA for the final regulations, and the Department has no additional data to estimate costs

institutions may avoid from the delayed effective date of the financial protection provisions.

Net Budget Impact

In order to estimate the net budget impact of the additional one-year delay in the effective date to July 1, 2019, the Department developed a scenario that revised the primary estimate assumptions from the final regulations for the affected 2017 to 2019 loan cohorts, as was done for the one-year delay described in the IFR. As before, the Department applies an assumed level of school misconduct, borrower claims success, and recoveries from institutions (respectively labeled as Conduct Percent, Borrower Percent, and Recovery Percent in Table 1) to the President's Budget 2018 (PB2018) loan volume estimates to generate the estimated net borrower defense claims for each cohort, loan type, and sector. The assumptions for the primary scenario from the 2016 final regulation were the basis for the President's Budget 2018 (PB2018) baseline that assumed the final regulations would go into effect on July 1, 2017. The scenario developed for this NPRM is designed to capture the incremental change from the one-year delay in the IFR associated with the further one-year delay in the effective date to July 1, 2019. Compared to the scenario developed for the IFR,

recoveries are reduced by an additional two percent for the 2017 and 2018 cohorts, all of the 2018 cohort is subject to the State-based standard, and the affected portion of the 2019 cohort is subject to the current, State-based standard and reduced recoveries at the five percent level used for the one-year delay in the IFR. Table 1 presents assumptions for the primary estimate from the final regulations and the revised estimate for the further one-year delay, from July 1, 2018 to July 1, 2019, in the effective date. In this scenario, the conduct percent is 90 percent of the primary scenario from the final regulations and the borrower percent is the same. The financial protection provided was always expected to increase over time, so the delayed effective date in the near term is not expected to significantly affect the amount of recoveries over the life of any particular loan cohort, limiting any net budget impact from the delay. To estimate the potential reduction in recoveries related to the proposed delayed effective date, we reduced recoveries for the affected portion of the 2017 and 2018 cohorts by seven percent for the private not-for-profit and proprietary sectors and by five percent for the 2019 cohort. As in the final regulations and the IFR, recoveries from public institutions were held constant at 75 percent across scenarios.

### TABLE 1—REVISED ASSUMPTIONS FOR ONE-YEAR DELAY FROM JULY 1, 2018 TO JULY 1, 2019

| Cohort | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Pub/Priv NFP | Prop | Pub/Priv NFP | Prop | Pub/Priv NFP | Prop |
| Conduct Percent: | | | | | | |
| Final Primary ........................................ | 3.0 | 20 | 2.4 | 16 | 2.0 | 13.6 |
| Delay to 2019 ...................................... | 2.7 | 18 | 2.16 | 14.4 | 1.8 | 12.24 |
| Borrower Percent: | | | | | | |
| Final Primary ........................................ | 35 | 45 | 36.8 | 47.3 | 36.8 | 47.3 |
| Delay to 2019 ...................................... | 35 | 45 | 36.8 | 47.3 | 36.8 | 47.3 |
| | Public | Priv/Prop | Public | Priv/Prop | Public | Priv/Prop |
| Recovery Percent: | | | | | | |
| Final Primary ........................................ | 75 | 23.8 | 75 | 23.8 | 75 | 23.8 |
| Delay to 2019 ...................................... | 75 | 22.134 | 75 | 22.134 | 75 | 24.871 |

The net budget impact associated with these effects of the additional one-year delay in the effective date on the borrower defense provisions only is approximately -$46.1 million from the 2017 to 2019 loan cohorts.

As the amount and composition of borrower defense claims and estimated recoveries over the lifetime of the relevant loan cohorts are not expected to change greatly due to the delayed effective date, the Department does not estimate an economically significant net

budget impact from the delay itself, with a potential net budget impact related to borrower defense claims of -$46.1 million in reduced costs for the affected cohorts. This represents the incremental change associated with the additional one-year delay from July 1, 2018 to July 1, 2019. If compared to the PB2018 baseline, the savings would be approximately -$78.8 million.

The closed school automatic discharge provisions were the other significant source of estimated net

budget impact in the final regulations. Under credit reform scoring, the modification to older cohorts for the automatic discharge provision estimated to cost $364 million was expected to occur in fiscal year (FY) 2017 in the President's Budget for FY 2018 (PB2018). As a result of the delay in the effective date, the Department will not execute the modification in FY 2017.

As indicated in the IFR, the Department does expect to incur the costs associated with the three-year

automatic discharge after the delayed effective date, but moving the execution of the modification beyond FY 2017 will require a new cost analysis with economic assumptions from the fiscal year of the execution. This will result in a change of cost, but at this point it is not possible to know the discount rates in future fiscal years, so the cost of the modification will be determined in the year that it is executed. While the actual cost of the future modification cannot be determined at this time, the Department did approximate the effect of the delay by shifting the timing of the relevant discharges back by a year and recalculating a modification using the discount rates and economic assumptions used for the calculation of the PB2018 modification. When calculated in this manner, the delay in the modification to July 2018 described in the IFR resulted in estimated savings of less than $10 million. Using the same approach, the further delay to July 2019 is expected to save approximately $15 million above the savings from the initial one-year delay.

As the delay does not change the substance of the automatic discharge, we would expect the amount and composition of loans affected by the automatic discharge not to change significantly. The closed school three-year automatic discharge provisions were applicable to loans made on or after November 1, 2013, and were not linked to the effective date of the final regulations. Therefore, delaying the effective date of those provisions will not change the set of loans eligible for this automatic discharge. Additionally, borrowers would have the ability to apply for a closed school discharge before July 1, 2019, if they did not want to wait for the automatic discharge to be implemented. For future cohorts, the delay is not significant as the three-year period will fall beyond the delayed effective date. Any significant change to the estimated net budget impact associated with the closed school automatic discharge depends on any substantive changes made to the provisions as a result of the upcoming rulemaking and changes to economic

assumptions when the modification is executed.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated that this proposed rule will result in cost savings. Therefore, this proposed rule would be considered an Executive Order 13771 deregulatory action.

Accounting Statement

In evaluating whether a regulation is economically significant, a key consideration is whether the annual effect in any given year is over $100 million. To evaluate this, the Department looked at the difference in the undiscounted cashflows related to the death, disability, and bankruptcy (DDB) claims in which borrower defense claims are included for the one-year delay established in the IFR and the further one-year delay scenario described under *Net Budget Impacts.* The difference from subtracting the further delay scenario from the IFR one-year delay scenario for the 2017 to 2019 cohorts is summarized in Table 2.

TABLE 2—DIFFERENCE IN UNDISCOUNTED NET CASHFLOWS FOR THE 2017 TO 2019 LOAN COHORTS FROM THE FURTHER ONE-YEAR DELAY IN 2016 BORROWER DEFENSE RULE TO JULY 1, 2019

|  | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| Change in DDB Cashflow ...................................... | 159 | 7,489 | 496,637 | 637,361 | 538,468 |
|  | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2026 |
| Change in DDB Cashflow ...................................... | 6,004,802 | 9,525,520 | 4,668,143 | 2,156,009 | 3,003,657 |

Table 3 shows the effects when those differences in the DDB cashflows are discounted at 7 and 3 percent and annualized.

| Category | Benefits | |
|---|---|---|
| Institutions may not incur compliance costs or costs of obtaining financial protection until the rule is in effect. .. | Not Quantified | |
| Category | Costs | |
|  | 7% | 3% |
| Continued use of State-law based standard<br>Delay in providing consumer information about institution's performance and practices<br>Potential decreased awareness and usage of closed school and false certification discharges | Not Quantified | |
| Savings associated with delay in compliance with paperwork requirements. ........................................................ | −9.5 | −9.51 |
| Category | Transfers | |
|  | 7% | 3% |
| Reduction in transfers from the Federal Government to affected borrowers in the 2017 to 2019 cohorts that would have been partially borne by affected institutions via reimbursements. ................................................... | −3.5 | −3.8 |
| Reduced reimbursements from affected institutions to affected students, via the Federal government as loan cohorts 2017 to 2019 are subject to the existing borrower defense regulation. ................................................. | −1.2 | −1.3 |
| Delay in closed school automatic discharge implementation from 2018 to 2019 ................................................. | −14.8 | −14.8 |

*Paperwork Reduction Act of 1995*

As indicated in the Paperwork Reduction Act section published in the final regulations, the assessed estimated burden was 253,136 hours, affecting both institutions and individuals, with an estimated annual cost of $9,458,484.

The table below identifies the regulatory sections, OMB Control Numbers, estimated burden hours, and estimated costs of the final regulations.

| Regulatory section | OMB Control No. | Burden hours | Estimated cost $36.55/hour institution $16.30/hour individual |
|---|---|---|---|
| 668.14 | 1845–0022 | 1,953 | 71,382 |
| 668.41 | 1845–0004 | 5,346 | 195,396 |
| 668.171 | 1845–0022 | 3,028 | 110,673 |
| 668.175 | 1845–0022 | 60,560 | 2,213,468 |
| 682.211 | 1845–0020 | 5,784 | 211,405 |
| 682.402 | 1845–0020 | 1,838 | 67,179 |
| 685.222 | 1845–0142 | 249 (Individuals) | 4,059 |
| 685.222 | 1845–0142 | 800 (Institutions) | 29,240 |
| 685.300 | 1845–0143 | 179,362 | 6,555,681 |
| Total | | 258,920 | 9,458,484 |
| Cost savings due to delayed effective date excluding 682.211 early implementation allowed. | | 253,136 | 9,247,079 |
| Burden remaining | | 5,784 | 211,405 |

This notice of proposed rulemaking delays the effective date of the implementation of all of the cited regulations and would result in a cost savings of the total amount of $9,458,484. However, § 682.211(i)(7) of the final regulations, regarding mandatory forbearance based on a borrower defense claim, with an estimated 5,784 hours and $211,405 cost, as would continue to be designated for early implementation. Lenders may have elected early implementation and, therefore, those specific costs and hours remain applicable and have been subtracted from the overall estimated cost saving. Based on the delayed effective date of July 1, 2019, the revised estimated annual cost savings to institutions and individuals is $9,247,079 ($9,458,484 − $211,405) with an estimated burden hours savings of 253,136 (258,920 − 5,784).

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register.** Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

## List of Subjects

### 34 CFR Part 668

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

### 34 CFR Part 674

Loan programs—education, Reporting and recordkeeping requirements, Student aid.

### 34 CFR Parts 682 and 685

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

Dated: October 16, 2017.

**Betsy DeVos,**

*Secretary of Education.*

[FR Doc. 2017–22850 Filed 10–20–17; 4:15 pm]

**BILLING CODE 4000–01–P**

## POSTAL SERVICE

### 39 CFR Part 20

### International Mailing Services: Proposed Product and Price Changes—CPI

**AGENCY:** Postal Service™.

**ACTION:** Proposed rule with a request for comments.

**SUMMARY:** The Postal Service proposes to revise *Mailing Standards of the United States Postal Service, International Mail Manual* (IMM®), to reflect changes in the prices, product features, and classification changes to Mailing Services. These changes would also implement a restriction on the contents of First-Class Mail International® to documents only, to comply with standards established by the Universal Postal Union (UPU).

**DATES:** We must receive your comments on or before November 24, 2017.

**ADDRESSES:** Mail or deliver comments to the manager, Product Classification, U.S. Postal Service®, 475 L'Enfant Plaza SW., RM 4446, Washington, DC 20260–5015. You may inspect and photocopy all written comments at USPS® Headquarters Library, 475 L'Enfant Plaza SW., 11th Floor N, Washington, DC by appointment only between the hours of 9 a.m. and 4 p.m., Monday through Friday by calling 1–202–268–2906 in advance. Email comments, containing the name and address of the commenter, to: *ProductClassification@usps.gov,* with a subject line of "January 2018 International Mailing Services Price Change—CPI." Faxed comments are not accepted.

subject to the Paperwork Reduction Act, 44 U.S.C. Chapter 35.

**List of Subjects in 22 CFR Part 126**

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, 22 CFR part 126 is amended as follows:

## PART 126—GENERAL POLICIES AND PROVISIONS

■ 1. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791, and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Sections 7045 and 7046, Pub. L. 112–74; E.O. 13637, 78 FR 16129.

■ 2. Section 126.1 is amended by revising the table in paragraph (d)(2), and adding paragraph (w), and by removing the Note to 126.1.

The revision and addition read as follows:

**§ 126.1  Prohibited exports, imports, and sales to or from certain countries.**

\*     \*     \*     \*     \*

(d) \* \* \*

(2) \* \* \*

| Country | Country specific paragraph location |
|---|---|
| Afghanistan | See also paragraph (g) of this section. |
| Central African Republic | See also paragraph (u) of this section. |
| Cyprus | See also paragraph (r) of this section. |
| Democratic Republic of Congo | See also paragraph (i) of this section. |
| Eritrea | See also paragraph (h) of this section. |
| Haiti | See also paragraph (j) of this section. |
| Iraq | See also paragraph (f) of this section. |
| Lebanon | See also paragraph (t) of this section. |
| Libya | See also paragraph (k) of this section. |
| Somalia | See also paragraph (m) of this section. |
| South Sudan | See also paragraph (w) of this section. |
| Sudan | See also paragraph (v) of this section. |
| Zimbabwe | See also paragraph (s) of this section. |

\*     \*     \*     \*     \*

(w) *South Sudan.* It is the policy of the United States to deny licenses or other approvals for exports of defense articles and defense services destined for South Sudan, except that a license or other approval may be issued, on a case-by-case basis, for:

(1) Defense articles and defense services for monitoring, verification, or peacekeeping support operations, including those authorized by the United Nations or operating with the consent of the relevant parties;

(2) Defense articles and defense services intended solely for the support of, or use by, African Union Regional Task Force (AU–RTF) or United Nations entities operating in South Sudan, including but not limited to the United Nations Mission in the Republic of South Sudan (UNMISS), the United Nations Mine Action Service (UNMAS), the United Nations Police (UNPOL), or the United Nations Interim Security Force for Abyei (UNISFA);

(3) Defense articles and defense services intended solely for the support of or use by non-governmental organizations in furtherance of conventional weapons destruction or humanitarian demining activities;

(4) Non-lethal defense articles intended solely for humanitarian or protective use and related technical training and assistance;

(5) Personal protective equipment including flak jackets and helmets, temporarily exported to South Sudan by United Nations personnel, human rights monitors, representatives of the media, and humanitarian and development workers and associated personnel, for their personal use only; or

(6) Any defense articles and defense services provided in support of implementation of the Comprehensive Peace Agreement, the Agreement on the Resolution of the Conflict in the Republic of South Sudan, or any successor agreement.

