## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MEAGHAN BAUER, *et al.*,<br><br>   *Plaintiffs*,<br><br> v.<br><br>ELISABETH DeVOS, Secretary, U.S.<br>Department of Education, *et al.*,<br><br>   *Defendants.* | Civil Action No. 17-1330 (RDM) |

### <u>MEMORANDUM OPINION AND ORDER</u>

Meaghan Bauer, Stephano Del Rose, and a coalition of nineteen states and the District of Columbia bring suit against the Department of Education under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Plaintiffs challenge three agency actions delaying the implementation of the "Borrower Defense Regulations," a package of regulatory changes to federal student loan programs designed to "protect student loan borrowers from misleading, deceitful, and predatory practices." William D. Ford Federal Direct Loan Program ("Borrower Defense Regulations"), 81 Fed. Reg. 75,926, 75,926 (Nov. 1, 2016). The Borrower Defense Regulations were published on November 1, 2016, and were to become effective on July 1, 2017. Shortly before the effective date, however, the Californi-a Association of Private Postsecondary Schools ("CAPPS"), brought suit challenging the regulations, and, a week later, CAPPS sought a preliminary injunction blocking the implementation of two changes. That motion was never fully briefed or decided because the Department, on its own accord, issued a stay under § 705 of the APA ("Section 705 Stay"), postponing not only the effective date of the two changes that CAPPS had asked the Court preliminarily to enjoin, but most of the other

portions of the regulations as well.  While the *CAPPS* litigation continued, the Department issued

an interim final rule on October 24, 2017 that delayed the effective date of the Borrower Defense

Regulations to July 1, 2018, and a notice of proposed rulemaking to further delay the effective

date to July 1, 2019.  Then, on February 14, 2018, the Department issued a final rule delaying the

effective date of the Borrower Defense Regulations until July 1, 2019.

Within weeks of the issuance of the Section 705 Stay, Bauer and Del Rose (student

borrowers who allege that they would benefit from the Borrower Defense Regulations) and the

coalition of nineteen states and the District of Columbia filed separate suits seeking to invalidate

the stay.  Over the course of the last year, both sets of plaintiffs have amended their complaints

to challenge the additional delay actions taken in October 2017 and February 2018.  On March 1,

2018, the Court consolidated the student borrower and state cases, stayed the *CAPPS* case

pending resolution of this case, and ordered a final round of summary judgment briefing.

The matter is now before the Court on cross-motions for summary judgment filed by the

state plaintiffs, Dkt. 55, the student borrower plaintiffs, Dkt. 56, and the Department, Dkt. 58;

Dkt. 59.  In brief, the Court concludes that Plaintiffs have standing to challenge the delay

actions; that the October 24, 2017 Interim Final Rule is based on an unlawful construction of the

Higher Education Act of 1965; that the February 14, 2018 Final Delay Rule is procedurally

invalid; that the Section 705 Stay is judicially reviewable; and that the Department's Section 705

Stay is arbitrary and capricious.  The Court, accordingly, will **GRANT** the state plaintiffs' and

the student borrower plaintiffs' motions for summary judgment, Dkt. 55; Dkt. 56, and will

**DENY** the Department's cross-motion, Dkt. 66.  Before entering a remedial decree, the Court

will order the parties in this case and the parties and proposed intervenors in *CAPPS v. DeVos*,

Civil Action No. 17-999, to appear for a status conference on September 14, 2018, at 10:30 a.m. in Courtroom 21.

## I. BACKGROUND

### A.     Borrower Defense Regulations

Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, empowers the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education" through various types of financial aid. *Id.* § 1070(a). The William D. Ford Federal Direct Loan Program ("Direct Loan Program") allows students who attend "participating institutions of higher education" to obtain direct loans from the federal government to pay for their educational expenses. *Id.* § 1087a(a). Those institutions of higher education that are selected to participate in the Direct Loan Program must enter into an agreement with the Secretary of Education, which may include any provisions "the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan Program. *Id.* § 1087d(a)(6); *see also id.* § 1087c. Moreover, and more generally, the Secretary has authority "to make, promulgate, issue, rescind, and amend rules and regulations governing the" Direct Loan Program. *Id.* § 1221e-3. In administering the Direct Loan Program, the Secretary must also "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan" made under the Direct Loan Program. *Id.* § 1087e(h).

Pursuant to these authorities, in January 1994, the Secretary issued "standards, criteria, and procedures governing the Federal Direct Student Loan . . . program." Federal Direct Student Loan Program, 59 Fed. Reg. 472, 472 (Jan. 4, 1994). Those standards included the first iteration of the borrower defense rule, which permitted a Direct Loan Program borrower to "assert as a defense against the repayment of the loan a claim based on the act or omission of the school" if

(1) that act or omission gave rise to a cause of action against the school under state law, (2) the borrower presented the "claim to the school and received no satisfaction," and (3) the borrower filed a timely claim with the Department of Education. *Id.* at 481.

In December 1994, the Secretary amended the Direct Loan Program regulations, including those governing borrower defenses. *See* William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994). Under the new regulations—which remain in effect today—borrowers are permitted to assert "as a defense against repayment, any act or omission of the school attended by the [borrower] that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1) (2016). If that defense to "repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan," and the Secretary may provide the borrower with further relief as appropriate. *Id.* § 685.206(c)(2). The Secretary may then bring a "proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of [the] Direct Loan to pay to the Secretary the amount of the loan to which the defense applies." *Id.* § 685.206(c)(3). In short, the 1994 borrower defense rule permits a student borrower to assert his or her school's misconduct as a reason for nonrepayment, and, if successful, the regulation shifts the obligation to repay the loan from the borrower to the school.

The adequacy of the 1994 borrower defense rule was tested by "the collapse of Corinthian Colleges (Corinthian)" in May 2015. William D. Ford Federal Direct Loan Program ("June 16, 2016 Notice of Proposed Rulemaking ('NPRM')"), 81 Fed. Reg. 39,330, 39,330 (June 16, 2016). Corinthian was "a publicly traded company [that] operat[ed] numerous postsecondary schools that enrolled over 70,000 students at more than 100 campuses nationwide." *Id.* at 39,335. After Corinthian "filed for bankruptcy" and the Department found "that the college had

misrepresented its job placement rates," the Department "received thousands of claims for student loan relief from Corinthian students." *Id.* In dealing with the aftermath, the Department concluded that the 1994 borrower defense rule was outdated and was no longer adequate to deal with the changed "landscape of higher education." *Id.*

To address these perceived deficiencies, the Department commenced a rulemaking. First, pursuant to its obligations under the HEA, it "obtain[ed] the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs under [Title IV of the HEA], such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." 20 U.S.C. § 1098a(a)(1). After obtaining those recommendations, the Department published a notice of intent to engage in negotiated rulemaking regarding borrower defenses and a request for public comment on August 20, 2015.[1] Negotiated Rulemaking Committee, Public Hearings, 80 Fed. Reg. 50,588 (Aug. 20, 2015). The Department selected a committee, but after a series of meetings in early 2016, the negotiators were unable to reach consensus. June 16, 2016 NPRM, 81 Fed. Reg. at 39,333–34. As a result, the Department issued its own notice of proposed rulemaking on June 16, 2016, and invited the members of the negotiating committee, in addition to members of the public, to submit comments on a set of regulations crafted by the Department in light of the negotiations and earlier public hearings. *Id.* More than 50,000 parties

---

[1] Pursuant to the HEA, "[a]ll regulations pertaining to" the federal direct loan programs at issue here are "subject to [this] negotiated rulemaking (including the selection of the issues to be negotiated), unless the Secretary determines that applying such a requirement with respect to given regulations is impracticable, unnecessary, or contrary to the public interest (within the meaning of section 553(b)(3)(B) of [the APA])." 20 U.S.C. § 1098a(b)(2).

submitted comments in response to the Department's notice of proposed rulemaking.  Borrower Defense Regulations, 81 Fed. Reg. at 75,928.

On November 1, 2016, the Department published the final regulations governing the Direct Loan Program.  *See id.* at 75,926.  In relevant part, the Borrower Defense Regulations: (1) revised the procedures for student borrowers seeking to discharge their federal loans as a result of school misconduct; (2) revised the processes for students seeking other forms of debt relief; (3) required "financially risky institutions [to be] prepared to take responsibility for the losses to the government for discharges of and repayments for [f]ederal student loans;" (4) expanded the disclosure obligations of institutions "at which the median borrower has not repaid in full, or made loan payments sufficient to reduce by at the least one dollar the outstanding balance of the borrower's loans received at the institution;" (5) altered the standard for students asserting a "borrower defense" to collection actions; (6) expanded the situations in which the Department could proactively forgive loans in groups, rather than upon individual applications; and (7) prohibited schools "participating in the Direct Loan Program from obtaining" or relying upon a borrower's "waive[r] [of] his or her right to initiate or participate in a class action lawsuit," or "from requiring students to engage in internal dispute processes before contacting accrediting or government agencies."  *Id.* at 75,926–27.

The Borrower Defense Regulations were set to take effect eight months later, on July 1, 2017.

**B.**     **California Association of Private Postsecondary Schools Litigation**

The California Association of Private Postsecondary Schools is an industry group that represents schools subject to provisions of the Borrower Defense Regulations.  CAPPS filed suit in this Court on May 24, 2017, alleging that four aspects of the regulations were unlawful.  *See* Dkt. 1 at 69–75 (Compl. ¶¶ 202–41), *CAPPS v. DeVos*, Civ. No. 17-999 (D.D.C.).  In particular,

CAPPS challenged (1) changes to the procedures and options available to students seeking debt

relief; (2) modifications of certain financial responsibility standards; (3) requirements that

proprietary schools disclose additional information about loan repayment rates to students and

prospective students; and (4) prohibitions on the inclusion of or reliance on arbitration and class

action waiver provisions in contracts with students.  *Id.*  CAPPS sought to enjoin the Department

"from implementing, applying, or taking any action whatsoever pursuant to the final

regulations," and to vacate the entirety of the final rule.  Dkt. 1 at 75 (Compl. ¶ 242), *CAPPS*,

Civ. No. 17-1999.

On June 2, 2017, CAPPS filed a motion for preliminary injunction.  Dkt. 6, *CAPPS*, Civ.

No. 17-999.  The relief sought in that motion, however, was more limited than that sought in the

complaint; CAPPS sought preliminarily to enjoin only the provision of the Borrower Defense

Regulations prohibiting predispute arbitration clauses and class action waivers.  *Id.* at 1.  The

Court set a briefing schedule, ordering the Department to file its opposition on or before June 15,

2017.  Minute Entry (June 6, 2017), *CAPPS*, Civ. No. 17-999.  On June 13, 2017, the same states

that are plaintiffs in the present action moved to intervene as defendants in the *CAPPS* case and

were soon followed by Bauer and Del Rose.  Dkt. 16, Dkt. 22, Dkt. 31, *CAPPS*, Civ. No. 17-999.

The day before the Department's opposition to CAPPS's motion was due, the Department

notified the Court that it was in the process of staying the implementation of the entirety of the

Borrower Defense Regulations under § 705 of the APA.[2]  Dkt. 20, *CAPPS*, Civ. No. 17-999.  At

that point, CAPPS withdrew its motion for a preliminary injunction, Dkt. 21, *CAPPS*, Civ. No.

---

[2]  Although this is actually section 10(d) of the APA, the Court adopts the convention of
referring to the provisions of the APA by their sections in title 5 of the U.S. Code.  *See Trudeau
v. FTC*, 456 F.3d 178, 183 n.3 (D.C. Cir. 2006).

17-999, and, on September 6, 2017, the Department filed an answer, Dkt. 52, *CAPPS*, Civ. No. 17-999.  Neither party took any step thereafter to advance the *CAPPS* litigation.