**Michael Miller,**

*Office Director, Office of Regional Security and Arms Transfers, Bureau of Political-Military Affairs, U.S. Department of State.*

[FR Doc. 2018–02995 Filed 2–13–18; 8:45 am]

**BILLING CODE 4710–25–P**

## DEPARTMENT OF DEFENSE

**Department of the Navy**

### 32 CFR Part 706

**Certifications and Exemptions Under the International Regulations for Preventing Collisions at Sea, 1972**

*Correction*

In rule document 2018–02554 appearing on pages 5536–5537 in the issue of February 8, 2018, make the following correction:

**§ 706.2  [Corrected]**

■ On page 5537, in Table Four, in the second column, "DDG 115" should read "DDG 116".

[FR Doc. C1–2018–02554 Filed 2–13–18; 8:45 am]

**BILLING CODE 1301–00–P**

## DEPARTMENT OF EDUCATION

**34 CFR Parts 668, 674, 682, and 685**

**[Docket ID ED–2017–OPE–0112]**

**RIN 1840–AD28**

**Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary delays, until July 1, 2019, the effective date of selected provisions of the final regulations entitled Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan (FFEL) Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program (the 2016 final regulations), published in the **Federal**

**Register** on November 1, 2016. The Secretary is delaying the 2016 final regulations to ensure that there is adequate time to conduct negotiated rulemaking and develop revised regulations. The provisions for which the effective date is being delayed are listed in the **SUPPLEMENTARY INFORMATION** section of this document. The original effective date of the 2016 final regulations, published November 1, 2016, was July 1, 2017. The effective date was delayed by a document issued under section 705 of the Administrative Procedure Act (the 705 Document). The Department announced in an interim final rule (IFR) issued on October 24, 2017, that, under the Department's interpretation of the Higher Education Act, the effective date could be no earlier than July 1, 2018.

**DATES:** As of February 14, 2018, the effective date for the amendments to or additions of: §§ 668.14(b)(30), (31), and (32); 668.41(h) and (i); 668.71(c); 668.90(a)(3); 668.93(h), (i), (j); 668.171; 668.175 (c) and (d) and (f) and (h); Appendix C to Subpart L of Part 668; 674.33(g)(3) and (g)(8); 682.202(b)(1); 682.211(i)(7); 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii); 682.405(b)(4); 682.410(b)(4) and (b)(6)(viii); 685.200(f)(3)(v) and (f)(4)(iii); 685.205(b)(6); 685.206(c); 685.212(k); 685.214(c)(2), (f)(4) through (7); 685.215(a)(1), (c)(1) through (c)(8), and (d); 685.222; Appendix A to Subpart B of Part 685; and 685.308(a), published November 1, 2016, at 81 FR 75926, and delayed on June 16, 2017 (82 FR 27621) and October 24, 2017 (82 FR 49114), is further delayed until July 1, 2019.

**FOR FURTHER INFORMATION CONTACT:** George Alan Smith, U.S. Department of Education, 400 Maryland Ave. SW, Mail Stop 294–34, Washington, DC 20202. Telephone: (202) 453–7757 or by email at: *George.Alan.Smith@ed.gov*.

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** On October 24, 2017 (82 FR 49114), the Department of Education (Department) published an IFR giving notice that under its interpretation of section 482 of the Higher Education Act of 1965, as amended (HEA) (20 U.S.C. 1089), also known as the ''master calendar requirement,'' selected provisions of the 2016 final regulations would have an effective date of July 1, 2018. (82 FR 49114) The original effective date of the 2016 final regulations (November 1, 2016 at 81 FR 75926) was July 1, 2017. On June 16, 2017, a 705 Document (82 FR 27621) delayed the effective date of certain provisions of the 2016 final regulations until a legal challenge by the California Association of Private Postsecondary Schools (CAPPS) is resolved. *See* Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos*, Civil Action No. 1:17–cv–00999 (D.D.C. May 24, 2017). As explained in the IFR, because the 2016 final regulations have been postponed by the 705 Document beyond July 1, 2017, they cannot become effective earlier than July 1, 2018, to comply with the master calendar requirement. (82 FR 49115–49116).

Also on June 16, 2017, the Department announced its intent to convene a committee to develop proposed regulations to revise the existing regulations on borrower defense to repayment of Federal student loans and other matters (82 FR 27640), the same topics addressed in the 2016 final regulations. Under the master calendar requirement, a regulatory change that has been published in final form on or before November 1 of the year prior to the start of an award year—which begins on July 1 of any given year—may take effect only at the beginning of the next award year, or in other words, on July 1 of the next year. In light of this requirement, the regulations resulting from negotiated rulemaking could not be effective before, at the earliest, July 1, 2019.

Accordingly, the Department published a notice of proposed rulemaking (NPRM) proposing to delay the effective date of the 2016 final regulations until July 1, 2019 (October 24, 2017 at 82 FR 49155). This notice adopts that proposal, delaying the effective date of the 2016 final regulations, to continue to preserve the regulatory status quo, until July 1, 2019. The Department will continue to process borrower defense claims under the existing regulations that will remain in effect during the delay so that borrowers may continue to apply for the discharge of all or a part of their loans.

Based on the above considerations, the Department delays until July 1, 2019, the effective date of the following provisions of the final regulations in title 34 of the Code of Federal Regulations (CFR):

§ 668.14(b)(30), (31), and (32) Program participation agreement.

§ 668.41(h) and (i) Reporting and disclosure of information.

§ 668.71(c) Scope and special definitions.

§ 668.90(a)(3) Initial and final decisions.

§ 668.93(h), (i), and (j) Limitation.

§ 668.171 General.

§ 668.175(c), (d), (f), and (h) Alternative standards and requirements.

Part 668 subpart L, Appendix C.

§ 674.33(g)(3) and (g)(8) Repayment.

§ 682.202(b)(1) Permissible charges by lenders to borrowers.

§ 682.211(i)(7) Forbearance.

§ 682.402(d)(3), (d)(6)(ii)(B)(*1*) and (*2*), (d)(6)(ii)(F) introductory text, (d)(6)(ii)(F)(*5*), (d)(6)(ii)(G), (d)(6)(ii)(H) through (K), (d)(7)(ii) and (iii), (d)(8), and (e)(6)(iii) Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.

§ 682.405(b)(4)(ii) Loan rehabilitation agreement.

§ 682.410(b)(4) and (b)(6)(viii) Fiscal, administrative, and enforcement requirements.

§ 685.200(f)(3)(v) and (f)(4)(iii) Borrower eligibility.

§ 685.205(b)(6) Forbearance.

§ 685.206(c) Borrower responsibilities and defenses.

§ 685.212(k) Discharge of a loan obligation.

§ 685.214(c)(2) and (f)(4) through (7) Closed school discharge.

§ 685.215(a)(1), (c)(1) through (c)(8), and (d) Discharge for false certification of student eligibility or unauthorized payment.

§ 685.222 Borrower defenses.

Part 685 subpart B, Appendix A Examples of borrower relief.

§ 685.300(b)(11), (b)(12), and (d) through (i) Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.

§ 685.308(a) Remedial actions.

**Note:** Section 668.90 has been redesignated as § 668.91 and § 668.93 has been redesignated as § 668.94 pursuant to the borrower defense procedural rule, published January 19, 2017 at 82 FR 6253 (the borrower defense procedural rule).

As noted in the IFR, the Department interprets all references to ''July 1, 2017'' in the text of the above-referenced regulations to mean the effective date of those regulations. The regulatory text included references to the specific July 1, 2017, date in part to provide clarity to readers in the future as to when the regulations had taken effect. Because the regulations did not take effect on July 1, 2017, we would, in connection with this delay of the effective date, read those regulations as referring to the new effective date established by this rule, *i.e.*, July 1, 2019.

AR-000002

This delay of the effective date of the 2016 final regulations does not delay the effective dates of the regulatory provisions published in 81 FR 75926 which: (1) Expand the types of documentation that may be used for the granting of a discharge based on the death of the borrower; (2) amend the regulations governing the consolidation of Nursing Student Loans and Nurse Faculty Loans so that they align with the statutory requirements of section 428C(a)(4)(E) of the HEA; (3) amend the regulations governing Direct Consolidation Loans to allow a borrower to obtain a Direct Consolidation Loan regardless of whether the borrower is also seeking to consolidate a Direct Loan Program or FFEL Program loan, if the borrower has a loan type identified in 34 CFR 685.220(b); (4) address severability; and (5) make technical corrections. In the 2016 final regulations, 34 CFR 682.211(i)(7) and 682.410(b)(6)(viii) were designated for early implementation, at the discretion of each lender or guaranty agency. That designation remains effective.

*Public Comment:* In response to our invitation in the NPRM, 14 parties submitted comments on the delay of the effective date. We do not discuss comments or recommendations that are beyond the scope of this regulatory action or that would require statutory change.

**Analysis of Comments and Changes**

An analysis of the comments and of any changes to this regulatory action since publication of the NPRM follows.

A number of commenters opposed the proposed rule to delay the effective date of selected provisions of the 2016 final regulations until July 1, 2019, stating that such delay (1) would harm student loan borrowers and, in some cases, taxpayers; (2) is unnecessary and unaligned with the mission of the Department of Education; (3) is not justifiable on the grounds that there is pending litigation as referenced in the NPRM; and (4) would not be compliant with the Administrative Procedure Act (APA). However, several commenters supported the delay because they believed, collectively, that a further delay would (1) relieve the regulatory burden on institutions; (2) mitigate uncertainty about the potential impact of the current regulations; and (3) prevent unnecessary harm and disruption to postsecondary educational institutions. We discuss and respond to these comments in greater detail below.

*Comments:* Several commenters stated that a further delay of the 2016 final regulations would harm borrowers because they would continue to be subject to the predatory practices of certain institutions without those institutions being held accountable through the financial responsibility standards and disclosures and student warnings contained in the 2016 final regulations. The commenters argued that the Secretary should protect and provide relief to borrowers who attended institutions of higher education that misrepresented their program offerings, or that employed deceptive marketing or recruiting tactics, instead of delaying the 2016 final regulations. The commenters claimed that a further delay would ensure that borrowers who apply or have applied for a loan discharge based on a borrower defense would be required to wait for new rules to go into effect before receiving consideration of their claims under the process established by the 2016 final regulations while interest, collection costs and financial distress continued to mount. The commenters also stated that a further delay of the pre-dispute arbitration and class action waiver provisions of the 2016 final regulations would leave students without access to the courts, while statutes of limitation run. Several commenters also argued that a further delay of the rule would harm student loan borrowers because borrowers would be denied access to the many provisions in the 2016 final regulations that are beneficial to borrowers, including provisions that provide:

—Automatic closed school discharges for borrowers who were enrolled in schools that closed on or after November 13, 2013, and who did not enroll in another school within three years of their school's closure;
—A second level of Departmental review for closed school discharge claims that were denied by a guaranty agency;
—An expansion of the conditions under which a FFEL or Direct Loan borrower may qualify for a false certification discharge;
—A clear process, based on new Federal standards, that establishes a borrower's procedural rights and describes how the Department will consider individual and group borrower defense discharge claims and pending requests for forbearance or suspension of collection on loans that are subject to borrower defense claims;
—Prohibitions on schools' ability to enforce pre-dispute arbitration agreements and class action waivers as to borrower defense-related claims for students receiving Direct Loans;

—Institutional financial responsibility triggers to protect the Federal government from losses that may arise from borrower defense claims and sudden school closures; and,
—Institutional financial protection disclosures for prospective and enrolled students to assist students in making informed choices about where to matriculate.

One commenter asserted that further delaying the 2016 final regulations would perpetuate existing harms experienced by borrowers, such as poor credit ratings resulting from debt that borrowers accumulated that the borrower may be able to discharge based on a borrower defense.

One commenter argued that further delay in the effective date harms borrowers because the delay creates uncertainty in how the Department will treat future borrower defense claims. The commenter asserted that while borrowers can wait for the outcome of the new rulemaking effort for clarity on the process, waiting has risks for borrowers as well, including the application of statutes of limitations which may limit the loan amount that may be discharged. The same commenter noted that Direct Loan borrowers with loans issued during the delay cannot avail themselves of the Federal standard in the 2016 final regulations; these borrowers will be limited to the State law standard. Finally, this commenter stated that although the Department claimed that borrowers would not be harmed by the further delay of the effective date of the 2016 final regulations because borrower defense claims would continue to be processed under existing regulations, the Department's own impact analysis estimates a reduction in student loan discharges of nearly two billion as a result of the further delay. Citing a July 2017 letter from the Department's Acting Under Secretary to Senator Richard Durbin, the commenter stated that the Department had not approved borrower defense applications since January 20, 2017, and that there were at least 64,000 outstanding borrower defense applications as of the date of the letter. The commenter noted that the number of unprocessed claims has since risen to 95,000, and that a further delay of the 2016 final regulations will exacerbate the lack of expediency in the Department's borrower defense discharge process to the detriment of borrowers who continue to wait for relief.

*Discussion:* The Department does not agree that borrowers will be significantly harmed by changing the effective date of the 2016 final

regulations to July 1, 2019. While the Department acknowledges that certain benefits of the 2016 final regulations will be delayed, it has determined that those benefits are outweighed by the administrative and transaction costs for regulated entities and borrowers of having those regulations go into effect only to be changed a short while later. First, the 2016 final regulations did not create the borrower defense regime but modified the pre-existing borrower defense regulations, in place since 1995. Those pre-existing regulations remain in effect, as does the statute that allows borrowers to assert defenses to repayment. Therefore, borrowers can continue to apply for relief from payment of loans under this existing process, and the Department is committed to processing those applications in a timely manner. Second, the instant rule merely delays the marginal benefits of the 2016 final regulations for a brief period of time (an additional year), it does not revoke them.

The Department does not share the commenters' concern that borrowers will be subject to certain institutions' predatory practices absent the 2016 final regulations. Because the current borrower defense regulations will remain in effect, borrowers will continue to be able to submit claims to the Department and have their claims processed in accordance with the HEA and those current regulations. Borrowers will not need to wait for new rules to go into effect to have a borrower defense claim considered. We do not anticipate that borrowers will be harmed by the current process because we routinely grant forbearances, and stop collection activities on defaulted loans, to borrowers while their discharge claims are under review. We acknowledge the commenter's concern regarding the number of pending claims before the Department. However, in the time since the commenter submitted the comment, the Department has issued decisions on borrower defense claims and we will continue to accept and process borrower defense claims.

In the event that the borrower defense regulations currently being negotiated result in discharge standards for a borrower defense claim different from the current standards, the new standards would apply only to loans first disbursed on or after the effective date of those regulations. Claims filed as to loans first disbursed before July 1, 2019, which would include currently pending claims and claims filed between the date of this final rule and July 1, 2019, will continue to be processed under the current standard for borrower defense claims.