## C.    Present Action

On July 6, 2017, shortly after the Department issued its Section 705 Stay, Plaintiffs Meaghan Bauer and Stephano Del Rose filed the present action.  Dkt. 1.  Bauer and Del Rose attended New England Institute of Art ("NEIA"), a for-profit college.  Dkt. 53 at 10 (Compl. ¶ 35).[3]  Bauer attended a filmmaking program from 2011 to 2014.  *Id.*  Del Rose attended the same program from 2009 to 2014.  *Id.*  Each borrowed more than $30,000 in federal direct loans to finance his or her attendance.  *Id.* (Compl. ¶¶ 36–37).  Each now owes more than $40,000 to the Department.  *Id.*  Bauer and Del Rose both seek loan forgiveness as a result of "NEIA's fraud and other related misconduct," *id.* at 12 (Compl. ¶ 45); they also wish to bring a class action on behalf of students at NEIA, *id.* at 11 (Compl. ¶ 40).  As such, they allege that the continued delay in implementing the Borrower Defense Regulations has impaired their ability to vindicate their rights against NEIA and to obtain related relief.  *Id.* at 12–17 (Compl. ¶¶ 44–62).

The state plaintiffs include nineteen states and the District of Columbia.  Dkt. 80 at 1–2 (Compl.), *Massachusetts v. DeVos*, Civ. No. 17-1331 (D.D.C.).[4]  The states allege that they "initiate numerous investigations and enforcement actions against proprietary and for-profit schools for violations of the States' consumer protection statutes," *id.* at 15 (Compl. ¶ 61), and that the Borrower Defense Regulations "afford[] a legally significant status to enforcement

---

[3]  Although the operative complaint filed by Bauer and Del Rose is in fact their second amended complaint, for ease of reference, the Court simply refers to that pleading as the complaint.

[4]  As with the student borrower plaintiffs, the Court refers to the state plaintiffs' second amended complaint as the complaint for ease of reference.  Although the student borrower and state cases have now been consolidated, the Court will reference the Civ. No. 17-1331 matter when referring to documents filed by state plaintiffs prior to the consolidation.

actions and investigations undertaken by state attorneys general," *id.* at 22 (Compl. ¶ 77). Specifically, under the rule, "[a] successful enforcement action brought against a postsecondary institution by a state attorney general gives rise to a borrower defense to loan repayment," and "a state agency's issuance of a civil investigative demand against a school whose conduct resulted in a borrower defense will qualify as notice permitting the Secretary of Education to seek repayment from the school for any amounts forgiven." *Id.* The state plaintiffs argue that, "[b]y incorporating state enforcement actions and investigations into the Department's borrower defense framework, the Borrower Defense [Regulations] enhance the effectiveness of state enforcement efforts and the remedies available for violations of state law." *Id.* (Compl. ¶ 78). The states, moreover, argue that the Borrower Defense Regulations protect "the economic health and well-being of state residents and . . . the quality of higher education within each state." Dkt. 64 at 23.

Although the state and student borrower plaintiffs initially challenged only the Section 705 Stay, over the course of the last year, they have amended their complaints to encompass challenges to additional agency actions delaying the effective date of the Borrower Defense Regulations. *See* Dkt. 25; Dkt. 53; *see also* Dkt. 46, Dkt. 80, *Massachusetts v. DeVos*, Civ. No. 17-1331. The Court discusses each of those agency actions in turn.

1. *Section 705 Stay and Notice of Negotiated Rulemaking to Revise Borrower Defense Regulations*

On June 16, 2017, the Department published a notice in the Federal Register delaying the effective date of the Borrower Defense Regulations "until the judicial challenges to the

regulations are resolved."[5]  William D. Ford Federal Direct Loan Program ("Section 705 Stay"),

82 Fed. Reg. 27,621, 27,621 (June 16, 2017).  The Department premised that decision on § 705

of the APA, which authorizes an agency to "postpone the effective date of action taken by it,

pending judicial review," if the "agency finds that justice so requires."  5 U.S.C. § 705.  In the

view of the Department, this standard was satisfied "[i]n light of the existence and potential

consequences of the pending [*CAPPS*] litigation."  Section 705 Stay, 82 Fed. Reg. at 27,621.

The Department identified three factors in support of its conclusion that a delay was

justified under § 705.  First, it found value in "preserv[ing] the regulatory status quo," because

the *CAPPS* "plaintiffs ha[d] raised serious questions concerning the validity of certain provisions

of the final regulations and ha[d] identified substantial injuries that could result if the final

regulations [went] into effect before those questions [were] resolved."  *Id.*  Specifically, the

Department pointed to the cost to institutions of "modify[ing] their contracts in accordance with

the arbitration and class action waiver regulations, which may be contrary to their interests" and

complying with the regulations' financial responsibility provisions.  *Id.*  On the other side of the

balance, the Department found that the delay would cause little harm to student borrowers

_____

[5]  The Department, however, did permit several ministerial provisions of the Borrower Defense
Regulations to take effect on July 1, 2017:

> We do not intend to postpone the effectiveness of the regulatory provisions
> published in 75[,]926 which: (1) Expand the types of documentation that may
> be used for the granting of a discharge based on the death of the borrower; (2)
> amend the regulations governing the consolidation of Nursing Student Loans
> and Nurse Faculty Loans so that they align with the statutory requirements of
> section 428C(a)(4)(E) of the HEA; (3) address severability; and (4) make
> technical corrections.

William D. Ford Federal Direct Loan Program, 82 Fed. Reg. 27,621, 27,621 (June 16, 2017).

because they could still obtain relief from the Department under the 1994 borrower defense rule, which would "remain in effect during the postponement." *Id.*

Second, the Department concluded that postponing the effective date of the Borrower Defense Regulations would cause "no significant harm" to the United States. *Id.* Rather, by delaying the implementation of provisions designed to make the discharge of federal student loans easier, the United States would stand to avoid "significant costs to the Federal government and ultimately the Federal taxpayer." *Id.* at 27,621–22 ("The final regulations were estimated to have a net budget impact in costs over the 2016–2026 loan cohorts of $16.6 billion in the primary estimate scenario, including a cost of $381 million for cohorts 2014–2016 attributable to the regulations providing for a three-year automatic closed school discharge.").

Finally, the Department stated, "[s]eparately," that it would be "announcing its plan to review and revise the regulations through the negotiated rulemaking process required under section 492 of the HEA." *Id.* at 27,622. Those potential revisions were relevant to the Section 705 Stay, because "[t]he postponement will allow the Department to consider and conduct a rulemaking process to review and revise the final regulations and ensures regulated parties will not incur costs that could be eliminated under any future regulations the Department promulgates on these matters." *Id.*

That same day, the Department published notice of its intent to establish a negotiated rulemaking committee to revise the Borrower Defense Regulations. Negotiated Rulemaking Committee; Public Hearings ("June 16, 2017 Notice of Intent"), 82 Fed. Reg. 27,640 (June 16, 2017).

2.      *October 24, 2017 Interim Final Rule and Notice of Proposed Rulemaking for Final Delay Rule*

The next agency actions relevant to the pending motions occurred four months later, on October 24, 2017, when the Department published two documents.  The first was an interim final rule delaying the effective date of the Borrower Defense Regulations until July 1, 2018, even if the Section 705 Stay was lifted before then.[6]  William D. Ford Federal Direct Loan Program ("Interim Final Rule"), 82 Fed. Reg. 49,114 (Oct. 24, 2017).  Invoking the good cause provisions of §§ 553(b)(3)(B) and (d)(3) of the APA, the Department issued the Interim Final Rule without advance notice or the opportunity for comment.  *Id.* at 49,114; *see also* 5 U.S.C. § 553(b)(3)(B) (providing an exception to the notice and comment requirement when those procedures are "impracticable, unnecessary, or contrary to the public interest"); 5 U.S.C. § 553(d)(3) (providing an exception to the "required publication or service of a substantive rule . . . 30 days before its effective date" upon a finding of good cause "published with the rule").  Even though the Interim Final Rule took effect immediately, the Department nevertheless invited comments for a thirty-day period.  *See* 82 Fed. Reg. at 49,115.

The Department premised the Interim Final Rule on the "Master Calendar Provision" of the HEA, 20 U.S.C. § 1089(c)(1).  *See* Interim Final Rule, 82 Fed. Reg. at 49,115–16.  That provision states that, except in cases of voluntary compliance, "any regulatory changes initiated

---

[6]  As in the case of the Section 705 Stay, the Interim Final Rule exempted certain provisions of the Borrower Defense Regulations from the delay.  In particular, the Department exempted each of the provisions that the Section 705 Stay had previously allowed to become effective, in addition to the portions of the Borrower Defense Regulations amending the regulations governing "Direct Consolidation Loans to allow a borrower to obtain a Direct Consolidation Loan regardless of whether the borrower is also seeking to consolidate a Direct Program or FFEL [Federal Family Education] loan, if the borrower has a loan type identified in 34 C.F.R. 685.220(b)."  Interim Final Rule, 82 Fed. Reg. at 49,116–17.

by the Secretary affecting the programs under [Title IV of the HEA] that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date."  20 U.S.C. § 1089(c)(1). An award year begins on July 1.  Interim Final Rule, 82 Fed. Reg. at 49,115.  A "regulatory change," accordingly, would have to be "published in final form on or before" November 1, 2017, to become effective by July 1, 2018.  *Id.* at 49,115–16.

The Department, however, did not simply rely on this November–July interval to justify the Interim Final Rule.  Instead, it interpreted the Master Calendar Provision further to require that all "regulations promulgated under Title IV of the HEA have an effective date of July 1" so that institutions could "avoid incurring the costs of compliance on a rolling basis throughout the year."  *Id.* at 49,116.  In other words, under the Department's reading, the Master Calendar Provision allows applicable rules to take effect on only one day every year—July 1.  Applied to the present circumstances, the Department posited that as soon as the Section 705 Stay delayed the effective date of the Borrower Defense Regulations beyond July 1, 2017, it lacked discretion to implement the regulations before July 1, 2018, even if the Section 705 Stay was lifted before that date.  *Id.*  The Department also relied on this reasoning to justify why it had good cause to forgo notice-and-comment and negotiated rulemaking; the Department concluded that because "it was impracticable" to do so between the initiation of the *CAPPS* litigation on May 24, 2017 and the July 1, 2017 effective date of the Borrower Defense Regulations, it "did not have any discretion to set an effective date earlier than July 1, 2018."  *Id.*

On October 24, 2017, the Department also issued a notice of proposed rulemaking to further delay the effective date of the Borrower Defense Regulations to July 1, 2019.[7]  William D. Ford Federal Direct Loan Program ("October 24, 2017 NPRM"), 82 Fed. Reg. 49,155 (Oct. 24, 2017).  The Department justified this delay on two grounds.  First, it asserted that delaying the effective date would "ensure that there is adequate time to conduct [a] negotiated rulemaking" to reconsider the Borrower Defense Regulations.  *Id.* at 49,155.  Second, it explained that, under the Master Calendar Provision, "the regulations resulting from [the] negotiated rulemaking could not be effective before July 1, 2019," because "the first negotiated rulemaking session" was not scheduled to take place until November 13–15, 2017.  *Id.* at 49,156.

Although the Department provided notice and an opportunity for comment on the proposed rule, it waived the negotiated rulemaking requirement of the HEA.  *Id.* at 49,157.  In doing so, the Department acknowledged that "all regulations proposed . . . for programs under Title IV of the HEA are subject to negotiated rulemaking requirements," unless the Department can establish "good cause" to waive the requirement.  *Id.*  It also acknowledged that "the HEA . . . requires the Secretary to publish the basis for waiving negotiations in the Federal Register at the same time as the proposed regulations in question are first published."  *Id.*  The Department concluded that good cause existed for waiving the negotiation process because "it would not be practicable before the July 1, 2018 effective date specified in the [Interim Final Rule], to engage in negotiated rulemaking and publish final regulations" amending the Borrower Defense Regulations.  *Id.*

---

[7]  As with the other delay actions, the Department stated its intent to exempt a handful of ministerial provisions of the Borrower Defense Regulations from the delay.  William D. Ford Federal Direct Loan Program, 82 Fed. Reg. at 49,156 (Oct. 24, 2017).

3.      *February 14, 2018 Final Delay Rule*

On February 14, 2018, the Department issued a final rule delaying the effective date of

the Borrower Defense Regulations until July 1, 2019.  William D. Ford Federal Direct Loan

Program ("Final Delay Rule"), 83 Fed. Reg. 6,458 (Feb. 14, 2018).  In doing so, the Department

addressed a number of comments regarding the proposed rule, both substantive and procedural.