We further disagree with commenters who claimed that the July 1, 2019 effective date would harm borrowers because the Federal standard established in the 2016 final regulations would not be in effect. As we noted in the 2016 final regulations, the Federal standard was designed to address much of the conduct covered by the State law-based standard so the vast majority of claims made by borrowers whose loans were first disbursed between July 1, 2017, and July 1, 2019, could be evaluated and discharges provided under the current State law-based standard. (81 FR 75937–75941). Any benefits to borrowers associated with having the Federal standard in place during that time period are outweighed by the confusion and disruption that would result from allowing the 2016 final regulations to take effect during a time when they are subject to a legal challenge and when the Department is reevaluating its borrower defense regulations generally. In addition to causing confusion for borrowers, implementing a different standard for a potentially short period of time could delay the processing of claims. One of the goals of the 2016 final regulations was to provide borrowers with more consistency and clarity about their borrower defense claims. (81 FR 39339–39340). Under the circumstances, the delay of the effective date of the 2016 final regulations provides greater clarity and consistency for borrowers, as well as a more streamlined process, than implementation of the rule under the current schedule.

With respect to the comment about a two billion dollar reduction in claims based on the difference in the primary and baseline scenarios from the net budget impact in the 2016 final regulations, as noted in the Regulatory Impact Analysis (RIA), the Department estimates the savings resulting from the delay to be much less. The savings resulting from the delay are mainly driven by slight differences between the State law-based standards in the current regulations and the Federal standards from the 2016 final regulations if they were applicable to loans disbursed between July 1, 2018, and July 1, 2019. Since we have always maintained that there would be significant overlap between the State law-based and Federal standards from the 2016 final regulations, the differences are estimated to be minor. The provisions of the 2016 final regulations pertaining to the process for review and determination of claims were not limited to specific cohorts designated by the effective date so the delay will not result in specific cohorts of borrowers being excluded from the process in effect when the claim is made. Additionally, the figures in the Accounting Statement for the 2016 final regulations would more appropriately be characterized as the costs associated with a single cohort and not the costs associated with a fiscal year. As part of its ongoing efforts to improve the utility of student loan information, the Department has updated its Accounting Statement presentation to better align with OMB Circular A–4, so the effects presented in this document do show the impact on the affected cohorts by fiscal year. The Net Budget Impact section of the RIA presents the assumptions about the effect of the delay.

With regard to the financial protection disclosures, the 2016 final regulations provided that before the disclosures would be required, the Secretary would conduct consumer testing to inform the identification of events for which disclosure would be required and to determine the form of the disclosure. In light of the fact that the 2016 final regulations provided for a future process before the disclosure requirement could be implemented, we do not believe a delayed effective date would significantly change what would occur in this regard during the period of the delay. In other words, because we did not anticipate the financial protection disclosures having a significant impact immediately following the 2016 final regulations' effective date, we believe the incremental effect of delaying those provisions is minimal. We address the comments related to institutional financial responsibility triggers in more detail in the RIA.

Moreover, there are other existing protections for borrowers, including periodic reviews and site visits by Department employees to title IV participating institutions to monitor regulatory compliance; and the activities of the enforcement unit within FSA charged with taking actions against parties participating in title IV, HEA programs to enforce compliance. In addition to the Department, other entities also act to protect students, borrowers, and taxpayers, such as the States through State law enforcement activities and other Federal agencies whose jurisdictions may overlap with, or affect, the higher education sector.

Finally, we note that borrowers may continue to apply for closed school and false certification discharges under the current regulations. With regard to the comments relating to the grounds for false certification discharge, as we stated in the notice of proposed

rulemaking that preceded the 2016 final regulations, these changes reflect statutory changes relating to false certification discharges for the lack of a high school diploma or its equivalent and for a disqualifying status. As a result, the Department's authority for false certification discharges on these grounds remains unchanged. (81 FR 39377–39378). In addition, under the current regulations, the Secretary has the authority to provide false certification discharges without an application based on information in the Secretary's possession. The 2016 final regulations explicitly provided that such information may include evidence that the school has falsified the Satisfactory Academic Progress of its students. Because the current regulation does not limit the information that may be considered by the Secretary to provide a false certification discharge without an application, we do not believe a delay of the 2016 revision to this provision will harm borrowers. With regard to a second level of review of a guaranty agency's determinations on closed school discharge requests, borrowers may raise any dispute with a guaranty agency to the Department's Federal Student Aid Ombudsman Group.

The Department acknowledges the commenters' concern that the window under applicable statutes of limitation for some borrowers to file lawsuits may end during the period covered by the delay of the 2016 final regulations' prohibitions on institutions' use of pre-dispute arbitration and class action waiver contractual provisions. However, as acknowledged in the 705 Document, serious questions regarding the legality of these provisions of the final regulations exist and these provisions are among the regulations directly challenged in the CAPPS litigation. The Department thinks that it is likely that the arbitration and class action waiver provisions will be overturned. Should the Department's regulations prohibiting schools from enforcing pre-dispute arbitration agreements and class action waivers be invalidated by the court, there would be significant confusion from borrowers and schools who may have engaged in court litigation on the basis of the prohibitions as to the enforceability of those agreements. We believe the harm from having these provisions take effect in the face of the CAPPS challenge is too great and outweigh any benefits these provisions would have. Further, we note that a borrower may continue to apply for relief, from the Department under the current, State-law based borrower defense to repayment regulations, irrespective of whether the borrower has a pre-dispute arbitration agreement with the school or an agreement to waive involvement in class action lawsuits.

We also note that the pre-dispute arbitration and class action waiver provisions of the 2016 final regulations would require some institutions to change their policies and procedures and to amend their enrollment agreements. In addition, re-training staff and sending notices to borrowers informing them of the changed class action waivers and pre-dispute arbitration provisions would impose administrative costs on institutions. If pre-dispute arbitration requirements and class action waivers are addressed through the current rulemaking process, institutions would need to repeat or reverse these steps to address any requirements that would go into effect on July 1, 2019. Maintaining the regulatory status quo with respect to pre-dispute arbitration agreements and class action waivers will reduce the administrative burden on schools and lessen confusion for borrowers who would be affected by these changes.

The Department further believes that implementing the 2016 final regulations at this time would cause significant confusion around borrower defenses generally that would be unfair to students and schools. Without a delay, if the current rulemaking process results in a different standard for borrower defense claims, there would be three separate sets of standards for borrower defense claims: the State-law based standard that is currently in effect; standards for loans disbursed between July 1, 2018, and July 1, 2019; and standards for loans disbursed on or after July 1, 2019. This would be more confusing for borrowers than the potential for two different standards— one for loans disbursed before July 1, 2019, and one for loans disbursed on or after July 1, 2019. Providing for an effective date of July 1, 2019, will allow the Department and the negotiating committee to develop new borrower defense regulations that would protect students from the most serious predatory practices, provide clear and evenhanded rules for students, colleges and universities to follow, and constrain the costs to taxpayers.

The Department's processing of borrower defense claims is not affected by the effective date of the 2016 final regulations, as the current regulations remain in effect. While the process for reviewing claims and the standard under which they are reviewed would have changed under the 2016 final regulations, the Department does not expect that the length of time required to review individual claims would have changed significantly if the 2016 final regulations had gone into effect as originally scheduled. With regard to group claims, the Department has granted group claims under the existing regulations. While the 2016 final regulations provided a regulatory process for granting group borrower defense claims, the Secretary had and continues to have the authority, and has exercised that authority, to grant group claims under the borrower defense regulations currently in effect.

*Changes:* None.

*Comment:* Some commenters claimed that the delay hurts American taxpayers because the 2016 final regulations would hold institutions that commit fraud monetarily accountable for their actions in cases of student loan discharges, rather than requiring taxpayers to absorb the costs of borrower defense discharges.

*Discussion:* As noted earlier in this section, the delay of the effective date of the 2016 final regulations will allow the Department to develop new borrower defense regulations that may be more beneficial to American taxpayers than the 2016 final regulations. We do not believe the delay will harm American taxpayers because the Department may assess liability for borrower defense claims on schools now, under the current regulations in effect. The financial protection triggers in the 2016 final rule were designed to increase the likelihood of recovering funds from institutions as claims come in over the life of the cohort, especially from institutions that might have significant exposure or that end up closing as a result of the financial risks identified by the triggers. The Department estimated that recovery activity would ramp up as the triggers were implemented, as reflected in the recovery assumption in the 2016 final rule (81 FR 76057), so a delay in the early years of recovery activity is not estimated to have a significant effect, as indicated by the change in the recovery assumption presented in this RIA. With the Department's authority to seek recoveries unchanged because of the change in effective date, we believe the possibility of slightly reduced recovery rates for a short period is warranted to further the goals of providing clarity by maintaining the regulatory status quo during this interim period. We note that the borrower defense procedural rule, which provided a regulatory framework for assessing liabilities against schools for which a borrower defense claim was successful, was published in the **Federal Register** on January 19, 2017,

and those regulations have been effective since that date.

*Changes:* None.

*Comment:* One commenter asserted that the data provided for the impact of the delays in the effective date of the 2016 final regulations were inadequate because the cost of providing financial protection was not quantified in the RIA of the 2016 final regulations and the NPRM preceding this final rule; and there is no additional data to estimate the costs institutions may avoid from the delayed effective date of the financial protection provisions.

Another commenter pointed out that if the effective date of the 2016 final regulations was not delayed, the Department estimated that $381 million in loans would be forgiven between July 1, 2017, and July 1, 2019. The commenter noted that the Department does point out that the Federal government will save this money by delaying the effective date but does not point out that borrowers will end up absorbing the cost. The commenter noted that the Department could change the current regulations and not include the new closed school discharge provisions, and noted that even a temporary delay causes financial stress that can trap some borrowers in poverty. Moreover, borrowers who default on their loans because they are not discharged would not be eligible for further financial aid.

*Discussion:* The Department appreciates the comments about the RIA for the NPRM preceding this final rule. In that RIA, the Department acknowledged that the costs of providing financial protection were not quantified in the RIA for the 2016 final regulations and that there is no additional data to estimate those costs. That fact, however, does not mean that we have not sufficiently justified this delay.

As discussed in the RIA for this final rule with respect to the delay of the financial protection provisions, several factors will affect the cost for individual institutions, including: the level of institutional conduct giving rise to borrower defense claims, the applicability of certain financial protection triggers, the financial strength of the institution, the manner in which the institution provides financial protection to the Department, and the potential development of financial products aimed at providing this protection. The Department believes that individual institutions are best positioned to evaluate their potential exposure to borrower defense claims, their financial relationships with parties who could provide

financial protection, and the cost of providing protection. Along with the uncertainty about the projected amount of claims as recognized in the different sensitivity runs presented in the RIA for the 2016 final regulations, the Department believes that quantifying the cost of providing financial protection would provide a false sense of precision. Rather than producing a number that would be inapplicable to most institutions, the Department focused on explaining the regulations and providing data about the provisions for which it had information such as the cohort default rate (CDR), 90/10 revenue requirement, fluctuation in title IV aid, withdrawal rate, and accreditor action triggers. The 2016 final regulations did not present information about the provisions related to U.S. Securities and Exchange Commission or stock exchange actions, gainful employment, the withdrawal of owner's equity from an institution, teach-outs, State licensing, financial stress tests, an institution's violation of a loan agreement, or pending borrower defense claims. Additionally, given that the known borrower defense claims at the time were from a small number of institutions and many had not been approved or disapproved, it is unclear how the distribution of successful borrower defense claims at institutions would match up with the distribution of institutions' performance on the financial responsibility triggers for which the Department had some information.

As is further discussed in the RIA for this final rule, the Department recognizes that the delayed effective date will postpone the impact of the financial protection provisions on institutions. This impact was not quantified for the same reasons described above, but would be a fraction of the total protection expected to be generated under the rule as some of the triggers are tied to the production of certain performance measures and would not have kicked in immediately under the 2016 regulations. Successful claims made by borrowers will be paid regardless of the limited delay in the date for requiring institutions to provide financial protection, and the Department believes the cost to taxpayers of the slightly reduced recoveries described in the Net Budget Impact in the RIA is justified by the benefits of reconsidering the financial protection provisions and appropriately balancing the costs to institutions with protection of borrowers and taxpayers.

With respect to the comment about closed school discharges, the Department disagrees with the claim

that borrowers will bear a $381 million cost because of the delay. As noted in the NPRM, the $364 million savings estimated for FY 2017 occurred because the Department did not execute the modification for cohorts 2014–2016 anticipated in the President's Budget (PB) for 2018 because of the change of the effective date of the 2016 final regulations. The difference in the $381 million estimated for the three-year automatic discharge in the 2016 final regulations and the $364 million estimate for the modification in this rule is that the $381 million was based on PB 2017 loan model assumptions and the modification to be executed was based on the PB 2018 assumptions. Under the credit reform scoring rules applicable to the student loan programs, the unexecuted modification created savings that needed to be recognized. This budget scoring requirement does not affect borrowers or their eligibility for a closed school discharge. Borrowers can avoid any uncertainty about the timing of receiving a closed school discharge or costs associated with a delay in receipt of such discharge by submitting a closed school discharge application at any time. Any costs or savings associated with changes in the automatic discharge provision as a result of the current negotiated rulemaking are outside the scope of the analysis of the delay, and we will address any related issues raised by commenters in response to the NPRM for the proposed rule resulting from the current rulemaking process.

*Changes:* None.

*Comment:* Some commenters expressed their belief that the delay is not aligned with Congressional intent, citing 20 U.S.C. 3402, and is contrary to the public interest.

*Discussion:* In 20 U.S.C. 3402, Congress states that the establishment of a Department of Education is in the public interest, will promote the general welfare of the United States, will help ensure that education issues receive proper treatment at the Federal level, and will enable the Federal government to coordinate its education activities more effectively.

In its execution of these responsibilities, and consistent with 20 U.S.C. 3402, the Department has determined that the public interest is best served by a delay in the effective date of the 2016 final regulations.

*Changes:* None.

*Comments:* Some commenters expressed concerns that the Department did not follow required rulemaking processes in delaying the effective date of the 2016 final regulations. These concerns alleged specific statutory and

APA violations. First, commenters stated that the Department's justification to waive negotiated rulemaking was insufficient. Second, commenters wrote that we did not provide sufficient justification for the delay. One commenter said that the NPRM fails to identify any specific deficiencies in the 2016 final regulations, or findings and rationale that support revising those regulations. Third, a commenter stated that the minor cost savings detailed in the RIA were insufficient justification to delay the rule. In addition, one commenter stated that further negotiated rulemaking on the 2016 final regulations was redundant and wasteful.

*Discussion:* The Department adhered to all applicable laws in promulgating this final rule. First, with regard to waiver of negotiated rulemaking, section 492(b)(2) of the HEA provides that the Secretary may waive negotiated rulemaking if she determines that there is good cause to do so, and publishes the basis for such determination in the **Federal Register** at the same time as the proposed regulations in question are first published. In the NPRM, the Department properly articulated the good cause supporting our waiver of the HEA's negotiated rulemaking requirement. The NPRM explained that the original catalyst for the delay was the CAPPS litigation, filed on May 24, 2017, and that it would not have been possible for the Department to engage in negotiated rulemaking and publish final regulations after that date (much less after October 24, 2017, the date the NPRM was published), and prior to July 1, 2018 (the current effective date of the 2016 final regulations). Negotiated rulemaking on this discrete issue simply was not practicable. It is a time-consuming and resource-intensive process, and could not practicably be completed by July 1, 2018.