Responding to concerns that further delay would harm borrowers, the Department stated

that, in its view, any costs of the delay were insignificant, and, in any event, "outweighed by the

administrative and transaction costs for regulated entities and borrowers of having those

regulations go into effect only to be changed a short while later."  *Id.* at 6,460–61.  The

Department stressed, for example, that the 1994 borrower defense rule would remain in effect,

"as [would] the statute that allows borrowers to assert defenses to repayment."  *Id.* at 6,461.  On

the other hand, the Department observed that the Borrower Defense Regulations' prohibition on

predispute arbitration clauses and class action waivers "would require some institutions to

change their policies and procedures[,] to amend their enrollment agreements," to re-train staff,

and to send "notices to borrowers informing them of the changed class action waivers and pre-

dispute arbitration provisions," only to "repeat or reverse these steps" in the "likely" event that

the provision is rescinded or struck down.  *Id.* at 6,462.

The Department was also unpersuaded by commenters' procedural objections.  *Id.* at

6,463–64.  The Department maintained that the October 24, 2017 NPRM "properly articulated

the good cause supporting" the Department's "waiver of the HEA's negotiated rulemaking

requirement."  *Id.* at 6,464.  According to the Department:

> The NPRM explained that the original catalyst for the delay was the *CAPPS*
> litigation, filed on May 24, 2017, and that it would not have been possible for
> the Department to engage in negotiated rulemaking and [to] publish final
> regulations after that date (much less after October 24, 2017, the date the NPRM
> was published), and prior to July 1, 2018 (the current effective date of the 2016

final regulations).  Negotiated rulemaking on this discrete issue simply was not practicable.  It is a time-consuming and resource-intensive process and could not practicably be completed by July 1, 2018.

*Id.* (italics added).  The Department also rejected the argument that it needed to identify a

deficiency in the underlying Borrower Defense Regulations to justify the delay.  *See id.* ("[A]n

agency's rulemaking [need only] justify the particular action or actions to be taken by that

rule.").  Rather, the Department reiterated that its earlier cost-benefit analysis of the "net budget

impact of the delay" was accurate and justified the rule, although it noted that "the delay was not

proposed solely on the basis of those calculations."  *Id.*  Finally, the Department addressed a

group of comments objecting to its use of the *CAPPS* litigation as a basis for the delay given that

CAPPS had challenged only the substance of a handful of provisions in the Borrower Defense

Regulations.  *Id.* at 6,465.  The Department responded that the *CAPPS* litigation was not the

basis for the delay from July 1, 2018 to July 1, 2019, and, that in any event, CAPPS had sought

relief that would have invalidated the entire rule (on grounds of non-severability).  *Id.*

>        4.        *Pending Motions for Summary Judgment*

>        At the time the Final Delay Rule was published in the Federal Register, the parties in the

then-separate actions pending before the Court had just completed a second round of summary

judgment briefing that encompassed challenges to the Section 705 Stay and the Interim Final

Rule.  *See, e.g.*, Dkt. 50 (Department's Reply in Support of its Cross-Motion for Summary

Judgment).  Following the publication of the Final Delay Rule, Plaintiffs moved to amend their

respective complaints, and the Court held a status conference with the parties in all three relevant

actions (Civil Action No. 17-999, Civil Action No. 17-1330, Civil Action No. 17-1331).

Although Plaintiffs sought to convert their then-pending motions for summary judgment into

motions for partial summary judgment on the Section 705 Stay and Interim Final Rule, *see, e.g.*,

Dkt. 52 (Borrower Plaintiffs' Motion to Convert), the Court instead denied the earlier motions as

moot and ordered the parties to file renewed motions for summary judgment addressing all three

delay actions.  Minute Entry (Mar. 1, 2018); Minute Order (May 24, 2018).  The Court also

consolidated the two actions challenging the delay actions and stayed CAPPS's challenge to the

Borrower Defense Regulations.  Minute Entry (Mar. 1, 2018).

## II.  ANALYSIS

Plaintiffs seek to vacate the Section 705 Stay, the Interim Final Rule, and the Final Delay

Rule.  They assert that these regulatory actions were arbitrary and capricious, not in accordance

with law, and taken without observance of the required procedures.  Broadly, Plaintiffs argue

that the Department impermissibly took these actions for the purpose of securing time to replace

the Borrower Defense Regulations (functionally rescinding the earlier rule); that it did not

adequately consider benefits to student borrowers lost through the delays; that it relied on

internally inconsistent assumptions and omitted key considerations when justifying the delay

rules; that it misinterpreted the HEA; and, that it failed to comply with the HEA's requirement

that public consultation and negotiated rulemaking be conducted prior to the promulgation of

rules affecting federal student loans.  The Department, for its part, contests each of these

assertions and argues that Plaintiffs lack standing.

On the threshold question of standing, the Court concludes that it need not decide

whether the state plaintiffs have carried their burden because, as the Department concedes and as

the record demonstrates, the student borrower plaintiffs have standing to seek the entirety of the

relief sought by all parties to the litigation.  The Court then considers Plaintiffs' challenge to the

Interim Final Rule—which expired on July 1, 2018—and concludes that it is moot, except for

one issue, and, as to that issue, the Court concludes that the Department's interpretation of the

Master Calendar Provision is contrary to law.  Next, the Court examines Plaintiffs' substantive

and procedural challenges to the Final Delay Rule and concludes that the Department failed to justify adequately its invocation of the good cause exception to the negotiated rulemaking requirement.  Given that procedural flaw, the Court does not reach Plaintiffs' substantive challenges to the rule.  Finally, the Court considers Plaintiffs' challenges to the Section 705 Stay and concludes that § 705 stays are subject to judicial review and that the Department failed to offer a reasoned basis to stay the implementation of the Borrower Defense Regulations.

### A.      Standing

"Article III limits federal judicial jurisdiction to cases and controversies."  *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (citing U.S. Const. art. III, § 2).  That means that federal courts may only adjudicate those disputes in which the plaintiff has "a personal stake in the outcome of the controversy [sufficient] to warrant *his* invocation of federal-court jurisdiction."  *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  The plaintiff bears the burden of establishing standing, and, accordingly, must make "a showing of injury-in-fact, causation, and redressability."  *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013).  Injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Causation, in turn, requires proof of "a causal connection between the injury and the conduct complained of— the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"  *Lujan*, 504 U.S. at 560–61 (alteration in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).  Finally, redressability requires "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact."  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).

The Department argues that the state plaintiffs lack standing to challenge the three delay actions. Dkt. 59-1 at 28–32. For purposes of resolving the pending motions, however, the Court need not reach that question. It is well-settled that, "[f]or each claim, if constitutional and prudential standing can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs to raise that claim." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."). Here, both sets of plaintiffs bring identical claims seeking identical relief: a declaratory judgment that the three delay actions were unlawful, an order vacating those actions, and immediate implementation of the Borrower Defense Regulations. *Compare* Dkt. 53 at 29–30 (Compl. Prayer for Relief), *with* Dkt. 80 at 41–42 (Compl. Prayer for Relief), *Massachusetts v. DeVos*, Civ. No. 17-1331. This means that if Del Rose and Bauer have standing, the case may proceed regardless of whether the state plaintiffs also have standing.[8] Although the Department does not challenge the student borrowers' standing to sue, the Court must consider that question *sua sponte* to ensure that it has jurisdiction. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (federal courts have an obligation to assure themselves that they have jurisdiction); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (same).

According to their complaint, Del Rose and Bauer attended a for-profit college in Massachusetts at different times between 2009 and 2014. Dkt. 53 at 10 (Compl. ¶ 35). They both borrowed more than $30,000 to finance their educations, and now owe more than $40,000 to the Department. *Id.* (Compl. ¶¶ 36–37). They allege that they were defrauded by their school.

---

[8] To the extent the state plaintiffs seek attorney's fees and costs, the Court would, presumably, need to address their standing in that separate context.

They contend, in particular, that they "relied on numerous representations made by [their school] with respect to the quality of instruction and equipment, the school's industry connections, the job prospects for . . . graduates, the school's job placement assistance, and the school's high costs, especially in comparison to its graduates' low-paying employment," but then "later learned that many of these representations were untrue." *Id.* (Compl. ¶ 38). If permitted, they intend to bring a class action in state court on the basis of these misrepresentations and have taken concrete steps to initiate that litigation. *Id.* at 10–11 (Compl. ¶ 39) (describing demand letter sent to the school). They are, however, prevented from doing so by provisions in their enrollment contracts that require arbitration and bar class actions. *Id.* at 11 (Compl. ¶ 40). Their school, moreover, has refused to waive these provisions. *Id.* (Compl. ¶ 41). If the delay actions were vacated and the Borrower Defense Regulations allowed to take effect, the school would be prohibited from relying on these provisions to keep Del Rose and Bauer from banding together with other alleged victims of the school's fraud to bring suit in state court. *Id.* at 11–12 (Compl. ¶¶ 43–44).

Bauer and Del Rose further allege that they "have also submitted 'borrower defense' applications to [the Department] seeking cancellation of their federal loans based on [their school's] fraud and other misconduct related to their education," and that these applications have now been pending for nearly three years. *Id.* at 12 (Compl. ¶ 45). If the delay rules challenged here were vacated and the Borrower Defense Regulations were allowed to take effect, Bauer and Del Rose would receive "significant new protections in the adjudication of their borrower defense applications," including "a fact-finding process" that involves additional records held by the Department and—in the event the applications were denied—written decisions including the bases for those decisions. *Id.* at 13 (Compl. ¶¶ 47–50). And, while those applications remain

pending, Bauer and Del Rose would automatically have their loans placed into forbearance, a status that Bauer has not yet been able to obtain and that Del Rose holds only subject the Department's continued agreement to renew it.  *Id.* at 13–14 (Compl. ¶ 51).

Bauer and Del Rose have supported these allegations with declarations detailing the misrepresentations allegedly made by their school, their efforts to sue in Massachusetts state court, and the status of their borrower defense applications.  *See* Dkt. 56-2 at 1–5; Dkt. 56-3 at 1–6.  They have also attached to their motion the demand letters sent to the school and the enrollment agreement that would be affected by the Borrower Defense Regulations.  *See* Dkt. 56-2 at 7–19; Dkt. 56-3 at 9, 11–23.  The Department has not contested that the student borrower plaintiffs would benefit from vacatur of the delay actions, nor has it called into question any of the facts that they have alleged.

In light of these undisputed facts, the Court concludes that the student borrower plaintiffs have carried their burden with respect to standing.  The Department's delay actions have deprived Bauer and Del Rose of several concrete benefits that they would have otherwise accrued under the Borrower Defense Regulations.  The relief they seek in this action— immediate implementation of the Borrower Defense Regulations—would restore those benefits. That suffices to demonstrate (1) an injury in fact (2) caused by the agency actions at issue (3) that would be redressed by a favorable decision.  *See Lujan*, 504 U.S. at 561–62; *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 316–17 (D.C. Cir. 2015).

Finally, although neither party has raised the issue, the Court notes that Plaintiffs brought separate actions, which the Court then consolidated.  Minute Entry (Mar. 1, 2018).  In the cases cited above for the proposition that a single plaintiff's standing is sufficient, in contrast, the plaintiffs had joined together in bringing a single case.  *See Watt*, 454 U.S. at 158; *Mountain*

*States Legal Found.*, 92 F.3d at 1231.  The Supreme Court's recent decision in *Hall v. Hall*, 138

S. Ct. 1118 (2018), suggests that this distinction might be of some import.  In that case, the Court

held that when actions are consolidated under Rule 42(a) of the Federal Rules of Civil

Procedure—as was the case here—each "retains its independent character" in at least some

respects.  *Id.* at 1125.  Notably, the Court explained that it has long "understood consolidation

not as completely merging the constituent cases into one, but instead as enabling more efficient

case management while preserving the distinct identities of the cases and the rights of the

separate parties in them."  *Id.*  In support of this historical understanding of consolidation, the

Court quoted a case from the mid-nineteenth century in which it had held that a consolidated

proceeding "is in reality a mere joinder of distinct causes of action by distinct parties, arising out

of a common injury, and which are heard and determined, so far as the merits are concerned, the

same as in the case of separate libels [suits] for each cause of action."  *Id.* at 1125–26 (quoting

*Rich v. Lambert*, 53 U.S. 356, 353 (1852)).  Rule 42(a) adopted, rather than superseded, this

"settled understanding of consolidation"—that is, "that separate actions do not merge into one"

when they are consolidated.  *Id.* at 1130.  All of this is to say that in consolidated cases, *Hall*

might be read to call into question the application of the general rule that as long as "[a]t least

one plaintiff . . . ha[s] standing to seek each form of relief requested in the complaint," the case

may proceed.  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).