Negotiated rulemaking typically takes the Department well over 12 months to complete. The statute requires the Department to hold public hearings before commencing any negotiations. Based upon the feedback the Department receives during the hearings, the Department then identifies those issues on which it will conduct negotiated rulemaking, announces those, and solicits nominations for non-Federal negotiators. Negotiations themselves are typically held over a 3 month period. Following the negotiations, the Department then prepares a notice of proposed rulemaking and submits the proposed rule to OMB for review. The proposed rules are then open for public comment for 30–60 days. Following the receipt of public comments, the Department then prepares a final regulation and submits it to OMB for review.

With the completion of all of these steps taking well over 12 months, it would not have been feasible for the Department to complete negotiated rulemaking on the delayed effective date by July 1, 2018. Indeed, it would not have been feasible even if the Department had commenced the process on May 24, 2017, when it learned of the CAPPS litigation. Thus, the Department had good cause to waive that requirement.

Regarding the comment that we did not provide sufficient justification to propose delay of the effective date of the 2016 final regulations, the Department is in the process of developing proposed revisions to the borrower defense regulations through the negotiated rulemaking process. As a result of the timing of the negotiated rulemaking and the effect of the master calendar requirement, any regulations resulting from the negotiated rulemaking cannot become effective before July 1, 2019. Therefore, the Department proposed in the NPRM to delay the effective date of the 2016 final regulations to July 1, 2019. This would prevent a scenario in which the 2016 final regulations might become effective for a short period of time before new regulations resulting from the current borrower defense rulemaking process take effect, a result which likely would lead to a great deal of confusion and difficulty for borrowers and schools alike. Accordingly, the Department articulated a reasonable and sufficient justification to propose a delay of a final rule.

Also with regard to the comment that the NPRM fails to identify any specific deficiencies in the 2016 final regulations, the APA and applicable case law require only that an agency's rulemaking justify the particular action or actions to be taken by that rule. This final rule does not amend the substance of the 2016 final regulations; it merely changes the effective date of the 2016 final regulations and is fully supported based on the information provided in the NPRM and in this final rule. Amending the substance of the 2016 final regulations (or prior borrower defense regulations) would require a separate rationale. We are separately conducting a negotiated rulemaking process to address the substance of the borrower defense regulations, and any resulting NPRM will provide a rationale for proposed changes.

The NPRM at issue here proposed only a delay of the effective date of the 2016 final regulations; it did not propose any other changes and therefore the Department was not required to solicit comment on any matters other than the effective date. Also contrary to the commenter's assertions, the number of comments received in response to an NPRM has no bearing on the sufficiency of the Department's solicitation of public engagement. The APA requires the Department to "give interested persons an opportunity to participate" and consider "the relevant matter presented," not to reach a certain threshold of comments before it may proceed with the rulemaking process. 5 U.S.C. 553(c). The Department requested comments that covered the scope of our rulemaking—delay of an effective date—and considered each applicable comment received in promulgating this final rule.

The regulatory impact analysis in the NPRM estimated the quantified economic effects and net budget impact of the delay, and projected that the delay would result in a net cost savings. However, the delay was not proposed solely on the basis of those calculations. Executive Order 13563 requires the Department to, in part, "propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs (recognizing that some benefits and costs are difficult to quantify)." Just as the commenters note harms to borrowers that cannot be definitively quantified, not all benefits of the delay are measurable in monetary terms. Delaying the effective date as proposed in the NPRM will preserve the regulatory status quo while the Department reconsiders the substance of its regulations governing borrower defense, preventing borrowers and institutions alike from being subject to an uncertain, quickly changing set of regulatory requirements. The Department undertook the required analysis and determined that the benefits of the delay would justify the costs.

With regard to the comment about redundancy and wastefulness, we have substantive concerns about the 2016 final regulations. In light of that, negotiated rulemaking and publication of an NPRM with request for further public comment is the statutorily required path to ensure public input and potentially make substantive changes to the Department's regulations. After careful consideration, we determined the benefits of proceeding with negotiated rulemaking to properly analyze the borrower defense regulations outweighed the costs of doing so.

*Changes:* None.

*Comment:* Some commenters also argued that the CAPPS lawsuit is an inappropriate basis for the delay

because CAPPS' litigation addresses only some of the regulatory provisions being delayed, but the notices effectuating the delay included many regulatory provisions, including those related to closed school discharge.

*Discussion:* The CAPPS litigation is not the basis for the delay proposed in the NPRM, although it was the reason for the initial delay of the 2016 final regulations' effective date. We further note that contrary to the commenter's assertion, CAPPS' complaint expressly prays for an order declaring ''that the entirety of the Final Rule is contrary to the Constitution,'' and asks that the Court enjoin the Department from ''taking any action whatsoever pursuant to the final regulations,'' indicating that its challenge is broader than the commenters portray.

*Changes:* None.

*Comment:* Some commenters supported the proposal in the NPRM. One commenter asserted that the 2016 final regulations' intention missed the mark and created an unnecessarily complex and costly system that is confusing to students, unfair to institutions, and puts taxpayers on the hook for huge costs. The commenter also suggested that maintaining the regulatory status quo under the 1994–95 standard is critical to the public interest and that requiring institutions to use their time and finances to implement the expensive 2016 final regulations while another rulemaking is occurring would be burdensome and contrary to the goals of Executive Order 13777, which is intended to help alleviate the regulatory burdens on the American people. This same commenter emphasized that the delay will help to maintain an existing, easily understood process—especially for students seeking redress under the current State law-based standard.

Commenters asserted that the delay of selected provisions of the 2016 final regulations would mitigate uncertainty about the potential impact of the regulations, especially in light of ongoing litigation, the master calendar requirement, and ongoing negotiated rulemaking.

One commenter asserted that the Department properly used Section 705 of the APA to avoid substantial harm to students. The commenter suggested that if some of the provisions of the 2016 final regulations went into effect and were quickly struck down by a court, the result would be chaotic, particularly if the subsequent regulatory framework change occurred in the course of an award year. The commenter asserted further that the ongoing negotiated rulemaking is justified based on the

need to improve the borrower defense regulations as part of a regulatory reset. This commenter argued that because the reset could lead to significant changes, it would be nonsensical, even aside from the litigation, to implement new regulations for a full or for part of an award year only to change them after the current negotiated rulemaking process is complete.

One commenter asserted that the arbitration and class action provisions in the 2016 final regulations would require institutions to incur significant costs in changing multiple policies and procedures and amending existing and future enrollment agreements, re-training staff, litigating new cases, and sending notices to borrowers that existing class action waivers or arbitration provisions will not be enforced. According to the commenter, the implementation of these requirements would divert resources from students and would require the further diversion of resources if schools were required to retrain staff and litigate the effects of the temporary ban on past agreements with students, including those signed during the interim period, if the regulations were to change as a result of the current rulemaking process.

The commenter also stated that the financial responsibility provisions that require, in some circumstances, an institution to obtain a letter of credit or some type of financial protection would impose a significant burden on schools because a letter of credit is difficult to obtain and the additional cost could cause many schools, including some historically black colleges and universities, to close. The commenter also argued that the delay is appropriate because schools may need to establish different compliance measures if the current negotiated rulemaking process modifies the financial responsibility provisions. In such event, the commenter stated that the temporary implementation of these provisions would lead to potentially unnecessary compliance and training costs for schools to accommodate different rules.

The commenter also argued that the repayment rate provisions which would require proprietary schools with a certain loan repayment rate to distribute a warning to students and prospective students might damage the reputation of such schools and impact such schools' ability to draw students and raise funds. The commenter argued that the delay would prevent any disruptions as changes to the requirements are considered during the negotiated rulemaking process.

Finally, the commenter stated its view that given the significant expansion of

borrower defense under the 2016 final regulations and the changes to the borrower defense regulations that may result from the Department's current rulemaking effort, the additional delay is required to prevent confusion for students and the expenditure of school resources on implementing the different borrower defense standards and procedures when those resources could otherwise be used to enhance student experiences.

*Discussion:* While comments regarding the effect of the 2016 final regulations are outside of the scope of the NPRM, the Department agrees that the delay will provide clarity for institutions and students, as well as save institutions from incurring the costs and expending the resources necessary to comply with the requirements under the 2016 final regulations that would potentially be in effect for only a short period of time.

*Changes:* None.

**Executive Orders 12866, 13563, and 13771**

*Regulatory Impact Analysis*

Under Executive Order 12866, it must be determined whether this regulatory action is ''significant'' and, therefore, subject to the requirements of the Executive Order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a ''significant regulatory action'' as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an ''economically significant'' rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

The Department estimates the quantified annualized economic and net budget impacts of the delay of the effective date to be −$26.9 million in reduced costs to institutions and the Federal government. These reduced costs result from the delay of the borrower defense provisions of the 2016 final regulations as they would apply to

the 2017 to 2019 loan cohorts, as well as from the delayed paperwork burden on institutions and the delayed execution of the closed school automatic discharge. This final regulatory action is a significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866.

We have also reviewed this final rule under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing this final rule only on a reasoned determination that its benefits justify its costs. Based on the analysis that follows, the Department believes that this final rule is consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

In accordance with both Executive Orders, the Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action.

The quantified economic effects and net budget impact associated with the delayed effective date are not expected to be economically significant.

**Effects of Delay**

As indicated in the RIA published with the 2016 final regulations on November 1, 2016, those final regulations were economically significant with a total estimated net budget impact of $16.6 billion over the 2017–2026 loan cohorts in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the provisions for a three-year automatic closed school discharge.

However, as noted in the RIA for the NPRM published October 24, 2017, the analysis of the net budget impact in this final rule is limited to the effect of delaying the effective date of the 2016 final regulations from July 1, 2018, to July 1, 2019, and does not account for any potential changes in the 2016 final regulations or administrative updates to existing processes and procedures related to borrower defense claims.

As the net budget impact is based on the net present value of the cash flows of the relevant cohorts over 40 years, delaying the 2016 final regulations until July 1, 2019, will have limited effect, as discussed below.

Even with the change in the effective date to July 1, 2019, borrowers will still be able to submit claims. The provisions of the 2016 final regulations pertaining to the process for review and determination of claims were not limited to specific cohorts designated by the effective date so the delay will not result in specific cohorts of borrowers being excluded from the process in effect when the claim is made. Loans made before July 1, 2017, were always subject to the State law-based standard, and borrowers' ability to bring claims under that standard is unchanged by the delay. For claims filed after the effective date of the regulations for loans made on or after July 1, 2019, the Federal standard established in the 2016 final regulations would apply. As discussed previously, the Department interprets all references to "July 1, 2017" in the text of the final regulations to mean the effective date of the final regulations. As a result, the delay in the effective date means that loans made between July 1, 2018, and June 30, 2019, will be subject to the current State law-based standard.

As we noted in the 2016 final regulations, the Federal standard was designed to address much of the conduct already covered by the State law-based standard, so the vast majority of discharge claims associated with loans made between July 1, 2017, and the delayed effective date could be made under the current, State law-based standard as well. (81 FR 76057)

Some commenters suggested that borrowers will be harmed by the delay, either through uncertainty as to how claims will be handled, the application of statutes of limitation, or processing delays. Commenters also expressed concerns about the processing of existing claims and the effect of the delay on their resolution. The Department does not agree that the delay of the effective date of the 2016 final regulations will affect the processing of existing claims. Existing claims were always subject to the State law-based standard in the current regulations. Efforts to improve the efficiency of claims processing are ongoing and are not contingent upon implementation of the 2016 final regulations.

The Department maintains that the loans affected by the delay from July 1, 2018 to July 1, 2019 are those issued between those dates and for which any potential borrower defense claims will now be evaluated under the State law-based standard. These loans have not been made yet, and the NPRM and this final rule clarify that the State law-based standard will apply to them—this provides borrowers certainty regarding the standard that will be applied to their claims. Some commenters noted the difference in the annualized estimate for the primary and baseline scenarios and suggested the delay will cost borrowers approximately two billion dollars. As explained in the *Net Budget Impact,* the Department estimates the cost of the delay to be much less than two billion dollars given that there is significant overlap between the current State law-based standard and the Federal standard from the 2016 final regulations and that claims associated with these loans will be handled under the process in place when their claim is made. The Department does not believe that the delay will result in reversion to the baseline scenario assumptions for the borrower percentage so the effect on borrowers will be much lower than the commenters suggested. Additionally, the figures in the Accounting Statement for the 2016 final regulations would more appropriately be characterized as the costs associated with a single loan cohort and not the costs associated with a fiscal year, so the change in the

effective date would not result in the two billion dollar difference as it reflects just one year of the 40-year life of the cohort. The Department has updated its Accounting Statement in this final rule so the effects presented in this RIA show the impact on the affected loan cohorts by fiscal year.

As discussed in the *Analysis of Comments and Changes* the potential effects on borrowers include possible reduced access to courts from the delay in the arbitration and class action waiver provisions while statutes of limitation are running. We think it is likely that these provisions will be overturned in the CAPPS litigation and are concerned about the confusion to borrowers that would result. We believe the harm that would occur outweighs any benefits of these provisions. We note that a borrower may submit a borrower defense claim to the Department with respect to his or her Federal loans at any time without regard to arbitration agreements or class action waiver clauses in agreements between the borrower and the school, as the loan is between the Federal government and the borrower.

In addition to borrowers, institutions are also affected by the delayed effective date. As indicated in the RIA for the 2016 final regulations, institutions would bear the major costs of compliance, paperwork burden, and providing financial protection to the Department. In terms of cost savings for institutions, the estimated annual paperwork burden was approximately $9.4 million in the first year after the 2016 final regulations were to take effect. In the revised scenario developed to estimate the effect of this delay in the effective date, estimated transfers from institutions to students, via the Federal government, would be reduced by approximately $9.3 million for the 2017 and 2018 loan cohorts because of the slight reduction in claims from the application of the State law-based standard and the change in the effective date of the financial protection provisions as reflected in the assumptions presented in Table 1. The costs of providing financial protection were not quantified in the RIA for the 2016 final regulations, and the Department has no additional data to estimate costs institutions may avoid from the delayed effective date of the financial protection provisions. Given the limited history of borrower defense claims and recovery actions and numerous factors that affect the cost for

individual institutions, the Department believed that quantifying the cost of providing financial protection would provide a false sense of precision. As noted in the 2016 final regulations and the NPRM, there are several ways for institutions to provide financial protection to the Department, including some that may be developed in the future. The price of this protection would likely vary by the size of the institution and the institution's existing financial relationships with parties who could provide the financial protection. Other key elements that contribute to the uncertain cost of financial protection overall are the distribution of borrower defense claims, the type of institutions involved, the applicability of specific financial protection triggers, and the Department's pursuit of recoveries. The Department recognizes that the delayed effective date will postpone the impact of the financial protection provisions on institutions. This would be a fraction of the total protection expected to be generated under the rule as some of the triggers are tied to the production of certain performance measures such as gainful employment rates and there would be some time, possibly months, between the effective date and the next release of rates. The recovery assumption always assumed some ramping up of financial protection as different metrics became available for application, so the change in effective date will affect the early years when recoveries were assumed to be smaller. Borrowers are not affected by institutions' delay in incurring the costs of financial protection, and the Department believes it is worth the cost to taxpayers from reduced recoveries described in the Net Budget Impact in the RIA to reconsider the financial protection provisions and appropriately balance the costs to institutions with protection of borrowers and taxpayers.