The Court nevertheless applies that well-established rule in this case for two reasons.

First, *Hall* acknowledged that "[n]one of [the Court's discussion of the meaning of

consolidation] means that district courts may not consolidate cases for 'all purposes' in

appropriate circumstances," leaving open the possibility that, in some situations, consolidated

cases may be treated as a single action.  138 S. Ct. at 1131.  This case is a prime candidate for

that treatment; the parties raise only questions of law that can be decided on the administrative record, and the two complaints (and two summary judgment motions) are mirror images of one another that could easily have been filed in the first instance as a single action (or as a single motion for summary judgment).  The extent of this overlap is perhaps best captured by the fact that, even if the Court were to hold that the state plaintiffs lack standing—and, to be clear, the Court is not deciding that question—it would make no difference to the Court's consideration of the pending motions, to the relief the Court would grant, or to any other aspect of this litigation.

Second, and more importantly, this Court must follow controlling precedent until it has been overruled by a court empowered to do so.  *See United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) (observing that the D.C. Circuit must leave to the Supreme Court "the prerogative of overruling its . . . decisions," and that "district judges, like panels of [the D.C. Circuit], are obligated to follow controlling circuit precedent until either [the Court of Appeals], sitting en banc, or the Supreme Court, overrule it" (internal quotation marks omitted)); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (noting that lower courts must follow precedent that "has direct application in a case," even if it "rests on reasons rejected in some other line of decisions"); *Seegars v. Gonzales*, 396 F.3d 1248, 1254 (D.C. Cir. 2005) (holding that binding precedent must be followed even when "tension" exists in the case law).  With respect to the question presented here—whether proof of one plaintiff's standing may suffice for purposes of Article III standing in an action consisting of consolidated cases— numerous decisions by the D.C. Circuit and Supreme Court have treated a showing that a single plaintiff has standing as sufficient.  *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *Sec'y of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984); *Belizan v. Hershon*, 495 F.3d 686, 689, 694 (D.C. Cir. 2007); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir.

2004); *cf. Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1286, 1297

(D.C. Cir. 2007) (declining to dismiss case after holding that one group of plaintiffs in

consolidated case lacked standing).  The Court, accordingly, concludes that it has jurisdiction

and need not evaluate standing on a plaintiff-by-plaintiff basis.

**B.**     **October 24, 2017 Interim Final Rule**

Plaintiffs' challenge to the Interim Final Rule delaying the effective date of the Borrower

Defense Regulations also poses a threshold, jurisdictional issue—this time, mootness.  All agree

that the Interim Final Rule delayed the effective date of the Borrower Defense Regulations until

July 1, 2018, and that July 1, 2018 has now passed.  The question, then, is whether this portion of

Plaintiffs' challenge still presents an "actual, ongoing controvers[y]" sufficient to sustain Article

III jurisdiction.  *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers'*

*& Cement Masons' Int'l Ass'n of U.S. & Can., AFL-CIO*, 721 F.3d 678, 687 (D.C. Cir. 2013)

(quoting *McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 55 (D.C. Cir.

2001)).  Federal courts must ensure not only that they have Article III jurisdiction at the outset of

a case, but also that the parties' dispute—or "controversy"—remains live "at all stages of

review."  *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974)).

When confronted with similar circumstances, the D.C. Circuit and this Court have

typically dismissed challenges to regulatory actions as moot once those actions have expired or

have been overtaken by other regulatory actions.  *See Fund for Animals, Inc. v. U.S. Bureau of*

*Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) (finding challenge to expired "guidance and

policy" moot); *Fund for Animals, Inc. v. Hogan*, 428 F.3d 1059, 1064 (D.C. Cir. 2005) (holding

challenge to 2001 environmental assessment and the regulations based upon it moot because they

"are no longer in effect"); *In re Bluewater Network*, 234 F.3d 1305, 1314 (D.C. Cir. 2000)

("Petitioners do not here challenge the 1997 temporary regulations, either for what they did or

did not do; those regulations have expired.  Whatever issues could have been raised regarding

their legality are moot."); *Fund for Animals v. Norton*, 512 F. Supp. 2d 49, 52–53 (D.D.C. 2007)

("A challenge to agency regulations becomes moot once those regulations expire.").  To take just

one example, in *People for the Ethical Treatment of Animals, Inc. v. U.S. Fish and Wildlife*

*Service*, 59 F. Supp. 3d 91, 95 (D.D.C. 2014), the district court held that the plaintiff's challenge

to fifteen Fish and Wildlife Service permits was "clearly moot," because "[t]he permits . . . [had]

already expired" and, thus, "there [was] no point in this Court issuing an injunction prohibiting"

their extension.

    This is, in many respects, a similar case.  Vacatur of a delay rule that, by its own terms,

no longer purports to affect the rights or obligations of the parties would be pointless.  It would

also be pointless to issue a declaratory judgment that the procedures used to adopt that interim

rule were unlawful, both because the Department's justification for the particular procedures

employed in promulgating the Interim Final Rule was premised on the specific factual

circumstances at the time of the rule's adoption and because the agency actions now preventing

the implementation of the Borrower Defense Regulations were adopted pursuant to different

procedures.  *Compare* Interim Final Rule, 82 Fed. Reg. at 49,117 (describing promulgation of

interim final rule without notice and comment or negotiated rulemaking), *with* Final Delay Rule,

83 Fed. Reg. at 6,459 (describing promulgation of final rule after notice and comment but

without negotiated rulemaking), *and* Section 705 Stay, 82 Fed. Reg. at 27,621–22 (describing

adoption of final rule pursuant to § 705 of the APA).

    But Plaintiffs' challenge to the Interim Final Rule does present one question with

continuing consequences for Plaintiffs: Plaintiffs seek a declaratory judgment that the

Department's interpretation of the Master Calendar Provision—the primary basis for the Interim

Final Rule—was unlawful.  Significantly, that interpretation was not limited to the Interim Final

Rule; rather, the Department relied upon that interpretation of the Master Calendar Provision in

the October 24, 2017 NPRM it issued that same day, and in the Final Delay Rule, which the

Department issued in February 2018.  In short, although announced in a rule that has now

expired, the Department's interpretation of the Master Calendar Provision has carried through to

a regulation that remains operative today and that is causing Plaintiffs a cognizable injury.

Under these circumstances, Plaintiffs' challenge to that limited aspect of the Interim Final Rule

presents a live controversy.  *See Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir.

2016) ("It is well-established that if a plaintiff challenges both a specific agency action and the

policy that underlies that action . . . the challenge to the policy is not necessarily mooted merely

because the challenge to the particular agency action is moot." (quoting *City of Houston, Tex. v.

Dep't of Hous. and Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994)).

That remaining live issue turns on the meaning of the HEA's Master Calendar Provision,

which provides, in relevant part:

> Except as provided in paragraph (2), any regulatory changes initiated by the
> Secretary affecting the programs under [Title IV of the HEA] that have not
> been published in final form by November 1 prior to the start of the award year
> [i.e., July 1] shall not become effective until the beginning of the second award
> year after such November 1 date.

20 U.S.C. § 1089(c)(1).  According to the Interim Final Rule—and as subsequently reflected in

the October 24, 2017 NPRM and Final Delay Rule—two conclusions necessarily follow from

this language:  First, "a regulatory change" must be "published in final form on or before

November 1" in order to take effect at the start of the next award year.  Interim Final Rule, 82

Fed. Reg. at 49,115; Final Delay Rule, 83 Fed. Reg. at 6,459.  Second, a "regulatory

change . . .  may take effect *only at the beginning* of the next award year," that is, "July 1 of the

next year."  Interim Final Rule, 82 Fed. Reg. at 49,115–16 (emphasis added); Final Delay Rule,

83 Fed. Reg. at 6,459 (same).  According to the Department, this means that, except in certain

cases of voluntary compliance, *see* 20 U.S.C. § 1089(c)(2)(B), a regulatory change affecting a

Title IV program may take effect *only* on July 1—if that date passes, the Department must wait

until the next July 1 before the regulation may go into effect.  Dkt. 58-1 at 68–73.  These

conclusions, moreover, are, according to the Department, compelled by the statute.  *Id.*  Indeed,

it was because the Department concluded that the Borrower Defense Regulations could go into

effect only on July 1, 2018—or July 1 of a subsequent year—that it found good cause to waive

the notice and comment and negotiated rulemaking requirements for the Interim Final Rule.  *See*

Interim Final Rule, 82 Fed. Reg. at 49,117.

Although one can imagine considerable debate about the meaning of "a regulatory

change" for purposes of the first of these conclusions,[9] at least for present purposes, Plaintiffs

agree that the HEA mandates that a regulation must be published on or before November 1 to

become effective on or after the following July 1.  They take issue, however, with the

Department's second conclusion.  In their view, "[t]he plain meaning of" the Master Calendar

Provision "is unambiguous," and it does not by any stretch require that all Title IV regulations

take effect *on* July 1.  Dkt. 55-1 at 46.  Rather, they read the statute to preclude a new regulation

from taking effect *before* July 1 of the following year, but to say nothing about when the

regulation may take effect *after* that date.  The Court agrees with Plaintiffs' reading of the

statute.

---

[9]  To take one example, which is discussed further below, the Department seems to take the view
that the change of the effective date of a Title IV rule, although typically subject to notice and
comment rulemaking, is not "a regulatory change" for purposes of the Master Calendar
Provision.

The Court "begin[s], as usual, with the statutory text." *Maslenjak v. United States*, 137 S. Ct. 1918, 1924 (2017).  Here, the text of the Master Calendar Provision compels the Court to conclude that "until" means exactly what Plaintiffs say it means—that is, "up to" or "before" a specified time, *see* 19 Oxford English Dictionary 234 (2d ed. 1989), and not, as Defendants suggest, "only at" that time, *see* Dkt. 59-1 at 39.  As used in the Master Calendar Provision, "until" is a preposition and thus "indicate[s] continuance . . . of an action or condition . . . to a specified time."  Merriam Webster's Collegiate Dictionary 1297 (10th ed. 1996).  Thus, a shopkeeper might say, "we don't open until ten" or the new widgets are "not available until tomorrow."  *Id.*  Nothing in either of these examples conveys a definite point in time; a customer arriving at eleven, for example, would reasonably expect to find the store open.  More generally, when used as a preposition, there is no "common usage[] of the word 'until' that [is] synonymous with the word 'on,' meaning . . . the day of an occurrence."[10]  *See Claude E. Atkins Enters., Inc. v. United States*, 27 Fed. Cl. 142, 144 n.4 (1992).

The Department's arguments to the contrary are unpersuasive.  The Department contends that the title of the Master Calendar Provision—"Delay of effective date of late publications," 20 U.S.C. § 1089(c)—"confirms that there is only one 'effective date' during the year" for all new regulations.  Dkt. 59-1 at 52–53.  As a threshold matter, this argument runs headlong into the Supreme Court's admonition that section headings "cannot limit the plain meaning of [the] statutory text."  *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018).  But, even putting that aside, the argument has little force.  The Department reads too much into

---

[10]  When used as a conjunction, there are times when the word "until" at least comes closer to specifying a particular point in time—*e.g.*, "the game continued until it got dark," Webster's Third New International Dictionary 2513 (1993)—but, even then, the word means "up to the time that," *id.*, not "only on, and not after."  In any event, "until" is used as a preposition, not as a conjunction, in the Master Calendar Provision.

Congress's use of the singular form: "effective date."  It is plain that, in the context of the title,

"effective date" does not reference a specific day—July 1—but rather, the date on which a new

rule is to come into effect.  In other words, the title simply indicates that whatever "effective

date" the Department might have otherwise planned must be "delay[ed]" if the regulatory change

is published "late."  20 U.S.C. § 1089(c).

 The Department also purports to find textual ambiguity "in the statute's inclusion of both

the word 'until,' . . . and the phrase 'beginning of the [award year].'"  Dkt. 58-1 at 68.