## Net Budget Impact

As described in the NPRM, to estimate the net budget impact of the delay in the effective date to July 1, 2019, the Department developed a scenario that revised the primary estimate assumptions from the 2016 final regulations for the affected 2017 to 2019 cohorts, as was done for the one-year delay described in the IFR. The Department has reviewed the comments it received, particularly those about the potential impacts and estimate of the effects of the delay and responded in the Analysis of Comments and Changes

section and this RIA. However, the Department believes that the assumptions for the scenario to estimate the net budget impact on the student loan program from the delay from July 2018 to July 2019 remain appropriate and reasonable.

As before, the Department applies an assumed level of school conduct that could generate borrower defense claims, borrower claims success, and recoveries from institutions (respectively labeled as Conduct Percent, Borrower Percent, and Recovery Percent in Table 1) to the PB 2018 loan volume estimates to generate the estimated net borrower defense claims for each loan cohort, loan type, and sector. The assumptions for the primary scenario from the 2016 final regulations were the basis for the PB2018 baseline that assumed the final regulations would go into effect on July 1, 2017. The scenario developed for the NPRM is designed to capture the incremental change from the one-year delay in the IFR associated with the further one-year delay in the effective date to July 1, 2019. Compared to the scenario developed for the IFR, recoveries are reduced by an additional two percent for the 2017 and 2018 cohorts, all of the 2018 cohort is subject to the State law-based standard, and the affected portion of the 2019 cohort is subject to the current, State law-based standard and reduced recoveries at the five percent level used for the one-year delay in the IFR. Table 1 presents assumptions for the primary estimate from the final regulations and the revised estimate for the delay from July 1, 2018 to July 1, 2019, in the effective date. In this scenario, the conduct percent is 90 percent of the primary scenario from the final regulations and the borrower percent is the same. The financial protection provided was always expected to increase over time, so the delayed effective date in the near term is not expected to significantly affect the amount of recoveries over the life of any particular loan cohort, limiting any net budget impact from the delay. To estimate the potential reduction in recoveries related to the proposed delayed effective date, we reduced recoveries for the affected portion of the 2017 and 2018 cohorts by seven percent for the private not-for-profit and proprietary sectors and by five percent for the 2019 cohort. As in the 2016 final regulations and the IFR, recoveries from public institutions were held constant at 75 percent across scenarios.

TABLE 1—REVISED ASSUMPTIONS FOR ONE-YEAR DELAY FROM JULY 1, 2018 TO JULY 1, 2019

| Cohort | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|
| | Pub/Priv NFP | Prop | Pub/Priv NFP | Prop | Pub/Priv NFP | Prop |
| Conduct Percent: | | | | | | |
| Final Primary ................................. | 3.0 | 20 | 2.4 | 16 | 2.0 | 13.6 |
| Delay to 2019 ................................. | 2.7 | 18 | 2.16 | 14.4 | 1.8 | 12.24 |
| Borrower Percent: | | | | | | |
| Final Primary ................................. | 35 | 45 | 36.8 | 47.3 | 36.8 | 47.3 |
| Delay to 2019 ................................. | 35 | 45 | 36.8 | 47.3 | 36.8 | 47.3 |
| | Pub | Priv/Prop | Public | Priv/Prop | Pub | Priv/Prop |
| Recovery Percent: | | | | | | |
| Final Primary ................................. | 75 | 23.8 | 75 | 23.8 | 75 | 23.8 |
| Delay to 2019 ................................. | 75 | 22.134 | 75 | 22.134 | 75 | 24.871 |

The net budget impact associated with these effects of the one-year delay in the effective date on the borrower defense provisions only is approximately −$46.1 million from the 2017 to 2019 loan cohorts.

As the amount and composition of borrower defense claims and estimated recoveries over the lifetime of the relevant loan cohorts are not expected to change greatly due to the delayed effective date, the Department does not estimate an economically significant net budget impact from the delay itself, with a potential net budget impact related to borrower defense claims of −$46.1 million in reduced costs for the affected cohorts. This represents the incremental change associated with the one-year delay from July 1, 2018, to July 1, 2019. If compared to the PB 2018 baseline, the savings would be approximately −$78.8 million.

The closed school automatic discharge provisions were the other significant source of estimated net budget impact in the 2016 final regulations. Under credit reform scoring, the modification to older cohorts for the automatic discharge provision estimated to cost $364 million was expected to occur in FY 2017 in the PB 2018. As a result of the delay in the effective date, the Department will not execute the modification in FY 2017.

Moving the execution of the modification beyond FY 2017 will require a new cost analysis with economic assumptions from the fiscal year of the execution. This will result in

a change of cost, but at this point it is not possible to know the discount rates in future fiscal years, so the cost of the modification will be determined in the year that it is executed. While the actual cost of the future modification cannot be determined at this time, the Department did approximate the effect of the delay by shifting the timing of the relevant discharges back by a year and recalculating a modification using the discount rates and economic assumptions used for the calculation of the PB2018 modification. When calculated in this manner, the delay in the modification to July 2018 described in the IFR resulted in estimated savings of less than $10 million. Using the same approach, the delay to July 2019 is expected to save approximately $15 million above the savings from the initial one-year delay.

As the delay does not change the substance of the automatic discharge, we would expect the amount and composition of loans affected by the automatic discharge not to change significantly. The closed school three-year automatic discharge provisions were applicable to loans made on or after November 1, 2013, and were not linked to the effective date of the final regulations. Therefore, delaying the effective date of those provisions will not change the set of loans eligible for this automatic discharge. Additionally, borrowers would have the ability to apply for a closed school discharge before July 1, 2019, if they did not want to wait for the automatic discharge to be

implemented. For future cohorts, the delay is not significant as the three-year period will fall beyond the delayed effective date. Any significant change to the estimated net budget impact associated with the closed school automatic discharge depends on any substantive changes made to the provisions as a result of the current rulemaking process and changes to economic assumptions when the modification is executed.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have determined that this rule will result in cost savings. Therefore, this rule would be considered an Executive Order 13771 deregulatory action.

**Accounting Statement**

In evaluating whether a regulation is economically significant, a key consideration is whether the annual effect in any given year is over $100 million.

To evaluate this, the Department looked at the difference in the undiscounted cash flows related to the death, disability, and bankruptcy (DDB) claims in which borrower defense claims are included for the one-year delay established in the IFR and the one-year delay scenario established in this notice and described under the heading "Net Budget Impact". The difference from subtracting this delay scenario from the IFR one-year delay scenario for the 2017 to 2019 loan cohorts is summarized in Table 2.

TABLE 2—DIFFERENCE IN UNDISCOUNTED NET CASHFLOWS FOR THE 2017 TO 2019 LOAN COHORTS FROM THE ONE-YEAR DELAY IN 2016 BORROWER DEFENSE RULE TO JULY 1, 2019

| | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| Change in DDB Cashflow ..... | 159 | 7,489 | 496,637 | 637,361 | 538,468 | 6,004,802 | 9,525,520 | 4,668,143 | 2,156,009 | 3,003,657 |

Table 3 shows the effects when those differences in the DDB cashflows are discounted at 7 and 3 percent and annualized.

| Category | Benefits | |
|---|---|---|
| Institutions may not incur compliance costs or costs of obtaining financial protection until the rule is in effect ... | Not Quantified | |
| Category | Costs | |
| | 7% | 3% |
| Continued use of State-law based standard<br>Delay in providing consumer information about institutions' performance and practices<br>Potential decreased awareness and usage of closed school and false certification discharges | Not Quantified | |
| Savings associated with delay in compliance with paperwork requirements ......................................... | −9.5 | −9.51 |
| Category | Transfers | |
| | 7% | 3% |
| Reduction in transfers from the Federal government to affected borrowers in the 2017 to 2019 cohorts that would have been partially borne by affected institutions via reimbursements .................................. | −3.5 | −3.8 |
| Reduced reimbursements from affected institutions to affected students, via the Federal government as loan cohorts 2017 to 2019 are subject to the existing borrower defense regulation ................................ | −1.2 | −1.3 |
| Delay in closed school automatic discharge implementation from 2018 to 2019 ................................ | −14.8 | −14.8 |

**Paperwork Reduction Act of 1995**

As indicated in the Paperwork Reduction Act section published in the 2016 final regulations, the assessed estimated burden was 253,136 hours, affecting both institutions and individuals, with an estimated cost of $9,458,484. The table below identifies the regulatory sections, OMB Control Numbers, estimated burden hours, and estimated costs of those final regulations.

| Regulatory section | OMB Control No. | Burden hours | Estimated cost $36.55/hour institution, $16.30/hour individual |
|---|---|---|---|
| 668.14 ................................................ | 1845–0022 | 1,953 ................................................ | 71,382 |
| 668.41 ................................................ | 1845–0004 | 5,346 ................................................ | 195,396 |
| 668.171 .............................................. | 1845–0022 | 3,028 ................................................ | 110,673 |
| 668.175 .............................................. | 1845–0022 | 60,560 .............................................. | 2,213,468 |
| 682.211 .............................................. | 1845–0020 | 5,784 ................................................ | 211,405 |
| 682.402 .............................................. | 1845–0020 | 1,838 ................................................ | 67,179 |
| 685.222 .............................................. | 1845–0142 | 249 (Individuals) ............................ | 4,059 |
| 685.222 .............................................. | 1845–0142 | 800 (Institutions) ........................... | 29,240 |
| 685.300 .............................................. | 1845–0143 | 179,362 ............................................ | 6,555,681 |
| Total ............................................. | | 258,920 ............................................ | 9,458,484 |
| Cost savings due to delayed effective date excluding 682.211 early implementation allowed. | | 253,136 ............................................ | 9,247,079 |
| Burden remaining .......................... | | 5,784 ................................................ | 211,405 |

This final rule delays the effective date of the implementation of all of the cited regulations and will result in a cost savings in the total amount of $9,458,484. However, 34 CFR 682.211(i)(7) which was included in the 2016 final regulations, regarding mandatory forbearance based on a borrower defense claim, with an estimated 5,784 hours and $211,405 cost, was designated for early implementation. Lenders may have elected early implementation and, therefore, those specific costs and hours remain applicable and have been subtracted from the overall estimated cost savings. Based on the delayed effective date of July 1, 2019, the revised estimated annual cost savings to institutions and individuals is $9,247,079 ($9,458,484 − $211,405) with an estimated burden hours savings of 253,136 (258,920 − 5,784).

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register**. Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.*

Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 674*

Loan programs—education, Reporting and recordkeeping requirements, Student aid.

*34 CFR Parts 682 and 685*

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

Dated: February 9, 2018.

**Betsy DeVos,**
*Secretary of Education.*

[FR Doc. 2018–03090 Filed 2–9–18; 4:15 pm]

**BILLING CODE 4000–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R06–OAR–2017–0435; FRL–9973–23—Region 6]**

**Approval and Promulgation of Air Quality Implementation Plans; Arkansas; Infrastructure State Implementation Plan Requirements for the National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA) is approving State Implementation Plan (SIP) revisions submitted by the State of Arkansas to address the requirements of sections 110(a)(1) and (2) of the Clean Air Act (CAA or Act) for the 2006 and 2012 fine particulate matter ($PM_{2.5}$) National Ambient Air Quality Standards (NAAQS), 2008 lead (Pb) NAAQS, 2008 ozone ($O_3$) NAAQS, 2010 nitrogen dioxide ($NO_2$) NAAQS, and the 2010 sulfur dioxide ($SO_2$) NAAQS. Under CAA sections 110(a)(1) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance, and enforcement of a revised primary or secondary NAAQS. CAA sections 110(a)(1) and (2) require each state to make a new SIP submission within three years after EPA promulgates a new or revised NAAQS for approval into the existing federally-approved SIP to assure that the SIP meets the applicable requirements for such new and revised NAAQS. This type of SIP submission is commonly referred to as an "infrastructure SIP or "i-SIP."

**DATES:** This final rule is effective on March 16, 2018.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R06–OAR–2017–0435. All documents in the docket are listed on the *http://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *http://www.regulations.gov* or in hard copy at the EPA Region 6, 1445 Ross Avenue, Suite 700, Dallas, Texas 75202–2733.

**FOR FURTHER INFORMATION CONTACT:** Nevine Salem, (214) 665–7222, *salem.nevine@epa.gov.* To inspect the hard copy materials, please schedule an appointment with her or Bill Deese at (214) 665–7253.

**SUPPLEMENTARY INFORMATION:** Throughout this document "we," "us," and "our" means the EPA.

**I. Background**

The background for this action is discussed in detail in our November 20, 2017 proposal (82 FR 55065). In that action, we proposed to approve the Arkansas i-SIP submittal dated March 24, 2017 to address the requirements of sections 110(a)(1) and (2) of the Act for the 2006 and 2012 $PM_{2.5}$ NAAQS, 2008 lead (Pb) NAAQS, 2008 ozone ($O_3$) NAAQS, 2010 nitrogen dioxide ($NO_2$) NAAQS, and the 2010 sulfur dioxide ($SO_2$) NAAQS. Under CAA sections 110(a)(1) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance, and enforcement of a revised primary or secondary NAAQS. CAA sections 110(a)(1) and (2) require each state to make a new SIP submission within three years after EPA promulgates a new or revised NAAQS for approval into the existing federally-approved SIP to assure that the SIP meets the applicable requirements for such new and revised NAAQS.

We received an anonymous public comment on December 18, 2017 on the proposed rulemaking action. The comment is posted to the docket (EPA–R06–OAR–2017–0435). The commenter raised concerns about the accuracy of agricultural and wild fires emissions inventory. Such comment is irrelevant and is outside the scope of this specific rule making action.