According to the Department, "Plaintiffs' interpretation [of the Master Calendar Provision]

renders the words 'beginning of the' superfluous," and thus—at a minimum—gives rise to a

statutory ambiguity.  *Id.*  Once again, the Court is unconvinced.  Rather than creating ambiguity,

the reference to the "beginning of the" award year adds clarity.  Just as it is clearer to say, "I will

not arrive until the beginning of July" than it is to say, "I will not arrive until July," it adds clarity

to refer to the "beginning of" the award year.  To be sure, most readers could probably figure out

what Congress meant without this added clause, but that is not the test for superfluity.  And even

if the Department was right, the canon against surplusage, like reliance on section headings,

cannot overcome clear statutory text.  *See Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003

(D.C. Cir. 2016).

 Nor is the Court persuaded by the Department's invocation of the "legislative history of

the HEA" and its "longstanding policy and practice."  Dkt. 58-1 at 69, 71.  To start, neither the

legislative history nor the Department's administrative practice can change the plain terms of the

statute.  *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 279 (D.C. Cir. 2018) (noting that

legislative history "may not be used to show an 'intent' at variance with the meaning of the text"

(quoting *Matter of Sinclair*, 870 F.2d 1340, 1344 (7th Cir. 1989)); *Exportal Ltda v. United*

*States*, 902 F.2d 45, 50 (D.C. Cir. 1990) ("[T]he plain meaning doctrine is an interpretive norm essential to perfecting the scheme of administrative governance established by the APA.").  But, in any event, nothing in the legislative history of the HEA actually supports the Department's contention that Congress set a specific day of the year on which all new Title IV regulations must take effect.  To the contrary, the legislative history merely confirms that the Master Calendar Provision "drive[s]" "the effective dates of all regulations on Title IV," H.R. Rep. No. 102-447, at 77 (1992), "in order to assure adequate notification and timely delivery of student aid funds," S. Rep. No. 99-296, at 11 (1986).

The Department's description of its longstanding practice is also unhelpful.  The Department, admittedly, has a history of setting effective dates on July 1.  But that history does not show that the July 1 date is *required by statute*; rather, it merely shows that the Department has —for pragmatic or other reasons—used that date in the past.  The one example that the Department offers to counter this understanding is unconvincing.  *See* Dkt. 59-1 at 63.  In that case, the Department declined to extend the comment period for final regulations combatting "troubling practices" in the "student financial products marketplace."  Program Integrity and Improvement, 80 Fed. Reg. 67,126, 67,126 (Oct. 30, 2015).  The Department chose to publish the final regulations on October 30, 2015, explaining that had it "extended the comment period beyond 45 days, [it] would have been unable to comply with" the November 1 deadline of "the [M]aster [C]alendar [P]rovision."  *Id.* at 67,131.  This, in turn, would have delayed the effective date of the regulations for one year—to July 1, 2017—thus allowing "the abuses" the Department had identified in support of the reforms "to persist an additional year."  *Id.*  Reading the Department's words in context, there is no indication that it contemplated July 1 as the only permissible effective date for all new regulations.  Instead, the Department's explanation merely

invokes the noncontroversial proposition that the Master Calendar Provision precludes Title IV rules finalized *after* November 1 from taking effect before July 1 of the following year; that is why the Department felt compelled to issue the final rule on October 30 (before November 1), rather than extending the comment period for 45 days (after November 1).

Finally, the Department's claim that its interpretation is entitled to *Chevron* deference fails for two reasons. First, agency interpretations are not entitled to deference where the "intent of Congress is clear." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see also Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002). Here, the plain meaning of the Master Calendar Provision is unambiguous: regulations published after November 1 cannot take effect *before* July 1 of the following year. The statute imposes no limits on when the regulation can take effect *after* that date. Second, an agency is entitled to deference only when the agency believes that it is exercising some form of administrative discretion. Here, however, the Department believed that its hands were tied.[11] In the Interim Final Rule, Notice of Proposed Rulemaking for the Final Delay Rule, and the Final Delay Rule, the Department repeatedly explained that the Master Calendar Provision compelled it to set July 1—and only July 1—as the effective date for all regulations. *See, e.g.*, Interim Final Rule, 82 Fed. Reg. at 49,115–16 ("Under the master calendar requirement, a regulatory change . . . may take effect only . . . on July 1."); *id.* at 49,116 ("For the July 1, 2017, postponement to be *consistent with the HEA*, . . . the effective date *must* be July 1, 2018 (or July 1 of a later year)." (emphasis added));

---

[11] That the Department now contends the Master Calendar Provision is ambiguous, Dkt. 59-1 at 51–52, is irrelevant. What matters for present purposes is the explanation the Department gave during the regulatory process. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 563 (2009); *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). That explanation had nothing to do with the Department's efforts to fill a statutory gap or to exercise its own judgment.

*see also* October 24, 2017 NPRM, 82 Fed. Reg. at 49,156–57 ("Under the master calendar

requirement, a regulatory change . . . may take effect only . . . on July 1."); Final Delay Rule, 83

Fed. Reg. at 6,459 (same).  As the D.C. Circuit has explained, this is precisely the circumstance

where "deference to an agency's interpretation of a statute is not appropriate"—that is, "when

the agency wrongly believes that interpretation is compelled by Congress."  *Peter Pan Bus Lines,*

*Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (internal

quotation marks omitted) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004)).

The Court, accordingly, concludes that the plain meaning of the HEA precludes the

Department's reading of the Master Calendar Provision to require that all new regulations take

effect on July 1.  *See Chevron*, 467 U.S. at 842–43 ("If the intent of Congress is clear, that is the

end of the matter; for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress.").  The Department, of course, has broad discretion to make most,

if not all, Title IV regulations effective on July 1 *as a matter of policy*—at least to the extent it

offers a reasoned and considered basis for doing so.  *See Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  But, that is not what the Department did here,

and the reading of the Master Calendar Provision that drove its decision is contrary to law.

## C.     February 14, 2018 Final Delay Rule

Plaintiffs raise both procedural and substantive challenges to the February 14, 2018 Final

Delay Rule.  Because the Court concludes that the Department improperly invoked the good

cause exception to the HEA's requirement for negotiated rulemaking, there is no need to reach

Plaintiffs' substantive challenges.

All agree that the Department's Final Delay Rule was subject to the HEA's negotiated

rulemaking requirement unless the Department established "good cause" for waiving the

requirement in its October 24, 2017 NPRM.  *See* 82 Fed. Reg. at 49,157.  In the words of the

HEA:

> All regulations pertaining to [Title IV of the HEA] . . . shall be subject to a
> negotiated rulemaking (including the selection of the issues to be negotiated),
> unless the Secretary determines that applying such a requirement with respect
> to given regulations is impracticable, unnecessary, or contrary to the public
> interest (within the meaning of section 553(b)(3)(B) of Title 5) and publishes
> the basis for such determination in the Federal Register at the same time as the
> proposed regulations in question are first published.

20 U.S.C. § 1098a(b)(2).  Citing to this requirement, the Department concluded that it had good

cause to waive negotiated rulemaking for the Final Delay Rule because "it would not be

practicable, before [the then-operative] July 1, 2018 effective date" of the Borrower Defense

Regulations to "engage in negotiated rulemaking and publish final regulations."  October 24,

2017 NPRM, 82 Fed. Reg. at 49,157.  In Plaintiffs' view, the Department's "cursory statement"

failed to establish good cause within the meaning of the HEA.  The Court agrees.

In determining whether good cause exists to dispense with negotiated rulemaking under

the HEA, the Department is required to apply the same legal standard that applies to waiving the

notice and comment requirement under the APA.  To be sure, as the Department argues, the

application of that standard may yield different results under the APA than under the HEA

because negotiated rulemaking is more time consuming than notice and comment.  *See* Dkt. 58-1

at 61.  But, in both cases, the standard itself—whether "good cause" exists to find that

compliance with the usual process is "impracticable, unnecessary, or contrary to the public

interest," 5 U.S.C. § 553(b)(3); 20 U.S.C. § 1098a(b)(2)—is identical, and, indeed, the HEA

expressly incorporates the APA standard, *id.*  The Court, accordingly, must be guided by the

substantial body of case law interpreting the APA's good cause exception to the notice and

comment requirement.

The D.C. Circuit has repeatedly observed that "the good cause exception" to the APA "is to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001)). That standard is "meticulous and demanding." *N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980). The exemption excuses agencies from the notice and comment requirement—and, by extension, excuses the Department from the negotiated rulemaking requirement for Title IV regulations—only "in emergency situations, or where delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (internal citation omitted). And the otherwise applicable procedures are "[i]mpracticable" only if "the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings" or negotiated rulemaking. *N.J. Dep't of Envtl. Prot.*, 626 F.2d at 1046 (quoting S. Doc. No. 248, at 200 (1946)); *see also United States v. Cotton*, 760 F. Supp. 2d 116, 129 (D.D.C. 2011) (same). The Court's review of the "agency's legal conclusion of good cause is de novo," although the Court defers to the agency's "factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 & n.3 (D.C. Cir. 2014).

The Department's invocation of the good cause exception to the negotiated rulemaking requirement did not come close to satisfying this demanding standard. As the HEA makes clear, and as the Department acknowledged in the October 24, 2017 NPRM, the waiver provision requires the Department to set forth "the basis for" its determination that good cause exists "at the same time" that that the "proposed regulations in question are first published." 82 Fed. Reg. at 49,157 (citing 20 U.S.C. § 1098a(b)(2)). Yet, when the Department published the October 24,

2017 NPRM, it said almost nothing about the basis for its decision to waive the negotiated

rulemaking requirement.  The Department wrote:

> For the reasons stated above, it would not be practicable, before the July 1, 2018 effective date specified in the [Interim Final Rule], to engage in negotiated rulemaking and publish final regulations.  There is, therefore, good cause to waive negotiated rulemaking pertaining to this delay.

82 Fed. Reg. at 49,157.  The "reasons stated above," moreover, shed little light on why the

Department would have been "unavoidably prevented" from performing its functions had it

complied with the negotiated rulemaking process, *N.J. Dep't of Envtl. Prot.*, 626 F.2d at 1046, or

what "emergency situation[]" or risk of "serious harm" required the Department to dispense with

the required process, *Jifry*, 370 F.3d at 1179.  To the contrary, all that precedes the Department's

waiver discussion is a discussion of the Master Calendar Provision and the timeline for

completing the negotiated rulemaking process for reconsidering the Borrower Defense

Regulations.  The Department wrote:

> Given that the first negotiated rulemaking session is scheduled for November 13–15, 2017, we cannot complete the negotiated rulemaking process and the development of revised regulations by November 1, 201[7].[12]  Under the master calendar, a regulatory change that has been published in final form on or before November 1 prior to the start of an award year—which begins on July 1 of any given year—may take effect only at the beginning of the next award year, or in other words, on July 1 of the next year.  In light of this requirement, the regulations resulting from negotiated rulemaking could not be effective before July 1, 2019.

*Id.* at 49,156.  Even liberally construed, this explanation for waiving the negotiated rulemaking

requirement fails on multiple levels.

---

[12]  The agency's notice states "November 1, 2018."  October 24, 2017 NPRM, 82 Fed. Reg. at 49,156.  In context, this is plainly a typographical error, and the notice meant to refer to November 1, 2017.  If it were true that the agency could not complete negotiated rulemaking by November 1, 2018, then July 1, 2020 would be the first possible day the resulting regulations could be effective.  *See* 20 U.S.C. § 1089(c)(1).

*First*, the October 24, 2017 NPRM addressed the wrong regulatory action for purposes of waiving the negotiated rulemaking requirement.  The HEA, unsurprisingly, requires the Department to state in the relevant notice of proposed rulemaking why it cannot practicably comply with the negotiated rulemaking requirement *"with respect to" that rulemaking*.  20 U.S.C. § 1098a(b)(2).  The Department's October 24, 2017 NPRM, however, said nothing about whether it had sufficient time to comply with the negotiated rulemaking requirement "with respect to" the Final Delay Rule.  To the contrary, the *only* discussion addressed the time the Department needed to finalize its revisions, if any, to the Borrower Defense Regulations.  *See* October 24, 2017 NPRM, 82 Fed. Reg. at 49,156.  Because the October 24, 2017 NPRM said nothing about whether it could have conducted a negotiated rulemaking "with respect to" the delay rule, it failed to satisfy the waiver requirement.