**II. Final Action**

As detailed in the proposal action, EPA is approving the majority of the March 24, 2017, Arkansas i-SIP submittal, which addresses the requirements of CAA sections 110(a)(1) and (2) as applicable to the 2006 $PM_{2.5}$, 2008 Pb, 2008 $O_3$, 2010 $SO_2$, 2010 $NO_2$, and 2012 $PM_{2.5}$ NAAQS. Table 1 outlines the specific actions [1] we are approving in this final rulemaking.

TABLE 1—FINAL ACTIONS ON THE ARKANSAS INFRASTRUCTURE SIP SUBMITTAL FOR VARIOUS NAAQS

| Element | 2006 $PM_{2.5}$ | 2008 Pb | 2008 Ozone | 2010 $NO_2$ | 2010 $SO_2$ | 2012 $PM_{2.5}$ |
|---|---|---|---|---|---|---|
| (A): Emission limits and other control measures ............... | A* | A | A | A | A | A |
| (B): Ambient air quality monitoring and data system ............... | A* | A | A | A | A | A |
| (C)(i): Enforcement of SIP measures ............... | A* | A | A | A | A | A |
| (C)(ii): PSD program for major sources and major modifications ............... | A* | A | A | A | A | A |
| (C)(iii): Permitting program for minor sources and minor modifications .......... | A* | A | A | A | A | A |

---

[1] Note that regarding CAA 110(D)(i)(II) Visibility Protection—("prong 4") for the 2006 $PM_{2.5}$, EPA previously proposed disapproval at 80 FR 38419 (July 6, 2015) for an earlier SIP submittal dated September 21, 2009. However, in the State's March 24, 2017 submittal, Arkansas submitted revisions to address CAA 110(D)(i)(II) ("prong 4") for the 2006 $PM_{2.5}$ that supersede the September 21, 2009 submittal. In Table 1 below, we are making an administrative correction to the table as was originally proposed. We are making an administrative correction to note a minor change from "No submittal" to "No action" for the 2006 $PM_{2.5}$ ("prong 4"). We will address the 2006 $PM_{2.5}$ NAAQs 110(a)(2)(D)(i)(II)("prong 4") element in a future rule making.

# Coalition Comments from 32 Organizations to the Department of Education re:
# Interim Final Rule Delaying, until July 1, 2018 (82 Fed. Reg. 49,114), and Notice of Proposed Rulemaking to Further Delay, until July 1, 2019 (82 Fed. Reg. 49,155), Effective Date of the 2016 Final Regulations on Borrower Defense, Closed School Discharge, False Certification Discharge, Financial Responsibility, and Forced Arbitration by Schools in the Direct Loan Program

## Docket IDs:  ED-2017-OPE-0108, ED-2017-OPE-0112

## November 19, 2017

### Comments submitted on behalf of:

Americans for Financial Reform

Center for Responsible Lending

Community Legal Services of Philadelphia

Consumer Action

Generation Progress

Higher Ed, Not Debt

Housing and Economic Rights Advocates

Kentucky Equal Justice Center

LAF

Lawyers' Committee for Civil Rights Under Law

League of United Latin American Citizens

Legal Aid Foundation of Los Angeles

Legal Services NYC

Maryland Consumer Rights Coalition

Montana Organizing Project

National Association for College Admission Counseling

National Association of Consumer Advocates

National Association of Consumer Bankruptcy Attorneys (NACBA)

National Center for Law and Economic Justice

National Consumer Law Center (on behalf of its low-income clients)

National Education Association

Public Counsel

Public Higher Education Network of Massachusetts

Public Law Center

Service Employees International Union (SEIU)

Student Debt Crisis

U.S. Public Interest Research Group

UnidosUS

Veterans Education Success

Woodstock Institute

Young Invincibles

The Institute for College Access & Success

1

## I.    Introduction

These comments are submitted in response to the Department of Education's two October 24, 2017 notices stating its intention to further delay implementation of the 2016 final regulations on borrower defense, closed school discharge, false certification discharge, financial responsibility, and forced arbitration by schools in the Direct Loan program ("Borrower Defense Rule" or "Rule") to July 1, 2018,[1] and again until July 1, 2019.[2]  The comments are submitted on behalf of legal aid, civil rights, consumer, and other non-profit organizations that work on behalf of students, student loan borrowers, veterans, consumers, low-income individuals, teachers, college counselors, and to advance the principles of college access and success, financial fairness, equal justice, and inclusive economies.  These comments address the costs and the harm borrowers will continue to suffer if the Borrower Defense Rule remains delayed.[3]

We oppose delaying implementation of the Borrower Defense Rule. It was supposed to go into effect on July 1, 2017.  Delay costs defrauded and cheated student loan borrowers dearly. By the Department's own prior estimates, delaying the Rule would cost borrowers over a billion dollars each year.[4]  Worse, those costs will fall on the stakeholders least able to bear them— borrowers who are already underwater on their loans because of predatory school conduct and abrupt school closures.  The Department's Interim Final Rule and Notice of Proposed Rule fail to acknowledge the known costs of delay to student loan borrowers. Thus the Department's assertion that these delays are supported by "a reasoned determination that [the] benefits justify [the] costs"[5] is not supported by the record.

Delayed implementation of the Borrower Defense Rule prevents federal student loan borrowers from benefiting from the important rights conferred on them by the Rule.  The protracted delay means that many harmed borrowers who have a right to relief from their schools or to have their student debt wiped clean under the Higher Education Act ("HEA") will instead remain burdened by invalid—often unaffordable—debt and mounting interest.  Many of these borrowers, who took out loans to attend schools that misled them or closed on them before they could graduate, are unsurprisingly in default on their federal student loans.  While they await relief, debt collection activities cause cascading financial consequences for borrowers struggling to pay heating, electric, and housing bills.  Ruined credit increases the cost of credit and

---

[1] Interim Final Rule, 82 Fed. Reg. 49,114 (Oct. 24, 2017).
[2] Notice of Proposed Rule, 82 Fed. Reg. 49,155 (Oct. 24, 2017).
[3] Many signatories to these comments have previously submitted detailed comments regarding the importance and substance of the Borrower Defense Rule. To avoid repetition, and in light of the Department's admonition that it will only consider comments on the delayed effective date and not the substance of the Rule, we focus these comments on the harm to students of delaying the Rule.
[4] *See* 2016 Final Borrower Defense Rule, 81 Fed. Reg. 76,051, 76,059 (Nov. 1, 2016) (estimating $2.5 billion annually in borrower defense discharges under the 2016 Rule, and $381 million in additional closed school discharges for the 2013-2016 cohort).
[5] 82 Fed. Reg. at 49,118; 82 Fed. Reg. at 49,157.

AR-000033

insurance, and is often a barrier to accessing employment and housing.[6]  Borrowers in default are also ineligible for additional federal student aid, preventing them from accessing the opportunity to succeed at a quality school.  Thus, borrowers who are eligible for discharges will suffer significant, irreparable damage during the delay even if their claims are ultimately granted.

Delaying implementation of the arbitration provisions prevents borrowers with valid claims against their schools from attaining timely relief.  Furthermore, because borrowers' legal claims against their schools must be brought before the limitation periods expire, delaying the provisions that restore access to the courts will fully deprive those borrowers whose limitation periods expire during the delay of their right to seek justice in the courts.

Finally, because the Department seeks to re-write the Borrower Defense Rule during the delay, the provisions of the Rule that would provide relief to harmed borrowers may never be implemented at all—at a cost of billions of dollars annually for harmed borrowers.[7]

## II.   Background

The Department of Education promulgated the now-delayed Borrower Defense Rule on November 1, 2016.  For the preceding 20 years, borrowers harmed by illegal conduct at predatory schools had been entitled to relief under the HEA.  For the first time, after an extensive rulemaking process, the Borrower Defense Rule finally provided those borrowers with a process for pursuing that relief.  It also restored to borrowers the right to challenge school fraud in court, included deterrent measures to limit harm to future students, and created mechanisms through which borrowers harmed by abrupt school closures or false certification of their federal financial aid eligibility could attain prompt relief.

On June 16, 2017, just weeks before the Rule was scheduled for implementation, the Department published notice that it was delaying implementation indefinitely and intended to conduct a new rulemaking.[8]  The Department did not engage in negotiated rulemaking with respect to this rule delay.  Although the Department stated that the delay was necessary to allow for resolution of litigation challenging the validity of certain provisions of the Rule,[9] invoking section 705 of the Administrative Procedure Act (APA) as authority to delay the rule without notice and comment, the provisions that the Department selected for delay went beyond those explicitly challenged or clearly at issue in the cited litigation.[10]  For example, a provision ensuring that

---

[6] *See* 81 Fed. Reg. at 76,051.

[7] *See, e.g.,* 81 Fed. Reg. at 76,059 (estimating that implementation of the Rule would increase successful borrower defense discharges to an annualized $2.465 billion from $637 million under the prior existing regulations that the Department currently seeks to preserve).

[8] Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27,621(June 16, 2017).

[9] *Id.* at 27,621 (citing California Association of Private Postsecondary Schools v. DeVos, No. 1:17–cv–00999 (D.D.C. May 24, 2017).

[10] *See id.* (explaining that the litigation challenged "in particular those provisions of the regulations pertaining to the standard and process for the Department to adjudicate borrower defense claims, requirements pertaining to financial responsibility standards, provisions requiring proprietary institutions to provide warnings about their students' loan

eligible students whose schools closed before they could complete their programs would receive automatic closed school discharges if they did not complete at another school within three years was not clearly at issue in the cited litigation, but was nonetheless delayed.[11]  As discussed below, delay of this provision is particularly costly for student loan borrowers, and the Department has not put forth a valid reason for its delay.  Further, the Department failed to acknowledge the requisite legal standard for delay under section 705, which requires assessment of harm caused by the delay—and thus should have assessed harm to the student loan borrowers whom the Rule was intended to protect.  Additionally, while the Department asserted that the delay was justified based on the litigation, its notice and press release stated that the delay was "to consider and conduct a rulemaking process"[12] and to conduct a "regulatory reset."[13]

Following lawsuits by 19 attorneys general and by borrowers alleging the Department unlawfully delayed the Rule, the Department announced on October 24, 2017 that it was issuing an interim final rule.  This rule took immediate effect—without prior notice or prior opportunity to comment.  It announced that the current delay of the Rule would last until July 1, 2018.[14]  The Department separately announced a notice of proposed rulemaking, proposing further delay of implementation until July 1, 2019.[15]

## III.  The Borrower Defense Rule is Needed to Protect Student Loan Borrowers from Pervasive School Fraud and Closures

According to testimony given by a former owner of a vocational training school:

*In the proprietary school business what you sell is dreams and so ninety-nine percent of the sales were made in poor, black areas, [at] welfare offices and unemployment lines, and in housing projects. My approach was that if [a prospect] could breathe, scribble his name, had a driver's license, and was over 18 years of age, he was qualified for North American's program.*[16]

---

repayment rates, and prohibitions against institutions including arbitration or class action waivers in their agreements with students").  But in addition to those provisions, the Department delayed other provisions that would expand access to student loan discharges based on school closures and false certification and providing for appeal of closed school discharge denials by guaranty agencies, among other things.  The only portions of the Rule not delayed deal will issues ancillary to the core student protection purpose of the Rule, including technical corrections and minor amendments to the Nurse loan consolidation and death discharge documentation provisions.  *Id.* at 27,622.

[11] *Id.*

[12] *Id.*

[13] Press Release, Department of Education, *Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions*, (June 14, 2017) ("June 2017 Press Release") *available at* https://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-reset-protect-students-taxpayers-higher-ed-institutions.

[14] 82 Fed. Reg. 49,114.

[15] 82 Fed. Reg. 49,155.

[16] S. Rep. No. 102-58, at 12–13 (1991) (testimony), quoted in Patrick F. Linehan, *Dreams Protected: A New Approach to Policing Proprietary Schools' Misrepresentations*, 89 Geo. L.J. 753 (2001).

As this testimony reflects, predatory recruitment targets specific communities with misleading or false information about higher education.  Among those targeted are those who are the first in their family to pursue post-secondary education or who are unfamiliar with the intricacies of higher education and financial aid.  Recruiters also target low-income students and students of color in disproportionately high numbers.  Typical targets also include so-called "non-traditional" students who may already be in the workforce, have children to support, and are hoping that their education will position them to earn more and break out of poverty.  Training materials from one for-profit college encouraged recruiters to target "Welfare Mom w/Kids. Pregnant Ladies. Recent Divorce. Low Self-Esteem. Low Income Jobs. Experienced a Recent Death. Physically/Mentally Abused. Recent Incarceration. Drug Rehabilitation. Dead-End Jobs-No Future."[17]  Training materials for other schools encouraged recruiters to identify sources of pain in prospective students' lives and "poke the pain" and insist that enrolling at the school is the solution.[18]

In recent years, state and federal law enforcement actions, as well as the Government Accountability Office and the Senate HELP Committee, have all uncovered widespread use of predatory, unfair and deceptive recruiting tactics by for-profit schools.[19]  For example, a Senate HELP Committee report found that recruiters made false guarantees that students would be placed in a job, and misrepresented several material facts at enrollment.  Those facts included the "cost of the program, the availability and obligations of federal aid, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of the credit, and the reputation and accreditation of the school."[20]

Misrepresentations during recruitment lead individuals to enter—and take on debt for—programs in which they otherwise would not enroll.  For example, a group of Spanish-speaking clients of Legal Aid Foundation of Los Angeles sought help with debt for a medical-assisting program in which they had enrolled because recruiters had told them that the program would be conducted entirely in Spanish.  In fact, instruction and class materials were all in English, which they did not speak or read.[21]

Predatory schools are also likely to close abruptly when their scams are uncovered or when they lose accreditation.  Over the past five years, thousands of schools across the country have closed.[22]  As a result, students who took out federal student loans for their education suffer

---

[17] Senate HELP Report, *supra* n. 4, at 58 (quoting Vatterott, March 2007, *DDC Training* (VAT-02-14-03904)).
[18] *Id*. at 60-63 (quoting materials from ITT, and Kaplan).
[19] *See* National Consumer Law Center, Ensuring Educational Integrity, *supra* note 8. *See e.g.,* U.S. Gov't Accountability Off., GAO-10-948T, For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices (2010); Senate HELP Report, *supra* n. 4, at 53.
[20] Senate HELP Report, *supra* n. 4, at 53.
[21] National Consumer Law Center, Comments to U.S. Dep't of Educ. Re: Intent to Establish Negotiated Rulemaking Committee on Borrower Defense and Gainful Employment at 5, Docket ID ED-2017-OPE-0076 (July 2017).
[22] *See* U.S. Dep't of Educ., "Closed School Search File," *at* https://www2.ed.gov/offices/OSFAP/PEPS/closedschools.html.

AR-000036

not just from wasted years, but from debt incurred for degrees they could not complete.