The Department confronts this problem in its briefing before this Court and attempts to find an implicit finding of "good cause" to dispense with the negotiated rulemaking requirement.  The Department asserts: "It would make little sense . . . to subject the rule delaying" the Borrower Defense Regulations "to the same negotiated procedures that created, at least in part, the need for" the delay rule "in the first place."  Dkt. 58-1 at 62.  That contention, however, fails to account for the Department's unstated assumption that the Master Calendar Provision applies to the ongoing rulemaking regarding the Borrower Defense Regulations but does not apply to the delay rules.  Without that assumption, the Final Delay Rule would be meaningless because it was finalized on February 14, 2018, and thus, under the Master Calendar Provision, could not have taken effect before July 1, 2019, the date that rule was due to expire.  It is only by assuming that the Master Calendar Provision does not apply to delay rules that the Department can avoid this fate.  Yet, once it takes that step, it can no longer draw even an implicit comparison between the

discussion of the timeline for completing the substantive revisions to the Borrower Defense

Regulations, which the Department discussed in the October 24, 2017 NPRM, and the timeline

for completing the delay rule, which it did not.

   *Second*, the October 24, 2017 NPRM did not identify any "emergency" or "serious harm"

that would result absent a waiver.  *Jifry*, 370 F.3d at 1179.  Although the relevant "inquiry . . . 'is

inevitably fact- or context-dependent,'" the D.C. Circuit has found good cause, by way of

example, when "air travel security agencies" would have otherwise been "unable to address

threats posing 'a possible imminent hazard to aircraft, persons, and property within the United

States,'" or when "a rule . . . of 'life-saving importance' to mine workers in the event of a mine

explosion" was at stake.  *Mack Trucks, Inc.*, 682 F.3d at 93 (citations omitted).  Here, in contrast,

the Department merely stated, without elaboration, that the purpose of the Final Delay Rule was

to maintain the "status quo" while it "conduct[ed] [a] negotiated rulemaking and, as necessary,

develop[ed] revised regulations."  October 24, 2017 NPRM, 82 Fed. Reg. at 49,155–56.  That is

*all* the NPRM said, and, by any measure, that bare assertion provided insufficient cause to waive

the negotiated rulemaking requirement.  Indeed, if that was sufficient, it is difficult to imagine a

circumstance in which an agency would be required to comply with the requirements of notice

and comment and, where applicable, negotiated rulemaking, to delay the effective date of a

regulation.

   Nor can the Department's subsequent efforts to supplement the October 24, 2017 NPRM

save the rule.  Each of these efforts fails either because the required findings were not included in

the proposed delay rule, as required by the HEA, 20 U.S.C. § 1098a(b)(2), or because they

constituted *post hoc* justifications that appeared nowhere in the administrative record, *Chenery*,

332 U.S. at 196–97; *see also Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of*

*Snohomish Cty., Wash.*, 554 U.S. 527, 568 (2008).  In the Final Delay Rule—but not in the

October 24, 2017 NPRM—for example, the Department asserted that it "typically takes . . . over

12 months to complete" a negotiated rulemaking and concluded that "it would not have been

feasible" to complete that process in a timely manner, "even if the Department had [begun] on

May 24, 2017, when it learned of the CAPPS litigation."  Final Delay Rule, 83 Fed. Reg. at

6,494.  By the time of briefing in this Court, however, the Department apparently recognized that

it might, in fact, have been possible to conduct a negotiated rulemaking on the sole issue of delay

in the 13 months between May 24, 2017 and July 1, 2018.  It thus, once again, amended its

theory of good cause, arguing that the Final Delay Rule "needed to be published well in advance

of the culmination of the (still ongoing) process to revise the borrower defense regulations, as

well as in advance of the July 1, 2018 date on which the [Borrower Defense Regulations] would

otherwise [have] become effective."  Dkt. 58-1 at 63; *cf.* Title I—Improving the Academic

Achievement of the Disadvantaged—Academic Assessments, 81 Fed. Reg. 88,886 (Dec. 8,

2016) (DOE conducted negotiated rulemaking under 20 U.S.C. § 6571 in approximately 10

months).  None of that analysis, however, appeared anywhere in the October 24, 2017 NPRM,

and thus both theories—the "over 12 month" theory and the "well in advance" theory—lie

outside the bounds of proper consideration.  *See* 20 U.S.C. § 1098a(b)(2); *Am.'s Cmty. Bankers

v. FDIC*, 200 F.3d 822, 835 (D.C. Cir. 2000).

      The Department also posited in the Final Delay Rule that regulated parties should not

have to bear the costs of complying with the Borrower Defense Regulations when those

regulations might be rescinded or "changed a short while later."  Final Delay Rule, 83 Fed. Reg.

at 6,461.  That rationale is—once again—too little, too late.  It is too late for the reasons

explained above.  And it is too little because it is at odds with the circuit's "longstanding position

that the [good cause] exception should be 'narrowly construed and only reluctantly countenanced.'" *Mack Trucks, Inc*., 682 F.3d at 94 (quoting *Util. Solid Waste*, 236 F.3d at 754). To be sure, regulatory uncertainty that "imperil[s]" "an entire industry and its customers," *id* at 93–94 (citing *Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981)), or that would cause "serious harm" to the regulated parties or the public, *Jifry*, 370 F.3d at 1179, can support a waiver.  Here, however, the Department has not specified any regulatory vacuum that would exist without the Final Delay Rule and has not identified any "serious harm"—only potentially unnecessary administrative costs—that the regulated parties would suffer if the Borrower Defense Regulations were permitted to take effect.

The Final Delay Rule did identify at least one actual cost, albeit in discussing the merits of the delay rule rather than the good cause exception.  Specifically, the Final Delay Rule asserted: "[t]he Department thinks it is likely that the arbitration and class action waiver provision will be overturned" in the *CAPPS* litigation and that allowing that provision to take effect would sow "significant confusion [among] borrowers and schools who may have engaged in court litigation on the basis of the prohibitions as to the enforceability of those agreements." Final Delay Rule, 83 Fed. Reg. at 6,462.  Allowing that provision to take effect, the Final Delay Rule added, would also require institutions to "change their policies and procedures[,] . . . amend their enrollment agreements," re-train staff, and send "notices to borrowers informing them of the changed class action waivers and pre-dispute arbitration provisions," only to "repeat or reverse these steps" in the "likely" event that the provision is rescinded or struck down.  *Id.*  But, even if the Court were to read this discussion as directed at the good cause requirement, and even had the Department raised it in the October 24, 2017 NPRM, as it was required to do, it would not suffice.  The problem with the rationale, as discussed further below, *see infra* at 54–55, is

39

that it is both unexplained and directly at odds with the determination that the Department made when it finalized the Borrower Defense Regulations that the arbitration and class action rules are lawful and that the "case law gives strong support for the position that the Department has authority to impose limits of [this] kind . . . ." Borrower Defense Regulations, 81 Fed. Reg. at 76,023. The Department is, of course, entitled to change its conclusion on that question, but it cannot do so without acknowledging its prior conclusion or offering *any* explanation for its fundamental change in course. *See Fox Television Stations, Inc.*, 556 U.S. at 515.

Without that example of an actual cost the Department arguably avoided by dispensing with the negotiated rulemaking requirement, the Department did little more than pay lip service to the good cause requirement. It merely asserted that allowing a rule to take effect, only to change the rule a year or so later, would "lead to a great deal of confusion and difficulty for borrowers and schools alike." Final Delay Rule, 83 Fed. Reg. at 6,464. Like the government's similar conclusion in *National Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5 (D.D.C. 2017), adopting such an expansive view of good cause "'would swallow the rule,' as an agency could always argue that any given regulation provides clarification or guidance." *Id.* at 19 (citation omitted).

The Court, accordingly, concludes that the Final Delay Rule was procedurally defective because it improperly invoked the good cause exception to the HEA's negotiated rulemaking requirement.

## D.    Section 705 Stay

Plaintiffs also challenge the Department's invocation of 5 U.S.C. § 705 to stay the Borrower Defense Regulations pending the resolution of the *CAPPS* litigation. This challenge raises three distinct questions. First, is an agency's decision to stay the effective date of a rule

pursuant to § 705 subject to judicial review?  Second, if so, what standard applies?  Third, did the Department satisfy that standard?

1.  *Reviewability*

The Department first argues that judicial review of its Section 705 Stay "is unavailable because" § 705 "commits to agency discretion the decision to postpone an effective date pending judicial review."  Dkt. 58-1 at 28–32.  The Department is correct that, when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," the agency's action taken pursuant to that statute is unreviewable.  *Chaney*, 470 U.S. 821, 830 (1985).  It is incorrect, however, that § 705 is such a provision.

The APA permits aggrieved parties to seek judicial review of final agency actions for which there is no other adequate judicial remedy.  *Chaney*, 470 U.S. at 828.  That waiver of sovereign immunity and cause of action, however, comes with a proviso: "before any review at all may be had, a party must first clear the hurdle of § 701(a)," which bars judicial review (1) if the applicable statute "preclude[s]" review, or (2) if the "agency action is committed to agency discretion by law."  *Id.* (quoting 5 U.S.C. § 701(a)).  An action is "committed to agency discretion" if "the [relevant] statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Id.* at 830; *see also Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971).  In other words, if a statute fails to set a "meaningful standard," then there is no basis for a court to conclude that the challenged agency action was unlawful or an abuse of discretion.  *Chaney*, 470 U.S. at 830.  Except in cases involving enforcement decisions, allocation of lump sum appropriations, or other "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993), however, courts must apply a presumption in favor of judicial review and must treat § 701(a) as a "very narrow" proviso that

41

"applies only in 'rare instances,'" *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (quoting

*Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 410).

In the Department's view, § 705 constitutes one of these "rare instances" for five

reasons—four based on the text of § 705 and the fifth based on structure of the APA.  The text of

§ 705 provides:

> When an agency finds that justice so requires, it may postpone the effective
> date of action taken by it, pending judicial review.  On such conditions as may
> be required and to the extent necessary to prevent irreparable injury, the
> reviewing court, including the court to which a case may be taken on appeal
> from or on application for certiorari or other writ to a reviewing court, may
> issue all necessary and appropriate process to postpone the effective date of an
> agency action or to preserve status or rights pending conclusion of the review
> proceedings.

5 U.S.C. § 705.  The Department finds a commitment of discretion, first, in the fact that the

statute does not say that an agency may postpone an effective date "when justice so requires"

but, rather, says that an agency may do so "when [the] *agency finds* that justice so requires."

Dkt. 59-1 at 33 (emphasis added) (quoting 5 U.S.C. § 705).  To this, it adds that the phrase

"justice so requires" is "inherently flexible;" that § 705's use of the word "may" further confirms

that Congress intended to commit stay decisions to agency discretion; and that the text

distinguished between the judicially manageable standard that courts must apply—"to the extent

necessary to prevent irreparable injury"—and the less definite standard applicable to agency

decisions.  Dkt. 59-1 at 34–35, 42–43.  In support of these textual arguments, the Department

relies on the Supreme Court's decision in *Webster v. Doe*, 486 U.S. 592 (1988).  There, the Court

held that a statute that allows the Director of the CIA to terminate CIA employees whenever the

Director "shall *deem* such termination necessary or advisable in the interests of the United

States" commits those discharge decisions to the Director's discretion.  *Id.* at 600.  Finally,

relying on the APA's structure, the Department argues that, because § 705 appears in a

standalone provision of the APA, which "is entirely separate from Section 704 . . . ('[a]ctions

reviewable')," it is appropriate to infer that Congress intended to make § 705 determinations

"unreviewable."  Dkt. 59-1 at 36 n.3.

Most of the Department's textual arguments are foreclosed by the D.C. Circuit's decision

in *Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995).  That case involved a statute

that allowed former servicemembers to request that the Army correct "errors or injustices in their

military records."  *Id.* at 1399.  Of relevance here, the statute set a limitations period to request

such a correction, but further provided that the Army Board for Correction of Military Records

("Board") "*may* excuse a failure to file within [that period] *if it finds it to be in the interest of

justice*."  *Id.* (emphasis added) (quoting 10 U.S.C. § 1552(b)).  Relying on this language, the

district court dismissed the plaintiffs' petition for review of the Board's refusal to grant a waiver

on the ground that the decision was committed to the Board's discretion and, as a result, was

unreviewable.  *Id.* at 1398.  On appeal, the D.C. Circuit reversed, and, in the course of doing so,

it rejected most of the same arguments that the Department makes here.