These predatory school practices are a tremendous source of frustration, financial loss, and loss of opportunity for students. Many students who are convinced to enroll based on false information about the value of the credential or the cost of attendance wind up worse off than they were before enrolling. Students who attend for-profit certificate, associate, and bachelor's degree programs earn *less* on average in the 5 to 6 years after attendance than they did before attending.[23] And with no earnings boost to show for it, these former students now owe significant federal student loan debt—averaging over $14,000 in 2014—and sometimes also private student loan debt.[24] Given their low wages and high debt, many of these students are unable to keep up with their student loan bills, and default. Indeed, nearly half of for-profit students default on their student loans within five years of entering repayment.[25]

## IV.    Delaying the Borrower Defense Rule Severely Harms Student Loan Borrowers

The Department's plan to delay and replace the Borrower Defense Rule through a new rulemaking process[26] would impose substantial costs on student loan borrowers who would receive relief under the Rule. As part of the rulemaking proceeding, we intend to advocate for strong, enforceable borrower protections, as weakening the 2016 final Rule would do great harm to borrowers. But even if the Department retains the 2016 final Rule at the end of the current rulemaking, delay of the Rule in the interim will cause profound harm to the students and borrowers who are intended beneficiaries of the Rule. As detailed below, delay ensures that, at minimum, many borrowers who have a right to discharge of their student loan debt under the HEA now could instead be burdened by such debt unless and until the provisions of the Rule implementing their HEA discharge rights go into effect. In the meantime, they face increasing interest, collection costs, and financial distress.

### a.    Delaying the Rule Harms Borrowers Entitled to Closed School Discharges

The Rule includes important new closed school discharge provisions. These include a new provision for automatic discharges for borrowers who did not complete a program at another school within three years of their school's closure. They also include a right to appeal closed school discharge applications denied by guaranty agencies to the Department of Education.

---

[23] Stephanie Riegg Cellini & Nicholas Turner, *Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data*, National Bureau of Economic Research Working Paper at 3 (May 2016), *available at* http://www.nber.org/papers/w22287.

[24] A recent report calculated that the median borrower at a for-profit schools owed $12,700 in 2013. Adam Looney & Constantine Yannelis, Brookings Papers, *A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributes to Rising Loan Defaults* 41 Tbl. 6 (Fall 2015), *available at* https://www.brookings.edu/bpea-articles/a-crisis-in-student-loans-how-changes-in-the-characteristics-of-borrowers-and-in-the-institutions-they-attended-contributed-to-rising-loan-defaults/.

[25] *Id.* at 50.

[26] 82 Fed. Reg. at 27,622 (announcing that the delay is intended to allow the Department to conduct a new rulemaking prior to implementation of the Rule).

AR-000037

Delaying implementation of these discharge provisions means that borrowers whose school closed and who have a right to have their student debts wiped clean under the HEA will instead be burdened by hundreds of millions of dollars in invalid and often unaffordable debt and mounting interest.  Further, the validity of the closed school discharge provisions was not clearly at issue in the litigation the Department has cited as the justification for delaying the effective date of this provisions.  There is simply no reasonable justification for imposing this costly delay on harmed borrowers.

The HEA requires the Department to discharge federal student loans for borrowers who are unable to complete their programs due to a school's closure.[27]  However, the vast majority of eligible borrowers are unaware of this right and suffer unnecessarily with debt.  Legal aid offices frequently see clients whose schools closed as many as 30 years ago and who have no idea they are eligible for a discharge.[28]  The Department has estimated that it received closed school discharge applications from only 6 percent of eligible borrowers.[29]

To the extent that borrowers are aware of this right and have FFEL loans, if they apply for a discharge to a guaranty agency which then improperly denies the discharge, they will have no way to appeal to the Department.  Current FFEL loan regulations are silent as to borrowers' right to seek review of guaranty agency denials of closed school discharges.[30]  The Administrative Procedure Act does not provide for judicial review of decisions by private, non-governmental entities such as guaranty agencies.  Nor is there any explicit right to judicial review of guaranty agency decisions in the Higher Education Act. As a result, FFEL borrowers whose loans are held by guaranty agencies have no clear way to challenge an erroneous closed school discharge decision from a guaranty agency.

The Rule addresses these issues by, among other things, providing automatic closed school discharges to eligible borrowers whose schools closed on or after November 1, 2013, and who do not re-enroll in another school within three years of their school's closure.  Delaying this provision means that borrowers whose loans would have been automatically discharged when the Rule was scheduled to be implemented—as well as those whose loans would be discharged later during the delay—will instead continue to be burdened with debt for  programs they could not complete. The Rule also provides FFEL loan borrowers who apply to a guaranty agency for a closed school discharge a right to seek review from the Department.  Delaying this provision means that borrowers whose discharges are erroneously denied will also be burdened with debt that should legally have been discharged.  They will have no recourse to correct a decision that

---

[27] 20 U.S.C. § 1087(c)(1).

[28] *See* Comments from the Legal Aid Community to the U.S. Dep't of Educ. re: Proposed Regulations on Borrower Defenses and Use of Forced Arbitration by Schools in the Direct Loan Program, and Proposed Amendments to Closed School and False Certification Discharge Regulations at 53, Docket ID ED-2015- OPE-0103 (August 1, 2016), *available at* https://www.nclc.org/images/pdf/special_projects/sl/comments_legal_aid_docketid-ED-2015-OPE-0103.pdf [hereinafter, Comments of the Legal Aid Community on Borrower Defense NPRM].

[29] *See* Paul Fain, *Best of a Bad Situation?*, Inside Higher Ed, (Dec. 9, 2014), *available at* https://www.insidehighered.com/news/2014/12/09/feds-respond-criticism-bid-ecmc-buy-most-corinthian.

[30] 34 C.F.R. § 682.402(d).

AR-000038

may be contrary to law.

The Department estimates reflect that if the Rule is not delayed, then between July 1, 2017 and July 1, 2019, borrowers whose schools shut down before they could complete their studies would have an estimated $381 million of loans cancelled as a result of the automatic closed school discharge provision.[31]  While the Department has noted that the federal government will save this amount by delaying the effective date,[32] it fails to account in its cost-benefit analysis for the fact that this will necessarily be at the cost of the borrowers who were the intended beneficiaries of the Rule.  In short, the Department's current and proposed delay of the closed school provisions of the Rule mean that borrowers whose schools closed suddenly will be left owing $381 million in debt for which Congress has decided they should not be legally responsible.

Borrowers face the risk that during the delay and re-write, the Department could eliminate the new closed school discharge provisions, costing these borrowers approximately $381 million plus future interest and consequential costs.  But even if the Rule is only temporarily delayed, in the meantime borrowers will be subject to the wholly unnecessary financial stress and real costs of responsibility for debt that Congress has decided they are not and should not be legally responsible for.  As long as the delay lasts, these borrowers will continue to be subject to monthly bills and mounting interest.  For many low-income borrowers struggling to pay for basic necessities, including heating and housing bills, continued student loan bills and collections will cause cascading financial consequences.

Additionally, the many harmed borrowers who cannot afford the debt and are in default face potentially devastating consequences.  Defaulted borrowers are subject to snowballing collection fees and aggressive debt collection practices that can trap them in poverty, including garnishment of their wages and seizure of Social Security and Earned Income Tax Credit payments.  Defaults also tarnish borrowers' credit histories—which often drives up insurance and borrowing costs and creates barriers to employment and housing.  Borrowers who default are also ineligible for further federal student aid, preventing them from getting a second chance at an education.  Thus, even if borrowers are later approved for discharges, the delay will cost them severely.

> **b.**    **Delaying the Rule Harms Borrowers Entitled to False Certification Discharges**

---

[31] *See* 82 Fed. Reg. at 27,621 (citing estimate of "$381 million for cohorts 2014-2016 attributable to the regulations providing for a three-year automatic closed school discharge"); see also 82 Fed. Reg. at 49,118 (same), 82 Fed. Reg. at 49,157 (same).

[32] *See* 82 Fed. Reg. at 27,621 ("Postponing the effectiveness of the final regulations will help to avoid these significant costs to the Federal government . . . .").

Similarly, delaying implementation of the false certification discharge provisions in the Borrower Defense Rule harms borrowers whose eligibility for federal student loans was falsified by schools taking advantage of them to access federal loan dollars. Delaying these provisions means these borrowers will at minimum be left burdened by mounting invalid debt during the delay, and will bear the cost of the invalid loans in their entirety if the provisions are not included in a revised rule. As with the closed school discharge provisions, delay of the false certification provisions is unjustified because the Department has not considered the cost of delay to borrowers. Further, the legality of the false certification provisions is not clearly at issue in the pending litigation cited as justification for the delay.[33]

While the HEA requires that the Department "shall discharge" the loans of borrowers whose eligibility for federal student loans was falsified by their schools,[34] false certification regulations had not kept pace with changes to eligibility criteria for federal student loans. As a result, while the law now provides that after July 1, 2012, most students without high school diplomas or equivalencies are ineligible for federal aid, the implementing regulations failed to recognize that borrowers were entitled to false certification discharges if their schools falsely certified that they had a high school diploma or equivalent for purposes of loan eligibility.[35]

This type of false certification has become increasingly common. Unscrupulous higher education companies either simply lie and say that students have high school diplomas, or direct students to online diploma mills that the school knows to be fraudulent, but uses to certify the student for loans.[36] For example, in 2016, the Department took enforcement actions against 23 Marinello Schools of Beauty campuses for precisely these sorts of violations.[37] In 2017, a court entered a $20 million judgment against another school, FastTrain College, and its president for repeatedly and knowingly submitting fake high school diploma and GED information to receive improper federal Title IV funds.[38] The court described the impact of FastTrain's fraud on students, to whom the school lied about their eligibility for aid and the validity of fake diplomas, as "abhorrent" and observed that "[t]he student victims" were "aggressively recruited" and were "vulnerable . . . young people who, for whatever reasons, had not graduated high school."[39] It further found that the school's scam left students with "debt that will be enormously difficult to

---

[33] *See* 82 Fed. Reg. at 27621 (citing judicial review of some portions of borrower defense rule in CAPPS v. DeVos, No. 17-999 (D.D.C. filed May 24, 2017) as basis for delay).

[34] 20 U.S.C. § 1087(c); *see also* 34 C.F.R. §§ 682.402(e)(3)(ii)(A); 685.215(c)(1)(i).

[35] Pub. L. No. 112-74, 125 Stat. 786 (Dec. 23, 2011); 20 U.S.C. § 1091(d). *See also* 81 Fed. Reg. 39,330, 39,377 (June 16, 2016).

[36] *See* Press Release, Fed. Trade Comm'n, *FTC Action Halts Online High School Diploma Mill That Made $11 Million Selling Worthless Diploma to Students* (Sept. 19, 2014).

[37] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Takes Enforcement Against Two School Ownership Groups* (Feb. 1, 2016).

[38] *United States v. FastTrain II Corp.*, Case No. 12-CIV-21431, 2017 WL 606346, at *9-10 (S.D. Fla. 2017).

AR-000040

pay off with what they can earn working the low-level jobs for which they are qualified."[40] While the Department was able to recoup loan amounts it disbursed to FastTrain, the false certification rules in place before the 2016 amendments fail to ensure that the student victims can receive relief from these same loans.

The 2016 Rule closes this loophole and brings the false certification discharge regulation in line with current statutory requirements for loan eligibility by making it clear that borrowers are eligible for discharges if their schools falsely certified that they had high school diplomas for purposes of loan eligibility.[41] The Rule also provides a clear pathway to relief in some circumstances when a school falsified loan eligibility by falsely reporting that a student had satisfactory academic progress—a measure of the value the student is getting from the loan investment.[42]

While the Rule is delayed, these borrowers are unlikely to obtain discharges that they should receive under the HEA. The Legal Aid Foundation of Los Angeles has clients in precisely this situation: their eligibility for federal loans was falsely certified by Marinello Schools of Beauty. The Department determined that Marinello arranged sham diplomas to access federal aid, yet has recently denied a number of student applications for discharge based on the Department's interpretation of existing regulations.

The Department fails to consider the cost to these borrowers of denying discharges they are entitled to and would clearly receive, absent the delay. As part of the rulemaking proceeding, we intend to advocate for retention of these false certification amendments, rather than a return to the narrow policies that deny relief to borrowers who were defrauded and now face mounting, unaffordable debt. But, even if the Rule is only temporarily delayed and borrowers are able to obtain false certification discharges following the delay, in the meantime borrowers will bear significant costs stemming from the liability for a debt they should and could have had discharged now absent the delay.

c.     **Delaying the Rule Harms Students with Meritorious Borrower Defenses**

Despite the long-standing existence of a right to loan relief on the basis of unlawful school conduct, the Department for over 20 years failed to provide any process through which student loan borrowers could exercise this right. As a result, the Department reports that prior to 2015, it was aware of only "a handful" of borrowers—out of hundreds of thousands likely eligible—who submitted borrower defense claims.[43] The Borrower Defense Rule promulgated in 2016 addresses this problem by setting forth a path for defrauded, misled, and deceived

---

[39] *Id.* at *10.
[40] *Id.*
[41] 81 Fed. Reg. at 76,082.
[42] *Id.*
[43] U.S. Dep't of Educ., First Report of the Special Master for Borrower Defense 5 (Sep. 3, 2015).

students to seek relief.[44] The Rule also clarifies the authority of the Department to pursue automatic group-wide relief in cases of systemic fraud.[45]

Delaying the borrower defense provisions of the Rule will harm defrauded and misled student loan borrowers in several ways. First, it deprives students with borrower defenses of enforceable procedural rights established by the Rule, as well as of valuable rights to forbearance and stopped collections while their applications are pending. Borrowers have an interest in the fair adjudication of their applications under the process set out by the Rule; this interest is plainly impaired by the delay. Valuable process rights established by the Rule include: (i) a fact-finding process that includes consideration of Department records; (ii) use of a preponderance of the evidence standard; (iii) access to records the Department considers relevant to the borrower defense; (iv) written decisions that for denials include "the reasons for the denial" and "evidence that was relied upon"; (v) reconsideration; (vi) appeals; and (vii) forbearance and suspension of collection of defaulted loans while borrowers' applications are pending or being reconsidered.[46]

These rights are especially critical given that under the old regulations borrowers' requests for relief have often sat pending for years and been ignored or "resolved" without acknowledging the borrower's evidence or arguments regarding school fraud. For example, a district court recently observed that the Department appeared to be attempting to evade a conclusive ruling on plaintiff's borrower defense that had been raised over two years prior, while continuing to garnish plaintiff's wages.[47] The Department also summarily denied the borrower's objection to garnishment premised on the borrower defense and supported with a 29-page letter brief and 254 pages of exhibits, without even acknowledging the defense or evidence.[48] In contrast, under the new Rule, a borrower is entitled to stopped collections—and thus prevention of wage garnishment—while a borrower defense application is pending. A borrower also has enforceable procedural rights to have the Department apply a preponderance of the evidence standard and state the evidence relied upon in adjudicating borrower defenses, as well as clear rights to seek reconsideration and appeal.