First, the Court of Appeals rejected the government's contention that Congress's use of

the word "may"—as opposed to "shall"—signaled an intent to commit the relevant action to the

agency's discretion.  *Id.* at 1401.  Although the Court acknowledged that the word "may"

conveys an intent "to confer some discretion on the agency," it disagreed that "such language"

means that "the matter is *committed* exclusively to agency discretion."  *Id.*  The same holds true

here; indeed, under both statutes, the agency may act only if it finds that the interest of justice

standard is satisfied.

The *Dickson* decision also undermines the Department's reliance on the "agency finds"

and "justice so requires" language in § 705.  Again, the language at issue in *Dickson*—if the

Board "finds it to be in the interest of justice"—parallels the language at issue here.  *Id*. at 1402.

And, again, the D.C. Circuit disagreed with the government's contention that the relevant

language committed "the matter solely to agency discretion."  *Id.*  In reaching that conclusion,

moreover, the Court of Appeals rejected the same expansive reading of *Webster* that the

Department presses here.  The Court found support for its conclusion in *Kreis v. Secretary of the

Air Force*, 866 F.2d 1508, 1513 (D.C. Cir. 1989), a case decided the year after *Webster*.  There,

the Court of Appeals held that the district court was entitled to review the adequacy of the

Secretary of the Air Force's explanation for denying appellant's request for a retroactive

promotion.  *Id.* at 1512.  In *Dickson* and in *Kreis*, as in this case, the government argued that

*Webster* stands for the broad proposition that a grant of authority to take an action if the agency

"finds" or "deems" that action "in the interest of justice" or "in the interests of the United States"

is sufficient to commit the relevant action to the discretion of the agency.  *Dickson*, 68 F.3d at

1403; *Kreis*, 866 F.2d at 1508.  And, in both *Dickson* and *Kreis*, the D.C. Circuit disagreed.  *Id.*

As the Court of Appeals explained in *Dickson*, that contention ignores the "context in which the

statutory mandate [at issue in *Webster*] operated," *Dickson*, 68 F.3d at 1403 (citation omitted),

and, as it stressed in *Kreis*, *Webster* involved a national security "determination particularly

unsuited to judicial assessment," *Kreis*, 866 F.2d at 1514.  In short, outside of the context of

national security or a similar context that raises doubts about judicial competence, *Webster* lacks

the broad meaning that the Department urges.

The Department's remaining arguments fare no better.  Pressing its final textual

argument, the Department observes that § 705 describes the standard applicable to judicial stays

in different terms and argues that, by distinguishing "between agency action and court action,"

Congress "commit[ed] each exclusively to the province of the entity taking action."  Dkt. 58-1 at

31.  But the Department offers no explanation for why the difference in language—short of the reasons rejected above—shows that Congress intended to commit the decision whether to grant a stay "exclusively to the province of" the agency or the court.  Nor does the fact that Congress provided both agencies and courts with the authority to stay regulations pending judicial review support the Department's view.  To the contrary, as the D.C. Circuit concluded in rejecting a similar argument regarding the Clean Air Act, "[g]iven that Congress granted [courts] the power to enter a stay, it seems quite anomalous that it did not also confer upon [courts] the lesser power to review the [agency's] decision to issue a stay."  *Clean Air Council v. Pruitt*, 862 F.3d 1, 7 (D.C. Cir. 2017).

The Department's structural argument is also unpersuasive.  The Department contends that because § 705 falls between §§ 704 and 706, which together delineate the scope and reach of judicial review, Congress intended a § 705 stay to be "a limited form of relief" that is itself immune from review.  Dkt. 74 at 12.  But the Department never explains why agency action taken pursuant to § 705 does not constitute "final agency action" subject to judicial review, *see* 5 U.S.C. § 704, and does not identify where Congress might have situated § 705 to avoid any implication that its placement was "intended to make the Section 705 stay . . . unreviewable." Dkt. 58-1 at 32 n.3.  A far more persuasive structure argument, moreover, points in the opposite direction.  As noted above, § 701(a) contains two exceptions to judicial review under the APA: the first exception, which is not applicable here, applies where a "statute[] preclude[s] judicial review," 5 U.S.C. § 701(a)(1), and the second exception, which the Department argues is controlling here, applies where "agency action is committed to agency discretion by law," *id.* § 701(a)(2).  The first of these exceptions "seems easy in application" and merely requires courts "to determine whether Congress intended to preclude judicial review," while the second applies

"even where Congress has not affirmatively precluded review." *Chaney*, 470 U.S. at 828–30. It seems improbable, to say the least, that Congress intended to preclude judicial review of agency decisions under § 705 of the APA, but did so in the roundabout way of committing those decisions to agency discretion instead of merely saying that administrative stays are not subject to judicial review.

Any remaining doubt regarding the reviewability of administrative stay decisions is put to rest by the fact that, despite the Department's arguments to the contrary, a "judicially manageable standard[] [is] available for judging how and when an agency should exercise its discretion." *Chaney*, 470 U.S. at 830; *see also Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (per curiam) (holding that "the absence of clear statutory guidelines" does not preclude judicial review "unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance" as to how an agency is to exercise its discretion). Numerous judicial decisions have confirmed that review is "judicially manageable," *see Safety-Kleen Corp. v. EPA*, No. 92-1629, 1996 U.S. App. LEXIS 2324, at *2 (D.C. Cir. Jan. 19, 1996); *Becerra v. U.S. Dep't of Interior*, 276 F. Supp. 3d 953, 964 (N.D. Cal. 2017); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1122 (N.D. Cal. 2017); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 34 (D.D.C. 2012), and, as discussed below, this Court can, in fact, discern the relevant standard. Review of § 705 stay decisions sit at the opposite end of the spectrum from the review of security clearances in *Webster*. While the Supreme Court noted in *Webster* that courts are unsuited for assessing risk in the national security context, *see* 486 U.S. at 601, there can be little doubt that courts are uniquely well-suited to determine whether equitable considerations warrant staying the implementation of existing regulations pending judicial review.

The Court, accordingly, concludes that § 705 stays are subject to judicial review.

2.      *Standard for Invoking Section 705*

The next question is what standard an agency must apply in deciding whether to issue a stay pursuant to § 705?  The parties agree that § 705 authorizes both "court[s]" and "agenc[ies]" to grant stays pending judicial review, *see* 5 U.S.C. § 705, and they agree (or at least do not dispute) that courts must apply the four-factor test used to evaluate requests for preliminary injunctive relief, *see Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985); *Sierra Club*, 833 F. Supp. 2d at 30; *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010).  They disagree, however, about whether agencies must apply that same four-factor test.

Plaintiffs contend that the Department's failure to apply the preliminary injunction test constitutes a legal error that renders the Section 705 Stay arbitrary and capricious.  Dkt. 55-1 at 37; Dkt. 56 at 36.  According to Plaintiffs, the text of § 705, its legislative history, and this Court's precedent all support the conclusion that courts and agencies are bound to apply the same standard.  Dkt. 55-1 at 31–37; Dkt. 56 at 36–41.  The Department, on the other hand, argues that nothing found in the text of § 705, or in any source, requires that agencies apply the judicially fashioned four-part test.  Dkt. 58-1 at 38–39.  Rather, in the Department's view, § 705 authorizes agencies to issue a stay when "justice so requires," 5 U.S.C. § 705—"a broad, flexible standard conferring discretion to act," Dkt. 58-1 at 33.  As explained below, the Court is unpersuaded by either extreme.

As an initial matter, the Court agrees with the Department that, absent good cause, courts must avoid "engrafting their own notions of proper procedures upon agencies."  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 525 (1978).  Here, nothing in the text of § 705 provides sufficient cause to require that agencies apply the same four-factor test that courts apply.  The statute uses different language to describe what an agency must find in order to issue a stay—"that justice so requires"—and to describe what a court must find—that

the stay is "necessary to prevent irreparable injury."  5 U.S.C. § 705.  Moreover, not even every

circuit applies precisely the same four-factor test; some, for example, apply a sliding scale, while

others do not, and while still others have not resolved that question.  *See Sherley v. Sebelius*, 644

F.3d 388, 392–93 (D.C. Cir. 2011) (noting a split between courts, like the Fourth Circuit, which

read likelihood of success on the merits as "an independent, free-standing requirement for a

preliminary injunction" and those, like the Second, Ninth, and Seventh Circuits, which follow a

"sliding scale" approach); *id.* (noting that the D.C. Circuit has declined to weigh in on the split).

Under these circumstances, it would be odd to suggest that administrative agencies are bound to

apply a particular formulation of the test.

Likewise, neither the legislative history of § 705 nor other agencies' practices compels

the conclusion that the judicially crafted four-factor test necessarily applies to administrative stay

determinations.  The Senate Report that Plaintiffs cite describes the purpose of § 705 as follows:

> This section [§ 705, formerly 5 U.S.C. § 1009(d)] permits either agencies or
> courts, if the proper showing be made, to maintain the status quo . . . .  The
> authority granted is equitable and should be used by both agencies and courts to
> prevent irreparable injury or afford parties an adequate judicial remedy.

APA, Pub. L. 1944-46, S. Doc. No. 248, at 277 (1946).  Although this language confirms that

courts and agencies are granted the same "equitable" authority to "maintain the status quo," *id.*, it

is far from clear that in exercising that authority, Congress intended courts and agencies to apply

the same standard.  Nor is the fact that other agencies have opted to apply the four-factor test

when deciding whether to issue a stay under § 705 dispositive here.  *Contra Sierra Club*, 833 F.

Supp. 2d at 31 (holding that the agency's failure to apply the preliminary injunction test was

arbitrary and capricious because "[the agency] . . . failed entirely . . . to justify its departure from

its many prior precedents applying this four-part test").  Had the Department done so, it might

48

have been bound to follow its own prior practice or to have explained why a different approach was warranted.  But that is not the case.

On the other hand, and despite the Department's arguments to the contrary, the text and legislative history of § 705 *do* provide the Court with a framework for reviewing whether an agency's determination that a stay is "require[d]" in the interests of "justice" was arbitrary and capricious.  Section 705 does not permit the Department to make its own untethered assessment of what is "just."  To begin, although the language differs in minor detail, the judicial and administrative authority to grant a stay is found in a single statutory provision that addresses a single topic—"relief pending review."  5 U.S.C. § 705.  The relevant standard, moreover, does not differ in significant respects.  The administrative determination that "justice . . . requires" issuance of a stay, *id.*, is the same type of determination that courts make when they decide whether to grant preliminary injunctive relief.  The legislative history of § 705 makes just this point.  It explains that "[t]he authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy."  S. Doc. No. 248, at 277.  As such, even though an agency need not apply the same canonical four-factor test that courts do, it must—given the statute's "equitable" mandate—weigh the same equities. This includes, but is not limited to, "balanc[ing] the competing claims of injury," "consider[ing] the effect on each party of . . . granting" the stay, and "pay[ing] particular regard for the public consequences."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (first quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987), then quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  At a minimum, an agency must provide a "reasoned explanation" that is sufficient to "enable . . . court[s] to evaluate," *Dickson*, 68 F.3d at 1404 (citation omitted), whether a stay was "require[d]," 5 U.S.C. § 705, to "afford parties an

adequate judicial remedy," S. Doc. No. 248, at 277—that is, to ensure that the prevailing party in the pending litigation would ultimately obtain meaningful relief.

Most significantly, the relevant equitable considerations are not free-floating but, rather, must be tied to the underlying litigation.  Section 705 expressly provides that an agency may "postpone the effective date of [agency] action . . . *pending judicial review*."  5 U.S.C. § 705 (emphasis added).  This requirement is best understood in light of the relationship between § 705 and the rest of the APA framework.  For present purposes, both Plaintiffs and the Department agree that § 705, at least in the usual course, does not require notice and comment (or negotiated) rulemaking.  The question is, why not?