Second, delaying the borrower defense provisions harms borrowers because it leaves them once again in the dark about how the Department will handle their claims for relief. They could wait it out—awaiting further guidance, potential restoration of their procedural rights and the new federal standard for eligibility, or yet another rulemaking and new set of rules—to provide clarity and potentially restore procedural protections that could enable them to effectively vindicate their rights. But waiting by itself causes many borrowers injury. Because the Department has stated that it will apply statutes of limitation to limit refunds of amounts

---

[44] *See* 81 Fed. Reg. at 76,083-86.
[45] *Id*. at 76,080, 76,084-85.
[46] 81 Fed. Reg. at 76,080-86.
[47] *Dieffenbacher v. DeVos*, Case 5:17-cv-00342-VAP-KK at 6-7 (C.D. Cal. June 9, 2017).
[48] *See id*. at 2-4.

already paid or collected on loans later found to be unenforceable,[49] waiting could prevent many defrauded borrowers with valid defenses from recovering amounts paid or collected from them on their loans during the delay.  More generally, if defrauded borrowers wait to submit applications for relief pending implementation of the 2016 Rule or a replacement, they will in the meantime be left on the hook for debt that is legally unenforceable.  These borrowers will suffer negative financial consequences as a result of continued liability for a debt that would be dischargeable under the Rule.

Third, because the Department has stated that its delay will also mean that borrowers with Direct loans issued during the delay cannot assert the new federal standards bases for borrower defense relief, it denies relief to those new borrowers and existing borrowers (who could consolidate to access the new federal standard) who could satisfy the federal standard but not the state law standard.

Finally, notwithstanding the Department's implication that borrowers would not be harmed by the delay of implementation because "the Department will continue to process borrower defense claims under existing regulations," the Department's own impact analysis reflects that processing claims under the existing regulations rather than the new regulations would reduce the amount of student loan debt discharged annually by nearly $2 billion.[50] Moreover, the evidence reflects that the Department has not, in fact continued to process borrower defense applications since the change in administration on January 20, 2017, but rather that processing has come to a standstill.  As the Department confirmed in its July 2017 letter to Senator Durbin, at that point there were at least 64,301 outstanding borrower defense applications and the Department had failed to approve a single application since January 20, 2017.[51] More recent reports from the Department indicate that there are now more than 95,000 outstanding borrower defense applications.[52]

> **d.** **Delaying the Rule Leaves Defrauded and Misled Students Without Access to the Courts While Statutes of Limitations on Their Claims Run**

---

[49] 81 Fed. Reg. at 75,956 ("[T]he Department will continue to apply the applicable State statute of limitations to claims relating to loans disbursed prior to July 1, 2017.")

[50] *See, e.g.*, 81 Fed. Reg. at 76,059 (estimating that implementation of the Rule would increase successful borrower defense discharges to an annualized $2.465 billion from $637 million under the prior existing regulations that the Department currently seeks to preserve).

[51] Letter from James F. Manning, Acting Under Secretary of Education, to Sen. Dick Durbin (July 7, 2017).

[52] Statement of James F. Manning, Acting Under Secretary of Education, to Borrower Defense Negotiated Rulemaking Committee (Nov. 14, 2017); *see also* Danielle Douglas-Gabriel, "DeVos Calls for Another Delay of Rule to Protect Students from Predatory Colleges," Washington Post (Oct. 24, 2017), *available at* https://www.washingtonpost.com/news/grade-point/wp/2017/10/24/devos-calls-for-another-delay-of-rule-to-protect-students-from-predatory-colleges/?utm_term=.5b5554896ed5 (discussing standstill and noting approximately 87,000 outstanding applications at the time).

To insulate themselves from liability for wrongdoing, and to prevent the Department of Education, accreditors, and law enforcement agencies from learning about complaints and settlements, predatory schools have increasingly used forced arbitration clauses and class action bans that require students to waive their rights to bring claims in court or to join together with other aggrieved students in class actions challenging systemic fraud.  Delaying the arbitration provisions in the Rule leaves millions of students without the opportunity to hold lawbreaking schools accountable in court or to realistically access full relief for their injuries, and in the meantime the statutes of limitations on their claims continue to run.

Arbitration clauses and class action bans cause enormous harm to student loan borrowers. Yet schools require students to waive their rights as part of the fine print of their enrollment agreements, long before students know what disputes they might have with the school.  A recent analysis revealed that the majority of for-profit schools now include arbitration clauses in their student enrollment agreements, though almost no public and very few non-profit schools do.[53] Requiring defrauded students to pursue their claims individually against their schools significantly limits access to justice.

Most students who have a valid legal claim against their school are unaware of their rights and lack the time and money necessary to pursue their claims individually against schools that have far more financial and legal resources than they do.  Indeed, the Supreme Court has repeatedly recognized the importance of class actions in providing legal redress for violations of the law that may be too time- and resource-intensive to realistically challenge through individual claims.[54]  Arbitration provisions make proving claims against schools all the more difficult because discovery is often limited, and borrowers and their advocates typically do not have access to prior arbitration decisions or evidence developed in those cases.  Even when such decisions and evidence do exist, they are typically shielded by confidentiality requirements. Additionally, arbitration clauses and class action bans prevent information about valid disputes from reaching the Department, accreditors, and other law enforcement agencies, meaning indicators of a failing or predatory school are suppressed.

The Borrower Defense Rule would restore federal student borrowers' rights to challenge school fraud claims in court and to do so on a collective basis through class actions.  The Rule thus benefits borrowers who have already been defrauded or scammed by ensuring that their opportunity to obtain relief through the courts is not unfairly denied.  It also protects future students by improving the odds that school misconduct will be brought to light and by restoring the risk of liability for wrongdoing—and thus law's deterrent effect.

---

[53] *See, e.g.,* Tariq Habash & Robert Shireman, *The Century Foundation Report:  How College Enrollment Contracts Limit Students' Rights*, *available at* https://tcf.org/content/report/how-college-enrollment-contracts-limit-students-rights/.
[54] *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980).

12

As the Department previously observed, "banning class action waivers as they pertain to potential borrower defense claims would promote direct relief to borrowers from the party responsible for the injury" and "encourage schools' self-corrective actions."[55]  While the borrower defense discharge process—if implemented—would provide an administrative means for borrowers to achieve *partial relief* for their injuries caused by illegal school conduct through discharge of their federal student loans, access to the courts would still be necessary for students to attain full relief.  Full relief may include compensation for their out-of-pocket educational expenses and private student loan debts incurred, loss of Pell Grant eligibility, lost time and other consequential economic damages, as well as punitive damages and damages for emotional distress.[56]

Further, delaying implementation of the arbitration provisions will not only prevent borrowers with valid claims against their school from attaining *timely* relief, but for many borrowers the delay will prevent them from accessing the courts and attaining relief *at all* due to statutes of limitations.  For borrowers whose valid claims are subject to limitations periods that expire during the delay, the delay will extinguish their opportunity to bring their claim in court.

> ### e.    Delaying the Rule Harms Students Who Will Enroll in Predatory Schools and Schools at Risk of Abrupt Closure

The Rule also protects current and future student loan borrowers by deterring abusive conduct by schools, reducing the risk to students of abrupt school closures, and requiring schools to warn prospective students of poor student outcomes.  School misconduct is deterred through provisions that restore school accountability for such misconduct, including limits on forced arbitration and class action bans and provisions specifying how the Department can recoup the cost of borrower defense discharges from schools that engage in misconduct.  Financial responsibility standards reduce the risk to students of abrupt school closures by providing information that will help the Department to identify schools at risk of abrupt closure and take action to protect students, and by deterring irresponsible school conduct that makes abrupt closures more likely.[57]  Future students are protected by new requirements to "warn students in advertising and promotional materials if the typical student experiences poor loan repayment outcomes" so that students can make more informed enrollment and financing decisions.[58]

Without these provisions, financially unstable schools can continue to recruit new

---

[55] 81 Fed. Reg. at 39,383.

[56] *See* Comments of the Legal Aid Community on Borrower Defense NPRM, *supra* n. 51, at 34-36.

[57] *See, e.g.,* U.S. Dep't of Educ., Office of Inspector General, ED-OIG/A09Q0001, Final Report: Federal Student Aid's Processes for Identifying At-Risk Title IV Schools and Mitigating Potential Harm to Students and Taxpayers at 15 (Feb. 24, 2017); see also 81 Fed. Reg. at 76,050 (explaining that the financial responsibility provisions "introduce far stronger incentives for schools to avoid committing acts or making omissions that could lead to a valid borrower defense claim than currently exist").

[58] 81 Fed. Reg. at 75,926.

AR-000045

students and load them up with loans without adequate protections in place to alert students to the risk that their schools may close, or to ensure that any closure will be adequately managed. In short, delaying these provisions allows the widespread predatory school conduct and abrupt school closures that prompted the rulemaking to continue unabated, harming more students, particularly those students who are already most financially vulnerable.

## V.    Conclusion

Thank you for consideration of these comments.  If you have any questions about these comments, please contact Abby Shafroth (ashafroth@nclc.org) or Robyn Smith (rsmith@lafla.org).



# THE COMMONWEALTH OF MASSACHUSETTS
# OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

**MAURA HEALEY**
**ATTORNEY GENERAL**

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

November 24, 2017

The Honorable Elisabeth DeVos
Secretary
United States Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Jean-Didier Gaina
United States Department of Education
400 Maryland Avenue, SW, Room 6W248
Washington, DC 20202

**Re: Docket ID ED-2017-OPE-0112**
Submitted electronically

Dear Secretary DeVos and Mr. Gaina:

As you are aware, we, the undersigned Attorneys General of Massachusetts, California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Minnesota, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington, have filed suit challenging the Department's various efforts to delay implementation of the final borrower defense to repayment regulations ("Borrower Defense Rule"). *Massachusetts et al. v. Dept. of Educ. et al*, No. 17-1331 (D.D.C. filed July 6, 2017). We continue to object to the Department's improper delay tactics for the reasons outlined in the Amended Complaint and Renewed Motion for Summary Judgment filed in that lawsuit.[1] In addition, we provide the following comments to highlight our further concerns with the Department's latest effort to delay the Borrower Defense Rule. The proposed rulemaking, which would delay until July 1, 2019 the effective date of numerous provisions of the Borrower Defense Rule, would harm borrowers and serve no legitimate purpose. Such an effort on the part of the Department to effectively rescind the Borrower Defense Rule would be an abrogation of the Department's responsibilities to

---

[1] *First Amended Complaint*, 1:17-cv-01331-RDM, Document 46, Filed 10/30/17; *Plaintiffs' Renewed Motion for Summary Judgment,* 1:17-cv-01331-RDM, Document 50, Filed 11/10/17.

promote the best interests of students and taxpayers and would violate the rulemaking requirements of the Higher Education Act ("HEA").

## The Department's Proposed Rule Will Harm Student Borrowers

The Borrower Defense Rule was finalized on November 1, 2016 after robust and thorough negotiated rulemaking. Numerous stakeholders, including state attorneys general, student advocates, and for-profit schools, participated in this rulemaking process. The resulting regulations established protections for students and taxpayers from predatory schools, including those in the for-profit education sector. The Borrower Defense Rule was established to protect students from abuse on the part of predatory schools. This Rule also protects taxpayers by holding schools accountable when their unlawful actions result in discharges of student loans and by prohibiting schools from using arbitration agreements and class action waivers to stop students from bringing claims against their schools in court.

The Department's proposed delay rule fails to appreciate or address the harms caused to student borrowers and other members of the public by the postponed implementation of numerous provisions of the Borrower Defense Rule. In particular, the Department's proposed rule does not mention or account for the harm caused to student borrowers by the postponement of new standards that streamline the loan discharge process, provide automatic loan discharges for groups of students who were unable to complete their degrees due to school closure, and require schools with poor loan repayment outcomes to provide enhanced disclosures. The proposed rule also fails to mention the harm to students that will result from the delay of provisions enabling students to bring legal actions against abusive schools and strengthening financial responsibility standards that deter misconduct. The loss of these protections is a substantial and, in some cases, irreparable harm to students. In the absence of the Borrower Defense Rule, student borrowers may be unable to obtain loan discharges in cases of school fraud and misconduct or bring actions in court against abusive schools, and students may enroll in abusive schools without receiving the information necessary to make informed decisions about their education.

The only reason advanced in the proposed rule to justify this damaging delay is the preservation of the "regulatory status quo" in order to ensure that the Department has adequate time to "develop revised regulations." This rationale does not adequately justify depriving student borrowers and taxpayers of critical protections established by the Borrower Defense Rule. The Department should faithfully implement existing regulations and follow procedures required by law in undertaking new rulemaking.

## The Department's Proposed Rule Violates the HEA's Negotiated Rulemaking Requirement

The Department acknowledges that publishing the proposed rule without engaging in negotiated rulemaking would be noncompliant with the HEA's rulemaking requirements under 20 U.S.C. § 1098a. Nonetheless, the Department claims that it is entitled to a waiver of the rulemaking requirements under the HEA's "good cause" exception because it would be "impracticable" for the Department to follow the HEA's requirements. This is, again, an inadequate justification. The good cause exception is not an invitation to circumvent procedures intended to ensure that stakeholders are given an opportunity to weigh in on regulatory changes. Delaying until July 1,

2

2019 the critical protections established by the Borrower Defense Rule is a significant action on the part of the Department that must be exposed to the full public consultation and negotiated rulemaking procedures required by the HEA to preserve the democratic accountability and legality of the rulemaking process.

Students count on the Department to protect their interests. The Department has a crucial and indispensable role to play in preventing misconduct by schools, protecting students from abuse, and protecting taxpayers from bearing the costs of schools' misconduct. The Borrower Defense Rule was designed to make progress towards these very goals. We call on the Department to fulfill its responsibilities to students and taxpayers and cease its efforts to postpone implementation of the Borrower Defense Rule.

Sincerely,

Maura Healey
Massachusetts Attorney General

Xavier Becerra
California Attorney General

George Jepsen
Connecticut Attorney General

Matthew P. Denn
Delaware Attorney General

Douglas S. Chin
Hawaii Attorney General

Lisa Madigan
Illinois Attorney General

Tom Miller
Iowa Attorney General

Janet T. Mills
Maine Attorney General

Brian E. Frosh
Maryland Attorney General

Lori Swanson
Minnesota Attorney General

3

Hector Balderas
New Mexico Attorney General

Eric T. Schneiderman
New York Attorney General

Josh Stein
North Carolina Attorney General

Ellen F. Rosenblum
Oregon Attorney General

Josh Shapiro
Pennsylvania Attorney General

Peter F. Kilmartin
Rhode Island Attorney General

Thomas J. Donovan, Jr.
Vermont Attorney General

Mark R. Herring
Virginia Attorney General

Bob Ferguson
Washington State Attorney General

4