The answer lies in the purpose of a § 705 stay: unlike a rulemaking, which triggers notice and comment procedures, *see* 5 U.S.C. § 553(b), an administrative stay under § 705 is not intended to "formulat[e], amend[], or repeal[]" a rule, *id.* § 551(5), nor is the stay a "rule" "designed to implement, interpret, or prescribe law or policy," *id.* at § 551(4).  Rather, just as when a court issues a stay, an agency stay under § 705 should be imposed for one—and only one—reason: to maintain the status quo in order to allow judicial review of the underlying regulation to proceed in a "just" manner.  *See Sierra Club*, 833 F. Supp. 2d at 27–28.  The Department, for its part, concedes as much, arguing that the Section 705 Stay in this case was "not a substantive rule" but, rather, was "purely [a] procedural device, employed for the specific purpose of temporarily postponing the effective date of agency action during the pendency of judicial review of that action."  Dkt. 58-1 at 44.  That is why the standard for an agency stay, like the four-part preliminary injunction test that courts apply, must be tethered to the litigation itself; to the extent the agency's action is intended to do more than preserve the status quo pending

judicial review, it would "prescribe law or policy," 5 U.S.C. § 551(4), and thus require notice and comment.

Finally, to justify a stay under § 705, an agency must do more than pay "lip service" to the pending litigation, *Sierra Club*, 833 F. Supp. 2d at 34, or merely assert, "without any specificity," that the litigation raises "serious questions concerning the validity of certain provisions of the [r]ule," *California v. Bureau of Land Mgmt.*, 277 F. Supp. 3d at 1122 (citation omitted). Although the agency need not adhere to the specific contours of the four-factor preliminary injunction test, it must weigh the same kinds of equitable considerations that courts have long applied and must explain why, in light of the pending litigation, a stay is "require[d]" to ensure the parties will ultimately obtain an adequate and just judicial remedy. 5 U.S.C. § 705; S. Doc. No. 248, at 277.

### 3.  *Substantive Defects*

Applying this standard, the Court concludes that the Department's invocation of § 705 was arbitrary and capricious. The Department offered three rationales: the *CAPPS* litigation raised "serious questions" about the validity of the Borrower Defense Regulations; the delay would not cause the government any significant harm; and the Department was, in any event, reconsidering the regulations. Section 705 Stay, 82 Fed. Reg. at 27,621. None of these reasons withstands APA scrutiny. As explained further below, the first rationale is mere boilerplate; it is unsupported by any analysis, and it is at odds with the Department's prior conclusion to the contrary. The second and third rationales also lack any meaningful analysis and, more importantly, are unrelated to the pending *CAPPS* case and are thus beyond the scope of the relevant § 705 considerations.

The Department first posited in the Section 705 Stay that the plaintiff in the *CAPPS* case "raised serious questions concerning the validity of certain provisions of the final regulations and

[has] identified substantial injuries that could result if the final regulations go into effect before those questions are resolved." *Id.* The Department then provided two examples in support of this conclusion. First, it asserted that "if the final regulations are not postponed, institutions . . . would be required, as of July 1, 2017, to modify their contracts in accordance with the arbitration and class action waiver regulations, which may be contrary to their interests." *Id.* "Postponing the final regulations," would, in the Department's view, allow schools to avoid that cost "while the regulation is subject to judicial review." *Id.* Second, it pointed out that, "if the final regulations are not postponed, institutions would be subject to financial responsibility trigger provisions that could impose substantial costs." *Id.*

The mere fact that parties would avoid the costs of complying with the existing regulations, however, is plainly insufficient to support a § 705 stay. As explained above, § 705 requires an agency to explain why, in light of the pending litigation, a stay is necessary to ensure that the parties ultimately obtain adequate and just relief. As a result, the Department's first rationale rises and falls based on the Department's reliance on the "legal uncertainty" that it contends is created by the "serious questions" *CAPPS* plaintiffs raise "concerning the validity of certain provisions" of the Borrower Defense regulations. *Id.* For the reasons explained below, that rationale fails.

As an initial matter, the Department failed to justify the scope of the Section 705 Stay. Although it covers twenty-two sections of the Borrower Defense Regulations, the Department never identifies whether a few, many, or all of these sections rest on legally questionable footing. The notion that the Department needed to stay the effective date of all twenty-two of these provisions—while exempting a handful of ministerial provisions—moreover, is difficult to square with the fact that CAPPS itself sought a preliminary injunction only with respect to the

arbitration and class action provision.  Dkt. 6, *CAPPS*, Civ. No. 17-999.  Although the

Department was not required to apply the four-factor test that courts apply, it was required to

apply something akin to it—some standard that ties the stay to ensuring that the outcome of the

pending litigation affords the parties adequate and just relief and that balances the relevant

equities.  The Department, however, offers no explanation for why it was necessary to stay

twenty-two sections of the final rule.

Moreover, the provisions of the Borrower Defense Regulations that the Department did

identify are, at best, mentioned only in a perfunctory manner.  The Department observed, in

passing, that "if the final regulations are not postponed, institutions would be subject to financial

responsibility trigger provisions that could impose substantial costs," Section 705 Stay, 82 Fed.

Reg. at 27,621, but it failed to tie that observation to the litigation in any way, and it failed to

consider how the public interest or the interest of student borrowers would be affected by its

decision.[13]  It offered slightly more detail regarding the arbitration and class action provision,

but, again, the Department simply asserted, without analysis, that CAPPS had "raised serious

questions concerning the validity of" the provision and that postponing the effective date would

save institutions the cost of making changes to their contracts "while the regulation is subject to

---

[13]  Although student borrowers can rely on the 1994 borrower defense rule, the Department did
not consider the harm they would sustain from being denied the benefits of the new regulations,
which were promulgated to address deficiencies that the Department itself found in the old rule.
The Department's assertion that "the postponement of the final regulations will not prevent
student borrowers from obtaining relief . . . under existing regulations," Section 705 Stay, 82
Fed. Reg. at 27,621, does not provide the type of reasoned balancing of equities that § 705
requires.  To take just one example, as the Department itself later acknowledged in the Final
Delay Rule, the statutes of limitations may run on student borrowers' claims before they are able
to take advantage of the new regulations' prohibition on predispute arbitration agreements and
class action waivers.  *See* Final Delay Rule, 83 Fed. Reg. at 6,460–61.  The Section 705 Stay,
however, makes no mention of that cost to student borrowers or, more importantly, of any other
harm student borrowers would suffer as a result of the stay.

judicial review." *Id.*  The arbitrary and capricious standard of the APA, however, requires that agencies "provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision."  *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). "[B]oilerplate language" like that the Department used here, however, "makes it impossible to discern [the Department's] 'path.'"  *Dickson*, 68 F.3d at 1405.  To justify a § 705 stay, an agency must, in short, do more than simply assert—without elaboration—that the litigation raises unspecified "serious questions" for resolution and that a stay will save regulated parties the cost of compliance.  *See Sierra Club*, 833 F. Supp. 2d at 34 ("The agency cannot use section 705 of the APA to stay the effectiveness of its rules . . . simply because litigation . . . *happens to be pending*.");  *see also California v. Bureau of Land Mgmt*., 277 F. Supp. 3d at 1122.

The problem with the Department's serious-legal-questions rationale, however, runs deeper than this.  As with the Final Delay Rule, the Department failed to acknowledge, much less to address, the inconsistency between its current view that those provisions stand on legally questionable footing, and its prior conclusion that they were legally sound.  While the Borrower Defense Regulations were under consideration, "[s]everal commenters objected that the Department lack[ed] the legal authority to ban either mandatory predispute arbitration agreements or class action waivers."  Borrower Defense Regulations, 81 Fed. Reg. at 76,021. The Department, in turn, devoted nine columns of the Federal Register to describing the legal objections and to responding to them.  *Id.* at 76,021–24.  It concluded that the provision were lawful and that existing "case law gives strong support for the position that the Department has authority to impose limits of the kind adopted here on the use of class action waivers and predispute arbitration agreements."  *Id.* at 76,022–23.  An agency is entitled, of course, to change its position, and, to do so, it need not even demonstrate that its current view is "better than [its]

old one." *Fox Television Stations, Inc.*, 556 U.S. at 515 (emphasis added).  But an

unacknowledged and unexplained inconsistency is the hallmark of arbitrary and capricious

decision-making.  *Id.* at 515; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545

U.S. 967, 981 (2005); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923–24 (D.C.

Cir. 2017); *Verizon v. FCC*, 740 F.3d 623, 636 (D.C. Cir. 2014); *Action for Children's Television

v. FCC*, 821 F.2d 741, 745 (D.C. Cir. 1987); *California v. Bureau of Land Mgmt.*, 286 F. Supp.

3d at 1064.

   The Department does not dispute that the position it took in the Section 705 Stay is at

odds with the position it took when it promulgated the Borrower Defense Regulations.  It argues,

however, that a Section 705 Stay is "a purely procedural device" that does not "effectuate[] a

substantive change in agency policy," and thus "the Department was not required to 'display

awareness that it is changing position and provide [a] reasoned explanation.'"  Dkt. 58-1 at 43.

Because a Section 705 Stay is temporary in nature, is often issued on short notice, and is not a

substantive rule requiring notice and comment, the Court is prepared to assume—without

deciding—that a less demanding standard of review should apply.  But the Department's

argument still goes too far, and, in effect, rehashes its contention that § 705 stays lie beyond the

reach of judicial review.  The unacknowledged and unexplained inconsistency that Plaintiffs

raise here could not be more apparent or more central to the Department's decision.

Commenters argued that the Department lacked legal authority to issue the arbitration and class

action waiver ban; the Department considered those objections in detail and concluded that it had

the legal authority; and, then, without acknowledging that conclusion or explaining why it

believed its legal authority was questionable, the Department stayed the rule.  That is, by any

measure, a fundamental and unexplained inconsistency, and, by any measure, it runs afoul of the APA's arbitrary and capricious standard.

The Department's remaining two rationales fare no better.  In the Department's view, the Section 705 Stay was also appropriate because "the United States would suffer no significant harm from postponing the effectiveness of the final regulations while the litigation is pending," and, indeed, postponing the effective date would allow the federal government and taxpayers to avoid "significant costs."  Section 705 Stay, 82 Fed. Reg. at 27,621–22.  And, "[s]eparately," the stay would "allow the Department to consider and [to] conduct a rulemaking process to review and [to] revise the" Borrower Defense Regulations, while "ensur[ing] [that] regulated parties [would] not incur costs that could be eliminated under any future regulations the Department promulgates on these matters."  *Id.* at 27,622.  Both of these rationales suffer from the same defect—they are not tied to the pending litigation and thus exceed the limited scope of § 705.  As the Department itself repeatedly observes, a Section 705 Stay is "a purely procedural device that operates by temporarily freezing the status quo during the pendency of judicial review," Dkt. 58-1 at 43, and "[i]t is not a substantive rule itself," *id.* at 44.  But when an agency decides to delay the effective date of a rule to save the federal government money or to alleviate confusion or a burden on regulated parties while the agency decides whether to amend or to rescind the rule, its action is "designed to implement . . . policy," 5 U.S.C. § 551(4).  Considerations of that type go beyond the limited reach of a § 705 stay and would have required the Department to proceed by rulemaking.  As such, they cannot provide a reasoned basis for the Department's decision to issue the Section 705 Stay.

The Court, accordingly, concludes that the Department's rationale for issuing the Section 705 Stay is arbitrary and capricious.

D.      Remedies

Plaintiffs contend that the appropriate remedy with respect to both the Final Delay Rule and the Section 705 Stay is immediate vacatur.  Dkt. 55-1 at 79; Dkt. 56 at 72.  They correctly note that, when a court concludes that a rule is unlawful, "the practice . . . is ordinarily to vacate the rule," *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997), and they maintain that there is no reason to depart from that usual practice here.  The Department, taking a risk, chose not to brief this issue and merely requested in a footnote that it be provided an opportunity to brief the issue, should the Court decide the case in Plaintiffs' favor.  Dkt. 58-1 at 79–80 n.28.  Because the Department had ample opportunity to respond to Plaintiffs' arguments, and because this case is, ultimately, about the lawfulness of delay, the Court will not delay matters further by setting a schedule for further briefing.  It will, however, schedule a prompt status conference and will permit the parties to present oral argument regarding the appropriate remedies.

**CONCLUSION**

The Court will **GRANT** the state plaintiffs' and student borrower plaintiffs' motions for summary judgment, Dkt. 55; Dkt. 56, and will **DENY** the Department's cross-motion for summary judgment, Dkt. 66.  It is further **ORDERED** that the parties shall appear for a status conference on September 14, 2018 at 10:30 a.m. in Courtroom 21 to address remedies.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 12, 2018